

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| REPUBLICAN NATIONAL COMMITTEE, *et al.*, | ) ) ) |
|  | ) |
| Defendants. |  |

Civil Action No. 81-3876

**MEMORANDUM IN SUPPORT OF
MOTIONS ON BEHALF OF INDIVIDUAL MINORITY
VOTERS TO INTERVENE AND REOPEN CASE, AND TAKE EXPEDITED
DISCOVERY FOR THE PURPOSE OF ENFORCING CONSENT DECREES**

Date of Argument: October 30, 2004

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

RIGHT TO INTERVENE ..................................................................................................... 3

HISTORY OF CONSENT DECREE PROCEEDINGS ................................................... 5

THE RNC'S CURRENT BALLOT SECURITY ACTIVITIES .................................... 7

CONCLUSION ...................................................................................................................... 15

## TABLE OF AUTHORITIES

### CASES

*Beckett v. Air Line Pilots Association*,
    995 F.2d 280 (D.C. Cir. 1993) .......................................................................... 4

*Berger v. Heckler*,
    771 F.2d 1556, 1565 (2d Cir. 1985) ................................................................ 4

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) .................................................................................... 4, 5

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
    645 F. Supp. 1419 (D. Del. 1987) ................................................................. 4, 5

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
    988 F.2d 386 (3d Cir. 1992) ........................................................................... 5

*Green v. Sielaff*,
    1992 U.S. Dist. LEXIS 11038 (N.D. Ill. July 23, 1992) ................................. 4

*Hook v. State of Arizona Department of Corrections*,
    972 F.2d 1012 (9th Cir. 1992) ..................................................................... 3, 5

*Virgo v. Local Union 580*,
    107 F.R.D. 84 (S.D.N.Y. 1995) ....................................................................... 4

*Washington Hospital v. Pennsylvania Dep't of Public Welfare*, 889 F.2d, ..............
    1294, 1299 (3d Cir. 1989) ............................................................................... 3

### STATUTES

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 11

Fed. R. Civ. P. 71 .......................................................................................... 1, 3, 4

Fed. R. Civ. P. 24 .................................................................................................. 1

## PRELIMINARY STATEMENT

Proposed Intervenors, are newly registered minority voters in Ohio who learned within the last few days that their names are on a 35,000-person list of challenged voters, which appears to have been compiled and used in violation of Consent Decrees entered in this case. The fact that their names are on this challenge list places in jeopardy their right to vote on election day next Tuesday. Consequently, these voters move on an emergency basis to intervene in and reopen this case, and for expedited discovery for the purpose of enforcing the Consent Decrees.    The Democratic National Committee ("DNC") was the Plaintiff in the original action. It entered into Consent Decrees with Defendant Republic National Committee ("RNC") designed to protect the rights of minority voters against intimidation and interference with their right to vote. The Consent Decrees were intended for the benefit of minority voters; and Intervenors move to intervene under Fed. R. Civ. P. Rules 71 and 24.

The two Consent Decrees restrain "ballot security" or "ballot integrity" activities of the RNC. The decrees arose out of Complaints filed by the DNC alleging, *inter alia*, that the RNC had participated in mass mailings to registered voters, and used letters returned undelivered to compile voter challenge lists. The challenge lists were allegedly discriminatory and fraught with errors. A voter is not disqualified from voting simply because he or she changes address. And the lists allegedly had a disproportional impact on racial and ethnic minorities, and threatened to disenfranchise numerous qualified African-American voters.

The RNC's "ballot security" activities were purportedly done to combat "vote fraud," but in fact had the effect of suppressing legitimate African-American votes. Consequently, Consent Decrees were entered. The second Consent Decree requires that the Defendant RNC apply for, and obtain, approval from this Court *before* it

engages in, or "assists or participates in," any ballot security or anti-voter fraud efforts.

It has come to light in the last few days that the RNC appears to have participated in other "ballot security" programs. It has been reliably reported that the Republican Party in Ohio has compiled a challenge list of 35,000 registered voters. This list was reportedly discussed at a press conference by RNC Chair Ed Gillespie. Based on this list, approximately 8,000 registered voters in Cuyahoga County, Ohio have been challenged. This list has been obtained, analyzed and found to affect African-American voters disproportionately.[1]  Intervenors' names are on this list. Both are fully qualified voters.[2]  But, the list is reportedly overwhelming the ability of Ohio election officials to adjudicate the challenges. And it threatens hopelessly to clog the election process in Ohio on Election Day.

The second Consent Decree requires advance approval of this Court before challenge lists may be compiled and used to challenge voters. It does so precisely to prevent such a list from being used to disrupt the election process at the Eleventh Hour. On information and belief, no such approval has been sought or received for this Ohio challenge list or any other such list in 2004. The ballot security program involving this list, if participated in by the RNC, plainly required advance approval by this Court. And it has been reported that the RNC chair has discussed the list and ballot security projects at a press conference last Friday, October 22, 2004.

---

[1] *See* Declaration of Philip Klinkner, attached hereto as Exhibit A ("Klinkner Dec.").

[2] *See* Declarations of Proposed Intervenors Ebony Malone, attached hereto as Exhibit B ("Malone Dec.") and Irving Agosto, attached hereto as Exhibit C ("Agosto Dec."). (Intervenors submit the Malone and Agosto affidavits unsigned, but will provide the Court with signed versions as soon as possible.)

Intervenors thus seek limited expedited discovery on the issue of the RNC's involvement in the ballot security program or programs leading to the list, for the purpose of enforcing the Consent Decrees.

In brief, the Consent Decree prohibits Defendant RNC from engaging in any ballot security efforts that disproportionately targets racial or ethnic populations. The Consent Decree also requires that the RNC obtain prior Court approval for any ballot security efforts. Intervenors allege that the RNC has not obtained Court approval for what appears to be a nationwide ballot security plan for the November 2nd election. Therefore, Intervenors respectfully request that the Court grant their motions to intervene and reopen this action and grant expedited discovery. Following such discovery, Intervenors will very promptly seek enforcement of the Consent Decrees.[3] If the Court should then find that prior approval was required, they will ask that its use be enjoined, unless the RNC can satisfy the Court that the list will not violate the terms of the Consent Decree.

## RIGHT TO INTERVENE

Plaintiffs, as intended beneficiaries of the Consent Decree, have standing to intervene and enforce its terms. Fed. R. Civ. P. 71 provides that "[w]hen an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the order by the same process as if a party . . . ." Fed. R. Civ. P. 71. "Federal Rule of Civil Procedure 71 allows a non-party to enforce a court order in its favor just as a party could." *Washington Hospital v. Pennsylvania Dep't of Public Welfare*, 889 F.2d 1294, 1299 (3d Cir. 1989). Rule 71 "clearly allows intended third party beneficiaries to enforce consent decrees . . . ." *Hook v. State of Arizona Dept. of Corrections*, 972 F.2d 1012 (9th Cir. 1992).

---

[3] A copy of Intervenors' Proposed Complaint is attached hereto as Exhibit D.

The rule that third party beneficiaries of consent decrees have standing to enforce their terms is frequently applied in civil rights cases. *See Coca-Cola Bottling Co. v. Coca-Cola Co.*, 645 F. Supp. 1419, 1438 (D. Del. 1987) ("*Coke IV*") ("Consent decrees arising from suits asserting violations of the civil rights statutes have also been found amenable to subsequent third-party enforcement"), *aff'd*, 988 F.2d 386 (3d Cir. 1993); *Virgo v. Local Union 580*, 107 F.R.D. 84, 91 (S.D.N.Y. 1995) ("As to consent decrees entered in civil rights cases, the weight of authority indicates that . . . those whom the parties to a consent decree intended to be benefited thereby may enforce the decree in a separate action"); *Green v. Sielaff*, 1992 U.S. Dist. LEXIS 11038 (N.D. Ill. July 23, 1992).

There is broad language in a decision of the United States Supreme Court suggesting that third parties do not have standing to enforce consent decrees to which they are not parties. In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975), the Supreme Court stated that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps* involved the question whether an antitrust consent decree requiring a party to offer stock to a third party gave the third party standing to bring a lawsuit as a "purchaser or seller" under the federal securities laws. The broad language in *Blue Chip Stamps* has therefore been widely distinguished by courts, on a number of different grounds. *See, e.g., Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288-89 (D.C. Cir. 1993) (noting inconsistency of language with Fed. R. Civ. P. 71 and that *Blue Chip Stamps* involved a consent decree with the government, which alone can seek enforcement of its consent decrees); *Hook*, 972 F.2d at 1015 (reasoning that *Blue Chip Stamps* prohibits only incidental third party beneficiaries from suing to enforce a consent decree); *Berger v. Heckler*, 771 F.2d 1556, 1565 (2d Cir. 1985) ("*Blue Chip* was not

4

intended to preclude nonparties from intervening to enforce a consent decree where otherwise authorized by the federal rules of civil procedure").

The Third Circuit has not squarely addressed the reach of the language in *Blue Chip Stamps*. It has, however, endorsed the reasoning of the district court in *Coke IV, supra*. *See Coca-Cola Bottling Co. v. Coca-Cola Co.*, 988 F.2d 386, 401-02 (3d Cir. 1992). In *Coke IV*, the court noted that different rules with regard to standing are applied to consent decrees in antitrust cases and those in civil rights cases. *Coke IV*, 654 F, Supp. 1438. The court explained that [t]he antitrust cases limit standing to actual parties to protect the private party from subjecting itself to perpetual liability to any unknown third parties," whereas the "civil rights consent decrees are remedial documents designed to protect the rights of a broader category of persons than the actual plaintiffs."

The Consent Decree Plaintiffs' moved for leave to enforce was issued in a civil rights case. Intervenors are therefore its intended beneficiaries, and accordingly have standing to enforce its terms.

## HISTORY OF CONSENT DECREE PROCEEDINGS

In 1981, the RNC, under the guise of a "Ballot Security Task Force," allegedly obtained lists of registered voters in predominately African-American precincts in New Jersey and sent letters to them in the mail. When 45,000 of those letters came back undeliverable, the RNC compiled a challenge list and attempted to have all of those individuals removed from the voter rolls and without knowing whether they still lived somewhere in the same voting precinct. The Task Force also allegedly used off-duty county deputy sheriffs and local policemen to watch polling places in predominantly African American and Hispanic precincts. The Task Force allegedly posted signs in these precincts warning that the Task Force was patrolling the area and that it was a crime to violate election laws.

5

After a lawsuit by the DNC, A final Consent Decree ("Final Consent Decree") was entered on July 27, 1987, to ensure that future RNC activities did not "us[e], nor appear[] to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud . . ." (See 07/27/1987 Final Consent Decree at pp. 1-2, attached hereto as Exhibit E.) Under the Consent Decree, the RNC must

> (e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting; and the conduct of such activities disproportionately in [sic] or directed toward districts that have a substantial proportion of racial or ethnic populations shall be considered relevant evidence of the existence of such a factor and purpose . . . .

(11/1/1982 Consent Decree, attached hereto as Exhibit F.)

In 1986, however, the RNC allegedly violated the Consent Decree under the guise of "ballot security" activities. The RNC allegedly contracted with a company to send mail to hundreds of thousands of African American voters in Louisiana. The RNC then tried to have 31,000 voters whose mail was returned undelivered removed from the rolls, many of whom were still entitled to vote in the precincts in which they were registered. As a result of these activities, the case was re-opened and a stipulation was agreed to on October 20, 1986, between the parties stating:

> (1) That the RNC, its agents, employees and parties acting in active concert will not conduct a direct mail campaign in the future directed at names appearing on voter registration lists in order: (1) to use the letters returned undelivered to compile voter challenge lists; (2) to make such challenges; or (3) to deter registered voters from voting.

(2)  That the RNC, its agents, employees, and parties
     acting in active concert will not use the results of
     any direct-mail campaign previously conducted …

This stipulation terminated by its terms on March 1, 1987.  It was replaced by a final Consent Decree which requires that the RNC obtain *prior court approval* before it engages in, assists or participates in any "ballot security" efforts (defined to include any "efforts to prevent or remedy vote fraud") other than normal poll watcher efforts.  However, even poll watchers cannot use the fruits of pre-election ballot security efforts, such as voter challenge lists, without prior court approval. (07/27/1987 Final Consent Decree at pp. 1-2.)

In 1990, the Court found that the RNC had violated the Consent Decree "by failing to include in ballot security instructional and informational materials guidance to state parties on unlawful practices under the consent decree or copies of such decree for their review." (11/15/1990 Order at ¶2, attached hereto as Exhibit G.)

Some things are clear from the past proceedings.  "Ballot Security" measures by the RNC have the real potential to overreach and result in voter intimidation and the denial of voting rights to minorities who are entitled to vote.  This potential requires that any such ballot security, ballot integrity or voter fraud measures by the RNC be scrutinized by this Court, *before they are implemented*, lest they create the chaos and mischief that is now apparently occurring in Ohio.

## THE RNC'S CURRENT BALLOT SECURITY ACTIVITIES

The RNC has reportedly compiled a challenge list of Ohio registered voters compiled just as the previous New Jersey and Louisiana lists were compiled:  mass mailings were sent to registered voters and voters whose mail was returned undelivered were put on that list.  Once again, numerous unsubstantiated allegations

7

were reportedly made by the RNC that there will be widespread "voter fraud" have been made as a justification for these new ballot security efforts.

> Ed Gillespie, chairman of the Republican National Committee, joined [Ohio Republican Party Chairman Robert Bennett] Tuesday and said Ohio's issues of voter registration fraud cases are alarming and part of a national problem.

Jim Sigel, *Thousands of New-Voter Cards in Ohio Undeliverable*, The Enquirer, October 20, 2004, attached hereto as Exhibit H. *See also* Tom Beyerlein, "*GOP Charges Voter Fraud in Ohio*, Palm Beach Post, October 20, 2004, attached hereto as Exhibit I ("Bennett said the state Republican Party this week will take out a full-page ad in some major Ohio newspapers urging residents to report voter fraud suspicions to local county boards of election.")

Armed with these unsubstantiated allegations, the RNC reportedly launched once again one of its "list driven" ballot security efforts that is almost exactly like its past efforts. Jeanne Cummings reports in the *Wall Street Journal* that the nationwide antifraud campaign is being "shepherded by the Republican National Committee headquarters, with help throughout the party." *See* Jeanne Cummings, Poll Monitors Brace for Nov. 2, *The Wall Street Journal*, October 22, 2004, attached as Exhibit J.

In the *Columbus Dispatch*, Mark Niquette described the Ohio efforts as follows:

> Republicans felt compelled to challenge the registrations "so any question about their validity could be cleared up prior to Election Day," said Ohio GOP chairman Robert T. Bennett.

> The challenges arose from a letter Bennett sent to all voters who registered between Jan. 1 and Aug. 31. The letter, Bennett said, welcomed the new voters "to the process" and invited them to vote Republican.

Of the 232,000 letters mailed, about 30,000 were returned as undeliverable either because the registrants didn't exist, had moved or died, or because the letters went to vacant houses or bogus addresses, Bennett said.

"It was an astounding number," he said, The potential for these fraudulent registrations to produce fraudulent votes at the ballot box is very real."

But Democrats said returned mail is not proof of fraud.

The challenges are "an unprecedented effort to throw tens of thousands of voters off of Ohio's voting rolls," said David Sullivan, Ohio coordinator for the Democrats' voter-protection project.

Bennett said there was no attempt to target Democratic strongholds. Most of the returns came form Ohio's large urban counties -- which tend to be Democratic — so that's where the majority of challenges were filed.

Mark Niquette, *GOP Challenges Voters, Party Questions Validity of Thousands in Ohio,* The Columbus Dispatch, October 23, 2004, attached as Exhibit K.

On October 22, the Republican Party reportedly filed this Ohio "challenge" list of 35,000 names. This list was discussed by RNC Chairman Ed Gillespie at a press conference in Ohio as a way of combating "voter fraud." *See* Jo Becker, *Ohio GOP Challenges 35,000 Voters*, Washington Post, Oct. 23, 2004, attached as Exhibit L ("Local party officials, joined by Republican national Committee Chairman Ed Gillespie at a news conference, said the voters were mainly registered by 'shadowy' Democratic-leaning groups and were chosen after the GOP sent them mail that was returned as undeliverable."). Mr. Gillespie also reportedly discussed these efforts on Sunday morning talk shows. *See* Paul Farhl and Jo Becker, *Some Fear Ohio Will Be Florida of 2004*, The Washington Post, October 25, 2004, attached hereto as Exhibit M ("Republicans have pointed to what they contend is widespread evidence of fraud in voter registration. Making the rounds on the

Sunday talk shows, for instance, RNC Chairman Ed Gillespie pointed out that in Franklin County, [Ohio] there are more registered voters than the latest census shows there are age-eligible residents.").

The 35,000 challenges have reportedly jeopardized the election process. Ohio election officials reportedly currently have no set procedure for providing notice to the challenged voters and resolving the challenges. Many officials are considering extreme measures in order to accomplish their duties by election day so that the challenged individuals who are eligible to vote will be able to vote with no complications, delays or errors.

> [O]verburdened elections officials were left wondering how to comply with a state law requiring a hearing on each challenge no later than two days before the election.

> "I'm not sure how we're going to accomplish this," said John Williams, deputy elections director in Hamilton County. "We've never had anything like this before."

> Those who have been challenged must receive a letter by first-class mail no later than three days before a hearing to answer the challenge -- with a lawyer and witnesses, if they choose.

> In Franklin County, where 4,219 challenges were filed, officials are considering using the Veterans Memorial auditorium to hold hearings.

*See* Exhibit K.

Scott Hiaasen reports in *The Cleveland Plain Dealer* that the Cuyahoga County Board of Elections will "hold hearings Friday and Saturday at the Cleveland Convention Center to review [the 17,000] challenges" that were filed in that county. Scott Hiaasen, *Republican Party Challenges 17,000 on Cuyahoga County's Voter Rolls*, October 26, 2004, attached as Exhibit N.

The unreturned mail challenge list reportedly has been used to challenge registered voters throughout Ohio. Some of the challenges have been withdrawn or

rejected on their face because the lists were riddled with errors. However, thousands of challenges remain unresolved. Approximately 8,000 registered voters in Cuyahoga County are under challenge. These challenges affect African-American voters disproportionately. In fact, a person living in a precinct that is over 90% African American is four times more likely to be challenged than a person living in a precinct over 90% white. *See* Exhibit A. Intervenors Malone and Agosto are two of those under challenge. *See* Exhibits B and C.

### THERE ARE REPORTS OF MULTI-STATE BALLOT SECURITY PROGRAMS THIS YEAR CONNECTED TO THE RNC

There are reports of ballot security programs in many states, and of the RNC's involvement in them. As set forth, *supra*, the *Wall Street Journal* reported that a nationwide "Republican antifraud campaign is being shepherded by the Republican National Committee headquarters, with help from throughout the party." Exhibit J.

The Wisconsin "Election Integrity Program" may be the most troubling of all the 2004 ballot security activities. The Wisconsin Republican Party has reportedly obtained the names of 100,000 new voters and has run background checks on them. *Id.* This would not only violate the Consent Decree's prohibition on creating challenge lists that are not approved by the court; it would also constitute direct intimidation. Individuals merely exercising their fundamental right to vote now know that they will be subjected to background checks by an unknown investigative entity retained by the Republican Party. The Wall Street Journal reported further that the Wisconsin program, which is "training more than 50,000 volunteers to monitor precincts on Election Day and lodge challenges against voters they view as questionable," is "a model for similar efforts that Republicans are launching nationwide." *Id.*

11

A Pennsylvania ballot security program is reportedly being undertaken with the intent to suppress the vote in Philadelphia, which has an African-American Mayor and a much higher minority population than other parts of the state. John Perzel, Republican Speaker of the Pennsylvania House and Bush-Cheney '04 State Regional Campaign Chair, has stated that his goal is to "keep that number [of voters in Philadelphia] down." Terence Samuel, "Facts on the Ground War," *U.S. News & World Report*, Nov. 1, 2004, attached hereto as Exhibit O. To accomplish that goal, Perzel is reportedly challenging "many of the more than 100,000 registered Democrats in Philadelphia." Also in Pennsylvania, Republicans purchased an official list of about 130,000 people who registered to vote in Philadelphia in the previous six months.  They mailed letters to each, and reportedly plan to challenge 10,000 voters whose letters came back as undeliverable.   Tom Infield, *Both Parties Complain of Voter Fraud*, The Philadelphia Inquirer, October 25, 2004, attached hereto as Exhibit P.

The BBC recently reported that in Florida, a challenge list of more than 1,800 predominantly African-American voters in Duval County has gone from the local Election Supervisor to the Bush-Cheney campaign. Greg Palast, *Tonight BBC to Reveal New Florida Vote Scandal*, BBC Newslight, Oct. 26, 2004, attached hereto as Exhibit Q.

This past August, John Pappageorge, a Republican state representative in Michigan and then-team leader for the state Bush-Cheney re-election campaign, said "If we do not suppress the Detroit vote, we're going to have a tough time in this election cycle."  Detroit is 83 percent African-American.  Kathleen Gray, *Remark Sets off Election Fervor*, The Detroit Free Press, October 13, 2004, attached hereto as Exhibit R. The Republican Party of Michigan announced that it was hoping to recruit 1,000 poll watchers for November 2nd, and is offering to pay up to

$100 per shift.  Kathleen Gray, *Preventing Election Fraud*, Detroit Free Press, April 29, 2004, attached hereto as Exhibit S.

Just last week, RNC Chair Ed Gillespie traveled to Ohio to preside over the unveiling of a statewide ballot security program.  Exhibit H.  On Friday, Oct. 22, RNC Senior Advisor Robert Traynham issued a press statement on the Ohio challenge program, stating in part: "The Ohio Republican Party is taking every precaution to protect and defend the voters of Ohio from having fraud perpetrated on their election system." Statement from RNC Senior Advisor Traynham on Ohio GOP's effort to Combat Voter Fraud, attached hereto as Exhibit T.

On Friday, October 22, the *Wall Street Journal* published an extensive account of the RNC's 2004 ballot security program, concluding that a nationwide program had been created and directed from RNC national headquarters.  This investigation discovered that the current ballot security program has been in development since at least 2002.  "At national party gatherings, Republican state chairmen have been comparing notes, exchanging ideas and sharing results from trial runs…." Exhibit J.

Consequently, we ask that the Court schedule a conference at the Court's earliest convenience to address Intervenor's Motions to Intervene and for Expedited Discovery consisting of the following:

Requiring the RNC, pursuant to Fed. R. Civ. P. 30(b)(6) to submit to a deposition on the topics of:

(1) its assistance or participation in any ballot security measures that have not been approved by this Court;

(2) the guidance it has given to state parties on unlawful practices under the consent decree;

(3) the use by the RNC, its agents, employees and parties acting in concert with the RNC, of direct mail campaigns to persons appearing on voter registration lists; and

(4) the use by the RNC, its agents, employees and parties acting in concert with the RNC of letters returned undelivered to compile voter challenge lists.

(5) Requiring RNC Chair Ed Gillespie to submit to a deposition on the same topics; and

(6) Authorizing immediate deposition testimony from the Ohio Republican Party Chair, Robert T. Bennett

Intervenors request that the Court schedule the deposition for the afternoon of Friday, October 29, 2004.

In addition, Intervenors seek expedited production of the guidance provided to state parties on practices that are prohibited by the Consent Orders, and all documents in the possession of the RNC mentioning any lists of voters in any State whose mail has been returned undelivered.

Upon receipt of discovery, Intervenors will ask the Court to preliminarily enjoin any challenges by the RNC or any organization acting in concert with it based on any ballot security efforts until approved by this Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion be granted.

Respectfully submitted,

_____

John W. Nields, Jr.
Patricia G. Butler
Laura S. Shores
Ari N. Rothman
**HOWREY SIMON ARNOLD & WHITE, LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 783-0800

_____

Craig H. Livingston
Ball Livingston, L.L.P.
661 Franklin Avenue
Nutley, New Jersey  07110
(973) 661-4545

Of Counsel:

15

Judith A. Browne
Edward Hailes
Advancement Project
1730 M St., NW Suite 910
Washington, D.C. 20036
(202) 728-9557

Dated: October 27, 2004          Counsel for Interveners

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of October, 2004, true copies of the foregoing Memorandum in Support of Motions on Behalf of Individual Minority Voters to Intervene and Reopen Case, and Take Expedited Discovery for the Purpose of Enforcing Consent Decrees were served by messenger, facsimile and federal express, postage prepaid, upon each of the parties listed below:

Democratic National Committee
430 South Capitol Street, S.E.
Washington, DC 20003


Republican National Committee
310 First Street, S.E.
Washington, DC 20003


Attorney for Intervenors