# EXHIBIT A

DECLARATION
OF
PROFESSOR PHILIP A. KLINKNER

I, Philip A. Klinkner, Declare Under Penalty of Perjury That The Following Is True And Correct To The Best Of My Knowledge And Belief:

1.  My name is Philip A. Klinkner and I am currently the James S. Sherman Associate Professor of Government at Hamilton College in Clinton, NY. I received my Ph.D. in Political Science from Yale University in 1992. My research focuses on American politics, including party and electoral politics, voting behavior, and race and American politics. This research also involves statistical analyses of race and electoral data.

2.  I was asked to analyze the relationship between challenged voters and the racial breakdown of the precincts in which they are located in Cuyahoga County and Hamilton County, Ohio.

3.  My analysis is based on data provided to me by PENDA HAIR indicating the precinct of all challenged voters in Cuyahoga and Hamilton Counties. This data was then merged with an existing file containing precinct data for total voters, new voters, and the racial breakdown of the voting age population (VAP). This file was generated from a purchased a copy of a file containing the ZipCode +4 and date of registration for each registered voter in Ohio. This file was then combined with data purchased from NCEC containing the voting age population (VAP) racial breakdown for all ZipCodes +4 in Ohio. These files were merged and then collapsed to give me the number of voters, the number of new voters, and the average VAP racial breakdown for each precinct.

1.  Analysis of Challenged Voters in Cuyahoga County, Ohio

In my analysis of Cuyahoga County, I found a strong and statistically significant relationship between the number of challenged voters and the race of the precincts in which they were challenged. In other words, challenges are substantially more likely to occur in heavily black precincts. As Table 1 shows, the percentage of voters that are challenged increases as the black composition of the precincts goes up.

Table 1.

| Black% Range | # Challenged | # of Voters | # of new Voters | % of Voters Challenged | % of New Voters Challenged |
|---|---|---|---|---|---|

| | | | | % of New |
|---|---|---|---|---|
| 00 - 10% | 5169 | 512879 | 52895 | 1.0% | 9.8% |
| 10 - 20% | 1701 | 79682 | 11617 | 2.1% | 14.6% |
| 20 - 30% | 462 | 22244 | 3247 | 2.1% | 14.2% |
| 30 - 40% | 363 | 22685 | 5922 | 1.6% | 6.1% |
| 40 - 50% | 275 | 19470 | 3257 | 1.4% | 8.4% |
| 50 - 60% | 930 | 28580 | 5179 | 3.3% | 18.0% |
| 60 - 70% | 408 | 15232 | 2304 | 2.7% | 17.7% |
| 70 - 80% | 777 | 16866 | 3076 | 4.6% | 25.3% |
| 80 - 90% | 875 | 22735 | 3579 | 3.8% | 24.4% |
| 90 - 100% | 3353 | 118000 | 19069 | 2.8% | 17.6% |

| Black% Range | # Challenged | # of Voters | # of new Voters | % of Voters Challenged | % of New Voters Challenged |
|---|---|---|---|---|---|
| 0-30%*** | 7615 | 614805 | 67759 | 1.2% | 10.8% |
| 30-100% | 8091 | 243568 | 42386 | 2.9% | 16.5% |

***The percentage of the voting age population that is black in Cuyahoga county is 25%

As Table 1 shows, voters in the most heavily black precincts are nearly three times as likely to be challenged compared to voters in heavily white precincts. Furthermore, this disparity is not explained by the number of new voters in various precincts. New voters in heavily black precincts are nearly twice as likely to be challenged as those in heavily white precincts.

To test this relationship more precisely, I ran two regression models, the first with percent of voters challenged as the dependent variable and the second with the percent of new voters challenged as the dependent variable. In both models, the independent variable was the range of percent black for the precincts. In both models I have weighted for the number of voters so that sets of precincts with smaller numbers of voters do not influence the results. The results are in Tables 2 and 3.

Table 2. Regression Output for Relationship of Race of Precinct to % of Voters Challenged

```
(sum of wgt is   8.4913e+05)

    Source |      SS         df       MS                Number of obs =    1435
-----------+------------------------------            F(  1,  1433) =  164.92
     Model | .100373721      1   .100373721           Prob > F      =  0.0000
  Residual | .872140315   1433   .000608612           R-squared     =  0.1032
-----------+------------------------------            Adj R-squared =  0.1026
     Total | .972514036   1434   .000678183           Root MSE      =  .02467
```

```
challenges-s |     Coef.    Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
        bper |   .023618    .0018391    12.84   0.000     .0200104    .0272256
       _cons |  .0109534    .0007971    13.74   0.000     .0093897     .012517
-------------+----------------------------------------------------------------
```

Table 3. Regression Output for Relationship of Race of Precinct to % of New Voters Challenged

```
(sum of wgt is   8.4912e+05)

      Source |       SS       df       MS              Number of obs =    1434
-------------+------------------------------           F(  1,  1432) =   60.27
       Model |  1.55956141     1  1.55956141           Prob > F      =  0.0000
    Residual |  37.0572726  1432  .025877984           R-squared     =  0.0404
-------------+------------------------------           Adj R-squared =  0.0397
       Total |  38.616834   1433  .026948244           Root MSE      =  .16087

challenges-w |     Coef.    Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
        bper |  .0931291    .0119964     7.76   0.000     .0695968    .1166614
       _cons |  .0952987    .0051996    18.33   0.000     .0850992    .1054983
-------------+----------------------------------------------------------------
```

In both models the relationship between the race of precincts and the percent of challenges is positive and statistically significant. In fact, these results show that less 1 time in 1000 will these results be due to random chance, far below the usual standard in social science of 5 times in 100. Overall, each 10 percentage point increase in the black VAP leads to a .2 percentage point increase in percent of challenged voters. In addition, each 10 percentage point increase in the black VAP leads to a .9 percentage point increase in percent of challenged new voters.


## 2. Analysis of Challenged Voters in Hamilton County, Ohio

In my analysis of Hamilton County, I found a strong and statistically significant relationship between the number of challenged voters and the race of the precincts in which they were challenged. In other words, challenges are substantially more likely to occur in heavily black precincts. As Table 1 shows, the percentage of voters that are challenged increases as the black composition of the precincts goes up.

Table 4.

| Black % Range | # Challenged | # of Voters | # of new Voters | % of Voters Challenged | % of New Voters |
|---|---|---|---|---|---|

| | | | | | Challenged |
|---|---|---|---|---|---|
| 00 - 10% | 1263 | 335999 | 41072 | 0.4% | 3.1% |
| 10 - 20% | 506 | 44742 | 7161 | 1.1% | 7.1% |
| 20 - 30% | 351 | 28356 | 4901 | 1.2% | 7.2% |
| 30 - 40% | 573 | 26817 | 4973 | 2.1% | 11.5% |
| 40 - 50% | 321 | 16104 | 3045 | 2.0% | 10.5% |
| 50 - 60% | 304 | 20089 | 3646 | 1.5% | 8.3% |
| 60 - 70% | 367 | 14620 | 2851 | 2.5% | 12.9% |
| 70 - 80% | 514 | 14721 | 3137 | 3.5% | 16.4% |
| 80 - 90% | 620 | 19195 | 3934 | 3.2% | 15.8% |
| 90 - 100% | 913 | 29806 | 6792 | 3.1% | 13.4% |

| Black% Range | # Challenged | # of Voters | # of new Voters | % of Voters Challenged | % of New Voters Challenged |
|---|---|---|---|---|---|
| 0-20%*** | 1769 | 380741 | 48233 | 0.5% | 3.7% |
| 30-100% | 3963 | 169708 | 33279 | 2.3% | 11.9% |

***The percentage of the voting age population that is black in Hamilton county is 21%

As Table 4 shows, voters in the most heavily black precincts are nearly 8 times as likely to be challenged compared to voters in heavily white precincts. Furthermore, this disparity is not explained by the number of new voters in various precincts. New voters in heavily black precincts are more than 4 times as likely to be challenged as those in heavily white precincts.

To test this relationship more precisely, I ran two regression models, the first with percent of voters challenged as the dependent variable and the second with the percent of new voters challenged as the dependent variable. In both models, the independent variable was the range of percent black for the precincts. In both models I have weighted for the number of voters so that sets of precincts with smaller numbers of voters do not influence the results. The results are in Tables 5 and 6.

Table 5. Regression Output for Relationship of Race of Precinct to % of Voters Challenged

```
(sum of wgt is   3.9956e+05)

    Source |       SS       df       MS              Number of obs =      712
-----------+--------------------------------         F(  1,   710) =  173.87
     Model | .064149756      1  .064149756           Prob > F      =  0.0000
  Residual | .26196301     710  .000368962           R-squared     =  0.1967
-----------+--------------------------------         Adj R-squared =  0.1956
     Total | .326112766    711  .000458668           Root MSE      =  .01921
```

```
challenges-s |     Coef.   Std. Err.      t     P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
        bper |   .0301098   .0022835    13.19   0.000     .0256266    .034593
       _cons |   .0063248   .0009425     6.71   0.000     .0044745   .0081752
```

Table 6. Regression Output for Relationship of Race of Precinct to % of New Voters Challenged

(sum of wgt is   3.9956e+05)

| Source | SS | df | MS | | |
|---|---|---|---|---|---|
| Model | .822510682 | 1 | .822510682 | Number of obs = | 712 |
| Residual | 4.87382696 | 710 | .006864545 | F( 1, 710) = | 119.82 |
| | | | | Prob > F = | 0.0000 |
| | | | | R-squared = | 0.1444 |
| | | | | Adj R-squared = | 0.1432 |
| Total | 5.69633765 | 711 | .008011727 | Root MSE = | .08285 |

```
challenges-w |     Coef.   Std. Err.      t     P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
        bper |   .1078155   .0098495    10.95   0.000     .0884777   .1271532
       _cons |   .0443956   .0040652    10.92   0.000     .0364143   .0523769
```

In both models the relationship between the race of precincts and the percent of challenges is positive and statistically significant. In fact, these results show that less 1 time in 1,000 will these results be due to random chance, far below the usual standard in social science of 5 times in 100. Overall, each 10 percentage point increase in the black VAP leads to a .3 percentage point increase in percent of challenged voters. In addition, each 10 percentage point increase in the black VAP leads to a 1.1 percentage point increase in percent of challenged new voters.

### 3. Conclusion

This analysis shows that there is a strong and statistically significant relationship between challenged voters and the racial breakdown of the precincts. Moreover, this relationship is not explained by the number of new voters in heavily black precincts since challenges as a percent of new voters is even more closely tied to the race of the precinct.

4. "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."

Dated: _____ 10/27/04

_____
Signature

# EXHIBIT B

# DECLARATION OF EBONY MALONE

1.  I am 20 years old and an African American citizen of the United States.  My date of birth is May 1, 1984.  My current address is 7908 Euclid Avenue, Apartment 503, Cleveland, OH 44103, and I have lived at that address since about February 2004.

2.  In or about November 2003, I registered to vote in Downtown Cleveland during a voter registration drive.  At that time, I lived at 12700 Shaker Boulevard, Apt 417, Cleveland, OH 44120.  I received my voter registration card for that address in about January 2004.

3.  In or about February 2004, I moved to my current address. I completed a voter registration application for my current address during a voter registration drive in Downtown Cleveland about three (3) times between February 2004 and September 2004.

4.  I am a first-time voter and I registered to vote three times because I wanted to make sure that I was registered to vote in the November 2004 election. I have not received a voter registration card for my current address.

5.  A few days ago, I was contacted by a representative from the ACORN organization who informed me that I was on a list of voters whose eligibility would be challenged at the polls.  I have not received any correspondence from the Cuyahoga elections office stating that my voter registration eligibility is being questioned.

1

6.  I am worried that I will be unable to vote on Election Day. Also, I am
    concerned that challenges made to voters at my precinct may slow down the
    electoral process and discourage other voters from casting a ballot.

Pursuant to 28 U.S.C. § 1746 and Ohio Stat. § 2921.11, I declare under penalty of
perjury that I have read the foregoing and that the facts stated in it are true and correct.

Dated: 10-27-04                        _Ms. Ebony S. Malone_

                                       Ebony Malone

2

# EXHIBIT C

# DECLARATION OF IRVING AGOSTO

1.  I am 39 years old and a Latino citizen of the United States. My date of birth is March 26, 1965. Currently, I reside at 2234 West 20th Street, Cleveland, OH and have lived at that address for 1 year.

2.  In or about 2001, I registered to vote when I lived at 3074 Park Drive, Parma, OH 44134.

3.  I moved to my current address in or about November 2003. In or about late August 2004, I registered to vote for my new address at a voter registration drive at the Public Square in Downtown Cleveland, Ohio. In early September 2004, I registered to vote again at my job, the Mr. Magic Carwash. I registered to vote twice because I wanted to make sure that I was registered to vote for the November 2004 election.

4.  I believe that I am qualified to register to vote. In or about the summer of 1992, I was convicted of a felony but upon release from prison in August 2000 my eligibility to vote was automatically restored. I have never been found mentally incompetent by a court.

5.  A few days ago, I was contacted by a representative from the ACORN organization who informed me that I was on a list of voters whose eligibility would be challenged at the polls.

6.  I have not received a voter registration card confirming that I am a registered voter. I have not received any correspondence from the Cuyahoga elections office stating that my voter registration eligibility is being questioned.

7. I am very upset about the fact that my name has appeared on a list of voters whose eligibility to vote will be challenged at the polls. On October 27th, 2004, I contacted the Cuyahoga lection office and was told that I was registered. I also fear that I will be unable to vote on November 2, 2004.

8. Additionally, I am concerned that challenges made to voters at my precinct may slow down the electoral process and discourage voters from casting a ballot on November 2, 2004.

Pursuant to 28 U.S.C. § 1746 and Ohio Stat. § 2921.11, I declare under penalty of perjury that I have read the foregoing and that the facts stated in it are true and correct.

Dated: _Oct 27 - 2004_          _Irving Agosto_

Irving Agosto

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | ) ) ) ) ) |
|  | Civil Action No.: 81-3876 |
|  | JUDGE DICKINSON R. DEBEVOISE |
| Plaintiffs, | ) ) |
| v. | ) ) |
| REPUBLICAN NATIONAL COMMITTEE, *et al.* Defendants. | ) ) ) ) ) ) |

## COMPLAINT IN INTERVENTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

Intervenors, by and through their undersigned counsel, allege upon knowledge as to themselves and upon information and belief as to all other matters as follows:

## DISCLOSURE OF LOCATION OF PARTIES UNDER L.R. 10.1(A)

1. Ebony Malone is located at 7908 Euclid Avenue, Apartment 503, Cleveland, Ohio 44103.

2. Irving Agosta is located at 2234 West 20th Street, Cleveland, Ohio 44113.

3. Plaintiff Democratic National Committee has its principal place of business located at 430 South Capitol Street, S.E., Washington D.C. 20003.

1

4.     Defendant Republican National Committee has its principal place of business located at 310 First Street, S.E., Washington, D.C. 20003.

## NATURE OF THE CASE

5.     Intervenors are newly registered African-American voters who seek to intervene, reopen, and enforce Consent Decrees entered into between Plaintiff Democratic National Committee ("DNC") and Defendant Republican National Committee ("RNC"). Enforcing the Consent Decrees will ensure Intervenors are able to vote in the upcoming November 2, 2004, general election.

6.     This Court has entered two Consent Decrees and an Order against the RNC that restrain the "ballot security" or "ballot integrity" activities of the RNC. The Consent Decrees arose out of complaints filed by the DNC alleging, *inter alia*, that the RNC had participated in mass mailings to registered voters, and used letters returned as undelivered to compile voter challenge lists.

7.     The RNC's "ballot security" activities were purportedly done to combat "vote fraud," but in fact had the effect of suppressing legitimate African-American votes. Consequently, Consent Decrees were entered. The second Consent Decree requires that the RNC apply for, and obtain, approval from this Court *before it engages in, or* "assists or participates in," any ballot security or anti voter fraud efforts.

8.     On information and belief, it has come to light in the last few days that the RNC has participated in yet another "ballot security" program, relying on mass mailings to registered voters and using letters returned undelivered to compile voter challenge lists. A list of 35,000 registered voters was developed in Ohio ("List"). Like the other lists leading to the Consent

Decrees, this List does not show that the voters on it are unqualified to vote. And like the other lists leading to the Consent Decrees, it affects African-American voters disproportionately.

9.   The List is reportedly overwhelming the ability of Ohio election officials to adjudicate the challenges. And it threatens to clog the election process in Ohio on Election Day.

10.   Intervenors, including newly registered African-American voters whose names are on the List, seek to intervene because they are extremely concerned that the Defendant RNC's "ballot integrity" program will deprive them and many African–American voters of the right to vote. The second Consent Decree requires advance approval of this Court before challenge lists may be compiled and used to challenge voters. It does so precisely to prevent such a list from being used to disrupt the election process at the Eleventh Hour. By continuing with its challenges to these voters, the RNC will disrupt the election process in Ohio where election resources already are stretched to the breaking point. The resulting chaos, confusion and delays will cause African–American voters disproportionately to be deprived of their right to vote.

## JURISDICTION AND VENUE

11.   "[A] federal district court has authority to enforce its consent decree . . . ." *National R.R. Passenger Corp. v. Pennsylvania Public Utility Comm'n*, 342 F.3d 242, 259 (3d Cir. 2003). This court has retained jurisdiction to enforce the Consent Decrees. (*See* July 27, 1987, Settlement Stipulation and Order of Dismissal, p. 3.)

12.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

3

## PARTIES AND STANDING

13.  Ebony Malone is a registered voter in Ohio that is on the List.  Ms. Malone
     fears that challenges made to voters at her precinct, including herself, will
     slow down the electoral process to the point where she will be prevented on
     November 2, 2004, from being able to cast a vote.  Ms. Malone is also
     African-American. (*See* Exhibit A, Malone Declaration.)

14.  Irving Agosta is a registered voter in Ohio that is on the List.  Mr. Agosta
     fears that challenges made to voters at his precinct, including himself, will
     slow down the electoral process to the point where he will be prevented on
     November 2, 2004, from being able to cast a vote.  Mr. Agosta is also
     African-American. (*See* Exhibit B, Agosta Declaration.)

15.  The Consent Decrees that Intervenors seek to enforce were issued in a civil
     rights case brought under 42 U.S.C. §§ 1971, 1973, 1983, and 1985.
     Intervenors are its intended beneficiaries, and accordingly have standing to
     enforce its terms.  Fed. R. Civ. P. 71; *see also Coca-Cola Bottling Co. v.
     Coca-Cola Co.*, 645 F. Supp. 1419, 1438 (D. Del. 1987) (*"Coke IV"*)
     ("Consent decrees arising from suits asserting violations of the civil rights
     statutes have also been found amenable to subsequent third-party
     enforcement"); *Virgo v. Local Union 580*, 107 F.R.D. 84, 91 (S.D.N.Y.
     1995) ("As to consent decrees entered in civil rights cases, the weight of
     authority indicates that . . . those whom the parties to a consent decree
     intended to be benefited thereby may enforce the decree in a separate
     action").

## A.  History of Consent Decree Proceedings.

16.  In 1981, the RNC, under the guise of a "Ballot Security Task Force" ("Task
     Force"), allegedly obtained lists of registered voters in predominately

African-American precincts in New Jersey and sent letters to them in the mail. When 45,000 of those letters came back undeliverable, the RNC compiled a challenge list and attempted to have all of those individuals removed from the voter rolls without knowing whether they still lived somewhere in the same voting precinct.

17.   A final Consent Decree ("Final Consent Decree") was entered on July 27, 1987, to ensure that future RNC activities did not "us[e], nor appear[] to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud . . ." (See 07/27/1987 Final Consent Decree at pp. 1-2.) Pursuant to initial Consent Decree, the RNC must

> (e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting; and the conduct of such activities disproportionately in [sic] or directed toward districts that have a substantial proportion of racial or ethnic populations shall be considered relevant evidence of the existence of such a factor and purpose . . . .

> (11/1/1982 Consent Decree.)

18.   Although the foregoing stipulation terminated by its terms on March 1, 1987, it was replaced by the Final Consent Decree, which required the RNC to obtain *prior court approval* for all "ballot security" efforts (defined to include any "efforts to prevent or remedy vote fraud") other than normal poll watcher efforts. (Final Consent Decree at p. 2.) Even poll watchers cannot use the fruits of pre-election ballot security efforts, such as voter challenge lists, without prior court approval. (*Id.*)

19.  In 1990, the Court found that the RNC had violated the Consent Decree "by failing to include in ballot security instructional and informational materials guidance to state parties on unlawful practices under the consent decree or copies of such decree for their review." (*See* 11/15/1990 Order at ¶2.)

**B.  The RNC's Current Ballot Security Activities.**

20.  On information and belief, October 22, the Republican Party filed a "challenge" list of 35,000 names in Ohio ("List"). The Intervenors are on this List. (*See* Exhibit A, Malone Declaration; Exhibit B, Agosta Declaration.)

21.  On information and belief, the List was discussed by RNC Chairman Ed Gillespie at a press conference in Ohio as a way of combating "voter fraud." *See* Jo Becker, *Ohio GOP Challenges 35,000 Voters*, Washington Post, Oct. 23, 2004.

22.  On information and belief, the List was compiled just as the previous illegal lists were compiled: mass mailings were sent to registered voters and voters whose mail was returned undelivered were put on that list.

23.  On information and belief, the List has been used to challenge registered voters throughout Ohio. Some of the challenges have been withdrawn or rejected on their face because the lists were riddled with errors. However, thousands of challenges remain unresolved. Approximately 8,000 registered voters in Cuyahoga County are under challenge.

24.  On information and belief, the 35,000 challenges on the List have jeopardized the election process. Ohio election officials currently have no set procedure for providing notice to the challenged voters and resolving the challenges. Many officials are considering extreme measures in order to accomplish their duties by election day so that the challenged individuals

who are eligible to vote will be able to vote with no complications, delays or errors.

25.     On information and belief, the challenges affect African-American voters disproportionately. A person living in a precinct that is over 90% African American is four times as likely to be challenged than a person living in a precinct over 90% white. (*See* Exhibit C, Declaration of Phillip Klinkner.)

26.     On information and belief, use of this List did not receive prior approval of this Court.

### COUNT ONE

### Violation of Consent Decree

27.     Intervenors reallege and incorporate herein the allegations set forth in Paragraphs 1 through 25 above.

28.     The Final Consent Decree requires that the RNC obtain prior court approval for all "ballot security" efforts, which include any "efforts to prevent or remedy vote fraud." The RNC recognized this requirement when it entered into the Final Consent Decree, but did not seek this Court's approval. This Court should preliminarily enjoin any challenges by the RNC or any organization acting in concert with it based on any ballot security efforts until approved by this Court.

### PRAYER FOR RELIEF

WHEREFORE, Intervenors request that this Court enter judgment in their favor as follows:

(a)     That this Court assume jurisdiction;

(b)     Declare that the ballot security efforts described in this Complaint were recognized to have been submitted to this Court for approval, but were not;

7

(c)     That this Court preliminarily enjoin any challenges by the RNC or any organization acting in concert with it based on any ballot security efforts until approved by this Court;

(d)     Award Intervenors reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1973*l*(e) and § 1988; and

(e)     Grant Intervenors such other relief as may be just.

Respectfully submitted,

_____

John W. Nields
Patricia G. Bulter
Laura S. Shores
Ari N. Rothman
**HOWREY SIMON ARNOLD & WHITE
LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 783-0800

_____

Craig H. Livingston (CHL0335)
Ball Livingston, L.L.P.
661 Franklin Avenue
Nutley, New Jersey  07110
(973) 661-4545

Of Counsel:

Judy Scott
Service Employees International Union AFL-CIO, CLC
1313 L Street
Washington, D.C. 20005
(202) 898-3453


Dated: October 27, 2004                    Counsel for Intervenors

# EXHIBIT E

7-29-87
ほご



### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

------------------------------------------

DEMOCRATIC NATIONAL COMMITTEE,

      Plaintiff,

v.

REPUBLICAN NATIONAL COMMITTEE,

      Defendant.

------------------------------------------

Hon. Dickinson R. Debevoise
Civil Action No. 86-3972

SETTLEMENT STIPULATION AND
ORDER OF DISMISSAL

     Whereas, on November 1, 1982, this Court entered a Consent Order in Democratic National Committee, et al. v. Republican National Committee, et al., Civil Action No. 81-3876 ("Consent Order"). The Democratic National Committee ("DNC"), Republican National Committee ("RNC") and others were parties to the settlement agreement incorporated in and adopted as the Consent Order. The Consent Order remains in full force and effect;

     Whereas, during the course of the case, the parties have engaged in extensive discovery from each other and third parties. More than 50 depositions have been taken and thousands of documents have been examined;

     Whereas, the RNC and DNC recognize the importance of encouraging citizens to register and vote and the importance of not hindering or discouraging qualified voters from exercising their right to vote;

     Whereas, the RNC and DNC recognize the importance of preventing and remedying vote fraud where it exists;

     Whereas, the RNC and DNC recognize the importance of neither using, nor appearing to use, racial or ethnic criteria in

connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud;

It is therefore ordered upon the agreement and stipulation of the parties and all prior proceedings herein that as to the RNC and DNC the Consent Order is amended to specifically provide:

A. "Ballot security" efforts shall mean ballot integrity, ballot security or other efforts to prevent or remedy vote fraud.

B. To the extent permitted by law and the November 1, 1982 Consent Order, the RNC may deploy persons on election day to perform normal poll watch functions so long as such persons do not use or implement the results of any other ballot security effort, unless the other ballot security effort complies with the provisions of the Consent Order and applicable law and has been so determined by this Court.

C. Except as provided in paragraph B above, the RNC shall not engage in, and shall not assist or participate in, any ballot security program unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the Consent Order and applicable law. Applications by the RNC for determination of ballot security programs by the Court shall be made following 20 days notice to the DNC which notice shall include a description of the program to be undertaken, the purpose(s) to be served, and the reasons why the program complies with the Consent Order and applicable law.

Until further order of the Court, the Court retains jurisdiction to make the determinations set forth above.

Except as provided herein, the RNC and DNC respectfully request that the above-captioned case be dismissed with prejudice upon the order of the Court with each to pay its own costs.

IT IS SO STIPULATED:

David Boies
Rodney L. Stenlake
G. Elaine Wood
CRAVATH, SWAINE & MOORE
One Chase Manhattan Plaza
New York, New York   10005
(212) 422-3000

William H. Schweitzer
Lee T. Ellis, Jr.
BAKER & HOSTETLER
Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.   20036
(202) 861-1500

Douglas S. Eakeley
Robert J. Gilson
RIKER, DANZIG, SCHERER,
   HYLAND & PERRETTI
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey   07960
(201) 538-0800

Thomas F. Campion
James M. Altieri
SHANLEY & FISHER
131 Madison Avenue
Morristown, New Jersey   07960
(201) 285-1000

Attorneys for Plaintiff
Democratic National Committee

Attorneys for Defendant
Republican National Committee

AND IT IS SO ORDERED this ___27___ day of July, 1987.

s/ Debevoise
Dickinson R. Debevoise, U.S.D.J.

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DEMOCRATIC NATIONAL COMMITTEE,
NEW JERSEY DEMOCRATIC STATE
COMMITTEE, VIRGINIA L.
FEGGINS, and LYNETTE MONROE,

          Plaintiffs,

    v.

REPUBLICAN NATIONAL COMMITTEE,
NEW JERSEY REPUBLICAN STATE
COMMITTEE, ALEX HURTADO,
RONALD C. KAUFMAN and JOHN A.
KELLY,

          Defendants.

Civil Action No. 81-3876
Hon. Dickinson R. Debevoise

FILED

NOV 1 1982

        Clerk

CONSENT ORDER

    This matter having been brought before the Court by
Plaintiffs Democratic National Committee ("DNC"), New Jersey
Democratic State Committee ("DSC"), Virginia L. Feggins and
Lynette Monroe, and by Defendants Republican National Committee
("RNC"), New Jersey Republican State Committee ("RSC"), John
A. Kelly, Ronald Kaufman and Alex Hurtado, for the entry of a
Consent Order disposing of all claims which have been raised and
which could have been raised by way of complaint, counterclaim or
crossclaim in the above-entitled matter, and the parties having
consented to the entry of this order, and the Court having found
good cause, it is on this 1st day of November, 1982,

    ORDERED that the annexed settlement agreement between
certain plaintiffs and certain defendants, without any finding by
this Court of, and without any admission of, liability or
wrongdoing by them or by any other person or entity be, and the
same hereby is adopted by this Court as its final order in the
above-entitled matter; and it is

    FURTHER ORDERED that, as a result of the amicable
resolution of this matter, Plaintiffs' Amended Complaint be, and
the same hereby is, dismissed with prejudice and without costs as
against all named Defendants.

                         _____
                         Dickinson R. Debevoise, U.S.D.J.

CONSENT AS TO FORM AND ENTRY:

SONOSKY, CHAMBERS, SACHES & GUIDO

BY: _____
    Kenneth Guido, Jr.

BAUMGART & GENOVA

BY: _____
    Angelo J. Genova
        Attorneys for Plaintiffs

SHANLEY & FISHER

BY: _____
    Thomas F. Campion
    Attorneys for Defendants
    Alex Hurtado and Ronald C.
        Kaufman

STERNS, HERBERT & WEINROTH

BY: _____
    Richard K. Weinroth
    Attorneys for Defendant
    Republican National Committee

                                        _____
                                        Philip D. Kaltenbacher
STRYKER, TAMS & DILL                    Chairman, Republican
                                        State Committee

BY: _____
    William J. Heller
    Attorneys for Defendant
    New Jersey Republican State
        Committee

JOHN J. BARRY, ESQ.

_____
Attorney for Defendant
John A. Kelly

- 2 -

### SETTLEMENT AGREEMENT

WHEREAS, the Democratic National Committee ("DNC"), New Jersey Democratic State Committee ("DSC"), Virginia L. Peggins and Lynette Monroe, Plaintiffs, have instituted an action in the United States District Court for the District of New Jersey, Civil Action No. 81-3876, against the Republican National Committee ("RNC"), New Jersey Republican State Committee ("RSC"), John A. Kelly, Ronald Kaufman and Alex Hurtado, Defendants; and

WHEREAS, the parties wish to resolve amicably all matters raised or which could have been raised in the pleadings in the above-entitled matter,

NOW THEREFORE, in consideration of the foregoing, in consideration of the mutual covenants and conditions herein contained, and for other good and valuable consideration, the parties hereto agree as follows:

1.    The undersigned plaintiffs agree to consent to the entry of an order dismissing their Amended Complaint against all Defendants, without costs, with all parties bearing their own attorneys' fees.

2.    The RNC and RSC (hereinafter collectively referred to as the "party committees") agree that they will in the future, in all states and territories of the United States:

> (a)  comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice;

> (b)  in the event that they produce or place any signs which are part of ballot security activities, cause said signs to disclose that they are authorized or sponsored by the party committees and any other committees participating with the party committees;

> (c)  refrain from giving any directions to or permitting their agents or employees to remove or deface any lawfully printed and placed campaign materials or signs;

> (d)  refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place;

> (e)  refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities

is to deter qualified voters from voting; and
the conduct of such activities disproportion-
ately in or directed toward districts that have
a substantial proportion of racial or ethnic
populations shall be considered relevant
evidence of the existence of such a factor and
purpose;

(f)  refrain from attiring or equipping
agents, employees or other persons or permitting
their agents or employees to be attired or
equipped in a manner which creates the
appearance that the individuals are performing
official or governmental functions, including,
but not limited to, refraining from wearing
public or private law enforcement or security
guard uniforms, using armbands, or carrying or
displaying guns or badges except as required by
law or regulation, in connection with any ballot
security activities; and

(g)  refrain from having private personnel
deputized as law enforcement personnel in
connection with ballot security activities.

3.   The party committees agree that they shall, as a
first resort, use established statutory procedures for challen-
ging unqualified voters.

4.   This Settlement Agreement, and the terms of the
Consent Order to be entered pursuant thereto, shall bind the DNC,
DSC, RNC, and RSC, their agents, servants and employees, whether
acting directly or indirectly through other party committees.  It
is expressly understood and agreed that the RNC and the RSC have
no present right of control over other state party committees,
county committees, or other national, state and local political
organizations of the same party, and their agents, servants and
employees.

5.   The parties to this Settlement Agreement shall ask
that the New Jersey legislature institute an examination of the
provisions of the New Jersey Election Laws to determine whether
present laws are adequate to insure the integrity of the
electoral process and the physical security of poll workers and
their property in New Jersey.

6.   All parties agree that they shall bear their own
costs and attorneys' fees and further agree that they shall not
seek to recover same in any action or proceeding instituted after
the execution of this Settlement Agreement and the Consent Decree
to be entered pursuant thereto.  No party to this Agreement shall
undertake any further legal action arising out of events
surrounding the November 1981 general election in the State of
New Jersey or arising out of the filing of this lawsuit, except
as specified in paragraph 7 below.

— 2 —

7.    The undersigned Plaintiffs, as Releasors, for and in consideration of the mutual covenants and conditions hereof, and in further consideration of the sum of One Dollar ($1.00), lawful money of the United States of America to the Releasors in hand paid by all Defendants, the receipt of which is hereby acknowledged, have remised, released and forever discharged, and by these presents do remise, release and forever discharge the Defendants-Releasees of and from all obligations, causes of action, claims or demands, at law or in equity, which arose out of ballot security activities during the 1981 general election in New Jersey that Releasors asserted or could have asserted against the Releasees in Civil Action No. 81-3876 in the United States District Court for the District of New Jersey, provided that nothing in this agreement shall prevent plaintiffs from seeking relief, at law or equity, for a violation of the terms of this settlement agreement or the related consent order incorporating the terms hereof. More particularly, but not by way of limitation, the undersigned plaintiffs expressly agree to abandon and to waive all claims to monetary relief asserted or which could have been asserted against the defendants.

8.    It is expressly understood and agreed that this Settlement Agreement, and the Consent Order incorporating the terms hereof, do not constitute any finding or admission of liability or wrongdoing by any defendant and do not constitute any finding or admission of merit or lack of merit to the allegations raised by the plaintiffs.  This agreement is not an admission that any of the activities which the party committees have agreed not to undertake were undertaken by any of the party committees or by any party to this lawsuit or by any other person or entity.  This agreement is not an admission of civil or criminal liability or responsibility on the part of any participant in it.

Dated _Kreuber 1_, 1982.

DEMOCRATIC NATIONAL COMMITTEE

By _____

By _____

NEW JERSEY DEMOCRATIC STATE
    COMMITTEE

By _____


REPUBLICAN NATIONAL COMMITTEE

By _____

NEW JERSEY REPUBLICAN STATE
    COMMITTEE

By _____

_____
Philip D. Kaltenbacher
Chairman, Republican
State Committee

- 3 -

SETTLEMENT AGREEMENT

WHEREAS, the Democratic National Committee ("DNC"), New Jersey Democratic State Committee ("DSC"), Virginia L. Peggins and Lynette Monroe, Plaintiffs, have instituted an action in the United States District Court for the District of New Jersey, Civil Action No. 81-3876, against the Republican National Committee ("RNC"), New Jersey Republican State Committee ("RSC"), John A. Kelly, Ronald Kaufman and Alex Hurtado, Defendants; and

WHEREAS, the parties wish to resolve amicably all matters raised or which could have been raised in the pleadings in the above-entitled matter,

NOW THEREFORE, in consideration of the foregoing, in consideration of the mutual covenants and conditions herein contained, and for other good and valuable consideration, the parties hereto agree as follows:

1. The undersigned plaintiffs agree to consent to the entry of an order dismissing their Amended Complaint against all Defendants, without costs, with all parties bearing their own attorneys' fees.

2. The RNC and RSC (hereinafter collectively referred to as the "party committees") agree that they will in the future, in all states and territories of the United States:

(a) comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice;

(b) in the event that they produce or place any signs which are part of ballot security activities, cause said signs to disclose that they are authorized or sponsored by the party committees and any other committees partici- pating with the party committees;

(c) refrain from giving any directions to or permitting their agents or employees to remove or deface any lawfully printed and placed campaign materials or signs;

(d) refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place;

(e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual con- duct of, such activities there and where a purpose or significant effect of such activities

is to deter qualified voters from voting; and
the conduct of such activities disproportion-
ately in or directed toward districts that have
a substantial proportion of racial or ethnic
populations shall be considered relevant
evidence of the existence of such a factor and
purpose;

    (f)  refrain from attiring or equipping
agents, employees or other persons or permitting
their agents or employees to be attired or
equipped in a manner which creates the
appearance that the individuals are performing
official or governmental functions, including,
but not limited to, refraining from wearing
public or private law enforcement or security
guard uniforms, using armbands, or carrying or
displaying guns or badges except as required by
law or regulation, in connection with any ballot
security activities; and

    (g)  refrain from having private personnel
deputized as law enforcement personnel in
connection with ballot security activities.

    3.   The party committees agree that they shall, as a
first resort, use established statutory procedures for challen-
ging unqualified voters.

    4.   This Settlement Agreement, and the terms of the
Consent Order to be entered pursuant thereto, shall bind the DNC,
DSC, RNC, and RSC, their agents, servants and employees, whether
acting directly or indirectly through other party committees.  It
is expressly understood and agreed that the RNC and the RSC have
no present right of control over other state party committees,
county committees, or other national, state and local political
organizations of the same party, and their agents, servants and
employees.

    5.   The parties to this Settlement Agreement shall ask
that the New Jersey legislature institute an examination of the
provisions of the New Jersey Election Laws to determine whether
present laws are adequate to insure the integrity of the
electoral process and the physical security of poll workers and
their property in New Jersey.

    6.   All parties agree that they shall bear their own
costs and attorneys' fees and further agree that they shall not
seek to recover same in any action or proceeding instituted after
the execution of this Settlement Agreement and the Consent Decree
to be entered pursuant thereto.  No party to this Agreement shall
undertake any further legal action arising out of events
surrounding the November 1981 general election in the State of
New Jersey or arising out of the filing of this lawsuit, except
as specified in paragraph 7 below.

- 2 -

7.   The undersigned Plaintiffs, as Releasors, for and in consideration of the mutual covenants and conditions hereof, and in further consideration of the sum of One Dollar ($1.00), lawful money of the United States of America to the Releasors in hand paid by all Defendants, the receipt of which is hereby acknowledged, have remised, released and forever discharged, and by these presents do remise, release and forever discharge the Defendants-Releasees of and from all obligations, causes of action, claims or demands, at law or in equity, which arose out of ballot security activities during the 1981 general election in New Jersey that Releasors asserted or could have asserted against the Releasees in Civil Action No. 81-3876 in the United States District Court for the District of New Jersey, provided that nothing in this agreement shall prevent plaintiffs from seeking relief, at law or equity, for a violation of the terms of this settlement agreement or the related consent order incorporating the terms hereof.  More particularly, but not by way of limitation, the undersigned plaintiffs expressly agree to abandon and to waive all claims to monetary relief asserted or which could have been asserted against the defendants.

8.   It is expressly understood and agreed that this Settlement Agreement, and the Consent Order incorporating the terms hereof, do not constitute any finding or admission of liability or wrongdoing by any defendant and do not constitute any finding or admission of merit or lack of merit to the allegations raised by the plaintiffs.  This agreement is not an admission that any of the activities which the party committees have agreed not to undertake were undertaken by any of the party committees or by any party to this lawsuit or by any other person or entity.  This agreement is not an admission of civil or criminal liability or responsibility on the part of any participant in it.

Dated _Nrewber 1_ , 1982.

DEMOCRATIC NATIONAL COMMITTEE          REPUBLICAN NATIONAL COMMITTEE

By _____          By _____

By _____

NEW JERSEY DEMOCRATIC STATE            NEW JERSEY REPUBLICAN STATE
   COMMITTEE                              COMMITTEE

By _____          By _____

                                      _____
                                      Philip D. Kaltenbacher
                                      Chairman, Republican
                                      State Committee

- 3 -

# EXHIBIT G





## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

Robert A. Bauer, Esq.
Barry J. Reingold, Esq.
Judith L. Corley, Esq.
Hilary Harp, Esq.
PERKINS COIE
1110 Vermont Avenue, N.W.
Washington, DC  20005
(202)887-9030

Angelo J. Genova, Esq.
GENOVA, BURNS & SCHOTT
Eisenhower Plaza II
354 Eisenhower Parkway
Livingston, NJ  07039
(201)533-0777



Attorneys for Plaintiff Democratic National Committee

**FILED**

NOV 5  1 9

At 8:30_____M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, )<br><br>            Plaintiff, )<br><br>      v. )<br><br>REPUBLICAN NATIONAL COMMITTEE, )<br><br>            Defendant. )<br> ) | Civ. Action No. 86-3972<br>Hon. Dickinson R. Debevoise<br><br><br>ORDER |

ORDER

Based on the factual findings of the Court as stated
in open court this 5th day of November, 1990, it hereby is
ORDERED that:

1.   The Democratic National Committee, following
expedited discovery ordered by this Court, has failed to
establish that the Republican National Committee conducted,
participated in, or assisted ballot security activities in
North Carolina as alleged in the Democratic National Committee's
motion to reopen.  The Democratic National Committee may
make further application for additional discovery in a
reopened proceeding, concerned with ballot security activity
in North Carolina, based on events occurring prior to the close of
the 1990 elections.

2.   The Republican National Committee, by failing to
include in ballot security instructional and informational
materials guidance to state parties on unlawful practices under
the consent decree or copies of such decree for their review,
has violated said decree and shall in all such materials include
such guidance or copy of the decree.  The materials submitted
to this Court for review are otherwise found to be directed
toward lawful ballot integrity programs and preparation.

3.   Subject to the right to make additional application
pursuant to paragraph 1, this matter is closed.

2.

SO ORDERED this 5th day of November, 1990.

D.R. Debevoise, U.S.D.J.