# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Defendants. | Civil Action No.: 81-3876 (DRD) |

**BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE WHY DEFENDNAT REPUBLICAN NATIONAL COMMITTEE SHOULD NOT BE HELD IN CIVIL CONTEMPT AND WHY PRELIMINARY INJUNCTIVE RELIEF SHOULD NOT ISSUE**

**GENOVA, BURNS & VERNOIA**
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777
Attorneys for Plaintiff,
Democratic National Committee

Of Counsel and On the Brief:

Angelo J. Genova
Peter J. Cammarano, III
Rajiv D. Parikh

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 4

BACKGROUND—CONSENT DECREE PROCEEDINGS .......................................................... 5

RNC CURRENT BALLOT SECURITY ACTIVITY ................................................................... 6

LEGAL ARGUMENT .................................................................................................................. 12

POINT 1 ........................................................................................................................................ 12

   THE CONSENT DECREE HAS BEEN VIOLATED ............................................................ 12

POINT 2 ........................................................................................................................................ 13

   A PRELIMINARY INJUNCTION SHOULD BE ISSUED ...................................................... 13

      A.   Standards for Issuance of Preliminary Injunction ........................................................ 13

CONCLUSION .............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

Bennington Foods LLC v. St. Croix Renaissance Group,
  528 F.3d 176 (3d Cir. 2008) ................................................................................................. 13

Council of Alternative Political Parties v. Hooks,
  121 F.3d 876 (3d Cir. 1997) ................................................................................................. 14

Escobedo v. Rogers,
  No. 1:08-cv-01002 (D.N.M., filed Oct. 27, 2008) .................................................................. 7

Instant Air Freight Co. v. C.F. Air Freight, Inc.,
  882 F.2d 797 (3d Cir. 1989) ................................................................................................. 13

McDowell v. Philadelphia Housing Auth.,
  423 F.3d 233 (3d Cir. 2005) ................................................................................................. 12

Montana Democratic Party v. Eaton,
  Case No. 08-141-M-DWM (D. Mont., Oct. 8, 2008) ............................................................ 10

Northwest Women's Center, Inc. v. McMonagle,
  868 F.2d 1342 (3d Cir. 1989) ............................................................................................... 13

United States v. Berks County,
  250 F. Supp. 2d 525 (E.D. Pa. 2003) .............................................................................. 14, 15

**PRELIMINARY STATEMENT**

Pursuant to Fed. R. Civ. P. 65 and L. Civ. R. 65.1, plaintiff Democratic National Committee ("DNC") respectfully applies for an order directed to defendant Republican National Committee ("RNC") to show cause why defendant RNC should not be held in civil contempt for violation of the Consent Order entered on November 1, 1982 in this action ("1982 Consent Order") and the Final Consent Decree entered in <u>Democratic National Committee v. Republican National Committee</u>, Civil Action No. 86-3972 (DRD) on July 27, 1987 ("1987 Consent Decree") and why a preliminary injunction should not issue enjoining the RNC and those acting in concert with it from engaging in certain activity that violates the Consent Order and Consent Decree.

In summary, based on the attached Affidavit of David O'Niell, the RNC has hired a California firm to contract with private investigators in New Mexico to investigate the backgrounds of voters for purposes of challenging those voters. This revelation follows the admission by an attorney for the Republican Party of New Mexico that the Republican Party had hired a private investigator to obtain the Social Security numbers of voters and other confidential information about voters for the purpose of alleging that the voters were illegal aliens and/or were impersonating other individuals. The hiring of private investigators by the RNC to investigate voters clearly does not constitute a "normal poll watch function" within the meaning of the 1987 Consent Decree but rather constitutes a "ballot security" effort within the meaning of that Decree, which the RNC is prohibited from undertaking without a determination by this court that such program complies with the terms of the 1982 Consent Order.

In addition, as described below, these developments have taken place against a background of other "ballot security" operations undertaken by officials and operatives linked to

the RNC, but without any prior notice to this Court. Accordingly, and for the reasons set forth below, a preliminary injunction should be issued, Defendant RNC should be held in contempt for their violations of the Consent Order and Consent Decree and enjoined from any further ballot security program in violation of the Consent Order and Consent Decree.

## BACKGROUND—CONSENT DECREE PROCEEDINGS

In 1981, the RNC created a "Ballot Security Task Force" that obtained lists of registered voters in predominately African American precincts in New Jersey; sent them letters; and used letters returned as undeliverable to compile a list of voters that the RNC then sought to have removed from the list of registered voters. The Task Force also allegedly used off-duty law enforcement officers to patrol polling places in predominantly African American and Hispanic neighborhoods. The DNC filed suit and, on November 1, 1982, a Consent Order was issued in which the RNC agreed, among other things, to refrain from directing or permitting their employees to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place. 1982 Consent Order. See Certification of Peter J. Cammarano, III, Esq. (hereinafter "Cammarano Cert.") at Ex. 1.

In 1986, the DNC alleged that the RNC violated the 1982 Consent Decree in connection with activities in Louisiana. A stipulation was entered, which terminated by its terms on March 1, 1987, and was replaced with the 1987 Consent Decree, entered July 27, 1987. See Cammarano Cert. at Ex. 2. The 1987 Consent Decree prohibits the RNC from engaging in, or assisting or participating in, *any* "ballot security program," regardless of the constituency targeted, other than "normal poll watch functions" "unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the [1982] Consent Order and applicable law." Id. at ¶ C.

5

Applications by the RNC for determination of ballot security programs by the Court shall be made following 20 days notice to the DNC. Id. Because of the risk of undue "hindering of qualified voters in exercising their right to vote," no other "ballot security program" by the RNC may lawfully proceed.

## RNC CURRENT BALLOT SECURITY ACTIVITY

David O'Niell is a private investigator licensed in New Mexico. See Cammarano Cert. at Ex. 3, Declaration of David O'Niell (hereinafter "O'Niell Dec.") at ¶ 1. On October 30, 2008, Mr. O'Niell received a call from a Todd Stefan, Id. ¶2, an executive vice president of Setec Security Technologies, a company headquartered in Los Angeles, California. O'Niell Dec. at ¶¶ 2-6. Mr. Stefan told Mr. O'Niell that the RNC was looking for "experts" such as Mr. O'Niell to assist Republican poll challengers in New Mexico on election day and afterwards. Id. at ¶2. Mr. Stefan confirmed again that it was the RNC who would be hiring private investigators in New Mexico. Id. at ¶4. Mr. Stefan indicated that the RNC was seeking the services of private investigators such as Mr. O'Neill to run down information for Republican challengers of voters. Id. at ¶5.

Mr. Stefan wanted to know if Mr. O'Niell knew of any other private investigators that might be interested in working on this project. Based on that conversation, on October 31, 2008, Mr. O'Niell contacted a colleague, David Keylon, also a licensed private investigator in New Mexico. Id. at ¶6. Mr. O'Niell gave Mr. Keylon, Mr. Stefan's telephone number. Id. Later that day, Mr. Keylon called Mr. O'Niell and told him that he, Mr. Keylon, had agreed to accept the work for election day and thereafter. Id. at ¶6.

Reports filed by the RNC with the Federal Election Commission disclose that the RNC has previously retained Setec. The RNC made two payments to Setec of $2,250 each, totaling

6

$4,500, both on November 16, 2006. See www.opensecrets.com, accessed November 2, 2008.

The nature of the work for which such investigators would likely be retained is suggested by public statements of the New Mexico Republican Party and press revelations about the role of private investigators in recent Republican voter challenge activity in New Mexico. On October 16, 2008, the New Mexico Republican Party held a press conference at which a Republican state representative, Justine Fox-Young, announced that the Republican Party had searched voter registration records for ninety-two (92) newly registered voters who had voted in the June 2008 New Mexico primary election. Cammarano Cert. at Ex. 4 (October 17, 2008, AP Newswire article). Ms. Fox-Young indicated that 28 of these voter registrations were "suspect." Id. The Republican Party handed out press packets containing information about ten (10) named individual voters, including copies of these ten individuals' voter registration applications showing address, phone number and date of birth. Id. According to the press packets and statements made at the press conference, the Republican Party had run driver's license checks, credit checks and other background checks using the dates of birth and social security numbers of these individual voters. In addition, Ms. Fox-Young stated at the press conference that some of the voter registrations used social security numbers from persons other than the registrant, id., although she did not disclose how she came to this conclusion. For one voter, the press packet stated that "no SSN number or date of birth is associated with the voter…" and revealed the results of a credit check of the voter. See Cammarano Cert. at Ex. 5, Complaint, Escobedo v. Rogers, No. 1:08-cv-01002 (D.N.M., filed Oct. 27, 2008).

Social security numbers and dates of birth of individual voters are redacted from the forms made publicly available, as required by New Mexico law. NMSA §1-4-5. It is clear, therefore, that non-public information was used to generate the press packets and the information

distributed at the press conference. Four of the ten voters named in the October 16, 2008 Republican Party press packets have charged that they were visited by a private investigator, Al Romero, who attempted to or did interrogate the voters about their voter registrations and/or immigration status. Two of those voters, Dora Escobedo and Lydia Olivarez, have filed suit in the U.S. District Court for the District of New Mexico. Cammarano Cert. at Ex. 5. Another voter, Emily Garcia, has brought suit in the District Court for Bernalillo County, New Mexico. See Cammarano Cert. at Ex. 6 (Complaint). An October 23, 2008 article in the New Mexico *Independent* then reported that Guadlupe Borquez and Ms. Garcia's granddaughter had been visited and interrogated by Mr. Romero about their voter registration status and immigration status. Cammarano Cert. at Ex. 7. The Associated Press reported that an attorney for the New Mexico Republican Party, Pat Rogers, admitted that a private investigator for the New Mexico Republican Party had been employed to develop information (later proven false) that two voters had social security numbers on their voter registration forms that were being used by other people. Cammarano Cert. at Ex. 8. And yet, according to the two Complaints and press accounts, all of the voters named in the October 16 press materials are eligible U.S. citizens and are legitimately registered. See Cammarano Cert at Ex. 5-6, 9 (October 18, 2008, *Albuquerque Journal* article).

   These revelations strongly indicate that the purpose of the RNC's effort to hire private investigators in New Mexico is to obtain information about registered voters that is not publicly available, in order to use that information—in particular, social security numbers, credit checks and similar confidential data—to challenge the identity of the voters at the polls. Moreover, these press accounts indicate that the RNC considered the ethnic background of the voters in question as a factor in the decision to conduct its ostensible "ballot security" activities.

These developments take place against a background of other recent efforts resembling ballot security programs that are linked to the national Republican Party, including ostensible ballot security programs resembling those that gave rise to the 1982 Consent Order and the 1987 Consent Decree. National Republican operatives and those working in concert with national Republican operatives have already acted to suppress legitimate voters elsewhere around the country, and threaten to suppress legitimate voters on Election Day elsewhere around the country, ostensibly in the interest of so-called "ballot security."

For example, despite the threat of intimidation, Republicans have publicly pledged to deploy law enforcement personnel in Wisconsin. Wisconsin Attorney General J. B. Van Hollen, co-chair of John McCain's Wisconsin campaign, announced this week that he would dispatch 50 criminal prosecutors and special agents from the Division of Criminal Investigation to state polling places. Cammarano Cert. at Ex. 10-11 (*Van Hollen Wants Prosecutors to Monitor State Polls*, CAPITAL TIMES, Oct. 29, 2008; Press Release, Wis. Dep't of Justice, Van Hollen Announces Department of Justice Election Day Activities to Ensure Right to Vote and Compliance with State Election Laws, Oct. 28, 2008, at http://www.doj.state.wi.us/news/2008/nr102808_06.asp). In contrast, as a precaution to maintain "an environment free of discrimination, suppression or intimidation," the U.S. Department of Justice has specifically announced that in its own deployment of observers to ensure a free and fair electoral process, "**no** criminal prosecutors will be utilized as election monitors." Cammarano Cert. at Ex. 12 (Press Release, U.S. Dep't of Justice, Statement of Acting Assistant Attorney General Grace Chung Becker Regarding the Decision Not to Utilize Criminal Prosecutors as Monitors in Polling Places on Election Day, Sept. 23, 2008, at http://www.usdoj.gov/opa/pr/2008/September/08-crt-849.html).

Furthermore, Attorney General Van Hollen's former staff, now in various staff positions at the Republican Party of Wisconsin, are recruiting additional individuals to intimidate voters, reminiscent of the original Ballot Security Task Force. They are particularly focusing on off-duty law enforcement personnel to be present at inner-city polling places. On October 8, 2008, Jonathan Waclawski, election day operations director for the Republican Party of Wisconsin, sent an email seeking "people who would potentially be willing to volunteer . . . at inner city (more intimidating) polling places. **Particularly, I am interested in names of Milwaukee area veterans, policemen, security personnel, firefighters** etc." Cammarano Cert. at Ex. 13 (Mary Pat Flaherty, *A Wis. Call for GOP Poll Watchers Draws National Notice*, WASH. POST (The Trail), Oct. 14, 2008, at http://tinyurl.com/wipollwatchers)(emphasis added).

Republicans across the country are also engaging in illegitimate and unlawful mass challenges to voters before Election Day. In Montana, for example, the "Special Projects" Director notarized facially frivolous challenges filed by the Executive Director and Legislative Director of the Montana Republican Party; in all, more than 6,000 voters were challenged. The challenges were premised on a flawed attempt to match information from voter registration rolls to other databases, and were conducted by Integram, a direct mail company retained by John McCain 2008, according to FEC records. The challenges were filed despite obvious errors on the face of the supporting affidavits themselves, much less any legal basis to conclude that any of the voters impacted was in fact ineligible. In roundly repudiating the tactic, a Montana federal court deemed the challenges a "partisan ploy" and "political chicanery". Cammarano Cert. at Ex. 14 (Montana Democratic Party v. Eaton, Case No. 08-141-M-DWM (D. Mont., Oct. 8, 2008)).

Similarly flawed mass challenges, premised once again on matching information from voter registration rolls to other databases, have also appeared in Florida in recent weeks. In Glades County, a Republican candidate for sheriff challenged 300 voters; again, there were obvious errors on the face of the challenges themselves. Cammarano Cert. at Ex. 15.

Republican officials in several states have also announced public threats to challenge voters on Election Day, using invalid and illegitimate information that does not call citizens' eligibility into question, but does foster confusion and concern among the voters impacted. In Macomb County, Michigan, the chair of the Republican Party disclosed a scheme to challenge voters based on foreclosure lists; public pressure and litigation forced the Republican Party, including the RNC, to recant and renounce that particular plan, but the same official acknowledged that the party intended to engage in voter "caging," of the sort presently enjoined by operation of the Consent Decree. Cammarano Cert. at Ex. 16-17 (Eartha Jane Melzer, *Lose Your House, Lose Your Vote*, MICH. MESSENGER, Sept. 10, 2008, at http://tinyurl.com/loseyourhouse; Eartha Jane Melzer, *Republicans Recant Plans to Foreclose Voters but Admit Other Strategies*, MICH. MESSENGER, Sept. 11, 2008, http://tinyurl.com/messenger-recant). Similar threats have been made – and then recanted – by Republican Party chairs in Franklin County, Ohio, and Marion County, Indiana, but the threats themselves accomplish much of the objective.

Most recently, in Florida, the Republican Supervisor of Elections of Volusia County announced that her party was planning to challenge voters based on foreclosure lists. Cammarano Cert. at Ex. 18 (Barb Shepard & Pat Hatfield, *In Volusia County Thousands Are Newly Registered, But May be Challenged at Polls*, DELAND-DELTONA BEACON, Oct. 10, 2008, at http://www.beacononlinenews.com/news/daily/1170).

## LEGAL ARGUMENT

## POINT 1

## THE CONSENT DECREE HAS BEEN VIOLATED

The 1987 Consent Decree defines "ballot security" efforts to include "ballot security or other efforts to prevent or remedy voter fraud." Cammarano Cert. at Ex. 2, ¶ A. That Decree provides that, except for "normal poll watch functions," the "RNC shall not engage in, and shall not assist or participate in, any ballot security program unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the [1982] Consent Order and applicable law." Id. at ¶ C.

A consent decree that is unambiguous should be enforced according to its terms. McDowell v. Philadelphia Housing Auth., 423 F.3d 233, 238 (3d Cir. 2005). In this case, clearly the RNC's effort to hire private investigators to check the backgrounds of voters, in order to assist in the challenging of those voters, is a form of "ballot security" as defined in the 1987 Consent Decree and does not remotely constitute a "normal poll watch function[]." And the hiring of those investigators, to plumb private and apparently unlawfully obtained information, has not, as required by the 1987 Consent Decree, been submitted to this Court, on 20 days notice to the DNC, for a determination of whether it complies with the provisions of the 1982 Consent Order and applicable law. For these reasons, the 1987 Consent Decree has been violated and the RNC should be ordered to show cause why it should not be held in civil contempt for violation of that Consent Decree.

## POINT 2

## A PRELIMINARY INJUNCTION SHOULD BE ISSUED

Given the RNC's activity in New Mexico combined with the other "ballot security" activities, a preliminary injunction should be issued enjoining the RNC from (1) hiring any private investigators in New Mexico or any other state to assist in the challenging of voters or using the fruits of any such investigation in the challenging of voters, and (2) employing any other "ballot security" program that has not been submitted to this Court as required by the 1987 Consent Decree, including but not limited to challenges based on matches of registered voter lists to information obtained from other sources, and including but not limited to the hiring of security or other personnel to deploy to areas where the racial or ethnic composition of such districts is a factor in the deployment.

### A.   Standards for Issuance of Preliminary Injunction

In order to obtain a preliminary injunction, the moving party must demonstrate "(1) the reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" Bennington Foods LLC v. St. Croix Renaissance Group, 528 F.3d 176, 179 (3d Cir. 2008), quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).

#### 1.   Likelihood of Success on the Merits

The DNC is clearly likely to succeed on the merits. The hiring of private investigators by the RNC, to investigate legitimate citizens based in part on their ethnic background, without

notice to the DNC or prior approval by this Court, is a clear violation of the core prohibitions of the Consent Decree.  As to the other ballot security activities conducted by Republican state officials, party officials and operatives, as described above, the links to the national Republican Party are close enough to warrant an expanded injunction.  The RNC would be held to violate the consent decree if and to the extent it uses third-parties with whom it acts in concert, to evade the decree.  See e.g., Northwest Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1355-56 (3d Cir. 1989).

### 2. Irreparable Injury

The loss of the right to vote cannot be remedied after the fact; thus the harm resulting from that loss is irreparable.  See e.g., Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997).  The loss of the right to vote is considered irreparable because "voters denied equal access to the electoral process cannot collect money damages after trial for the denial of the right to vote." United States v. Berks County, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003).  In this case, the voters who will be challenged based on the use of confidential information uncovered by private investigators hired by the RNC in violation of the 1987 Consent Decree, may well lose the right to vote even if the challenge is meritless because of the time required to resolve a challenge on election day.  Those voters will have no remedy for the loss of their right to vote.  The harm caused by the RNC's violation of the Consent Decree will thus be irreparable.

### 3. Relative Harm

According to press accounts, not one of the 28 voters whose registrations were identified by the Republican Party of New Mexico as "suspect" turned out to be improperly registered.  In fact, the voters who were visited by Mr. Romero, the private investigator hired by the New

14

Mexico Republican Party, have specifically alleged in court filings that they are in fact U.S. citizens who are lawfully registered. See Cammarano Cert. at Ex. 5 and 6. Thus, this case balances the fundamental right to vote against claims of fraud on the part of the Republican Party which have, in this and every other case described above, evaporated into thin air upon even cursory examination. The balance of harms lies in favor of granting the preliminary injunction.

### 4. The Public Interest

The public interest would be served by issuance of an injunction that would prevent the RNC from hiring private investigators and engaging in other ballot security activities without prior approval by this Court. Clearly the public has an interest in ensuring that legitimately registered voters can exercise the right to vote free from fear and intimidation. The public interest is served by issuing a preliminary injunction that will ensure "that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy." Berks County, 250 F. Supp. 2d at 541.

### CONCLUSION

For the reasons set forth above, the Court should issue an order to the RNC to show cause (1) why the RNC should not be held in civil contempt for violating the 1987 Consent Decree and (2) why a preliminary injunction should not issue enjoining the RNC from hiring private investigators to assist in conducting background investigations to be used in challenging voters, or using the fruits of any such investigation in the challenging of voters, and enjoining the RNC from employing any other ballot security program that does not constitute a "normal poll watch function" without the prior approval of this Court, including but not limited to challenges based on matches of registered voter lists to information obtained from other sources, and including but not limited to the hiring of security or other personnel to deploy to areas where the racial or

15

ethnic composition of such districts is a factor in the deployment.

                              **GENOVA, BURNS & VERNOIA**
                              Attorneys for Plaintiff,
                              Democratic National Committee


                        By:    s/ Angelo J. Genova
                              **ANGELO J. GENOVA**

Dated: November 3, 2008