**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, et al., | |
| Plaintiffs, | **Civil Action No: 81-3876 (DRD)** |
| v. | |
| REPUBLICAN NATIONAL COMMITTEE, et al., | |
| Defendants. | |

---

**BRIEF ON BEHALF OF PLAINTIFF DEMOCRATIC NATIONAL COMMITTEE IN OPPOSITION TO DEFENDANT REPUBLIC NATIONAL COMMITTEE'S MOTION TO VACATE OR MODIFY THE CONSENT DECREE**

---

**GENOVA, BURNS & VERNOIA**
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777

**SANDLER, REIFF & YOUNG**
300 M Street, SE
Suite 1102
Washington, DC 20003
(202) 479-1111

Attorneys for Plaintiff,
Democratic National Committee

**HILL WALLACK, LLP**
202 Carnegie Center
Princeton, New Jersey 08543
(609) 924-0808

Attorneys for Plaintiff,
New Jersey Democratic State
Committee

*Of Counsel and On the Brief:*
Angelo J. Genova, Esq.
Joseph Sandler, Esq.

*On the Brief:*
Peter J. Cammarano III, Esq.
Rajiv D. Parikh, Esq.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF THE CASE.......................................................................................................2

A.  Introduction ...........................................................................................................................2

B.  Statement of Facts and Procedural History ..........................................................................5

LEGAL ARGUMENT...................................................................................................................9

POINT I .........................................................................................................................................9

THE MOTION SHOULD BE DENIED BECAUSE RNC HAS FAILED TO ESTABLISH ANY BASIS FOR VACATING OR MODIFYING THE CONSENT DECREE ...................................................................................................................................9

A.    Factual Circumstances Reinforce the Continued Need for the Consent Decree .........10

B.    There Has Been No Change In the Law Making Legal the Conduct Forbidden by the Consent Decree ...............................................................................................16

POINT II .....................................................................................................................................28

THE MOTION SHOULD BE DENIED BECAUSE RNC HAS FAILED TO ESTABLISH THAT THE CONSENT DECREE WAS NOT VALIDLY ENTERED INTO BY THE PARTIES .........................................................................................................28

CONCLUSION............................................................................................................................32

## TABLE OF AUTHORITIES

## Cases

Building & Constr. Trades Council of Phila. v. Nat'l Labor Relations Board,
   64 F.3d 880 (3d Cir. 1995) ................................................................... 9, 25

Coltec Indus., Inc., v. Hobgood,
   280 F.3d 262 (3rd Cir. 2002) ............................................................... 27

Cooper v. Noble,
   33 F.3d 540 (5th Cir. 1994); .............................................................. 29

Cousins v. Wigoda,
   419 U.S. 477 (1975) ............................................................................ 25

Democratic Party of the United States v. Wisconsin ex rel. LaFollette,
   450 U.S. 107 (1981) ............................................................................ 25

Denike v. Fauver,
   3 F. Supp. 2d 540 (D.N.J. 1998) ......................................................... 9, 10

Harris v. City of Philadelphia,
   137 F.3d 209 (3d Cir. 1998) ............................................................... 11, 29

Holland v. New Jersey Dep't of Corrections,
   246 F.3d 267 (3d Cir. 2001) ............................................................... 9

Hoxworth v. Blinder Robinson & Co.,
   903 F.2d 186 (3d Cir. 1990) ............................................................... 24

In re Fine Paper Antitrust Litig.,
   840 F.2d 188 (3d Cir. 1988) ............................................................... 27

Local Number 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland,
   478 U.S. 501 (1986) ............................................................................ 29

Regal Knitwear Co. v. Nat'l Labor Relations Bd.,
   324 U.S. 9 (1945) ............................................................................... 24

Rufo v. Inmates of Suffolk County Jail,
   502 U.S. 367 (1992) ....................................................................... passim

United States v. Armour & Co.,
   402 U.S. 673 (1971) ............................................................................ 29

United States v. United Shoe Mach. Corp.,
   391 U.S. 244 (1968) ............................................................................ 9

## Unreported Cases

Larranaga v. Herrera,
No. CV 2004 05391 (2nd Dist. Ct. Bernallilo County, New Mexico, (Aug. 20, 2004)............. 18

Montana Democratic Party v. Eaton,
2008 U.S. Dist. LEXIS 105849 (D. Mont. 2008) .................................................... 15

Sierra Club v. Browner,
1994 U.S. Dist. LEXIS 16400 (D.D.C. 1994) ................................................ 30, 31

United States v. North Carolina Republican Party, et al.,
Civil Action No. 5:92-00161-F) (E.D.N.C., Feb. 26, 1992)...................................... 7

## Statutes

U.S. Constitution.................................................................................... 28

42 U.S.C. §§ 1973gg, et seq.........................................................................16

42 U.S.C. §§ 15301, et seq..........................................................................16

42 U.S.C. § 15485...................................................................................22

42 U.S.C. § 1983....................................................................................28

## Other Authorities

A. Bernstein, "Dems: Minority voters to be harassed by GOP,"
*Houston Chronicle*, Oct. 31, 1998 at A31. ............................................... 11

E. George, "GOP poll watchers create a stir in PB3";
*Arkansas Democrat-Gazette*, Oct. 22, 2002 at 10; Associated Press, Oct. 22, 2002............... 12

Eartha Jane Melzer, "Lose Your House, Lose Your Vote,"
MICH. MESSENGER, Sept. 10, 2008 ...................................................... 15

Eartha Jane Melzer, "Republicans Recant Plans to Foreclose Voters but Admit Other Strategies,"
MICH. MESSENGER, Sept. 11, 2008 ...................................................... 15

G. Franke-Ruta and H. Meyerson, "The GOP Deploys,"
THE AMERICAN PROSPECT, Feb. 1, 2004................................................. 13

H. Tobar, "New Mexico GOP assailed for vote fraud reward plan,"
*Los Angeles Times*, Oct. 18, 2000 at A15 .............................................. 11

J. Becker, "Ohio GOP challenges 35,000 voters,"
*Washington Post*, Oct. 23, 2008 at A9 .................................................................................. 19, 20

L. Chimola and J. Henry, "House early voting, spilled ballots among problems delaying count,"
*Houston Chronicle*, Dec. 7, 1997 at A20 .................................................................................. 11

L. Minnite, AN ANALYSIS OF VOTER FRAUD IN THE U.S. at 13 (Demos 2003) ............................ 18

Mary Pat Flaherty, "A Wis. Call for GOP Poll Watchers Draws National Notice,"
*Washington Post* (The Trail), Oct. 14, 2008 ............................................................................. 14

R. Joffee, "Democrats Accuse G.O.P. of Intimidating Minorities in New Jersey Voting,"
*Washington Post*, Nov. 7, 1981 ................................................................................................. 5

T. Edsall, "'Ballot Security Effects Calculated; GOP Aide Said Lousiriana Effort 'Could Keep the Black Vote Down,"
*Washington Post*, Oct. 24, 1986 at A1 ...................................................................................... 6

## Rules

FED. R. CIV. P. 60(b) ................................................................................ 1, 2, 9, 26, 27

## **PRELIMINARY STATEMENT**

Defendant Republican National Committee's (hereinafter "Defendant" or "RNC") motion to vacate or modify the consent decree submitted pursuant to FED. R. CIV. P. 60(b) must be denied.  To prevail on such a motion the RNC must prove (1) a change in the factual circumstances; (2) a change in the law that legalizes what the decree was designed to prevent; (3) unforeseen obstacles to implementation of the decree; or (4) that continued enforcement of the decree would be detrimental to the public interest.  The purpose of the RNC's application is simple: the RNC wants to abrogate the Consent Decree, for the purpose of making it easier for the Republican Party to engage in the precise activity the Consent Decree was designed to prevent - systematic disenfranchisement of legitimately registered voters.

However, the RNC has not, and cannot, satisfy the high burden set forth in the Rules and case law, because:

> (1) there has been no change in the factual circumstances that led to the entry of the consent decree;
> (2) the conduct barred by the consent decree remains illegal and has not been changed by any voting-related law enacted since 1982;
> (3) the consent decree has been reasonably applied to its signatories;
> (4) it is in the public's interest to prevent the disenfranchisement of lawfully registered voters; and
> (5) the consent decree is jurisdictionally valid.

Simply stated, FED. R. CIV. P. 60(b) sets forth an extremely high standard that must be met prior to the dissolution or modification of a consent decree which was voluntarily entered into by informed, sophisticated and adequately represented parties.  The RNC has wholly failed to provide a single iota of substantiated proof to overcome this high threshold.  Accordingly, and for the reasons set forth below in more detail, Plaintiff Democratic National Committee respectfully requests that Defendant's motion be denied in its entirety.

## STATEMENT OF THE CASE

### A.      Introduction

This is a brief submitted by Plaintiff Democratic National Committee ("Plaintiff" or "DNC") in opposition to a motion to vacate or modify a consent decree submitted pursuant to FED. R. CIV. P. 60(b) by the RNC.

This matter should be viewed against the decades-long backdrop of this federal lawsuit, and consent decree between the parties, wherein the DNC challenged the ballot security programs devised by the RNC.  On two separate occasions in the 1980's, the DNC sued the RNC for engaging in systematic and illegal efforts to disenfranchise voters -- efforts specifically targeted at African-American and Hispanic voters.  On both occasions, the RNC defended its illegal efforts as being necessary to combat alleged "voter fraud."  However, rather than attempting to defend its abhorrent conduct in this Court, the RNC voluntarily agreed to enter into a Consent Decree — an original decree in 1982, modified in 1987 — forbidding the RNC from engaging, assisting or participating in such conduct (collectively hereinafter, the "Consent Decree" or "Decree").  The RNC now seeks to dissolve the Consent Decree, proffering an amalgam of incredulous arguments, including sensational claims under the cloak of Constitutionally protected speech and a decades delayed challenge to this Court's jurisdiction.

Nonetheless, the RNC has failed to satisfy the high burden required by FED. R. CIV. P. 60(b).  The RNC argues that "much has changed in politics and voting procedures since this Court first entered the Consent Decree" in 1982. (RNC Memorandum In Support of Its Motion (hereinafter "RNC Mem.") at 1; Docket Entry No. 43-4).  Despite the RNC's assertions, developments in the last two decades have confirmed that the safeguards contained in the Consent Decree were prescient, appropriate and continue to be vitally necessary to achieve the

fundamental purpose for which the Consent Decree was entered: to prevent the RNC from engaging in or supporting unlawful, systematic efforts to disenfranchise eligible voters.

To obtain modification of the Consent Decree, the RNC must show (1) a change in the factual circumstances; (2) a change in the law that makes legal what the decree was designed to prevent; (3) unforeseen obstacles to implementation of the decree; or (4) that continued enforcement of the decree would be detrimental to the public interest. The RNC has not established the existence of any of these factors.

First, there has been no change in factual circumstances warranting modification of the Decree, and the RNC does not, and cannot, claim otherwise. To the contrary, the history of the RNC and Republican Party "ballot security" activity since the entry of the Decree shows that the RNC has continued to engage in and/or actively support precisely the type of conduct the Decree was designed to bar.

Second, none of the voting-related laws enacted since 1982 and cited by the RNC have changed or modified the absolute illegality of the conduct barred by the Consent Decree. Nor is there any evidence whatsoever, as the RNC claims, that these laws have increased the potential for "voter fraud" in a way that necessitates freeing the RNC to engage in more unlawful "ballot security" activity. Indeed, the RNC's inability to conspire with its State parties to engage in the specific activity barred by the Decree is hardly an infringement of the RNC's First Amendment rights.

Third, the Consent Decree has not been applied or enforced in any way contrary to the RNC's "reasonable expectations." To the contrary, the RNC has been held only to the precise terms of the modified Decree with respect to its dealings with Republican State Party committees. In the original Decree, the RNC clearly agreed not only to a "disparate impact" test

rather than a "discriminatory intent" test, but also, in the modified Decree, to a much broader scope of "ballot security" activity that would require pre-clearance by this Court. Moreover, to the extent the RNC is complaining about enforcement by third parties, the DNC is willing to modify the Decree to exclude future enforcement by third-party intervenors.

Fourth, the RNC's contention that the "public interest" requires it to be able to engage in "ballot security" activity to prevent "voter fraud" is belied by the repeated pattern, over the last twenty years, of baseless claims of "voter fraud" used in an attempt to justify programs of systematic disenfranchisement of lawfully registered voters.

Finally, the RNC's contention that the Decree should be vacated because it was void <u>ab initio</u> is based on the incredulous claim that the Decree afforded broader relief than the Court could have ordered, had the DNC's claims been litigated to judgment. It is well-established, however, that in a consent decree, defendants may agree to do more than a judicially imposed injunction, in a fully-litigated proceeding, could have required. The courts have consistently rejected, as a basis for vacating or modifying a consent decree, the fact that the decree affords relief broader than the Court would have granted if the case had not been settled.

For all the reasons stated herein, the RNC's Motion to Vacate or Modify the Consent Decree should be denied pursuant to Fed. R. Civ. P. 60(b).

## B.    Statement of Facts and Procedural History

The 1982 Consent Decree has its origins in a program conducted by the RNC during the general election for Governor of New Jersey in 1981.  The RNC's "ballot security" program had two parts: (1) a mass mailing of sample ballots to precincts with a majority of African-American and Hispanic voters, with returned mailers used to create list of voters whose names the RNC would ask to be removed from the voter rolls; and (2) a program of intimidation of minority voters through tactics including the hiring of off-duty sheriffs and policemen, some displaying revolvers and two-way radios, and wearing armbands with words "National Ballot Security Task Force," to patrol African-American and Hispanic precincts.  See Certification of Angelo J. Genova, Esq. (hereinafter "Genova Cert.") at Ex. 1. (Complaint, Democratic Nat'l Comm. et al. v. Republican Nat'l Comm. et al., Civil Action No. 81-3876 (DRD) (D.N.J.1981); see also id. at Ex. 2 (C. Davidson, T. Dunlap, G. Kenny and B. Wise, REPUBLICAN BALLOT SECURITY PROGRAMS: VOTE PROTECTION OR MINORITY VOTE SUPPRESSION—OR BOTH? at 49-54 (Sept. 2004), Chapters  V & VI (hereinafter "REPUBLICAN BALLOT SECURITY PROGRAMS")).

After the DNC filed suit, the then-chairman of the RNC, Richard Richards, stated that: "We are delighted to be a partner with the Republican Party in New Jersey in their ballot security program to ensure an honest election . . . Anyone opposed to ballot security obviously must be supportive of election fraud."  See Genova Cert. at Ex. 2 (REPUBLICAN BALLOT SECURITY PROGRAMS at 54 (quoting R. Joffee, "Democrats Accuse G.O.P. of Intimidating Minorities in New Jersey Voting," Washington Post, Nov. 7, 1981)).

Rather than defend against the DNC's claims, however, the RNC voluntarily entered into the 1982 Consent Decree.  See Genova Cert. at Ex. 3 (Consent Order, DNC v. RNC, Civil Action No. 81-3876 (DRD) (D.N.J., Nov. 1, 1982)).  In the 1982 Consent Decree, the RNC,

among other things, agreed that "in the future, in all states and territories of the United States," the RNC would "refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities to deter qualified voters from voting." Id.

In 1986, the RNC hired a private contractor, Ballot Security Group, to conduct a program in Louisiana in connection with the mid-term elections for Congress, in which about 350,000 non-forwardable letters were sent to registered voters statewide, most of them African-American. About 30,000 of the letters were returned and the RNC intended to have those voters removed from the voter lists. See Genova Cert. at Ex. 2 (REPUBLICAN BALLOT SECURITY PROGRAMS at 60-61). Several voters brought suit in state court, and in the course of discovery, the RNC produced a memo from its Midwest political director to its Southern political director, stating: "I would guess that his program will eliminate at least 60,000-80,000 folks from the rolls . . . If it's a close race . . . which I'm assuming it is, this could keep the black vote down considerably." Id. (quoting T. Edsall, "'Ballot Security Effects Calculated; GOP Aide Said Lousisiana Effort 'Could Keep the Black Vote Down,'" Washington Post, Oct. 24, 1986 at A1).

The DNC returned to this Court alleging a violation of the 1982 Consent Decree. See Genova Cert. at Ex. 4 (M. Tolchin, "G.O.P. Memo Tells of Black Vote Cut," The New York Times (Oct. 25, 1986) (referencing DNC v. RNC, Civil Action No. 86-3972 (DRD) (D.N.J 1986)); see also RNC Mem. at 5. Again, the RNC voluntarily chose not to defend the legality of its actions but instead entered into a modification of the 1982 Consent Decree. See Genova Cert. at Ex. 5 (Settlement Stipulation and Order of Dismissal, DNC v. RNC, Civil Action No. 86-3972 (DRD) (D.N.J., July 27, 1987)(hereinafter "1987 Order")). In the 1987 Order, the RNC agreed

to refrain from engaging, assisting or participating in any ballot security program – beyond "normal poll watch functions" — unless the program "has been determined by this Court to comply with the provisions" of the 1982 Consent Decree. The 1987 Order mandates that the RNC apply to the Court "for determinations of ballot security programs . . . following 20 days notice to the DNC," including a "description of the program to be undertaken, the purposes to be served, and the reasons why the program complied with the" 1982 Consent Decree and applicable law. Id. at §C.

The RNC portrays the Consent Decree as a constantly swinging Sword of Damocles held over its head. RNC Mem. at 6-7, 22-24. To the contrary, since entry of the 1987 Order, the DNC itself has in fact sought enforcement of the Consent Decree only **twice**:

First, in 1990, the North Carolina Republican Party sponsored a ballot security program in which 150,000 postcards were sent into predominantly African-American precincts, warning voters that it is a "federal crime . . . to knowingly give false information about your name, residence or period of residence to an election official," and falsely claiming that voters were required to have lived in the same precinct for thirty (30) days prior to the election. See Genova Cert. at Ex. 2 (REPUBLICAN BALLOT SECURITY PROGRAMS at 73). The DNC sought enforcement of the Consent Decree in this Court, which specifically found that the RNC, "by failing to include in ballot security instructional and informational materials guidance to state parties on unlawful practice under the consent decree . . . has violated said decree." See Genova Cert. at Ex. 6 (Order, DNC v. RNC, No. 86-3972 (D.N.J., Nov. 5, 1990)). In addition, the United States Department of Justice brought suit against the North Carolina Republican Party and the Helms for U.S. Senate Campaign for violations of the Voting Rights Act, resulting in a separate consent decree entered into by those parties with the federal government. See Genova Cert. at Ex. 7

(Complaint, Consent Decree and Docket Sheet, <u>United States v. North Carolina Republican Party, et al.</u>, Civil Action No. 5:92-00161-F (E.D.N.C. Feb. 26, 1992)).

Second, the DNC sought enforcement of the Consent Decree in November 2008 based on information -- a sworn statement from an investigator in New Mexico contacted by the RNC's vendor -- that the RNC had hired private investigators in New Mexico to investigate the backgrounds of voters for purposes of challenging those voters. <u>See</u> <u>generally</u> DNC Brief In Support of Order to Show Cause (Nov. 3, 2008) [Docket Entry No. 38]. This Court denied relief based on a sworn statement from the RNC's vendor that the investigators had in fact been hired for other purposes. The RNC did not dispute, however, that the New Mexico Republican Party had run driver's license checks, credit checks and other background checks on newly registered Hispanic voters; and an attorney for the New Mexico Republican Party admitted that the State Party had hired a private investigator to develop information, which was later proven false, that voters had social security numbers on their registration forms being used by other persons. <u>See</u> Genova Cert. at Ex. 8.

Eventually, on November 3, 2008 the RNC filed the instant motion seeking to vacate or modify the consent decree [Docket Entry No. 43]. For the reasons set forth below, RNC's motion to vacate or modify the Consent Decree must be denied.

**LEGAL ARGUMENT**

**POINT I**

**THE MOTION SHOULD BE DENIED BECAUSE RNC HAS FAILED TO ESTABLISH ANY BASIS FOR VACATING OR MODIFYING THE CONSENT DECREE**

FED. R. CIV. P. 60(b) "does not authorize relief merely when it is no longer convenient to live with the terms of a consent decree." Building & Constr. Trades Council of Phila. v. Nat'l Labor Relations Board, 64 F.3d 880, 886 (3d Cir. 1995), quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992). Rather, "a consent decree is a final judgment that may be reopened only to the extent that equity requires." Denike v. Fauver, 3 F. Supp. 2d 540, 545 (D.N.J. 1998), quoting Rufo, 502 U.S. at 391.

While a plaintiff may seek modification of a consent decree upon "a finding that conditions have changed so that the basic purpose of the original consent decree has been thwarted," Holland v. New Jersey Dep't of Corrections, 246 F.3d 267, 283-84 (3d Cir. 2001), the United States Supreme Court "has **set a more rigorous standard for defendants seeking modification** because defendants usually seek modification not to achieve the purposes of the provisions of the decree but to escape their impact." Id. at 284 n.16 (emphasis added) (quoting United States v. United Shoe Mach. Corp., 391 U.S. 244, 249 (1968)). That "more rigorous standard" was set forth in Rufo, supra, and requires that a defendant establish one or more of four factors: (1) "a significant change either in factual conditions," Rufo, 502 U.S. at 384; (2) that "the statutory or decisional law has changed to make legal what the decree was designed to prevent," id. at 388; (3) "when a decree proves to be unworkable because of unforeseen

obstacles," id. at 384; or (4) "when enforcement of the decree without modification would be detrimental to the public interest." Id. Accord, Denike, 3 F. Supp. 2d at 545.

The RNC has wholly failed to establish the existence of any of these four factors.

**A.**    **Factual Circumstances Reinforce the Continued Need for the Consent Decree**

The RNC does not, and can not, contend that there has been any significant change in **factual** conditions warranting vacating or modification of the Consent Decree. Indeed, factual developments over the past twenty (20) years have underscored the continuing need for the Consent Decree. In addition to the voter suppression efforts challenged under the Decree in 1986 and 1990, the RNC and its affiliated State and county parties have, during this period, continued to engage repeatedly in the exact type of conduct that the Decree was specifically designed to prevent: systematic efforts at disenfranchisement targeted at minority communities. Among many examples of this are the following illustrative situations:

- In the general election in November 1988, the Orange County California Republican Party arranged for the hiring of uniformed guards at heavily populated Latino polling places. The guards took down voters' license plate numbers and asked them about their citizenship. See Genova Cert. at Ex. 2 (REPUBLICAN BALLOT SECURITY PROGRAMS at 68-69).

- In the 1997 general election for Mayor of Houston, in which the Democratic nominee was African-American, signs suddenly appeared in African-American neighborhoods days before the election, offering a reward for information leading to the arrest and conviction of anyone found guilty of voter fraud. The project was traced to a Republican donor with strong ties to the Republican nominee for Mayor.

See Genova Cert. at Ex. 9 (L. Chimola and J. Henry, "Heavy early voting, spilled ballots among problems delaying count," *Houston Chronicle*, Dec. 7, 1997 at A20).

- In March 1998, the Harris County (Houston, Texas) Republican Party announced plans for "the most comprehensive ballot security program in Harris Country Republican Party history."  In October 1998, the Party trained "ballot security" teams to focus on minority precincts in Houston, distributing a two-page outline listing "excuses" for voter fraud, including "It is a form of affirmative action," and "You don't understand my people."  The Republican County Chair Gary Polland defended the program as an effort "to prevent illegal voting."  See Genova Cert. at Ex. 10 (A. Bernstein, "Dems: Minority voters to be harassed by GOP," *Houston Chronicle*, Oct. 31, 1998 at A31.)

- In October 2000, a top election official in New Mexico charged Republican Party activists with trying to intimidate voters, after a flier offering a $20,000 reward to those reporting voter fraud was leaked to her office.  Republican leaders claimed that they had considered, but later decided against, offering the reward as part of an effort to fight voter fraud in predominantly Democratic counties.  Those counties are also predominantly Latino.  According to Denise Lamb, the State's election chief, the reward was "bounty" designed to intimidate voters.  New Mexico Republican Party Chair John Dendahl said the flier was part of an anti-fraud effort for election day, which included establishing a toll-free number for citizens to report "improprieties." See Genova Cert. at Ex. 11 (H. Tobar, "New Mexico GOP Assailed For Vote Fraud Reward Plan," *Los Angeles Times*, Oct. 18, 2000 at A15).

- On October 23, 2002, five (5) Republican poll watchers were present at the courthouse in Pine Bluff, Arkansas — a heavily Democratic area — for the first day of early voting. They allegedly focused exclusively on African-Americans, asking them for identification and taking photographs. They claimed to be "targeting anybody who does not have an ID to prove who they say they are." Guy Cecil, a Democrat coordinating national efforts with Arkansas campaigns, said, "They were literally going up to them and saying, 'Before you vote, I want to see your identification.'" Local law enforcement officials escorted the poll watchers out, but they later returned. See Genova Cert. at Ex. 12 (E. George, "GOP poll watchers create a stir in PB3," *Arkansas Democrat-Gazette*, Oct. 22, 2002 at 10; C. Huse, "The 2002 Campaign: Polling Place: Democratic Party Accuses G.O.P. of Intimidating Arkansas Voters," *New York Times*, Oct. 14, 2002).

- In the 2003 election for statewide offices in Kentucky, Jefferson County Republicans placed challengers in fifty-nine (59) voting precincts in predominately African-American neighborhoods to question voters' registrations and residence. The Kentucky Republican Party also announced that it had assembled a "ballot security task force" comprised of more than one hundred (100) attorneys on hand to respond to their precinct workers' allegations of voter fraud. The county GOP chairman denied that the racial makeup of the precincts was a factor in their selection, and claimed that the precincts were either chosen randomly or because the GOP had trouble locating registered voters to serve as election workers. See Genova Cert. at Exs. 13, 14 (S. Shafer, "GOP to put challengers; critics call strategy intimidation,"

*Louisville Courier-Journal*, Oct. 23, 2003 at 1A; N. Rodriguez, "Poll workers learn about vote challenge," *Louisville Courier-Journal*, Oct. 26, 2003 at 1B).

- In the 2003 Philadelphia Mayor's race, in which a white Republican candidate faced an African-American Democratic candidate for an open seat, a plot was uncovered to send roving bands of Republican challengers to challenge and intimidate African-American voters. The Republican workers used a fleet of three hundred (300) sedans with magnetic signs designed to look like a law enforcement insignia, and planned to carry clipboards displaying the insignia of various federal law enforcement agencies. <u>See</u> Genova Cert. at Ex. 15 (G. Franke-Ruta and H. Meyerson, "The GOP Deploys," THE AMERICAN PROSPECT, Feb. 1, 2004).

- In the Maryland 2006 general election – with hotly contested races for U.S. Senate and Governor - the Election Day manual for Maryland Republican Party poll workers at the polls stated that, "Your most important duty as a Poll Watcher is to challenge people who present themselves to vote but who are not authorized to vote." <u>See</u> Genova Cert. at Ex. 16 (2006 MARYLAND REPUBLICAN POLLWATCHER GUIDE at 8). "[I]f you doubt that the voter is the person who is registered to vote, you should challenge that person's right to vote on the basis of identity . . . Of course, your reason will be that the challenged voter either incorrectly stated his or her name or his or her address or his or her month and day of birth." <u>Id.</u> at 9. GOP pollwatchers were told to intimidate the official election judges if necessary: "If the election judges should try to ignore your challenge, point out that they would be committing a criminal offense punishable by not less than 30 days in jail." <u>Id.</u> at 9-10.

- In 2008, Republicans publicly pledged to deploy law enforcement personnel in Wisconsin. Wisconsin Attorney General J. B. Van Hollen, co-chair of John McCain's Wisconsin campaign, announced that he would dispatch fifty (50) criminal prosecutors and special agents from the Division of Criminal Investigation to State polling places. <u>See</u> Genova Cert. at Exs. 17, 18 ("Van Hollen Wants Prosecutors to Monitor State Polls", CAPITAL TIMES, Oct. 29, 2008; Press Release, Wis. Dep't of Justice, "Van Hollen Announces Department of Justice Election Day Activities to Ensure Right to Vote and Compliance with State Election Laws," Oct. 28, 2008 (available at http://www.doj.state.wi.us/news/2008/nr102808_06.asp)(last retrieved on January 19, 2009). Attorney General Van Hollen's former staff, then in staff positions at the Republican Party of Wisconsin, also recruited additional individuals to intimidate voters, reminiscent of the original Ballot Security Task Force. They were, reportedly, particularly focusing on off-duty law enforcement personnel to be present at inner-city polling places. On October 8, 2008, Jonathan Waclawski, Election Day Operations Director for the Republican Party of Wisconsin, sent an email seeking "people who would potentially be willing to volunteer . . . **at inner city (more intimidating)** polling places. Particularly, I am interested in names of Milwaukee area veterans, policemen, security personnel, firefighters, etc." <u>See</u> Genova Cert. at Ex. 19 (Mary Pat Flaherty, "A Wis. Call for GOP Poll Watchers Draws National Notice," *Washington Post* (The Trail), Oct. 14, 2008) (emphasis added).

- In Montana, in the 2008 presidential general election, the State's "Special Projects" Director notarized facially frivolous challenges filed by the Executive

Director and Legislative Director of the Montana Republican Party; in all, more than six thousand (6,000) voters were challenged.  The challenges were premised on a flawed attempt to match information from voter registration rolls to other databases. The challenges were filed despite obvious errors on the face of the supporting affidavits, much less any legal basis to conclude that any of the voters impacted were in fact ineligible.  A Montana federal court deemed the challenges a "partisan ploy" and "political chicanery."  See Genova Cert. at Ex. 20 (Montana Democratic Party v. Eaton, 2008 U.S. Dist. LEXIS 105849 (D. Mont., Oct. 8, 2008)).

- Also in the 2008 presidential general election, in Macomb County, Michigan, the chair of the Republican Party announced a scheme to challenge voters based on foreclosure lists.  Public pressure and litigation forced the Party to recant and renounce that particular plan, but the same official acknowledged that the party intended to engage in voter "caging," of the sort presently enjoined by operation of the Consent Decree.  See Genova Cert. at Exs. 21, 22 (Eartha Jane Melzer, "Lose Your House, Lose Your Vote," MICH. MESSENGER, Sept. 10, 2008; Eartha Jane Melzer, "Republicans Recant Plans to Foreclose Voters but Admit Other Strategies," MICH. MESSENGER, Sept. 11, 2008).

These factual scenarios are demonstrative of a pattern of activity that has continued since the entry of the Decree.  Thus, the factual circumstances have not changed in any way warranting modification or vacatur of the Consent Decree.  To the contrary, the record of Republican Party conduct over the past twenty-one (21) years reinforces the continued need for the Decree.

**B.    There Has Been No Change In the Law Making Legal the Conduct Forbidden by the Consent Decree**

"[M]odification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." Rufo, 502 U.S. at 388. The "relevant factor" is "whether the conduct previously enjoined has become legal due to a change in the law." Building & Constr. Trades Council, 64 F.3d at 888.  In this case, none of the changes in law cited by the RNC has in any way legalized the conduct prohibited by the Consent Decree.

**1.    The RNC Has Made No Showing That It Should Be Allowed to Engage In the Prohibited Conduct Because of Increased "Opportunities for Voter Fraud"**

No voting-related law enacted since the entry of the Decree legalizes or permits the systematic disenfranchisement of lawfully registered voters in targeted minority areas.  The RNC contends that enactment of the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg, et seq., has "increased the potential for voter fraud to an extent that did not exist . . . when the RNC agreed to the Decree."  RNC Mem. at 11.  The RNC suggests that the Bipartisan Campaign Reform Act of 2002, also "resulted in an increased likelihood of voter fraud" by allegedly leading the DNC to "outsource" voter registration and mobilization activities to "independent groups" operations with "less accountability and transparency," leading to "significant voting irregularities" Id. at 12-13.  The Help America Vote Act of 2002, 42 U.S.C. §§ 15301, et seq., according to the RNC, has "caused confusion over provisional ballots" and the advent of provisional voting "raises serious concerns about voter fraud."  Id. at 13.  Finally, the RNC claims, the expansion of alternative voting procedures including early voting, voting by mail and absentee balloting "has also increased opportunities for voter fraud."  Id. at 14.

The RNC of course cannot, and does not, claim that any of these new laws has actually made legal the conduct enjoined by the Consent Decree. Such conduct remains as unlawful today as it was in 1982, and the RNC does not suggest otherwise.

Rather, the RNC is complaining that the Consent Decree "prevents the RNC from any involvement in detecting and reporting these new avenues of voter fraud." RNC Mem. at 14. In other words, the RNC is incredulously asking the Court to vacate the Consent Decree in order to allow the RNC to freely engage in the kind of "ballot security" activity forbidden by the Consent Decree, on the theory that such activity has become necessary because of the "avenues for voter fraud" supposedly opened up through enactments by Congress and the State legislatures over the past twenty (20) years.

The RNC's request is illogical and unsupportable. Despite its repeated references to "new avenues of voter fraud," the RNC fails to cite a **single** instance of actual voter fraud that has actually occurred as a result of these laws. Indeed, the RNC's claim that it needs to be able to engage in activity prohibited by the Consent Decree activity in order to combat "voter fraud" is belied by the record of the RNC and the Republican Party, in recent years, of making repeated **false** charges of "voter fraud," — charges which themselves have been used as part of the ongoing effort to disenfranchise legitimate voters. Illustrative examples of Republican claims of "voter fraud" that turned out to be mythical include the following:

- Republicans contested the 1996 general election in the 46th Congressional District in California, which included a substantial Latino population, and in which Loretta Sanchez defeated then nine-term Republican incumbent Robert K. Dornan by less than one thousand (1,000) votes. Dornan charged that Democrats and a non-profit group had registered numerous illegal aliens to vote and that his was "the first case in

history where a congressional election was decided by non-citizens."  See Genova Cert. at Ex. 23 (L. Minnite, AN ANALYSIS OF VOTER FRAUD IN THE U.S. at 13 (Demos 2003)).  In a formal U.S. House contest, a Republican-majority task force of the Congressional House Committee on Oversight conducted a year-long investigation that found so little actual voter registration fraud that the Republican-controlled House of Representatives refused to overturn the election and thus, voted 378-33 to dismiss the contest and seat Sanchez.  Id. (Minnite, ANALYSIS OF VOTER FRAUD at 14).

- In August 2004, Republicans sued in State court in New Mexico alleging that non-profit progressive groups had registered the same persons multiple times, had registered persons with erroneous or missing information and had registered ineligible persons, and that Bernalillo County (Albuquerque) had accepted "fraudulent" registrations with invalid or inaccurate addresses because a number of voter ID cards were returned as undeliverable.  The suit demanded that the State require that any registrant who did not submit a voter registration form in person be required to show identification at the polls.  See Genova Cert. at Ex. 24 (Docket Sheet, Larranaga v. Herrera, No. CV 2004 05391 (2nd Dist. Ct. Bernallilo County NM, filed Aug. 20, 2004); "State GOP files lawsuit over voter registration," *Albuquerque Tribune* (Aug. 20, 2004); Tim McGivern, "Request Denied – State District Judge rules against call for stricter voter I.D. enforcement").  During a trial in the case, in which the supposedly fraudulent registrants were brought in as witnesses by the non-profit groups, **not a single one** of the registrations challenged by the Republicans in the lawsuit turned out to be fraudulent in any way.  On September 8, 2004, the court

denied the requested relief.  <u>See</u> Genova Cert. at Ex. 25 (*Municipal Litigation Reporter* (Oct. 2004)).

- In August 2004, the RNC mailed forty-nine thousand (49,000) letters to newly registered voters in Cuyahoga County, Ohio; 3,353 letters were returned undelivered. <u>See</u> Genova Cert. at Ex. 26 (Declaration of Maria Cino (hereinafter "Cino Dec.") at ¶4); <u>see</u> <u>also</u> <u>id.</u> at Ex. 38 (Deposition of Maria Cino, Oct. 29, 2004) (also filed with Memorandum in Support of Intervenor's Motion for a Preliminary Injunction ("2004 Intervenor's Mem."), <u>DNC v. RNC</u>, No. 81-3876 (DRD) (Oct. 31, 2004) [Docket Entry No. 23]).  In September, the Ohio State Republican Party then mailed the same letters to newly registered voters in Cuyahoga, Franklin, Summit, Hamilton and Montgomery Counties -- all counties with key urban areas and significant concentrations of low-income minority voters.  Cino Dec. at ¶ 5.  From that second mailing, 15,238 letters were returned as undeliverable.  <u>Id.</u>  In early October, the State Republican Party obtained lists of mail sent by county boards of elections and returned undeliverable and, on that basis, had its lawyers file challenges to 35,000 newly registered voters, again, virtually all in urban areas with high concentrations of minority voters.  Cino Dec. at ¶¶ 6, 10; <u>see</u> <u>also</u> Genova Cert. at Ex. 27 (J. Becker, "Ohio GOP challenges 35,000 voters," *Washington Post*, Oct. 23, 2008 at A9).  These pre-election challenges required county boards of elections to hold hearings, one by one, on each challenge.  In late October, RNC National Chairman Ed Gillespie and Ohio Republican Party Chair Bob Bennett announced that they had uncovered widespread voter registration fraud: "The reports of voter fraud in Ohio are some of

the most alarming in the nation," Gillespie said.  <u>See</u> Genova Cert. at Ex. 28 (Cox News Service, Oct. 20, 2004).

This program was the subject of an action for relief under the Consent Decree brought by intervenors Ebony Malone and Irving Agosto.  <u>See</u> Genova Cert. at Ex. 29 (<u>DNC v. RNC</u>, Civil Action No. 81-3876 (DRD) (D.N.J., Oct. 27, 2004)) [Docket Entry No. 1] (hereinafter the "<u>Malone</u> action").  While this Court's decision finding a violation of the Decree and enjoining the RNC from using the challenge list was stayed by the Court of Appeals, what remains significant is that **not a single verified instance of registration fraud was established.** <u>See</u> Genova Cert. at Ex. 30 (<u>DNC v. RNC</u>, No. 04-4186, 2004 U.S. App. LEXIS 22689 (3d Cir., Nov 2, 2004), motion to vacate stay denied, 543 U.S. 1304 (2004) (Souter, J.)).

In Summit County (Akron, Ohio), Republican challengers admitted they had no real basis for challenging registrations. Members of the Summit County Board of Elections tossed out the challenges and said they were "appalled," described the challenges as an "absolute travesty," and considered them an "attack on the fundamental right of people's right to vote." <u>See</u> Genova Cert. at Ex. 31 (Summit County Hearing Transcript at 31).  Many of the challenged voters in Franklin and Montgomery Counties turned out to be U.S. troops overseas, whose mail could not be forwarded.  <u>See</u> Genova Cert. at Ex. 32 (P. Farhi & J. Becker, "Some fear Ohio will be Florida of 2004," *Washington Post*, Oct. 26, 2004 at A1).  Even the RNC/Ohio GOP's own efforts turned up nothing in the way of registration fraud.  Of the 3,353 letters returned undelivered from the Cuyahoga County mailing, 950 names were identified by the GOP, but they concluded that a grand total of ten (10) were "highly

suspicious."  See Genova Cert. at Ex. 26 (Transcript of Deposition of Maria Cino, Oct. 29, 2004 at 88, 94). No fraud was actually ever established as to any of them.  Id.

- A nonprofit group, ACORN, was accused by a former worker, Mac Stuart, of engaging in voter registration fraud in Florida in 2004, including charges of paying canvassers for each completed registration, collecting registrations from ineligible voters and withholding registration cards from persons who registered Republican. Republicans publicized the charges widely, and the Florida Department of Law Enforcement announced an investigation.  See Genova Cert. at Ex. 37 (Minnite, THE POLITICS OF VOTER FRAUD at 23 (Project Vote 2006) (hereinafter "THE POLITICS OF VOTER FRAUD").  Stuart filed suit against ACORN, and his lawyers filed a second suit on behalf of individuals whose registrations had allegedly been withheld.  In the first suit, ACORN counterclaimed for defamation.  In that suit, Stuart's charges were dismissed when Stuart finally admitted he had no case; he was sanctioned and ordered to pay ACORN's costs, and ACORN won its defamation counterclaim.  See Genova Cert. at Ex. 33 (Final Order of Dismissal and Docket Sheet, Stuart v ACORN, No. 04-22764-CIV (S.D. Fla. Dec. 5, 2005)).   The State criminal investigation found **no** evidence of illegal or fraudulent registration activity.  POLITICS OF VOTER FRAUD at 23-24.

There is simply no basis, therefore, for the RNC's claim that the Motor Voter Law, HAVA, BCRA[1] or State laws expanding early voting and vote by mail have increased the

---

[1] Specifically with respect to the Bipartisan Campaign Reform Act, the RNC's notion that the Democratic Party has "outsourced" voter registration and mobilization to third party groups is belied by what actually happened in the 2008 presidential election.  The Obama for America campaign itself, working with the national and State Democratic Party committees, was

"avenues for voter fraud" since 1987 in a way that justifies allowing the RNC to engage in or support the conduct forbidden by the Consent Decree — conduct that was and remains unlawful. Additionally, conduct that is lawful under the Consent Decree — specifically normal poll watch functions, 1987 Order § C — remains lawful.  For example, it is simply not true, as the RNC contends, that the Consent Decree bars the RNC from "exercising its rights to challenge improper provisional balloting under HAVA."   RNC Mem. at 13.  The specific procedures for determining whether to count provisional ballots, including opportunities for candidate or party representatives to challenge them, are left to the laws and regulations of the individual states.  42 U.S.C. § 15485.  It is indisputable that a challenge to a particular provisional ballot under the procedures established by State law would be a "normal poll watch" function and permitted by the Consent Decree.

Thus, contrary to the RNC's contention, legal circumstances have not changed, since 1987, in any way that would make lawful any of the conduct that is prohibited by the Consent Decree.  Accordingly, the RNC's motion to vacate or modify the consent decree must denied, because they have failed to clearly establish any changes or modifications in the law, which legalizes the conduct the Decree was designed to prevent.

---

responsible for far more of the new voter registrations than any independent group.  The resources expended by the campaign and the Democratic Party dwarfed those expended by any such groups.  See generally Genova Cert. at Ex. 34 (A. MacGillis, "Obama Camp Relying Heavily on Ground Effort," *Washington Post*, Oct. 12, 2008 at A4)

>    **2.    There Is No New First Amendment Jurisprudence Protecting RNC Communications With State Parties That Would Violate the Consent Decree**

The RNC complains that this court, in a proceeding brought by a third party to enforce the Consent Decree, applied the Decree in a way that infringes the RNC's First Amendment right to have discussions with Republican State party committees about legal ways to combat "voter fraud." RNC Mem. at 15-16. Specifically, the RNC protests that, in the Malone action, this Court ruled that specific discussions between RNC and Ohio Republican Party officials about the systematic use of a list of returned mailers to challenge voters violated the Consent Decree "in that advanced Court approval was not obtained." See Genova Cert. at Ex. 35 (Minute Entry, DNC v. RNC, Civil Action No. 81-3876 (DRD), Motion Hearing before the Hon. Dickinson R. Debevoise, U.S.S.D.J., Nov. 1, 2004) [Docket Entry No. 24]. Nothing about this ruling, however, shows that any change in the law — specifically, First Amendment jurisprudence — warrants modification or vacatur of the Consent Decree.

First, it is simply untrue, as the RNC contends, that "this Court has interpreted the Decree to bar the RNC from engaging in perfectly legal discussions about voter fraud and fraud prevention with state Republican parties." RNC Mem. at 15. The terms of the 1987 Order are clear: the RNC is barred only from assisting or participating in a "ballot security program" — meaning efforts to "prevent or remedy vote fraud" that go beyond "normal poll watch functions" — unless the program is submitted in advance for review by this court. Nothing in the 1987 Order precludes the RNC from discussing, with its State parties or anyone else, any lawful effort to prevent voter fraud. The issue is not the legality of such **discussions**; it is the legality of the **program** being discussed. The suggestion that judicial review of a proposed **program** is "prior restraint" of speech is meritless. Indeed, the RNC is free to carry out or support any such

23

program that is a "normal poll watch function," i.e., does not involve systematic efforts to disenfranchise voters, use of private investigators or the like. Indeed, despite its complaints, the RNC has been and continues to be free to carry out or support a program that even goes beyond a "normal poll watch function" upon prior review by this court and a determination that such a program does not violate the Consent Decree.

Second, requiring the RNC to notify State parties of the terms of the Decree when the RNC becomes aware of a State party's intent to engage in a program covered by the Decree is certainly not "forced speech." The State parties are not subject to or bound by the Consent Decree. It is well-established, however, that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors." Hoxworth v. Blinder Robinson & Co., 903 F.2d 186, 211 (3d Cir. 1990)(quoting Regal Knitwear Co. v. Nat'l Labor Relations Bd., 324 U.S. 9, 14 (1945)). The 1990 Order simply requires that when the RNC communicates with its State parties about "ballot security" efforts, it must inform them about the terms of the Decree — a perfectly reasonable requirement to ensure that the RNC does not use State parties to nullify the effect of the Decree by using the State parties to carry out prohibited acts. For this same reason, the RNC is not caught in any sort of dilemma about communicating with its State parties. Contrary to the RNC's suggestion, it is free to have legal counsel monitor its discussions with State parties concerning activities to promote **compliance** with the Decree, without risking being held complicit in activities that **violate** the Decree. Cf. RNC Mem. at 16.

Finally, there is no new or, for that matter, existing First Amendment jurisprudence that warrants any modification of the Consent Decree. The "right to freedom of association among party committees through speech" cited by the RNC (RNC Mem. at 16), was well-established prior to the RNC's decision to voluntarily enter into the Consent Decree. See Democratic Party

of the United States v. Wisconsin ex rel. LaFollette, 450 U.S. 107, 122-126 (1981); Cousins v. Wigoda, 419 U.S. 477, 489-90 (1975).  In fact, nothing in the Consent Decree, infringes, in any manner, the RNC's right to associate with its State parties to discuss, plan and implement political strategy, including poll watching, poll monitoring and challenging of individual voters on legitimate grounds, in accordance with procedures established by State law.

Indeed, there is no kind of communication forbidden by the Decree.  The only thing proscribed is the RNC's use of its State parties to evade the Decree's specific prohibition on systematic efforts to disenfranchise or intimidate legitimately registered voters, targeted at minority communities.  It goes without saying that such conduct is not, in itself, entitled to any First Amendment protection.  For these reasons, the RNC has utterly failed to show any change in the law -- statutory or decisional -- that makes legal what the Consent Decree forbids.

**3.    The Decree Has Not Been Applied In a Way Contrary to the RNC's Reasonable Expectations**

The RNC asks for relief on the further ground that the "Court has interpreted the Consent decree to have a far more substantial impact on the RNC's activities than the RNC reasonably understood when it agreed to the Decree."  RNC Mem. at 22.  Modification is warranted, however, only "when a decree becomes unworkable because of unforeseen obstacles."  Building & Constr. Trades Council of Phila., 64 F.3d at 886.  That a court may interpret a consent decree in a manner with which one party disagrees is hardly an "unforeseen obstacle" to its implementation.

In any event, this Court has not interpreted the Decree in a manner which by any logical measure can be said to be contrary to the RNC's reasonable expectations when it entered the Decree in 1982 and agreed to the modification in 1987.  First, for reasons discussed above, it is not true, as the RNC suggests, that this court has extended the Decree to "restrict the RNC's

communications with state Republican parties" about anything.  See Point I, B, 3, supra; cf. RNC Mem. at 22.

Second, to the extent the RNC is complaining that the court has permitted non-parties, such as Malone, to intervene and seek enforcement of the Decree (id. at 23), the DNC has no objection to modifying the Decree to exclude future enforcement by third-party intervenors.

Third, this Court's use, in its 2004 Order in the Malone action, of a "disparate impact" test, as opposed to requiring a finding of specific discriminatory intent, is entirely consistent with the terms of the original 1982 Decree.  The 1982 Decree forbids the RNC from undertaking ballot security activities in precincts and districts "where the racial or ethnic composition of such districts is a **factor in** the decision to conduct, **or the actual conduct of,** such activities there . . . And the conduct of such activities disproportionately in . . . districts that have substantial proportion of racial or ethnic populations shall be considered relevant evidence of the existence of such a factor and purpose."  See Genova Cert. at Ex. 3 (1982 Decree, § 2(e) (emphasis added)).  The RNC thus cannot possibly claim that it did not "acquiesce in or anticipate" application of a "disparate impact" test in interpreting the Consent Decree.

For these simple, but dispositive reasons, the RNC has failed to show any "unforeseen obstacles" to carrying out the Consent Decree consistent with its original intent and purpose, and, therefore, its motion must be denied.

### 4.  Continuation of the Decree Is Consistent With the Public Interest

Invoking FED. R. CIV. P. 60(b)(6), the RNC contends that "substantial reasons of public policy militate against continued enforcement of the Consent Decree." RNC Mem. at 24. To establish the existence of this factor, the RNC must show that "enforcement of the unmodified decree would be detrimental to the public interest." Building & Constr. Trades Council of Phila., 64 F.3d at 888. Under Rule 60(b)(6), the burden is a heavy one: "[T]his court has consistently held that the Rule 60(b)(6) ground for relief from judgment provides for extraordinary relief and may only be invoked upon a showing of exceptional circumstances." Coltec Indus., Inc., v. Hobgood, 280 F.3d 262, 273 (3rd Cir. 2002)(quoting In re Fine Paper Antitrust Litig., 840 F.2d 188 (3d Cir. 1988)). In particular, there is "a high hurdle for Rule 60(b) relief from consensual orders." Coltec Indus. at 274.

Here, RNC argues that modification or vacatur is made necessary by the public interest "in protecting the integrity of the electoral process and preventing voter fraud." RNC Mem. at 24. As discussed above, however, the notion that the RNC needs to engage in the conduct prohibited by the Decree in order to prevent "voter fraud" is preposterous. The RNC has failed to cite a single instance of actual voter fraud, let alone an instance that would have been effectively prevented by any of the conduct proscribed by the Consent Decree. Indeed, the continued pattern of attempted systematic disenfranchisement by the RNC and its State and local party committees — reviewed in Point I, A, supra — makes clear that, if anything, the public interest strongly militates in favor of continuing the Consent Decree in full force and effect. With regard to the public interest factor, then, the RNC has utterly failed to meet its heavy burden under Rule 60(b)(6) and the Rufo standard.

In summary, the RNC has failed to show any change in the factual circumstances, any change in legal circumstances, any unforeseen obstacles or any public interest considerations that would warrant modification or vacatur of the Consent Decree.  Rufo, 502 U.S. at 389.  For these simple, but dispositive reasons, the instant motion must be denied in its entirety.

**POINT II**

**THE MOTION SHOULD BE DENIED BECAUSE RNC HAS
FAILED TO ESTABLISH THAT THE CONSENT DECREE
WAS NOT VALIDLY ENTERED INTO BY THE PARTIES**

The consent decree was not void ab initio, because the court had proper jurisdiction over Plaintiff's claims when the case was settled in 1982.  The RNC incredulously argues that the Consent Decree was void ab initio because (1) it encompassed RNC's private conduct beyond that undertaken "under color of state law" for purposes of the U.S. Constitution and the Civil Rights Act, 42 U.S.C. § 1983; and (2) the DNC failed to show any basis for prospective relief when the original case was filed in 1981.  RNC Mem. at 17-22.  However, the RNC has not, and cannot establish that this court lacked subject matter jurisdiction over the DNC's claims when the case was settled in 1982.  What the RNC is really arguing is that the Consent Decree afforded relief broader than that to which the DNC would have been entitled, under the applicable law, if the case had been fully litigated.

As the RNC concedes, the Amended Complaint filed in this action in 1982 ("Amended Complaint") claimed that Defendants' actions "were undertaken under color of state law," and included specific factual allegations supporting that claim.  RNC Mem. at 18-19 (quoting Amended Complaint at ¶30,  Counts 1 and 4).  There is no question and no dispute, then, that this Court had subject matter jurisdiction over at least some of the claims in the Amended Complaint.  The RNC argues, however, that the "injunctive relief entered by this Court in 1982,

28

and expanded in 1997, goes far beyond actions undertaken 'under color of state law.'" RNC Mem. at 18. In other words, the RNC contends that the **relief** to which it agreed in the Consent Decree goes beyond what the DNC would have been entitled to under the applicable law, had the case been litigated.

It is well-established, however, that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." Local Number 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland, 478 U.S. 501, 525 (1986). "[W]e have no doubt that, to save themselves the time, expense and inevitably risk of litigation, . . . [the parties] could settle the dispute over the proper remedy for constitutional violations that had been found by undertaking **to do more than the Constitution itself requires** (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but **also more than what a court would have ordered** absent the settlement." Rufo, 502 U.S. at 389 (emphasis added)(quoting United States v. Armour & Co., 402 U.S. 673, 681 (1971)). Therefore, "a court may enforce agreements in consent judgments that are not constitutionally mandated." Cooper v. Noble, 33 F.3d 540, 545 (5th Cir. 1994); see also Harris v. City of Philadelphia, 137 F.3d 209, 212 (3d Cir. 1998) ("By consenting to a decree, a defendant waives the right . . . to litigate the issues raised by the plaintiff's complaint").

Thus, for example, in Local Number 93, the United States Supreme Court held that a consent decree was valid even though the trial court may have lacked authority under Title VII of the Civil Rights Act to award the specific relief granted. The Court held that a consent decree "must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction," that the "consent decree must [come] within the general scope of the case made by the

pleadings," and that the decree cannot "conflict[] with or violate[] the statute upon which the complaint was based." Local Number 93, 478 U.S. at 525-26 (internal citation omitted). The Court ruled, however, that "to the extent that the consent decree is not otherwise shown to be unlawful, the court is not barred from entering a consent decree merely because it might lack authority under [the governing statute] to do so after a trial." Id. at 526. Similarly, in Rufo, the Court held that, even though a particular practice to which the State government had agreed in a case about prison conditions was not constitutionally mandated, a consent decree including that condition was valid since the parties could settle their dispute by agreeing to "more than what a court would have ordered absent the settlement." Rufo, 502 U.S. at 389.

In Sierra Club v. Browner, 1994 U.S. Dist. LEXIS 16400 (D.D.C., Sept. 20, 1994), an environmental group and the Environmental Protection Agency ("EPA") had entered into a consent decree in which the EPA had agreed to include a certain category of emissions in a rule that, under the Clean Air Act, the District Court would have lacked jurisdiction to require the EPA to include. See Genova Cert. at Ex. 36 (Sierra Club, 1994 U.S. Dist. LEXIS 16400 (D.D.C., Sept. 20, 1994). A company subject to the rule argued that that portion of the consent decree was therefore void for lack of subject matter jurisdiction. The court disagreed, noting the holding in Rufo that "almost any affirmative decree beyond a directive to obey the [law] **necessarily** encompasses broader relief than the given law may require when the parties to public interest litigation negotiate a settlement to be enforced by an order of the court." Sierra Club, supra at *4 (brackets and emphasis in original) (quoting Rufo, 502 U.S. at 389). The court found that the "consent decree clearly springs from and resolves a matter within the subject matter jurisdiction of this court," and "the mere fact that EPA voluntarily agreed to relief that

may have been beyond this Court's power to order after trial does not deprive this Court of subject matter jurisdiction over a consent decree involving such relief."  Id. at *7, 10.

In this case, too, it is clear that the dispute between the DNC and RNC brought before this Court in 1982 did "spring from and serve to resolve a dispute within the court's subject matter jurisdiction," Local 93, 478 U.S. at 526, namely a properly pled cause of action under section 1983; that the Decree came "within the general scope of the case made by the pleadings," id.; and that the Decree did not and does not violate any federal law.  But, these circumstances – where the RNC **voluntarily agreed to relief** beyond what this Court could have ordered - do not mean the Court lacked subject matter jurisdiction or that the Decree was invalid.  Accord Local Number 93, supra; Sierra Club, supra.

In both 1982 and 1987, the RNC chose not to litigate against the DNC's claims or defend their illegal activity, but, rather, to negotiate and enter into the Consent Decree.  Even if the RNC's "decision to settle was improvident in hindsight, the decision has been made and cannot be revisited."  Coltec Indust., Inc., 280 F.3d at 275.  Simply, the RNC's motion to vacate must denied because the Consent Decree was validly entered into by the parties, and the parties voluntarily agreed to the relief contained therein.

## <u>CONCLUSION</u>

The RNC has failed to establish any basis in law or fact for modifying or vacating the Consent Decree. Accordingly, for the foregoing reasons, Plaintiff respectfully requests that this court deny Defendant's Motion to Vacate or Modify the Consent Decree in its entirety.

**GENOVA, BURNS & VERNOIA**
Attorneys for Plaintiff,
Democratic National Committee


BY:    s/  Angelo J. Genova
          ANGELO J. GENOVA

          and

**SANDLER, REIFF & YOUNG**
Attorneys for Plaintiff,
Democratic National Committee

Dated:  January 19, 2009


1856\002\Motion to Vacate\Opposition Brief Final.doc