# EXHIBIT 5

7-29-87
BC



## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

DEMOCRATIC NATIONAL COMMITTEE,

           Plaintiff,

v.

REPUBLICAN NATIONAL COMMITTEE,

           Defendant.

Hon. Dickinson R. Debevoise
Civil Action No. 86-3972

SETTLEMENT STIPULATION AND
ORDER OF DISMISSAL

Whereas, on November 1, 1982, this Court entered a Consent Order in <u>Democratic National Committee, et al. v. Republican National Committee, et al.</u>, Civil Action No. 81-3876 ("Consent Order"). The Democratic National Committee ("DNC"), Republican National Committee ("RNC") and others were parties to the settlement agreement incorporated in and adopted as the Consent Order. The Consent Order remains in full force and effect;

Whereas, during the course of the case, the parties have engaged in extensive discovery from each other and third parties. More than 50 depositions have been taken and thousands of documents have been examined;

Whereas, the RNC and DNC recognize the importance of encouraging citizens to register and vote and the importance of not hindering or discouraging qualified voters from exercising their right to vote;

Whereas, the RNC and DNC recognize the importance of preventing and remedying vote fraud where it exists;

Whereas, the RNC and DNC recognize the importance of neither using, nor appearing to use, racial or ethnic criteria in

connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud;

It is therefore ordered upon the agreement and stipulation of the parties and all prior proceedings herein that as to the RNC and DNC the Consent Order is amended to specifically provide:

A. "Ballot security" efforts shall mean ballot integrity, ballot security or other efforts to prevent or remedy vote fraud.

B. To the extent permitted by law and the November 1, 1982 Consent Order, the RNC may deploy persons on election day to perform normal poll watch functions so long as such persons do not use or implement the results of any other ballot security effort, unless the other ballot security effort complies with the provisions of the Consent Order and applicable law and has been so determined by this Court.

C. Except as provided in paragraph B above, the RNC shall not engage in, and shall not assist or participate in, any ballot security program unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the Consent Order and applicable law. Applications by the RNC for determination of ballot security programs by the Court shall be made following 20 days notice to the DNC which notice shall include a description of the program to be undertaken, the purpose(s) to be served, and the reasons why the program complies with the Consent Order and applicable law.

Until further order of the Court, the Court retains jurisdiction to make the determinations set forth above.

Except as provided herein, the RNC and DNC respectfully request that the above-captioned case be dismissed with prejudice upon the order of the Court with each to pay its own costs.

IT IS SO STIPULATED:

David Boies
Rodney L. Stenlake
G. Elaine Wood
CRAVATH, SWAINE & MOORE
One Chase Manhattan Plaza
New York, New York  10005
(212) 422-3000

Douglas S. Eakeley
Robert J. Gilson
RIKER, DANZIG, SCHERER,
   HYLAND & PERRETTI
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07960
(201) 538-0800

Attorneys for Plaintiff
Democratic National Committee

William H. Schweitzer
Lee T. Ellis, Jr.
BAKER & HOSTETLER
Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 861-1500

Thomas F. Campion
James M. Altieri
SHANLEY & FISHER
131 Madison Avenue
Morristown, New Jersey  07960
(201) 285-1000

Attorneys for Defendant
Republican National Committee

AND IT IS SO ORDERED this ___27___ day of July, 1987.

s/ Debevoise
Dickinson R. Debevoise, U.S.D.J.

# EXHIBIT 6

(64)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Robert A. Bauer, Esq.
Barry J. Reingold, Esq.
Judith L. Corley, Esq.
Hilary Harp, Esq.
PERKINS COIE
1110 Vermont Avenue, N.W.
Washington, DC 20005
(202)887-9030

Angelo J. Genova, Esq.
GENOVA, BURNS & SCHOTT
Eisenhower Plaza II
354 Eisenhower Parkway
Livingston, NJ 07039
(201)533-0777



**ENTERED**

**FILED**

Attorneys for Plaintiff Democratic National Committee

NOV 5

At 8:30 _____ M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) |
| Plaintiff, | ) Civ. Action No. 86-3972 |
| | ) Hon. Dickinson R. Debevoise |
| v. | ) |
| REPUBLICAN NATIONAL COMMITTEE, | ) |
| Defendant. | ) ORDER |
| | ) |

No. 1125

ORDER

Based on the factual findings of the Court as stated in open court this 5th day of November, 1990, it hereby is ORDERED that:

1. The Democratic National Committee, following expedited discovery ordered by this Court, has failed to establish that the Republican National Committee conducted, participated in, or assisted ballot security activities in North Carolina as alleged in the Democratic National Committee's motion to reopen. The Democratic National Committee may make further application for additional discovery in a reopened proceeding, concerned with ballot security activity in North Carolina, based on events occurring prior to the close of the 1990 elections.

2. The Republican National Committee, by failing to include in ballot security instructional and informational materials guidance to state parties on unlawful practices under the consent decree or copies of such decree for their review, has violated said decree and shall in all such materials include such guidance or copy of the decree. The materials submitted to this Court for review are otherwise found to be directed toward lawful ballot integrity programs and preparation.

3. Subject to the right to make additional application pursuant to paragraph 1, this matter is closed.

2.

SO ORDERED this 5th day of November, 1990.

D.R. Debevoise, U.S.D.J.

# EXHIBIT 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT FOR DECLARATORY |
| | ) | AND INJUNCTIVE RELIEF |
| NORTH CAROLINA REPUBLICAN PARTY; | ) | |
| HELMS FOR SENATE COMMITTEE; | ) | |
| JEFFERSON MARKETING, INC.; | ) | |
| COMPUTER OPERATIONS AND MAILING | ) | |
| PROFESSIONALS, INC.; | ) | |
| DISCOUNT PAPER BROKERS, INC.; | ) | |
| CAMPAIGN MANAGEMENT, INC.; | ) | |
| EDWARD LOCKE; DOUGLAS DAVIDSON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America alleges that:

1.   This action is brought by the Attorney General on behalf of the United States, pursuant to Sections 11(b) and 12(d) of the Voting Rights Act of 1965, 42 U.S.C. 1973i(b) and 1973j(d), and Section 131(c) of the Civil Rights Act of 1957, 42 U.S.C. 1971(b).

2.   This Court has jurisdiction pursuant to 42 U.S.C. 1973j(f) and 28 U.S.C. 1345.

3.   Defendant North Carolina Republican Party is a political party organized, operating and functioning as an official political party in the State of North Carolina.  The North

Carolina Republican Party's headquarters are located in Raleigh, North Carolina.

4.   Defendant Helms for Senate Committee was the authorized principal campaign committee of Senator Jesse A. Helms for his 1990 campaign for United States Senate from North Carolina.   The Helms for Senate Committee's headquarters are located in Raleigh, North Carolina.

5.   Defendant Computer Operations and Mailing Professionals, Inc., is a business corporation with its principal place of business in Raleigh, North Carolina formed in 1985 under and by virtue of the laws of the State of North Carolina.

6.   Defendant Campaign Management, Inc., is a business corporation with its principal place of business in Raleigh, North Carolina formed in 1985 under and by virtue of the laws of the State of North Carolina.

7.   Defendant Discount Paper Brokers, Inc., is a business corporation with its principal place of business in Raleigh, North Carolina formed in 1978 under and by virtue of the laws of the State of North Carolina.

8.   Defendant Jefferson Marketing, Inc., is a business corporation with its principal place of business in Raleigh, North Carolina formed in 1978 under and by virtue of the laws of the State of North Carolina.   Computer Operations and Mailing Professionals, Inc., Campaign Management, Inc., and Discount Paper Brokers, Inc. are wholly-owned subsidiaries of Jefferson Marketing, Inc.

9.   Defendant Edward Locke is a consultant who was retained by and served as an agent of the Defendant Helms for Senate Committee and/or the Defendant North Carolina Republican Party to coordinate a so-called ballot security program in 1990.

10.   Defendant Douglas Davidson served as an employee of Defendant Campaign Management, Inc., from 1986 to shortly after the November 6, 1990 general election.   During the 1990 campaign, he served as an agent of both the Defendant Helms for Senate Committee and the Defendant North Carolina Republican Party.   He also had supervisorial and managerial control over the personnel and resources of Campaign Management, Inc., Computer Operations and Mailing Professionals, Inc. and Discount Paper Brokers, Inc., during the 1990 campaign.

11.   In the summer of 1990, representatives of Defendant Helms for Senate Committee and Defendant North Carolina Republican Party discussed whether to conduct a so-called ballot security program, a set of activities purportedly designed to combat and deter election fraud, in conjunction with the November 6, 1990, general election and to finance the program with funds from the North Carolina Republican Party [hereinafter referred to as "1990 ballot security program"].

12.   In mid-October 1990, the North Carolina State Board of Elections released voter registration figures showing that the statewide black voter registration had increased 10.6 percent between April and October 1990, compared to a 5.3 percent

- 3 -

increase among white registered voters throughout the State during the same period.

13. In mid-October 1990, a poll conducted by the Charlotte Observer was released which showed that the Democratic candidate for United States Senate, Harvey B. Gantt, had an eight-percentage point advantage over the Republican candidate, incumbent Senator Jesse A. Helms.

14. In mid-October 1990, contemporaneous with the release of the voter registration figures referred to in paragraph 12 and the poll showing Mr. Gantt with an advantage in the United States Senate race referred to in paragraph 13, Defendant Locke was contacted by representatives of Defendant Helms for Senate Committee and Defendant North Carolina Republican Party to discuss his availability to coordinate the 1990 ballot security program.

15. On or about October 16 and 17, 1990, Defendant Locke attended a series of meetings at which the 1990 ballot security program was discussed. Among those attending such meetings were Defendant Davidson, Mr. Peter Moore, the campaign manager of the Defendant Helms for Senate Committee, Mr. Thomas Farr, an attorney who had been involved in past ballot security efforts on behalf of Senator Helms and/or the Defendant North Carolina Republican Party, and Mr. Mark Stephens, President of Defendant Jefferson Marketing, Inc.

16. During the meetings referred to in paragraph 15 above, some of the participants formulated a tentative outline for the

- 4 -

1990 ballot security program, which included a mailing targeted to voters who may have changed residences.

17.   Representatives of Defendant Helms for Senate Committee and/or Defendant North Carolina Republican Party agreed to retain Defendant Locke to coordinate the ballot security program.   The Defendant Helms for Senate Committee and/or the Defendant North Carolina Republican Party agreed that Defendant Locke would be paid a sum of $2500 plus expenses for his services.

18.   At the time the 1990 ballot security program was being formulated, defendants and defendants' agents, officers and employees expected voting in the Helms-Gantt contest to be racially polarized with most whites voting for Senator Helms and blacks overwhelmingly supporting Mr. Gantt.

19.   For purposes of Defendant Locke's work on the 1990 ballot security program, Defendant Helms for Senate Committee provided Defendant Locke with an office within the Helms for Senate Committee headquarters in Raleigh.   Defendant Helms for Senate Committee also provided Defendant Locke with the assistance of a paid employee of the Defendant Helms for Senate Committee for his work on the 1990 ballot security program.

20.   On or about October 22, 1990, Defendant Locke and Defendant Davidson met with Mr. Jack Hawke, Chairman of the Defendant North Carolina Republican Party during the 1990 election season and Ms. Effie Pernell, Executive Director of the Defendant North Carolina Republican Party, and discussed the proposed activities of the 1990 ballot security program.

- 5 -

21.   On October 26 and 29, 1990, as part of the ballot security program, at least 81,000 postcards containing the following language were mailed first-class with "address correction requested" to selected voters throughout the State of North Carolina [hereinafter "first-class mailing"]:

Voter Registration Bulletin

If you moved from your old precinct over 30 days ago, contact the County Board of Elections for instructions for voting on Election day.

When you enter the voting enclosure, you will be asked to state your name, residence and period of residence in that precinct.  <u>You must have lived in that precinct for at least the previous 30 days or you will not be allowed to vote.</u>

It is a Federal crime, punishable by up to five years in jail, to knowingly give false information about your name, residence, or period of residence to an Election Official.

Paid for by N.C. Republican Party

The return address on the postcard was that of the Defendant North Carolina Republican Party.

22.   The first-class mailing was sent to households with at least one registered Democrat in at least 86 selected precincts throughout the State of North Carolina.  The postcards were mailed to the address under which the voter(s) in the selected households were registered according to voter registration lists maintained by Defendant Jefferson Marketing, Inc., and/or its defendant subsidiaries, and utilized by Defendant North Carolina Republican Party and Defendant Helms for Senate Committee.

23.   According to the voter registration files used as a database for the first-class postcard mailing, black voters

- 6 -

constituted approximately 94 percent of the registered voters within the targeted precincts.

24. The voters targeted to receive the first-class mailing were selected, in part, based upon race.

25. On October 29, 1990, at least 44,000 postcards containing the identical text as the postcard reflected in paragraph 21 were mailed bulk rate to selected voters throughout the State of North Carolina [hereinafter "bulk-rate mailing"]. The bulk-rate mailing postcard did not contain the disclaimer "Paid for by the N.C. Republican Party." The absence of a disclaimer from the postcard for this mailing reflected a deliberate decision.

26. The bulk-rate mailing was sent exclusively to black voters throughout the State of North Carolina, regardless of political party affiliation. The targeted black voters were selected based upon data concerning the addresses of registered voters in North Carolina provided to the defendant organizations by a mass mailing business concern. The data purported to identify more than 260,000 registered voters who had current addresses different from the addresses contained in voter registration lists maintained by Defendant Jefferson Marketing, Inc., and/or its defendant subsidiaries, and utilized by Defendant North Carolina Republican Party and Defendant Helms for Senate Committee. No postcards were mailed to the over 220,000 white registered voters so identified. The postcards were mailed to the targeted black voters at the alternative address provided

- 7 -

to the defendant organizations, not to the address under which they were registered.

27.   Of the black voters who were identified as having changed residences by the data described in paragraph 26, at least 22,000 such voters were identified as having new addresses which were within the county in which they were registered to vote.

28.   The voters targeted to receive the bulk-rate mailing were selected, in part, based upon race.

29.   The text of the postcard, which is set forth in paragraph 21, falsely informed voters who were eligible to vote in the November 6, 1990 election that they were not eligible to vote in that election.   Contrary to the text of the postcard:

A.   Voters who move out of the precinct in which they are registered and into another precinct within the county in which they are registered more than 30 days prior to an election are still eligible to vote in that election; and

B.   Voters who move out of the precinct in which they are registered to any other precinct in the State of North Carolina within 30 days of an election are eligible to vote in that election.

30.   The text of the postcard, which is set forth in paragraph 21, falsely informed voters that they would be asked at the polling place to state the length of time they have lived at their residence.

31.  The false information described in paragraphs 29 and 30, was included in the text of the postcard to misinform and confuse the targeted voters and others concerning their eligibility and right to vote in the November 6, 1990 election.

32.  The statement in the postcard setting forth federal criminal penalties for election fraud was included in the text of the postcard to induce fear and apprehension in the minds of the targeted voters and others concerning their eligibility and right to vote in the November 6, 1990 election.

33.  Upon the return of undeliverable postcards to the Defendant North Carolina Republican Party, an effort was undertaken to compile lists of voters whose cards were returned with the intent of using such lists as a basis to encourage the challenge of voters on election day.  Employees of the Defendants Helms for Senate Committee, North Carolina Republican Party, Campaign Management, Inc., Computer Operations and Mailing Professionals, Inc., and Discount Paper Brokers, Inc., were all involved in the effort to compile such voter lists from the returned cards.  This effort was terminated shortly before the election and subsequent to the initiation of an investigation of the 1990 ballot security program by the United States Department of Justice.

34.  On October 31, 1990, and subsequent thereto, Mr. Hawke, in his official capacity as Chairperson of Defendant North Carolina Republican Party, advised the news media that the postcard mailing was a legitimate component of the Party's ballot

-- 9 --

security program.  Such statements were made by Mr. Hawke after he knew or should have known that the postcard contained false and/or misleading information and that the targeting criteria were, in part, based upon race.

35.  Defendant Helms for Senate Committee, no later than five days before election day, knew or should have known that the postcard contained false and/or misleading information and that the targeting criteria were, in part, based upon race.

36.  On October 31 and November 1, 1990, an effort was made by Mr. Calvin Kervin, President of Defendant Discount Paper Brokers, Inc., and others to remail a group of the first-class postcards that had been mailed to selected voters in Mecklenburg County, after it was discovered that a computer error had caused many of the postcards to such voters to be misaddressed.  This effort was undertaken contemporaneous with press accounts reporting that the postcard contained false and misleading information and that state and county election officials had issued press releases correcting the false information conveyed in the postcard.

37.  On November 15, 1990, Defendant Locke was paid in full by the Defendant North Carolina Republican Party for his services and the expenses he incurred in assisting in the coordination and implementation of the 1990 ballot security program in connection with the November 6, 1990 general election.

38.  Defendant Locke, in his capacity as an agent of the Defendant Helms For Senate Committee and/or Defendant North

-10-

Carolina Republican Party, and Defendant Davidson, in his capacity as an agent of the Defendant Helms for Senate Committee and/or Defendant North Carolina Republican Party, and as a principal and/or employee of the Defendants Campaign Management, Inc., Computer Operations and Mailing Professionals, Inc., Discount Paper Brokers, Inc., and Jefferson Marketing, Inc. (and possibly other agents, officers and/or employees of the defendant organizations), played a significant role in establishing the criteria for selecting the voters to be sent the postcards and/or in developing the text that appeared on both versions of the postcard.

    39.  Defendants North Carolina Republican Party, Helms for Senate Committee, Campaign Management, Inc., Computer Operations and Mailing Professionals, Inc., Discount Paper Brokers, Inc., Jefferson Marketing, Inc., actively participated through its officers, employees and agents in the 1990 ballot security program, including the postcard mailing described above in connection with the November 6, 1990 general election.

    40.  Black citizens of the State of North Carolina have experienced a long history of discrimination against them on account of their race in voting and other areas, such as education, housing, employment and public accommodations.

    41.  The socioeconomic status of the State of North Carolina's black citizens is markedly lower than the socioeconomic status of the state's white population.  The depressed socioeconomic status of the black population of the

State of North Carolina is related to the effects of past discrimination on account of race.  These effects of past discrimination may have the tendency to exacerbate the pernicious effect of practices designed to discourage eligible black voters from exercising their right to vote.

42.  The postcard mailing, as described above, was undertaken, at least in part, to influence the election contest for United States Senate on November 6, 1990 between Senator Jesse A. Helms and Mr. Harvey B. Gantt, and in part, to influence future election contests.

43.  A purpose of the postcard mailing, as described above, was to intimidate and/or threaten black voters in an effort to deter such voters from exercising their right to vote in the November 6, 1990 general election and future election contests in North Carolina.

44.  The postcard mailing, as described above, had the effect of intimidating and/or threatening voters concerning their right to vote in the November 6, 1990, general election and future election contests in North Carolina.

45.  The postcard mailing, as described above, had a reasonable tendency to intimidate and/or threaten black voters and others concerning their right to cast a ballot in the November 6, 1990 general election and future election contests in North Carolina.

46.  The defendants' actions, as described above, constitute intimidating and/or threatening conduct against black voters, or

an attempt to intimidate and/or threaten black voters, for purposes of interfering with the right to vote in the November 6, 1990 general election in North Carolina in violation of 42 U.S.C. 1971(b).

47. The defendants' actions, as described above, constitute intimidating and/or threatening conduct against black voters and other voters in violation of Section 11(b) of the Voting Rights Act of 1965, 42 U.S.C. 1973i(b).

48. Unless enjoined by order of this Court, defendants will continue to engage in actions prohibited by 42 U.S.C. 1971(b) and 42 U.S.C. 1973i(b).

WHEREFORE, the United States prays that this Court enter an order:

(1) Declaring that the defendants' actions as described above constituted an act of intimidation and/or a threat, or an attempt to intimidate and/or threaten, primarily black voters for purposes of interfering with their right to vote, in violation of 42 U.S.C. 1971(b);

(2) Declaring that the defendants' actions as described above constituted intimidating and/or threatening conduct to black voters or other voters, or an attempt to intimidate and/or threaten black voters concerning their right to vote, in violation of Section 11(b) of the Voting Rights Act of 1965, 42 U.S.C. 1973i(b);

(3) Enjoining the defendants, their officers, agents, employees, and all persons in active concert with them, from

-13-

undertaking activities which are designed to intimidate, threaten, or coerce voters concerning their right to vote in an election or which are designed to in any way interfere with or discourage the lawful exercise of the franchise; and

(4)   Enjoining the defendants, their officers, agents, employees, and all persons in active concert with them, from assisting in or participating in any ballot security program unless the program has been determined by this Court to comply with federal law.

Plaintiff further prays that this Court grant such
additional relief as the interests of justice may require,
together with the costs and disbursements of this action.


                         DICK THORNBURGH
                         Attorney General


                  By: /s/ John R. Dunne
                         _____
                         JOHN R. DUNNE
                         Assistant Attorney General
                         Civil Rights Division

                         /s/ Margaret Currin
                         _____
                         MARGARET P. CURRIN
                         United States Attorney

                         /s/ Gerald W. Jones
                         _____
                         GERALD W. JONES
                         Attorney, Voting Section
                         Civil Rights Division
                         Department of Justice
                         P.O. Box 66128
                         Washington, D.C.  20035-6128

                         /s/ Steven Rosenbaum
                         _____
                         STEVEN H. ROSENBAUM
                         LEE H. RUBIN
                         Attorneys, Voting Section
                         Civil Rights Division
                         Department of Justice
                         P.O. Box 66128
                         Washington, D.C.  20035-6128
                         (202) 724-6292

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.

*FILED*
*FEB. 27 1992*

UNITED STATES OF AMERICA, )
               Plaintiff )
               )
     v. )
               )
NORTH CAROLINA REPUBLICAN PARTY; )
HELMS FOR SENATE COMMITTEE; )
JEFFERSON MARKETING, INC.; COMPUTER )
OPERATIONS AND MAILING )
PROFESSIONALS, INC.; DISCOUNT PAPER )
BROKERS, INC.; CAMPAIGN MANAGEMENT, )
INC.; EDWARD LOCKE; DOUGLAS )
DAVIDSON, )
               Defendants. )

*91·161·CIV·5·F*

CONSENT DECREE

## I.   INTRODUCTION

The United States filed this action to enforce provisions of the Civil Rights Act of 1957 and the Voting Rights Act of 1965 that prohibit the intimidation of voters, 42 U.S.C. 1971(b) and 42 U.S.C. 1973i(b).  The United States alleges that the defendants, North Carolina Republican Party ("NCGOP"), Helms for Senate Committee, et al, conducted a postcard mailing in connection with the November 6, 1990 general election in North Carolina for the purpose of intimidating black voters and discouraging them from participating in the November 6, 1990 election, and that the postcard mailing had the effect of intimidating such voters. Defendants admit that an independent contractor of the Defendant NCGOP, Defendant Edward Locke, conducted a postcard mailing in connection with the November 6, 1990 general election but deny that the mailing had either the intent or effect of intimidating black voters or

EXHIBIT
526

1

discouraging them from participating in the election or otherwise violated any state of federal law.  Defendants also deny that the disputed mailing was "conducted" by any of the other defendants.

Following the notice to the defendants of the United States' decision to file this lawsuit, the parties engaged in good-faith negotiations in an effort to resolve the claims raised in the complaint without resort to costly and protracted litigation.  The decree shall not be construed as an admission by the defendants of any of the allegations in the complaint.  Nor shall the decree be construed as an admission of any wrongdoing or liability by any of the defendants.  The decree is final and binding on all parties to this action, including all principals, agents and successors in interest of defendants, as well as any person acting in concert with any of the defendants.

II.  JOINT STIPULATION OF THE PARTIES

For purposes of this action only, the parties stipulate to the following statements:

1.  "Ballot security" effort means all activities, programs or other efforts to prevent or remedy voter fraud or which otherwise are intended to inform voters of their eligibility to participate in an election and/or to inform voters of the penalties which attend voter fraud.  Ballot security programs shall not include:

(a)  Activities encouraging citizens to register or to vote to the extent that such activities do not form the

2

basis in whole or in part of an effort to challenge or cause
to be challenged registered voters; or

(b)  Poll observer activities permitted and/or
authorized by state law, to the extent that such activities
do not involve the use of any information obtained from any
other ballot security effort.

2.  In October and November, 1990, a ballot security
program was conducted in connection with the November 6,
1990 general election in North Carolina.  Approximately
125,000 postcards were mailed to selected voters throughout
the State of North Carolina through two separate mailings, a
bulk-rate mailing and a first-class mailing.

3.  The text of the postcard reads as follows:

If you moved from your old precinct over 30
days ago, contact the County Board of Elections
for instructions for voting on Election Day.

When you enter the voting enclosure, you will
be asked to state your name, residence and per-
iod of residence in that precinct.  <u>You must
have lived in that precinct for at least the
previous 30 days or you will not be allowed
to vote.</u>

It is a Federal crime, punishable by up to
five years in jail, to knowingly give false
information about your name, residence, or
period of residence to an Election Official.

4.  N.C. Gen. Stat. Section 163-72.3 states, "a
registered voter who has moved from one precinct to another
within the same county more than thirty days before a
primary or general election but who has not submitted a
change of address report. . . nevertheless may vote" under
the procedures set forth in N.C. Gen. Stat. 163-72.3.

3

5.   Under Article VI, Section 2 of the Constitution of the State of North Carolina, "[r]emoval from one precinct, ward, or other election district to another in this State shall not operate to deprive any person of the right to vote in that precinct, ward, or other election district from which that person has moved until 30 days after the removal."

6.   Pursuant to N.C. Gen. Stat. Section 163-150, "a person seeking to vote shall enter the voting enclosure at the voting place through the appropriate entrance and shall at once state his name and place of residence to one of the judges of the election."

Based upon the stipulated facts and the consent of the parties, it is hereby ORDERED, ADJUDGED and DECREED that:

1.   The defendants, their officers, agents, employees, successors in interest, and persons acting in concert with any of the defendants, are enjoined from engaging in any activity or program which is designed, in whole or in part, to intimidate, threaten, coerce, deter, or otherwise interfere with a qualified voter's lawful exercise of the franchise or which, based on objective factors, would reasonably be expected to have that effect.

This provision does not apply to activities solely designed to promote or sell a service or product unrelated to voting.

2.   The defendants, their officers, agents, employees, successors in interest, and persons acting in concert with

4

any of the defendants, are enjoined from engaging in any ballot security program directed at qualified voters in which the racial minority status of some or all of such voters is a factor in the decision to target those voters.

3.   The defendants, their officers, agent, employees, successors in interest, and any persons acting in concert with defendants, shall not engage in any ballot security program unless and until such program has been determined by this Court to comply with the provisions of this decree and applicable federal law.  Applications by any of the defendants for review of a proposed ballot security effort by this Court shall be made following twenty days notice to the Department of Justice.  Such notice shall include a complete description of the proposed ballot security program, including the basis for selecting persons to receive any communication related to ballot security, the purpose(s) to be served by the program, and the reasons the program complies with this decree and other applicable federal law.

4.   For purposes of this decree, "ballot security program" shall mean all activities, programs or other efforts to prevent or remedy voter fraud or which otherwise are intended to inform voters of their eligibility to participate in an election and/or to inform voters of the penalties which attend voter fraud.  Ballot security programs shall not include:

(a)  Activities encouraging citizens to register or to vote to the extent that such activities do not form the basis in whole or in part of an effort to challenge or cause to be challenged registered voters; or

(b)  Poll observer activities permitted and/or authorized by state law, to the extent that such activities do not involve the use of any information obtained from any other ballot security effort.

5.  The defendants shall have a continuing obligation to take all reasonable steps to advise their officers, agents, employees, successors in interest and all persons acting in concert with them of the provisions of this decree.

6.  The Court shall retain jurisdiction of this action to enforce provisions of this decree until December 1, 1996, at which time this decree and all of its provisions shall be terminated, unless the Court determines it is necessary to extend any of the requirements imposed by this decree, in which case those specific requirements shall be extended.

ENTERED the 27th day of FEBRUARY            , 1992.

s/ JAMES C. FOX
UNITED STATES DISTRICT JUDGE

6

AGREED AND CONSENTED TO:

FOR THE PLAINTIFF UNITED STATES:
JOHN R. DUNNE
Assistant Attorney General

STEVEN H. ROSENBAUM

LEE H. RUBIN
Attorneys, Voting Section
Civil Rights Division
Department of Justice
P.O. Box 66128
Washington, D.C.  20035-6128
(202) 514-6347

FOR THE DEFENDANT NORTH CAROLINA
REPUBLICAN PARTY:

JOE THOMAS KNOTT, III
McNamara, Pipkin & Knott
2626 Glenwood Ave., Suite 500
Raleigh, N.C.  27608
(919) 783-5900

MICHAEL A. CARVIN
Shaw, Pittman, Potts & Trowbridge
2300 North Street, N.W.
Washington, D.C.  20037
(202) 663-8346

FOR THE DEFENDANT HELMS
FOR SENATE COMMITTEE:

ROBERT A. VALOIS

THOMAS A. FARR
Maupin, Taylor, Ellis & Adams
Highwoods Tower One
3200 Beechleaf Court, Suite 500
Raleigh, N.C.  27619-2764
(919) 981-4000

7

FOR THE DEFENDANTS JEFFERSON
MARKETING, INC.; COMPUTER
OPERATIONS AND MAILING PRO-
FESSIONALS, INC.; DISCOUNT
PAPER BROKERS, INC.; CAMPAIGN
MANAGEMENT, INC.


JERRY ALVIS
Young, Moore, Henderson & Alvis
P.O. Box 31627
Raleigh, N.C.   27622
(919) 782-6860


FOR THE DEFENDANT DOUGLAS DAVIDSON:


PALMER SUGG
Broughton, Wilkins & Webb, P.A.
P.O. Box 2387
Raleigh, N.C.   27602
(919) 833-2752

8

FOR THE DEFENDANT EDWARD LOCKE:


KENNETH P. ANDRESEN
Caudle & Spears, P.A.
1600 Interstate Tower
121 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 377-1200

9



CLOSED

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
# CIVIL DOCKET FOR CASE #: 5:92-cv-00161-F

USA v. NC Republican Party, et al
Assigned to: Judge James C. Fox
Demand: $0
Cause: 42:1981 Civil Rights

Date Filed: 02/26/1992
Date Terminated: 02/27/1992
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**USA**                                 represented by **Margaret Person Currin**
                                        Currin Law Firm
                                        sam@currinlaw.com
                                        P.O. Box 269
                                        Raleigh , NC 27602-0269
                                        919-833-0888
                                        Fax: 833-8171
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Steven Rosenbaum**
                                        U.S. Dept. of Justice
                                        950 Pennsylvania Ave., N.W.
                                        Northwestern Bldg., 7th Floor
                                        Washington , DC 20530
                                        202-514-4713
                                        Fax: 514-1116
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**North Carolina Republican Party**     represented by **Joseph Thomas Knott , III**
                                        Knott & Berger, LLP
                                        4800 Six Forks Rd.
                                        Suite 100
                                        Raleigh , NC 27609-5245
                                        919-783-5900
                                        Fax: 783-9650
                                        Email: jtk@knott-berger.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Helms for Senate Committee**

**Defendant**

**Jefferson Marketing, Inc.**                    represented by **Jerry S. Alvis**
Womble, Carlyle, Sandridge & Rice
P.O. Box 831
Raleigh , NC 27602
919-755-2100
Fax: 755-6046
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Computer Operations and Mailing**             represented by **Jerry S. Alvis**
**Professionals, Inc.**                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Discount Paper Brokers, Inc.**                 represented by **Jerry S. Alvis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Campaign Management, Inc.**                    represented by **Jerry S. Alvis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Edward Locke**                                 represented by **Randolph Palmer Sugg**
Broughton, Wilkins, Sugg, Hall &
Thompson
psugg@bws-law.com
P. O. Box 2387
Raleigh , NC 27602
919-833-2752
Fax: 833-1059
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Douglas Davidson**

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 02/26/1992 | 1 | Complaint filed for declaratory and injunctive relief for violation of Voting Rights Act and Civil Rights Act in 1990 senatorial election; cy. to Judge Fox w/proposed consent decree. (jj) (Entered: 02/27/1992) |
| 02/27/1992 | 2 | Consent judgment - re "Ballot Security" and certain voting activities. The court shall retain jurisdiction of this action to enforce provisioins of this decree until 12/1/96 at which time this decree and all of its provisions shall be terminated, unless the court determines it is necessary to extend any of the requirements imposed by this decree, in which case those specific requirements shall be extended; signed by Fox, Judge. OB Ref: 117, pg. 33 Counsel served. (fdc) (Entered: 02/28/1992) |
| 02/27/1992 | | Case closed - non-permanent (fdc) (Entered: 02/28/1992) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/19/2009 13:37:45 | | |
| PACER Login: | gb0349 | Client Code: | 1856.002 |
| Description: | Docket Report | Search Criteria: | 5:92-cv-00161-F |
| Billable Pages: | 2 | Cost: | 0.16 |

# EXHIBIT 8

Westlaw.

10/24/08 ALBUQJNL (No Page)

NewsRoom

Page 1

10/24/08 Albuquerque J. (N.M.) (Pg. Unavail. Online)
2008 WLNR 20293315

Albuquerque Journal (NM)
Copyright 2008 Albuquerque Journal, N.M.

October 24, 2008

Group: Voters Harassed: Investigator linked to GOP allegedly checked people re-
gistered through ACORN
Dan Mckay
Albuquerque Journal, N.M.

Oct. 24--A nonpartisan group is asking federal authorities to investigate the possibility of voter intimidation in New Mexico.

In a letter to U.S. Attorney Greg Fouratt, the nonprofit group Project Vote said a private investigator with ties to the GOP visited the addresses of two people "in an effort to keep these voters silent."

The Bernalillo County clerk also received a complaint and turned the issue over to the FBI.

Guadalupe Bojorquez said she talked on the phone to the investigator, who wanted her mother to give him documents proving she's a legitimate voter. Her mom ended up in tears.

"I think what he was trying to do was scare her into not voting," Bojorquez told the Journal.

Jenais Griego described a similar encounter. She said a man with a notebook showed up at her home looking for her grandmother, Emily Garcia. He wouldn't say for whom he worked.

State GOP spokeswoman Shira Rawlinson wouldn't answer questions about the private investigator. Instead, she released a statement saying that the "Republican Party takes all claims of voter fraud and intimidation very seriously" and that it would continue providing information to law enforcement as it looks into election irregularities.

The two voters were identified last week in a Republican news conference as being suspicious. A GOP press packet said Garcia's Social Security number is being used by someone else. But Griego said her grandmother is a legitimate voter.

As for Bojorquez's mom, the GOP packet said she was suspicious because they

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

couldn't find a driver's license for her or a Social Security number. Bojorquez said her mother became a citizen this year and doesn't drive.

Bojorquez said the private investigator said he worked for a Republican lawyer. Her mom was registered to vote by ACORN, the Association of Community Organizations for Reform Now.

"Trying to silence (voters) and intimidate them is definitely crossing the line," Matthew Henderson of ACORN said.

---- INDEX REFERENCES ----

COMPANY: JOURNAL

NEWS SUBJECT:  (Economics & Trade (1EC26))

REGION:  (New Mexico (1NE26); North America (1NO39); Americas (1AM92); USA (1US73))

Language:  EN

OTHER INDEXING:  (ACORN; ASSOCIATION OF COMMUNITY ORGANIZATIONS; FBI; GOP; JOURNAL; STATE GOP; VOTERS HARASSED)  (Bojorquez; Emily Garcia; Garcia; Greg Fouratt; Griego; Group; Guadalupe Bojorquez; Jenais Griego; Project Vote; Shira Rawlinson)

Word Count: 390
10/24/08 ALBUQJNL (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 9

Westlaw.

12/7/97 HSTNCHRON A20

NewsRoom

Page 1

12/7/97 Hous. Chron. A20
1997 WLNR 6575017

Houston Chronicle
Copyright 1997 Houston Chronicle

December 7, 1997

Section: A

ELECTION '97: RUNOFFS / Heavy early voting, spilled ballots among problems delaying count

LISA M. CHMIOLA, JOHN C. HENRY

Vote counting in the Houston runoff election was delayed Saturday night because of a heavier than normal early vote and because a box of early ballots broke open and spilled before they were counted.

Harris County Clerk Beverly Kaufman, whose staff was hired by the city to run the election, said the early vote -- ballots that were cast under the early voting law or by mail - was delayed because of heavy participation by voters.

Those ballots - which were assembled at another location - were slow to arrive downtown at the Harris County Administration Building, where they are counted because the Balloting Board had to sort mail ballots that arrived Saturday, then consolidate them with other ballots by precinct, a process that officials said took longer.

"We try to exercise extreme diligence," said Jack Burton, explaining that often means checking everything three times. Burton is a real estate broker who serves as chairman of the Balloting Board.

In addition, some Balloting Board workers were distracted Friday with the arrest of one of their cohorts, Ronald Hinge, 66, was arrested after he allegedly punched a previously unmarked ballot so it indicated a vote for mayoral candidate Rob Mosbacher.

"All of our energies haven't been totally focused on the task at hand," Burton said. Friday "was not as productive as we had hoped."

When Burton and his staff arrived with the early ballots at the county administration building for counting, a box broke open and spilled. They had to be picked up and reconsolidated by precinct, Kaufman said.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Included in the count were early ballots that Hinge allegedly tampered with. Kauf-man said no more than eight or 10 ballots could have been marked by Hinge, a GOP precinct chairman and election judge in northwest Harris County who was hired by the county to help sort the ballots.

On Friday, Hinge was arrested and charged with illegal voting after an undercover investigator from the district attorney's office allegedly observed him punch an unmarked ballot for Mosbacher. Hinge was released on $5,000 bail Friday night.

Because all the ballots except one confiscated for evidence were mixed with other ballots, Kaufman said it was impossible to extract them from the total. The con-fiscated ballot was duplicated and votes on the card were counted, she said.

Meanwhile, signs outside Houston polling locations offering a $1,000 reward for evidence of election fraud produced controversy and misplaced blame amid Sat-urday's runoff elections.

Members of mayoral candidate Lee Brown's campaign released a statement alleging opponent Rob Mosbacher's campaign was responsible for the signs. The statement also said they were an effort to intimidate and suppress voting in African-Amer-ican precincts.

"To imply there is fraud and there are people that are being offered a reward for reporting fraud only in the inner-city areas" is a way to intimidate minority voters, said Craig Varoga, Brown's campaign manager.

The Mosbacher camp denied any connection to the signs, which City Council candid-ate Elizabeth Spates confirmed. Spates, an African-American, said they were her signs and that they were erected in several areas, not just minority areas.

Spates, who was seeking At-Large Position 5, said she put up about 200 signs "be-cause of the stuffing of the ballots and the buying of the precinct judges in this city. We want clean elections."

"I didn't do it based on black, brown or white," but rather on the importance of right and wrong, she added.

Varoga said the link to Mosbacher was the phone number on the signs - a voice mail for Mosbacher contributor James Evans.

Evans told the Chronicle he was working with Spates' campaign, not Mosbacher's, which is why he gave Spates the use of the phone number.

Spates said although she used Evans' voice mail, the sign project was her idea.

"This has nothing to do with the Mosbacher campaign," she said. Howard Opinsky, communications director for Mosbacher, said the campaign was not involved with the signs.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

12/7/97 HSTNCHRON A20                                                    Page 3

Precinct judges in the Sunnyside and Third Ward areas said they had not seen the
signs or heard of any voters who had.

Varoga said Brown campaign workers were taking down several of the signs. "As we
find them, we take them down," he said.

Meanwhile, other problems included confusion over where to vote and who was eli-
gible. Some voters' names apparently were left off the poll lists.

"(The phones) have been active all day," said City Secretary Anna Russell. Calls
ranged from inquiries on voting locations to complaints from voters living outside
the city but voting in a split precinct.

"Some of them (living outside the city) are a little irate that they can't vote
for mayor," Russell said.

Some voters found their names were not on the precinct list, even though they
voted in the Nov. 4 election, said Deloyd Parker, director of the SHAPE Community
Center in the Third Ward.

Once precinct judges were informed these voters could vote with proof of registra-
tion, the problem was solved.

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Government (1GO80); World Elections (1WO93); Global Politics
(1GL73); Public Affairs (1PU31))

INDUSTRY:  (Telecom (1TE27))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); Texas (1TE14))

Language:  EN

OTHER INDEXING:  (BALLOTING BOARD; CHRONICLE; GOP; SHAPE COMMUNITY CENTER)  (Anna
Russell; Beverly Kaufman; Brown; Burton; Calls; Craig Varoga; Deloyd Parker; ELEC-
TION; Elizabeth Spates; Evans; Hinge; Howard Opinsky; Jack Burton; James Evans;
Kaufman; Lee Brown; Members; Mosbacher; Rob Mosbacher; Ronald Hinge; Russell;
Spates; Varoga)

EDITION: 4 STAR

Word Count: 996
12/7/97 HSTNCHRON A20
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 10

Westlaw.

10/31/98 HSTNCHRON A31

10/31/98 Hous. Chron. A31
1998 WLNR 7391124

Houston Chronicle
Copyright 1998 Houston Chronicle

October 31, 1998

Section: A

Dems: Minority voters to be harassed by GOP

ALAN BERNSTEIN, Houston Chronicle Political Writer

Using evidence obtained undercover, the Texas Democratic Party charged Friday that
the Harris County Republican Party is planning to intimidate minority voters in
Tuesday's election.

Local Republican Chairman Gary Polland denied the allegation, saying his party has
openly planned to deploy 300 to 400 poll watchers to stop fraud at precincts with
a history of alleged voting violations.

He said the precincts were selected without regard to race.

Democrats cited documents obtained at a Thursday meeting of the local Republican
"ballot security" team. The meeting focused on anticipated voter fraud at 11 Hous-
ton-area precincts that are Democratic strongholds where most voters are black
and/or Hispanic, Democratic officials said.

The undercover Democrat quoted the Republican team leader, Bill Borden, as saying
that Republican election observers should not drive expensive cars to the pre-
cincts and should park in well-lighted areas.

The Democrats said Borden also distributed a two-page outline that listed "excuses
occasionally heard for voter fraud," including: "It is a form of affirmative ac-
tion," and "you don't understand my people."

Democratic officials said it is considering asking the Justice Department and the
Texas secretary of state to intervene to stop any Republican harassment of minor-
ity voters.

Borden could not be reached for comment Friday. Polland defended his party's pre-
parations, saying that he filed with the county clerk's office a list of Republic-
an election judges and the precincts where they will work.

He said the GOP effort is designed to prevent illegal voting, especially voting by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

10/31/98 HSTNCHRON A31                                    Page 2

people who are not entitled to cast ballots.

"If the Democrats want the Justice Department to come, I really don't care," Pol-
land said. "If there is anyone to make sure every live citizen votes once, it's
fine with me."

Democrats said that Borden was planning a strategy different from the one that
Polland said in public.

"No, the Democrats don't know the areas that we have targeted, unless one of you
out there is a `plant,' " the Democrats quoted Borden as saying.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Government (1GO80); Political Parties (1PO73); Public Affairs
(1PU31))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); Texas (1TE14))

Language:  EN

OTHER INDEXING:  (DEMOCRATIC; GOP; HISPANIC; JUSTICE DEPARTMENT; LOCAL REPUBLICAN;
TEXAS; TEXAS DEMOCRATIC PARTY)  (Bill Borden; Borden; Democrats; Gary Polland;
Polland)

EDITION: 3 STAR

Word Count: 416
10/31/98 HSTNCHRON A31
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 11

Westlaw.

10/18/00 LATIMES 15

10/18/00 L.A. Times 15
2000 WLNR 8407877

Los Angeles Times
Copyright 2000 Los Angeles Times

October 18, 2000

Section: Main News

CAMPAIGN 2000
New Mexico GOP Assailed for Vote Fraud Reward Plan
HECTOR TOBAR
TIMES STAFF WRITER

A top election official in New Mexico charged Republican Party activists Tuesday with trying to intimidate voters in this highly contested state after a flier offering a $20,000 reward to those reporting voter fraud was leaked to her office.

Republican leaders said they had considered, but later decided against, offering the reward as part of an effort to fight potential voter fraud in predominantly Democratic counties, most of them in rural areas.

Those rural counties are also predominantly Latino. Denise Lamb, the state's election chief, called the reward a "bounty" designed to intimidate voters. "These are the kinds of things that happen when you're going to have a close election. People engage in what I consider very undemocratic tactics to make sure they win."

Lamb said she referred the matter to the voting rights division of the U.S. Justice Department because it reminded her of efforts to intimidate Latino voters in previous elections in New Mexico and California.

The chairman of the Republican Party of New Mexico, John Dendahl, said the release of the draft of the reward flier--titled "Fairvote 2000"--smacked of campaign dirty tricks. "We either have a mole in our organization or the Democrats have broken into our files electronically."

Dendahl said the flier was drafted as part of a Republican anti-fraud effort for election day. The party will establish a toll-free number for citizens to report "improprieties." Lawyers will staff the phones.

"We don't want the election stolen," Dendahl said. "The [Democratic] Party machine in New Mexico still controls a vast majority of our courthouses. We have to worry about ballot security."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

10/18/00 LATIMES 15

Various state polls have shown the presidential race in New Mexico a dead heat, with a marked ethnic gap. Latino voters support Gore by 70% to 30%, according to a Sept. 28 poll by New Mexico State University. The same poll showed Bush winning among non-Latinos by 59% to 41%.

Democratic Party officials in New Mexico were quick to criticize the reward plan.

"This flier from the Republican Party is a scare tactic," said David Alire Garcia, a spokesman for the state Democratic Party's Coordinated Campaign. "It's designed to intimidate voters."

The flier offers a $20,000 reward for evidence of ballot tampering and a $5,000 reward for "information leading to the first conviction of an individual or individuals who engage in false voting. . . ." It lists a toll-free number to report any illicit activity.

Lamb, an appointee of Secretary of State Rebecca Vigil-Giron, a Democrat, said her office was sent the document anonymously. Asked if the reward plan violated any state laws, Lamb said it fell into a legal "gray" area.

"There's always a possibility that if someone has a cranky neighbor who dislikes them, are they going to turn them in for a reward?"

A spokeswoman for the Justice Department said the agency had received the material and was looking into the matter, but she declined further comment.

Dendahl was critical of officials at the secretary of state's office for commenting on the flier without contacting the Republican Party first for an explanation.

"We have not or are not putting up any [reward] money," Dendahl said. "That was something we had under consideration. We decided not to do it."

"There was a draft of a press release or something. It was clearly delivered to someone in the Democratic Party."

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Crime (1CR87); Social Issues (1SO05); Government (1GO80); Political Parties (1PO73); Minority & Ethnic Groups (1MI43); Public Affairs (1PU31))

REGION:  (New Mexico (1NE26); USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (CAMPAIGN; DEMOCRATIC; DEMOCRATIC PARTY; JUSTICE DEPARTMENT; MEXICO; NEW MEXICO STATE UNIVERSITY; US JUSTICE DEPARTMENT; VOTE FRAUD REWARD) (David Alire Garcia; Democratic Party; Dendahl; Denise Lamb; John Dendahl; Lamb;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Latino; Lawyers; Party; Rebecca Vigil-Giron; Republican; Republican Party)

KEYWORDS: NEW MEXICO -- ELECTIONS; REPUBLICAN PARTY -- NEW MEXICO; HISPANICS --
NEW MEXICO; ELECTION FRAUD -- NEW MEXICO; VOTING RIGHTS; HARASSMENT

EDITION: Home Edition

Word Count: 676
10/18/00 LATIMES 15
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 12

1 of 1 DOCUMENT

Copyright 2002 Little Rock Newspapers, Inc.
Arkansas Democrat-Gazette (Little Rock, AR)

October 22, 2002, Tuesday
Correction Appended

**SECTION:** ARKANSAS; Pg. 10

**LENGTH:** 299 words

**HEADLINE:** GOP poll watchers create a stir in PB 3 dispatched to keep tabs on early voting

**BYLINE:** BY EMMETT GEORGE ARKANSAS DEMOCRAT-GAZETTE

**BODY:**

PINE BLUFF - Confusion reigned Monday morning as some unexpected guests arrived for the first day of early voting at the Jefferson County Courthouse.

"They are calling themselves poll watchers," County Clerk Helen McClinton Bradley said.

Marty Ryall, state Republican Party chairman, said Monday the "poll watchers" were sent to Pine Bluff after Jefferson County Republicans complained that clerks weren't asking for proper identification before allowing people to cast ballots.

They watched voters closely and took pictures of identifying information, said Michael Cook, executive director of the Arkansas Democratic Party.

"I think it's disgusting," said Trey Ashcraft, chairman of both the Jefferson County Democratic Party and the Jefferson County Election Commission. "They are using Gestapo tactics. They are trying to intimidate African-American voters into not voting. It's a funny thing they are not stopping whites, only African-Americans."

Some frustrated black voters were intimidated into not voting, Ashcraft said.

"Absolutely not," Ryall responded. "No one down there is harassing any voters. We were told the county clerk was not requesting verification of identification of voters. So we sent three poll watchers down there with a copy of the law."

All of the fuss may have been about nothing, because Bradley said no voters had been disqualified as of Monday afternoon.

Under Arkansas Code Annotated 7-5-305, would-be voters must produce photo identification issued by a governmental agency. If the voter cannot, a voter can fill out what's known as "a challenged ballot," which is counted after verification of the voter's registration status by the county before an election is certified.

This story was originally published on Tuesday, October 22, 2002.

**CORRECTION-DATE:** October 24, 2002, Thursday

**CORRECTION:**

The Democrat-Gazette wants its news reports to be fair and accurate.

We correct all errors of fact.

If you know of an error, write: Frank Fellone Deputy Editor P.O. Box 2221 Little Rock, Ark. 72203 or call 378-3475 during business hours Monday through Friday. Under Arkansas Code Annotated 7-5-305, before a person is permitted to vote, an election official must ask to see identification, including "a valid driver's license, photo identification card issued by a governmental agency, voter card, social security card, birth certificate, United States passport, employee identification card issued by a governmental agency containing a photograph, employee identification card issued in the

GOP poll watchers create a stir in PB 3 dispatched to keep tabs on early voting Arkansas Democrat-Gazette (Little Rock, AR) October 22, 2002, TuesdayCorrection Appended

normal course of business of the employer, student identification card, Arkansas hunting license, or United States military identification card." If the voter is unable to provide the identification, the election official shall indicate on the precinct registration list that the voter did not provide it and an election commission may report the matter to a local prosecuting attorney for investigation of voter fraud. An article Tuesday on Republican poll watchers monitoring the first day of early voting in Jefferson County incorrectly reported that voters must produce photo identification issued by a governmental agency.

In 1965, Jack Kemp was named most valuable player in the American Football League. A story in Wednesday's edition incorrectly identified the league in which Kemp played.

This story was originally published on Thursday, October 24, 2002.

**LOAD-DATE:** October 22, 2002

**The New York Times**
nytimes.com

October 24, 2002

# THE 2002 CAMPAIGN: POLLING PLACES; Democratic Party Accuses G.O.P. Of Intimidating Arkansas Voters

By CARL HULSE

National Democratic officials said today that Republicans had tried to intimidate black voters during early balloting in Arkansas. The accusation, denied by Republicans, together with other voting incidents, is a sign of the close scrutiny both parties say they are planning for voting procedures in the first national election after the Florida turmoil two years ago.

The incident, which prompted a letter from Terry McAuliffe, chairman of the Democratic National Committee, to the Justice Department, occurred on Monday in Pine Bluff, when Democrats say people trying to vote were pressed for identification by Republican poll watchers.

"These people deliberately tried to discourage voters," said Mr. McAuliffe, who asked Attorney General John Ashcroft to investigate the incident for possible violations of the Voting Rights Act.

Republicans dismissed the complaints as exaggerated and said they were acting only to ensure that all the votes being cast were valid in what were potentially very close elections.

"We have every right to be there," said Marty Ryall, the chairman of the state Republican Party.

The confrontation in Pine Bluff and in other early voting disputes in Arkansas came as voting and registration irregularities were being reported in Texas and South Dakota, among other places. Almost two-dozen states allow early voting, partly in an effort to improve turnout. Officials of both parties and representatives of other groups say they have organized new, sophisticated monitoring of the voting process after the problems in Florida threw the 2000 presidential election into the courts.

According to accounts by Democrats in Washington and Arkansas, five Republican poll watchers at the courthouse in heavily Democratic Pine Bluff were pressing people who showed up for the first day of early voting for identification and took pictures of some. The Democrats that said the poll watchers seemed to question only blacks and that two of the Republicans were on the staff of Senator Tim Hutchinson, the Republican incumbent in a close race with Attorney General Mark Pryor, a Democrat.

"They were literally going up to them and saying, 'Before you vote, I want to see your identification,'" said Guy Cecil, who is coordinating the national Democratic effort with state campaigns in Arkansas.

Mr. Cecil said that under state law the poll watchers could only monitor voting and challenge the vote for later review if there were questions and that poll watchers might not confront voters.

Mr. Ryall said that the poll watchers asked for identification because the Jefferson County officials refused to do so and that one voter produced a Michigan driver's license. He said the only photographs taken were of that license and of a voter wearing campaign paraphernalia not allowed in a polling place. He said poll watchers did not put an emphasis on members of minorities.

"We are targeting anybody who does not have an ID to prove who they say they are," Mr. Ryall said.

He also said Republicans were stepping up their monitoring because the party had determined that some people paid by the state Democratic Party in another Arkansas county had tried to register the names of dead people. Mr. Ryall also said a court decision this week had led to the purging of 800 students from a conservative Baptist college in Arkansas from voter rolls after a challenge by local Democrats.

Donna Brazile, chairman of the Democratic Party's Voting Rights Institute, said that Monday's incident was like a scene from the 1960's and that such activities humiliated potential voters and were meant to suppress turnout.

Copyright 2009 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

EXHIBIT  13

# Courier-Journal

Estimated printed pages: 5

October 23, 2003
**Section:** NEWS
**Edition:** MET=METRO
**Page:** 01A

**GOP to put challengers**
*SHAFER SHELDON*
*STAFF*

in black voting precincts

Critics call strategy intimidation

SHELDON S. SHAFER

sshafer@courier-journal.com

The Courier-Journal

Jefferson County Republicans intend to place Election Day challengers at 59 voting precincts in predominantly black neighborhoods, a move that NAACP leaders yesterday called blatant intimidation.

The GOP election workers, most of whom live outside the targeted precincts in western and central Louisville, Portland and Newburg, will be on hand to challenge voters who they suspect aren't eligible.

Jefferson County GOP Chairman Jack Richardson IV said the precincts were chosen at random or because the Republican Party has had trouble finding registered voters in those areas to serve as election workers. The challengers, who will receive the same training as precinct workers, could fill in if needed.

Richardson said the precincts weren't chosen because of their racial makeup or voting patterns. Using challengers is a "legal, proper and permissible" way to ensure that voters are bona fide, he said.

"It is in the best interest of everybody and the responsibility of both parties to protect the ballot integrity," Richardson said. "That is the bottom line."

Kentucky law allows political parties to each place one challenger at any precinct on Election Day to question the credentials of any voter who they have "a reason to believe" isn't legitimate.

Republicans filed a list of the challengers and precincts with the Jefferson County Board of Elections. Democrats have filed no list and say they have no plans to use challengers.

Those challenged must sign an oath swearing they are valid voters. Anyone who refuses won't be allowed to vote unless an election officer decides the challenge is unwarranted, said Walter Cato, a Democrat and one of the four members of the Jefferson County Board of Elections.

Raoul Cunningham, former state NAACP voting-empowerment coordinator, and former state Sen. Georgia Powers called the use of GOP challengers "an assault by voter intimidation and an effort to suppress the African-American community."

Cunningham urged voters in the precincts with challengers to carry identification and to be aware that challengers will be present. Jefferson County's election board policy calls for residents to show picture identification when they sign in to vote.

DEMOCRATS called the Republican challengers an attempt to intimidate black voters in what is expected to be a close race

for governor between Ernie Fletcher, a Republican, and Democrat Ben Chandler.

"(They) have only one purpose: to intimidate and suppress votes in the West End and other minority areas," Tim Longmeyer, chairman of the Jefferson County Democratic Party, said during a news conference yesterday attended by County Attorney Irv Maze Jefferson Commonwealth's Attorney David Stengel and Louisville Metro Council members Cheri Bryant Hamilton and Mary Woolridge.

Longmeyer said nearly all of the challengers live outside their assigned precincts and many are from the East End, Fairdale and Okolona. He questioned whether those people will know who is voting or whether those voters reside in the precinct.

Fletcher said yesterday that the challengers "shouldn't be any barrier. … We're doing legally what we can just to make sure that everything is done right in voting, and we invite all members of that community to come out and vote. We want them to vote, and there's absolutely no reason that they shouldn't feel welcome to come out and vote."

Both parties have employed challengers in the past, although county clerk spokeswoman Paula McCraney said the county election board doesn't keep records on challengers or challenged votes.

Democrats said they couldn't remember the last time they used challengers, but Cato said he recalls Democratic challengers in some ward races for alderman as recently as the mid-1990s.

RICHARDSON said Republicans used them in Jefferson County as recently as the 2000 presidential election, although he didn't remember how many challengers were used or where they were stationed.

He said the decision to use challengers this year had nothing to do with previous elections in which Republicans questioned the procedures or voting in some West End precincts. Republicans questioned voting practices in western Louisville in 1995 when Democrat Paul Patton narrowly defeated Republican Larry Forgy for governor.

And last year Republican Mike Czerwonka alleged there were a variety of voting irregularities on Election Day when he lost to Democrat Paul Bather by 695 votes in the 43rd District race. Jefferson election officials said they found no improprieties.

Harry Rothgerber, first assistant to Stengel, said the office used signed oath cards to investigate one or two voter challenges in the early 1990s, but no prosecutions resulted.

Among this year's challengers is Rita Seum, wife of Republican state Sen. Dan Seum. She lives in Fairdale and is assigned to the M-107 precinct near 28th and West Kentucky streets.

"My role is to be there, if anything comes up," she said. She said she plans to monitor the sign-in flow Nov. 4 and report to party officials instances in which improperly registered voters try to cast ballots.

Joann Gammon, who lives on Zorn Avenue, has been assigned to precinct N-110 at Christ the King Church on 44th Street. She said she will be at the voting site to report to party officials any voting irregularities, although she acknowledges she doesn't know anyone in her assigned precinct.

Gladys Bailey, who works at King Solomon Missionary Baptist Church in western Louisville and plans to vote Nov. 4, said she wouldn't be intimidated by challengers, although she worries that older residents might be deterred.

"I don't understand why they (challengers) would be there," she said.

MOST OF the 59 precincts where Republicans plan to assign challengers are heavily Democratic in voter registration.

State law requires each precinct to be staffed by at least three election officers, including at least one Democrat and one Republican. The officers do not have to live in the precinct.

Cato said Republicans traditionally have trouble finding a registered voter who lives in precincts to serve as the election officer at perhaps 20 to 30 polling sites, mostly in western Louisville. The NAACP said yesterday that Republicans have not been able to find GOP officers for at least 33 precincts.

Richardson predicted at least one-third of the challengers would end up serving as election officials. They would be paid $89.56 by the Board of Elections for the 12-hour shift on Nov. 4.

Courier-Journal: Document Display

Staff writer Al Cross contributed to this story.

HOW IT WORKS

Precinct challengers can question whether people trying to vote are registered, whether they are who they claim to be or whether they live in the precinct.

Challenged voters must sign an oath swearing they are bona fide before they will receive a ballot. Those who refuse won't be allowed to vote unless an election officer verifies that they meet voting requirements or that the challenge is unwarranted.

The state law says voters can't be challenged indiscriminately and that challengers must have "a reason to believe" a voter's qualifications are questionable.

Voters can help avoid challenges by bringing a picture ID with a current address to the precinct.

The plan is intended "to protect the ballot integrity."

GOP's Jack Richardson IV

INFORMATIONAL GRAPHIC CHALLENGING THE VOTE BY STEVE DURBIN, THE C-J (SEE LIBRARY MICROFILM OR LIBRARY KIOSK PDF PAGES)

Copyright (c) The Courier-Journal. All rights reserved. Reproduced with the permission of Gannett Co., Inc. by NewsBank, inc.

# EXHIBIT 14

# Courier-Journal

Estimated printed pages: 4

October 26, 2003
**Section:** NEWS
**Edition:** MET=METRO
**Page:** 01B

### Poll workers learn about vote challenge
*RODRIGUEZ NANCY C*
*STAFF*

NANCY C. RODRIGUEZ

nrodriguez@courier-journal.com

The Courier-Journal

More than 150 people participated in a training session for Jefferson County poll workers yesterday at Sullivan University, where they learned how they should handle challengers who might be stationed in their precincts .

Jefferson County Republicans said last week they intend to place challengers at 59 voting precincts in predominantly black neighborhoods on Nov. 4 - a move that has angered minority leaders, who call the move blatant intimidation.

Republican leaders say they selected the precincts in Louisville's West End, Newburg and Portland neighborhoods at random or because the party has had trouble finding registered voters in those areas to serve as election workers. The precincts also have been the sites where Republicans have alleged past voting irregularities, although GOP leaders say that isn't the reason why challengers will be posted there this year.

Yesterday, election officials said they had filled all the Republican positions they needed for the election.

For many election workers, challengers will be a new and unknown commodity, said Walter Cato, a member of the Jefferson County Board of Elections, who spent about 45 minutes at the training session explaining the law regarding challengers.

"A challenger cannot take over" the election process, "and a challenger is only there to challenge votes," Cato said. "I'm confident that if the election officers and the challengers observe these statutes as they are set out, there is not going to be a problem that day."

Election workers and challengers undergo the same two-hour training and must be certified by the board of elections before serving at the polls. The board has been holding training sessions for several weeks.

During his presentation, Cato stressed to election workers that all voters must show identification or be recognized by election workers before they are given a ballot and allowed to vote. Acceptable identification includes a driver's license, a Social Security card, credit card or a voter identification card, he said.

"It does not have to be a picture ID. ... You could whip out a MasterCard or something, and that would suffice," Cato said.

Challengers can only question a voter's eligibility if they believe the voter:

Is not a duly registered voter in a precinct

Is not a resident of the precinct

Is a felon

is not whom he or she claims to be.

"The law requires that the challenger has to have reason to believe the basis for his objections or his challenge," Cato said.

Challenges must be issued to election workers before a voter receives a ballot, Cato said. Challengers can't confront voters directly.

A challenged voter must sign an oath verifying his or her identity and right to cast a ballot in that precinct. The challenger must sign the same oath and write down the reason for the challenge.

Even if election workers know the challenge isn't correct, "they have to go ahead and make his challenge," Cato said. "It's not a case where the election officers can assume that they have the power to determine whether a challenge is valid or not. They don't have that power."

A challenged voter will be allowed to vote - and that vote will be counted in the election . Voter s' oaths are collected later by the election office and forwarded to the commonwealth's attorney for investigation.

Cato stressed that challengers cannot campaign in the precincts, handle official election material or "attempt to intimidate or harass ... any voter who is being challenged, or any precinct election officer."

Challengers who are disruptive or interfere with election workers can be issued warnings or be ejected from precincts, Cato said. If election workers believe a challenger should be removed, they should call the board of elections, he said.

A challenger who is removed is banned from resuming the position in any precinct for five years, Cato said.

Election workers said afterward that they were glad they learned the rules and doubt they will have problems on Election Day.

"As long as everyone acts professional, I think it will go smoothly. I don't foresee any problems," said Shawn Bertholt, who will work at the Community Towers precinct downtown, where a challenger will be stationed.

Jim Ragland, a worker who will be at the precinct at the Knights of Columbus on River Road, also didn't think there would be many problems.

"I think they're going to get there and find out there is really nothing for them to do," he said of the challengers. "If you're a challenger and you don't know the neighborhood, what are you going to challenge?"

BY PAM SPAULDING, THE COURIER-JOURNAL

Paula Thomas and others took an oath yesterday in a training session for poll workers for the Nov. 4 election.

MAP BY STEVE DURBIN, THE COURIER-JOURNAL, SHOWING LOCATION OF PRECINCTS WHERE REPUBLICAN CHALLENGERS WILL BE STATIONED, (SEE LIBRARY MICROFILM OR LIBRARY KIOSK PDF PAGES)

Copyright (c) The Courier-Journal. All rights reserved. Reproduced with the permission of Gannett Co., Inc. by NewsBank, inc.

# EXHIBIT 15

Westlaw.

2/1/04 AMPROSP 29

2/1/04 Am. Prospect 29
2004 WLNR 11317240

American Prospect
Copyright 2004 ProQuest Information and Learning Company; All Rights Reserved.

February 1, 2004

Volume 15; Issue 2

The GOP Deploys
Franke-Ruta, Garance
Meyerson, Harold

HEADNOTE

Campaign events masquerading as "official" visits. A massive army on the ground.
And--wouldn't you know it--a secret headquarters. Welcome to Bush-Cheney 2004.

IMAGE PHOTOGRAPH

1

Orange Alert: On the December day that Bush visited this Home Depot in Maryland,
Dick Cheney went to Oklahoma and Treasury Secretary John Snow hit Missouri.

AN UNDISCLOSED LOCATION, VA.- FROM THE OUTSIDE, THE headquarters of the Bush-
Cheney re-election campaign is completely unremarkable-so unremarkable that pass-
ersby have no way of knowing it's even there. Through the tinted windows of the
Arlington office tower where the headquarters is lodged, people shuffling papers
can be glimpsed as through a glass darkly. There is no storefront-style sign out
front, even though the office is on the ground floor, nor is there a sign on the
door. The campaign is not listed in the building directory, and there's no address
for it posted on the Internet or in the local directory services.

"Our location is disclosed, but not completely," says Brian Danzaof the Bush-
Cheney communications office. "We just don't like having media people out here."

The administration's love of secrecy, its concerns about being a soft target for
terrorists and its desire to depict the president as above the fray have turned
the re-election project into the ultimate under-the-radar campaign. While the
Democratic Party has been noisily tearing itself apart for the past six months,
the Bush-Cheney re-election team has been quietly and methodically building a for-
midable grass-roots operation. Since launching on May 17, 2003, the president's
team has grown into a 24-state operation with 160 people at its headquarters. And,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

as with the buildup of troops before the Iraq War, the deployment has gone largely
unnoticed.

Though the president has publicly avoided election-year wrangling, on any given
day his campaign has been sending Cheneys, cabinet members and the first lady out
on the trail. Take Nov. 6, for instance: The president was in Washington to sign
the Iraq and Afghanistan reconstruction supplemental funding bill, Laura Bush went
down to campaign events in Virginia and West Virginia and Lynne Cheney popped up
to a Bush-Cheney reception in Pennsylvania. Or Dec. 5, when the president attended
a Bush-Cheney '04 fund-raising lunch in Baltimore and stopped by a Home Depot to
give a talk on the economy. Meanwhile, Treasury Secretary John Snow talked jobs in
the swing state of Missouri, the vice president campaigned in Oklahoma and the
Bush-Cheney '04 staff trained grass-roots supporters in Port St. Lucie, Fla. Three
days later, on Dec. 8, while George W. Bush was at the Daughters of the American
Revolution Constitution Hall signing the Medicare prescription-drug bill, campaign
manager Ken Mehlman was rolling out the re-elect team in South Carolina and Com-
merce Secretary Don Evans was attending Bush-Cheney '04 fund-raising receptions in
Kentucky.

As with everything about the Bush presidency, its re-election campaign seems to
exist at two levels. There's the public campaign, in which a moderate, visionary
president comes up with inclusionary programs-pro-Mars, pro-Mexican-to broaden his
base of support. And there are the more niche campaigns, hidden in the shadows, in
which the campaign stirs its right-wing supporters to action by appealing to their
baser instincts. There are impressive efforts to register and turn out millions of
new voters. And there's evidence of national Republican efforts to perfect long-
standing voter-intimidation programs directed at blacks and Hispanics.

All that can lead to a multitude of messages. Having endeared himself to movement
conservatives during his first three years in office, for instance, the president
is now moving more to the center to pick off portions of the Democratic base with
such policies as his prescription-drug coverage act and his proposal for immigra-
tion reform. Both policy shifts fall far short of meeting the real needs of the
targeted populations, but politically they're intended to move small percentages
of senior and Hispanic voters into the Republican column. Republican strategists,
for instance, speak of boosting Bush's share of the Hispanic vote from the 35 per-
cent he won in 2000 to 38 percent next year, which could spell the Republican mar-
gin of victory in New Mexico and Arizona. In a nation more or less split down the
middle between Democrats and Republicans, just a little movement within discrete
constituencies can drop three or four additional states into your column.

But while broadcasting moderation, the campaign is also narrow casting a meaner
message toward its true believers. There's a neat division of labor here: While
the e-mails that go out over the president's signature to supporters are chipper
and unremarkable, those from Mehlman sometimes play to classic right-wing phobias
in order to keep supporters' zealotry suitably stoked.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

On Dec. 18, for instance, Mehlman sought to rouse his troops with a message titled, "Foreign liberal cash used to defeat President Bush!" What followed was an extremely unflattering photograph of a grimacing, hook-nosed George Soros (one of the most significant contributors to the unofficial Democratic voter-mobilization organizations that have arisen in the wake of McCain-Feingold) and a message be-moaning the "billionaire liberals and the flood of foreign money that they're en-couraging." Mehlman called on "450,000 AMERICAN grassroots contributors" to counter the sinister attempt by Soros-a native of Hungary but a naturalized Amer-ican citizen who has lived in the United States since 1956-to provide the Demo-crats with money from an immigrant. The ad comes close to resurrecting the classic anti-Semitic stereotype of the Jewish cosmopolitan financier undermining a Chris-tian republic.

MUCH OF WHAT THE REPUBLICANS HAVE WROUGHT OUTside the limelight is, to be sure, not so sinister. All the same, Democrats should be paying far more attention than they are to what the GOP has done here-both in terms of its fund raising and the very early on-the-ground organizing, which has frankly given it an undeniable head start in an area that Democrats used to own. In 2003, Bush very publicly raised a record $130.8 million and ended the year with a soothing $99 million cash on hand. His campaign also used the fall and winter to bring on campaign chairs, hire key staff, build online networks, hold voter-registration and get-out-the-vote (GOTV) training sessions for thousands of activists, and prepare to go into the field in key battleground states months ahead of when it had been able to in the 1999-2000 electoral cycle.

Visiting the Bush campaign headquarters after spending time at former Gov. Howard Dean's (D-Vt.) bustling Burlington hive feels rather like being a scholarship stu-dent visiting a rich friend whose family name graces the school buildings. The whole setup speaks of wealth and security. Instead of the Dean offices'mismatched, secondhand furniture, everything at the Bush headquarters is new, comfortable-look-ing and designed expressly for the purpose it is serving. Instead of being stuffed four to a corner, staffers each have a neat little cubicle, complete with par-tially padded walls in a tasteful orange-and-blue tapestry design. The desks all have chairs of which the Occupational Safety and Health Administration would ap-prove. The computers, also new, all match. Terry Holt, press secretary for the campaign, is dressed on the day before New Year's in his day-off casuals-a blue sweater, slacks and a well-worn, pumpkin-colored "W" cap-when we sit down in his spacious office, where the floor is covered by Persian rugs and the two televi-sions are tuned to MSNBC and the FOX News Channel.

Most staffers on this pre-holiday afternoon, says Holt, are taking the day off to watch ballgames. Though he doesn't say it, it's clear that this is some of what $130 million buys you. No competitive primaries. No frantic late nights. Time to plan and to be thorough. Time to go to ballgames. But as different as the Bush and Dean campaigns may appear, when it comes to voter outreach, they sound remarkably similar.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

2/1/04 AMPROSP 29

"The president has made clear that this campaign is going to be won or lost by people talking to people," says Holt. The line between the personal and political, as Holt sketches the campaign, will be a thin one: Re-electing Bush will be the work of countless block parties and yard sales. "The best endorsement," Holt adds, "comes from your neighbor." In fact, he sounds a lot like Dean's campaign manager, Joe Trippi, talking about the Democratic candidate's community-based, "people-powered" campaign. Holt looks surprised and a little taken aback at the idea. "Well," he says, he says of Trippi, "he's right."

That the Bush and Dean campaigns are using similar rhetoric about the importance of the grass roots is no coincidence. Both Bush and Dean come across as "conviction" politicians who assiduously cultivate their parties' activist bases. But their similarities are not merely stylistic; they are organizational as well. While the Dean campaign likes to present the growth of its own grass roots as an organic surge of popular sentiment, both it and the Bush campaign are, in fact, working out of the same playbook. To a considerable degree, they got it from the AFL-CIO.

The story, on the Republican side, starts just after the 2000 election, which Bush's chief strategist, Karl Rove, had expected to yield a 50-percent to 51-percent popular vote for his candidate. Instead, Bush's backing declined in the final week: He won just 48 percent of the popular vote and entered the White House thanks chiefly to the friendly ministrations of five Supreme Court justices. Once they had installed their man, Republicans scurried to see what had gone wrong. Blaise Hazelwood, the Republican National Committee's (RNC) political director, had research showing that union households in 1998 and 2000 were turning out to vote at rates much higher than their percentage in the population. Evangelicals, meanwhile, were underperforming, putting Republicans at a distinct disadvantage in the final 72 hours of a race, when union mobilizations led by the AFL-CIO were having a strong impact in turning out households that would vote Democratic. "It seemed that they had a really good ground game." Hazelwood told The Washington Post in 2002.

IMAGE PHOTOGRAPH

2

Uriah Veep: One more time around the track for Dick

So the RNC'S organizers developed a 72-Hour Task Force to work on the problem. They tried more than 50 different organizing methods, doing trial runs in the state elections of 2001. They learned that knocking on doors, instead of merely leaving fliers, could be worth 2 to 3 percentage points in a tight election. In another RNC experiment, four volunteers were pitted against a professional tele-marketing firm, each with an identical script and separate lists of voter names. The four volunteers got almost 5 percent more people to the polls than the pros.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

2/1/04 AMPROSP 29                                                              Page 5

"The 72-Hour [Task Force] reads like a Democratic GOTV manual," says Teresa Vil-
main, the general election strategist for the Democratic National Committee (DNC).

More particularly, the tests the Republicans ran and the answers they found are
remarkably similar to those that Steve Rosenthal, then the AFL-CIO'S political
director, had conducted for the federation after the 1996 election. "We found that
union members calling union members were more effective than paid phone bankers,"
Rosenthal says. "We found that the most effective form of communication was for
someone they knew-a shop steward, for instance-to talk to them and hand them ma-
terials from their union. You want the contacts to be as personal as you can make
them; you want as many contacts as possible. It's not rocket science." The AFL-CIO
transformed its field program accordingly, and the union household share of the
electorate rose from 19 percent in 1992 to 26 percent in 2000.

What worked for the house of labor, though, also worked for the party of capital.
In the 2002 midterm elections, the Republicans sent more than 1,500 activists from
Washington and 15,000 volunteers from across the country to sway voters in compet-
itive races. Mobilizing conservatives in swing states while the Democrats had vir-
tually no message and no one in the field but labor, the GOP'S GOTV program
worked. The percentage of Republicans voting went up, and for the first time in
decades the party in the White House gained congressional seats in a midterm elec-
tion.

THIS COMING NOVEMBER, JUST AS IN 2002, the Democrats won't have GOTV to them-
selves. Starting in September 2003, the Bush campaign began forming local leader-
ship teams in battleground states. By January 2004, it had campaign leaders in
place in 24 states: West Virginia, Ohio, Arizona, Missouri, Tennessee, Michigan,
Oregon, New Hampshire, Iowa, Nevada, Washington, Minnesota, Wisconsin, Maine,
Arkansas, New Jersey, Hawaii, Virginia, California, Texas, South Carolina, Geor-
gia, Pennsylvania and, of course, Florida. Like the Democrats, the Republicans at-
tend to voter mobilization so urgently because they believe the nation is so
evenly divided. In a memo last November to Mehlman and Karl Rove, Matthew Dowd,
the chief strategist for the Bush-Cheney campaign, noted that "this race will be
decided within a four- or five-point margin, not the 18- to 20-point margins like
1984 or 1972."

So the war in the field has already begun. In Florida, the state party is regis-
tering 75,000 new Republican voters and boosting turnout to more than 80 percent
among those already registered as Republicans. According to the St. Petersburg
Times, the campaign will have trained more than 2,500 activists and volunteers at
12 get-out-the-vote training sessions by the end of January. Organizations in
nearly all of the state's 67 counties are already in place. The campaign plans to
recruit 65,000 volunteers in Florida alone to talk to voters, host block parties
and write letters to the editor. "I don't think they've ever been this close to
the ground ever," Geoffrey Becker, executive director of the Florida GOP, told the
Prospect.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

This year, says Becker, Florida Republicans are scouring the property-tax rolls to find people in GOP precincts who aren't yet registered. They're also tapping into Florida's abundant localized church alliances and organizations, along with such longtime allies as the National Rifle Association and the Florida Farm Bureau. Above all, the party is starting earlier this year than ever before. In 2002, says Becker, the national committee initiated its 72-Hour Task Force in July and August; this year, it's starting in February.

Like their Democratic counterparts, GOP activists have become something of a flying squadron, especially throughout the South. In the 2002 gubernatorial election, according to Becker, between 1,500 and 2,000 people came from out of state to volunteer in the 72-Hour Task Force for Gov. Jeb Bush (R-Fla.).

"I was told to get ready for more of this in 2004," Becker says. "Last year we sent people to Mississippi for [the] governor's race [on behalf of Haley Barbour], and Mississippi might be sending their folks here in '04. They're not looking at a very contested [presidential] election there."

For its part, the Florida state Democratic Party has announced it has no plans to start ground organizing until March, which is still considerably earlier than it has mobilized before. In 2000, "We didn't have our field staff in place until mid-summer," DNC Chairman Terry McAuliffe told the Prospect last year. Perhaps more significant for the Democrats, some of the "5275"-the independent organizations formed in reaction to campaign-finance reform laws that will be carrying out most of the Democrats' registration and GOTV campaigns this year-are already deploying in Florida.

(The 5275 are certainly shaping up this year as the Democrats' counter the Republicans' newfound affinity for the grass roots. In last November's Philadelphia mayoral election, Democrat John Street was returned to office in good part due to the efforts of one such labor-backed group, Partnerships for America's Families, which registered 86,000 black and Hispanic voters in a city of 1.5 million people.)

In Michigan, the GOP appointed its 72-Hour Task Force director, Beth Thompson, close to a year ago. Its goal is 40,000 new Republican voters in a state where people don't register by party. Michigan Republicans are canvassing unidentified voters by phone, flushing out the potential Bush backers by asking them, says Thompson, about such time-honored wedge issues as "life and guns." The Democrats are hoping to counter this by registering tens of thousands of new voters at their Feb. 7 presidential caucuses. Ed Bruley, who served as chief of staff for former Rep. David Bonior (D-Mich.), the onetime House Democratic whip, notes that 40,000 new Republicans "doesn't amount to much in a state where 6 million voters are registered." (In 2000, Al Gore beat Bush by 217,000 votes there.)

Which raises a key question for campaign 2004: Which party's base can be enlarged

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

more? Rove has said that the Republicans aim to register and turn out 3 million new evangelical Christian voters. Rosenthal questions whether they're up to the task and argues that the universe of unregistered Democrats among African Americans, Hispanics and working women is the more expandable. The election's outcome may turn on who's right and which side does the better job of following through on its promises.

VOTER REGISTRATION AND IDENTIFICATION WEREN'T THE only mobilization programs that occupied the Republicans in 2003, however. They were involved in a major voter-intimidation program as well. The battleground on which they tested their latest tactics was the Philadelphia mayor's race, where the campaign of the Republican challenger, Sam Katz, grew extremely nervous at the success the Democrats had had at registering minority voters. The Republican response was an attempt to scare black and Hispanic voters away from the polls-not a new trick in the Republican playbook by any means, but one that the DNC had better be studying and preparing to confront this November.

To begin, according to Democratic consultant Tom Lindenfeld, who ran the counter-intimidation program for the campaign of Democrat John Street, the Republicans assembled a fleet of 300 cars driven by men with clipboards bearing insignias or decals resembling those of such federal agencies as Drug Enforcement Agency and Bureau of Alcohol, Tobacco, Firearms and Explosives. Thus arrayed, says Lindenfeld, these pseudo-cops spent election day cruising Philadelphia's African American neighborhoods and asking prospective voters to show them some identification-an age-old method of voter intimidation. "What occurred in Philadelphia was much more expansive and expensive than anything I'd seen before, and I'd seen a lot," says Lindenfeld, who ran similar programs for the campaigns of Harvey Gantt in North Carolina and other prominent Democrats. In a post-election poll of 1,000 black voters, 7 percent of them said they had encountered these efforts (this being Philadelphia, there were allegations of violence and intimidation against Street supporters as well). Lindenfeld employed 800 people to confront the GOP'S faux-agents at polling places.

Lindenfeld's operatives found Republican volunteers from as far away as Missouri, and attorneys from the District of Columbia were discouraging Philadelphia voters from exercising their franchise. That doesn't make the effort an official activity of the RNC, of course. But it does mean that a broad network of Republicans are still honing their techniques for manipulating an election.

There are, after all, a multitude of tasks this year for which the Republicans must ready themselves: soothing the centrists while inflaming the right; getting their vote up and keeping the Democrats' vote down. In 2003, the Republicans' early deployment of their field campaign, much less their cultivation of the blacker arts, went all but unnoticed. In 2004, with the electorate divided evenly between the parties, even the smallest ploy can pay dividends. Republicans mean to be ready.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

SIDEBAR

While broadcasting moderation, the campaign is also narrow casting a meaner message toward its true believers. There's a neat division of labor here.

SIDEBAR

"What occurred in Philadelphia was much more expansive and expensive than anything I'd seen before, and I'd seen a lot," says consultant Tom Lindenfeld.

American Prospect Feb 2004

---- INDEX REFERENCES ----

COMPANY: MICROSOFT CORP; HOME DEPOT INC

NEWS SUBJECT:  (Legal (1LE33); Social Issues (1SO05); World Elections (1WO93); Global Politics (1GL73); International Terrorism (1IN37); Government (1GO80); Government Litigation (1GO18); Minority & Ethnic Groups (1MI43); Political Parties (1PO73); Public Affairs (1PU31))

INDUSTRY:  (Regional Web Presences (1RE47); Pharmaceuticals & Biotechnology (1PH13); Drugs (1DR89); Internet Regulatory (1IN49); Internet (1IN27); Prescription Drugs (1PR52))

REGION:  (Pennsylvania (1PE71); Maryland (1MA47); Missouri (1MI10); Oklahoma (1OK58); North America (1NO39); West Virginia (1WE81); Gulf States (1GU47); Iraq (1IR87); Arab States (1AR46); South Carolina (1SO63); Americas (1AM92); Mississippi (1MI74); Middle East (1MI23); USA (1US73); Michigan (1MI45); Florida (1FL79))

Language:  EN

OTHER INDEXING:  (AMERICAN REVOLUTION CONSTITUTION HALL; BUREAU OF ALCOHOL; BURLINGTON; CHRISTIAN; CIO; COMMERCE; DEMOCRATIC; DEMOCRATIC NATIONAL COMMITTEE; DNC; DRUG ENFORCEMENT AGENCY; FIREARMS; FLORIDA GOP; FOX NEWS; GOP; GOTV; HALEY BARBOUR; HARVEY GANTT; HEADNOTE; HOME DEPOT; HOUR TASK FORCE; HOUSE DEMOCRATIC; JEWISH; MARS; MARYLAND; MEDICARE; MSNBC; NATIONAL RIFLE ASSOCIATION; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; OKLAHOMA; PROSPECT; REPUBLICAN; REPUBLICAN NATIONAL COMMITTEE; RNC; SIDEBAR; SUPREME COURT; TASK FORCE; TOBACCO; TREASURY; VOTER; WHITE HOUSE)  (African Americans; Al Gore; Arkansas; Becker; Beth Thompson; Blaise Hazelwood; Brian Danzaof; Bush; Cheneys; David Bonior; Dean; Democrats; Dick; Dick Cheney; Ed Bruley; Florida Republicans; Geoffrey Becker; George Soros; Hazelwood; Holt; Howard Dean; IDENTIFICATION WEREN; Jeb Bush; Joe Trippi; John Snow; John Street; Karl Rove; Ken Mehlman; Laura Bush; Lindenfeld; Lynne Cheney; Matthew Dowd; Mehlman; Republicans; Rosenthal; Rove; Sam Katz; Semitic; Soros; Steve Rosenthal; Street; Teresa Vilmain; Terry Holt; Terry McAuliffe; Thompson; Tom Lindenfeld; Trippi; Uriah Veep)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

2/1/04 AMPROSP 29                                                     Page 9

```
Word Count: 4117
2/1/04 AMPROSP 29
END OF DOCUMENT
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.