# EXHIBIT 3





# Building Confidence in U.S. Elections






SEPTEMBER 2005

ORGANIZED BY
Center for Democracy and Election Management
American University

SUPPORTED BY
Carnegie Corporation of New York
The Ford Foundation
John S. and James L. Knight Foundation
Omidyar Network

RESEARCH BY
Electionline.org/The Pew Charitable Trusts





# Building Confidence in U.S. Elections

## REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM

### SEPTEMBER 2005

**ORGANIZED BY**
Center for Democracy and Election Management
American University

**SUPPORTED BY**
Carnegie Corporation of New York
The Ford Foundation
John S. and James L. Knight Foundation
Omidyar Network

**RESEARCH BY**
Electionline.org/The Pew Charitable Trusts

# Building Confidence in U.S. Elections
REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM

# Table of Contents

Letter from the Co-Chairs ........................... ii

Preface by the Executive Director ..................... iii

Executive Summary .................................. iv

1: Goals and Challenges of Election Reform ........... 1
  1.1 Help America Vote Act: Strengths and ........ 2
      Limitations
  1.2 Learning from the World ...................... 5
  1.3 Transforming the Electoral System — ......... 6
      Five Pillars
  1.4 Urgency of Reform ............................ 7

2: Voter Registration and Identification ............. 9
  2.1 Uniformity Within States – Top-Down ........ 10
      Registration Systems
  2.2 Interoperability Among States ............... 12
  2.3 Provisional Ballots ......................... 15
  2.4 Communicating Registration Information ..... 16
  2.5 Voter Identification ........................ 18
  2.6 Quality in Voter Registration Lists ........ 22

3: Voting Technology ................................ 25
  3.1 Voting Machines ............................. 25
  3.2 Audits ...................................... 28
  3.3 Security for Voting Systems ................. 28
  3.4 Internet Voting ............................. 32

4: Expanding Access to Elections .................... 33
  4.1 Assured Access to Elections ................. 33
  4.2 Vote by Mail ................................ 35
  4.3 Vote Centers ................................ 36
  4.4 Military and Overseas Voting ................ 37
  4.5 Access for Voters with Disabilities ......... 39
  4.6 Re-Enfranchisement of Ex-Felons ............ 40
  4.7 Voter and Civic Education ................... 41

5: Improving Ballot Integrity ....................... 45
  5.1 Investigation and Prosecution of Election ... 45
      Fraud
  5.2 Absentee Ballot and Voter Registration Fraud .. 46

6: Election Administration .......................... 49
  6.1 Institutions ................................ 49
  6.2 Poll Worker Recruitment ..................... 54
  6.3 Polling Station Operations .................. 56
  6.4 Research on Election Management ............. 57
  6.5 Cost of Elections ........................... 59

7: Responsible Media Coverage ....................... 61
  7.1 Media Access for Candidates ................. 61
  7.2 Media Projections of Election Results ....... 62

8: Election Observation ............................. 65

9: Presidential Primary and Post-Election Schedules .. 67
  9.1 Presidential Primary Schedule ............... 67
  9.2 Post-Election Timeline ...................... 68

Conclusion ......................................... 69

Appendix ........................................... 71
    Estimated Costs of Recommended Improvements

Endnotes ........................................... 72

Summary of Recommendations ......................... 79

Additional Statements .............................. 88

About the Commission on Federal Election Reform ..... 92

# LETTER FROM THE CO-CHAIRS

Elections are the heart of democracy. They are the instrument for the people to choose leaders and hold them accountable. At the same time, elections are a core public function upon which all other government responsibilities depend. If elections are defective, the entire democratic system is at risk.

Americans are losing confidence in the fairness of elections, and while we do not face a crisis today, we need to address the problems of our electoral system.

Our Commission on Federal Election Reform was formed to recommend ways to raise confidence in the electoral system. Many Americans thought that one report — the Carter-Ford Commission — and one law — the Help America Vote Act of 2002 (HAVA) — would be enough to fix the system. It isn't. In this report, we seek to build on the historic achievement of HAVA and put forward a bold set of proposals to modernize our electoral system.

Some Americans will prefer some of our proposals to others. Indeed, while all of the Commission members endorse the judgments and general policy thrust of the report in its entirety, they do not necessarily support every word and recommendation. Benefiting from Commission members with diverse perspectives, we have proposed, for example, a formula for transcending the sterile debate between integrity and access. Twenty-four states now require identification for voters, with some systems likely to restrict registration. We are recommending a photo ID system for voters designed to increase registration with a more affirmative and aggressive role for states in finding new voters and providing free IDs for those without driver's licenses. The formula we recommend will result in both more integrity and more access. A few of our members have expressed an alternative view of this issue.

Still, our entire Commission is united in the view that electoral reform is essential and that our recommended package of proposals represents the best way to modernize our electoral system. We urge all Americans, including the legislative and executive branches of government at all levels, to recognize the urgency of election reform and to seriously consider the comprehensive approach outlined herein.

We present this report because we believe the time for acting to improve our election system is now.

Jimmy Carter

James A. Baker, III

*Co-Chairs of the Commission on Federal Election Reform*

# PREFACE BY THE EXECUTIVE DIRECTOR

Polls indicate that many Americans lack confidence in the electoral system, but the political parties are so divided that serious electoral reform is unlikely without a strong bipartisan voice. Our country therefore owes a great debt to former President Jimmy Carter and former Secretary of State James A. Baker, III for leading this Commission and forging a plan for election reform.

To build confidence, the Commission recommends a modern electoral system built on five pillars: (1) a universal and up-to-date registration list, accessible to the public; (2) a uniform voter identification system that is implemented in a way that increases, not impedes, participation; (3) measures to enhance ballot integrity and voter access; (4) a voter-verifiable paper trail and improved security of voting systems; and (5) electoral institutions that are impartial, professional, and independent. Democrats, Republicans, and Independents tend to prefer different elements of this package, but President Carter and Secretary Baker drew strength rather than stalemate from the diverse perspectives in fashioning an approach that is greater than the sum of these parts.

Our Commission was fortunate to have an outstanding staff and academic advisors, and we have benefited from advice by Members of Congress and staff, election officials, and representatives of a wide range of non-governmental organizations devoted to improving our democracy. See our website for a list of advisors and the studies and testimony: www.american.edu/Carter-Baker.

We acknowledge the support of many at the end of this report, but let me identify here a few people whose work was crucial to the Commission: Daniel Calingaert, the Associate Director of American University's Center for Democracy and Election Management, Doug Chapin of Electiononline.org, John Williams, Senior Advisor to Secretary Baker, Kay Stimson, Media Liaison, and Murray Gormly, Administrative Coordinator. The Commission was organized by American University's Center for Democracy and Election Management. We are also grateful to the James A. Baker III Institute for Public Policy of Rice University and The Carter Center for hosting the other two meetings.

Finally, the Commission could not have accomplished its goal without the generosity of its funders and the advice and support of the following individuals: Geri Mannion of the Carnegie Corporation; Thomasina Williams of the Ford Foundation; Julie Kohler of the John S. and James L. Knight Foundation; Dena Jones of Omidyar Network, and The Pew Charitable Trusts.

At AU's Center for Democracy and Election Management, we view this Commission as a major step toward developing the educational foundation for students, professionals, and the public to deepen our understanding of democracy and elections in the United States and the world.

*Robert A. Pastor*

Robert A. Pastor,
*Executive Director*

# EXECUTIVE SUMMARY

Building confidence in U.S. elections is central to our nation's democracy. At a time when there is growing skepticism with our electoral system, the Commission believes that a bold new approach is essential. The Commission envisions a system that makes Americans proud of themselves as citizens and of democracy in the United States. We should have an electoral system where registering to vote is convenient, voting is efficient and pleasant, voting machines work properly, fraud is deterred, and disputes are handled fairly and expeditiously.

This report represents a comprehensive proposal for modernizing our electoral system. We propose to construct the new edifice for elections on five pillars:

First, we propose a universal voter registration system in which the states, not local jurisdictions, are responsible for the accuracy and quality of the voter lists. Additionally, we propose that the U.S. Election Assistance Commission (EAC) develop a mechanism to connect all states' list. These top-down and interoperable registration lists will, if implemented successfully, eliminate the vast majority of complaints currently leveled against the election system. States will retain control over their registration list, but a distributed database can remove interstate duplicates and help states to maintain an up-to-date, fully accurate registration list. This would mean people would need to register only once in their lifetime, and it would be easy to update their registration information when they move. We also propose that all states establish uniform procedures for counting provisional ballots, and many members recommend that the ballots should be counted if the citizen has voted in the correct jurisdiction.

Second, to make sure that a person arriving at a polling site is the same one who is named on the list, we propose a uniform system of voter identification based on the "REAL ID card" or an equivalent for people without a drivers license. To prevent the ID from being a barrier to voting, we recommend that states use the registration and ID process to enfranchise more voters than ever. States should play an affirmative role in reaching out to non-drivers by providing more offices, including mobile ones, to register voters and provide photo IDs free of charge. There is likely to be less discrimination against minorities if there is a single, uniform ID, than if poll workers can apply multiple standards. In addition, we suggest procedural and institutional safeguards to make sure that the rights of citizens are not abused and that voters will not be disenfranchised because of an ID requirement. We also propose that voters who do not have a photo ID during a transitional period receive a provisional ballot that would be counted if their signature is verified.

Third, we propose measures that will increase voting participation by having the states assume greater responsibility to register citizens, make voting more convenient, and offer more information on registration lists and voting. States should allow experimentation with voting centers. We propose ways to facilitate voting by overseas military and civilians and ways to make sure that people with disabilities have full access to voting. In addition, we ask the states to allow for restoration of voting rights for ex-felons (other than individuals convicted of capital crimes or registered sex offenders) when they have fully served their sentence. We also identify several voter and civic education programs that could increase participation and inform voters, for example, by providing information on candidates and the voting process to citizens before the election. States and local jurisdictions should use Web sites, toll-free numbers, and other means to inform citizens about their registration status and the location of their precinct.

To improve ballot integrity, we propose that federal, state, and local prosecutors issue public reports on their investigations of election fraud, and we recommend federal legislation to deter or prosecute systemic efforts to deceive or intimidate voters. States should not discourage legal voter registration or get-out-the-vote activities, but they need to do more to prevent voter registration and absentee ballot fraud.

Fourth, we propose ways to give confidence to voters using electronic voting machines that their votes will be counted accurately. We call for an auditable backup on paper at this time, but we recognize the possibility of alternative technologies to audit those machines in the future. We encourage independent testing of voting systems (to include voting machines and software source code) under EAC supervision.

Finally, we recommend strengthening and restructuring the system by which elections have been administered in our country. We propose that the EAC and state election management bodies be reconstituted on a nonpartisan basis to become more independent and effective. We cannot build confidence in elections if secretaries of state responsible for certifying votes are simultaneously chairing political campaigns, and the EAC cannot undertake the additional responsibilities recommended by this report, including critical research, without gaining additional funds and support. Polling stations should be organized to reduce the chances of long lines; they should maintain "log-books" on Election Day to record complaints; and they need electronic poll-books to help voters find their correct precinct. HAVA should be fully funded and implemented by 2006.

The Commission puts forward 87 specific recommendations. Here are a few of the others:

- We propose that the media improve coverage of elections by providing at least five minutes of candidate discourse every night in the month preceding the election.

- We ask news organizations to voluntarily refrain from projecting presidential election results until polls close in the 48 contiguous states.

- We request that all of the states provide unrestricted access to all legitimate domestic and international election observers, as we insist of other countries, but only one state currently permits; and

- We propose changing the presidential primary schedule by creating four regional primaries.

Election reform is neither easy nor inexpensive. Nor can we succeed if we think of providing funds on a one-time basis. We need to view the administration of elections as a continuing challenge, which requires the highest priority of our citizens and our government.



# 1. Goals and Challenges of Election Reform

The vigor of American democracy rests on the vote of each citizen. Only when citizens can freely and privately exercise their right to vote and have their vote recorded correctly can they hold their leaders accountable. Democracy is endangered when people believe that their votes do not matter or are not counted correctly.

Much has happened since November 2000, when many Americans first recognized that their electoral system had serious problems with flawed voter registration lists, obsolete voting machines, poorly designed ballots, and inadequate procedures for interpreting disputed votes. Congress and the President, Democrats and Republicans, responded with a truly historic initiative – the Help America Vote Act of 2002 (HAVA), the first comprehensive federal law in our nation's history on electoral administration. The law represents a significant step forward, but it falls short of fully modernizing our electoral system.

On the eve of the November 2004 election, a *New York Times* poll reported that only one-third of the American people said that they had a lot of confidence that their votes would be counted properly, and 29 percent said they were very or somewhat concerned that they would encounter problems at the polls. Aware of this unease, the U.S. Department of Justice deployed 1,090 election observers — more than three times the number sent in 2000.[1] After the election, a minority of Americans — only 48 percent — said they were very confident that the votes cast across the country were accurately counted, according to a Pew Research Center survey. Thirty-seven percent had doubts (somewhat confident), and 14 percent were not confident that the votes were accurately counted.[2]

With a strong desire to contribute to building confidence in our electoral process, this Commission came together to analyze the state of the electoral system, to assess HAVA's implementation, and to offer recommendations for further improvement. Public confidence in the electoral system is critical for our nation's democracy. Little can undermine democracy more than a widespread belief among the people that elections are neither fair nor legitimate. We believe that further important improvements are necessary to remove any doubts about the electoral process and to help Americans look upon the process of casting their ballot as an inspiring experience — not an ordeal.



Former President Jimmy Carter and former Secretary of State James A. Baker, III (AP Photo/Charles Dharapak)

We address this report to the American people and to the President, Congress, U.S. Election Assistance Commission, states, election administrators, and the media. Our recommendations aim both to increase voter participation and to assure the integrity of the electoral system. To achieve those goals, we need an accurate list of registered voters, adequate voter identification, voting technology that precisely records and tabulates votes and is subject to verification, and capable, fair, and nonpartisan election administration.

While each state will retain fundamental control over its electoral system, the federal government should seek to ensure that all qualified voters have an equal opportunity to exercise their right to vote. This will require greater uniformity of some voting requirements and registration lists that are accurate and compatible among states. Greater uniformity is also needed within states on some voting rules and procedures. The federal government should fund research and development of voting technology that will make the counting of votes more transparent, accurate, and verifiable.

## 1.1 HELP AMERICA VOTE ACT: STRENGTHS AND LIMITATIONS

The Help America Vote Act of 2002 (HAVA) established numerous federal requirements for state and local election administration in exchange for a promise of $3.97 billion in federal funding, of which approximately $3.1 billion has been appropriated to date. These requirements reflected a national consensus on the general outline of reform, best represented by the 2001 report of the National Commission on Federal Election Reform, co-chaired by former Presidents Jimmy Carter and Gerald Ford. HAVA's mandates were adopted as part of a compromise between the parties on the divisive issue of access to the ballot (largely championed by Democrats and their allies) versus protecting the integrity of the electoral process (generally favored by Republicans and their supporters).



Commissioners Susan Molinari and Tom Daschle
(American University Photo/Wilford Harewood)

Under this compromise, described by its sponsors as making it "easier to vote and harder to cheat," HAVA sought to lower barriers to voting while establishing somewhat tighter controls on registration and voter identification. Consequently, HAVA's mandates focused on four major requirements: (1) statewide computerized voter lists; (2) voter ID for individuals who register by mail but do not provide it when registering; (3) provisional ballots for voters whose names are missing from the registration rolls on Election Day; and (4) measures to make voting more accessible for voters with disabilities. The main provisions of HAVA are as follows:

- Voter registration lists, which were typically maintained at the local level, are now being consolidated into statewide voter databases.

- All states are required to provide provisional ballots on Election Day to citizens who believe they are registered but whose names do not appear on the registration lists.

- HAVA provides federal funding — for the first time — to create statewide voter databases and to replace old voting machines.

- All voting systems used in federal elections are required to meet minimum standards for voter verification of ballots, accessibility for voters with disabilities and language minorities, notification of over-votes, and auditing procedures.



(Getty Images Photo/Mike Simons)

- HAVA calls for the testing and certification of voting systems as a way to make sure they operate properly on Election Day.

- The U.S. Election Assistance Commission (EAC) was created to disburse federal funds, develop guidelines for voting systems, serve as a clearinghouse of information to improve election administration throughout the country, and study and report on how to make elections more accessible and accurate.

Under HAVA, states are required to complete their statewide voter databases by January 1, 2006, and some expenditures of HAVA funds will extend well beyond that date. Our Commission therefore calls for full implementation and full funding of HAVA.

The first presidential election after HAVA became law — on November 2, 2004 — brought to light as many problems as in 2000, if not more. HAVA, which will take years to be fully implemented, was not responsible for most of the complaints. Instead, voters were discouraged or prevented from voting by the failure of election offices to process voter registration applications or to mail absentee ballots in time, and by the poor service and long lines at polling stations in a number of states. There were also reports of improper requests for voter ID and of voter intimidation and suppression tactics. Concerns were raised about partisan purges of voter registration lists and about deliberate failures to deliver voter registration applications to election authorities. Moreover, computer malfunctions impugned election results for at least one race, and different procedures for counting provisional ballots within and between states led to legal challenges and political protests. Had the margin of victory for the presidential contest been narrower, the lengthy dispute that followed the 2000 election could have been repeated.

The November 2004 elections also showed that irregularities and fraud still occur. In Washington, for example, where Christine Gregoire was elected governor by a 129-vote margin, the elections superintendent of King County testified during a subsequent unsuccessful election challenge that ineligible ex-felons had voted and that votes had been cast in the names of the dead. However, the judge accepted Gregoire's victory because with the exception of four ex-felons who admitted to voting for Dino Rossi, the authorities could not determine for whom the other illegal votes were cast. In Milwaukee, Wisconsin, investigators said they found clear evidence of fraud, including more than 200 cases of



Commissioners Bob Michel and Shirley Malcom
(American University Photo/Milford Harewood)

felons voting illegally and more than 100 people who voted twice, used fake names or false addresses, or voted in the name of a dead person. Moreover, there were 4,500 more votes cast than voters listed.[3] One potential source of election fraud arises from inactive or ineligible voters left on voter registration lists. By one estimate, for example, there were over 181,000 dead people listed on the voter rolls in six swing states in the November 2004 elections, including almost 65,000 dead people listed on the voter rolls in Florida.[4]

Some of these problems may be addressed by the full implementation of HAVA, but it is clear that others will not. Due to vague mandates on provisional voting and identification cards, counties and states applied different standards. This led to a significant proliferation of legal challenges. A closer presidential election likely would have brought an avalanche of litigation. HAVA does not address interoperable registration lists among states, and it is also vague as to whether states should create a top-down, state-controlled registration list or a bottom-up list controlled by local election administrators. The weak structure of the U.S. Election Assistance Commission, a product of a HAVA compromise, has stymied its ability to be clear or authoritative on almost any subject, even on whether to verify electronic machine votes with paper ballots. Thus, there is a compelling need for further election reform that builds on HAVA.

One of the most important laws on the right of Americans to vote is the Voting Rights Act of 1965. Key provisions of the Act are due to expire in 2007. These include the language provision (Section 203), which requires jurisdictions to provide voting materials in minority languages in areas where language minority groups make up a significant portion of the population, and the pre-clearance provision (Section 5), which requires federal pre-clearance for all changes to voting rules or procedures made by specified jurisdictions with a history of voter discrimination. Our Commission believes this Act is of the utmost importance.

---

### Recommendations on the Help America Vote Act and the Voting Rights Act

**1.1.1** The Help America Vote Act should be fully implemented by 2006, as mandated by the law, and fully funded.

**1.1.2** The Commission urges that the Voting Rights Act be vigorously enforced and that Congress and the President seriously consider reauthorizing those provisions of the Act that are due to expire in 2007.

## 1.2  LEARNING FROM THE WORLD

In its deliberations, our Commission considered the best practices of election systems around the world. Many other democracies achieve significantly higher levels of voter participation due, in part, to more effective voter registration. Election authorities take the initiative to contact and register voters and conduct audits of voter registration lists to assure that they are accurate. In addition, voter registration in many countries is often tied directly to a voter ID, so that voter identification can enhance ballot integrity without raising barriers to voting. Voters in nearly 100 democracies use a photo identification card without fear of infringement on their rights.[5]

Nonpartisan election administration has also proved effective abroad. Over the past three decades, election management institutions have evolved in many other democracies. Governments had previously conducted elections, but as concern was raised that they might give advantage to incumbents, independent election commissions were formed. Initially, election commissioners in other countries frequently represented political parties, but they often stalemated or reached agreement with each other at the public's expense. This explains why the trend in the world is toward independent election commissions composed of nonpartisan officials, who serve like judges, independently of the executive or legislative branches (see Table 5 on page 52). Political party representatives can observe deliberations on these commissions but not vote on decisions. Nonpartisan election officials are generally regarded as fair arbiters of the electoral process who make their best efforts to administer elections impartially and effectively.



Mexico's Federal Electoral Institute (IFE)
(AP Photo/Marco Ugarte)

## 1.3  TRANSFORMING THE ELECTORAL SYSTEM — FIVE PILLARS

The recommendations of our Commission on Federal Election Reform aim both to increase voter participation and to assure the integrity of the electoral system. To accomplish these goals, the electoral system we envision should be constructed on the following five sturdy pillars:

- Voter registration that is convenient for voters to complete and even simpler to renew and that produces complete, accurate, and valid lists of citizens who are eligible to vote;

- Voter identification, tied directly to voter registration, that enhances ballot integrity without introducing new barriers to voting, including the casting and counting of ballots;

- Measures to encourage and achieve the greatest possible participation in elections by enabling all eligible voters to have an equal opportunity to vote and have their votes counted;

- Voting machines that tabulate voter preferences accurately and transparently, minimize under- and over-votes, and allow for verifiability and full recounts; and

- Fair, impartial and effective election administration.

An electoral system built on these pillars will give confidence to all citizens and will contribute to high voter participation. The electoral system should also be designed to reduce the possibility or opportunity for litigation before, and especially after, an election. Citizens should be confident that the results of the election reflect their decision, not a litigated outcome determined by lawyers and judges. This is achieved by clear and unambiguous rules for the conduct of the election established well in advance of Election Day.

The ultimate test of an election system is its ability to withstand intense public scrutiny during a very close election. Several close elections have taken place in recent years, and our election system has not always passed that test. We need a better election system.



Common Cause President Chellie Pingree (American University Photo/Jeff Watts)

## 1.4 URGENCY OF REFORM

Although the public continues to call for election reform, and several election bills have been introduced, the issue is low on the Congress's agenda at this time. Some congressional leaders believe that further reform should wait until HAVA is fully implemented. We believe that the need for additional electoral reform is abundantly clear, and our recommendations will bolster HAVA to further strengthen public confidence in the electoral process. If we wait until late 2006, we will lose the opportunity to put new reforms in place for the 2008 elections, and as a result, the next presidential election could be fraught with problems. Electoral reform may stay out of public view until the 2006 elections begin to approach, but by that time, it may be too late. We need Congress to press ahead with election reform now. Indeed, election reform is best accomplished when it is undertaken before the passions of a specific election cycle begin.

We are Republicans, Democrats, and Independents. But we have deliberately attempted to address electoral issues without asking the question as to whether a particular political party would benefit from a particular reform. We have done so because our country needs a clear unified voice calling for serious election reform. Congress has been reluctant to undertake reform, in part because members fear it could affect their chances of re-election and, when finally pressed by the public, Democrats and Republicans have addressed each reform by first asking whether it would help or harm each party's political prospects. This has proven to be not only a shortsighted but also a mistaken approach. Despite widespread belief that two recent reforms — the National Voter Registration Act of 1993 and the Bipartisan Campaign Finance Reform of 2002 — would advantage Democrats at the expense of Republicans, evidence suggests such beliefs were wrong. Having a fair electoral process in which all eligible citizens have an opportunity to participate freely is a goal that transcends any individual partisan interest. This assures the winning candidates the authority to legitimately assume office. For the losing candidate it assures that the decision can be accepted as the will of the voters.



League of Women Voters President Kay Maxwell at the April 18 hearing (American University Photo/Jeff Watts)

Our recommendations are aimed at several timeframes and audiences. Some require immediate action, and others can be considered later. We propose some for the federal government and some for the states. But we have offered all the recommendations based on our views as to how they can best help our country — not our political parties. Together, these reforms should catalyze a shift in the way that elections are administered. We hope they will not only restore American confidence in our elections, but also strengthen the respect from those in the world who look to our democracy as a model.



(AP Photo/Ric Francis)

## 2. Voter Registration and Identification

Effective voter registration and voter identification are bedrocks of a modern election system. By assuring uniformity to both voter registration and voter identification, and by having states play an active role in registering as many qualified citizens as possible, access to elections and ballot integrity will both be enhanced. These steps could help bring to an end the sterile debate between Democrats and Republicans on access versus integrity.

The most common problems on Election Day concern voter registration (see Table 1 on page 17). Voter registration lists often are riddled with inaccuracies because Americans are highly mobile, and local authorities, who have maintained most lists, are poorly positioned to add and delete names of voters who move within or between states. To comprehend the magnitude of this challenge, consider the following. During the last decade, on average, about 41.5 million Americans moved each year. Of those, about 31.2 million moved within the same state, and 8.9 million moved to a different state or abroad. Young Americans (aged 20 to 29), representing 14 percent of the U.S. population, moved to a different state at almost three times the rate of the rest of the population.[6] The process of registering voters should be made easier, and renewal due to a change of address should be made still easier.

In response to the challenge of building and maintaining better registration lists, HAVA requires states to establish statewide, computer-based registration lists that are interactive within each state by January 1, 2006. HAVA also requires provisional ballots for eligible voters who seek to vote within their jurisdiction but who are denied a ballot because their name is not found on the voter roll or because they are otherwise challenged by an election official as being ineligible to vote.

Although few states have completed their new statewide voter databases, the limitations of the existing efforts are already clear. Several states have left the primary responsibility for voter lists in the hands of counties and municipalities. There is little if any effort to assure quality in statewide voter databases. The U.S. Election Assistance Commission (EAC) has not assessed the quality of statewide voter databases and is unlikely to do so in the future. Moreover, it has provided only vague guidance to states on how to organize their voter registration lists — on even the most basic question as to whether states or counties should be in charge.



Commissioner Robert Mosbacher
(American University Photo/Wilford Harewood)

In addition to statewide registration systems and provisional ballots, HAVA requires that states insist on voter identification only when a person has registered by mail for the first time in a federal election. This provision, like the others, was implemented very differently across the country, with some areas not even applying the minimum requirement. Since HAVA, an increasing number of states have insisted on stringent, though very different, ID requirements for all voters. This, in turn, has caused concern that such requirements could erect a new barrier to voting for people who do not have the requisite identification card. Georgia, for example, introduced a new law in July 2005 that requires all voters to show a government-issued photo ID at the polls.

Although there are 159 counties, only 56 locations in the entire state issue such IDs, and citizens must either pay a fee for the ID or declare indigence.

While states will retain principal responsibility for the conduct of elections, greater uniformity in procedures for voter registration and identification is essential to guarantee the free exercise of the vote by all U.S. citizens. The EAC should facilitate greater uniformity in voter registration and identification procedures and should be empowered to do so by granting and withholding federal funds to the states. If Congress does not appropriate the funds, then we recommend that it amend the law to require uniformity of standards.

## 2.1 UNIFORMITY WITHIN STATES — TOP-DOWN REGISTRATION SYSTEMS

A complete, accurate, and current voter roll is essential to ensure that every eligible citizen who wants to vote can do so, that individuals who are ineligible cannot vote, and that citizens cannot vote more than once in the same election. A voter registration list must contain all eligible voters (including new registrants) and must contain correct information concerning the voter's identity and residence.

Incomplete or inaccurate registration lists lie at the root of most problems encountered in U.S. elections. When a voter list omits the names of citizens who believe they properly registered or contains incorrect or out-of-date information on registered voters, eligible citizens often are denied the right to vote. Invalid voter files, which contain ineligible, duplicate, fictional, or deceased voters, are an invitation to fraud.



Commissioner Benjamin Ladner
(American University Photo/Jeff Watts)

One reason for flawed lists is decentralized management. Local authorities often fail to delete the names of voters who move from one jurisdiction to another, and thus the lists are often inflated. For this reason, the Carter-Ford National Commission on Federal Election Reform recommended the creation of statewide voter registration systems, and this recommendation was codified into law in HAVA.

HAVA requires each state to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the state level." But states have not carried out this requirement in a consistent manner. Some are creating a "top-down" voter registration system, in which local election authorities supply information to a unified database maintained by the state. Others rely on a "bottom-up" system, whereby counties and municipalities retain their own registration lists and submit information to a state compilation of local databases at regular intervals. Top-down databases typically deliver information in real time — counties can see changes from other localities as these changes are made to the voter list. Bottom-up systems may continue

the problems that gave rise to flawed registration lists — i.e., counties retain control of the lists. Counties might not delete the names of voters who move or might not add the names of voters who register at motor vehicle bureaus or other state agencies under the National Voter Registration Act (NVRA or "Motor Voter"). Thus, the statewide lists might be different from the controlling county lists. Having two inconsistent voter lists is like a person with two watches who never knows what time it is. It is essential to have a single, accurate, current voter list.



Commissioners Kay Coles James and Raul Yzaguirre
(American University Photo/Wilford Harewood)

As of June 2005, 38 states were establishing top-down voter registration systems. The remaining states were either (a) building bottom-up systems; or (b) creating systems with both top-down and bottom-up elements. Three states had not finalized plans.[7] The EAC, in its interpretation of the HAVA requirement on statewide voter databases, expressed a preference for top-down systems for voter registration but did not insist on it and did not rule out bottom-up systems.

In the judgment of our Commission, bottom-up systems are not capable of providing a complete, accurate, current, and valid voter registration list. They are ineffective in removing duplicate registrations of individuals who move from one county to another and in coordinating with databases of other state agencies. Even in the best of circumstances, with excellent cooperation and interaction between states and counties — an unlikely scenario with the bottom-up system — there will be a time lag in updating voter files in a bottom-up system. This time lag could be particularly harmful in the period approaching the deadline for voters to register.

---

**Recommendation on Uniformity Within States**

**2.1.1**  The Commission recommends that states be required to establish unified, top-down voter registration systems, whereby the state election office has clear authority to register voters and maintain the registration list. Counties and municipalities should assist the state with voter registration, rather than have the state assist the localities. Moreover, Congress should appropriate funds for disbursement by the U.S. Election Assistance Commission (EAC) to states to complete top-down voter registration systems.

---

## 2.2 INTEROPERABILITY AMONG STATES

Interoperable state voter databases are needed to facilitate updates in the registration of voters who move to another state and to eliminate duplicate registrations, which are a source of potential fraud. Approximately 9 million people move to another state or abroad each year, or about one in eight Americans between each presidential election. Such interoperability is possible because state voter databases that are centralized can be made to communicate with each other.

The limited information available on duplicate registrations indicates that a substantial number of Americans are registered to vote in two different states. According to news reports, Florida has more than 140,000 voters who apparently are registered in four other states (in Georgia, Ohio, New York, and North Carolina).[8] This includes almost 46,000 voters from New York City alone who are registered to vote in Florida as well. Voting records of the 2000 elections appear to indicate that more than 2,000 people voted in two states. Duplicate registrations are also seen elsewhere. As many as 60,000 voters are reportedly registered in both North Carolina and South Carolina.[9]

Current procedures for updating the registration of voters who move to another state are weak or nonexistent. When people register to vote, they are usually asked to provide their prior address, so that the jurisdiction where they lived can be notified to delete their names from the voter list. Such notification, however, often does not occur. When a voter moves from Virginia to Illinois, for example, a four-step process is required to update voter registration: (1) election authorities in Illinois must ask for prior address; (2) the voter must provide prior address; (3) Illinois election authorities must notify the correct election authorities in Virginia; and (4) Virginia election authorities must remove the voter from its list. Unless all four steps are taken, this voter will remain on the voter list in Virginia. In fact, states often fail to share data or notify each other of voters who move. As a result, a substantial number of Americans are registered to vote in more than one state.



From left to right, Ken Smukler, Michael Alvarez, Paula Hawthorn, and Robert Stein at the June 30 hearing (Rice University Photo/Jeff Fitlow)

Duplicate registrations have accumulated over the years not just because there are no systems to remove them other than the one described above, but also because people who own homes in two states can register to vote in both places. In fact, when 1,700 voters who were registered in both New York and Florida requested absentee ballots to be mailed to their home in the other state, no one ever bothered to investigate.[10]

Interoperability among state voter databases is needed to identify and remove duplicate registrations of citizens who are registered to vote in more than one state. To make the state voter databases interoperable, the Commission recommends the introduction of a uniform template, shared voter data, and a system to transfer voter data across states.[11]

The template will define a common set of voter data that all states will collect in their voter databases and will share with each other. This set of data will consist of each person's full legal name, date and place of birth, signature captured as a digital image, and Social Security number. The signature is needed to confirm the identity of voters who vote by mail.

Under HAVA, voter databases need a "unique identifier," which is a number used to distinguish each individual, particularly those with the same or similar names. Some states use the driver's license number as the unique identifier for voter registration. In other states, the unique identifier is the Social Security number. Efforts to match voter registrations in states that use different identifiers are complicated and may fail. Take, for example, the problem of figuring out whether Paul Smith in Michigan is the same person as Paul Smith in Kentucky. Since the unique identifier for voter registration is the driver's license number in Michigan but the Social Security number in Kentucky, an accurate match of the two registered Paul Smiths is not likely. Any match will need to rely on Paul Smith's date of birth to estimate, based on some level of probability, whether the Paul Smith in each state is the same person or not.

To make different state voter databases interoperable, therefore, they must use the same unique identifier, and this identifier must distinguish each American from every other voter in the country. The state voter databases will need to use a nationwide identifier. Since the same driver's license number might be used in different states, the Social Security number provides the most feasible option for a federal unique identifier.

While the use of Social Security numbers for voter registration raises concerns about privacy, these concerns can be adequately addressed by the measures the Commission recommends to ensure the security of voter databases. The Commission stresses the importance for states to allow only authorized election officials to use the Social Security numbers. States should not provide Social Security numbers in the voter lists they release to candidates, political parties, or anyone else. This should not be hard to do. Forty-nine states collect Social Security numbers for driver's licenses,[12] and they have protected the privacy of the Social Security numbers.



Commissioners Jack Nelson, Ralph Munro, and Spencer Overton (American University Photo/Wilford Harewood)

Congress should direct that all states use the same unique identifier — i.e., the voter's Social Security number — and template, but a new system will also be needed to share data on voters among states. Such a system should maintain a uniform state voter list while allowing systematic updating of lists to take into account moves between states. The Commission proposes using a model similar to the one supervised by the U.S. Department of Transportation (DOT) to make sure that commercial drivers have only one license. The Commercial Driver's License Information System (CDLIS) shares data among states on commercial driver's licenses, using a "distributed database" — a collection of 51 databases (the 50 states and Washington, D.C.) that are linked to each other. When state officials want to check a particular driver's record, they go to the central site, which then connects them to the database of the state that issued a commercial license to that particular driver. Since all of the state databases are inter-connected, an update in one state database is immediately available to all other states. CDLIS is operated by the American Association of Motor Vehicle Administrators under the supervision of the U.S. Department of Transportation.

Similarly, our Commission recommends a "distributed database" that will connect all states' registration lists. The creation of a computerized system to transfer voter data between states is entirely feasible. This system could be managed either by the EAC or by an interstate compact or association of state officials under EAC supervision.

Implementation of the Commission's recommendation on cross-state interoperability of voter databases will require state election authorities to collect Social Security numbers and digital images of signatures for all registered voters. While many states use the driver's license number as their unique identifier, they can collect Social Security numbers from their state's department of motor vehicles (a Social Security number is required by 49 states to issue a driver's license).[13]



Commissioner Nelson Lund with Commission Co-Chair James A. Baker, III. (American University Photo/Wilford Harewood).

We recommend that the EAC oversee the adoption of the template for voter data and for assisting states in the creation of a new system to share voter data among states, including for setting up a distributed database.

Congress should appropriate federal funds to complete top-down state voter databases, cover the costs of adding Social Security numbers and digital images of signatures to the databases, and create and maintain the federal distributed database system for sharing voter data among states. Congress should provide these funds to the EAC for distribution to states that adopt the uniform template for voter data and join the system for data sharing. Federal funds would be withheld from states that do not make their voter files interoperable with the voter databases of other states.

As states make their voter databases interoperable, they will retain full control over their registration lists. They will only need to add to their current databases the voter data required to complete the uniform template.

Two additional innovations might help to eliminate registration problems that voters have encountered. First, voters should have an opportunity during the registration process and before Election Day to review the registration online list to see whether their name is correctly inscribed and to check their proper precinct for voting.[14] Whenever an error is discovered, voters should notify the statewide registration office to correct it, and every statewide registration office should have procedures in place to correct such an error in a timely manner. Second, precincts should have an "electronic poll-book" that connects them to the statewide registration list and allows them to locate the correct polling site for each voter. For those precincts that are small, lack the resources for such an instrument, or do not have online access, precinct officials should telephone to a neighboring jurisdiction to obtain the correct information. Poll workers should also have a dedicated phone number to contact local election officials in case assistance is needed. This phone number should be different from the number provided to the public. Too often, poll workers cannot connect with election officials when assistance is needed because public phone lines are overwhelmed.

The entire system should permit state-of-the-art, computer-based registration lists that will be accurate and up-to-date for the entire nation.

**Recommendations on Interoperability Among States**

2.2.1   In order to assure that lists take account of citizens moving from one state to another, voter databases should be made interoperable between states. This would serve to eliminate duplicate registrations, which are a source of potential fraud.

2.2.2   In order to assist the states in creating voter databases that are interoperable across states, the EAC should introduce a template for shared data and a format for cross-state data transfers. This template should include a person's full legal name, date and place of birth, signature (captured as a digital image), and Social Security number.

2.2.3   With assistance and supervision by the EAC, a distributed database system should be established to make sure that the state lists remain current and accurate to take into account citizens moving between states. Congress should also pass a law mandating that states cooperate with this system to ensure that citizens do not vote in two states.

2.2.4   Congress should amend HAVA to mandate the interoperability of statewide registration lists. Federal funds should be appropriated for distribution by the EAC to states that make their voter databases interoperable, and the EAC should withhold federal funds from states that fail to do so. The law should also provide for enforcement of this requirement.

2.2.5   With proper safeguards for personal security, states should allow citizens to verify and correct the registration lists' information on themselves up to 30 days before the election. States should also provide "electronic poll-books" to allow precinct officials to identify the correct polling site for voters.

2.2.6   With interoperability, citizens should need to register only once in their lifetime and updating their registration will be facilitated when they move.

## 2.3   PROVISIONAL BALLOTS

Because of flaws in registration lists and other election administration procedures, HAVA mandated that any eligible voter who appears at the polls must be given a provisional ballot if his or her name does not appear on the voter registration list or an election official asserts that the individual is not eligible to vote. November 2, 2004, marked the first time that all states were supposed to offer provisional ballots in a general election. Out of 1.6 million provisional ballots cast, more than one million were counted.[15] The 1.6 million provisional ballots do not include an unknown number of voters who were encouraged by poll workers to go to other polling sites where they might be registered.

Practices for offering and counting provisional ballots in the 2004 presidential election varied widely by state and by county. Around the country, the percentage of provisional ballots counted ranged from a national high in Alaska of 97 percent to a low of 6 percent in Delaware.[16]



Provisional ballots cast during the 2004 presidential election (AP Photo/Tony Dejak)

This was due in part to whether a state accepted a provisional ballot cast outside of a voter's home precinct. In other situations, provisional ballots were counted without first having been verified as eligible ballots.

If the recommendations for strengthening the registration lists are approved, the need for provisional ballots will be reduced. In 2004, provisional ballots were needed half as often in states with unified databases as in states without.[17] Nonetheless, in the absence of the reforms recommended by this Commission, or in the period before they come fully into effect, provisional balloting will continue to be a crucial safety net. During the interim, in order to reduce the chances that elections are litigated, we need consistent procedures for handling provisional ballots and full training for poll workers who carry out these procedures.

---

### Recommendations on Provisional Ballots

**2.3.1**  Voters should be informed of their right to cast a provisional ballot if their name does not appear on the voter roll, or if an election official asserts that the individual is not eligible to vote, but States should take additional and effective steps to inform voters as to the location of their precinct.

**2.3.2**  States, not counties or municipalities, should establish uniform procedures for the verification and counting of provisional ballots, and that procedure should be applied uniformly throughout the State. Many members of the Commission recommend that a provisional ballot cast in the incorrect precinct but in the correct jurisdiction should be counted.

**2.3.3**  Poll workers should be fully trained on the use of provisional ballots, and provisional ballots should be distinctly marked and segregated so they are not counted until the eligibility of the voter is determined.

---

## 2.4  COMMUNICATING REGISTRATION INFORMATION

The hotlines set up by nonprofit organizations to assist voters on Election Day received hundreds of thousands of calls (see Table 1 on page 17). Most of the callers had two simple questions: Am I registered to vote? And where do I go to vote? Answers to these questions, however, too often were difficult to obtain. Only nine state election Web sites were able to provide voters with their registration information or with the address of their polling site. Information was equally difficult to obtain from election offices by telephone. One Election Day hotline transferred callers to their county board of elections, but barely half of these calls were answered, and of the other half, few provided the information that was requested.[18]

Failure to provide voters with such basic information as their registration status and their polling site location raises a barrier to voting as significant as inconsistent procedures on provisional ballots or voter ID requirements. As states gain responsibility for voter registration, they will be well positioned to inform voters if they are listed in the voter files. The Web sites of local jurisdictions should allow voters to check whether they are registered and the location of their precinct. This precinct-locator feature should be added to state elections Web sites. In addition, information on how to register and where to vote should be disseminated in local media, on posted lists, and in other government offices, including welfare and social services agencies.

Since election officials may have difficulty responding to telephone calls on Election Day as they are conducting the election, states and local jurisdictions should encourage voters to inquire about their registration status and the location of their polling place considerably before Election Day.

TABLE 1 : Voter Calls to the MYVOTE1 Hotline on Election Day 2004

| Topic of Question or Complaint on Election Day 2004 | Percent of Total |
| --- | --- |
| Registration Issues/Poll Access | 43.9% |
| Absentee Voting | 24.2% |
| Coercion/Intimidation | 4.9% |
| Mechanical | 4.5% |
| Identification | 2.5% |
| Provisional Ballots | 1.9% |
| Ballot/Screen | 1.3% |
| Other | 16.8% |
| TOTAL | 100.0% |

**NOTES:** Totals are based upon an analysis of 55,000 phone calls to the MYVOTE1 hotline on November 2, 2004. Two major, nonpartisan hotlines and the U.S. Election Assistance Commission received a total of approximately 255,000 voter calls on Election Day 2004.

**SOURCES:** Testimony before the Commission on Federal Election Reform by Ken Smukler, President of Info Voter Technologies, on June 30, 2005; Testimony before the U.S. House of Representatives Administration Committee by the U.S. Election Assistance Commission, on February 9, 2005.

---

### Recommendation on Communicating Registration Information

**2.4.1** States and local jurisdictions should use Web sites, toll-free numbers, and other means to answer questions from citizens as to whether they are registered and, if so, what is the location of their precinct, and if they are not registered, how they can do so before the deadline.

## 2.5  VOTER IDENTIFICATION

A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed.

There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election.[19] The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.



Commissioner Lee Hamilton
(American University Photo/Wilford Harewood)

The voter identification requirements introduced by HAVA are modest. HAVA requires only first-time voters who register by mail to show an ID, and they can choose from a number of different types of identification. States are encouraged to allow an expansive list of acceptable IDs, including those without a photograph, such as utility bills or government checks. These requirements were not implemented in a uniform manner and, in some cases, not at all. After HAVA was enacted, efforts grew in the states to strengthen voter identification requirements. While 11 states required voter ID in 2001, 24 states now require voters to present an ID at the polls.[20] In addition, bills to introduce or strengthen voter ID requirements are under consideration in 12 other states.[21]

Our Commission is concerned that the different approaches to identification cards might prove to be a serious impediment to voting. There are two broad alternatives to this decentralized and unequal approach to identification cards. First, we could recommend eliminating any requirements for an ID because the evidence of multiple voting is thin, and ID requirements, as some have argued, are "a solution in search of a problem." Alternatively, we could recommend a single national voting identification card. We considered but rejected both alternatives.

We rejected the first option — eliminating any requirements — because we believe that citizens should identify themselves as the correct person on the registration list when they vote. While the Commission is divided on the magnitude of voter fraud — with some believing the problem is widespread and others believing that it is minor — there is no doubt that it occurs. The problem, however, is not the magnitude of the fraud. In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference. And second, the perception of possible fraud contributes to low confidence in the system. A good ID system could deter, detect, or eliminate several potential avenues of fraud— such as multiple voting or voting by individuals using the identities of others or

those who are deceased — and thus it can enhance confidence. We view the other concerns about IDs — that they could disenfranchise eligible voters, have an adverse effect on minorities, or be used to monitor behavior — as serious and legitimate, and our proposal below aims to address each concern.

We rejected the second option of a national voting identification card because of the expense and our judgment that if these cards were only used for each election, voters would forget or lose them.

We therefore propose an alternative path. Instead of creating a new card, the Commission recommends that states use "REAL ID" cards for voting purposes. The REAL ID Act, signed into law in May 2005, requires states to verify each individual's full legal name, date of birth, address, Social Security number, and U.S. citizenship before the individual is issued a driver's license or personal ID card. The REAL ID is a logical vehicle because the National Voter Registration Act established a connection between obtaining a driver's license and registering to vote. The REAL ID card adds two critical elements for voting — proof of citizenship and verification by using the full Social Security number.



Former Atlanta Mayor Andrew Young addresses the Commission on August 30 at The Carter Center. (American University Photo/Wilford Harewood)

The REAL ID Act does not require that the card indicates citizenship, but that would need to be done if the card is to be used for voting purposes. In addition, state bureaus of motor vehicles should automatically send the information to the state's bureau of elections. (With the National Voter Registration Act, state bureaus of motor vehicles ask drivers if they want to register to vote and send the information only if the answer is affirmative.)

Reliance on REAL ID, however, is not enough. Voters who do not drive,[22] including older citizens, should have the opportunity to register to vote and receive a voter ID. Where they will need identification for voting, IDs should be easily available and issued free of charge. States would make their own decision whether to use REAL ID for voting purposes or instead to rely on a template form of voter ID. Each state would also decide whether to require voters to present an ID at the polls, but our Commission recommends that states use the REAL ID and/or an EAC template for voting, which would be a REAL ID card without reference to a driver's license.

For the next two federal elections, until January 1, 2010, in states that require voters to present ID at the polls, voters who fail to do so should nonetheless be allowed to cast a provisional ballot, and their ballot would count if their signature is verified. After the REAL ID is phased in, i.e., after January 1, 2010, voters without a valid photo ID, meaning a REAL ID or an EAC-template ID, could cast a provisional ballot, but they would have to return personally to the appropriate election office within 48 hours with a valid photo ID for their vote to be counted.

To verify the identity of voters who cast absentee ballots, the voter's signature on the absentee ballot can be matched with a digitized version of the signature that the election administrator maintains. While such signature matches are usually done, they should be done consistently in all cases, so that election officials can verify the identity of every new registrant who casts an absentee ballot.

The introduction of voter ID requirements has raised concerns that they may present a barrier to voting, particularly by traditionally marginalized groups, such as the poor and minorities, some of whom lack a government-issued photo ID. They may also create obstacles for highly mobile groups of citizens. Part of these concerns are addressed by assuring that government-issued photo identification is available without expense to any citizen and, second, by government efforts to ensure that all voters are provided convenient opportunities to obtain a REAL ID or EAC-template ID card. As explained in Section 4.1, the Commission recommends that states play an affirmative role in reaching out with mobile offices to individuals who do not have a driver's license or other government-issued photo ID to help them register to vote and obtain an ID card.



Commissioners David Leebron, Betty Castor, and Tom Phillips (American University Photo/Wilford Harewood).

There are also longstanding concerns voiced by some Americans that national identification cards might be a step toward a police state. On that note, it is worth recalling that most advanced democracies have fraud-proof voting or national ID cards, and their democracies remain strong. Still, these concerns about the privacy and security of the card require additional steps to protect against potential abuse. We propose two approaches. First, new institutional and procedural safeguards should be established to assure people that their privacy, security, and identity will not be compromised by ID cards. The cards should not become instruments for monitoring behavior. Second, certain groups may see the ID cards as an obstacle to voting, so the government needs to take additional measures to register voters and provide ID cards.

The needed measures would consist of legal protections, strict procedures for managing voter data, and creation of ombudsman institutions. The legal protections would prohibit any commercial use of voter data and impose penalties for abuse. The data-management procedures would include background checks on all officials with access to voter data and requirements to notify individuals who are removed from the voter registration list. The establishment of ombudsman institutions at the state level would assist individuals to redress any cases of abuse. The ombudsman would be charged with assisting voters to overcome bureaucratic mistakes and hurdles and respond to citizen complaints about the misuse of data.

The Commission's recommended approach to voter ID may need to adapt to changes in national policy in the future. Since the attacks of September 11, 2001, concerns about homeland security have led to new policies on personal identification. Under a presidential directive, about 40 million Americans who work for or contract with the federal government are being issued ID cards with biometrics, and the REAL ID card may very well become the principal identification card in the country. Driven by security concerns, our country may already be headed toward a national identity card. In the event that a national identity card is introduced, our Commission recommends that it be used for voting purposes as well.

---

### Recommendations on Voter Identification

**2.5.1**  To ensure that persons presenting themselves at the polling place are the ones on the registration list, the Commission recommends that states require voters to use the REAL ID card, which was mandated in a law signed by the President in May 2005. The card includes a person's full legal name, date of birth, a signature (captured as a digital image), a photograph, and the person's Social Security number. This card should be modestly adapted for voting purposes to indicate on the front or back whether the individual is a U.S. citizen. States should provide an EAC-template ID with a photo to non-drivers free of charge.

**2.5.2**  The right to vote is a vital component of U.S. citizenship, and all states should use their best efforts to obtain proof of citizenship before registering voters.

**2.5.3**  We recommend that until January 1, 2010, states allow voters without a valid photo ID card (Real or EAC-template ID) to vote, using a provisional ballot by signing an affidavit under penalty of perjury. The signature would then be matched with the digital image of the voter's signature on file in the voter registration database, and if the match is positive, the provisional ballot should be counted. Such a signature match would in effect be the same procedure used to verify the identity of voters who cast absentee ballots. After January 1, 2010, voters who do not have their valid photo ID could vote, but their ballot would only count if they returned to the appropriate election office within 48 hours with a valid photo ID.

**2.5.4**  To address concerns about the abuse of ID cards, or the fear that it could be an obstacle to voting, states should establish legal protections to prohibit any commercial use of voter data and ombudsman institutions to respond expeditiously to any citizen complaints about the misuse of data or about mistaken purges of registration lists based on interstate matching or statewide updating.

**2.5.5**  In the event that Congress mandates a national identification card, it should include information related to voting and be connected to voter registration.

## 2.6 QUALITY IN VOTER REGISTRATION LISTS

Voter registration lists provide the basis for determining who is qualified to vote. Yet only a few states, notably Oregon and North Carolina, have assessed the quality of their lists, or have developed plans to do so. This is also true as states rush to complete statewide voter databases before the January 1, 2006, deadline. Moreover, the EAC does not assess the quality of voter files.

The little information available on the quality of voter files is not reassuring. The creation of statewide voter databases allows for the elimination of duplicate registrations within states, but attempts to match voter files with records of other state agencies are often ineffective. Death records, for example, sometimes are not provided to election officials for three or four months, and information on felons is usually incomplete.[23] Comparison with U.S. Census Bureau statistics also points to extensive "deadwood" on the voter registration lists. Some states have a large portion of inactive voters on their voter registration lists. One in four registered voters in Oregon is inactive, as is one in every three registered voters in California.[24] There also are numerous jurisdictions, such as Alaska, where the number of registered voters is greater than the number of voting-aged citizens.[25] These jurisdictions clearly have not updated their voter registration lists by removing the names of voters who have died or have moved away.



An elections clerk in Detroit gives a voter an absentee ballot after verifying her registration status. (AP Photo/Carlos Osorio)

Voter registration lists are often inflated by the inclusion of citizens who have moved out of state but remain on the lists. Moreover, under the National Voter Registration Act, names are often added to the list, but counties and municipalities often do not delete the names of those who moved. Inflated voter lists are also caused by phony registrations and efforts to register individuals who are ineligible. Registration forms in the names of comic figures, for example, were submitted in Ohio in 2004. At the same time, inaccurate purges of voter lists have removed citizens who are eligible and are properly registered.

From what little is known, the quality of voter registration lists probably varies widely by state. Without quality assurance, however, cross-state transfers of voter data may suffer from the problem of "garbage in, garbage out." They may pass on inaccurate data from certain states to the rest of the country. The overall quality of a system to share voter data among states will only be a strong as the quality of the worst state voter database.

Each state needs to audit its voter registration files to determine the extent to which they are accurate (with correct and current information on individuals), complete (including all eligible voters), valid (excluding ineligible voters), and secure (with protections against unauthorized use). This can be done by matching voter files with records in other state agency databases in a regular and timely manner, contacting individuals when the matches are inconclusive, and conducting survey research to estimate the number of voters who believe they are registered but who are not in fact listed in the voter files. Other countries regularly conduct such audits.[26]

Effective audits assess not only the quality of voter files but also the procedures used to update, maintain, and verify data and to ensure security of voter databases. To assure continual quality of voter databases, effective procedures are needed to maintain up-to-date lists of eligible voters, verify the accuracy of those lists, and remove voters who have become ineligible. These should include procedures to delete those who have moved out of state and to effectively match voter files with records of driver's licenses, deaths, and felons. Given the controversial "purges" that have occurred, special care must be taken to update the lists in a fair and transparent manner. States should adopt uniform procedures and strong safeguards against incorrect removal of eligible voters. Every removal should be double-checked before it is executed, and a record should be kept of every action. The process of updating the lists should be continuous, and before each statewide election the voter rolls should be audited for accuracy.

In addition, states need to assure the privacy and security of voter files. There is no justification for states to release voter files for commercial purposes. However, components of voter files should remain public documents subject to public scrutiny. States must carefully balance the right to privacy of registered citizens with the need for transparency in elections when they decide what information on voter registration to make available to the public. Procedures are also needed to protect voter files against tampering or abuse. This might be done by setting up the voter database to make an automatic record of all changes to the voter files, including a record of who made the changes and when.

---

### Recommendations on Quality in Voter Registration Lists

**2.6.1** States need to effectively maintain and update their voter registration lists. The EAC should provide voluntary guidelines to the states for quality audits to test voter registration databases for accuracy (correct and up-to-date information on individuals), completeness (inclusion of all eligible voters), and security (protection against unauthorized access). When an eligible voter moves from one state to another, the state to which the voter is moving should be required to notify the state which the voter is leaving to eliminate that voter from its registration list.

**2.6.2** All states should have procedures for maintaining accurate lists such as electronic matching of death records, drivers licenses, local tax rolls, and felon records.

**2.6.3** Federal and state courts should provide state election offices with the lists of individuals who declare they are non-citizens when they are summoned for jury duty.

**2.6.4** In a manner that is consistent with the National Voter Registration Act, states should make their best efforts to remove inactive voters from the voter registration lists. States should follow uniform and strict procedures for removal of names from voter registration lists and should adopt strong safeguards against incorrect removal of eligible voters. All removals of names from voter registration lists should be double-checked.

**2.6.5** Local jurisdictions should track and document all changes to their computer databases, including the names of those who make the changes.



(AP Photo/Rich Pedroncelli)

# 3.   Voting Technology

The Help America Vote Act of 2002 authorized up to $650 million in federal funds to replace antiquated voting machines throughout the country. States are using these funds and their own resources to upgrade voting technology, generally to replace punch card and lever voting machines with new optical scan and electronic voting systems. As a result, voting technology is improving,[27] but new concerns related to electronic voting systems have arisen. These concerns need to be addressed, because it is vital to the electoral process that citizens have confidence that voting technologies are registering and tabulating votes accurately.

## 3.1   VOTING MACHINES

The purpose of voting technology is to record and tally all votes accurately and to provide sufficient evidence to assure all participants — especially the losing candidates and their supporters — that the election result accurately reflects the will of the voters.

Voting machines must be both accessible and transparent. As required by HAVA, the machines must be accessible to language minorities and citizens with disabilities, including the blind and visually impaired citizens, in a manner that allows for privacy and independence. Voting machines must also be transparent. They must allow for recounts and for audits, and thereby give voters confidence in the accuracy of the vote tallies.

Two current technology systems are optical scan and direct recording electronic (DRE) systems. Optical scan systems rely on preprinted paper ballots that are marked by the voter, like the ovals students fill in with a No. 2 pencil on a standardized exam, and then are run through an optical scan machine that determines and tallies the votes. Such systems provide transparency because the paper ballots can be recounted and audited by hand. Under HAVA, all aspects of the voting system, including the production of audit trail information, must be accessible to voters with disabilities.

DRE machines present voters with their choices on a computer screen, and voters choose by touching the screen or turning a dial. The vote is then recorded electronically, usually without ballot paper. DREs make up a growing share of voting equipment. Nearly 30 percent of voters live in jurisdictions that use DREs, compared to 17 percent in the 2000 election (see Table 2 on page 27).[28] DREs allow voters with disabilities to use audio prompts to cast ballots privately and independently, and they facilitate voting by non-English speakers by offering displays of the ballot in different languages. DREs also provide greater accuracy in recording votes, in part by preventing over-votes, whereby people mistakenly vote for more than one candidate, and by discouraging accidental under-votes by reminding voters when they overlooked one or more races.

The accessibility and accuracy of DREs, however, are offset by a lack of transparency, which has raised concerns about security and verifiability. In most of the DREs used in 2004, voters could not check that their ballot was recorded correctly. Some DREs had no capacity for an independent recount. And, of course, DREs are computers, and computers malfunction. A malfunction of DREs in Carteret County, North Carolina, in the November 2004 elections caused the loss of more than 4,400 votes. There was no backup record of the votes that were cast. As a result, Carteret County had no choice but to rerun

the election, after which it abandoned its DREs. Other jurisdictions have lost votes because election officials did not properly set up voting machines.[29]

To provide backup records of votes cast on DREs, HAVA requires that all voting machines produce a "permanent paper record with a manual audit capacity." This requirement is generally interpreted to mean that each machine must record individual ballot images, so that they can be printed out and examined in the event of a disputed result or of a recount. This will make DREs somewhat more transparent, but it is still insufficient to fully restore confidence.

One way to instill greater confidence that DREs are properly recording votes is to require a paper record of the ballot that the voter can verify before the ballot is cast. Such a paper record, known as a voter-verifiable paper audit trail (VVPAT), allows the voter to check that his or her vote was recorded as it was intended.

Because voter-verifiable paper audit trails can permit recounts, audits, and a backup in case of a malfunction, there is a growing demand for such paper trails. As of early August 2005, 25 states required voter-verifiable paper ballots, and another 14 states had proposed legislation with such a requirement.[30]

Since very few of the DREs in use today are equipped to print voter-verifiable paper audit trails, certain bills before Congress would require election authorities to "retrofit" DREs with such printers. In 2004, DREs with voter-verifiable paper audit trails were used only in Nevada. They appear to have worked well.[31] When Nevadans went to the polls and made their selection, a paper record of their vote was printed behind a glass cover on a paper roll, like the roll of paper in a cash register. Voters were able to view the paper record and thereby check that their vote was recorded accurately before they cast their ballot. The paper record was saved in the machine and thus was available for later use in recounts or audits. After the 2004 elections, Nevada election officials conducted an internal audit, which confirmed the accuracy of the votes recorded by the DREs. While less than one in three Nevada voters reportedly looked at the paper record of their ballot, these voters had the opportunity to confirm their vote, and the paper allowed a chance to verify the computer tallies after the election.

While HAVA already requires that all precincts be equipped with at least one piece of voting equipment that is fully accessible to voters with disabilities for use in federal elections by January 1, 2006, must be accessible to voters with disabilities, the Commission believes that transparency in voting machines should also be assured in time for the 2008 presidential election. With regard to current technology, states will need to use either DREs with a voter-verifiable paper audit trail and an audio prompt for blind voters or optical scan voting systems with at least one computer-assisted marking device for voters with disabilities to mark their ballot. To ensure implementation of this requirement, Congress will need to appropriate sufficient funds to cover the costs of either retrofitting DREs with voter-verifiable paper audit trails or purchasing a computer-assisted marking device for each polling place that uses optical scan voting systems.

Concerns have been raised that the printers could malfunction just as computers do. Of course, the previous ballot papers will be available, and the operators will know when the printers fail. Still, precincts should have backup printers for that contingency. A second concern is that the length of the ballot in some areas — such as California, which frequently

has referenda — would require paper trails that would be several feet long. In the case of non-federal races, state law would determine whether the non-federal portion of the ballot would similarly be required to provide a voter-verified paper audit trail. That is not a perfect solution, but it is still better than having no paper backup at all.

The standards for voting systems, set by the EAC, should assure both accessibility and transparency in all voting machines. Because these standards usually guide the decisions of voting machine manufacturers, the manufacturers should be encouraged to build machines in the future that are both accessible and transparent and are fully capable of meeting the needs of Americans with disabilities, of allowing voters to verify their ballots, and of providing for independent audits of election results.

| TABLE 2: Types of Voting Equipment Used in Recent Presidential Elections | | |
|---|---|---|
| Type of Voting Equipment | Registered Voters in 2000 (by percentage) | Registered Voters in 2004 (by percentage) |
| Punch Card | 27.9% | 12.4% |
| Lever | 17.0% | 14.0% |
| Paper Ballots | 1.3% | 0.7% |
| DataVote | 2.8% | 1.3% |
| Optical Scan | 29.5% | 34.9% |
| Electronic | 12.6% | 29.4% |
| Mixed | 8.9% | 7.4% |
| TOTAL | 100.0% | 100.0% |

source: Election Data Services, Voting Equipment Summary by Type, 2004. Election Data Services, New Study Shows 50 Million Voters Will Use Electronic Voting Systems, 32 with Punch Cards in 2004.

## Recommendations on Voting Machines

**3.1.1**  Congress should pass a law requiring that all voting machines be equipped with a voter-verifiable paper audit trail and, consistent with HAVA, be fully accessible to voters with disabilities. This is especially important for direct recording electronic (DRE) machines for four reasons: (a) to increase citizens' confidence that their vote will be counted accurately, (b) to allow for a recount, (c) to provide a backup in cases of loss of votes due to computer malfunction, and (d) to test — through a random selection of machines — whether the paper result is the same as the electronic result. Federal funds should be appropriated to the EAC to transfer to the states to implement this law. While paper trails and ballots currently provide the only means to meet the Commission's recommended standards for transparency, new technologies may do so more effectively in the future. The Commission therefore urges research and development of new technologies to enhance transparency, security, and auditability of voting systems.

**3.1.2**  States should adopt unambiguous procedures to reconcile any disparity between the electronic ballot tally and the paper ballot tally. The Commission strongly recommends that states determine well in advance of elections which will be the ballot of record.

## 3.2 AUDITS

While voter-verifiable paper ballots will contribute to strengthening public confidence in DREs, regular audits of voting machines are also needed to double-check the accuracy of the machines' vote tallies. Such audits were required by law in 10 states as of mid-August 2005.[32] To carry out such audits, election officials would randomly select a sample of voting machines and compare the vote total recorded by the machines with the vote total on the paper ballots. The audits would test the reliability of voting machines and identify problems, often before a close or disputed election takes place. This, in turn, would encourage both suppliers and election officials to effectively maintain voting machines.

Some concern has been expressed about the possibility of manipulation of paper audit trails.[33] If DREs can be manipulated to alter the vote tallies, the same can be done with paper audit trails. Such manipulation can be detected and deterred by regular audits of voting machines. Regular audits should be done of all voting machines, including DREs and optical scan systems.

---

**Recommendation on Audits**

3.2.1 State and local election authorities should publicly test all types of voting machines before, during, and after Election Day and allow public observation of zero machine counts at the start of Election Day and the machine certification process.

---

## 3.3 SECURITY FOR VOTING SYSTEMS

DREs run on software that can be compromised. DRE software may get attacked or hacked by outsiders, perhaps through the Internet. As experience in computer security shows, it is often difficult to defend against such attacks. Hackers often are creative and determined, and voting systems provide a tempting target. However, while some DREs send their results to election headquarters over the Internet, they are not connected to the Internet during voting.

The greater threat to most systems comes not from external hackers, but from insiders who have direct access to the machines. Software can be modified maliciously before being installed into individual voting machines. There is no reason to trust insiders in the election industry any more than in other industries, such as gambling, where sophisticated insider fraud has occurred despite extraordinary measures to prevent it. Software can also be programmed incorrectly. This poses a likely threat when local programmers who lack the necessary skills nonetheless modify the ballot for local offices, and many might not have the sophistication required for the new machines.

In addition to the output of DREs, which can be verified through a paper audit trail, the inside process of programming DREs should be open to scrutiny by candidates, their supporters, independent experts, and other interested citizens, so that problems can be detected, deterred, or corrected, and so that the public will have confidence in the machines.

At the same time, manufacturers of voting machines have legitimate reason to keep their voting machine software and its source code proprietary. The public interest in transparency and the proprietary interests of manufacturers can be reconciled by placing the source code in escrow with the National Institute of Standards and Technology (NIST), and by making the source code available for inspection on a restricted basis to qualified individuals. NIST might make the source code available to recognized computer security experts at accredited universities and to experts acting on behalf of candidates or political parties under a nondisclosure agreement, which would bar them from making information about the source code public, though they could disclose security flaws or vulnerabilities in the voting system software.



Stanford University Professor David Dill at the April 18 hearing (American University Photo/Jeff Watts)

Doubt has been raised that some manufacturers of voting machines provide enough security in their systems to reduce the risk of being hacked. Such concerns were highlighted after a group of computer security experts examined a voting system source code that was accidentally left on the Internet.[34] Independent inspection of source codes would strengthen the security of voting systems software by encouraging manufacturers to improve voting system security. Expert reviews may also detect software design flaws or vulnerabilities. This, in turn, could bolster public confidence in the reliability of DREs to accurately record and tally the vote in elections.

In addition to the source codes, the software and the voting machines themselves are potentially vulnerable to manipulation. Security for voting systems should guard against attempts to tamper with software or individual voting machines. When voting machines are tested for certification, a digital fingerprint, also known as a "hash," of their software is often sent to NIST. Following the delivery of new voting machines, a local jurisdiction can compare the software on these machines to the digital fingerprint at NIST. This comparison either will identify changes made to the software before delivery or, if the software is unaltered, will confirm that the software on the individual machines meets the certified standards.

Once voting machines arrive at the local jurisdiction, election officials must take precautions to ensure security by restricting access to authorized personnel and by documenting access to the machines.

The process of testing and certifying voting machines is designed mainly to ensure their reliability. Testing and certification is conducted under EAC supervision, although some states require additional testing and certification. The state testing can make the process more rigorous, particularly when voting machines are field tested. When California conducted a mock election with new voting machines in July 2005, it found unacceptable rates of malfunctions that were not apparent in lab tests.[35]

No matter how secure voting machines are or how carefully they are used, they are liable to malfunction. To avoid a situation where a machine malfunction will cause a major disruption, local jurisdictions need to prepare for Election Day with a backup plan, including how the vendor will respond to a machine malfunction and what alternatives, including paper ballots, should be made available.

---

**Recommendations on Security for Voting Systems**

**3.3.1** The Independent Testing Authorities, under EAC supervision, should have responsibility for certifying the security of the source codes to protect against accidental or deliberate manipulation of vote results. In addition, a copy of the source codes should be put in escrow for future review by qualified experts. Manufacturers who are unwilling to submit their source codes for EAC-supervised testing and for review by independent experts should be prohibited from selling their voting machines.

**3.3.2** States and local jurisdictions should verify upon delivery of a voting machine that the system matches the system that was certified.

**3.3.3** Local jurisdictions should restrict access to voting equipment and document all access, as well as all changes to computer hardware or software.

**3.3.4** Local jurisdictions should have backup plans in case of equipment failure on Election Day.

---

## 3.4 INTERNET VOTING

The Internet has become such a pervasive influence on modern life that it is natural for the public and election officials to begin considering ways to use it to facilitate voting. The first binding Internet election for political office took place in 2000, when the Arizona Democratic Party used it during its primary. In 2004, the Michigan Democratic Party allowed voting by Internet during its caucuses. Meanwhile, Missouri announced that any member of the U.S. military serving in combat areas overseas could complete an absentee ballot for the general election and email a scanned copy to the Department of Defense, which then would forward it to the appropriate local election offices.

Despite these much-publicized trials, serious concerns have been raised about the push for a "digital democracy." In 2004, the Department of Defense cancelled its $22 million Secure Electronic and Voting Registration Experiment (SERVE) program designed to offer Internet voting during the presidential election to members of the U.S. military and other overseas citizens. The cancellation came after a group of top computer scientists who reviewed the system reported that without improved security, Internet voting is highly susceptible to fraud.

First, there are the issues of privacy and authentication. When using the Internet, one cannot assure voters that their ballot will remain secret. Second, the current system is not fully secure. Although data sent via the Internet can be encrypted and then decoded by local election administrators, hackers can compromise the system. This was the conclusion of the computer scientists who reviewed the SERVE program for the Pentagon. Due to security threats, some state and local election offices do not allow vote totals to be transmitted via the Internet. Third, no government or industry standards specifically apply to Internet voting technology. The EAC may begin developing such standards, but that work has not begun. Finally, Internet voting from homes and offices may not provide the same level of privacy as the voting booth.

To date, the most comprehensive study of Internet voting is contained in a 2001 report sponsored by the National Science Foundation.[36] This report urges further research and experimentation to deal with the problems posed by this form of voting. Its authors suggest that it will take at least a decade to examine the various security and authentication issues. Our Commission agrees that such experimentation is necessary, and that the time for Internet voting has not yet arrived.



Harris County (TX) election official Elsa Garcia, far right, demonstrates an electronic voting machine for Commissioners (l-r) Susan Molinari, Tom Daschle, and Betty Castor. (Rice University Photo/Jeff Fitlow)



(AP Photo/Julia Cumes)