# 4. Expanding Access to Elections

The Commission believes that the vitality of America's democracy depends on the active participation of our citizens. Yet, even in the presidential election in 2004, when voter interest was higher than normal, more than one in three eligible voters did not participate. We need to do more to increase voter participation, and we have considered numerous methods. None of them will solve the problem, but we encourage states to experiment with alternatives to raise the level of voter participation.

Recent elections have seen a substantial increase in early voting and in voting by mail. While only 8 percent of ballots were cast before Election Day in 1994, by 2004 the percentage of ballots cast before Election Day had risen to 22 percent. This increase in early and convenience voting has had little impact on voter turnout, because citizens who vote early or vote by mail tend to vote anyway.[37] Early and convenience voting are popular, but there is little evidence that they will significantly expand participation in elections.[38]



Commissioner Rita DiMartino
(American University Photo/Wilford Harewood)

There are other measures that can be taken to expand participation, particularly for military and overseas voters and for citizens with disabilities. There is also much to do with regard to civic and voter education that could have a long-term and lasting effect, particularly on young people. However, we first need to reach out to all eligible voters and remove any impediments to their participation created by the registration process or by identification requirements.

All citizens, including citizens with disabilities, need to have access to polling places. Polling places should be located in public buildings and other semipublic venues such as churches and community centers that comply with the Americans with Disability Act (ADA). Additionally, polling places should be located and protected so that voters can participate free of intimidation and harassment. Polling places should not be located in a candidate's headquarters or in homes or business establishments that are not appropriately accessible to voters with disabilities.

## 4.1 ASSURED ACCESS TO ELECTIONS

The Commission's proposals for a new electoral system contain elements to assure the quality of the list and the integrity of the ballot. But to move beyond the debate between integrity and access, specific and important steps need to be taken to assure and improve access to voting.

States have a responsibility to make voter registration accessible by taking the initiative to reach out to citizens who are not registered, for instance by implementing provisions of the National Voter Registration Act that allow voter registration at social-service agencies or by conducting voter registration and REAL ID card drives with mobile offices. Michigan, for



A woman in St. Louis goes door-to-door soliciting new voter registrants for the 2004 election. (AP Photo/Ron Edmonds)

example, uses a mobile office to provide a range of services, including driver's licenses and voter registration. This model should be extended to all the states.

Political party and nonpartisan voter registration drives generally contribute to the electoral process by generating interest in upcoming elections and expanding participation. However, they are occasionally abused. There were reports in 2004 that some party activists failed to deliver voter registration forms of citizens who expressed a preference for the opposing party. During the U.S. House Administration Committee hearings in Ohio, election officials reported being deluged with voter registration forms at the last minute before the registration deadline, making it difficult to process these registrations in a timely manner. Many of the registration forms delivered in October to election officials were actually collected in the spring.

Each state should therefore oversee political party and nonpartisan voter registration drives to ensure that they operate effectively, that registration forms are delivered promptly to election officials, that all completed registration forms are delivered to the election officials, and that none are "culled" and omitted according to the registrant's partisan affiliation. Measures should also be adopted to track and hold accountable those who are engaged in submitting fraudulent voter registrations. Such oversight might consist of training activists who conduct voter registration drives and tracking voter registration forms to make sure they are all accounted for. The tracking of voter registration forms will require better cooperation between the federal and state governments, perhaps through the EAC, as the federal government puts some registration forms online. In addition, states should apply a criminal penalty to any activist who deliberately fails to deliver a completed voter registration form.

---

### Recommendations on Assured Access to Elections

**4.1.1**  States should undertake their best efforts to make voter registration and ID accessible and available to all eligible citizens, including Americans with disabilities. States should also remove all unfair impediments to voter registration by citizens who are eligible to vote.

**4.1.2**  States should improve procedures for voter registration efforts that are not conducted by election officials, such as requiring state or local registration and training of any "voter registration drives."

**4.1.3**  Because there have been reports that some people allegedly did not deliver registration forms of those who expressed a preference for another party, states need to take special precautions to assure that all voter registration forms are fully accounted for. A unique number should be printed on the registration form and also on a detachable receipt so that the voter and the state election office can track the status of the form.[35] In addition, voter registration forms should be returned within 14 days after they are signed.

## 4.2  VOTE BY MAIL

A growing number of Americans vote by mail. Oregon moved entirely to a vote-by-mail system in 1998, and the practice of casting ballots by mail has continued to expand nationwide as voters and election officials seek alternatives to the traditional system of voting at polling stations. The state legislatures of California and of Washington state have considered legislation to expand the use of vote by mail, and in 24 states no excuse is required to vote absentee.

The impact of vote by mail is mixed. Proponents argue that vote by mail facilitates participation among groups that experience low voter turnout, such as elderly Americans and Native Americans.

While vote by mail appears to increase turnout for local elections, there is no evidence that it significantly expands participation in federal elections.[49] Moreover, it raises concerns about privacy, as citizens voting at home may come under pressure to vote for certain candidates, and it increases the risk of fraud. Oregon appears to have avoided significant fraud in its vote-by-mail elections by introducing safeguards to protect ballot integrity, including signature verification. Vote by mail is, however, likely to increase the risks of fraud and of contested elections in other states, where the population is more mobile, where there is some history of troubled elections, or where the safeguards for ballot integrity are weaker.



An Oregon voter drops off his mail ballot (AP Photo/Rick Bowmer)

The case of King County, Washington, is instructive. In the 2004 gubernatorial elections, when two in three ballots there were cast by mail, authorities lacked an effective system to track the number of ballots sent or returned. As a result, King County election officials were unable to account for all absentee ballots. Moreover, a number of provisional ballots were accepted without signature verification.[41] The failures to account for all absentee ballots and to verify signatures on provisional ballots became issues in the protracted litigation that followed Washington state's 2004 gubernatorial election.

Vote by mail is popular but not a panacea for declining participation. While there is little evidence of fraud in Oregon, where the entire state votes by mail, absentee balloting in other states has been one of the major sources of fraud. Even in Oregon, better precautions are needed to ensure that the return of ballots is not intercepted.

The evidence on "early" voting is similar to that of vote by mail. People like it, but it does not appear to increase voter participation, and there are some drawbacks. It allows a significant portion of voters to cast their ballot before they have all of the information that will become available to the rest of the electorate. Crucial information about candidates may emerge in the final weeks or even days of an election campaign. Early and convenience voting also detracts from the collective expression of citizenship that takes place on Election

Day. Moreover, the cost of administering elections and of running campaigns tends to increase when early and mail-in voting is conducted in addition to balloting on Election Day. Early voting should commence no earlier than 15 days prior to the election, so that all voters will cast their ballots on the basis of largely comparable information about the candidates and the issues.

---

**Recommendation on Vote by Mail**

**4.2.1** The Commission encourages further research on the pros and cons of vote by mail and of early voting.

---

## 4.3 VOTE CENTERS

Another alternative to voting at polling stations is the innovation of "vote centers," pioneered by Larimer County, Colorado. Vote centers are larger in size than precincts but fewer in number. They are dispersed throughout the jurisdiction, but close to heavy traffic routes, larger residential areas, and major employers. These vote centers allow citizens to vote anywhere in the county rather than just at a designated precinct. Because these vote centers employ economies of scale, fewer poll workers are required, and they tend to be more professional. Also, the vote centers are reported to use more sophisticated technology that is more accessible to voters with disabilities. Vote centers eliminate the incidence of out-of-precinct provisional ballots, but they need to have a unified voter database that can communicate with all of the other centers in the county to ensure that eligible citizens vote only once.

While vote centers appear to have operated effectively in Larimer County, further research is needed to determine if the costs of establishing vote centers are offset by the savings of eliminating traditional polling sites. Moreover, because vote centers replace traditional voting at precincts, which are generally closer to a voter's home, it is not clear that citizens actually view them as more convenient.

---

**Recommendations on Vote Centers**

**4.3.1** States should modify current election law to allow experimentation with voting centers. More research, however, is needed to assess whether voting centers expand voter participation and are cost effective.

**4.3.2** Voting centers need a higher quality, computer-based registration list to assure that citizens can vote at any center without being able to vote more than once.

---

## 4.4 MILITARY AND OVERSEAS VOTING

Military and overseas voting present substantial logistical challenges, yet we cannot overstate the imperative of facilitating participation in elections by military and overseas voters, particularly by service men and women who put their lives on the line for their country. The Commission calls on every state, with federal government assistance, to make every effort to provide all military and overseas voters with ample opportunity to vote in federal elections.

More than six million eligible voters serve in the Armed Forces or live overseas. These voters include 2.7 million military and their dependents and 3.4 million diplomats, Peace Corps volunteers, and other civilian government and other citizens overseas.[42]

Voter turnout among members of the armed forces is high. So is the level of frustration they experience when their votes cannot be counted. This happens largely because of the time required by the three-step process of applying for an absentee ballot, receiving one, and then returning a completed ballot. The process is complicated by the differences among states and among localities in the registration deadline, ballot format, and requirements for ballot return, and it is exacerbated because of the mobility of service men and women during a time of conflict. Since September 11, 2001, more than 500,000 National Guard and Reserve personnel have been mobilized, and many were relocated before they received their absentee ballots.



A U.S. Army officer stationed in Bosnia fills in his 2004 voting forms (AP Photo/Amel Emric)

Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) in 1986 to help eligible members of the armed services and their families, and other citizens overseas, to vote. UOCAVA required each state to have a single office to provide information on voter registration and absentee ballot procedures for military voters. The Help America Vote Act of 2002 (HAVA) recommended — but did not require — that this state office should coordinate voting by military personnel by receiving absentee ballot applications and collecting voted ballots. The introduction of statewide voter registration databases under HAVA provides an opportunity to put this recommendation into practice. But aside from Alaska, which already had a single state office, no state has centralized the processing of absentee ballots. This is another example as to why recommending, rather than requiring, a course of action is insufficient.

The Commission recommends that when registering members of the armed forces and other overseas voters, states should inquire whether to send an absentee ballot to them automatically, thus saving a step in the process.

In the 2004 presidential election, approximately one in four military voters did not vote for a variety of reasons: The absentee ballots were not returned or arrived too late; they were rejected for procedural deficiencies, such as a signature not properly witnessed on the back of the return envelope; blank ballots were returned as undeliverable; or Federal Post Card Applications were rejected.[43]

The U.S. Department of Defense's Federal Voting Assistance Program, which assists military and overseas voters, tried to reduce the time lag for absentee voting by launching an electronic voting experiment. However, this experiment was ended because of fundamental security problems (see above on "Internet voting").[44] In the meantime, the Federal Voting Assistance Program encouraged states to send blank ballots out electronically and to accept voted ballots by fax. There now are 32 states that permit fax delivery of a blank ballot to military voters and 25 states that allow military voters to return their voted ballot by fax. In addition, some jurisdictions allow the delivery of blank ballots by email.[45] The return of voted ballots by fax or email, however, is a violation of the key principle of a secret ballot, and it is vulnerable to abuse or fraud.

Although the Uniformed and Overseas Citizens Absentee Voting Act applies to both military and nonmilitary voters overseas, procedures to facilitate overseas voting serve military voters better than civilians. To provide civilian overseas voters with equal opportunities to participate in federal elections, new approaches are needed at both the federal and state levels.

---

### Recommendations on Military and Overseas Voting

**4.4.1** The law calling for state offices to process absentee ballots for military and overseas government and civilian voters should be implemented fully, and these offices should be under the supervision of the state election offices.

**4.4.2** New approaches should be adopted at the federal and state levels to facilitate voting by civilian voters overseas.

**4.4.3** U.S. Department of Defense (DOD) should supply to all military posted outside the United States a Federal Postcard Application for voter registration and a Federal Write-in Absentee Ballot for calendar years in which there are federal elections. With adequate security protections, it would be preferable for the application forms for absentee ballots to be filed by Internet.

**4.4.4** The states, in coordination with the U.S. Department of Defense's Federal Voting Assistance Program, should develop a system to expedite the delivery of ballots to military and overseas civilian voters by fax, email, or overnight delivery service, but voted ballots should be returned by regular mail, and by overnight mail whenever possible. The Defense Department should give higher priority to using military aircraft returning from bases overseas to carry ballots. Voted ballots should not be returned by email or by fax as this violates the secrecy of the ballot and is vulnerable to fraud.

**4.4.5** All ballots subject to the Uniform and Overseas Civilians Absentee Voting Act must be mailed out at least 45 days before the election (if request is received by then) or within two days of receipt after that. If the ballot is not yet set, due to litigation, a late vacancy, etc., a temporary ballot listing all settled offices and ballot issues must be mailed.

**4.4.6** States should count the ballots of military and overseas voters up to 10 days after an election if the ballots are postmarked by Election Day.

**4.4.7** As the technology advances and the costs decline, tracking systems should be added to absentee ballots so that military and overseas voters may verify the delivery of their voted absentee ballots.

**4.4.8** The Federal Voting Assistance Program should receive a copy of the report that states are required under HAVA to provide the EAC on the number of absentee ballots sent to and received from military and overseas voters.

## 4.5   ACCESS FOR VOTERS WITH DISABILITIES

There are almost 30 million voting-aged Americans with some kind of disability—about 15 percent of the population (see Table 3 on page 40). Less than half of them vote. There are federal laws to facilitate voting and registration by eligible Americans with disabilities, but these laws have not been implemented with any vigor. As a result, voters with disabilities still face serious barriers to voting.[46] Congress passed the Voting Accessibility for the Elderly and Handicapped Act in 1984 and the Americans with Disabilities Act of 1990, which required local authorities to make polling places physically accessible to people with disabilities for federal elections. Yet a Government Accountability Office survey of the nation's polling places in 2000 found that 84 percent of polling places were not accessible on Election Day. By 2004, accessibility for voters with disabilities had improved only marginally. Missouri, for example, surveyed every polling place in the state and found that 71 percent were not accessible. Most other states have not even conducted surveys.[47]



A voter tries out a disability-accessible voting machine (AP Photo/Mike Derer)

There is similarly weak implementation of laws designed to facilitate voter registration by citizens with disabilities. Section 7 of the National Voter Registration Act (NVRA) requires state-funded agencies which provide services to citizens with disabilities to offer the opportunity to register citizens to vote. Implementation of this requirement, according to advocates for voters with disabilities, is rare or poor.[48]

HAVA provided additional support to Section 7 of NVRA by including social-service agencies as places to register voters, but only one state, Kentucky, has complied with Section 7, according to advocates for voters with disabilities. Moreover, at the current time, there is not a single case where the new statewide voter databases comply with Section 7.[49] Thus, 12 years after the National Voter Registration Act was passed, voters with disabilities still cannot apply for voter registration at all social service offices.

| TABLE 3: Estimates of U.S. Voting Population with Disabilities by Type | | |
|---|---|---|
| Disability Type | Population Age 16 and Older (in millions) | Percent of Total Voting Age Population |
| Sensory, Physical, Mental or Self-Care Disability | 29.5 | 15% |
| Self-Care Disability | 6.4 | 3% |
| Physical Disability | 12.5 | 6% |
| Mental Disability | 4.0 | 2% |
| Sensory Disability | 3.9 | 2% |
| Sensory and Physical Disability | 2.5 | 1% |
| Sensory, Physical, and Mental Disability | 2.0 | 1% |
| Total Voting Age Population in the U.S. (18 and older) | 203.0 | 100% |

NOTES: Respondents were able to report more than one type of disability.

SOURCES: U.S. Census Bureau, Selected Types of Disability for the Civilian Noninstitutionalized Population 5 Years and Over by Age: 2000; U.S. Census Bureau, Voting and Registration in the Election of November 2000.

### Recommendations on Access for Voters With Disabilities

**4.5.1** To improve accessibility of polling places for voters with disabilities, the U.S. Department of Justice should improve its enforcement of the Americans with Disabilities Act and the accessibility requirements set by the Help America Vote Act.

**4.5.2** States should make their voter registration databases interoperable with social-service agency databases and facilitate voter registration at social-service offices by citizens with disabilities.

**4.5.3** States and local jurisdictions should allow voters with disabilities to request an absentee ballot when they register and to receive an absentee ballot automatically for every subsequent election. Local election officials should determine which voters with disabilities would qualify.

## 4.6   RE-ENFRANCHISEMENT OF EX-FELONS

Only Maine and Vermont allow incarcerated citizens to vote. In all other states, citizens who are convicted of a felony lose their right to vote, either temporarily or permanently. An estimated 4.65 million Americans have currently or permanently lost their right to vote as a result of a felony conviction. Most states reinstate that right upon completion of the full sentence, including of parole, but three states — Florida, Kentucky, and Virginia — permanently ban all ex-felons from voting, and another 10 states have a permanent ban on

voting by certain categories of ex-felons.[50] These laws have a disproportionate impact on minorities.

Some states impose a waiting period after felons complete their sentence before they can vote. Few states take the initiative to inform ex-felons when their voting rights are restored. As a result, only a small portion of the ex-felons who have regained their voting rights are registered to vote.

Proponents of re-enfranchisement argue that ex-felons have paid their debt to society when they have completed their full sentence. Restoring their right to vote would encourage them to reintegrate into society. Each state therefore should automatically restore the voting rights of ex-felons who have completed their full sentence, including any terms of parole and compensation to victims. Opponents of re-enfranchisement, however, see this as a "punishment" issue rather than a "voting rights" issue. They believe that each state should be free to decide whether to restore the voting rights of ex-felons. States set punishment for state crimes, and this often extends beyond the completion of a felon's sentence. Ex-felons are, for instance, usually barred from purchasing firearms or from getting a job as a public-school teacher. Nonetheless, weighing both sides of the debate, the Commission believes that voting rights should be restored to certain categories of felons after they served the debt to society.

---

### Recommendations on Re-Enfranchisement of Ex-Felons

**4.6.1**  States should allow for restoration of voting rights to otherwise eligible citizens who have been convicted of a felony (other than for a capital crime or one which requires enrollment with an offender registry for sex crimes) once they have fully served their sentence, including any term of probation or parole.

**4.6.2**  States should provide information on voter registration to ex-felons who have become eligible to vote. In addition, each state's department of corrections should automatically notify the state election office when a felon has regained eligibility to vote.

---

## 4.7  VOTER AND CIVIC EDUCATION

Among the simplest ways to promote greater and more informed participation in elections is to provide citizens with basic information on voting and the choices that voters will face in the polling booth. HAVA requires only that basic voter information, including a sample ballot and instructions on how to vote, be posted at each polling site on Election Day. However, additional voter information is needed.

States or local jurisdictions should provide information by mail and on their Web sites to educate voters on the upcoming ballot — on the issues and the candidates, who will provide the information about themselves. Local election officials should set limits on the amount — but not the content — of information to be provided by the candidates. In Washington state, for example, every household is mailed a pamphlet with information on how to register, where to vote, and texts of election laws and proposed ballot initiatives and

referendums. This voter's pamphlet also has a picture of each candidate for statewide office and a statement of the candidate's goals for the office they seek. In addition, there should be greater use of the radio and television to communicate these messages.

Efforts to provide voter information and education to young Americans merit particular attention. Voter turnout among youth declined steadily from the 1970s to 2000, when it was 24 percent lower than turnout of the entire electorate. In 2004, however, there was a surge of 11 percent in voter turnout among Americans aged 18 to 24, and the gap between youth turnout and overall turnout dropped to 17 percent (see Table 4).[51]

While participation by youth increased significantly in the last election, it continues to lag far behind the rest of the population. It can and should be increased by instructing high school students on their voting rights and civic responsibilities. Just one course in civics or American government can have a strong influence on youth participation in elections. According to a 2003 survey, about twice as many young Americans who have taken a civics course are registered to vote and have voted in all or most elections than young Americans who have never taken such a course.[52]



A college student in New Mexico registers to vote as part of a campaign to reach new voters (AP Photo/Las Cruces Sun-News, Norm Dettlaff)

Moreover, Americans want public schools to prepare their children for citizenship and to provide better civic education. While most Americans believe that the most important goal of public schools is to develop basic skills, seven in 10 respondents to a 2004 survey agreed that preparing students to become responsible citizens is a "central purpose of public schools." When asked to grade the civic education programs of public schools, 54 percent of respondents give these programs a "C" and 22 percent give them a "D."[53]

It is difficult to assess the current efforts of state and local voting and civic education programs because only one state, Florida, publishes a report on its activities and spending in this area. We recommend that more states and local jurisdictions follow Florida's example in order to generate more information on the most effective methods for voter and civic education.

**TABLE 4:**
Voter Turnout in Presidential Elections by Age, 1972-2004

| Age Range | 1972 | 1976 | 1980 | 1984 | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| 18 to 24 years | 49.6 | 42.2 | 39.9 | 40.8 | 36.2 | 42.8 | 32.4 | 32.3 | 41.9 |
| 25 to 44 years | 62.7 | 58.7 | 58.7 | 58.4 | 54.0 | 58.3 | 49.2 | 49.8 | 52.2 |
| 45 to 64 years | 70.8 | 68.7 | 69.3 | 69.8 | 67.9 | 70.0 | 64.4 | 64.1 | 66.6 |
| 65 years+ | 63.5 | 62.2 | 65.1 | 67.7 | 68.8 | 70.1 | 67.0 | 67.6 | 68.9 |

**SOURCE:** U.S. Census Bureau (2004).

## Recommendations on Voter and Civic Education

**4.7.1**  Each state should publish a report on its voter education spending and activities.

**4.7.2**  States should engage in appropriate voter education efforts in coordination with local election authorities to assure that all citizens in their state have the information necessary to participate in the election process.

**4.7.3**  Each state should use its best efforts to instruct all high school students on voting rights and how to register to vote. In addition, civic education programs should be encouraged in the senior year of high school, as these have been demonstrated to increase voter participation by youth.

**4.7.4**  Local election authorities should mail written notices to voters in advance of an election advising the voter of the date and time of the election and the polling place where the voter can cast a ballot and encouraging the citizens to vote. The notice should also provide a phone number for the voter to contact the election authorities with any questions.

**4.7.5**  States should mail pamphlets to voters, and post the pamphlet material on their Web sites, to provide information about the candidates for statewide office and about ballot initiatives and referenda.

**4.7.6**  The federal government should provide matching funds for the states to encourage civic and voter education and advertisements aimed to encourage people to vote.





OFFICIAL ABSENTEE BALLOTING MATERIAL - MISSISSIPPI - FIRST CLASS MAIL

NO POSTAGE NECESSARY IN THE U.S. MAIL – DMM 137.3

BARBARA DUNN
Clerk of Circuit Court
P. O. Box 327
JACKSON, MISSISSIPPI 39205

SEP

39205

Type of Election - Check One

☐ First Primary
☐ Second Primary
☐ General or Special

Party designation if any

AFFIDAVIT OF VOTER TO BE
MADE ON BACK OF THIS ENVELOPE

OFFICIAL ABSENTEE BALLOTING MATERIAL

**Circuit Clerk**
**Hinds County**
**P. O. Box 327**
**Jackson, MS 39205-0327**

(AP Photo/Rogelio Solis)

# 5. Improving Ballot Integrity

Because the integrity of the ballot is a hallmark of democracy, it is imperative that election officials guarantee eligible voters the opportunity to vote, but only once, and tabulate ballots in an accurate and fair manner.

## 5.1 INVESTIGATION AND PROSECUTION OF ELECTION FRAUD

While election fraud is difficult to measure, it occurs. The U.S. Department of Justice has launched more than 180 investigations into election fraud since October 2002. These investigations have resulted in charges for multiple voting, providing false information on their felon status, and other offenses against 89 individuals and in convictions of 52 individuals. The convictions related to a variety of election fraud offenses, from vote buying to submitting false voter registration information and voting-related offenses by non-citizens.[54]

In addition to the federal investigations, state attorneys general and local prosecutors handle cases of election fraud. Other cases are never pursued because of the difficulty in obtaining sufficient evidence for prosecution or because of the low priority given to election fraud cases. One district attorney, for example, explained that he did not pursue allegations of fraudulent voter registration because that is a victimless and nonviolent crime.[55]

Election fraud usually attracts public attention and comes under investigation only in close elections. Courts may only overturn an election result if there is proof that the number of irregular or fraudulent votes exceeded the margin of victory. When there is a wide margin, the losing candidate rarely presses for an investigation. Fraud in any degree and in any circumstance is subversive to the electoral process. The best way to maintain ballot integrity is to investigate all credible allegations of election fraud and otherwise prevent fraud before it can affect an election.

Investigation and prosecution of election fraud should include those acts committed by individuals, including election officials, poll workers, volunteers, challengers or other nonvoters associated with the administration of elections, and not just fraud by voters.

---

### Recommendations on Investigation and Prosecution of Election Fraud

**5.1.1** In July of even-numbered years, the U.S. Department of Justice should issue a public report on its investigations of election fraud. This report should specify the numbers of allegations made, matters investigated, cases prosecuted, and individuals convicted for various crimes. Each state's attorney general and each local prosecutor should issue a similar report.

**5.1.2** The U.S. Department of Justice's Office of Public Integrity should increase its staff to investigate and prosecute election-related fraud.

---

**5.1.3**  In addition to the penalties set by the Voting Rights Act, it should be a federal felony for any individual, group of individuals, or organization to engage in any act of violence, property destruction (of more than $500 value), or threatened act of violence that is intended to deny any individual his or her lawful right to vote or to participate in a federal election.

**5.1.4**  To deter systemic efforts to deceive or intimidate voters, the Commission recommends federal legislation to prohibit any individual or group from deliberately providing the public with incorrect information about election procedures for the purpose of preventing voters from going to the polls.

## 5.2  ABSENTEE BALLOT AND VOTER REGISTRATION FRAUD

Fraud occurs in several ways. Absentee ballots remain the largest source of potential voter fraud.[56] A notorious recent case of absentee ballot fraud was Miami's mayoral election of 1998, and in that case, the judge declared the election fraudulent and called for a new election. Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted. Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail. States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots. States also should make sure that absentee ballots received by election officials before Election Day are kept secure until they are opened and counted.

Non-citizens have registered to vote in several recent elections. Following a disputed 1996 congressional election in California, the Committee on House Oversight found 784 invalid votes from individuals who had registered illegally. In 2000, random checks by the Honolulu city clerk's office found about 200 registered voters who had admitted they were not U.S. citizens.[57] In 2004, at least 35 foreign citizens applied for or received voter cards in Harris County, Texas, and non-citizens were found on the voter registration lists in Maryland as well.[58]

The growth of "third-party" (unofficial) voter registration drives in recent elections has led to a rise in reports of voter registration fraud. While media attention focused on reports of fraudulent voter registrations with the names of cartoon characters and dead people, officials in 10 states investigated accusations of voter registration fraud stemming from elections in 2004, and between October 2002 and July 2005, the U.S. prosecuted 19 people charged with voter registration fraud.[59] Many of these were submitted by third-party organizations, often by individuals who were paid by the piece to register voters.

States should consider new legislation to minimize fraud in voter registration, particularly to prevent abuse by third-party organizations that pay for voter registration by the piece. Such legislation might direct election offices to check the identity of individuals registered through third-party voter registration drives and to track the voter registration forms.

HAVA requires citizens who register by mail to vote in a state for the first time to provide

an ID when they register or when they vote. Some states have interpreted this requirement to apply only to voter registration forms sent to election offices by mail, not to forms delivered by third-party organizations. As a result, neither the identity nor the actual existence of applicants is verified. All citizens who register to vote with a mail-in form, whether that form is actually sent by mail or is instead hand-delivered, should comply with HAVA's requirements or with stricter state requirements on voter ID, by providing proof of identity either with their registration application or when they appear at the polling station on Election Day. In this way, election offices will be obliged to verify the identity of every citizen who registers to vote, whether or not the registration occurs in person.



John Fund and Colleen McAndrews at the April 18 hearing (American University Photo/Jeff Watts)

In addition, states should introduce measures to track voter registration forms that are handled by third-party organizations. By assigning a serial number to all forms, election officials will be able to track the forms. This, in turn, will help in any investigations and prosecutions and thus will serve to deter voter registration fraud.

Many states allow the representatives of candidates or political parties to challenge a person's eligibility to register or vote or to challenge an inaccurate name on a voter roll. This practice of challenges may contribute to ballot integrity, but it can have the effect of intimidating eligible voters, preventing them from casting their ballot, or otherwise disrupting the voting process. New procedures are needed to protect voters from intimidating tactics while also offering opportunities to keep the registration rolls accurate, and to provide observers with meaningful opportunities to monitor the conduct of the election. States should define clear procedures for challenges, which should mainly be raised and resolved before the deadline for voter registration. After that, challengers will need to defend their late actions. On Election Day, they should direct their concerns to poll workers, not to voters directly, and should in no way interfere with the smooth operation of the polling station.

---

### Recommendations on Absentee Ballot and Voter Registration Fraud

**5.2.1**   State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

**5.2.2**   All states should consider passing legislation that attempts to minimize the fraud that has resulted from "payment by the piece" to anyone in exchange for their efforts in voter registration, absentee ballot, or signature collection.

**5.2.3**   States should not take actions that discourage legal voter registration or get-out-the-vote activities or assistance, including assistance to voters who are not required to vote in person under federal law.



# 6. Election Administration

To build confidence in the electoral process, it is important that elections be administered in a neutral and professional manner. Election officials, from county clerks and election board members to secretaries of state and U.S. Election Assistance Commission members, generally have shown great skill and dedication in administering elections in a fair and impartial manner. The institutions of election administration, however, are in need of improvement, so that they may instill greater public confidence in the election process and allow election officials to carry out their responsibilities more effectively (see Table 5 on page 52).

Elections are contests for power and, as such, it is natural that politics will influence every part of the contest, including the administration of elections. In recent years, some partisan election officials have played roles that have weakened public confidence in the electoral process. Many other partisan election officials have tried to execute their responsibilities in a neutral manner, but the fact that they are partisan sometimes raises suspicions that they might favor their own party. Most other democratic countries have found ways to insulate electoral administration from politics and partisanship by establishing truly autonomous, professional, and nonpartisan independent national election commissions that function almost like a fourth branch of government. The United States, too, must take steps to conduct its elections impartially both in practice and in appearance.

Impartial election administration, however, is not enough. Elections must also be administered effectively if they are to inspire public confidence. Long lines at polling stations, inadequately trained poll workers, and inconsistent or incorrect application of electoral procedures may have the effect of discouraging voter participation and may, on occasion, raise questions about bias in the way elections are conducted. While problems at polling stations usually reflect a shortage of trained poll workers or poor management of polling station operations, rather than an attempt to seek partisan advantage, the result is much the same. Such problems raise public suspicions or may provide grounds for the losing candidate to contest the result in a close election.

## 6.1 INSTITUTIONS

The intense partisanship and the close division of the American electorate, coupled with the Electoral College system, raise the possibility of another presidential election decided by a razor-thin margin in one or more battleground states. Although voting technology is improving, presidential elections are held in a decentralized system with a patchwork of inconsistent rules. In addition, in recent years, election challenges in the courts have proliferated.

Close elections, especially under these conditions, put a strain on any system of election administration, and public opinion demonstrates this. Significant segments of the American public have expressed concern about voter fraud, voter suppression, and the fairness of the election process in general.[60] While substantially more Democrats than Republicans surveyed in national polls considered the 2004 presidential election unfair, 41 percent more Republicans than Democrats said the electoral process was unfair in Washington state's 2004 gubernatorial election, which the Democratic candidate won by a very narrow margin.[61] The losing side, not surprisingly, is unhappy with the election result, but what is new and dangerous in the United States is that the supporters of the losing side are beginning to believe that the process is unfair. And this is true of both parties.

At its base, the problem is a combustible mixture of partisan suspicion and irregularities born in part from a decentralized system of election administration with differing state laws determining voter registration and eligibility and whether a ballot is actually counted. The irregularities, by and large, stem from a lack of resources and inadequate training for election workers, particularly those who work just on Election Day. In other countries, such irregularities sometimes lead to street protests or violence. In the United States, up until now, we have been relatively fortunate that irregularities are addressed in court. The dramatic increase in election-related litigation in recent years, however, does not enhance the public's perception of elections and may in fact weaken public confidence. The average number of election challenges per year has increased from 96 in the period of 1996 to 1999 to 254 in 2001 to 2004.[62]



Elections manager Lori Augino, left, Pierce County Auditor Pat McCarthy, U.S. EAC Commissioners Ray Martinez, III, and Paul DeGregorio, right, observe the 2004 manual gubernatorial recount in Washington (AP Photo/*The News Tribune*, Janet Jensen)

Another major source of public mistrust of the election process is the perception of partisanship in actions taken by partisan election officials. In a majority of states, election administration comes under the authority of the secretary of state. In 2000 and 2004, both Republican and Democratic secretaries of state were accused of bias because of their discretionary decisions — such as how to interpret unclear provisions of HAVA. The issue is not one of personality or a particular political party because allegations and irregularities dogged officials from both parties. The issue is the institution and the perception of partiality that is unavoidable if the chief election officer is a statewide politician and the election is close, has irregularities, or is disputed. The perception of partiality is as important, if not more so, than the reality.

Bipartisan election administration has the advantage of allowing both parties to participate, but the flaws of such a system are evident in the experience of the Federal Election Commission (FEC). The FEC has often become deadlocked on key issues. In the cases when the FEC commissioners agree, they sometimes protect the two parties from enforcement rather than represent the public's interest in regulating campaign finance.

**NONPARTISAN ELECTION ADMINISTRATION.** To minimize the chance of election meltdown and to build public trust in the electoral process, nonpartisan structures of election administration are very important, and election administrators should be neutral, professional, and impartial. At the federal level, the U.S. Election Assistance Commission should be reconstituted on a nonpartisan basis to exercise whatever powers are granted by law, and the EAC chairperson should serve as a national spokesperson, as the chief elections officer in Canada does, for improving the electoral process. States should consider transferring the authority for conducting elections from the secretary of state to a chief election officer, who would serve as a nonpartisan official.

States could select a nonpartisan chief elections officer by having the individual subject to approval by a super-majority of two-thirds of one or both chambers of the state legislature. The nominee should receive clear bipartisan support. This selection process is likely to yield a respected consensus candidate or, at least, a nonpartisan candidate.

The EAC, in its 18 months of operation, has managed to make its decisions by consensus. While this is a significant accomplishment for a bipartisan, four-member commission, it has come at a cost. The EAC has been slow to issue key guidance, and the guidance it has issued has often been vague. The process of forging consensus among the EAC's commissioners appears to have slowed and watered down key decisions, particularly as they have come under pressure from their respective political parties. If the EAC were reconstituted as a nonpartisan commission, it would be better able to resist partisan political pressure and operate more efficiently and effectively.

To avoid the dangers of bipartisan stalemate, the EAC should be reconstituted as a five-member commission, with a strong chairperson and nonpartisan members. This would be done initially by adding a fifth position to the EAC and making that position the chairperson, when the current chairperson's term ends. The new EAC chairperson would be nonpartisan, nominated by the President, and confirmed by the U.S. Senate. Later, as the terms of other EAC commissioners expired, they would be replaced by nonpartisan commissioners, subject to Senate confirmation as well.



Kansas Secretary of State Ron Thornburgh at the April 18 hearing (American University Photo/Jeff Watts)

**INDEPENDENCE AND AUTHORITY.** For the positions of EAC commissioners and state chief elections officers to remain both nonpartisan and effective, they must be insulated from political pressure. This can be done by the terms of appointment and the lines of responsibility. The EAC commissioners and state chief elections officers should receive a long-term appointment, perhaps 10 years. The grounds for dismissal should be limited, similar to the rules for removal of a federal or state judge. The EAC should have the autonomy to oversee federal election laws that Congress directs it to implement and advise Congress and the President on needed improvements in election systems. State chief elections officers should have similar autonomy.

Under HAVA, the EAC distributes federal funds to the states, issues voluntary guidance on HAVA's mandates, and serves as a clearinghouse for information on elections. In addition, it develops standards for voting equipment and undertakes research on elections.

The flaws identified in the electoral system described in this report were due in large part to a very decentralized system with voting standards implemented in different ways throughout the country. If HAVA is fully and effectively implemented, states should be able to retrieve authority to conduct elections from counties and impose a certain degree of uniformity.

In this report, we have proposed the kinds of reforms needed to improve significantly our electoral process. To implement those reforms, a new or invigorated institution like the EAC is needed to undertake the following tasks:

- Statewide registration lists need to be organized top-down with states in charge and counties assisting states rather than the other way around;

- A template and a system is needed for sharing voter data across states;

- The "REAL ID" needs to be adapted for voting purposes and linked to the registration list;

- To ensure that the new requirements — ID and registration list — do not impede access to voting, an expanded effort is needed to reach out and register new voters;

- Quality audits of voter databases and certification of voting machine source codes is essential;

- Voting machines need a voter-verifiable audit trail; and

- Extensive research on the operations and technology of elections is needed.

**TABLE 5: Types of Electoral Administration**

| Type of Institution | WORLD REGION | | | | Total Number of Cases (percent of total) |
| | The Americas | Asia & the Pacific | East & Central Europe | Sub-Saharan Africa | |
|---|---|---|---|---|---|
| Government | 5* | 9 | 0 | 3 | 17 (14%) |
| Government supervised by judges or others | 6 | 2 | 6 | 14 | 28 (23%) |
| Independent electoral commission | 25 | 19 | 12 | 19 | 75 (63%) |

\* The U.S. is included in this category.

**SOURCE:** Rafael López-Pintor, *Electoral Management Bodies as Institutions of Governance* (NY: United Nations Development Programme, Bureau for Development Policy, 2000).

These reforms, but particularly those that require connecting states, will not occur on their own. The EAC needs to have sufficient authority to assure effective and consistent implementation of these reforms, and to avoid repeating past problems, its guidance must be clear and compelling. A stronger EAC does not mean that the states will lose power in conducting elections. To the contrary, the authority of state election officials will grow with the creation of statewide voter databases, and their credibility will be enhanced by the new nonpartisan structure and professionalism.

**CONFLICT-OF-INTEREST RULES.** No matter what institutions are responsible for conducting elections, conflict-of-interest standards should be introduced for all federal, state, and local election officials, including some of the provisions in Colorado's new election law and of the Code of Conduct prepared by the International Institute for Democracy and Electoral Assistance (IDEA).[69] This Code of Conduct requires election administrators to avoid any activity, public or private, that might indicate support or even sympathy for a particular candidate, political party, or political tendency.

Election officials should be prohibited by federal and/or state laws from serving on any political campaign committee, making any public comments in support of a candidate, taking a public position on any ballot measure, soliciting campaign funds, or otherwise campaigning for or against a candidate for public office. A decision by a secretary of state to serve as co-chair of his or her party's presidential election committee would clearly violate these standards.

## Recommendations on Institutions

**6.1.1** To undertake the new responsibilities recommended by this report and to build confidence in the administration of elections, Congress and the states should reconstitute election management institutions on a nonpartisan basis to make them more independent and effective. U.S. Election Assistance Commission members and each state's chief elections officer should be selected and be expected to act in a nonpartisan manner, and the institutions should have sufficient funding for research and training and to conduct the best elections possible. We believe the time has come to take politics as much as possible out of the institutions of election administration and to make these institutions nonpartisan.

**6.1.2** Congress should approve legislation that would add a fifth member to the U.S. Election Assistance Commission, who would serve as the EAC's chairperson and who would be nominated by the President based on capability, integrity, and nonpartisanship. This would permit the EAC to be viewed more as nonpartisan than bipartisan and would improve its ability to make decisions. That person would be subject to Senate confirmation and would serve a single term of ten years. Each subsequent vacancy to the EAC should be filled with a person judged to be nonpartisan so that after a suitable period, all the members, and thus the institution, might be viewed as above politics.

**6.1.3** States should prohibit senior election officials from serving or assisting political campaigns in a partisan way, other than their own campaigns in states where they are elected.

**6.1.4** States should take additional actions to build confidence in the administration of elections by making existing election bodies as nonpartisan as possible within the constraints of each state's constitution. Among the ways this might be accomplished would be if the individuals who serve as the state's chief elections officer were chosen based on their capability, integrity, and nonpartisanship. The state legislatures would need to confirm these individuals by a two-thirds majority of one or both houses. The nominee should receive clear bipartisan support.

**6.1.5** Each state's chief elections officer should, to the extent reasonably possible, ensure uniformity of voting procedures throughout the state, as with provisional ballots. Doing so will reduce the likelihood that elections are challenged in court.

## 6.2 POLL WORKER RECRUITMENT

For generations, civic-minded citizens, particularly seniors, have served as poll workers. The average age of poll workers is 72.[64] Poll workers generally are paid minimum wages for a 15-hour day. Not surprisingly, recruitment has proven more and more difficult. For the 2004 election, the United States needed 2 million poll workers, but it fell short by 500,000.

Effective administration of elections requires that poll workers have the capability and training needed to carry out complex procedures correctly, the skills to handle increasingly sophisticated voting technology, the personality and skills to interact with a diversity of people in a calm and friendly manner, and the energy to complete a very long and hard day of work on Election Day. Poll workers must administer complex voting procedures, which are often changed with each election. These include issuing provisional ballots, checking voter identification in accordance with state law, and correctly counting the votes after the polling station closes. Poll workers must also set up voting machines, instruct voters to use these machines, and provide helpful service to voters, including to voters with disabilities and non-English speakers.



Commissioner Sharon Priest, Daniel Callingaert, Michael Alvarez, and Election Center Executive Director Doug Lewis (Rice University Photo/Jeff Fitlow)

A broad pool of potential recruits, drawn from all age groups, is needed to meet the demands made on today's poll workers. To adequately staff polling stations, states and local jurisdictions must offer better pay, training, and recognition for poll workers and recruit more citizens who have full-time jobs or are students. Recruitment of teachers would serve to spread knowledge of the electoral process, while recruitment of students would educate future voters and attract individuals who may serve as poll workers for decades to come.

Local election authorities should also consider providing incentives for more rigorous training. Guilford County, North Carolina, for example, initiated a "Precinct Officials Certification" program in cooperation with the local community college. The program requires 18 hours of class and a final exam. While voluntary, more than 80 percent of Guilford County's 636 permanent precinct officials completed the course. Certified officials receive an additional $35 per election in pay. Retention of officials has risen from roughly 75 percent to near 95 percent.

In addition, poll workers deserve greater recognition for their public service. States might establish a Poll Worker Appreciation Week and issue certificates to thank poll workers for their contribution to the democratic process.

Several states have passed laws to provide paid leave for state and local government workers who serve as poll workers on Election Day. A pilot program titled "Making Voting Popular" was implemented in 1998 in six counties surrounding the Kansas City metropolitan area to encourage employers to provide a paid "civic leave" day for employees who work as poll workers. Many states have introduced laws to encourage the recruitment of student poll workers. Partnered with experienced poll workers, student poll workers can learn about elections while contributing their technological skills.

It will be easier to recruit skilled poll workers if they are given flexibility in the terms of their service by working part of the day. Since a large proportion of voters arrive either at the beginning or the end of the day, it would make sense to hire more poll workers for those periods, although this is not now the case. Bringing poll workers in from other jurisdictions might also serve to provide partisan balance in jurisdictions where one party is dominant. Flexibility in the terms of service by poll workers is often restricted by state laws. Where this is the case, states should amend their laws to allow part-day shifts for poll workers on Election Day and to permit state residents to staff polling stations in a different jurisdiction.

In addition, states might consider a new practice of recruiting poll workers in the same way that citizens are selected for jury duty. This practice is used in Mexico, where citizens are selected randomly to perform what they consider a civic obligation. About five times as many poll workers as needed are trained in Mexico, so that only the most skilled and committed are selected to serve as poll workers on Election Day. The process of training so many citizens serves the additional purpose of educating the public in voting procedures. This practice both reflects and contributes to a broad civic commitment to democracy.

---

### Recommendations on Poll Worker Recruitment

**6.2.1** States and local jurisdictions should allocate sufficient funds to pay poll workers at a level that would attract more technologically sophisticated and competent workers. Part-time workers should also be recruited for the beginning and the end of Election Day. States should amend their laws to allow shifts for part of the day for poll workers on Election Day.

**6.2.2** States and local jurisdictions should implement supplemental training and recognition programs for poll workers.

**6.2.3** To increase the number and quality of poll workers, the government and nonprofit and private employers should encourage their workers to serve as poll workers on Election Day without any loss of compensation, vacation time or personal time off. Special efforts should be made to enlist teachers and students as poll workers.

**6.2.4** Because some jurisdictions have large majorities of one party, which makes it hard to attract poll workers from other parties, local jurisdictions should allow poll workers from outside the jurisdiction.

**6.2.5** States should consider legislation to allow the recruitment of citizens as poll workers as is done for jury duty.



long line of Ohio voters on Election Day 2004
(AP Photo/Mark Duncan)

## 6.3 POLLING STATION OPERATIONS

A visible problem on Election Day 2004 was long lines. This should have been anticipated because there was a surge in new registrations and people expected a close election, particularly in "battleground states." Still, too many polling stations were unprepared. While waiting until 4 a.m. to vote was an extreme case, too many polling stations experienced long lines at the beginning of the day when people went to work or at the day's end when they returned. Fast-food chains hire extra workers at lunchtime, but it apparently did not occur to election officials to hire more workers at the times when most people vote. Long lines were hardly the only problem; many polling stations had shortages of provisional ballots, machines malfunctioned, and there were too many inadequately trained workers on duty. Although most states ban campaigning within a certain distance of a polling station, other states or counties permit it, though many voters find it distasteful if not intimidating.

Problems with polling station operations, such as long lines, were more pronounced in some places than in others.[65] This at times gave rise to suspicions that the problems were due to discrimination or to partisan manipulation, when in fact the likely cause was a poor decision by election administrators. The U.S. Department of Justice's investigation into the allocation of voting machines in Ohio, for example, found that problems were due to administrative miscalculations, not to discrimination.[66]

The 2004 elections highlighted the importance of providing enough voting machines to each polling place. While voter turnout can be difficult to predict, the ratio of voters per machine can be estimated. Texas, for example, has issued an administrative rule to estimate the number of machines needed per precinct at different rates of voter turnout.[67]

The impression many voters get of the electoral process is partially shaped by their

experience at the polling station, and yet, not enough attention has been given to trying to make them "user-friendly." Elementary questions, which most businesses study to become more efficient and responsive to their customers, are rarely asked, let alone answered by election officials. Questions like: How long does it normally take for a citizen to vote? Would citizens prefer to go to a neighborhood precinct, or to a larger, more service-oriented but more distant "voting center"? How many and what kinds of complaints and problems do polling stations hear in an average day? How do they respond, and are voters satisfied with the response? How many citizens find electronic machines useful, and how many find them formidable? By answering these fundamental questions, we might determine ways to provide efficient and courteous service at polling locations

A simple way to compile useful information about problems voters face on Election Day would be to require that every voting station maintain a "log book" on Election Day to record all complaints from voters or observers. The log book would be signed by election observers at the end of the day to make sure that it has recorded all the complaints or problems. An analysis of the log books would help identify common problems and help design more efficient and responsive polling sites.

---

### Recommendations on Polling Station Operations

**6.3.1**  Polling stations should be made user-friendly. One way to do so would be to forbid any campaigning within a certain distance of a polling station.

**6.3.2**  Polling stations should be required to maintain a "log-book" on Election Day to record all complaints. The books should be signed by election officials and observers and analyzed for ways to improve the voting process.

**6.3.3**  Polling stations should be organized in a way that citizens would not have to wait long before voting, and officials should be informed and helpful.

---

## 6.4  RESEARCH ON ELECTION MANAGEMENT

Despite the wealth of expertise and literature on U.S. elections and voting behavior, little research focuses on the administration or conduct of elections. Until the 2000 election stirred interest in the subject, we had no information on how often votes went uncounted. Today, we still do not know how many people are unable to vote because their name is missing from the registration list or their identification was rejected at the polls. We also have no idea about the level of fraud or the accuracy and completeness of voter registration lists.

To effectively address the challenges facing our election systems, we need to understand better how elections are administered. The log books and public reports on investigations on election fraud, described above, can provide some good raw material. But we need more systematic research to expand knowledge and stimulate needed improvements in U.S. election systems. Moreover, beyond the reforms needed today, U.S. election systems will need to adapt in the future to new technology and to social changes.



A North Dakota election Judge on Election Day 2004.
(AP Photo/Will Kincaid).

The Center for Election Systems at Kennesaw State University in Georgia is the first university center established to study election systems and to assist election administration. With funding from the state government, this Center develops standards for voting technology used in Georgia and provides an array of other services, such as testing all election equipment, providing training, building databases, and designing ballots for many counties. The Center thus provides critical services to state election authorities and supports constant improvements in election systems. Since election laws and procedures vary significantly, each state should consider supporting university centers for the study of elections.

In addition to research on technology, university election centers could assist state governments on issues of election law, management, and civic and voter education. They could assemble experts from different disciplines to assist state governments in reviewing election laws, improving administrative procedures, strengthening election management, and developing programs and materials to train poll workers.

Comparative research is also needed on electoral systems in different states, and national studies should be conducted on different elements of election administration and causes of voter participation. These studies might address such questions as: What factors stimulate or depress participation in elections? How do voters adapt to the introduction of new voting technologies? And what are the costs of conducting elections? Research on these and a host of other questions is needed at the national, state, and local levels, with findings shared and efforts coordinated. Moreover, federal, state, and private foundation funds are needed to generate the research our election systems require to effectively inform decision-making, to monitor and advance best practices, and to measure implementation and enforcement.[68]

---

**Recommendation on Research on Election Management**

**6.4.1** The Commission calls for continuing research on voting technology and election management so as to encourage continuous improvements in the electoral process.

---

## 6.5  COST OF ELECTIONS

Based on the limited available information, the cost of elections appears to vary significantly by state. Wyoming, for example, spent $2.15 per voter for the 2004 elections, while California spent $3.99 per voter.[69] Information on the cost of elections is difficult to obtain, because both state and local authorities are involved in running elections, and local authorities often neglect to track what they spend on elections. At the county level, elections typically are run by the county clerk and recorder, who rarely keeps track of the staff time and office resources allocated to elections as opposed to other office responsibilities.

Election administration expenditures in the United States are on the low end of the range of what advanced democracies spend on elections. Among advanced democracies, expenditures on election administration range from lows of $2.62 in the United Kingdom and $3.07 in France for national legislative elections, through a midrange of $4.08 in Spain and $5.68 in Italy, to a high of $9.30 in Australia and $9.51 in Canada.[70] While larger expenditures provide no guarantee of greater quality in election administration, they tend to reflect the priority given to election administration. The election systems of Australia and Canada are the most expensive but are also considered among the most effective and modern election systems in the world. Both local and state governments should track and report the cost of elections per registered voter. This data would be very important in offering comparisons on alternative and convenience voting.

---

### Recommendations on Cost of Elections

6.5.1  As elections are a bedrock of our nation's democracy, they should receive high priority in the allocation of government resources at all levels. Local jurisdictions, states, and the Congress should treat elections as a high priority in their budgets.

6.5.2  Both local and state governments should track and report the cost of elections per registered voter.

---



# 7. Responsible Media Coverage

The media's role in elections is of great consequence. Effective media coverage contributes substantially to the electoral process by informing citizens about the choices they face in the elections and about the election results. In contrast, irresponsible media coverage weakens the quality of election campaigns and the public's confidence in the electoral process.

## 7.1 MEDIA ACCESS FOR CANDIDATES

More than $1.6 billion was spent on television ads in 2004 by candidates, parties, and independent groups.[71] This was a record for any campaign year and double the amount spent in the 2000 presidential election.

The pressure to raise money to pay for TV ads has tilted the competitive playing field in favor of well-financed candidates and has created a barrier to entry in politics. Moreover, TV ads tend to reduce political discourse to its least attractive elements—campaign spots are often superficial and negative. This has a significant impact on the quality of campaigns, as television is the primary source of campaign information for about half of all Americans.[72]

Broadcasters receive free licenses to operate on our publicly owned airwaves in exchange for a pledge to serve the public interest. At the heart of this public interest obligation is the need to inform the public about the critical issues that will be decided in elections.

In 1998, a White House advisory panel recommended that broadcasters voluntarily air at least five minutes of candidate discourse every night in the month preceding elections. The goal of this "5/30 standard" was to give television viewers a chance to see candidates in nightly forums that are more substantive than the political ads that flood the airwaves in the final weeks of election campaigns. National networks were encouraged to broadcast a nightly mix of interviews, mini-debates, and issue statements by presidential candidates, and local stations were asked to do the same for candidates in federal, state, and local races. Complete editorial control over the forums for candidate discourse was, of course, left to the national networks and local stations, which would decide what campaigns to cover, what formats to use, and when to broadcast the forums.

In 2000, about 103 television stations pledged to provide at least five minutes of campaign coverage every night in the final month of the election campaign, yet they often fell short of the 5/30 standard. Local news broadcasts of these 5/30 stations provided coverage, on average, of only two minutes and 17 seconds per night of candidate discourse.[73] On the thousand-plus stations that did not pledge to meet the 5/30 standard, coverage of candidate discourse was minimal.

During the 2004 campaign, substantive coverage of candidate discourse was still modest:[74]

- Little attention was given to state and local campaigns. About 92 percent of the election coverage by the national television networks was devoted to the presidential race. Less than 2 percent was devoted to U.S. House or U.S. Senate races.

- The presidential campaign also dominated local news coverage, but the news focuses on the horse race between candidates rather than on important

issues facing Americans. While 55 percent of local news broadcasts contained a story about the presidential election, only 8 percent had one about a local race. About 44 percent of the campaign coverage focused on campaign strategy, while less than one-third addressed the issues.

- Local campaign coverage was dwarfed by other news. Eight times more local broadcast coverage went to stories about accidental injuries, and 12 times more coverage went to sports and weather than to all local races combined.

- Only 24 percent of the local TV industry pledged to meet the "5/30" standard.

Notwithstanding the dramatic expansion of news available on cable television, broadcasters can and should do more to improve their coverage of campaign issues. Some propose to require broadcasters to provide free air time to candidates, but others are concerned that it might lead toward public financing of campaigns or violate the First Amendment.

---

**Recommendations on Media Access for Candidates**

**7.1.1** The Commission encourages national networks and local TV stations to provide at least five minutes of candidate discourse every night in the month leading up to elections.

**7.1.2** The Commission encourages broadcasters to continue to offer candidates short segments of air time to make issue statements, answer questions, or engage in mini-debates.

**7.1.3** Many members of the Commission support the idea that legislation should be passed to require broadcasters to give a reasonable amount of free air time to political candidates, along the lines of the provisions of the Our Democracy, Our Airwaves Act of 2003 (which was introduced as S.1497 in the 108th Congress).

---

## 7.2  MEDIA PROJECTIONS OF ELECTION RESULTS

For decades, early projections of presidential election results have diminished participation in the electoral process. Projections of Lyndon Johnson's victory in 1964 came well before the polls closed in the West. The same occurred in 1972 and in 1980. In all of these cases, candidates further down the ballot felt the effect. In 1980, the estimated voter turnout was about 12 percent lower among those who had heard the projections and not yet voted as compared with those who had not heard the projections.[75]

On Election Night in 2000, the major television news organizations — ABC, CBS, NBC, CNN, and Fox — made a series of dramatic journalistic mistakes. While polls were still open in Florida's panhandle, they projected that Vice President Gore had won the state. They later reversed their projection and predicted that Governor Bush would win Florida and, with it, the presidency. Gore moved to concede the election, beginning with a call to Bush. Gore later withdrew his concession, and the news organizations had to retract their projection of Bush's victory. The first set of mistakes may have influenced voters in Florida and in other states where the polls were still open. The second set of mistakes irretrievably influenced public perceptions of the apparent victor in the election, which then affected the subsequent controversy over the outcome in Florida.

Having made these mistakes in 2000, most television news organizations were cautious about projecting presidential election results in 2004. This caution is worth repeating in future elections and should become a standard media practice.

The Carter-Ford Commission was highly critical of the practice of declaring a projected winner in a presidential election before all polls close in the contiguous 48 states of the United States. In the Commission's view, this practice discourages voters by signaling that the election is over even before some people vote.

Voluntary restraint by major media organizations is a realistic option. National news networks in the last several presidential elections have voluntarily refrained from calling the projected presidential winner in the Eastern Standard Time zone until after 7:00 p.m. (EST). In addition, as a result of the mistakes they made in 2000, the networks have now agreed to refrain from calling the projected presidential winner in states with two time zones until all of the polls across the state have closed.

Media organizations should exercise similar restraint in their release of exit poll data. The Carter-Ford Commission noted the mounting body of evidence that documents the unreliability of exit polls. In 2000, exit polls conflicted with the actual election results in many states — and in five specific instances by as much as 7 percent to 16 percent. Network news organization officials acknowledged that exit polls have become more fallible over the years as more and more voters have refused to take part. In 2000, only about half of the voters asked to participate in exit polls agreed to do so, and only 20 percent of absentee and early voters agreed to participate in telephone "exit" poll interviews. That response rate is too low to assure reliability in exit polls.

Despite the effort made to improve exit polls for the 2004 presidential election, they were well off the mark and misled some Americans about the election's outcome. By now it should be abundantly clear that exit polls do not reliably predict election results. While exit polls can serve a useful purpose after Election Day in providing data on the composition and preferences of the electorate, they lack credibility in projecting election results, and they reflect poorly on the news organizations that release them prematurely. This ought to give news organizations sufficient reason to abandon the practice of releasing exit poll data before elections have been decided.

Government cannot prohibit news organizations from irresponsible political reporting, and efforts to legislate a delay in the announcement of projected election results are problematic. Voluntary restraint on the part of news organizations offers the best recourse. By exercising voluntary restraint, news organizations will enhance their credibility and better serve the American people by encouraging participation and public confidence in elections.

---

### Recommendations on Media Projections of Election Results

**7.2.1** News organizations should voluntarily refrain from projecting any presidential election results in any state until all of the polls have closed in the 48 contiguous states.

**7.2.2** News organizations should voluntarily agree to delay the release of any exit poll data until the election has been decided.



## 8. Election Observation

In too many states, election laws and practices do not allow independent observers to be present during crucial parts of the process, such as the testing of voting equipment or the transmission of results. In others, only certified representatives of candidates or political parties may observe. This limits transparency and public confidence in the election process. Above all, elections take place for the American people, rather than for candidates and political parties. Interested citizens, including those not affiliated with any candidate or party, should be able to observe the entire election process, although limits might be needed depending on the size of the group.

Although the United States insists on full access by its election observers to the elections of other countries, foreign observers are denied or granted only selective access to U.S. elections. Observers from the Organization for Security and Cooperation in Europe (OSCE), who were invited to the United States in 2004, were not granted access to polling stations in some states, and in other states, their access was limited to a few designated polling stations. Only one of our 50 states (Missouri) allows unfettered access to polling stations by international observers. The election laws of the other 49 states either lack any reference to international observers or fail to include international observers in the statutory categories of persons permitted to enter polling places.

To fulfill U.S. commitments to the OSCE "Copenhagen Declaration" on International Standards of Elections, accredited international observers should be given unrestricted access to U.S. elections. Such accreditation should be provided to reputable organizations which have experience in election observation and which operate in accordance with a recognized code of conduct. The National Association of Secretaries of State has encouraged state legislatures to make any necessary changes to state law to allow for international observers.[76]

---

**Recommendation on Election Observation**

**8.1.1** All legitimate domestic and international election observers should be granted unrestricted access to the election process, provided that they accept election rules, do not interfere with the electoral process, and respect the secrecy of the ballot. Such observers should apply for accreditation, which should allow them to visit any polling station in any state and to view all parts of the election process, including the testing of voting equipment, the processing of absentee ballots, and the vote count. States that limit election observation only to representatives of candidates and political parties should amend their election laws to explicitly permit accreditation of independent and international election observers.

---



A presidential elector casts a ballot. (AP Photo/Seth Perlman)