1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2                 CIVIL ACTION  81-3876(DRD)

 3   DEMOCRATIC NATIONAL COMMITTEE, : TRANSCRIPT OF PROCEEDINGS
     et al.,                       :
 4                                  :        H E A R I N G
               Plaintiffs,          :
 5                                  :
            -vs-                    :        Pages 1 - 176
 6                                  :
     REPUBLICAN NATIONAL COMMITTEE, :
 7   et al.,                        :
                                    :
 8             Defendants.          :
     - - - - - - - - - - - - - - -
 9                                     Newark, New Jersey
                                       May 5, 2009
10
     B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
11                  SENIOR UNITED STATES DISTRICT JUDGE

12

13   A P P E A R A N E S S:

14
         GENOVA, BURNS & VERNOIA
15       BY: ANGELO J. GENOVA, ESQ. and
         JOHN BARTLETT, ESQ.,
16       RAJIV D. PARIKH, ESQ.
         Attorneys for the Plaintiff
17
         HILL WALLACK, LLP
18       BY:  MEGAN M. SCHWARTZ, ESQ.
         Attorney for the Plaintiff
19

20       _____
21   Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record as
22   taken stenographically in the above entitled proceedings.

23                         S/Mollie Ann Giordano
24
                          Official Court Reporter
25
```

```
 1
        APPEARANCES - continued
 2

 3      DRINKER BIDDLE & REATH, LLP
        BY:  MARK D. SHERIDAN, ESQ.
 4      Attorney for the Defendant

 5
        McDERMOTT, WILL & EMERY
 6      BY:  BOBBY R. BURCHFIELD, ESQ.
        JASON A. LEVINE, ESQ.
 7      Attorneys for the Defendant

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   WITNESSES           DIRECT   CROSS   REDIRECT   RECROSS

 3   FOR THE DEFENDANT

 4   THOMAS JOSEFIAK        47      107      146       155

 5
     FOR THE PLAINTIFF
 6
     CHANDLER DAVIDSON      56
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.

2          MR. GENOVA:  Good morning, your Honor.

3          THE COURT:  I think you may have to give your

4     appearances, and I have a chart showing where everybody is

5     seated, so we're all set to go.  Let me just give you a few

6     suggestions as to how we might proceed, and any comments or

7     counter suggestions I'd be glad to take.

8          I'm suggesting that we perhaps have a 30-minute

9     opening statement by each side where you could outline your

10    general theme, let us know where you will be going.  I don't

11    want us to have any re-litigating of this case.  We have the

12    record in the case and there's no need to reprove what has

13    already been established.  I don't want any re-litigating of

14    other cases of this nature, or fraud cases, or what not.  They

15    can be referred to in general terms and relied on the record.

16    The testimony should be limited to the facts which are relevant

17    to this proceeding, how you responded, or was unable to respond

18    to the consent decree, but not, not wander much beyond that.

19    I'm suggesting we just receive in the record all the exhibits

20    that have been presented that are quite numerous, and I've been

21    through the folders as they came in, and it seems they have

22    covered a lot of territory, and we can just, without formerly

23    offering them as exhibits, just deem them to be in the record,

24    unless anybody has any objections.

25          And we have some rather monumental expert -- proposed

1    expert opinions which could take us months if we put these

2    various experts on the stand and they testify.  I'm suggesting

3    if you want to put them on the stand, that we have a narrative

4    presentation by the expert, that means they could use the

5    question and answer form.  But just give maybe a 30-minute

6    summary of what their opinions are, what their views are

7    concerning either fraudulent voting or voter intimidation,

8    whatever the subject matter maybe, and then rely on the

9    exhibits which have been submitted and which set forth the

10   views I think of most of the experts in considerable detail of

11   the various subjects which are relevant.  In fact, at least one

12   of the experts has an article as one of the exhibits.  So I

13   don't think I have to see it or hear it, you know, twice.

14           And then the other side wishes to examine the expert

15   after the expert's 30-minute presentation, maybe 5 or 10

16   minutes, 15 minutes of cross examination.  And then at the end

17   we could have a more extended argument after the material has

18   gone in.

19           In view of the length of the material that was

20   submitted, I anticipated we might have to go more than one day,

21   with a potential for weeks here.  I have available today,

22   tomorrow, and Thursday, if it's needed.  So just -- I think it

23   would work well if we could to confine it to this week and see

24   if the case can conclude by the end of the week, that is by the

25   Thursday, which would be the end of this week as far as we're

Colloquy                                    6

1   concerned.  Is there any problems with proceeding in this

2   manner?  No problems?

3            MR. BURCHFIELD:  Your Honor, I have a court appearance

4   in Los Angelos on Thursday, so it's our hope that we can

5   actually finish this today, or perhaps a little tomorrow.  Our

6   presentation, I think you will see, is likely not to last more

7   than half a day.

8            THE COURT:  I can see you're in the spirit of what I

9   was proposing, and you will have an incentive to see if we can

10  wrap this up by the end of tomorrow at the very latest.  All

11  right.

12           MR. GENOVA:  Your Honor, we have more than the spirit,

13  we're committed to concluding by the close of business

14  tomorrow.  We cleared our calendar if this may proceed beyond

15  today.

16           THE COURT:  Let's see how it goes.

17           I guess the Republican National Committee would be

18  first.  Mr. Burchfield, are you wanting to present it,

19  hopefully?

20

21           THE CLERK:  Mr. Burchfield, would you like me to kind

22  of close the shutters on top?

23           MR. BURCHFIELD:  That would be terrific if you could

24  do that.

25           THE COURT:  Yes, go ahead, Mr. Burchfield.

1            MR. BURCHFIELD:  Your Honor, as you know, the RNC has

2    operated under this consent decree for 27 years.  It was first

3    entered in 1982, and it was amended in 1987.  We believe the

4    RNC record of compliance with this decree is exemplary and that

5    27 years is ample time for any consent decree.  We come to the

6    Court asking the Court, because of the duration of the consent

7    decree, but more importantly because the political and legal

8    landscape has changed significantly during that period of time,

9    to vacate the consent decree.  My presentation this morning

10   will proceed in the following order.

11           First of all, just recognizing, as we all do, that the

12   situation in 1982 was different than it was in 2009.  Second,

13   I'll speak briefly about the terms and history of the consent

14   decrees.  Third, I will argue that the decrees were no longer

15   necessary.  Four, the decrees are antiquated in light of legal

16   changes that have occurred during the past 27 years.  Fourth --

17   fifth, the decrees are honest.  They impose significant burdens

18   on the RNC, both financial and otherwise.  And fifth, and

19   finally, we do not intend to make this proceeding about both

20   fraud and the existence, extent of both fraud, but I think it

21   is important to note that numerous entities, including this

22   Court, has noted that both fraud does exist.  The extent could

23   be debated, but it is appropriate for the RNC to have latitude

24   to observe elections appropriately on Election Day.

25           THE COURT:  In support of your position, there was an

1   article in the New York Times today, on April -- maybe you

2   don't read the New York Times, coming from Washington.

3           MR. BURCHFIELD:  I haven't seen it today, your Honor.

4   But ACORN does get its share of publicity.

5           To begin with, your Honor, we can reflect back on

6   1982.  I began private practice of law in 1981 after completing

7   a clerkship in the Third Circuit with Judge Baltusrol.  What I

8   saw was an IBM typewriter.  Things have changed dramatically,

9   not only the law at large and the way we practiced law, but the

10  way we deal with day-to-day activities.  But they changed

11  significantly in this context as well.  The DNC has admitted in

12  its brief in at least one respect in which modification of the

13  consent decree would be appropriate.  The DNC has said in its

14  opposition brief twice that it would not oppose amending the

15  consent decree to make clear that only the DNC can come in to

16  enforce the consent decree.  We have seen instances, and I will

17  talk about these in a few minutes, where not only the DNC, but

18  also the interveners such as in 2004, Miss Malone, and

19  candidates, Senator Daschle out of South Dakota, have attempted

20  to invoke this decree.  That's one important way which the

21  consent decree should be modified.  And the DNC has not

22  objected to that modification.

23          The DNC suggests another modifications, or at least a

24  clarification of the decree.  In its opposition brief at page

25  22, the DNC says it is undisputable to a challenge of the

1    particular validity under the procedures established by state

2    law would be a normal poll watch function and permitted by the

3    consent decree.  We would consider that a debatable proposition

4    under the consent decree.  If the RNC is -- it doesn't fully

5    alleviate the burdens on the RNC, but that is one issue that

6    needs to be clarified.

7            The terms and history of the decrees.  In the 1982

8    decree, the RNC, as you know, did not admit liability, but it

9    did agree to comply with state and federal laws protecting

10   qualified voters' right to vote.  It agreed that -- to various

11   provisions involving signage, involving campaign within polling

12   stations, interrogating prospective voters and use of uniform

13   personnel polling stations.  The central provision in the 1982

14   decree appears in the following language, that the RNC will

15   refrain from valid security activities in polling places or

16   election districts for the racial or ethnic composition of such

17   districts is a factor in the decision to conduct or the actual

18   conduct of such activities there, and where a purpose or

19   significant effect of such activities is to deter qualified

20   voters from voting.  And the conduct of such activities

21   disproportionately in or directed towards districts that have a

22   substantial proportion of racial or ethnic populations shall be

23   considered relevant evidence of the existence of such a factor

24   and purpose.

25           I know that's not the Court's language.  It is

1    somewhat laborious language.  And I think it is because of the

2    potential breadth of that language that is what has caused the

3    RNC tremendous problems over the last couple of decades.   In

4    1987, the decree was amended again with no admission of

5    liability by the RNC, but the decree defined valid security to

6    include valid integrity, valid security, or other efforts to --

7    it expanded the definition of valid security and then it

8    allowed the RNC to deploy persons on Election Day for normal

9    poll watch functions.

10          And, your Honor, I will note that in -- among the

11   various state laws, normal poll watch functions can be

12   different state to state.  So that's a matter of ambiguity

13   within the decree.

14          And finally, again, very importantly, the provision,

15   the '87 decree required preclearance by the Court of any valid

16   security program with 20 days advanced notice to the DNC.  That

17   is a particularly onerous position of the decree.  First of

18   all, the RNC does not know where and what manner the issues are

19   going to be on Election Day to get preclearance, number one.

20   And number two, by announcing to the DNC and coming to the

21   Court to get those security measures precleared, that is like

22   an accounting firm giving over its accounting methods before an

23   audit begins.  It alerts anyone who might have mischievous

24   activities in mind how to get around those poll watch

25   functions.  So we think for two reasons the preclearance is a

1     burden on the RNC.

2            Now, the litigation under the decree, there have been

3     the following cases that have been brought.  Since 1987 -- in

4     1990, the DNC brought action, an action regarding activities in

5     the North Carolina Senate race between Jessie Helms.  The Court

6     found in that case that the DNC had failed to establish that

7     the RNC conducted, participated in, or assisted valid security

8     activities in North Carolina as alleged.  So there was no

9     finding that the RNC had been involved in a prohibited

10    activity.  Rather, the Court found that although valid security

11    activities were found to be directed toward lawful valid

12    integrity programs, the RNC violated the decree by failing to

13    provide guidance to state parties on unlawful practices under

14    the decree or copies of the decree for their review.

15           So the RNC was found guilty not -- found in breach of

16    the decree, not from engaging in prohibited activities, but not

17    providing information to the State parties.  The testimony we

18    will show you today, we advance today, will indicate that the

19    RNC has been very careful to inform the state parties about the

20    provisions of the decree since that time.

21           In 2002, the New Jersey Democratic party brought an

22    action regarding New Jersey against the New Jersey Republican

23    party.  And in that instance, the Court found no violation of

24    the decree.  In 2004, Senator Tom Daschle in an action in South

25    Dakota invoked the decree and the Court, although it ultimately

1    entered a restraining order against some activity in South

2    Dakota, recognized that this decree did not apply there, it

3    applies to the RNC and New Jersey party.  It does not apply to

4    other parties or republican candidates.  But that did create

5    issues for the RNC.

6            Also, in 2004, Ebony Malone, a voter in Ohio, brought

7    an action before this Court seeking a preliminary injunction

8    entitling her to vote, guaranteeing that the RNC would not use

9    certain voter lists of returned mail.  And the Court did enter

10   an order in that case, but that order was stayed, and the case

11   was later dismissed by the Third Circuit.

12           THE COURT:  Was it dismissed because of lack of

13   standing by Miss Malone?

14           MR. BURCHFIELD:  Your Honor, on Election Day, the

15   Third Circuit in fact stayed the order.  It does not state

16   specific reasons in the order staying the case.  Later in

17   December, the Third Circuit dismissed the appeal from the case

18   as moot and sent it back, I believe, for the case to be

19   dismissed as moot.

20           THE COURT:  Miss Malone was allowed to vote.

21           MR. BURCHFIELD:  Exactly.

22           Finally, in 2008, the DNC brought an action regarding

23   New Mexico, and this Court found that there was no violation of

24   the decree.

25           So you have a history of five actions under the decree

1    since 1987, and the only violation that has not -- that has

2    stood was the, what we believe is the technical violation in

3    1990 concerning the RNC providing information about voting,

4    about the decree and voting -- and vote watching in North

5    Carolina.  In North Carolina, importantly the Civil Rights

6    Division brought a separate action against the North Carolina

7    party in the Helms campaign.  And the North Carolina parties in

8    the Helms campaign issued the consent decree.  It is attached

9    in one of the exhibits in the defendant's submission.  And as

10   you can see in paragraph 6 of the consent decree, the consent

11   decree which was entered in February of 1992, was only

12   effective until December 1, 1996.  In other words, for a little

13   over four years, and then that decree terminated.  Unlike this

14   decree, which has been in effect for 27 years, that decree

15   expired by its own terms in less than five years.

16        But, again, the RNC was not a party to this case by

17   the Civil Rights Division.  The decrees are no longer

18   necessary.  According to the DNC:  The RNC and its affiliated

19   state and county parties have, during this period, continued to

20   engage repeatedly in the exact type of conduct that the decree

21   was specifically trying to prevent, the disenfranchisement

22   targeted at minority communities.  They go through a long list

23   of activities of allegations principally against local and

24   state Republican parties or people identified as Republican

25   operatives.  In fact, the DNC admits that:  Since the entry of

Colloquy                           14

1    1987 order, the DNC itself has in fact sought enforcement of

2    the consent decree only twice.  That is in their opposition

3    briefs.  If there were widespread involvement by the

4    Republicans, if there were widespread efforts by the Republican

5    National Committee to engage in disenfranchisement of minority

6    voters, you can bet the DNC would have brought all of those

7    allegations to this Court and sought a remedy, and it has not

8    done so.  And even in its brief it does not identify any

9    instances in which the RNC has been involved in prohibited

10   activities.

11          Your Honor, I think also worth noting that at this

12   point in time we have the first African American President in

13   the United States, and the first Attorney General in the United

14   States.  The Attorney General is in charge of enforcing the

15   civil rights in this country, and I think it's a fair

16   assumption that the civil rights laws and the Voting Rights

17   Act, and allowing enfranchisements, and encouraging people to

18   vote, will be fully enforced to the fullest extent of the law

19   by the government of the United States.

20          This past February, the Republican National Committee

21   elected its first African American chairman, Michael Steele.

22   The Chief Administrative Officer, the Chief Operating Officer

23   is also a African American gentlemen named Boyd Rutherford.

24   Two of the officers are now African Americans and, your Honor,

25   we would submit, and Mr. Gillespie will testify that it is

1    inconceivable the RNC would allow this sort of minority voter

2    intimidation that is prohibited by this decree.

3         THE COURT:  In one of your exhibits you have a

4    proposed statute directed to voter intimidation.  And I

5    couldn't quite make out the purpose of that.  Is that a

6    proposed bit of legislation, or is that something that is

7    already in effect?

8         MR. BURCHFIELD:  Your Honor, there are a number of

9    statutes.  The Voting Rights Act has provisions in it that

10   prohibit intimidation of voters.  And the Justice Department

11   has enforced that.  There are state laws, and those are also

12   enforced.

13        THE COURT:  But is there anything that parallels the

14   consent decree here?  Obviously it would be much preferable to

15   have a federal statute which will be enforced by public

16   authority then the consent decree which is limited, it's

17   limited, enforceable in the City of Newark, applicable

18   apparently to the whole United States.  It seems somewhat of an

19   anomaly.  But when I think there is no statute at this point

20   which would parallel the provisions of the consent decree --

21        MR. BURCHFIELD:  There is no provision, your Honor,

22   that requires the RNC to seek preclearance of its poll watching

23   activities.

24        THE COURT:  No.  I'm thinking of the kind of

25   objectionable conduct, the inhibiting minority districts,

1    areas, legions, individuals from voting.

2         MR. BURCHFIELD:  Your Honor, I believe the Civil

3    Rights Division has taken the position that those are allowed

4    under the act.

5         THE COURT:  What is the purpose of submitting the

6    revised statute?  I think it was your latest submission.

7         MR. BURCHFIELD:  Your Honor, there was legislation

8    proposed by then Senator Obama that would expand protections

9    for minority voters.  I have to confess, I'm not as familiar

10   with that statute.  If you want more information on that, my

11   colleague Mr. Levine can talk about that.  That bill was not

12   passed.  And at the current time, I stand on my statement that

13   the Voting Rights Act, as interpreted by the Civil Rights

14   Division, prohibits, we believe, all or at least all of the

15   activities that the RNC was accused of that led to these

16   decrees.

17        In any event, the RNC has, as a matter of policy as

18   shown by this letter, former Chairman Terry McCauliff makes

19   very clear that the RNC does not tolerate that sort of

20   activity.  I think it speaks volumes, your Honor, that during

21   the history of this consent decree, there has been so little

22   litigation against the RNC relating to allegations of voter

23   intimidation.  If our political adversary cannot find it and,

24   you know, frankly some of the allegations that have been made

25   have not withstood scrutiny, as was the case in the North

1    Carolina litigation, as was the case we believe in the 2004

2    litigation, then the RNC is not engaged in this sort of

3    behavior.

4          THE COURT:  I think I found that it was.

5          MR. BURCHFIELD:  In 1994.

6          THE COURT:  In the Ohio case.

7          MR. BURCHFIELD:  And that decision was set aside by

8    the Third Circuit.

9          THE COURT:  No not on the grounds that there wasn't

10   intimidation.

11         MR. BURCHFIELD:  Well, we argued a number of things to

12   the Third Circuit, your Honor, and the Third Circuit, without

13   specifying its reasons, did stay the order.

14         THE COURT:  With a very rapid series of events.  I was

15   affirmed two to one, I guess, on election morning, and reversed

16   8 to 7 in the afternoon.

17         MR. BURCHFIELD:  I'm sorry, your Honor.

18         THE COURT:  I think it was -- the reason for -- the

19   reasons were not articulated.

20         MR. BURCHFIELD:  That's correct, your Honor.

21         What I have on the screen now is a letter from

22   Chairman Gillespie, and this is the publicly stated position of

23   the Republican National Committee, it remains the position of

24   the Republican National Committee to Chairman McCauliff, you

25   have falsely and unfairly charged the Republican party with

Colloquy                    18

1    trying to intimidate voters.  The Republican National Committee

2    is not and had not been engaged in any effort to suppress or

3    intimidate voters.  Our party finds such conduct reprehensible.

4    And if we receive any evidence that such conduct is occurring,

5    I will take all steps necessary to ensure that it ceases

6    immediately.  Rather, our goal in this election is an

7    unprecedented effort to register new voters and encourage

8    participation in the political process.  That is the stated

9    policy of the RNC, as stated by Chairman Gillespie and it

10   remains the policy.

11        Your Honor, what we've done here is constructed a

12   timeline of some of the key events since the decree was entered

13   in 1982.  The decree was modified in 1987.  In 1990, there was

14   the North Carolina case.  In 1993, a statute often referred to

15   as the voter law was passed which enhances the ability of all

16   citizens to register to vote at -- when you get a driver's

17   license, when you apply for public assistance benefits.  There

18   are a variety of avenues available.  That has in fact enhanced

19   voter registration.

20        On March 27, 2002, the Bipartisans Campaign Reform

21   Act, often referred to as the McCain Statute, was passed.  As a

22   result of that fact, two things have happened.  The first is,

23   the Democratic National Committee has relied increasingly on

24   groups like ACORN on registration and gets out the vote

25   efforts.  When nonparties file lawsuits against the RNC under

1    the consent decree, those parties litigate with soft money from

2    corporate sources, undisclosed corporate sources, the RNC must

3    respond with hard money raised pursuant to Federal Election

4    Law.

5           The third event was the Help America Vote Act, which

6    sets up a procedure for challenged voters to submit a

7    provisional ballot.  Any voter who is challenged can fill out

8    and submit a provisional ballot.  And that ballot is submitted

9    by election officials during the count of the vote.  No voter

10   who is challenged is turned away from the polls.  All voters

11   are allowed by HAVA to fill out a provisional ballot.

12          In 2004, as I mentioned, was the Malone case and also

13   the Daschle case, and then in 2008 it was the New Mexico case.

14   If you look at 1982, African Americans and Hispanic Americans

15   constituted 12.7 percent of registered voters.  As of 2006, the

16   latest data, they constituted 17.7 percent of registered

17   voters.  African, Hispanic, other minorities have increasingly

18   registered to vote.  And in fact they have been voting at an

19   increasing percentage of the electorate.  Here is the percent

20   by demographic rule from 1982 to 2006.  And this shows that

21   while white registration, non-Hispanic white registration is

22   increased know by 13.2 percent, African American registration

23   is increased by 41 .6 percent, and Hispanic registration by 201

24   percent during the time this consent decree has been in effect.

25          In terms of voting, voting by non-Hispanic whites is

1    increased by 7.8 percent, and this does not include the 2008

2    election because the Census Bureau hasn't published that.  And

3    it would be influenced obviously by the fact that we had an

4    African American candidate on a major party ticket.  African

5    American voting had increased by 31 percent in 1996.  Since

6    1982, Hispanic voting by 162 percent.  These figures

7    demonstrated that minorities are in fact getting to the polls.

8    Their percentage of the electorate in terms of registration and

9    in terms of voting is increasing, and that we believe largely

10   belies the notion of any widespread suppression of minority

11   vote by the RNC or anybody else.

12          In addition, many states since 1982 have adopted

13   alternative methods of voting, such as early voting, where you

14   could go in advance of Election Day and vote at a specified

15   location.  No excuse absentee voting, where you could vote

16   absentee by mail for any or no reason, and even permanent

17   absentee voting.  You see 31 states have adopted early voting.

18   Twenty-eight states have no excuse absentee voting, and five

19   states have permanent absentee voting.  Now, what does that

20   mean?  If a voter, for some reason, believes that he or she is

21   going to be interfered with on Election Day, they could vote

22   before Election Day or that voter can fill out an absentee

23   ballot and vote by mail and never have to deal with poll

24   watchers or a polling station.

25          Is that actually happening?  Well, as of 2006, 11

1    million voters voted absentee.  Four million voted early, and

2    791,000 provisional ballots were submitted in the United

3    States.  People who were challenged at the polls who voted

4    anyway by means of a provisional ballot pursuant to the HAVA

5    statute.  In selected states, the numbers were even more

6    impressive.  In Washington State, 87.8 percent of the voters

7    voted absentee.  In Arizona, which has a large Hispanic

8    population, 47 percent.  In Colorado, almost 40 percent.  And

9    in California, 35.3 percent.  These methods are not only out

10   there, but they're being widely used, and it is difficult, if

11   not impossible, even if someone wanted to intimidate a voter,

12   from intimidating someone to fill out an absentee ballot.

13          Your Honor, as I wrap up, our next point is the decree

14   is honest.  The RNC has been sued under the decree by the DNC,

15   by state parties, and by candidates, and even by voters.  And

16   those allegations sometimes have more merit than others, but

17   the fact that so many different groups can bring suit under

18   this consent decree is burdensome for the RNC.

19          In the Malone matter, the RNC paid hundreds of

20   thousands of dollars in defense of that for production of

21   documents, production of senior campaign -- senior party

22   officials for depositions the very weekend before the election,

23   for outside lawyer's fees for production, for review of

24   electric documents internally.  It creates great cost on the

25   RNC to be subject to challenge by political adversaries.  In

 1    addition, it is onerous on the RNC to try to enforce this

 2    decree.

 3            As I said, we do not intend to make the existence of

 4    voter fraud the central part of the proceeding.  Our point is,

 5    it is important for political parties, both political parties,

 6    to have poll watchers available on Election Day.  The

 7    Carter-Baker Commission found in 2005 says as follows:  While

 8    election fraud is difficult to measure, it occurs.  The U.S.

 9    Department of Justice has launched more than 180 investigations

10    into election fraud since October, 2002.  These investigations

11    have resulted in charges for multiple voting, providing false

12    information on the felon status and another offenses against 89

13    individuals and convictions of 52 individuals.  So on that

14    three-year period of time, 52 convictions for voter fraud.

15            The Supreme Court of the United States in the Crawford

16    case observed that voter fraud, the extent of it may be

17    debatable, but it exists, and reasonable efforts to address

18    voter fraud were within the voter fraud -- within the states to

19    adopt.  The Supreme Court rejected arguments by some amica

20    curae that voter fraud was a myth, and upheld a state statute

21    based upon the purview of the State to police voter fraud.

22            And finally, your Honor, in the Malone matter in 2004,

23    your Honor recognized that by mid October, there were

24    widespread reports in the press and elsewhere that thousands of

25    voter irregularities had occurred during the Ohio registration

1   campaign.  There was certainly sufficient data to cause the

2   Republican party to present improperly registered voters in

3   casting ballots.  The officials of the Ohio Republican

4   Committee kept the RNC informed of many allegations of

5   registration fraud and the need to do something about it,

6   particularly as the questionable conduct appeared to emanate

7   from groups such as ACORN and ACT, which were aggressively

8   supported by the Democratic party.  That's from the transcript

9   of your oral decision AT page 64.

10          A couple of things are noteworthy about that, your

11   Honor.  I don't have to elaborate on your words to you.  First

12   of all, you mentioned that this has occurred by mid October,

13   within a 20-day window of the election.  Second, you mentioned

14   ACORN and ACT working collaboratively with the Democratic

15   Party.  We think both of those things are true.  We do emphasis

16   the difficulty of knowing where the issues are going to arise

17   within the 20 day period to notify the DNC, and then come to

18   this Court for preclearance.  The preclearance process is very

19   onerous on the RNC.  And for that reason we believe the consent

20   decree needs to be vacated or at least modified.  The relief

21   the RNC is requesting is first and foremost to vacate the

22   decree.  The RNC vigorously urges the Court to vacate the

23   decree.  There have been many legal and factual changes in the

24   legal and political climate in the United States since then and

25   vacation of the 27-year old decree would be appropriate.  If it

1    is not vacated, the RNC urges that it be modified, first of

2    all, by excluding enforcement by persons and entities other

3    than the DNC, which the DNC appears to agree to.  And second,

4    by eliminating the preclearance requirement.  Third, by making

5    clear that the following activities are not precluded.  First,

6    poll watching and valid security programs that are consistent

7    with state and federal law.  Second, communications between the

8    RNC and state and local parties regarding lawful ballot

9    security programs.  And third, challenges to provisional

10   balance.

11          Your Honor, the RNC's position and the evidence that

12   we'll put forward today, I think is consistent with the primary

13   points that the RNC has complied with the decree, that there

14   have been few, if any, instances of the RNC being involved in

15   activities that would support continuation of the decree; that

16   the law has changed to enhance minority voter registration,

17   minority voting, and minority access to the polls in the 27

18   years this decree has been in effect.  And accordingly, the RNC

19   argues or submits to the Court that the decree should be

20   vacated.

21          THE COURT:  Good.  Thank you Mr. Burchfield.  Thank

22   you.

23          Mr. Genova.

24          MR. GENOVA:  Good morning.  Angelo Genova for the

25   Democratic National Committee, your Honor.

 1          THE COURT:  Good morning.

 2          MR. GENOVA:  Your Honor is very mindful and very aware

 3   of the history and genesis of this consent order, and

 4   recognizing your admonition against re-litigating matters

 5   already heard, I am not going to replay the events of 1981,

 6   other than to say that I think it's very important to

 7   understand the factual context, the entry of a settlement

 8   agreement which became converted into this Court's order that

 9   has withstood the test of time for reasons that I'll speak to

10   in a moment.  But it was born of conduct that occurred in a

11   hotly contested, heated, close election in New Jersey, who's

12   outcome was determined by 1700 plus votes.

13          So the concepts that we're talking about today, the

14   importance of people's participation in the process, the fact

15   that we create environments that allow and ensure that

16   everybody gets a chance to participate in the process were

17   somewhat prophetic in that close contest when we see, since

18   that time, close contests which have affecting the outcome of

19   our rights for president of the United States in 2000, and

20   involve President Bush and Vice President Al Gore; the closest

21   of an election as most recently as the Minnesota Senate

22   contest.  So at its start, what's not changed is the importance

23   of the voter franchise.  What has not changed is the impact of

24   people's participation on the outcome of election.  And, in

25   fact, I dare say that has been heightened.

1          I brought with me something that actually was behind a

2     piece of furniture in my office, your Honor, but is -- what I'm

3     sharing with the Court is the original model that was used to

4     print the hundreds, if not thousands of signs used in minority

5     voting precincts in New Jersey in that fateful election in

6     1981.  If only as a reminder of the significance and

7     intimidating effect that the conduct the parties can have

8     surrounding a election, and why it is we are here today asking

9     this Court to reject the application of the Republican National

10    Committee as it seems to have the court vacate, resolve or

11    modify.

12         THE COURT:  Are you asking rejected in toto, or are

13    there elements you're willing to concede?

14         MR. GENOVA:  Well, we did concede in our brief, your

15    Honor, and if your Honor may recall, did not join in AN

16    application for intervention in the 2004 matter.  We appeared,

17    once the intervention was granted, we took a position.  But we

18    have conceded in our brief and will concede before the Court

19    that the consent order was the result of a negotiation between

20    FOUR political parties:  The Democratic National Committee, the

21    Republican National Committee and the New Jersey Republican

22    State Committee.  It's the parties' agreement.  It's a

23    settlement between the parties.  As part to the litigation, we

24    conceded that it's the parties to the underlying litigation who

25    are the beneficiaries of the terms of their settlement and the

1    order that ultimately was entered.

2          I was struck as well by the creative illustration Mr.

3    Burchfield presented.  He started practicing law in 1982.  I

4    had a carrier pigeon and not a phone in 1978 when I started

5    practicing law.  He must have been with a law firm that can

6    afford a telephone.  But the point to it is this.  Technology

7    is great -- it was a great illustration and struck in my mind

8    the notion that in many ways technology may very well

9    contribute or exacerbate the very purposes behind this consent

10   decree.

11         THE COURT:  He would argue that it contributed and

12   exacerbated the opportunities for fraud.

13         MR. GENOVA:  I'm sure he would, your Honor.  But I

14   didn't hear him say that.  But I'm sure he would argue that.

15         THE COURT:  It's argued in his papers.

16         MR. GENOVA:  Here there's been a legacy of success,

17   and I think that we've learned in this proceeding or the

18   proceedings in this as recently as 2004, we have learned it

19   from certifications from the Republican National Committee's

20   own lawyers in the Ebony Malone matter.  You might recall in

21   that case when Ebony Malone sought refuge from the Court from

22   the Republican's caging effort in Ohio in 2004, there the Court

23   was told by the Republican National Committee's witnesses and

24   the evidence in that case that their conduct is guided by the

25   consent decree, and that they declined to participate or assist

1  state-level Republican organizations whose conduct crosses the

2  line drawn by the consent order.  And Mr. Burchfield said as

3  much today on behalf of his client.  So he's acknowledged that

4  the consent decree, which had as its principal objective to

5  deter or eliminate valid security activity that had as its

6  purpose or significant effect the intimidation of minority

7  voters, he concedes that it has that.  But success in that

8  regard is not fulfillment, because the central question I think

9  before your Honor is whether or not the risk of voter

10  suppression continues.  The very risk for which the litigation

11  at its inception was brought in 1981, and the very risk that

12  the order itself seeks to address.

13        So to the extent that we believe, and we believe our

14  evidence will establish in this Plenary Hearing that the risk

15  of voter suppression exists, and the fact of voter suppression

16  occurs, the Court should uphold the order as written, keep it

17  on the books precisely for the very reason that it is working.

18        Now, in 2004, your Honor, you concluded that the RNC's

19  participation in the Ohio caging effort violated the consent

20  order, and it violated the consent order because they

21  participated and coordinated with the Ohio Republican party in

22  valid security efforts that violated both the '82 and the '87

23  consent orders.  I differ with Mr. Burchfield's

24  characterization of the procedural posture.  And given your

25  Honor's questions, suggests that our view maybe more than

1    consistent with what your questions reflect.

2              Our view is that your Honor's conclusion was never

3    overturned on review.  In fact, the Third Circuit apparently

4    considered your opinion at the time, concluded that adequate

5    evidence of a violation has been presented, and that you did

6    not abuse your discretion in concluding that a violation

7    occurred.  So we have of recent vintage recognizing that in  --

8    I would characterize 2004 recent vintage after due discovery of

9    an actual violation premised on voter intimidation efforts,

10   minority voters intimidation efforts in Ohio.  The Third

11   Circuit position was not a remediation, it was only a response

12   to the RNC's appeal to the Supreme Court, and the Supreme

13   Court's denial of certification, and the Circuit Court's

14   subsequent remand reflected no more than, in our view, the fact

15   that the matter had been mooted as a consequence of Miss Malone

16   having had the opportunity to cast her vote.

17             So here we are nearly four years have passed since

18   that event where it was last found by the Court that there was

19   a violation of a consent order, and now the defendants are

20   seeking to have this Court vacate the court order.  Your Honor

21   knows, as I've appeared before you many times since the

22   inception of the order, and I come to view it as a montra, that

23   the burden has always resided on the Democratic National

24   Committee.  But any applicant under the order, there have been

25   two occasions where the Democratic National Committee has

1    appeared before your Honor, you've always insisted that we come

2    forward.  You've always insisted that their exists a factual

3    basis for a nexus between the conduct that we allege to be

4    violative of the order, and the conduct of the parties to that

5    order, whether it be the New Jersey Republican State Committee

6    or the Republican National Committee.  You've also insisted as

7    a matter of practice that we be held to our proofs.  In fact,

8    in our own experience when you have had concerns about the

9    facial proofs presented by evidence recorded to some form of

10   limited discovery to allow us to do that.  In your policing of

11   this order, you've held us to a heavy burden, so it should not

12   be a surprise to anyone, given the expectations of this Court

13   who retained jurisdiction, given the fact that the cyclical

14   election cycles, the fact that you're held to not an

15   insignificant burden that applications have been made only to

16   due caution, and only when in fact there's hard evidence to

17   substantiate the claim that the activity at issue relates to

18   that activity conducted under the auspices of the parties to

19   the litigation, whether it be the Republican National Committee

20   or the New Jersey Democratic State Committee.

21        What I heard today, and what I read in the briefs is

22   that the Republican National Committee is offering essentially

23   four possible bases for its motion to vacate, which in their

24   central core comes down to an argument that times have changed,

25   that things have changed.  Times have changed, and that should

1   be the basis for revisiting the terms and conditions of the

2   consent order.

3          Let's first deal with their burden today, your Honor.

4   I've talked about ours on seeking enforcement, let's talk about

5   theirs.  It's our contention that they have a high burden, a

6   heavy burden, and in fact the U.S. Supreme Court has held that

7   when a defendant seeks to escape the terms and conditions of a

8   consent decree, they have to meet a more vigorous standard.

9   And we've cited the relevant standard in our brief.  This

10  application is being made under Rule 60B, and under 60B, it's

11  our contention that they're going to be held in its Plenary

12  Hearing to a clear and convincing evidence standard.  And they

13  have to show the changes in both the legal and factual backdrop

14  of the case, or other extraordinary circumstances compelling

15  this Court to vacate or modify its decree.  That is a heavy

16  burden.  It's not a matter of rhetoric, it's not a matter of

17  argument of counsel, it's a matter of some evident sham basis

18  supporting a legal or factual change of some significance.  And

19  it's our contention, your Honor, that despite the eloquence of

20  counsel, the power point presentations, the bells and whistles

21  of today, in the end, your Honor will be bound to abide by that

22  standard in determining whether the evidence produced by the

23  Republican National Committee meets the test.

24         Times may have changed, your Honor.  They may have

25  changed in a variety of ways, but what the evidence from our

1    vantage point will show is that when it comes to the Republican

2    National Committee's behavior, times really haven't changed

3    nearly enough.  We believe we'll be presenting evidence

4    indicating to your Honor that voter suppression is alive and

5    well, and the RNC and its operatives remain involved.  And in

6    light of this evidence, the Court should keep this decree in

7    place, not vacate it, because it's still needed.

8         What was striking as I read the briefs, and in fact

9    was quite stunning, is that the defendants Republican National

10   Committee in their own brief admit, as I read footnote 3 on

11   page 5 of their brief, admit that the efforts they propose to

12   undertake if this Court vacates the decree, could have the

13   significant effect of deterring qualified voters from voting.

14   In other words, put another way, if you look at that footnote,

15   I read them to say that the very things that this order would

16   prescribe, were they allowed to pursue them, would nonetheless

17   have a significant effect to the deterrence of qualified

18   voters.  They essentially acknowledge by their footnote that

19   their methodology for challenging provisional ballots of voters

20   is so broad and so flawed that they would target a substantial

21   number of qualified voters in an attempt to address what we

22   will maintain, without getting too much into the weeds, unless

23   your Honor asks us too, what we think is a rare phenomenon of

24   actual voting fraud.

25        Your Honor asked the question of Mr. Burchfield that

1    I'd like to respond to, and that was whether or not there

2    exists any body of federal law or under the exhibits that were

3    produced which speak to the conduct for which the consent

4    decree is intended to address.  We are not aware of a specific

5    law that speaks to conduct, but notably he cited the Voting

6    Rights Act as law.  And I would suggest to your Honor that the

7    Voting Rights Act is limited to state action, and that the

8    consent decree by its very terms speaks to the conduct of

9    private parties in this case, state and federal political

10   parties.  So in terms of the participants of the order, we're

11   not talking about state action here, we're talking about

12   private action of a political party.

13           The Republican National Committee, they cite

14   essentially three laws for the proposition that there's a new

15   playing field and they cite the National Voter Registration Act

16   and Voter Act, and became final, Campaign Finance Reform Act

17   and To Help America Vote Act.  And they maintain that these

18   laws establish new playing fields and consequently, with the

19   evolution of these new laws, it places the Republicans at an

20   unfair disadvantage.  First observation that I have, and it's

21   to the contrary, the argument that they advance, nothing in any

22   of those laws makes legal the conduct restricted by the consent

23   decree.  And what is that conduct?  That conduct is

24   intimidation, efforts in delay harassing qualified voters to

25   prevent them from casting a ballot.  That's the core of what

1   the consent order was intended to accomplish, and in fact

2   arises from a set of facts in 1981 where it was that conduct

3   which bore out the remedy negotiated between the parties.

4         Now, the Republican story in these proceedings is that

5   these laws have engendered or precipitated, or made fertile an

6   environment for voter fraud.  I think they even use terms like

7   "massive voter fraud" in their papers.  And astonishingly they

8   propose that the only way to protect the Democratic process

9   from some voters committing voter fraud is to subject most

10  voters from intimidating -- it was an argument that struck me,

11  that whether the suppression is two wrongs don't make a right,

12  you don't meet one evil with another evil.  It sounds like an

13  argument that says:  We think the environments changed, laws

14  have been created to engender more participation to vote.

15  Those laws may create an environment that allow for greater

16  voter fraud.  Let's go intimidate people.

17        THE COURT:  I think you're carrying their argument a

18  little further than they push it.

19        MR. GENOVA:  Maybe in the argument that might be so,

20  but I read the briefs as recently as last evening.  We'll see

21  in the hearing what it is they choose to produce.

22        THE COURT:  All right.

23        MR. GENOVA:  Your Honor, I think that the scholarship

24  that we intend to produce through our expert witnesses will

25  suggest to the Court that admittedly voter fraud is something

1    worthy of attention.  But it's highly exaggerated, and in some

2    ways exaggerated with a purpose by those that would want to

3    advance the kind of tactics that the consent order is designed

4    to diminish.

5              Just by way of illustration, Mr. Burchfield talked

6    about provisional ballots and the change in the law which allow

7    for voters to cast provisional ballots under the Help America

8    Vote Act which, as your Honor is probably aware, it's a process

9    where if someone goes to a polling place and there's a question

10   involving the residency or other eligibility criteria, they're

11   given a ballot, and they get to fill out that ballot.  They

12   don't get to use the machine.  It's like an emergency ballot.

13   They get to cast the ballot, it's sealed, it's placed in a

14   separate box.  It's not on the voting machine register, that

15   provisional ballot gets counted back at the Board of Elections.

16   The Board of Elections is a polling place.  At the Board of

17   Elections each party can have a challenger, and they can have a

18   contest of whether that vote -- after the application of the

19   voter is verified by the election official charged with the

20   responsibility, the neutral objective responsibility to

21   determine whether that person should get to vote.  The RNC's

22   argument that the availability of provisional ballots to

23   challenge voters has made the consent order obsolete we think

24   misses the mark.  And we think it misses the mark because the

25   consent order I think as its core, and I brought this poster in

1    part for a reason, is -- it's designed to not merely protect

2    challenge voters at the polls, but it's also designed to

3    protect the qualified voters who are scared away from the

4    polls, and the qualified voters who are delayed by the

5    challenge activities.  So when we talk about the normal poll

6    watching functions, I would suggest to the Court that they do

7    exist and the order was not intended to embrace, unless the

8    methodology was designed to have a disparate effect on

9    minorities, that both parties have available to them, whether

10   it's by way of provisional challenge or the like, the

11   opportunity to challenge within the bounds of the law.  I think

12   where the Republican's missed the mark, the methodology, and

13   their targeting of the use of otherwise legitimate means to

14   challenge voters, what might otherwise appear to be facially

15   neutral, result in a significant disparate affect on minority

16   population or minority voter population, that's when they run

17   afoul of the order.

18          Your Honor, it is age old.  We have a generation of

19   housing discrimination laws, voter discrimination laws.  Voter

20   discrimination laws where the facially neutral participation --

21   the facially neutral policy or the participation in what

22   appears to be an appropriate means or method, nonetheless where

23   it has a disparate effect on minority population is going to be

24   found to be discriminatory in its application.

25          Now, in their brief the Republican National Committee

1    appealed to public policy, reasons why this Court should

2    vacate, dissolve or modify the order.  And their argument is

3    grounded on notions of equity, which I think under 60B this

4    Court sits in part s the Court of Equity on this issue.  And

5    they argue what we think is the very opposite of a balance of

6    equity, which is the point I make before.  I don't know how

7    it's equitable, even if you were to say that my argument is a

8    little bit too far on counterbalancing voter forward with voter

9    suppression, I still think that if you find that there's a

10   legitimacy and a continuing viability to the risk of voter

11   suppression, which we believe there is, and their indeed is

12   voter suppression, which we believe we will prove through the

13   studies of our experts, that on balance, that the equity favors

14   retention of an order designed to deter voter suppression among

15   the parties who agreed to it at arm's length negotiations,

16   under the direction and under the auspices and supervision of

17   the Court.  To compound one legal wrong with another we think

18   is not the solution here.

19          I'd like to point out to the Court the proofs that we

20   intend to bring to the Court's attention in rebuttal to those

21   that were advanced either by power point or by the exhibits

22   that were presented, it's our contention to prove that there's

23   some fallacy to the notion that voter fraud is as prolific as

24   being suggested in the papers and documents submitted by the

25   Republican National Committee.  And we're going to do that a

1    little differently, I think with greater power and depth.  It's

2    our contention to present to the Court academic research by

3    noted authorities who are experts with voter fraud and voter

4    suppression, and who have studied on a national basis and

5    regional basis the kind of conduct, and have gone beyond the

6    rhetoric reflected in many of the self-serving news articles

7    and statements of both partisans.

8           We also are going to be able to point out when you do

9    look at the concepts of voter fraud advanced by Republican

10   National Committee in this proceeding, many of them speak to

11   evidence of public corruption, or what I'll call voter

12   registration fraud, which is a fraud related to eligibility

13   which proceeds to the period of time when one shows up at a

14   polling place.  If you go back to the genesis for this

15   litigation, the underlying facts of the case had to do with

16   Election Day activities proceeded by a purchasing list, which

17   became the basis for challenges on Election Day and targeted

18   the activities in the valid security task force in minority

19   precincts.  We are going to be relying on the testimony of a

20   representative of the Brennon Center for Justice at NYU, and

21   they developed an authority for tracking voter fraud which

22   concludes that to the extent it exists, and more often than not

23   as a matter of duplicate voter registration, and the RNC calls

24   that evidence a risk of fraud, but for the most part what they

25   found is that evidence or risk of fraud is always the product

1    of data entry errors or partial -- or when the same voter is

2    registered t two addresses because of a move, and they don't

3    resolve in double voting.

4         Lorraine Minneti, who is another academic who we'll

5    present today, she went further than a lot of the news articles

6    and the like that were submitted, and she made FOIA requests

7    and surveys of state and local prosecutors and conducted

8    interviews.  And she's found that from 2002 to 2005, that only

9    40 voters, only 40 voters nationwide were charged with

10   violating federal law prohibiting multiple voting, and only 26

11   were convicted.  This is over a three-year period.  And of

12   these 26 convictions, only five cases involved multiple voting,

13   and 20 involved voting by an ineligible person, such as a felon

14   or non-citizen.  So to take it to its core, that's 26

15   convictions out of hundreds of millions of votes cast during a

16   three-year period, and that appears as Exhibit 22 for reference

17   in our April 30th submission.

18        Now, on the state-level allegations and convictions,

19   Justice Levitt, who we will produce in rebuttal, wrote a paper

20   called:  The truth about voter fraud.  And he's with the

21   Brennan center.  And that paper included, even assuming a worst

22   case scenario, documented voter fraud presents only between 1

23   and 3,000 votes cast, and that appears as Exhibit 24, your

24   Honor, to our submission.  So, for example, eight votes

25   statewide in New Jersey in 2004, two votes in the state of New

1    York, combined 2002 and 2004, six votes in Kansas City Missouri

2    in 2002 combined.

3          Professor Minneti, when she testified, will reveal,

4    she's included that even in states where voters can register

5    for the first time at the polls on Election Day, which is one

6    of the elements where the Republican National Committee argues

7    creates or fosters this environment for a higher propensity of

8    voter fraud, that even in states where voters can register for

9    the first time at polls on Election Day, voter fraud is

10   essentially nonexistent because registration takes place under

11   the supervision and under the eyes and authority of election

12   officials.

13         Other instances of voter fraud that are reflected in

14   their papers, and I'm sure we'll hear them speak to, are in

15   fact instances of attempted voter registration fraud as opposed

16   to an effort to show up at a polling place and such occurs when

17   someone already registered to vote, mistakenly registers again,

18   or when a voter registration volunteers forgery registration

19   materials, mistakenly, the kinds of things that have caught the

20   media attention in the past.

21         Mr. Levitt can testify and will testify with respect

22   to that kind of conduct, that most if not all of these types of

23   forgeries are caught by the voter registration organization,

24   itself, through quality control means.  The documents are

25   submitted to the registration authorities only because voter

1    registration organizations are required to submit all the forms

2    to the state, including those that he believes to be incomplete

3    or inaccurate.

4         One of the other laws that the Republican National

5    Committee cites, the Motor Voter Law.  In their brief they

6    quote the 2001 congressional testimony of the Heritage

7    Foundation Research, without noting that whether the Help

8    America Vote Act was passed in 2002, its remedy or its intended

9    remedy was precisely the speculation of the Heritage

10   Foundation's witness.  HAVA was a response to the potential for

11   voters to be simultaneously registered in more than one

12   jurisdiction.  The reason why Republican majority members of

13   the court lauded HAVA when they announced the HAVA's I.D.

14   requirements for new voters and mandates for statewide voter

15   registrations systems would solve the problem of multiple

16   registration.  The reason they did that was that HAVA

17   responded, among other things, that potential for voters to

18   simultaneously registered in more than one jurisdiction.  We

19   disagree that multiple registrations actually resulted to a

20   material degree in multiple voting.  That's laid out in Exhibit

21   8 of our papers.

22        These issues of multiple voting under HAVA were in

23   fact considered by HAVA when it passed the Motor Voter Law in

24   1993, and Congress concluded that permitting voters to register

25   in locations like Motor Vehicle Commission and Social Services

Colloquy                                    42

1    Office, would provide more protection for registration fraud

2    precisely because these locations require individuals to prove

3    their identities for other reasons.  And again that appears as

4    Exhibit 17 to our submission.

5         So the point is, that the very argument that the

6    defendants make here that HAVA was designed or HAVA fostered

7    voter fraud when Congress adopted it, thought they were doing

8    the exact opposite.  They were doing a means and mechanism,

9    having people register in locations where government official

10   presided would only add more protection against them.

11        If there's an argument that times have changed, that

12   arguments actually favor the Democratic National Committee here

13   between state voter registration systems, between HAVA's voter

14   I.D. requirements, it's extraordinarily difficult to

15   fraudulently vote more than once.  And it's extraordinarily

16   rare because of the imbalance between the risk.  For instance,

17   the years in prison vote and the reward one additional marginal

18   vote.

19        So we would say the laws that they proposed have

20   enhanced the prospect of voter fraud in fact create greater

21   protections against voter fraud.

22        THE COURT:  All right.  Have you about used up your

23   half hour?

24        MR. GENOVA:  Yes, I'm close, if you would give me five

25   more minutes and I will conclude.

1          THE COURT:  All right.

2          MR. GENOVA:  Your Honor, with respect to the voter

3     registration you need only look to determine whether or not RNC

4     registration continues to the present day.  I alluded to the

5     Ebony Malone matter, and what's essential to remember about

6     this case is this Court concluded that Miss Malone had

7     presented competent evidence of the RNC participation in voter

8     caging efforts targeted at the majority black Cayuga County in

9     Ohio.  I was struck by the letter that Mr. Burchfield put up on

10    the screen from Chairman Gillespie, but I think it states his

11    protestations in that letter, regarding the activities in Ohio

12    in which the evidence and e-mails submitted in that case and

13    record here revealed that Chairman Gillespie had full knowledge

14    of what transpired in Ohio and had some level of participation

15    in that, in addition to the record in this case to what's

16    occurred since that case.  There were e-mails that were not

17    available in the Malone case, which we've submitted as Exhibit

18    9, which indicate that the RNC headquarters at the time was

19    also conferring in the State of Florida about creating caging

20    lists along the order that was used in Ohio.  Well, present

21    Chandler Davidson, a noted authority, to speak to these

22    activities on voter suppression in the Reagan and beyond.  He

23    is a noted authority in this field.

24         THE COURT:  All right.

25         MR. GENOVA:  Your Honor, we don't think that the order

1   needs to be changed, other than the modification that we

2   propose.  We think that it retains its viability.  We think

3   it's had a deterrent effect and the reasonable effect still had

4   viability in the environment which we operate.

5         THE COURT:  That's fine.  Thank you.

6         We'll take a 10-minute break and then we'll resume

7   with the first witness.

8         (Recess)

9         THE COURT:  Mr. Burchfield, who is your first witness?

10        MR. BURCHFIELD:  Before calling our first witness, let

11  me, if I may, make a couple of very discrete points, three very

12  discrete points in response to Mr. Genova.

13        The first is, as the Court may recall, the DNC did in

14  fact try to intervene in the Malone matter and this Court

15  denied their motion to intervene.  That is at pages 55 through

16  59 of the transcript in the Malone matter.

17        Second, I believe Mr. Genova suggested that the Third

18  Circuit order staying the Court's opinion was an order to allow

19  the RNC's cert petition to be filed.  In fact, the petition to

20  the Third Circuit was for review of the panel's decision.

21  There was no cert petition pending at the time we went to the

22  Third Circuit in Bank.

23        And then thirdly, your Honor had inquired earlier

24  about federal law that might prohibit intimidation of voters.

25  And that statute is 49 -- 42 U.S.C. Section 1973(i)(b), which

Colloquy                                      45

1    states in pertinent part:  "No person, whether acting under

2    color of law or otherwise, shall intimidate, threaten or

3    coerce, or attempt to intimidate, threaten or coerce, any

4    person from voting or attempting to vote."

5            I think Mr. Genova suggested that the Voting Rights

6    Act did not apply to private action, and that provision very

7    specifically by its terms does apply to that.

8            THE COURT:  All right.

9            MR. BURCHFIELD:  Our first witness is Mr. Tom

10   Josefiak.

11           THE COURT:  You can take the stand.

12           MR. BURCHFIELD:  Your Honor, while he's settling in,

13   we have the exhibits that the RNC has submitted into notebooks

14   with tabs.  These maybe easier for you to handle.

15           THE COURT:  Now, as a matter of practice, when the

16   witness is being sworn, I ask that people just remain

17   stationary, not shuffling papers or talking while the oath is

18   being administered.

19           THOMAS JOSEFIAK, Sworn.

20   DIRECT EXAMINATION BY MR. BURCHFIELD:

21   Q   Mr. Josefiak, you have stated your name.  What's your

22   current residence address?

23   A   I live at 7200 Ludwig Court, in Alexandria, Virginia.

24   Q   And what is your current occupation?

25   A   I'm an attorney.

1   Q   Which bars are you a member of?

2   A   The Texas bar.

3   Q   And what's your educational background?

4   A   I did my undergraduate work at Fairfield University in

5   Connecticut, and I received my GD from Georgetown University

6   Law Center in Washington, D.C.

7   Q   And in the notebook that is up there, Defendant's Exhibit

8   1, is a biography of you from your law firm's current website.

9   The law firm of Holtzman Vogel.  And is that biography true and

10  accurate to the best of your knowledge?

11  A   To the best of my knowledge, it is.

12  Q   Let's review just very briefly since the Judge has it in

13  the biography your background focussing on the time you spent

14  in the Republican National Committee.  Upon graduating from law

15  school, just walk us through your various positions.

16  A   Upon graduating from law school, I was the legislative

17  assistant to my congressman from Massachusetts Silvio Conte.  I

18  then became a counsel to the National Republican Congressional

19  Committee.  And at that time I also served as special counsel

20  to the House Administration Committee that dealt with various

21  election law issues, including the 1979/1980 amendments to the

22  Federal Election Campaign Act.  After that, I was a special

23  deputy for -- representing the United States Senate at a

24  Federal Election Commission and served in that capacity until

25  1985.  From '81 to -85, until I was named commissioner by

1    President Ronald Reagan and served in that capacity until

2    January of 1992.

3    Q    So you were a -- you were a commissioner on the Federal

4    Election Commission appointed by the President and approved by

5    the Senate?

6    A    That's correct.  And from 1992 up until the present, I've

7    had some relationship with the Republican National Committee.

8    Q    Starting in 1992, what was your position?

9    A    In 1992, I was a special counsel to the Republican National

10   Committee serving at the pleasure of Chief Counsel and General

11   Counsel of the committee.

12   Q    And as of 1995, did you become Chief Counsel of the

13   Republican National Committee?

14   A    I was appointed Chief Counsel in 1995, and served in that

15   capacity until 2004, and then back again in 2005.

16   Q    And what did you do in 2004?

17   A    In 2004, I was the general counsel to the Bush Re-elect

18   Committee during that period.

19   Q    And from 2005 until when did you serve in the position of

20   the Chief Counsel?

21   A    I served in that position until 2007, and then became of

22   counsel to the Committee until the Convention in 2008.  And

23   after that, I was retained by the RNC to continue in that

24   position with the private law firm.

25   Q    And your current law firm is Holtzman Vogel?

Josefiak-direct                              48

1    A   That's correct.

2    Q   Now, Mr. Josefiak, in connection with your various

3    positions at the Republican National Committee, did you become

4    familiar with the 1982 and 1987 consent decrees in this matter?

5    A   Yes, I have.

6    Q   And would you look at the notebook at Defendant's Exhibit

7    2.  Can you identify that document?

8    A   Yes.  That is the 1992 consent order issued by Judge

9    Debevoise.

10   Q   1982?

11   A   1982, that's correct.

12   Q   And Defendant's Exhibit 3, what is that?

13   A   That is the order from 1987 from this Court.

14   Q   How familiar are you with those consent decrees?

15   A   I'm very familiar with those consent decrees.  They became

16   part of my life upon entering the employ of the Republican

17   National Committee going back to 1992.

18   Q   And are you familiar with the RNC's efforts to comply with

19   the decrees over the years?

20   A   Yes, I am.

21   Q   And are you familiar with the various challenges that have

22   been filed under the consent decrees, starting with 1990, which

23   was before you got to the RNC?  Are you familiar with that

24   challenge?

25   A   Yes, I am.

1   Q   And how did you become familiar with that challenge?

2   A   Based on the 1990 challenge in particular, it became

3   very -- I became very aware of the fact of the need to apprise

4   state party committees of the RNC's restrictions under the

5   consent decree, and became my compliance operation and was

6   ingrained in me as soon as I entered the RNC at that time, that

7   that was a very important part of the counsel's job at the RNC.

8   Q   And did you become familiar with a matter that was brought

9   by the New Jersey Democratic Party in 2002 -- in 1992 -- I'm

10  sorry, 2002, against the New Jersey Republican Party?

11  A   Yes, I was made aware of that.

12  Q   And in 2004, were you familiar with the Malone matter that

13  was brought to this Court?

14  A   Yes, I was.

15  Q   And how were you familiar with the Malone matter?

16  A   Well, in 2004, obviously, I was made very much aware of the

17  Malone matter because I was the general counsel to the

18  President's re-elect.  Ohio was a very important state for both

19  sides for that election, and certainly I was made very much

20  aware of what the political implications were from those kinds

21  of charges.

22  Q   And were you also familiar with a matter out in South

23  Dakota, in which senator Daschle had invoked the consent

24  decree?

25  A   Yes, I was.

1    Q   And in 2008, were you familiar with the action brought by

2    the DNC concerning matters in New Mexico?

3    A   Yes, I was.

4    Q   And how were you familiar with that matter?

5    A   As part of my role as an on-going counsel to the RNC, I was

6    very much aware of the fact that this charge was being raised,

7    and the facts surrounding the RNC's efforts in New Mexico, and

8    realized that there was a -- to put it mildly, a misstatement

9    of facts.

10   Q   And what in your recollection was the he misstatement of

11   facts?

12   A   Probably an FDC report looked at the hiring of some sort of

13   person, I thought that was an investigator, turned out to be a

14   forensic expert in machines, and I think that the -- obviously

15   this Court agreed with that in its decision to dismiss that

16   case.

17   Q   Now, as part of your positions with the -- with the House

18   and in the Senate, and the Federal Election Commission, and the

19   Republican National Committee, and even into today, have you

20   made it part of your professional responsibility to remain

21   aware of changes in the various campaign finance and election

22   laws?

23   A   Most certainly.

24   Q   And how have you become -- and how have you become familiar

25   with those changes and how have you followed them over the

1    years?

2    A   Well, obviously it's part of my job as the counsel to the

3    committee.  It would be irresponsible for me not to follow

4    those things, just on an on-going basis.  I mean, from a staff

5    perspective, from observing changes in laws and regulations up

6    and down the board.  I mean, federal and state, that's the

7    responsibility of the office there.  And not only understanding

8    compliance with the federal laws, but also compliance with

9    various state election laws which the office was responsible

10   for putting together and understanding so that we were in total

11   compliance.  And I felt very confident from day once since I've

12   been there that there's been total compliance with the

13   statutes.

14   Q   Mr. Josefiak, have you had an opportunity in preparation

15   for this hearing to look at voter registration transfer between

16   1982 and the present time?

17   A   Yes, I have.

18            MR. GENOVA:  Your Honor, when the proffer was

19   originally made, it was both as an expert and as a fact

20   witness.  So I'm not sure whether we're now entering into the

21   arena of expert testimony.  I don't know that any foundations

22   been established that he'd have any particular expertise in the

23   area that Mr. Burchfield just inquired about.  I just want to

24   understand under what auspices he's being offered.

25            THE COURT:  Are you offering him as an expert or fact

1    witness?

2         MR. BURCHFIELD:  We're actually offering him as both.

3    He's an expert on election -- on statutes and laws regulating

4    the election process in this country, as he's just testified

5    for the last 30 years he's been involved in those activities.

6    And he's a fact witness in that he has served in the Republican

7    National Committee for the better part of the last 20 years.

8         THE COURT:  I think he's certainly qualified to

9    testify as to the election laws and the subject matter in which

10   he's about to go into.

11        So you want to repeat the question, is that what you

12   want?

13        MR. BURCHFIELD:  I think he had answered the question.

14   The question was, did he have an opportunity in preparation for

15   this hearing to look at registration transfers since 1982.  And

16   he answered that question yes.

17        What sources did you consult in connection with that

18   investigation?

19   A   Basically it was census bureau data information going back

20   up through 2006.

21        MR. BURCHFIELD:  And, your Honor, behind tabs 4 and 5

22   are U.S. Census Bureau reports regarding the election of 2006;

23   and behind tab 4, the election of 1982; behind tab 5, we

24   believe those are public records that are subject -- that are

25   admissible and they are also subject to judicial notice.

 1              THE COURT:  Yes, I see no problem.

 2              MR. GENOVA:  I have no objection.

 3              THE COURT:  All right.

 4    Q   Let me ask you, Mr. Josefiak, to look at Exhibit 6.  That

 5    should be a chart looking something like this.  Do you

 6    recognize that chart?

 7    A   Yes, I do.

 8    Q   And is that a fair summary of certain data in the two

 9    census reports, one from 1982, and one from 2006, that we just

10    talked about?

11    A   Yes, it is.

12    Q   And let's walk through this chart very quickly, which I

13    think is largely self-explanatory.  And can you just walk us

14    through it and describe what is on this chart.

15    A   Sure.  It demonstrates the registration totals from 1982

16    through 2006, and how those totals have changed from that

17    period.

18    Q   And it breaks it down by demographic group?

19    A   Yes, it does.  It breaks it down by demographic group,

20    first, obviously, graph of all the voters' registrations.  The

21    second is white voter registrations.  And then we have,

22    according to the U.S. Census Bureau, the terminology, black

23    registrations, and then Hispanic registrations.

24    Q   Which demographic group has increased its registration the

25    greatest amount?

1      A    The Hispanic.

2      Q    By what percent?

3      A    Two and a half percent.

4      Q    And in what graphic group?

5      A    What the Census Bureau defines as black.

6      Q    And how much has that increased?

7      A    Forty-one point six percent.

8      Q    And which is the third of the demographic groups?

9      A    Obviously the white.

10     Q    And how much has that increased?

11     A    Thirteen point two percent.

12     Q    By the way, Mr. Josefiak, why did you use figures for 1982

13     and 2006 as opposed to 1982 versus 2008?

14     A    Well, first of all, the data from the Census Bureau is not

15     available for 2008.  There's a lot of information out there

16     now, but it's not the same information.  The other is, I think

17     it would be sort of disingenuous to talk about this in terms of

18     registration and actual voting with the African American

19     community, since this was the first time that there was a

20     African American nominee.  And that had a tremendous effect.

21     And third, the presidential election is very different than

22     other election years.  And even if it had, it would probably

23     have skewed it in a very dramatic way.  So those are the

24     reasons it wasn't used for 2008.

25     Q    And on our third point there, 1982 was an off year

1   congressional election year, as was 2006?

2   A   Yes, correct.

3   Q   And so you're comparing apples to apples?

4   A   Yes, hopefully, yes.

5   Q   Would it be your expectation that the percentages of

6   registration under the African American community would be

7   greater, lesser, or about the same if we did have the data from

8   2008?

9   A   I think, you know, again, this is not based on the data,

10  but based on my experience, especially in a president election

11  year, and especially with this candidate it would have been

12  much higher.

13  Q   And let me ask you to look at the Defendant's Exhibit

14  number 7, which is a chart entitled:  Voting Total Counts 1982

15  versus 2006.  Do you have that in front of you.

16  A   Yes, I do.

17  Q   And can you explain what that chart is?

18  A   As opposed to the first time chart that dealt with

19  registration, this is dealing with time percentages of voters.

20  And obviously in the first graph we have all voters and the

21  increase there from 1982 to 2006.  Then we have a breakdown

22  just similar to the registration of white voters, black voters,

23  and Hispanic voters.

24  Q   And let's walk through each of those separate demographic

25  groups.  Which group showed the greatest demographic group?

1   A   Again, similar to the registration, Hispanics increased the

2   most dramatically.

3   Q   By how much?

4   A   By 152 percent.

5   Q   And what is the next demographic group?

6   A   Well, the Census Bureau identifies it as black voters.

7   Q   Increasing by how much?

8   A   Increased by 31.1 percent.

9   Q   And what's the final demographic?

10  A   Obviously, white voters increased by 7.8 percent.

11  Q   Now, Mr. Josefiak, again, based upon your experience, how

12  would you expect these numbers to differ if in fact we did have

13  data for 2008?

14  A   Based on the intensity of voter registration drives that

15  commonly occur in the get-out-to-vote efforts, I would expect

16  that those numbers would have increased against dramatically.

17  Q   And what about specifically for the black or African

18  American community?

19  A   Again, with the same rational as the registration, the

20  intensity that I think most people observed of in the African

21  American community for their nominee was intense, so I would

22  expect that again it would have been dramatically higher.

23  Q   Mr. Josefiak, you've been in the RNC building from the

24  time, 1982 and 2006, and even beyond, was that a general

25  recognition in the RNC leadership about the voter registration

1    and voter trends?

2    A   Yes, naturally, there was.

3    Q   And was it commonly understood within the RNC the minority

4    voters, African Americans and Hispanics, were becoming a

5    largest extent of the voting population.

6         MR. GENOVA:  Your Honor, I held back, and I know your

7    Honor wants to proceed with this, but many of these questions

8    are leading.  I'll object to the last as leading.

9         THE COURT:  No, I think it's something we want to go

10   into.  The objection is overruled.

11   A   Well, of course, ever since I arrived at the RNC, and again

12   I can't speak to the RNC before my arrival, ever since I

13   arrived at this RNC there was, I think, a general outreach to

14   minority voters based on this trend in voter registration.  It

15   would be political suicide for a party not to acknowledge that.

16   Quite frankly, parties are in this process, particularly at the

17   national level, to win elections.  And to ignore the fact that

18   committees from a practical standpoint would have to broaden

19   its base was a very pragmatic position.  And there were a

20   number of outreach programs that were instituted ever since I

21   was there, from Chairman Bond being there, to Chairman Barber

22   being there, to Mark Roscoe being there, to Ed Gillespie being

23   there.  And in particular, the highlight I think is when Ken

24   Melon was there.  He made that a priority of his chairmanship

25   at the RNC.

1    Q    Were there any -- were there any notable successes by the

2    RNC in its outreach to minority voters?

3    A    Well, obviously not as much as the committee would have

4    liked.  But I think 2004, particularly with the Hispanic

5    community, 40 percent voted for President Bush.  So to some

6    degree there was some success.  I wish I could say that that

7    was true across the board, but it's a work in progress, to say

8    the least.

9    Q    And what would be the impact on these outreach efforts on

10   the RNC's ability to court and obtain minority voters if the

11   RNC were involved in minority vote suppression efforts as

12   alleged by the Democratic National Committee?

13   A    First of all, if you get the legal problems with that, from

14   a practical standpoint, it would be political suicide.  Here we

15   are in an effort to have an outreach program to create a larger

16   tendency for all communities to be a part in the Republican

17   National Committee.  And to say one thing on one side and

18   another thing on the other side would be hypocritical, and it

19   would not obviously, from a practical standpoint, be where the

20   committee wanted to be.  Again, from my prospective, I thought

21   the opposite on both fronts.  Why would the RNC make concerted

22   efforts to reach out to the minority communities and then at

23   the same time prevent those minority communities from voting?

24   It's just common sense.

25   Q    And are you familiar -- and I gave the citation just a few

1   minutes ago to Judge Debevoise with 42 U.S.C. section

2   1979(i)(b), which is the anti-intimidation provision with the

3   Voting Rights Act?

4   A   I'm familiar with that.  And I was quite surprised that

5   there was no private cause of action there.  I always thought

6   there was.  And quite frankly, if you go to the Justice

7   Department website and you look at this issue, and you want to

8   know what to do about these issues of voter intimidation or

9   vote suppression, the Justice Department obviously says the

10   first place you go is the statement.  But if you think these

11   are real problems for suppression votes, it gives the contact

12   information for the public integrity sections of the Civil

13   Rights Division, as well as the Criminal Division, as well as

14   the Civil Rights Division of the Department of Justice, if you

15   want to file a complaint.  So there are vehicles available to

16   individuals who feel that their votes are being suppressed or

17   they're being intimidated.

18   Q   During the time you've been at the RNC, has the RNC ever

19   been accused of voter intimidation?

20   A   No, not since I've been there.

21   Q   And have you followed the Democratic National Committee's

22   efforts to enforce this decree over the last 20 years?

23   A   I certainly have.

24   Q   And under the DNC claims that the RNC continues to engage

25   in efforts to suppress minority voting and those efforts are

1    continuing?

2    A    Yes, I heard that.

3    Q    And to what do you attribute DNC's allegations regarding

4    the Republican National Committee's voter suppression efforts?

5    A    First of all, other than what I submit the technical

6    violation that was found by the Court of the RNC not providing

7    adequate information to the state parties, I don't think the

8    DNC has ever been successful in raising those issues before

9    this Court with any chart that the RNC has violated the consent

10   decree.  But having said that, the Democratic National

11   Committee is out to win elections as well.  In my experience,

12   has been in every election cycle, a month before the election

13   the chairman of the DNC sends a letter to the RNC saying:  Stop

14   the voter suppression.  And that letter is disseminated.  And

15   it activates their voter base with these ideas and there have

16   been incidents in the past from 2004 where there have been

17   memos put out and documents put out saying:  If it's not there,

18   just make it up.  I think it's their effort to actually

19   motivate their base just like we want to win elections, they

20   want to win elections.

21          MR. GENOVA:  Your Honor, I'm going to object and ask

22   that the last colloquy be stricken from the record.  There is

23   no foundation laid.

24          THE COURT:  I think this is getting a little off the

25   reservation, so I'll sustain the objection to this line of

1   questioning.

2   Q   Mr. Josefiak, you mentioned a few minutes ago a speech,

3   efforts by former RNC Chairman Timmelman  to reach out to the

4   minority community.  Can you reach out on that?

5   A   Yes.  I remember this very well because it was during the

6   National Committee meeting that the RNC was conducting in

7   January 2005, Chairman Timmelman actually left that meeting

8   which was of considerable concern because it was an RNC meeting

9   to specifically go and take time out of that meeting, which by

10  the way the RNC only meets twice a year.

11       THE COURT:  Can you slow down a little bit?

12  A   Meets only twice a year, and went and spoke to the NAACP at

13  its conventions in Milwaukee.  And that he laid out his belief

14  that what the Republican party offered for minorities,

15  particularly the African American community with regard to

16  education and housing, were issues that should resonate in that

17  community.  And he was making a personal effort to reach out as

18  chairman of the RNC, as the representative of the president, to

19  encourage the black community to at least take a look at the

20  Republican party as an alternative to the Democratics because

21  of where we stood on certain issues.

22       THE COURT:  And I understand a copy of his speech is

23  included in your papers?

24       MR. BURCHFIELD:  Yes, it is.

25  Q   Can you identify that speech, Mr. Josefiak, also behind tab

1    9?

2    A   Yes, that's the speech.

3        MR. BURCHFIELD:  And, your Honor, rather than have Mr.

4    Josefiak go through that speech, it's available.

5        THE COURT:  I've read it.  I'm familiar with it.

6    Q   And, Mr. Josefiak, you're familiar with the Voter Rights

7    Act of 1965?

8    A   Yes, I am.

9    Q   And does that act periodically has it periodically come up

10   for extension?

11   A   Yes, it has.  As a matter of fact, it had -- it was about

12   to expire.  And in 2006, lead basically by Congressman --

13   basically passed the Republican house and Republican Senate,

14   and was signed by the Republican President for an extension for

15   another 25 years.

16   Q   And is that, to your knowledge, was that the longest period

17   of time the Voting Rights Act has ever been extended?

18   A   To my knowledge, yes, it has.

19   Q   And what about the leadership of the Republican National

20   Committee, who is the current chairman of the Republican

21   National Committee?

22   A   Michael Steele from Maryland.  And he represents the first

23   African American chairman that the RNC has had.

24   Q   And can you tell us a little bit about Mr. Steele?

25   A   Yes, sure.  Mr. Steele was the chairman of the Republican

1   Party of Maryland.  That's when I first got to meet him back in

2   2002.  He then ran successfully as a Lieutenant Governor

3   candidate and had full party support there.  He then ran an

4   unsuccessful campaign for the United States Senate in 2006 with

5   full party support.  He's done things in between, but this past

6   January, he was elected chairman of the Republican National

7   Committee.

8   Q   And are there -- who is the Chief Administrative Officer of

9   the Republican National Committee?

10  A   Well, the Chief Administrative Officer and the Republican

11  National Committee is a recent decision to the RNC, and his

12  name is Boyd Rutherford.  Again, he is basically in charge of

13  the committee's budget, and basically administering the entire

14  operation.  And he's also an African American, which is the

15  first African American we've had in that position as well,

16  representing the top echelon of leadership at the RNC.

17  Q   The Chief Administrative Officer be analogous to the Chief

18  Operating Officer?

19  A   Yes, that's correct.

20  Q   And we've talked about some of the changing political

21  realities and the changed composition of the RNC leadership.

22  Are there any other factors that you can point to that might

23  suggest that this leadership is more necessary?

24  A   Certainly.  I think the obvious speaks for itself.  As the

25  Chairman of the Republican National Committee, there's no way

1   that Michael Steele is going to be in any position to suppress

2   any minority voter.

3           MR. GENOVA:  He said -- there's no foundation has been

4   laid whether he would know what's in Michael Steele's mind or

5   not.

6           THE COURT:  I think it's probably objectionable.

7   Q   Have you had conversations --

8   A   I have had conversations with Chairman Steele on this point

9   with regard to this consent decree.

10          THE COURT:  We have an objection.  You're objecting to

11  the conversation?

12          MR. GENOVA:  Your Honor, it sounds like it's hearsay

13  to me.

14          MR. BURCHFIELD:  I haven't asked him what Mr. Steele

15  said yet.

16          MR. GENOVA:  All right.  Your Honor, I'll let Mr.

17  Burchfield finish his question.

18          MR. BURCHFIELD:  Thank you.

19  Q   Have those conversations you've had with Mr. Steele lead

20  you to understand the current policy in the RNC as far as it

21  concerns voter suppression?

22  A   Yes.

23  Q   And what is your understanding of the current RNC policy?

24  A   It would be the same as it has been under others, no

25  tolerance for such a policy.

1   Q    To your knowledge, has the RNC made efforts to act

2   consistently with the consent decree over the last 20 years

3   since you've been involved with the RNC?

4   A    Could you repeat the question again?

5   Q    Sure.

6          To your knowledge, has the RNC made efforts to act

7   consistently with the consent decree since you've been

8   affiliated with the RNC?

9   A    Yes.

10  Q    And is that pattern of behavior attributable to the consent

11  decree exclusively?

12  A    No.  From my perspective, it has nothing to do with the

13  consent decree.

14  Q    What is it related to?

15  A    Well, first of all, the law; second of all, it would be the

16  practical reality that we've already discussed about the change

17  in registration, and the change in voting patterns, and the

18  imports of minority votes, particularly when elections seem to

19  be more devided and close.  And also, you can't underestimate

20  the leadership with the RNC.  And one thing we did not talk

21  about, quite frankly, in a broader seasons, quite frankly, the

22  change of leadership at the top of this government.  I find it

23  very difficult to believe that with an African American

24  president, and an African American Attorney General, that the

25  laws that are already on the books regarding voter fraud, voter

1    intimidation, and voter suppression are going to be actively

2    pursued by this Justice Department.

3              MR. GENOVA:  Your Honor, I'm not sure what this is.

4    Is this argument?  Is it expert testimony?  Is it

5    pontification?  He's speculating.

6              THE COURT:  I'm going to let things go pretty loosely

7    here, and I'll do that with your witnesses, and we get a

8    broader perspective.

9              MR. GENOVA:  Okay, fine.

10   Q   Mr. Josefiak, can you look at Defendant's Exhibit 10 in the

11   notebook in front of you.  Do you recognize that as a letter

12   dated June 15th, 2004, from then Chairman Ed Gillespie of the

13   Republican National Committee to then Chairman Terry McCauliff

14   of the Committee?

15   A   Yes, I do.

16   Q   And you mentioned before on the eve of election, each

17   election cycle, the chairman of the Democratic Committee tends

18   to write a letter to the RNC accusing it of voter suppression.

19   Is this Mr. Gillespie's response to the 2004 interrogation of

20   that letter?

21   A   If it wasn't the response, it was in anticipation of that

22   letter, yes.

23   Q   Would you look at the third paragraph of this letter, and

24   let me read it into the record to make sure we're clear.  It

25   says:  You have falsely and unfairly charged the Republican

1    Party with trying to intimidate voters.  The Republican

2    National Committee is not and had not been engaged in any

3    effort to suppress or intimidate voters.  Our party finds such

4    conduct reprehensible.  And if we receive any evidence that

5    such conduct is occurring, I will take all steps necessary to

6    ensure that it ceases immediately.  Rather, our goal in this

7    election is an unprecedented effort to encourage participation

8    in the political process.

9         Does that paragraph accurately state to your knowledge

10   the position of the RNC on voter suppression?

11   A    Yes.

12   Q    And Mr. Genova in his opening statement suggested that this

13   letter was somewhat cynical, I guess, in the sense that it

14   preceded the Malone complaint in 2004.  How do you respond to

15   that suggestion?

16   A    Well, first of all, I think this was Chairman Gillespie's

17   attempt to reach out to the chairman of the Democratic National

18   Committee in an effort to avoid these kinds of charges and

19   counter charges, and work together so there was a common

20   agreement and understanding that we're all out for the same

21   thing, to register as many voters as possible to get them to

22   the polls, disregarding how they were going to vote.  I found

23   that a little disconcerting, and knowing full well how Chairman

24   Gillespie personally felt about minority outreach and having

25   worked with him for many years, I found that to be difficult to

Josefiak-direct                                    68

1    swallow.  And also the results of that effort in that basically

2    raised the charges of him being in violation of the consent

3    decree raises in my mind the complexity of trying to interpret

4    what the consent decree actually means.  Sometimes we say too

5    much, and sometimes we say two little.

6    Q   In connection with the North Carolina consent decree issue,

7    what was your understanding of the instruction that was given

8    by this Court in that case?

9    A   That the RNC was instructed to notify any state where there

10   was a valid security operation going, the limitation placed on

11   the Republican National Committee to be a participant in any

12   way, shape, or form in a valid security program.

13   Q   And in the Malone matter, did you view the Malone -- the

14   Court's position in the Malone matter to be inconsistent with

15   that?

16   A   It's confusing at best.  And so we went out of our way post

17   the North Carolina case to make it clear to the state parties,

18   not only in any materials that we sent out with regard to

19   Election Day operations about the RNC's restrictions and

20   non-participation, but also at compliance seminars to instruct

21   the state parties from the legal perspective to not only what

22   the rules of engagement were, or could not be -- what the rules

23   of engagement were for state parties based on the laws of state

24   laws that were currently on the books, as in Ohio having

25   conversation that seem to go over the line, at least in this

1   Court's views, caused this Court to find that the DNC was

2   engaged enough in with the Ohio Republican Party to be viewed

3   as violating the consent decree.

4   Q   We'll come back in a few minutes to how the RNC deals with

5   the parties in light of the decree.

6          Let me ask you now, do you recall whether Miss

7   Malone's -- whether Miss Malone was flagged for challenge by

8   the RNC by the state party, or by state election officials in

9   Ohio during 2004?

10  A   My understanding, I certainly know it wasn't the RNC that

11  flagged Miss Malone.  My recollection was that it was actually

12  the state that flagged Miss Malone from multiple registrations.

13  Q   And what's your understanding of whether Miss Malone

14  actually got to vote in 2004?

15  A   Well, based on --

16         MR. GENOVA:  Your Honor, I don't believe Mr. Josefiak

17  was at the RNC at the time.  I think he was at Bush/Chaney at

18  the time.

19         THE COURT:  You're technically raising the hearsay

20  objection.

21         MR. GENOVA:  Yes.

22         MR. BURCHFIELD:  Your Honor, I will withdraw the

23  question.  I think it's publicly noted in the Court's opinion

24  that Miss Malone did vote in 2004, despite her allegations.

25         THE COURT:  I think the record will establish this

1   fact.  I don't think we need the testimony to do so.

2           MR. BURCHFIELD:  Thank you, your Honor.

3   Q   Mr. Josefiak, would you look at Exhibit 11 in your notebook

4   there, Defendant's Exhibit 11.  My question for you is, do you

5   recognize that as the -- this Court's order relating to the

6   challenge in 1990 concerning the North Carolina Senate

7   election?

8   A   Yes, correct.

9   Q   And would you look please at Exhibits 12 -- Exhibit 12, and

10  you recognize that as this Court's decision in the Malone

11  matter in 2004?

12  A   Correct.

13  Q   And in Exhibit 13, you recognize that as the exhibit's

14  Third Circuit panel decision in the Malone manner?

15  A   Correct.

16  Q   And Exhibit 14 is the Third Circuit's decision staying the

17  Malone order?

18  A   Correct.

19  Q   And Exhibit 15 is Justice Suter's order denying Miss

20  Malone's effort to stay the Third Circuit's issues?

21  A   Yes, correct.

22  Q   You mentioned federal remedies for voter intimidation and

23  for interfering with efforts to vote.  Are there state remedies

24  available as well?

25  A   Yes, absolutely.  Most states have rules about poll

1    watching and challenging, and have laws of preventing a

2    violation of voters rights.

3    Q    And in your experience were those laws affected?

4    A    Yes.

5    Q    And can you give an example of the effective application of

6    a state-level anti-voter intimidation law?

7    A    Well, it's a different context.  But it's the same idea.

8    And in 2004, the Democratic National Committee was enjoined by

9    the State Court in Florida for -- based on the class action

10   brought by Florida Republican poll watchers that they were

11   being intimidated by their duties.  That was allowed for by

12   state law.

13   Q    And let me ask you to look at Exhibit 18 in the notebook.

14   Do you recognize that as an order entered by the Circuit Court

15   of the 18th Judicial Circuit and for the Seminal County,

16   Florida, granting a temporary injunction against the Democratic

17   National Committee, Democratic Committee, and the Democratic

18   Party of Seminal County?

19   A    Yes, I do.

20   Q    And attached to that order as Exhibit A, what do you see?

21   A    That is a flyer with the DNC logo saying, "Important Legal

22   Notice," dated October 28th, 2004.  It was sent to all

23   Republican Party Election Day poll watchers and the disclaimer

24   at the bottom of the page said it was paid for by the

25   Democratice National Committee.

1    Q    Let me ask you to look at Plaintiff's Exhibit 19.  Do you

2    recognize that as an order from the Florida appellate court

3    denying a petition for review of that temporary restraining

4    order?

5    A    Yes, I do.

6    Q    More general, Mr. Josefiak, is it the case that state laws

7    enforced by state officials are in your experience effective at

8    deterring and preventing voter intimidation and voter

9    suppression?

10   A    Yes.

11   Q    Mr. Josefiak, would you look police at Exhibit 20 in your

12   notebook, Defendant's Exhibit 20.  And that exhibit should be a

13   timeline, much as this one I'm putting on the board.  Do you

14   have that?

15   A    Yes, I do.

16   Q    Now, since the decree was entered in 1982, have there been

17   any legislative developments that have addressed or affected

18   the issue of minority registration and voting?

19   A    Yes, there have.

20   Q    Are you familiar with a statute often referred to as the

21   Motor Voter Law, the National Voter Registration Act?

22   A    Yes, I am.

23   Q    And when was that enacted?

24   A    It was enacted in May of 1993.

25   Q    And just generally, the Court obviously can review that

1    statute and determine what it means.  Generally, can you

2    describe how that has affected the ability of minorities, the

3    public at large, to register and vote in the United States?

4    A    Certainly.  It made it easier for all voters, which would

5    include minority voters, to register by requiring states to

6    allow for registration when they obtain their driver's license

7    and other sort of other public assistance benefits.  And so it

8    did have an impact on making it a lot easier.  You went to get

9    their driver's license, you went to get certain assistance from

10   your local government, you were allowed to register to vote.

11   It made it a lot easier, you didn't have to go through a

12   registrar, you could go at a normal time, you were getting

13   other government prerequisites, and get yourself registered.

14   So it may be easier.

15   Q    And how, if at all, did this Motor Voter Act affect the

16   political climate surrounding minority voting so far as the RNC

17   was concerned?

18   A    Well, I think what -- because it increased, I think that

19   we've already talked about the increase in voter registration.

20   But because it was a trend increasing voter registrations

21   across the board, and particularly minority voter

22   registrations, it made it from a practical standpoint a

23   prerogative from a party to see what it could do to generate

24   more interest from the party.  And, quite frankly, I see the

25   Voting Rights Act basically touted as reasons why minority

1    registrations and voting acts increased over the years.  So it

2    made it much more of a practical realty, a political realty, I

3    should say, that there was much more of an interest within the

4    RNC to do more minority outreach and get more minority interest

5    in the participation in the Republican Party.

6    Q    In March 27, 2002, the Bipartisan Campaign Reform Act was

7    enacted.  How, if at all, did that bear upon voter

8    registration, voting, and in particular, focussed on

9    minorities?

10   A    Well, unlike the other laws that were election

11   administrative type laws, that actually dealt with the process.

12   One would think probably not very much, but in the world that

13   we live in, I think it has great effect for two reasons.  One,

14   part of the Bipartisan Campaign Reform Act that we commonly

15   referred to as BCRA, or others refer to as McCain/Feingold,

16   basically prohibits national party committees from receiving

17   any sort of what we call soft money.  And soft money basically

18   means money that is not limited as to source and amount, so it

19   could come from a corporation, let's say, or an individual or

20   certain amount; as opposed to hard money, which is federally

21   regulated money which means individual contributions of a

22   certain amount, and whether it's the -- limits the sources.  So

23   that source was a new phenomenon for national parties.  The

24   committees to be that restricted to the kinds of money it could

25   raise.  In the past, prior to BCRA, you could use a combination

1     of so-called soft money and hard money for voter registration

2     drives, and get out the vote drives.  And from my perspective,

3     it appeared to me from our party's perspective, we were sort of

4     in a pattern of having to continue doing what we were doing.

5     But from the DNC's perspective, it relied more and more on

6     outside groups such as any ACORN and others to do their voter

7     registration programs.  And so that outsourcing had an effect,

8     I think, on our ability.  But more from a practical standpoint,

9     with regard to the enforcement of the consent decree,

10    particularly without groups bringing the actions more with the

11    DNC itself, those outside groups were not limited to any

12    restricted source of money.  Whereas the RNC, in order to

13    actually defend itself in any of these litigations, would be

14    required to use that hard money to defend itself and take away

15    money from its political efforts, which again is why the

16    committees are in existence in the first place, to win

17    elections.

18    Q   So just to make sure we're clear on this.  If the RNC

19    engages in -- or the DNC engages in any sort of voter

20    registration activity, or get out the vote activity, or poll

21    watching activity, any of that, now has to be paid for with one

22    hundred percent hard money raised under the restrictions and

23    reporting requirements of the Federal Election Campaign?

24    A   Yes, that's correct.

25    Q   Whereas if an outside group, such as ACORN, engages in vote

1    registration, get out the vote, and Election Day activities,

2    are they or are they not subject to those same financial

3    restrictions?

4    A   They are not.

5    Q   Now, is it -- just hypothetically, if a political party

6    were going to rely more on outside routes to engage -- to do

7    voter registration among its likely allies, does BCRA restrict

8    the ability of that political party to supervise that outside

9    group to make sure that it is acting lawfully and within the

10   bounds of the law?

11        MR. GENOVA:  Your Honor, I'm going to object to that

12   hypothetical.

13        THE COURT:  That's too speculative, so I'll sustain

14   the objection.

15   Q   Can a political party under BCRA direct or supervise an

16   entity that is funded by soft money?

17   A   No.  The way BCRA is written, it is a total prohibition of

18   a national party committee's involvement with either raising or

19   the spending, or the directing of spending, and those are the

20   words from the statute, itself, any non-federally raised money.

21   Q   And are groups -- are groups that do not register and

22   report to the Federal Election Commission, are they subject to

23   public reporting and transparency the same way that political

24   parties are?

25   A   Not generally.  There can be situations where that's

1    different, but generally speaking, if a group is strictly doing

2    it as a non-political group, they are likely not going to be

3    subject to the same kinds of disclosure and limitation

4    requirements.

5    Q    And is it your observation that the Democratic National

6    Committee was relying more on groups like ACORN and ACT to do

7    voter registration and get out the vote activities concern you?

8              MR. GENOVA:  Your Honor, I'm going to object.

9              THE COURT:  No.

10             MR. GENOVA:  There's no foundation that he had an

11   observation.

12             THE COURT:  No.  I'll permit that.  It concerns them

13   and we certainly know whether or not it concerned him.

14   A    Yes.  As a matter of fact, there was more than concern,

15   there were actually complaints filed that based on the

16   activities, these groups actually had gone over the line and

17   become affiliates of the Democratic National Committee, and

18   complaints were filed in the past, specifically in the spring

19   of 2004 by the RNC at the time, and then also by the re-elect

20   committee, challenging the appropriateness of that activity,

21   because it was too close.

22   Q    If the more distant it becomes from the DNC -- in other

23   words, if the DNC were not supervising it, was that a concern

24   of yours?

25   A    Yes.  Because the more distance -- I mean, there is some

1   accountability with both the National Party Committee, that if

2   they are responsible for something, they have to pay the

3   consequences for making sure that that program runs the way

4   it's supposed to run or they will pay the consequences.

5   Q   Political consequences?

6   A   Political consequences.  And from time to time, legal

7   consequences.  However, the more distance you are from that,

8   the more difficult it is to assure that the programs are being

9   practiced the way you would practice it yourself, if you were

10  actually doing it.

11  Q   Mr. Josefiak, let's talk about the Help America Vote Act

12  for a few minutes.  It was passed in October of 2002, as shown

13  in our chart here as acted in 2002.  Do you see that?

14  A   Yes, I do.

15  Q   And are you familiar with the Help America Vote Act or

16  HAVA?

17  A   I certainly AM.

18  Q   In broad terms, how does HAVA effect the political climate

19  insofar as this consent decree is concerned?

20  A   HAVA did a number of things, as we already heard.  I think

21  HAVA had the effect, with regard to the consent decree, of

22  basically allowing challenged voters that were being challenged

23  under the color of state law, these are all legitimate

24  challenges that are allowed under state law, whenever such a

25  voter is challenged, to vote provisionally after Election Day,

1    those ballots are reviewed.  And if the voter is determined to

2    be eligible, it's discounted -- it is counted.

3    Q   So if I'm a voter and I show up on election Day and I want

4    to vote, and there's a poll watcher there and he challenges my

5    right to vote, what does HAVA do in that circumstance?

6    A   HAVA requires that the state, that it be procedure to allow

7    that voter to vote provisional ballot.  And after the Election

8    Day goes by, those ballots are reviewed.  And if the ballot is

9    reviewed as legitimate, it's counted.  And if it's viewed as

10   ineligible, it's discarded.

11   Q   And even if I'm not registered in that precinct and I show

12   up to vote, does HAVA let me submit a provisional ballot?

13   A   If you're not on the poll books in that particular

14   precinct, yes, you are given the opportunity to vote

15   provisionally.

16   Q   And if someone -- if I show up to vote and someone screams

17   out "he's a felon," does that -- do I still get a vote by

18   provisional ballot?

19   A   Yes.

20   Q   And are there any circumstances that you are aware of in

21   which HAVA does not entitle a person who actually takes the

22   time to show up at a voting place, that HAVA would not allow

23   that person to cast at least a provisional ballot?

24   A   Not to my knowledge.

25   Q   Now, have there been any developments, we talked about the

1    federal level, we talked about the Motor Voter Act,

2    McCain/Feingold, and HAVA, have there been any developments in

3    the last 27 years at the state level that bear upon the

4    continued need for this consent decree?

5    A    I think the involvement -- yes, there have been

6    developments at the state level.

7    Q    And what developments can you think of?

8    A    Well, I'm thinking in terms of the ease of which voters are

9    allowed to vote these days without having to go to the polls.

10   For example, no excuse absentee voting, early voting, those

11   sorts of things have made it much easier to take the onus of

12   Election Day and the trend seems to be more and more people are

13   voting through absentee, or early voting, rather than actually

14   going to the polls on Election Day, for whatever reason.

15   Q    Let me ask you to look in your exhibit notebook at Exhibit

16   21, Defense Exhibit 21, which bears the heading:  National

17   Conference of State Legislatures.  It's dated October 27 --

18   October 30, 2008.  Do you see that?

19   A    Yes, I do.

20   Q    And are you familiar with the National Conference of State

21   Legislatures?

22   A    Yes, I am.  And CSL is a good source of information such as

23   this.

24   Q    And is that -- is the National Conference of State

25   Legislatures considered an authoritative source when it comes

1    to compiling summaries of the 50 state's laws?

2    A    Yes.

3    Q    Let me ask you to look, if you would, at Defendant's

4    Exhibit 22, which is headed:  Authoritative Voting Methods of

5    State, 2008.  Do you have that in front of you?

6    A    Yes, I do.

7    Q    And what does this chart show?

8    A    It shows the number of states that actually allow for

9    alternative voting as of 2008.

10   Q    Now, it shows, does it not, that 31 states as of 2008 allow

11   early voting?

12   A    Certainly.  If you want to break it down, 31 states allow

13   for early voting, which means, you know, again, it's the state

14   law provision.  Some states, it's a couple days.  Some states,

15   it's a couple weeks that you can go into a designated voting

16   place and actually cast your ballot in person.  But not --

17   there are designated polling places in 31 states.  That seems

18   to be a growing trend.  As a matter of fact, just this past

19   year other states have actually passed legislation that would

20   increase that number.  But for 2008, that is the definitive

21   number, 31 states that would allow for that early voting.

22   Q    And so you think this number maybe higher than 31 right

23   now?

24   A    Currently, yes.

25   Q    And what effect does that have on the need for -- the

1   necessity for the consent decree that brings us here today?

2   A   Well, when you have these kinds of alternate methods it

3   takes again the onus of having to be there on Election Day and

4   for whatever reason, there is a feeling that there's a problem,

5   there are other ways to exercise your right.  Obviously if you

6   prefer going directly on Election Day, you can.  But you also

7   have these other methods.  It allows all flexible, including

8   minority voters to cast their vote, other than to have to go to

9   the normal precinct to do so.

10  Q   This chart shows 28 states have no excuse absentee voting.

11  What is no excuse absentee voting?

12  A   It means that you can just apply with your state to -- for

13  an absentee ballot.  You don't have to give any reason why

14  you're going to be absent from the polls that day.  This is a

15  change, traditionally, and absentee ballots were only allowed

16  when you had a good reason for not showing up at the polls, why

17  you couldn't be in your jurisdiction on Election Day.  But 28

18  states now have this no excuse, where you don't have to give a

19  reason, you just may not feel like getting up or going there,

20  or for whatever reason, you just don't want to go to the polls,

21  and now allow for no excuse absentee voting.

22  Q   And if it were rumored in the minority community that there

23  was going to be an effort to suppress the minority vote, could

24  people vote by no excuse absentee ballot?

25          MR. GENOVA:  Objection, your Honor.

1          THE COURT:  I'll permit it.  Overruled.

2          MR. GENOVA:  It's speculative, your Honor, if it were

3     rumored.

4          THE COURT:  Well, hypothetical, I'll permit you to

5     answer.  The answer is probably pretty obvious.

6     A    It would seem to me that if I felt that I was being, for

7     whatever reason, I felt uncomfortable, I certainly would have

8     an opportunity to do it this way.  I still would have the

9     right, if I wanted to go ahead and go to the polls and exercise

10    my duty that way, I could do that as well.  It certainly is

11    another alternative that would be available.  If, for whatever

12    reason, individual, whether it was something like that, or

13    just -- people didn't want to go on that day or both, they had

14    just to do this through the no excuse absentee program.

15    Q    And the five states that this chart says have permanent

16    absentee voting, based upon the National Conference of State

17    Legislatures, is that an accurate number for you?

18    A    That's what their information states.

19    Q    What is permanent absentee voting?

20    A    Once you've asked for your absentee ballot, you constantly

21    would get that the same way in the future.  So you don't have

22    to ask for it again, it comes in the mail again.

23    Q    And in these five states, if you apply to vote absentee,

24    the state automatically sends you an absentee ballot, every

25    election cycle --

1    A    Again, the mailing produces for all these states will vary.

2    Some states require it to be in the day before, and other

3    states require it as the polls close on Election Day.  And

4    there are other ballots to be required to be post-marked and

5    sent on Election Day.  It varies, but that basically is it.

6    Once you get the ballots, you are under state law as to when

7    those ballots must be returned.

8    Q    Under no excuse, absentee ballot or permanent absentee

9    ballot, a voter can vote in an election without ever leaving

10   his or her home; is that correct?

11   A    Yes, correct.

12   Q    And, Mr. Josefiak, are these procedures actually used in

13   elections?

14   A    Oh, rather extensive.

15   Q    Let's look if you would at Defense Exhibit 23.  This is a

16   report by the U.S. Election Assistance Commission summarizing

17   key findings about the 2006 election.  Do you have that exhibit

18   in front of you?

19   A    Yes, I do.

20   Q    And -- your Honor, this is a -- this is a public document

21   which is admissible on that basis, and also subject to judicial

22   notice.

23          Mr. Josefiak, what is the U.S. Election Assistance

24   Commission?

25   A    Actually it was a by-product of HAVA that was created as an

1    independent federal agency.  It doesn't have the authority to

2    promote regulations, but does have authority to do studies and

3    surveys such as this, to present that information to the states

4    in order to enhance the administration of elections.

5    Q   And does this document, Exhibit 23, contain information

6        that would help us answer whether early voting and absentee

7        voting procedures are actually used by voters?

8    A   Yes.  There's information specifically in Table 2 that

9        absolutely reflects that information.

10           THE COURT:  Mr. Burchfield, you're going into such

11   detail, you're sacrificing your hope to be available elsewhere

12   on Thursday.

13           MR. BURCHFIELD:  Well, your Honor, I am coming down

14   the stretch and Mr. Josefiak is our only witness.

15           THE COURT:  Oh, all right.

16   Q   Mr. Josefiak, do you recognize Defendant's Exhibit 24?

17   A   Yes, I do.

18   Q   Could you describe briefly what this chart demonstrates?

19   A   Yes.  It's a compilation of the data found in the Elections

20   Assistance Commission studies, surveys about nationwide voting

21   methods in 2006.

22   Q   And this chart demonstrates that in the states that

23   permitted absentee voting in 2006, that over 11 million people

24   cast absentee ballots; is that correct?

25   A   Yes, that's correct.

1    Q    Which was 14.3 percent of the electorate?

2    A    That's correct.

3    Q    And over 4 million people avail themselves of the right to

4    cast an early ballot?

5    A    Yes, that's correct.

6    Q    And that's 5.6 percent?

7    A    Yes, that's correct.

8    Q    And there were 798,000 provisional ballots cast nationwide?

9    A    Yes, that's correct.

10    Q    And this is 2006 data.

11         Do you have any basis to understand whether there

12    would be more use of these procedures in 2008, or less use of

13    these procedures in 2008?

14    A    Again, it's not based on any specific studies, but based on

15    information that has been in the public domain about the

16    increase of early votes, and also absentee voting.  I think

17    these figures would have -- especially in the presentation,

18    would have dramatically increased.

19    Q    And in selected states drawn from the Election Assistance

20    Commission, Defense Exhibit 23, a summary appears in Exhibit 25

21    of certain selected states.  Do you have that exhibit?

22    A    Yes, I do.

23    Q    And is that information correctly drawn from Defendant's

24    Exhibit 23?

25    A    Yes, it is.  And basically it shows the percentage, you

1    look at specific states, the absentee vote cast in the 2006

2    elections is more dramatic.  Washington, for example, is 87.68.

3    Washington is basically a paper state.  Arizona, which has a

4    high propensity of Hispanic voters, 47 percent voted absentee.

5    And Colorado, again 39.6 percent.  And California, 35.3

6    percent.

7    Q   Mr. Josefiak, I don't want to spend a whole lot of time on

8    this, but I do want to spend a little bit of time talking about

9    the issue of voter fraud and the -- whether or not it is a real

10   phenomenon in American politics.  What evidence do you -- and

11   let me just back up.  Does the possible existence of voter

12   fraud affect your -- did it affect your decision making as

13   chief counsel of the RNC about how the -- about how you -- how

14   the RNC would address Election Day activities?

15   A   Certainly.  Other than making sure what the activities

16   comprised was fair and accurate, the whole idea of making sure,

17   as is part of the chief counsel's job is making sure that all

18   legends are fair and all votes are counted.  And any sort of

19   vote fraud would dilute that.  And so it was a major part of my

20   job to ensure that the integrity of the system was as best as

21   we can make it, run by individuals, and vary from state to

22   state.  So it's very important, in particularly, and I think

23   this is already referred to earlier, when you have close

24   elections, you had for the first time, which I think really

25   dramatizes this thing nationwide, because of my experience in

1    the dealings I've had, always been close elections, for the

2    first time nationwide cast a -- cast an interest in this whole

3    issue, and how every vote does count, and how important even

4    one fraudulent vote can make in determining those elections.

5    Minnesota, this time around, were a couple of hundred votes,

6    makes a difference.  And that's still being litigated.  And

7    recently, I just came back from the New York 20 special

8    election ballot count in Albany, New York, where again that was

9    down to the wire where there was all sorts of issues about

10   people voting outside of their residents.  People living in

11   no -- voting in the district which is a rural county and not

12   anywhere near New York City.  Every vote does count, and every

13   one should be encouraged to vote.  But, again, because we have

14   such close elections these days, we have to make sure and

15   ensure that the public in general, the voters in particular,

16   and the system is as clean and fair as we can make it, and not

17   be diluted by these fraudulent votes, whether it be one, one

18   hundred, or one thousand.

19   Q    And what particular -- are you familiar with the

20   Carter-Baker Commission?

21   A    Yes, I am.

22   Q    And would you look please at Exhibit 26.  This is a

23   document entitled:  Building Confidence in U.S. Elections,

24   dated September, 2005.  Organized by the Center for Democracy

25   and Election Management, American University.  Are you

1    generally familiar with this document?

2    A   Yes, I am.

3    Q   And is this report frequently referred to as the

4    Carter-Baker Commission Report?

5    A   Yes, it is.  And the genesis of this was a formation of

6    this commission by Former President Carter, and former

7    Secretary of State Jim Baker, sort of as a successor to the

8    original Carter Ford Commission.  And it took as its mantra to

9    review the election process, have hearings, investigate, and

10   come up with its findings, and make recommendation.  So that's

11   the genesis, but this is the report.

12   Q   And would you look at page 45 of this report, please.  And

13   the number is in the upper right hand corner.  It's under

14   Section 5.1:  Investigation and Prosecution of Election Fraud.

15   Do you have that provision?

16   A   Yes, I do.

17   Q   And let me read you this paragraph out of it, and I'll

18   just -- the question is, does this bear upon your -- did that

19   bear upon your view as the chief counsel of the RNC as to

20   whether voter fraud was or was not a fact?  "While election

21   fraud is difficult to measure, it occurs.  The U.S. Department

22   of Justice has launched more than 180 investigations into

23   election fraud since October 2002.  These investigations have

24   resulted in charges for multiple voting, providing false

25   information on their felon status, and other things against 99

1    individuals and convictions of 52 individuals.  The convictions

2    related to a variety of election fraud voting related offenses

3    by non-citizens."

4              Did that comment in the Carter-Baker Commission Report

5    bear upon your view as to whether election fraud voter fraud

6    was a realty?

7    A    It just reinforced what I knew and verified my view with

8    the need to continue the vigilant effort as a primary counsel

9    for the committee to ensure that the process maintained it's

10   integrity.

11   Q    Are you aware of -- are you aware of state-level

12   investigations that have disclosed voter fraud?

13   A    Yes.

14   Q    And which states?

15   A    Wisconsin, and one in particular that comes to mind.  There

16   have been others as well.

17   Q    And let me ask you to look at Exhibit 29, which is a May 10

18   2005 paper entitled:  Preliminary Findings of Joint Task Force

19   Investigating Possible Election Fraud.  Do you see that?

20   A    Yes, I do.

21   Q    And did that arise out of the Wisconsin situation that you

22   just referred to?

23   A    Yes, it has.  It was the preliminary findings of an FBI

24   joint task force, yes, it was.

25   Q    And who was involved in that task force, Mr. Josefiak?

Josefiak-direct                     91

1    A    It was the Milwaukee Police Department, Milwaukee County

2    District Attorney's Office, the Federal Bureau of

3    Investigation, and the United States Attorney's Office.

4    Q    And would you look, please at page 2, under:  Summary of

5    Findings.  And look at -- look at findings number 1 referring

6    to 100 individual instances of suspected double voting, and

7    names of persons who would not vote, and voting names to be, if

8    any.  In your experience, are those sorts of allegations easy

9    to prove?

10   A    No.

11   Q    In the second -- in the second paragraph, it says:  In

12   addition, the task force has determined that more than 200

13   felons voted when they were not eligible to do so.  In order to

14   establish criminal cases, the government must establish willful

15   violations in individual instances.

16   A    Yes.

17   Q    And is it your understanding -- what is your understanding

18   of the strength of the case a district attorney would need to

19   have in order to prosecute someone criminally for a type of

20   vote fraud?

21   A    Basically they would have to know that it was a violation

22   of a law to vote and actually went and did it, which is again

23   very difficult to prove.

24   Q    And would criminal convictions of voter fraud be an

25   accurate indication of the extent of voter fraud in this

1    country?

2    A    It would be an indication, but not an accurate indication,

3    no.  I would say no.

4    Q    And let me ask you to look at -- have you also become aware

5    of allegations of voter fraud investigated by the Florida

6    Department of Law Enforcement?

7    A    Yes, I have.

8    Q    And let me ask you to look at Exhibit 27.  Are you familiar

9    with that report?

10    A    Yes, I am.

11    Q    And also Exhibit 28.

12    A    Yes, I'm very familiar with that.

13    Q    You seem more familiar with 27 than you do with 28.

14    A    Obviously I'm familiar with the report issued in 1998

15    because it raises the same kinds of issues, again, as chief

16    counsel, I would have to worry about:  Voter registration

17    fraud, absentee ballot fraud, illegality.  Those are issues

18    that, again, would be of some concern to me and of concern to

19    me going forward as the chief counsel.  But what was

20    particularly important to me was what was going on in October

21    of '04, because as a general counsel of the President's

22    Re-elect Committee, and this is Florida again, these sorts of

23    issues were very important based on the experience of 2000, and

24    it was very, very -- I was very sensitive to this, and making

25    sure that we kept an eye on this.  So I was very, very up on

Josefiak-direct                                    93

1    this, yes.

2    Q   So especially in Florida, you, from your own experience,

3    knew that even a few fraudulent votes could have potentially

4    determined the president?

5    A   Yes, absolutely.

6    Q   And let me ask you to look at the other notebook, Mr.

7    Josefiak, Defendant's Exhibit 40 --

8    A   Forty?

9    Q   Four zero.  You have to that in front of you?

10   A   Yes, I do.

11   Q   And does this refresh your recollection about allegations

12   of voter fraud, in fact, guilty pleas on voter fraud by ACORN

13   workers in Missouri?

14   A   Yes.  Missouri was one of the states that was in the back

15   of my mind.

16   Q   And Missouri -- does Missouri tend -- sometimes tend to be

17   a closely contested state?

18   A   It has on occasion been very close and very contentious,

19   yes.

20   Q   In your experience, does the consent decree restrict the

21   ability to monitor, report and prevent voter fraud?

22   A   Absolutely.

23   Q   How so?

24   A   Well, we try, particularly on the Republican side, to work

25   as a team with our state parties.  We have what has become

1    known as a 72-hour program, which is more than 72 hours, which

2    basically is our voter registration, get out vote program,

3    where as a team we work together to register as many new

4    Republicans as we can and get out the vote as best we can.  We

5    work as a team up to a point, and then when it comes to

6    Election Day activities, it stops because of the consent

7    decree.  And even though there is a provision in the consent

8    decree where we can be involved with normal poll watching

9    activities, quite frankly where I sit, what is past security is

10    a very, very difficult line.  And so as a result, as a

11    practical matter, RNC stays out of all Election Day activities.

12    So it causes that break from a team effort up to Election Day,

13    and getting out the vote on Election Day to actually monitoring

14    the polls them, themselves.  And so this has been a difficulty

15    for the committee in the past.

16    Q    So just to make sure we're clear on this, in the period

17    leading up to the election, the RNC works with state parties;

18    right?

19    A    Yes, correct.

20    Q    Local parties?

21    A    Correct.

22    Q    Candidates?

23    A    Correct.

24    Q    To register voters?

25    A    Correct.

1    Q    Encourage them to vote through get out the vote activities?

2    A    Yes, correct.

3    Q    And come Election Day, why is it that the RNC peels itself

4    off and doesn't become involved in poll watching activities on

5    Election Day?

6    A    Well, again, because the RNC cannot be engaged with valid

7    security, in any sort of question of whether the poll watching

8    goes over the line would implicate state party.  We don't want

9    to implicate state parties, which has occurred in the past.

10   And even though we don't get involved, we have allegations made

11   in this court and other courts where we have been involved when

12   in fact we have been involved.  Because of the history of this

13   consent decree, and because third parties have brought this,

14   and candidates have brought this in a context that doesn't even

15   apply to the RNC, we've just stayed out of the Election Day

16   operation business.  And even when we do, as I said, we still

17   have these charges brought against us in various forums.

18   Q    So the difference is that state parties, local party

19   candidates are not subject to the consent decree, and they can

20   engage in poll watching activities within the bounds of the

21   law, without being hampered by the consent decree?

22   A    That's correct, other than New Jersey.  The only state that

23   is subject to this particular consent decree in some ways.

24   Other state parties are not subject to this consent decree,

25   only the RNC.

1    Q    And so you're telling the Court that the RNC has polled

2    back from Election Day activities in cooperation with state

3    parties, locals parties, and candidates as a direct result of

4    this consent decree?

5    A    That's what I'm saying.

6    Q    And that's your experience at the RNC for almost 20 years?

7    A    Yes, sir.

8    Q    Mr. Josefiak, let's talk about the -- let's talk about the

9    preclearance process.  Most of us follow the political polling

10   leading up to elections, and we know that the states that are

11   in play tend to change as the Election Day gets closer.  What

12   about areas that are suspected problem precincts on Election

13   Day?  How far in advance do you know those, can you identify

14   those precincts with any sort of certainty?

15   A    Again, I think this goes to some sort of problem with the

16   consent decree.  Obviously there are a number of states, I'll

17   use a presidential, because that is probably a little more

18   national but, you know, in the state it's even more difficult

19   to determine what the problem there is in a Senate race or a

20   gubernatorial race or anything else.  There are certain battle

21   ground states that people start thinking about here in advance,

22   and it gets whittled down.  And there are decisions made to

23   change.  And even in those battle ground states, there are

24   areas that become more concern than others.  So the idea of

25   having to notify, in this case the DNC even before coming to

1   this court with a plan, even if we wanted to provide a plan,

2   becomes very impractical.  Because 20 days, according to the

3   consent decree, in my experience in dealing with all of these

4   kinds of issues, would be more than 30 days or maybe even 45

5   days because we would have to notify the DNC, and they would

6   have an opportunity to respond to that, and then we'd have to

7   come before the court.  So that is a problem that I see.  But

8   beyond that, we also have the issue of not being able to know

9   precisely, even if we could comply with the 20-day rule, where

10  exactly we would want to be.  So even if we came in with some

11  plan within that 20-day period, a week out or three days out,

12  that plan may very well change.  I don't know how we could

13  comply with that provision, if we were to go ahead and actually

14  try to implement it.

15  Q   As you understand the consent decree, before the RNC gets

16  preclearance from the Court, can it begin the implementation of

17  the poll watching program?

18  A   Well, certainly the consent decree seems to allow for poll

19  watching.  Again, from my concern in sitting in judgment of

20  what it is and making sure that a state isn't going to be

21  implicated or, again, my client, the RNC wouldn't be

22  implemented, found in violation of this, I would find it very

23  difficult to advise, to begin any sort of program period

24  without any sort of clearance.  I just think that would be

25  irresponsible for any attorney in my position to do that.

1    Q    And implementing the program would entitle signing up and

2    training volunteers?

3    A    Well, implemented a program would be actually the sort of

4    effort that would get ready for Election Day operations on the

5    ground, yes.

6    Q    And it takes time to do all that; right?

7    A    It takes time, yes.  It takes time.

8    Q    After preclearance --

9    A    Certainly after preclearance it would almost be too late if

10   we waited that long.

11          MR. BURCHFIELD:  Your Honor, I have probably, and you

12   know lawyers are notoriously bad at making these predictions,

13   but I have maybe 10 to 15 minutes more examination.  We can do

14   that now.

15          THE COURT:  Why don't we try to finish it before

16   lunch.

17   Q    Mr. Josefiak, is that okay with you?

18   A    That's perfectly fine with me.

19          THE COURT:  Miss Giordano, is it all right with you?

20          THE REPORTER:  Yes.

21   Q    Mr. Josefiak, we've seen the history where a number of

22   incidents the RNC has been subjected to election eve lawsuits

23   by the Democratic National Committee, and sometimes its allies

24   in connection with its consent decree.  Is that burdensome on

25   the RNC?

1   A    Definitely.

2   Q    In what ways?

3   A    Well, financially, again, because we would have to use our

4   hard dollars to defend this.  But more importantly, it takes

5   away the focus on what we're all about, and that's winning

6   elections, particularly a couple days before the election, and

7   so it's a drain on financial, it's a drain on resources.  And

8   it takes us off our game.

9   Q    And in 2004, in the Malone matter, do you recall who was

10   deposed in that case?

11   A    Yes, I do.  From the RNC perspective, our Deputy Chairman

12   Maria Cino was deposed for an entire day.  And our Senior

13   Political Director Blaze Hazelwood was also deposed.  The

14   preparation for -- particularly for Maria Cino was a good part

15   of that week before the election, and depositions took place

16   just previous to that.  It took her off her stride in doing

17   what she was supposed to be doing in actually administering the

18   RNC's election process.  I also know that we had an expert

19   witness that was deposed as well as the RNC deposed the expert

20   witness for the DNC as well as -- the expert witness for the

21   other side, as well as Miss Malone.

22   Q    And in the -- in the week -- in the -- I think that

23   complaint was filed on the Thursday, and Election Day was the

24   following Tuesday.  Is that consistent with your recollection?

25   A    Yes, correct.

1    Q    And during that five-day period of time, what would Miss

2    Cino, the Deputy Chairman of the RNC, this is C-I-N-O?

3    A    Yes.

4    Q    What would Miss Cino, the Deputy Chairman of the RNC, have

5    been doing if she were not involved in deposition preparation,

6    deposition, otherwise responding to matters in this case?

7    A    Again, dealing with various state parties, dealing with the

8    presidential campaign, dealing with other congressional

9    campaigns and gubernatorial campaigns, doing the

10   get-out-to-vote efforts, the final, that would have been her

11   responsibility.

12   Q    And she could not -- she could not do that as a result of

13   being involved --

14   A    Her focus was taken off of her duties and placed entirely

15   in preparation for deposition and actual deposition.

16   Q    Similarly for Miss Hazelwood?

17   A    Correct.

18   Q    And do you -- you mentioned the financial cost to the RNC.

19   Do you recall how much the RNC paid to defend against the

20   allegations coming out of New Mexico in 2008?

21   A    In 2008, in New Mexico, my recollection it was -- it was

22   after we had to ire you, around $10,000.

23   Q    A bargain.

24        And in the Malone -- and in that matter, the 2008

25   matter was brought by the DNC?

1    A   Yes, correct.

2    Q   And in 2004, in Miss Malone's matter, do you recall how

3    much the RNC had to spend for that almost a week of intensive

4    activity.

5            MR. GENOVA:  Your Honor, I don't believe the witness

6    testified that he was RNC counsel in 2004.

7            THE COURT:  Well, were you or weren't you?

8            THE WITNESS:  I was not RNC counsel in 2004.  However,

9    I'm very much aware of this cost because when I came back in

10   2005, it became a major budget issuing forward.

11           THE COURT:  All right.  Let's go on, what was the

12   cost?

13           THE WITNESS:  The cost, very clearly, your Honor, was

14   $300,000, coming right out of my legal budget.  I had to deal

15   with that very clearly and being prepared for the budget

16   committee meetings, and getting a budget approved for the next

17   cycle.

18   Q   Mr. Josefiak, we've seen the DNC file a lawsuit to enforce

19   the decree in 2008, an individual voter file a lawsuit in 2004

20   to enforce the decree, and also in 2004.  Were you aware of a

21   filing by Senator Daschle out in South Dakota?

22   A   Yes, I am.

23   Q   And was the RNC named in that lawsuit?

24   A   No, the RNC was not named at that lawsuit.

25   Q   Let me ask you to look at Defendant's Exhibit 30.

1          MR. GENOVA:  Your Honor, I'd like an opportunity --

2     the issue is how this consent order, the enforcement

3     proceedings associated with this consent order.

4          THE COURT:  It purported to be enforcing the consent

5     order.

6          MR. GENOVA:  It does, your Honor.  It says it in the

7     caption of the complaint and also in the first paragraph.

8          THE COURT:  So this would be occasioned by the

9     existence of the consent order.

10         MR. GENOVA:  I think at best there's a reference to

11    the order, but it's not an application under the order, and the

12    Court doesn't rely on the order.

13         MR. BURCHFIELD:  It is an application of the order.

14    It says:  Seeks temporary restraining order to compel

15    defendants to comply with the 1982/1987 consent orders of the

16    Honorable Dickenson R. Debevoise.

17         THE COURT:  It sounds to me that it was under the

18    consent order.  We're trying to get to lunch, so let's move on

19    and concludes this examination.

20         MR. BURCHFIELD:  Thank you, your Honor.

21         Mr. Josefiak, going back to preclearance for a moment,

22    is there any other problem that you see with the preclearance

23    procedure, other than the difficulty of compliance with the

24    timing of the preclearance procedure?

25    A    Well, certainly from the place that I sit, not only is the

1    compliance an issue but, you know, quite frankly, allowing the

2    opposition party access to our plans and strategies with regard

3    to where we -- what we think that may be issues is problematic

4    to us.  It just would be -- it's inconceivable to me that

5    anyone else would offer strategy for any other kind of program

6    that they were having to win an election or to preserve the

7    process, then to let the other side have not only a say in

8    what's going on but an acknowledgement of what's going on; and,

9    quite frankly, have an opportunity to counter that somehow.  I

10   just think that, you know, again, from the perspective where I

11   sat, there just seemed to be a non-start and would just be

12   problematic.

13   Q   And just to draw a link here, do you have a concern that if

14   the RNC gave its plans to the DNC, that that plan might somehow

15   find its way to the ACORN or the other allies.

16           MR. GENOVA:   Objection, your Honor.

17   A   My point is, once it's out there, it's out there.  And,

18   quite frankly, whether it's a DNC or third party, it's

19   irrelevant.  It's giving up more information that, quite

20   frankly, we would not want to give up.

21   Q   And, Mr. Josefiak, do you have a view on whether the RNC

22   would make its best efforts to comply with all laws governing

23   voting rights if the consent decree were vacated?

24   A   No question.

25   Q   And what's your view?

1   A    First of all, it would be illegal and immoral if we didn't.

2   Second of all, I think the political realities are such that it

3   would be political suicide, as I said earlier, for us not to

4   acknowledge minorities are an important part of any sort of

5   winning team.  And that to somehow suppress their vote from a

6   political realty standpoint would be suicide.  And finally,

7   quite frankly, we have a change in leadership with an African

8   American at the lead who would never permit this kind of thing.

9   I just think it's sort of ludicrous when I sit here and hear

10  all these arguments all the time, and for 20 years I've been in

11  the middle of this, and quite frankly don't understand how we

12  get labeled this way.  It is offensive to me to hear it, but it

13  is also part of my ongoing operation, no matter what party I'm

14  in, to ensure, number one, that everyone who's entitled to vote

15  and wants to vote gets the vote, and their votes can't be

16  excluded because someone comes in and fraudulently votes and

17  takes their vote away.

18          MR. BURCHFIELD:  Thank you, Mr. Josefiak.  Thank you,

19  your Honor.

20          THE COURT:  All right.  We'll have to come back for

21  cross examination after lunch, and so we'll recess until two.

22          (Recess)

23          THE COURT:  All right.  We have our witness back again

24  please.

25          Welcome Back, Mr. Genova.

1          MR. GENOVA:  Does your Honor have any objection if I

2     pose my questions from counsel table?

3          THE COURT:  No, that's fine.  Normally I would say no,

4     but they've beefed up the microphone, so I think I can hear you

5     from there.

6          MR. GENOVA:  I'll do my best, your Honor.

7     CROSS EXAMINATION BY MR. GENOVA:

8     Q   Mr. Josefiak, can you hear me?

9     A   Yes, I can.

10    Q   How do you do?

11    A   Fine, thank you.  Yourself?

12    Q   I'm fine.

13          Mr. Josefiak, I'm going to get a better understanding

14    of some timeframes that you testified to with respect to your

15    service to the party.  I take it that prior to 1992, you held

16    no position with the Republican National Committee?

17    A   With the Republican National Committee, that's correct.

18    Q   And so you did not serve as its counsel or special counsel,

19    or held no title with the Republican National Committee?

20    A   Correct.

21    Q   And so it's fair to say that in 1981, when the initial

22    litigation in this case was brought, you weren't a lawyer in

23    that litigation; correct?

24    A   Correct.  I was at the Federal Election Commission.

25    Q   In 1981?

1      A    Correct.

2      Q    As a public servant, I take it?

3      A    As a Special Deputy for the U.S. Senate.

4      Q    But you didn't participate in the 1981 litigation?

5      A    Correct.

6      Q    Nor were you present in any conference, nor the settlement?

7      A    Correct.

8      Q    The same true with respect to the 1987 order entered

9      modifying the original consent order?  Is all that true?

10     A    Correct.

11     Q    You played no role in that either?

12     A    Correct.

13     Q    And you testified to the 1990 litigation that was brought

14     seeking the enforcement of this order.  Do you remember that

15     testimony?

16     A    Yes.

17     Q    And you held no position, you were not a litigant in that

18     case?

19     A    Correct.

20     Q    You weren't a lawyer in that case?

21     A    Correct.

22     Q    And you held no official position with the Republican

23     National Committee at that time?

24     A    Correct.

25     Q    Now, you also testified, and you might recall the chart

1    that Mr. Burchfield showed you that you referred to Ebony

2    Malone application.  Do you remember that?

3    A    Yes.

4    Q    When that application was litigated in 2004, you did not

5    appear as a lawyer in that litigation; is that correct?

6    A    Correct.

7    Q    Nor did you appear as a litigator in that litigation?

8    A    Yes, correct.

9    Q    And you were off doing your thing for the Bush/Chaney

10   campaign?

11   A    Correct.

12   Q    And is it fair to say that the only enforcement proceeding

13   in which you had any direct contact with the underlying

14   litigation was in the 2008 application arriving out of the New

15   Mexico experience?

16   A    Correct.

17   Q    And in that regard you served as special counsel to the

18   Republican National --

19   A    Of counsel.

20   Q    What's the difference, of counsel or chief counsel?

21   A    My position at the RNC was maintained because of my

22   expertise and experience with the committee for the decade and

23   more that I was there, and it was a chief counsel that was in

24   place, and I assisted the general counsel and chief counsel on

25   various issues, including election issues like this.

1   Q   Okay.

2         And it is fair to say, is it not then, that you have

3   no personal knowledge with respect to the facts and

4   circumstances, or the intent of the parties with respect to

5   what the consent decree was intended to accomplish at the time

6   of the negotiation, having not been there?

7   A   Correct.

8   Q   And any opinions that you offered as to its meaning and the

9   like are a function of your own observations; correct?

10  A   Own observations and discussions with individuals that may

11  have been part of that process.

12  Q   Did you ever have a discussion with Mark Braden about the

13  intent of it?

14  A   I have a discussion with Mark Braden?

15  Q   Do you know who Mark Braden is?

16  A   Yes, I do.

17  Q   And he was the lead counsel of the Republican National

18  Conference?

19  A   He was the lead counsel.

20  Q   Top lawyer?

21  A   Working under the general counsel.

22  Q   And you understood him to have been one of the lawyers

23  involved in the negotiation of the original 1981 consent

24  decree; is that right?

25  A   Correct.

1    Q    And, in fact, I'm sure he told you, did he not, that at the

2    time he communicated with various individuals on the import of

3    that consent decree; is that right?

4    A    My conversations with Mr. Braden dealt with the final

5    outcome of that decree and with the ramifications of it, not

6    necessarily who he discussed the issue with during that period

7    of time.

8    Q    Did he ever tell you that he sent out a communication

9    shortly after the entry of that order advising Republican State

10   Committees and other organizations of its content?

11   A    I am not aware of that.  We have not had that discussion.

12   Q    Now, I think your words were that when you did assume the

13   role as chief counsel of the RNC, you said you became very

14   familiar with the consent decree, it became, "a part of my

15   life," something you became intimate with, I take it?  I was

16   paraphrasing.

17   A    Correct.

18   Q    And you served how many years as RNC counsel?

19   A    I served in the counsel's office from 1992 through '08, and

20   then as outside counsel.  But as chief counsel, from

21   approximately 1985 to 2004 and 2005.

22   Q    And during that period of time, you never initiated an

23   application to this Court seeking to modify the order until

24   this application; is that right?

25   A    Correct.

1   Q    Nor did you seek any clarification from the Court as to its

2   original entry of the consent decree; is that right?

3   A    Correct.

4   Q    You might recall some questions Mr. Burchfield asked you

5   with respect to the existence of federal laws that would

6   proscribe intimidation of minority voters and other voters.  Do

7   you remember those questions?

8   A    Yes.

9   Q    And I think your testimony was -- and you cited the Voting

10  Rights Act at Section 1973I.  Do you remember that testimony?

11  A    Yes, I do.

12  Q    And it's your testimony that that provision of the law

13  accomplishes in your view the same purposes of the consent

14  decree?

15  A    It accomplishes the fact that if there is a violation of

16  these provisions, that there's a legal remedy outside of the

17  consent decree.

18  Q    Outside the consent decree.

19         In fact, wasn't the legal remedy that was sought from

20  this litigation from which the consent decree arose?

21  A    I am not -- I cannot address that.

22  Q    Did you ever read the amended complaint filed in this

23  litigation, Mr. Josefiak?

24  A    The amended complaint in this litigation?

25  Q    In this litigation.

1    A   I recall reading it, but I don't recall that.

2    Q   Sitting here today, you wouldn't be surprised if I told you

3    that this is an action brought under the Voting Rights Act

4    1973I?

5    A   No.

6    Q   That wouldn't surprise you?

7    A   No.

8    Q   And it wouldn't surprise you either that it was under that

9    application that we entered into a consent decree providing a

10   remedy under that law.  Has anything changed, to your

11   knowledge, being as observant as you re of election laws from

12   1981 when the Voting Rights Act contained Section 1973I to

13   today, did that section of the law change?

14   A   The law did not change.  I think the enforcement of the law

15   has become more aggressive.

16   Q   But the underlying law for which this -- upon which this

17   application, this case in which we're here to modify a consent

18   decree has not changed?

19   A   Not to my knowledge.

20   Q   And you understand the consent decree in this litigation to

21   have fashioned a remedy for claims under that law?

22   A   Yes.

23   Q   And you don't dispute, do you, that Judge Debevoise--

24   strike that.  Given your testimony that section 1973I offers a

25   vehicle, to believe -- you would agree that a federal court has

1    jurisdiction to hear those claims?

2    A   Yes.

3    Q   And the jurisdiction to hear those claims, the subject

4    matter of jurisdiction under that section of the law?

5    A   Yes.

6    Q   So would it surprise you that the Republican National

7    Committee in this case is saying that this Court lacks subject

8    matter jurisdiction on the underlying claims having been

9    brought in this litigation?

10            MR. BURCHFIELD:  Objection, your Honor.  I think that

11   mischaracterizes our position.

12            THE COURT:  Well, I don't know whether -- what is the

13   basis for the question?

14            MR. GENOVA:  I'll withdraw the question.

15            THE COURT:  All right.

16   Q   Mr. Burchfield asked you a series of questions with respect

17   to how the consent decree impacts on programs that the

18   Republican National Committee would seek to engage in.

19   Remember those questions?

20   A   Yes.

21   Q   Sitting here today, and as special counsel to the

22   Republican National Committee, what program or programs do you

23   seek to administer that you believe you can't run today because

24   of this consent order?

25   A   Providing individuals to be in polling places to -- whether

1    or not they're under the guise of whatever the state law is to

2    challenge, to observe, and to bring to the attention of the

3    appropriate authorities any sort of issues that maybe arising

4    from a particular voter, or a particular process in place at

5    the polling place.

6    Q    Is it your testimony that you believe this consent order

7    bars you from having duly qualified challengers under state law

8    at polling places?

9    A    Yes.

10   Q    That's one program, that's to have challengers at a polling

11   place?

12   A    Correct.

13   Q    And you believe this order prescribes the RNC from having

14   duly credentialed challengers in polling places to log voter

15   challenges under state law?

16   A    The order, as I read it, allows for poll watchers, the

17   question is, does poll watcher become a challenger or more than

18   a poll watcher?  And as I testified earlier, from my

19   prospective and the responsibility that I have to the client,

20   and also to the state parties who we would be working with,

21   other than the state party of New Jersey, that we have just

22   stayed away from all of that because of that.

23   Q    I'm trying, Mr. Josefiak, to understand all of that.  I'm

24   asking you specific questions.  You've identified one program.

25   You've testified, I take it, that there's a program that the

1   RNC would like to run whereby credentialed challengers sit in

2   polling places and lodge challenges, that's program number one.

3   That you think the order prescribes -- what other programs does

4   the RNC wish to implement that it believes violate the consent

5   decree?

6   A    To have observers in the polling places is another, without

7   worrying about whether it is or is not going over the line

8   under the consent decree.  To be able to have RNC volunteers

9   outside of the polling places where it's legally permissible

10  within the distances allowed by state law to provide valid

11  information on candidates and issues that maybe before the

12  voters.  To generally be able to be around and monitor the

13  activities of polling places.  We, as a general rule, based on

14  this consent decree, have stayed away from anything that has

15  any direct relation with a voter anywhere near a polling place.

16  Q    And you're aware that there are state laws that deal with

17  each of these categories?

18  A    Definitely.

19  Q    And your testimony is that this consent decree so far has

20  deprived the Republican National Committee of placing observers

21  in polling places, credentialed observers in polling places,

22  utilizing outside volunteers, providing valid information to

23  voters, and generally monitoring activities at polling places?

24  A    Correct.  But there's -- there's a more fundamental issue

25  with the consent decree.

Josefiak-cross                                115

1    Q    I just asked you --

2         THE COURT:   No, let him finish the answer.

3    A    There's a more fundamental issue.  Again, as I stipulated,

4    there have only been two times where the DNC, as the entity,

5    has actually brought a consent decree issue before this Court.

6    However, it's the anticipation of that, and the use of that

7    consent decree on an ongoing basis in every election, that

8    information is put out there in anticipation of that consent

9    decree being violated, which is just as problematic as actually

10   being there in the polling place.

11   Q    Let's talk about the consent decree, and get to what I'll

12   call the anticipatory breach.  Let's talk about the content of

13   the order.  You testified earlier your concerns about the

14   preclearance on inviting any application for preclearance to

15   this Court.

16   A    No.

17   Q    There's none whatsoever?

18   A    No.

19   Q    Isn't that correct?

20   A    No.

21   Q    In fact, it's a general standing invitation, if you want to

22   have a program, the RNC seeks to have a program, we can go

23   before Judge Debevoise and you can ask Judge Debevoise:  Is

24   this okay?

25   A    Only after we've given information to the DNC.

1    Q    Okay.

2         That was a procedure that's in the consent decree; is

3    that right?

4    A    Correct.

5    Q    And this is a procedure that you, as general counsel or

6    chief counsel for the RNC, never utilized; is that correct?

7    A    Correct.

8    Q    And it's a procedure not only you did not utilize, but to

9    your knowledge, the Republican National Committee has not used

10   since the entry of this order in 1982?

11   A    Correct.

12   Q    Not once?

13   A    Correct.

14   Q    Now, you described a series of programs in your

15   observations of the various applications under the consent

16   order over these years.  Has the Democratic National Committee

17   ever challenged the placement of Republican observers in

18   polling programs under this order?

19   A    Not the Democratic National Committee.

20   Q    Has the New Jersey State Committee ever challenged the

21   placement of credentialed challengers to observe polling places

22   in New Jersey?

23   A    Not that I'm aware of.

24   Q    Has the Democratic National Committee as a party litigant

25   to this action ever challenged the use of outside volunteers by

1    the Republican National Committee?

2    A    No.

3    Q    In fact, we used volunteers in this 20-year period?

4    A    For get-out-to-vote efforts.

5    Q    And you have used credential challengers in polling places,

6    haven't you?

7    A    Not the RNC, no.

8    Q    Have the Republican Party Committees locally done that?

9    A    Yes.

10   Q    And so there are credentialed Republican representatives of

11   local parties, whether it be municipal or state, at polling

12   places; is that correct?

13   A    Correct.

14   Q    Has the Democratic National Committee ever challenged -- to

15   your knowledge, has the Democratic National Committee ever

16   sought to enforce this order in a manner against any Republican

17   party organization, state or local, to deprive the Republican

18   party, state or local, of the opportunity to place credentialed

19   challengers or observers in the polling place?

20   A    Not to my knowledge.

21   Q    Have you ever observed the Democratic National Committee

22   under this order seek to deprive the Republican National

23   Committee, or any of its local or state party affiliates the

24   opportunity to send valid information to voters?

25   A    Not that I'm aware of.

1    Q    Are there any other programs within the contemplation, as

2    you know them, of the Republican National Committee, given your

3    proximity to Chairman Steele, that you would have implemented,

4    that you believe you are deprived of implementing under this

5    consent decree?

6    A    Not that I can recall at the moment.

7    Q    You testified to, I think what you've characterized as your

8    observations with respect to the Democratic National

9    Committee's reliance on outside organizations to accomplish

10   voter registration.  Do you remember that testimony?

11   A    Yes.

12   Q    Do you know what a 527 committee is?

13   A    Yes.

14   Q    And you want to define that for the Court?

15   A    Basically, in it's most generic sense, the 527 committee is

16   any political organization that's viewed as tax-exempt for

17   certain circumstances under the Internal Revenue Code.  It

18   applies to the DNC, the RNC, the Candidate Committee, federal

19   impact or non-federal impact.  Over the years, particularly in

20   the 2004 cycle and beyond, 527 committees have been a term used

21   to define sort of the non-regulated political committees that

22   don't -- that are not regulated by the FDC or any state law.

23   Q    But regulated by the Internal Revenue Service?

24   A    As far as disclosure of who they are and certain reports,

25   yes.

1    Q    And that, in fact, within the last decade, amendments were

2    made to the Internal Revenue Code to require greater disclosure

3    of the activities of 527 as registered with the agencies;

4    correct?

5    A    Correct.

6    Q    And so when you refer to ACT or ACORN, these are 527

7    organizations?

8    A    Some are 527 and some are 501C4, non profit, tax-exempt

9    organizations.

10   Q    And like any other nonprofit organization, you would agree

11   that they are -- they have certain constitutional rights to

12   communicate and engage in activities, free association under

13   the First Amendment?

14   A    Yes.

15   Q    Now, have can you identify any correspondence sitting here

16   today that identifies your correspondence that any one of these

17   organizations in fact combined with the Democratic National

18   Committee to do registration on its behalf?  Did you ever see a

19   letter that says that?

20   A.   I do not have access to it, but I have seen, in the 2004

21   cycle, a document that was attributed to a number of

22   organizations, including C4 labor organizations and 527s in

23   conjunction with the Democratic National Committee.  But I have

24   not seen that since, but I do recall seeing that.

25   Q    And what facts do you rely upon for that statement that the

1   Democratic National Committee combines with ACORN?  What facts

2   do you have, what evidence do you produce here today that the

3   DemocratIC National Committee combines or coordinates with any

4   organization to do its registration programs?

5   A   I have no facts that I can present to you in this

6   courtroom.

7   Q   So any statements you made to that effect aren't based on

8   any facts you can present in this courtroom, you chose not to

9   present them in this courtroom; is that correct?

10  A   Well --

11  Q   Is that correct?  Is that correct?

12  A   Yes.

13       MR. BURCHFIELD:  I thought the witness was trying to

14  say something and was cut off.

15       THE COURT:  Is there anything further that you have?

16  A   All I was going to say, I can't recall any DNC letter or

17  memorandum, but I do recall testimony that's been in the public

18  with regard to ACORN involvement with particular campaigns and

19  other perhaps state or local party organizations.

20  Q   You haven't produced that?

21  A   No, I have not.

22  Q   So your statement is your opinion?

23  A   It's my opinion based on my recommendation, but I have no

24  document to substantiate it that's before this Court.

25  Q   Do you still have in front of you, Mr. Josefiak, the

1   exhibit both provided by your counsel?

2   A   Yes, I do.

3   Q   I want to identify, I think it's Exhibit 10, this was the

4   letter from Chairman Gillespie to Chairman McCauliff on June

5   15th, 2004.  Do you remember that letter?

6   A   Yes, I do.

7   Q   And Mr. Burchfield read a paragraph of it from you, or to

8   you.  Do you remember that?

9   A   Yes, I do.

10  Q   Now, Chairman Gillespie in this letter proposes some mutual

11  cooperation between the two National Committees, does he not?

12  A   Yes, he does.

13  Q   And on page 2 of the letter, beginning at the top, the

14  first paragraph, do you want to read that out loud to the

15  Court?

16  A   Page 2, the first paragraph.  "What I hope we can do is

17  join together for the program to bring transparency and

18  openness, where either of us believe there is potential -- I'm

19  sorry.  What I hope we can do is join together for a program to

20  bring transparency and openness to every voting place in the

21  country.  Where either of us believes there is a potential for

22  voter intimidation, fraud or mistrust of the tabulation

23  process, the proposal which I look forward to discussing and

24  refining further with you is an unprecedented and massive

25  undertaking, but worth it."

1    Q    Okay.

2              Now, if you know, is Chairman Gillespie, when he

3    refers to, did either of us believe there was potential for

4    voter intimidation, do you believe that Chairman Gillespie

5    believes there is potential for voter intimidation when he says

6    that?

7    A    I believe what he was referring to is the perineal letter

8    that would come from the chairman of the Democratic Committee

9    talking about the voter intimidation, and the back letter that

10   would talk about voter fraud, and this was an attempt to try to

11   combine and work together to deal with what the issues were for

12   Terry McCauliff.

13   Q    And did you draft this letter?

14   A    I did not draft this letter.

15   Q    And were you involved in the drafting of this letter?

16   A    No.

17   Q    Did you have anything to do with its creation?

18   A    I probably have seen it, but I have not created it.

19   Q    And you never spoke to Chairman Gillespie by --

20   A    I've had conversations with Chairman Gillespie, but not as

21   to the specifics.  But I'm aware of what he was attempting to

22   do, and I hopefully have paraphrased what his attempt was, to

23   try to bring both sides together, because one had an issue with

24   voter intimidation, and the other had an issue with voter

25   fraud.  Let's, together, you've got intimidation issues and

1   we've got fraud issues, whatever it is, where you think there

2   are problems, we'll go.  Where we think there are problems,

3   we'll go together.

4   Q   And I think in this letter, this letter was preemptive of

5   the every four-year ritual, as you would put it, of sending a

6   letter to the RNC saying, or watching you don't engage in voter

7   intimidation; is that right?

8   A   Yes.

9   Q   And he sent this before he received any letter from

10  Chairman McCauliff?

11  A   That is my recollection.

12  Q   And his words were:  Either of us believes there's

13  potential for voter intimidation, fraud or mistrust.  You

14  really don't know whether or not he believed there was

15  potential for voter intimidation, himself, other than what you

16  read in his words here?

17  A   Correct.

18  Q   This letter from Chairman Gillespie, again, you were off on

19  the Bush/Chaney trail then; right?

20  A   Correct.

21  Q   Now, would this not have seemed like an opportune time to

22  make an application for the modification of the consent decree,

23  given the spirit of cooperation that Chairman Gillespie was

24  inviting?

25  A   If we had received any sort of response from Chairman

1    McCauliff to do that, I can't speculate what would have been

2    the case with regard to that at that point.  Certainly, in

3    order for the RNC to engage in that kind of a program, it more

4    than likely would require such a request.

5    Q   Would it surprise you if I told you that Chairman McCauliff

6    did respond?

7    A   My recollection is the response was nonresponsive.

8    Q   But he responded?

9    A   But not to the particular --

10   Q   You returned -- he sent a letter back saying:  I'm

11   responding to your letter?

12   A   Yes.

13   Q   And he may not have responded in a way that Chairman

14   Gillespie wanted him to respond.

15   A   Right.  He didn't ignore Chairman Gillespie, but he ignored

16   the request.

17   Q   Having ignored the question, in your view, still no

18   application was made seeking to modify the consent order or to

19   secure preclearance for anything that might have been

20   contemplated at that time?

21   A   Correct.  Correct.

22   Q   Any program.

23          Now, if you can turn to Exhibit 26, this is the

24   Carter-Baker Commission.

25   A   Yes.

1    Q    First of all, this is not a government entity right, this

2    commission?

3    A    Definitely not.  It was an independent, bipartisan

4    commission, but it was not at all sanctioned by any government

5    entity.

6    Q    This is a government -- this is an official government

7    document.  It's a commission under the auspices of the American

8    University; is that right?

9    A    Correct.

10   Q    Now, Mr. Burchfield called your attention, and the Court's

11   attention, specifically, to the sections on voter fraud.  This

12   document also contains recommendation and reports of this

13   August body on the issue of voter intimidation, does it not?

14   A    Yes, it does.

15   Q    And calling your attention specifically to page 8 of 41 in

16   the document -- do you want to read the first paragraph on the

17   top of that page?

18   A    I don't see it there.

19   Q    It's one of the things to improve valid integrity?

20   A    Are you looking at the right pagination?

21   Q    I'm looking at the -- my photocopy I have is hard to see.

22   A    Yes, okay.  I apologize.  I was looking at bottom, and I

23   didn't have it.

24   Q    That's okay.  Thank you.

25   A    I'm sorry.  Could you repeat your question?

1    Q    I just want you to read the first full paragraph appearing

2    on page 8 of 41, using the top page numbers.

3    A    Sure, sure.  "To improve valid integrity, we propose that

4    federal, state, and local prosecutors issue public reports on

5    their investigation of election fraud, and we recommend federal

6    legislation to deter and prosecute.  States should not

7    discourage legal voter registration or get-out-to-vote

8    activities, but they need to do more to prevent voter

9    registration and absentee ballot fraud.

10   Q    Now, specifically the commission in the summary is

11   recommending federal legislation to deter or prosecute systemic

12   efforts or to deceive or intimidate voters.  Do you see that

13   sentence?

14   A    Yes, I do.

15   Q    And at the time this was written, section 1973I and the

16   Voter Rights Act existed; right?

17   A    Yes.

18   Q    And do you understand this to be recommending, the need for

19   further law to deter, as it says, systemic efforts to deceive

20   or intimidate voters?

21   A    Yes.

22   Q    Is it not a fair characterization of the consent decree

23   that its remedy is designed to abate systemic efforts by the

24   Republican National Committee to intimidate voters?

25   A    I'm sorry, could you repeat that?

1    Q    That the remedy articulated in the consent decree agreed to

2    by your party is designed to abate systemic efforts, to deter

3    minority, or intimidate minority voters from voting?

4    A    It's designed to prevent the RNC from getting involved in

5    ballot security efforts.

6    Q    Which have the purpose or significant effect of deterring

7    minority voters from voting.  Is that what you understand its

8    purpose is?

9    A    Yes.

10   Q    And do you understand that this Commission's report felt

11   that federal law was inadequate to do that at the time it

12   drafted its opinion?

13   A    It wanted additional federal legislation, yes, and state

14   legislation as well.

15   Q    And, in fact, if you go further in the report, I'm still in

16   Exhibit 26, Mr. Josefiak, and this appears kind of as broken

17   up.  It goes through -- up to page 40 and 41.  Forty-one is a

18   photograph, and then it starts again at page 1.  So why don't

19   you go first, 40 to 41, and then I can help you get to where

20   you need to go.

21   A    I'm right there.

22   Q    You see a paragraph, the word "vote"?  Do you see that?

23   It's a picture -- it's a picture of a voting line.  I can help

24   you out there.  If I can approach, your Honor?

25              THE COURT:  Yes, certainly.

1    Q    So you're in the section, I'll get you to the page.

2          Mr. Josefiak, there's a section where they do a box of

3    recommendation.   Do you see 5.1.3 and 5.1.4?

4    A    Yes, I do.

5    Q    And you want to read each of those recommendations?

6    A    Yes, sure.   5.1.3, in addition to the penalties set by the

7    Voting Rights Act, there should be a federal felony for any

8    individual group or individuals or organizations to engage in

9    any act of violence, property destruction of more than $500 in

10   value, or threatened act of violence that is intended to deny

11   any individual his or her lawful right to vote or to

12   participate in a federal action.

13   Q    How about 5.1.4?

14   A    To ensure systemic efforts, to deter systemic efforts to

15   deceive or intimidate voters.   To deter systemic efforts to

16   deceive or intimidate voters, the Commission recommends federal

17   legislation to prohibit any individual or group from

18   deliberately providing the public with incorrect information

19   about election procedures for the purpose of preventing voters

20   from going to the polls.

21   Q    And, again, I take it that the Carter-Baker commission at

22   the time wouldn't have made that recommendation if they felt

23   there existed, at least under federal laws, laws to prescribe

24   the kind of conduct that they believed needed to be addressed

25   by changes in federal law?

1    A    It certainly appears that they wanted additional

2    legislation to ensure that this did not occur, specific

3    legislation.

4    Q    And the Voting Rights Act, specifically 53I, existed to

5    your knowledge at the time this report issued?

6    A    Correct.

7    Q    Which was in September of 2005?

8    A    Correct.

9    Q    You talked about your commitment, and generally the

10   commitment in varying roles, and the commitment of RNC, I think

11   you characterized as zero tolerance for programs which deterred

12   minority voters from registering or voting.  Is that right?

13   A    Correct.

14   Q    And you articulated that aside from moral and legal

15   reasons, it made little political sense, why would you deter

16   those who you would seek to have the party embrace?

17   A    Correct.

18   Q    You apparently have some understanding of this Court's

19   finding in 2004, that certain conduct occurred in Ohio

20   regarding an intervener and her claims, Ebony Malone, and the

21   Court made a finding that officials in the Republican National

22   Committee had engaged in activity that violated the consent

23   decree.  You're aware of that?

24   A    Yes, I am.

25   Q    And that was in 2004?

1   A   Correct.

2   Q   And you've read the record of that proceeding, I take it?

3   A   Yes, I have.

4   Q   And you're well aware that the Court put the Democrats to

5   their burden, to present proofs to the Court's satisfaction

6   that there was some connection between the activity that was

7   the basis for the claim that the consent decree had been

8   violated, and the Republican National Committee?

9   A   Yes.

10   Q   In the aftermath of that Court's finding, what systems if

11   any did you take to discipline or address the behaviors of

12   those who engaged in the conduct that formed the basis for the

13   finding of this Court that the consent decree had been violated

14   in that instance?

15   A   First of all, again, the consent decree, from my

16   understanding, was viewed as violating, because of the

17   communications with regard to the employees of the RNC and the

18   Ohio Republican party, number one.  Number two, as far as

19   disciplinary actions, we had a -- this is where we had the

20   change of administration in 2005, when Ken Melvin continued and

21   emphasized the need to embrace the minority community.  And,

22   again, would not tolerate this kind of effort.  And it was made

23   very clear in the directives that we would continue to make

24   sure that there was an education program, that people

25   understood the differences of what would be viewed as a

1    requirement of the consent decree to communicate the

2    restrictions of the RNC, and any other kind of communication

3    that could be viewed by this Court or anyone else as a

4    violation of the consent decree.  So it became even more of a

5    sensitive issue as to define more clearly the interactions,

6    preelection with any state party that may have this kind of

7    impact on the consent decree.

8    Q    Was anyone fired?

9    A    Was anyone fired?

10   Q    Yes.

11   A    I can't answer that question.  As a general rule, post

12   election, like the one in 2004, there's a general departure of

13   personnel.  But as far as being fired for a particular reason,

14   I don't recall that.  But there was also a mass exodus from RNC

15   headquarters, which is typical for both committees after a

16   major presidential election.

17   Q    After sitting here today, you can't recall whether or not

18   Republican National Committee fired any individual who

19   participated in the caging program in Ohio that formed the

20   basis of both the allegations and finding of this Court that

21   the consent decree was violated in 2004?

22   A    I do not know of anyone that was being fired for this

23   Court's decision that the consent decree was violated for the

24   communications that took place between the RNC and the Ohio

25   Republican Party individuals.

1   Q   Now, you testified that Ohio was very important to both

2   parties?

3   A   Correct.

4   Q   That was your testimony.  And as counsel to Bush/Chaney at

5   that time, what were ways that you were involved with the

6   Republican campaign in Ohio?

7   A   The presidential committee had its own operation outside of

8   the party structure in Ohio.  A lot of it was for legal

9   purposes.  Obviously we are under a restriction as to what we

10   could use our public funds for, but we had a separate operation

11   to encourage the get-out-and-vote effort on behalf of strictly

12   the presidential campaign.

13   Q   I have what we provided with our binders.  I would like to

14   approach the bench, provide the bench and the witness with the

15   exhibit, and then I have some questions.

16          THE COURT:  Yes.  Go ahead.

17   Q   I'm showing Mr. Josefiak what's marked as Plaintiff's

18   Exhibit 6.  It is an affidavit filed in the 2004 enforcement

19   proceeding, the Malone action we'll call it.  I'm going to

20   present it to you.  Take a minute to peruse it, and I have a

21   few questions.

22          Mr. Josefiak, there's a series of e-mails attached to

23   this document.

24   A   I haven't gotten to them.

25   Q   It would be at the end of the affidavit.  There's just some

1    names there.  I want to see if you had any role in discussing

2    anything with them, and then we'll move on.

3           Among the names is Tim Griffin.  Did you have any

4    dealings with him at the time?

5    A    At the time I believe Tim Griffin worked at the RNC on a

6    daily basis.  I would not have any conversations with him to my

7    recollection.

8    Q    Did you see any of these e-mails at the time?

9    A    I don't recall ever seeing these e-mails at the time.

10   Q    Did you speak to anybody about these e-mails at the time?

11   A    I would not have seen them, so I would not have talked to

12   anybody to my recollection about these e-mails at the time.

13   Q    Did you -- did anybody forward these to you, your

14   recollection?

15   A    I did not recall at that time being forwarded these

16   e-mails.

17   Q    And did you have an opportunity to read the deposition that

18   was taken of Vice Chairman Cino that you spoke about at the --

19   in the earlier testimony.

20   A    I don't remember -- I don't recall ever reading the

21   deposition that she had given, although I can't say that I have

22   not.  I don't recall at this point in time.

23   Q    And are you aware that she admitted in that deposition that

24   the Republican Committee did new voters in -- with the new

25   voters going to the Ohio Republican parties?

1    A    I am not aware of the deposition, so I don't know what she

2    would have said.

3    Q    And did the you know, or do you know now, did you know at

4    the time that the Republican National Committee has sent a

5    mailing to new voters in Cayuga County, Ohio?

6    A    I do know that now, yes.

7    Q    And did you know that the Ohio Republican Party created a

8    list based on that return mail?

9    A    I do not know that, no.

10   Q    And did anybody ever tell you what it was for, that list?

11   A    No.

12   Q    You know what caging is?

13   A    I know what it means in the world of direct mail, yes.

14   Q    And what does it mean?

15   A    It means when you get -- when you do a mail piece and it is

16   returned because of non-deliverables.

17   Q    And then what do you do with the information?

18   A    You usually purge your files so you're not wasting

19   resources and asking for another donation from that particular

20   individual.

21   Q    And in Cayuga County, Ohio, what was this caging method

22   used for?

23   A    I'm not sure.  You're referring to caging, I wouldn't refer

24   to caging --

25   Q    What would you call what happened in Cauyga County and what

1   happened in Republican National Committee parlance?

2   A    Furthermore, I can't swear what happened.  Assuming that

3   under your facts, letters were sent out and returned, that

4   there would be an indication that those individuals were not

5   receiving their mail at those addresses.

6   Q    And that would be the basis for a challenge list?

7   A    It could be a basis for purging the file.  I don't know

8   what the basis was at that particular time, since I was not

9   engaged in it.

10  Q    Mr. Burchfield showed you two charts, I think it was

11  Exhibits 6 and 7.  These were vote totals and registration?

12  A    Correct.

13  Q    Nothing on these charts tell us about the overall

14  population increases in the representative groups for the

15  corresponding time.  In other words, isn't it a fact that

16  Latino population in the United States increased during the

17  corresponding time from 1982 to 2006?

18  A    Yes.

19  Q    And so you wouldn't be surprised if there had been an

20  increased in registration, that population --

21  A    Population increased.  No, I would not be surprised that

22  that may have something to do with it.

23  Q    And so that may have had something to do with it, in

24  addition to your testimony that greater access to voter

25  registration through some of these federal laws contributed to

1    that?

2    A    Again, the population rise, obviously in order to be an

3    eligible voter, you would have had to be eighteen years old.

4    It would be -- I still think it's very -- and from my

5    observation it's because of the opening up of the process

6    through Motor Voter and the Voting Rights Act, which others

7    have already testified to have -- have increased that, and

8    probably is the major reason for that.

9    Q    Well, there are other contributing factors, particularly

10   with respect to the -- that would contribute to the rise in

11   registration?

12   A    There's always contributing factors.

13   Q    And it's not just about greater access to registration?

14   A    Certainly.

15   Q    Okay.

16         And the proportions here in terms of what was

17   happening in '82 to what was happening in 2006, the relative

18   proportions would remain pretty much the same?

19   A    Correct.

20   Q    So numerical numbers may have changed, but is it fair to

21   say that over this 24- or 20- -- 24-year period, that

22   proportionately we were still pretty much the same place?

23   A    I think that -- I think that my observations were based on

24   the percentages.  And I think that from my own observations,

25   that the increases can be at least, in major part, derived from

1    the fact that these new laws were put in place.

2    Q   But you would agree that even on your chart, looking at the

3    towers that were built, we're talking about relatively same

4    positions facing each other; is that right?

5    A   Yes.

6    Q   Do you believe -- do you think any of these programs, as

7    you would like -- you being Republican National Committee,

8    would like to have implemented, would unintentionally suppress

9    minority voters if implemented?

10   A    If what we were asking for would unintentionally suppress

11   voters, it would be the same program that DNC is currently

12   allowed to do.  So if we're intentionally doing that, so is

13   everybody else doing it right now.  There's always that -- I'm

14   assuming there's always a risk that any effort would have some

15   potential to do something.  Our idea is that there are state

16   and federal laws, and political reality, and a sensitivity at

17   the top echelons of at least our party at this point that would

18   preclude that from hopefully happening.  But there's always an

19   unintentional consequence to anything.  All we're asking for is

20   to put on the same level playing field.  And if there's a

21   problem, you know, we do have the court system to come through.

22   We have laws that are in place, and I -- the consent decree is

23   an issue, I think that from my perspective, is not necessary.

24   If someone has a problem, bring it to court and litigation it.

25   Q   And just like if you had a problem with the consent decree,

1    you could come to court and litigate it.

2    A    Well, if we had a problem --

3    Q    It's a yes or no question?

4    A    Usually it's someone else that has a problem.  We have to

5    come and defend it and use our resources.

6    Q    That option was available to you?

7    A    Certainly it's available to us.

8    Q    Mr. Josefiak, if you would get back to my three questions,

9    which I think is an answer to my specific question.  You

10   identified four programs.  I'm asking about the Republican

11   National Committee.  Do you think that any of these programs,

12   if implemented, would unintentionally suppress minority voters?

13   A    I think that's a hypothetical question.  My view is that

14   being allowed to do these programs in an effective and

15   responsible way, they would not.

16   Q    What steps would the Republican National Committee take to

17   ensure that they would not?

18   A    Again, it's hypothetical, if it did.  If it did, for what

19   reason and what was the issue?  If there was an issue that took

20   place, you would correct the problem.  But this is a

21   generality, and I'm not -- I don't know how to answer that

22   question.

23   Q    How did the RNC decide where to implement any one of those

24   four programs?

25   A    Any of these programs that would be decided on where the

1    RNC viewed as targeted raises, in a presidential, it would be

2    battle ground states.  It would be those states for

3    competitive, house senate gubernatorial races and house senate

4    races.

5    Q   And the decision to send a mailing to Cayuga County, Ohio,

6    what factors went into that decision?

7    A   I don't know the answer to that question.

8    Q   The mailing program, which was the basis for the 2004

9    litigation in Cayuga County, was that part of the program like

10   the other four programs that the RNC typically utilizes in

11   connection with its election activities?

12   A   The mailing program that you're alleging that the RNC did

13   in Cayuga County --

14   Q   I'm not alleging, it was found by this Court.

15   A   The mailing was done by this Court.  Is that part of a

16   normal process?  I don't believe so, no.

17   Q   You're familiar with the mailing that was the basis for the

18   1981 litigation?

19   A   Yes.

20   Q   And the challenge list created from that?

21   A   Yes.

22   Q   And the Court's -- and the allegations made in the

23   complaint that that was sponsored by the Republican National

24   Committee?

25   A   Yes.

1    Q   And you're aware of the allegation in the Louisiana

2    litigation in '87?

3    A   Yes.

4    Q   And those were -- that was conduct engaged by the

5    Republican National Committee?

6    A   Yes.

7    Q   And the allegations was that was conduct engaged in by the

8    Republican National Committee; is that correct?  Is that

9    correct?

10   A   There were activities engaged by the Republican National

11   Committee, and there were other activities engaged as well.

12   I'm not -- state party efforts, and which were other efforts.

13   Q   This Court found that the Republican National Committee was

14   involved in 2004?

15   A   This Court found that the public was involved in

16   communications with the Ohio Republican Party.

17   Q   And each of those illustrations which we just talked about

18   involved mailing, the creation of purged list for challenges;

19   is that right?

20   A   Well, certainly for '81, and I believe in '87, yes.

21   Q   And 2004?

22   A   Not purging list for the RNC, no.

23   Q   And did not the RNC do a mailing with return envelopes

24   inviting the participants to join the Republican Party in

25   Cayuga I County?

1    A    Yes.

2    Q    And was not that list utilized as a basis to challenge

3    35,000 voters in Cayuga County?

4    A    I do not know that.

5    Q    And you do know that the Republican National Committee did

6    a mailing?

7    A    Yes.

8    Q    And what's changed between that mailing in 2004, and the

9    mailing the Republican National Committee participated in, in

10   1981?

11   A    What's changed since -- I'm sorry, repeat the question?

12   Q    What's changed between in that 25-year period between the

13   mailing that was used to create a challenge list in 1981, in

14   New Jersey, and the mailing that was generated in 2004, to

15   create a challenge list in Ohio?

16   A    You're suggesting that the challenge list was recreated --

17   Q    I'm not suggesting that.  That was the mailing --

18   A    I did not know that.  What has changed in my mind is that

19   information generated from any sort of mailing would not be

20   used currently in any sort of purging of the list.

21   Q    And when I asked you four different ways to identify the

22   programs that you think the order bars you from doing, you

23   would agree that the consent decree does proscribe the kind of

24   conduct that was engaged in, in Cayuga County?

25   A    The consent decree would prohibit the use of that

1    information to be used against -- it would be an impact on

2    minority voters, right.

3    Q    And sitting here today, you would still agree that it has

4    that purpose?

5    A    Yes.

6    Q    And you're not seeking to have the Court modify the order

7    for the purpose of having you -- having the Republican National

8    Committee engage in the same conduct that it engaged in, in

9    Cayuga County?

10   A    I'm asking that the consent decree be lifted from the RNC

11   so it could do exactly the same thing that the DNC could do.

12   Q    You talked about alternative voting methods.  I'm going to

13   use these fancy charts here.  I think that's Exhibit -- maybe

14   8, It's the exhibit entitled:  Alternative voting methods by

15   2008.  That chart does not reflect the demographics of who it

16   is that is participating in the alternative voting methods;

17   correct?

18   A    Correct.

19   Q    So we really don't know in each category.  You have early

20   voting of 31 as the number of states.  This just represents the

21   number of states?

22   A    Correct.

23   Q    And I think you testified about higher incidents based on

24   the report of the National Council of Legislatures about the

25   higher incidents of participation.  Do you remember that?

1    A    Right.

2    Q    And that report doesn't tell us that there's a higher

3    propensity using the alternative voting systems or not; is that

4    correct?

5    A    Correct.

6    Q    Is it your testimony based on your earlier testimony, and I

7    think the question, Mr. Burchfield, was that if it was rumored

8    that there was to be activities which were designed or intended

9    or had the effect of deterring minority voters, that there's

10   this opportunity that they could just vote at home.  Is that

11   correct?

12   A    They could.  But it would be at the discretion and decision

13   of the voter.  Certainly if anyone felt that they wanted, as a

14   matter of right or principal, or whatever, to go to a polling

15   place, that certainly is that voter's right and that voting

16   right should be protected at all costs.

17   Q    And are you suggesting that the solution at the polling

18   place or voter intimidation, when the law allows you to vote at

19   home, why don't you just stay there and vote at home, and you

20   won't have to be confronted at a polling place and be

21   confronted with a sign such as this --

22   A    It's an alternative method.  There is a right -- all I was

23   indicating is that there's a right to vote by alternative

24   means.  I certainly wasn't implying that anyone who wanted to

25   go there, and had a right to go in, shouldn't go to their

1   normal polling place in their neighborhood.

2   Q   You're familiar with the state laws to give notice days in

3   advance of the election?

4   A   Yes.

5   Q   For instance, in New Jersey there's a seven-day notice

6   period to get your absentee ballot.

7   A   Correct.

8   Q   And so that person, if confronted with the prospect of

9   voter intimidation, in the alternative may have passed them by?

10  A   In some instances it could.  However, in my experience, all

11  major parties at the state, local, and national level had

12  programs to encourage absentee ballot.  It's not based on

13  statistics yet because it's still a 2008 activity.  But there's

14  been a dramatic increase in alternative voting methods, and

15  including absentee ballots.  Some states require a shorter

16  timeframe, other states require longer timeframe.

17  Q   My last question, Mr. Josefiak, I take it, it was an error

18  on your part when you testified that you thought there would be

19  a higher participation of African American voters in the 2000

20  election because their candidate was running for office.  The

21  African American community have a political party?

22  A   No.  I was saying the Democratic nominee in 2008 was an

23  African American, therefore, there was a keen interest in the

24  African American community to vote some of them for the first

25  time in a presidential election.

1          MR. GENOVA:  Your Honor, nothing further.

2          THE COURT:  Any redirect?

3          MR. BURCHFIELD:  Yes.

4   REDIRECT EXAMINATION BY MR. BURCHFIELD:

5   Q    Let me start by the timeline here.  This is defendant's

6   exhibit, Exhibit 20.  At the bottom of the timeline you see

7   1982.  It has African American, and Hispanics are 12.7 percent

8   of registered voters.  Do you see that?

9   A    Yes, I do.

10  Q    And in 2000, African Americans are 7.7 percent of

11  registered voters.  Do you see that?

12  A    Yes, I do.

13  Q    And that's increasing of the entire electorate?

14  A    It appears so.

15  Q    And the RNC motivation is to increasingly reach out to the

16  minority communities and try to court them for Republican

17  candidates?

18  A    That was the basics of my testimony on the political

19  formality, that in order -- particularly as this increases, to

20  have an impact and to get -- to win elections that we would

21  have to make stronger outreach to the minority community.

22  Q    Mr. Josefiak, Mr. Genova asked you a number of questions

23  about the Court's ruling in 2004.  Let me read you a couple of

24  passages of the Court's ruling and I'll ask you some questions

25  about that.  This is from the transcript of the hearing on

1    November 1, 2004, and I'm reading from page 64.

2              Do you recall that Mr. Genova asked you some questions

3    about whether you had any evidence that the DNC was

4    collaborating with ACT.  I think the term used was:  You have

5    no facts about the DNC combining with ACORN and ACT?

6              Do you remember those questions?

7    A    Right.

8    Q    And let me read you this passage from the Court's opinion

9    in 2004.  It says:  The officials of the Ohio Republican

10   Committee by e-mail and otherwise kept the DNC informed with

11   the many allegations and the need to do something about it.

12   Particularly, as the questionable conduct appears to emanate

13   from groups such as ACORN and ACT, which were aggressively

14   supported by the Democratic Party.  Do you recall that from the

15   Court's decision?

16   A    Yes.

17   Q    And is that consistent with your understanding of what was

18   actually going on in 2000 --

19   A    My recollection, that's exactly what my understanding was,

20   that there was that kind of interaction.  And, again, the

21   demonstration of the complaint that was filed by both the

22   Bush/Chaney campaign and the RNC with regard to the

23   coordination of efforts on a number of fronts by all of these

24   organizations was a subject of a complaint that was filed and

25   pursued.

1    Q   Now, putting a side the issue of whether or not the DNC

2    actually collaborated the act, is it your understanding that

3    the DNC pulled back on its own voter registration

4    get-out-to-vote, and get out the experience of 2004 in

5    subsequent elections while at the same time ACORN and ACT, and

6    other groups, were increasing their efforts for voter

7    registration and get-out-and-vote?

8    A   Certainly sitting where I was sitting, that appeared to be

9    the case where there had been a concerted effort by others, and

10   less of an effort by the national party to get to do the voter

11   registration effort.

12   Q   And do you know a polling organization called Sovi

13   International?

14   A   I've heard of it.

15   Q   And is it pretty well regarded?

16   A   In some circles.

17   Q   And let me ask you to look --

18        MR. GENOVA:  Your Honor, this is beyond -- if I might

19   object, you're going beyond my cross.

20        THE COURT:  Well, that is all right.  We'll let it in.

21   Q   Defendant's Exhibit 38, Mr. Josefiak.  Do you have that in

22   front of you?  Do you recognize this as a post-election

23   analysis by Sovi International entitled -- dated November 5,

24   2004, entitled:  How George Bush Won?

25   A   Yes, I see that.

1    Q    And in that last paragraph on that page it talks about 527

2    Democratic interest groups and it says:  By the time Kerry had

3    clinched the nomination these three groups were in place.  The

4    Kerry campaign was barred by law from coordinating election

5    activities, but the Kerry campaign was barred by law from

6    coordinating election activities with them.  The Kerry GOTV

7    operation had essentially been, in a word, outsourced.

8            Do you see that?

9    A    Yes, I do.

10   Q    And is that consistent with your understanding?

11   A    It certainly, from where I was sitting, it appeared to be

12   the case.  This substantiates what was apparent to some of us.

13   Q    Also in 2004, let me read you this passage from page 67,

14   and it talks about the return list.

15           "This and other evidence demonstrates quite clearly

16   coordination between the RNC and the Ohio Republican Party and

17   the Ohio Voter Fraud Program.  And the -- while this was not in

18   and of itself illegal under Ohio or federal law, it was a clear

19   violation of the 1987 consent decree in that advanced court

20   approval was not obtained."

21           Is it your understanding that the RNC, particularly

22   after the 2004 episode, that the RNC would need to come to this

23   court to seek approval for activities that were clearly

24   allowable under federal and state law?

25   A    Yes.

1    Q    And is that burdensome for the RNC?

2    A    Of course it is, when you're looking at a level playing

3    field, when our counterparts are going to do exactly the same

4    thing under state and federal laws.

5    Q    Mr. Genova asked you some questions about why the --

6    suggesting that the RNC might have come to the court earlier

7    seeking modification or vacatur of this consent decree.  Do you

8    have any reason to believe the DNC's position would have been

9    different if you had moved to vacate the decree ten years ago?

10   A    Not to my knowledge.  Based on the fact that it has been a

11   very effective political tool for them in their election eve

12   letters to the RNC, and then distributing them publicly in

13   press releases and getting picked up by the media, and getting

14   picked up by local organizations to be used in their effort to

15   encourage and activate their voter base.

16   Q    With regard to those press releases, do those press

17   releases generally come about -- you mentioned they come about

18   virtually every election cycle, or the DNC -- do those press

19   releases typically come about in enough time for any voter who

20   wants to get an absentee ballot to do so?

21   A    It's hard to say.  It depends on the state provisions.  But

22   I would say it usually comes within a month before the

23   election.

24   Q    And in most states if you have a month's notice, you can

25   get an absentee ballot?

Josefiak-redirect                                      150

1    A    In most states, yes.

2    Q    And so if the DNC is making allegations of widespread vote

3    suppression by the RNC a month or more in advance of the

4    election, is that sufficient time for a concerned voter to get

5    an absentee ballot and vote absentee?

6    A    Yes.  And just one clarification on the letters.  It has

7    been the experience in the past, sometimes the letters are in

8    the media before they are actually received by the Chairman of

9    the Republican National Committee, because it goes out

10   simultaneously, and sometimes the press are inquiring about the

11   letter from the Chairman of the DNC before the Chairman of the

12   RNC has even seen it.

13   Q    Let me ask, Mr. Genova asked you some questions about the

14   Carter-Baker Commission report, and I'd like to ask you some

15   questions about the portions he focussed on.  I'm on page 45 of

16   that report, lower right hand corner number.

17   A    I have it.

18   Q    Down at the bottom there are recommendations relating to

19   voter fraud.  Is that right?

20   A    Yes.

21   Q    And including the Justice Department issuing public reports

22   on its investigation of election fraud, over a number of years.

23   Do you see that?

24   A    Yes.

25   Q    And then the second recommendation is the Department of

1    Justice office public integrity should increase its staff to

2    investigate and prosecute election related fraud.

3    A    Yes.

4    Q    Now, on the next page the recommendation 5.1.3 talks about

5    additional penalties under Voting Rights Act for violence,

6    property destruction or threatened act of violence that is

7    intended to deny any individual his or her lawful right to vote

8    or participate in a federal election.  Mr. Josefiak, are you

9    aware of violence occurring in any recent election directed in

10   any -- in connection with any recent election?

11   A    In connection with election, I recall violence in

12   certain -- against certain campaign headquarters, particularly

13   tire slashing.  And then in 2004, in Florida, the presidential

14   campaign headquarters was attacked with -- and shot at, and

15   there was individuals intimidated in Pennsylvania.  Those were

16   all violent acts.

17   Q    And were they prosecuted?

18   A    Yes.

19   Q    Under current law?

20   A    Under current law.

21   Q    And the next recommendation says to deter systemic efforts

22   to deceive or intimidate voters, the Commission recommends

23   federal legislation to prohibit from providing the public

24   with -- the Commission recommends federal legislation to

25   prohibit any individual or group from deliberately providing

1    the public with incorrect information about election procedures

2    for the purpose of preventing voters from going to the polls.

3        Mr. Josefiak, as to your knowledge in the history of

4    litigation under this consent decree, has the RNC ever been

5    accused of that?

6    A   No.  And what has occurred, and I think was the genesis of

7    this, there are these anonymous flyers that come out with wrong

8    dates or -- and are sent around, and it's happened on both

9    sides and no one knows exactly who is doing this, but certainly

10   nothing that has been charged that the RNC has done.

11   Q   And wasn't there an incident in the Maryland Senate

12   election where Mr. Steele was victimized?

13   A   Yes, that's correct.  That's why I said it occurred on both

14   sides.  Mr. Steele was the victim of exactly this kind of

15   erroneous flyer that gave wrong information about the election.

16   Q   So the Carter-Baker Commission insofar as they talk about

17   voter intimidation and suppression, talk about violence?

18   A   Correct.

19   Q   Which is covered by current law?

20   A   Correct.

21   Q   And they talk about misinformation; correct?

22   A   Correct.

23   Q   Which has not been the subject of controversy with respect

24   to this decree?

25   A   Correct.

1            MR. BURCHFIELD:  Nothing further, your Honor.

2            THE COURT:  I assume there's nothing more?

3            MR. GENOVA:  One question.

4            THE COURT:  One question.

5    RECROSS EXAMINATION BY MR. GENOVA:

6    Q   Mr. Josefiak, while affiliated with the RNC as special

7    counsel or RNC counsel, RNC ever issue a press release making

8    allegations of vote voter fraud on the part of Democrats or any

9    other party?

10   A   The Republican National Committee has issued releases of

11   voter fraud before an election; correct.

12   Q   Thank you.  Nothing further.

13           THE COURT:  Thank you, Mr. Josefiak.

14           THE WITNESS:  Thank you, your Honor.

15           THE COURT:  All right.

16           (Witness excused)

17           THE COURT:  Does the DNC have a witness?

18           MR. GENOVA:  First, I take it that Mr. Burchfield has

19   rested?

20           THE COURT:  I gather he has.

21           MR. GENOVA:  If he has, your Honor, I would like to

22   interpose a motion.

23           THE COURT:  I'm going to reserve all motions to the

24   end

25   of the case.  We'll proceed.

1          MR. GENOVA:  Thank you, your Honor.

2          THE COURT:  Do you have a witness?

3          MR. GENOVA:  Yes, your Honor.  We will be calling Dr.

4     Chandler.

5          MR. BARTLETT:  Professor Chandler Davidson.

6          MR. GENOVA:  My colleague Mr. Bartlett will be

7     conducting the examination, your Honor.

8          THE COURT:  All right.

9          CHANDLER DAVIDSON, Sworn.

10    DIRECT EXAMINATION BY MR. BARTLETT:

11         MR. BARTLETT:  May I approach, your Honor?

12         THE COURT:  Yes.

13         MR. BARTLETT:  A little light reading.

14         May it please the Court, your Honor, may I pass up

15    binder 1 of 2 for the DNC?  I don't expect we'll get past

16    binder 1 this afternoon.

17         Professor Davidson, I'd like a copy of binder number 1

18    on the witness stand for you as well?

19    A    Okay.

20    Q    You've already introduced yourself and spelled your name.

21         Professor, would you take a few moments and describe

22    to us your academic background, beginning with your education.

23    A    I received my BA degree from the University of Texas, and a

24    Ph.D. from Princeton.  And I went from there to Rice University

25    in 1966.  I was still working on my dissertation and continued

1    at Rice until 2003, when I retired.

2    Q    And your CV does speak for itself.  Do you write books and

3    articles for publication?

4    A    Yes.  I've had several of them.

5    Q    How many, ballpark?

6    A    Oh, four, five, including -- including edited books.

7         THE COURT:  Excuse me.  Is Dr. Davidson's resume in

8    the record?  Do we have to spend time going through all this,

9    or is it one of your exhibits?

10        MR. BARTLETT:  It's exhibit number 1 in the binder in

11   front of you.

12        THE COURT:  Well, why don't we just rely on that, and

13   then we don't have to spend so much time on it.  If I haven't

14   read it already, which I have not, I will.

15        MR. BARTLETT:  That sounds fine, your Honor.  Thank

16   you, your Honor.

17        To get started on the subject matter, Professor, can

18   you tell me generally the subject matter of your academic

19   writing?

20   A    It is focussed largely on racial politics in Houston and

21   the south, and to some extent in the nation at large.  And more

22   specifically, I've been a student of the Voting Rights Act, and

23   a colleague and I co-edited a book on that subject called:

24   Revolution of the South, the Impact of the Voting Rights Act.

25   And it was published in the early nineties.  And I take it is

1    a -- the book that establishes the impact that the Voting

2    Rights Act has had on those states, entirely covered by Section

3    5 of the act, from 1965 until about 1990.

4    Q    Excuse me.  Does your study of racial politics include the

5    study of the subject including voter suppression?

6    A    Yes.

7    Q    And what is, very briefly, some of the methodology that you

8    used in the study of voter suppression?

9    A    Okay.  This is a study I did with three young historian

10   colleagues at Rice, and we did what one usually does under

11   these circumstances.  We search the academic literature, both

12   the journals and the books where we thought we might find

13   something on the subject.  We went to the Internet, of course,

14   and we went through -- I think the title of it is "American

15   Newspapers," which is a vast archive of major American

16   newspapers.  We put in a number of search words.  We read many,

17   many newspaper articles.  We looked into various archives that

18   we thought might have some useful information.  And in one case

19   we spent sometime reading the record of confirmation hearings

20   of Mr. justice Renquest when he was confirmed to the Supreme

21   Court, and then confirmed to the Chief Justice -- the Chief

22   Justice.

23   Q    And the particular work you're describing, Professor, is

24   the work entitled:  Republican Ballots Security Programs,

25   Protection of Minority Vote Suppression or Both?

Davidson-direct                    157

1    A   Yes.

2    Q   And for the Court's reference, that appears in tab 2 of the

3    binder.  And, Professor, if you find it useful to have a binder

4    open, you are more than welcome to do so.

5             How did this particular piece of written work come

6    about?

7    A   I began research on the subject in the 1980s.  And then I

8    got a significant grant from the National Science Foundation,

9    from the Rockefeller Foundation.  I put that aside and frankly

10   forgot about it.  And I was approached in 2000 and -- earlier,

11   in late 2003, by the Center for Voting Rights and Protection, a

12   non-profit in Washington, D.C.  And the man who approached me,

13   Bob Bauer, had -- we had a mutual friend, and the mutual friend

14   had mentioned to him that I had done this research back in the

15   eighties.  And Mr. Bauer asked me if I would like to continue

16   it, and I said I would, and he wanted me to do it in a year.

17   And so we narrowed it down, and the four of us got to work on

18   it.

19   Q   What were you looking to describe in creating this work?

20   A   My recollection is that what got me interested in the

21   subject was either the 1981 events in New Jersey, or the 1986

22   events in Louisiana.  And it occurred to me that ballot

23   security was in some cases being used as a cover for

24   intimidation of minorities.  And so I began to look around and

25   see what I could find on that subject.  We ended up making it

1    very clear that we were not suggesting that all or most valid

2    security programs that are run by the Republican Party go askew

3    in the way that these did.  We were in a sense looking at -- at

4    the very worst cases just to show what happens when these

5    ballot security programs do get off track and bad things

6    happen.  And so I just wanted the make that clear.  This is not

7    made to be representative of the Republican Party efforts.

8    Q    And is it -- is it fair to say also that the 14 particular

9    events described in your paper aren't an exhaustive list of the

10   ballot security efforts that you encountered in your research

11   on the period from 1982 to 2003?

12   A    Yes.  Those are the only ones that we could find that had

13   enough information to really make us comfortable in describing

14   and then drawing conclusions.

15   Q    And describe for us briefly your findings in this paper.

16   A    Well, we found generally there in these cases where valid

17   security programs go bad, they end up harming minority groups.

18   And this often occurs as a result of a process called the vote

19   caging.  At least it sometimes does.  And the first case that

20   we came upon of this was in the 1950s, in Phoenix, when Mr.

21   Renquest was a -- was a lawyer for the Republican Party and was

22   overseeing valid security programs in Phoenix.  And it turned

23   out that that kind of provided a model for some of those later

24   programs, the one in 1981, and it's one in 1986 in particular.

25   And we were especially lucky, I guess you could call it, in

1    that case because the subject of a vote suppression and the

2    name -- in the name of valid security came up in both the

3    confirmation hearings of Mr. justice Renquest in 1980 -- 1971,

4    and in 1986, and a good deal of attention was focussed upon the

5    role that he played in those programs in Phoenix in the late

6    fifties and up into the sixties.

7    Q    And would you describe the manner in which the voter

8    suppression that you're describing takes place, the course of

9    events that create one of these stories that you described.

10   A    "Do not forward" letters are sent out.  They're targeted to

11   minority communities.  In the case of Phoenix, both Latinos --

12   and when letters are returned, both blacks and Latinos, when

13   they are returned, these are registered voters that the letters

14   are addressed to, the assumption is that they no longer live

15   there.  They may live in another precinct.  If they arrive to

16   vote at the old precinct, they will not be able to do so if

17   they are challenged.  And in the case of Phoenix in these

18   years, and I gather this was to some extent true also in New

19   Jersey, you had several things happen simultaneously.  You

20   would have misinformation put out as to when voting would take

21   place and how it would take place.  Signs were put up that were

22   intimidating, and poll watchers would show up at the polls,

23   typically dressed in suits, and they would begin asking voters

24   questions.  And in the Phoenix case, to make matters even more

25   complicated, at the time they had literacy test, and sometimes

1    the poll watchers would come up to people standing in line and

2    flash a little card that had a section of the Constitution and

3    ask them to read off that card.  That was illegal, by the way.

4    Poll watchers were not allowed to test people's literacy.  And

5    if the person did not read the passage well, the poll watchers

6    would sometimes ask them to get out of line and tell them they

7    were not entitled to vote and they're going home.  This created

8    a good deal of controversy, and there were some scuffles at the

9    polls, and a great deal of attention was paid to it.  And I

10   think it was in the Arizona Republic, and this kind of event

11   continued to occur there in Phoenix over a number of years, and

12   up until I think the 1964 elections.

13        Let me add one thing, that description that I have

14   just given you of the way these particular Phoenix events

15   happened, we don't use the term in our study, and to my

16   knowledge the term was not invented until 1960 -- until 2004,

17   but suddenly it surfaced and it was called vote caging.  And so

18   what went on in Phoenix back in those years was a typical case

19   of a vote caging.

20   Q   And do you know the origin of the term "vote caging"?

21   A   Well, as another witness testified, it's a direct mail

22   term.  And I think I try to trace the etymology of it, and as a

23   direct mail term, it goes back quite away.  And the first time

24   I encountered it, or the first time it appeared in this little

25   on-line dictionary of slang, vote caging as such was used in

1   2004, with regard to a Republican program that was going on in

2   Jacksonville, Florida.  And what happened was that in -- an

3   e-mail had been sent from Timothy Griffin, who I believe was a

4   research director for maybe the Bush/Chaney campaign.  He sent

5   an e-mail.  He thought he was sending it to the White House.  I

6   think it was whitehouse.com.  What it was supposed to -- what

7   was real, the real website he thought he was sending it to, but

8   he sent it to a satirical website instead, whitehouse.org.

9   Maybe I've got that backwards.  And maybe it became obvious

10  then what seemed to be going on.  And in the subject list was

11  the term "cage list".  And from that, the term "vote caging"

12  apparently was derived.

13  Q   For the convenience of everyone, the e-mail that you're

14  describing is found behind tab 9 in the binder that everyone

15  has.  I apologize, tab 8.  We'll come back to that a bit later

16  in your testimony.

17        We bounced around in time.  I just want to clarify,

18  you were speaking about events in Phoenix, Arizona in the

19  1950s.  You were speaking about this e-mail in 2004.  What is

20  the time period covered with the study?

21  A   I believe it's 2008, to an event in Louisville in 2003.

22  Q   And you found incidents of vote caging occurring across in

23  that time period?

24  A   What happened -- no, I wouldn't go that far.  I believe the

25  last event that we covered that involved vote caging per se,

1    I'm -- I think I'm correct here, it was the Louisiana case in

2    1986.  There were other kinds of issues that went on in some of

3    the cases that we studied, and the one in Louisville in 2003

4    did not involve caging as such, but just the announcement by

5    some local Republicans that they were going to send poll

6    watchers to a certain number of precincts in the upcoming

7    gubernatorial election on the east side of Louisville on

8    Election Day and African American leaders took numbers.

9    Virtually all of them were African American, and that stirred

10   up the African American community.  And I think that particular

11   valid security measure may have backfired because plenty of

12   people, black people who showed up at polls that day to ensure

13   nothing like what had happened in the previous 1986 I guess

14   would occur there.

15   Q   Okay.

16        And so the world of voter suppression was bigger than

17   the world of vote caging, and I apologize for being improperly

18   specific there.

19   A   Yes.

20   Q   You described vote caging, and you described the variation

21   on that, that you found in Louisville.  What are other

22   modalities of vote suppression that you observed over the

23   period of 1982?

24   A   Most all of them involved charges of minority vote stealing

25   without any evidence to back it up.  And in some cases calls

1    for police, or public officials of some sort, to be at these

2    voting sites.  And in one case in New York and an Attorney

3    General's race a few years ago, it was a very narrowly-decided

4    race.  The Republican assistant -- the Republican Attorney

5    General lost that race and he made some very strong claims

6    about massive vote fraud in some African American precincts and

7    wanted policemen and some of the people in his Attorney

8    General's Office to go door to door in various black

9    communities in order to ascertain that the people had indeed

10   voted.  That didn't occur, by the way.  It was prevented from

11   occurring, but that's what he was calling for.

12   Q    Returning to the topic of vote caging, you've testified

13   that the beginning of the process is that a non-forwardable

14   letter is sent out, and those that are returned are -- somehow

15   become the basis for the caging effort, as you described it.

16   Is the return letter necessarily an indication that a voter is

17   no longer eligible to vote?

18   A    No.  There are a number of reasons why something else could

19   explain why the letter came back.  In fact, I read in the

20   Brendan Center publication not too long ago that there were ten

21   different reasons why you cannot always infer correctly that a

22   returned letter is a result of someone to whom it was

23   addressed, not living there.  And, for example --

24   Q    Before you continue, Professor, would you flip to tab 3 in

25   the binder that's sitting in front of you.  Is that the Brendon

1    Center study that you're referring to?

2    A    Yes.

3    Q    Both for your ease and the readers, would you flip to page

4    10.  What are some of the reasons, other than a move to

5    diseased voter, the Brendon Center study found, and you have

6    indicated that you agree can be the reason for a piece of

7    return mail?

8    A    Page 10, okay, but for many reasons undelivered mail need

9    not be an indication that a person registered to give an

10   address is not entitled to vote there.  A voter maybe away from

11   home for work like a Louisiana Congress woman because she

12   received her mail from Washington, like an Ohio service woman

13   challenged because she received her mail where she was

14   stationed in North Carolina, or an extended vacation, an Oregon

15   woman rendered inactive.  A voter may live with others but been

16   unlisted on the mailbox.  Or like Ohio resident Raymond

17   Schaeffer, he may receive mail at a post office box or other

18   mail service but not his registered residence.  Moreover, some

19   mail is not delivered through no fault of the voter.  In the

20   1990 census, for example, the New York Times reported that at

21   least 4.8 million census forms were found to be undeliverable

22   by the postal service, 1.8 million of those were later

23   delivered by hand.

24   Q    And based on your research, and I'm not -- no longer

25   referring to the Brendon Center study, your 2004 paper, and the

1    rest of your body of reference on voter's professions, who

2    engages in the types of voter suppression activity that you

3    described?

4    A    Almost all of the cases that we found in the period that we

5    were looking at were carried out by Republicans.

6    Q    And why do you think that is?

7    A    Well, first of all, I think that African Americans, and to

8    a somewhat lesser extent Latinos, tend to be Democratic.  They

9    also know because of some of the reasons that I mentioned here,

10   that there will be a significant number of returned letters

11   that come in, and that gives them a chance to go to the polling

12   site then confront these folks.

13        I guess I would also say that part of the intimidation

14   that sometimes occurs in these confrontations is the result of

15   people, the people being intimidated, not being fully aware of

16   what the election laws are, and being disconcerted or

17   discombobulated from people who begin to ask them questions or

18   tell them sometimes false information.  I think that would be

19   less likely to occur if Democrats say:  Do not forward letters

20   into the type of neighborhoods that many Republicans live in.

21   I can only find one case at the time we were doing this study

22   of Democrats caging, and that happened I believe in 1958 in

23   Phoenix and it was in response to the Republican's caging

24   efforts there.

25   Q    Professor, does caging only affect --

1          MR. BURCHFIELD:  Your Honor, just generally an

2     objection.  The witness is throwing around the term

3     "Republicans" quite loosely, it seems to us.  This consent

4     decree applies to two entities, it applies to the Republican

5     National Committee and the Republican Party in the state of New

6     Jersey.  His recounting of incidents going back to the 1950s

7     involving the late Justice Renquest is --

8          THE COURT:  It's very remote.  I haven't yet heard it

9     tied into the Republican National Committee except the two

10    examples that he gave, Louisiana and New Jersey.  But I suppose

11    this is giving a method.  We'll see if it applies in this case.

12         MR. BURCHFIELD:  And, your Honor, more -- the other

13    part of my objection is, if he's going to talk about

14    Republicans, let's just have him say -- the Republican Party is

15    a very broad entity.  There is only one Republican National

16    Committee that is well-defined and is the subject of this

17    decree.  I object to his use of the term "Republicans", who may

18    be some person registered as a Republican voter in some county

19    in Texas, and that is not under this consent decree, and that

20    is clear in the 1981 decree.

21         THE COURT:  I'm fully aware of all that, and I

22    understand Republicans need some unit identified with the

23    Republican party.

24         MR. BURCHFIELD:  Thank you, your Honor.

25         THE COURT:  Unified Republican Party.

1          THE WITNESS:  Yes, Judge.

2          THE COURT:  It would be just state or local or county

3   Republican organization?

4          THE WITNESS:  Yes.

5          THE COURT:  And we'll just understand what you mean

6   when we say Republican?

7          THE WITNESS:  That's correct.

8          THE COURT:  He's not identifying all this as a

9   Republican National --

10          THE WITNESS:  Not at all.

11          THE COURT:  Go ahead.

12   Q   Moving along, and the point well taken.  Over the weekend,

13   Professor, you reviewed several documents that we provided to

14   you, a complaint, a deposition transcript, and certain exhibits

15   from an action that was brought in this case in 2004 by an

16   intervener named Bonnie Malone.  Looking briefly at tabs 4, 5,

17   6, and 7, in your binder, are those the materials that you

18   reviewed?

19   A   Four, 5, 6 and 7?

20   Q   Yes, that's right.

21   A   Yes.

22   Q   Having read those documents, how would you, based on your

23   scholarly knowledge, characterize what the RNC, Bush/Chaney and

24   2004, and the Ohio Republican Party were planning?

25   A   It looked to me like they were planning a caging operation,

1    as I have defined it.

2    Q    And why do you say that?

3    A    They have sent out "do not forward" mail.  And on the basis

4    of the returned mail, they drew up a caging list which they

5    were going to use for the purposes of challenging the voters.

6    And a disproportionate number of the returned letters came from

7    African American precincts.

8    Q    And is that consistent with the -- some of the examples

9    that you have studied over the years in your work on voter

10   suppression?

11   A    Yes.

12   Q    We also showed you two e-mails and attachments that were

13   posted on the website georgewbush.org, and those are behind tab

14   8 in your binder.

15   A    Yes.

16   Q    Are these the e-mails that you referred to earlier when we

17   talked about the term of "vote caging"?  And I realize they're

18   a little bit difficult to read, I apologize.

19   A    Yes, I believe they are.

20   Q    What is the final name of the Microsoft document attached

21   to these two e-mails.

22   A    I'm sorry, would you repeat the question?

23   Q    What are the file names of the Microsoft Excel documents

24   that are shown as attachments to the two e-mails on the first

25   page of this exhibit?

1    A    Caging, one dot, excel less.   Caging.exceless.

2    Q    And acknowledging the strikingly small type that these came

3    out in, what do the Excel files appear to contain in terms of

4    data?

5    A    Apparently names an addresses.   They are -- if they do

6    constitute caging lists.

7    Q    Having read those e-mails and looked at the content of the

8    Excel spread sheets that are attached, what does this look like

9    you to?   Would it be okay if I restated the question?

10   A    Yes, please.

11   Q    What sort of effort does the writer of this e-mail appear

12   to be attempting to engage in?

13   A    As best as I can tell, it's an attempt to send a caging

14   list from --

15          MR. BURCHFIELD:   Objection, your Honor.   The witness

16   is just speculating.

17          THE COURT:   Well, I think we're more emphatic in his

18   answer.   I would think he was drawing on his expertise.   But he

19   seems to be not quite sure what it is.   I think I'll sustain

20   the objection and we can all read it ourselves and see what it

21   is.

22          All right, next question.

23   Q    Professor, is vote caging, the term we've been using, the

24   only type of ballot security measure you've seen targeted at

25   minority precincts?

1   A   No.

2   Q   What are the other or others?

3   A   One that is very common is, as I mentioned a few minutes

4   ago, false information being purveyed at those precincts or

5   sometimes via mail, via robo calls, even radio adds, sometimes;

6   intimidation in a sense of people dressed in official looking

7   uniforms.  In Orange County, California, a few years ago at 20

8   Latino precincts, men showed up in official looking uniforms

9   and they had arm bands on, and they made it clear to people

10  that if they were mistaken, if they voted and they were not

11  fully entitled to, they could get in trouble.  And intimidation

12  of many different sorts in the purveyance of a false

13  information about voting are the two -- the two types that come

14  through on a regular basis.

15  Q   I'm not trying to do all of this for you from memory.  I'm

16  going to bring up to you the second binder.  I'll be providing

17  that in full tomorrow, and provide a copy to counsel as well.

18  This is an exhibit behind tab 11 in our second binder which

19  will be in use tomorrow.  Have you seen this monograph before,

20  Professor?

21  A   Yes, I saw it quite awhile back.  As I recollect, it came

22  out just about the time we were finishing our report.

23  Q   And without going -- doing an exhaustive detail through the

24  entire thing, based on your research, the voter suppression

25  efforts that you encountered, both those that you wrote about

1   and those that you didn't over the years, is that an accurate

2   list of some of the voting suppression incidents that you have

3   encountered and become aware of for your research over the

4   decree indicate?

5   A   Just skimming.

6   Q   Just skimming, yes.  You indicated that you had read it

7   before?

8   A   Yes.

9   Q   Based on your academic research is voter suppression going

10  away?

11  A   I don't think so.  I guess maybe I should -- maybe I should

12  rephrase that.  My involvement in the National Commission on

13  the Voting Rights Act brought to my attention a fairly

14  widespread degree of intimidation in one sort or another around

15  the country.

16  Q   And that's a very good segue, Professor, to Exhibit 10 in

17  the binder that's in front of you and to the parties.

18           Do you recognize that report?

19  A   Yes.  This is -- you're talking about protecting minority

20  voters?

21  Q   Yes.

22  A   Yes.

23           MR. BURCHFIELD:  I have that as exhibit -- behind tab

24  9?

25  A   Yes, I do too, actually.

Davidson-direct                                  172

1    Q    I apologize.  I don't have the entire binder here with me.

2    Right, tab 9.

3         Professor, how were you selected to serve as a

4    Commissioner of the National Committee on the Voting Rights

5    Act?

6    A    Well, I was asked, I'm not sure precisely why they asked

7    me, as I said, I co-edited a book a few years ago measuring the

8    impact of the Voting Rights Act.

9    Q    And how did the Commission do its work?  First of all, over

10   what time period did the Commission do its work?

11   A    It carried out most of its work in 2004.

12   Q    And how did the Commission do its work?

13   A    We had atendance around the country at widely different

14   locations.  Minneapolis, no -- Los Angelos, Orlando, and

15   several others.  They were quite diverse parts of the country.

16   And I think the effort was made in selecting the cities to

17   ensure that there would be a significant number of people

18   testifying from various ethnic minority groups.

19   Q    And how many of those hearings did you attended?

20   A    Nine of the 10.

21   Q    And can you describe for us briefly the Commission's

22   findings.

23   A    Basically, two things.  Very broadly speaking:  A, the

24   Voting Rights Act had made a tremendous difference; and B, THAT

25   was still a long way to go.  I remember hearing one of the

Davidson-direct                        173

1    elected official when we asked him generally what he thought

2    about the impact of the Voting Rights Act, I believe this was

3    in Georgia, he said in the Dickensian fashion, these are the

4    best of times, and these are the worst of times.  I think we in

5    Georgia had the largest black caucus of any state in the south,

6    or maybe the nation, and then we have some pretty bad things

7    happen.  A mayor of Milledgeville, Georgia, which was the

8    capital of Georgia before the civil war, an African American

9    man who had been -- he was a retired colonel in the military.

10   He was the first African American elected as mayor of

11   Milledgeville and he said that his race was the -- the race was

12   highly polarized.  And he won by about 20 votes, but he did.

13   And so for the first time in almost two centuries a black man

14   was mayor.  He said, however, a few months later the City

15   Council changed the form of government from a strong mayor

16   system to a city manager forum wherein the mayor simply had a

17   symbolic role.  And for him, I guess you would say that that

18   was the worst of times.  And this was a repeated version of it

19   in most of the hearings that we held.

20         MR. BURCHFIELD:  Your Honor, again, this is pretty

21   remote from any -- to the consent decree.

22         THE COURT:  Very remote.  But I'm hearing everything.

23   I recognize it -- I have difficulty relating this to the issue

24   before me, but it's nice background.  It's interesting.

25         MR. BURCHFIELD:  It's -- it may be interesting, your

1    Honor, but it relates apparently to activities by the state

2    actors in Georgia, rather than to the Republican National

3    Committee.

4            THE COURT:  As far as I can see, it has nothing to do

5    with the Republican National Committee.

6            MR. GENOVA:  Excuse me, your Honor.

7            THE COURT:  You're delaying his exit to wherever

8    you're going next.

9            MR. GENOVA:  Not by design, your Honor.  I would like

10   to be heard on that.

11           Part of our argument, again, the burden resides with

12   the Republican National Committee.  One of the underlying legal

13   basis for -- is the necessity for an order.  And part of the

14   context is this, whether or not the risks that are intended to

15   be abated by this consent decree still exist, and whether the

16   specter of voter suppression still exists.  And your Honor gave

17   great latitude to allow Mr. Josefiak to pontificate on his

18   observation.

19           THE COURT:  I'm giving you the same amount.

20           MR. GENOVA:  And, your Honor, I'm here to say that we

21   appreciate that.  There is a context for this, and it's

22   remoteness, and the loops will be tied in the course of our

23   defense.

24           THE COURT:  All right.  That's what I'll be looking

25   for.

Davidson-direct                           175

1          I think we have to recess at this point.  This makes a

2      good time to do it, and we'll pick up tomorrow morning where we

3      had left off.

4          Do you want to start earlier in order to get you out

5      of here?

6          MR. BURCHFIELD:  Your Honor, I believe nine -- well,

7      I'll defer to my colleague.  We should be able to finish

8      tomorrow.

9          MR. GENOVA:  Your Honor, we hope to conclude by the

10     end of the day.  We hope to conclude with all of our witnesses

11     by midday.  We think we can do that rationally, and that's our

12     goal.  And we're prepared to start at whatever point is

13     convenient for your Honor.  If 8:30, 9 o'clock is best, that's

14     fine with us, with all deference to your staff.

15         THE COURT:  Well, why don't we start at nine, which

16     will give us a little bit more margin.  And if necessary, we

17     could instead of having extended closing statements, we could

18     do it in supplemental writings.

19         MR. GENOVA:  We're amenable to that.  And we were

20     going to be requesting post-hearing submissions anyway.

21         THE COURT:  All right.  Well then, it looks as if

22     we'll be able to get through in time.

23         MR. BURCHFIELD:  Thank you, your Honor, for your

24     concern about accommodating my schedule, and nine, 9:30, either

25     one tomorrow morning would be fine.

Colloquy                          176

1                THE COURT:  Let's aim for nine.

2                MR. BURCHFIELD:  All right.  Thank you.

3                THE COURT:  We'll see everybody then.  Dr. Davidson,

4     you can step down.

5                (Witness excused)

6                (Matter adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25