1

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2                  CIVIL ACTION  81-3876(DRD)

3    DEMOCRATIC NATIONAL COMMITTEE, : TRANSCRIPT OF PROCEEDINGS
     et al.,                       :
4                                  :        H E A R I N G
                 Plaintiffs,       :
5                                  :
                  -vs-             :        Pages 1 - 189
6                                  :
     REPUBLICAN NATIONAL COMMITTEE, :
7    et al.,                       :
                                   :
8             Defendants.          :
     - - - - - - - - - - - - - - -
9                                       Newark, New Jersey
                                        May 6, 2009
10
     B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
11                   SENIOR UNITED STATES DISTRICT JUDGE

12

13   A P P E A R A N E S S:

14

         GENOVA, BURNS & VERNOIA
15       BY: ANGELO J. GENOVA, ESQ. and
         JOHN BARTLETT, ESQ.,
16       RAJIV D. PARIKH, ESQ.
         Attorneys for the Plaintiff
17
         HILL WALLACK, LLP
18       BY:  MEGAN M. SCHWARTZ, ESQ.
         Attorney for the Plaintiff
19

20
     _____
21   Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record as
22   taken stenographically in the above entitled proceedings.

23
                         S/Mollie Ann Giordano
24
                         Official Court Reporter
25

```
1
        APPEARANCES - continued
2

3       DRINKER BIDDLE & REATH, LLP
        BY:  JACK FROST, JR., ESQ.
4       Attorney for the Defendant

5
        McDERMOTT, WILL & EMERY
6       BY:  BOBBY R. BURCHFIELD, ESQ.
        JASON A. LEVINE, ESQ.
7       Attorneys for the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                    I N D E X

2    WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

3    FOR THE DEFENDANT

4    THOMAS JOSEFIAK         47       107      146         155

5
     FOR THE PLAINTIFF
6
     CHANDLER DAVIDSON       56
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  I guess Dr. Davidson was on

2     the stand.  Dr. Davidson, could you come back please.

3          Dr. Chandler Davidson, resumes the stand, having

4     previously been sworn.

5          THE COURT:  Good morning, Mr. Bartlett.

6          MR. BARTLETT:  Good morning, your Honor.

7          THE COURT:  You seem to be heavily laden.

8          MR. BARTLETT:  As always.  I'm delivering up with,

9     your permission, Volume 2 of the defendant's -- excuse me, the

10    plaintiff's exhibit binders for this hearing.  Those are your

11    Honor's.

12         THE COURT:  Thank you.

13         MR. BARTLETT:  Good morning, your Honor.

14         THE COURT:  Good morning.

15    CONTINUED DIRECT EXAMINATION BY MR. BARTLETT:

16    Q    Good morning, Professor Davidson.

17    A    Good morning.

18    Q    I delivered to the Court and the witness Volume 2 of the

19    binders that we are using in the presentation of the

20    plaintiff's case today and yesterday.

21         Dr. Davidson, we're continuing your direct testimony

22    from yesterday, and we would remind you that you're still under

23    oath.  And other than that, we would continue what we began

24    yesterday afternoon.

25    A    Yes, sir.

1    Q    And we talked yesterday about your research into incidents

2    for voter suppression which included looking in detail in your

3    academic work at the 1981 incidents in New Jersey that lead to

4    this action, and after the 1986 Louisanna race that

5    precipitated the second order in this action.  You also

6    testified that you had reviewed the complaint and some of the

7    discovery in the Ebony Malone matter that was before the court

8    in 2004.

9    A    Yes, sir.

10   Q    And we introduced all of those yesterday, so I won't take

11   the time to introduce those again today.  Is the experience

12   that you saw in the papers that you reviewed from the Ebony

13   Malone matter in 2004 consistent with what you saw on the

14   academic research in the events of 1981 and 1986?

15   A    Yes.  There was obviously a vote caging project.  It was

16   under way, and I suppose if it hadn't been for the consent

17   decree, it wouldn't have been carried forward to its

18   conclusion.

19   Q    And what does that tell you about change or continuity of

20   the area of voter suppression in the U.S.?

21   A    I think that the RNC is going to continue under the guise

22   of valid security to engage in these kinds of vote caging

23   activities.  I think we have a society in which --

24            MR. BURCHFIELD:  Objection, your Honor.  Move to

25   strike.  This is speculation.

1          THE COURT:  No, this is his opinion.  It's expert

2     opinion.

3     A    We live in a society where people of color still face

4     numerous barriers.  And I've read in the New York Times just a

5     few weeks ago Justice Kennedy's assertion of just that fact,

6     and pointing out that racism in America is not ancient history.

7          THE COURT:  What justice did you mention?

8          THE WITNESS:  Justice Kennedy I was hoping to refer

9     to.

10          THE COURT:  And what context did he make this

11     reference?

12          THE WITNESS:  This was in a civil rights case.  I

13     believe it was a voting rights case that he was hearing, but I

14     cannot give you the type of the case.

15          THE COURT:  Was it a reported decision or was it the

16     source?

17          THE WITNESS:  All I know is that it was reported in

18     the New York Times on April the 29th.

19          THE COURT:  You don't have the opinion, itself?

20          THE WITNESS:  No, I don't.

21          MR. BARTLETT:  We can look into what the news article

22     was.

23          THE COURT:  It seems to me to be a news article is

24     kind of unreliable.

25          MR. BARTLETT:  I'll track down the details on that.

1          THE COURT:  All right.  An opinion that would be

2     something else.

3          MR. BARTLETT:  For the information.

4          Professor, yesterday you described to us the long and

5     difficult history of voting rights in the U.S. from the middle

6     of the 20th century to the present.  Based on all your

7     research, and particularly on the experience on the Voting

8     Rights Act Commission on 2005, have you drawn any conclusions

9     about whether the social and political climate in the U.S.

10    still fuels the impetus to engage in voter suppression?

11    A    Yes, I have.  And I believe that it is still at a point

12    where voter suppression can be expected.  I don't mean to

13    suggest that progress hasn't been made over the last 50 years

14    in many respects, but as the events with Miss Malone indicated

15    in 2004, we have that same problem that we had that lead to

16    this consent decree.

17    Q    You described having taken part in nine of the ten hearings

18    of the National Commission on the Voting Rights Act.  What did

19    you hear in those hearings?

20    A    There was much repetition of complaints from one hearing to

21    the next.  When we were listening to Asian Americans, specific

22    islanders, Native Americans, an African Americans, or Latinos,

23    there were many complaints about problems they encountered at

24    the polling place, including false information they handed out,

25    including harassment, and in some cases intimidation.  One of

1     the things that I was really impressed by was the fact that

2     over and over people mentioned, people, other -- people

3     standing outside of the polling place with video cameras taking

4     pictures of the minority people who are going in to vote, and

5     in a number of cases they also were taking photographs of the

6     voters' license plates.  And there were just -- it was just a

7     litany of complaints along those lines from one hearing to the

8     next across the nation.

9     Q    And just to be clear, the incidents that were described to

10    you in those hearings had taken place recently, as of 2005?

11    A    Yes, they had.  Most of them had occurred in the current

12    century.  Some people talked about events in the 1990's, and

13    even back in the 1980s, but by and large these were ordinary

14    citizens.  They were minority leaders.  And we also had

15    admissions and voting rights, lawyers testifying, but this was

16    a common complaint that we heard throughout the hearings.

17    Q    Is there any other evidence that you have discovered

18    through your research and through your service related to the

19    impetus to continue to engage in voter suppression in the

20    present day?

21    A    Well, the study that I did of valid security programs from

22    the fifties into the current century, I recall that near the

23    end of our hearings, in 2004, the newspapers carried the story

24    of Republican efforts to suppress the Vietnamese American vote

25    in Alabama.  There was a Vietnamese American running for mayor

1    and there were attempts there, according to the newspapers, to

2    intimidate the Vietnamese American voters.

3    Q    And in your academic work, you've written of the term

4    "racially polarized voting".  Can you explain what racially

5    polarized voting is?

6    A    Very simply, it's where one race votes very heavily for one

7    candidate and another race votes very heavily for another

8    candidate.  And I should say in that regard we have several

9    academicians, academics, professors, doing research on racially

10   polarized voting in the United States in recent years.  And

11   without exception, they stressed that it was continuing into

12   the 21st century.

13   Q    Now, what's the relevance of this phenomenon that you've

14   identified with racially polarized voting to the issue of voter

15   suppression?

16   A    I think it is the case that it is still a big deal of

17   difference between the races on the suitability of candidates.

18   And inasmuch as most of the racial minority groups belong to

19   the Democratic party, and many whites belong to the Republican

20   party, I think in some kind of elections racially polarized

21   voting is just a reflection of polarization as well that

22   continues in our society.

23   Q    In your opinion, has the Voting Rights Act of 1965 been a

24   deterrent to voter suppression activities?

25   A    In my opinion it really hasn't.  And especially where we're

1    talking about situations that occur shortly before an election.

2    I had to rack my brain to think of any cases where that's true.

3    The Voting Rights Act is just typically not able to react

4    quickly to the kind of situation that occurred at a polling

5    place.  There is one exception, and that is that the Voting

6    Rights Act does allow people in Section 5 jurisdiction and in

7    Section 203 jurisdiction, those are the language jurisdictions,

8    it does allow them to contact the Justice Department before an

9    election if they have worries about what might happen on

10   Election Day.  And if the Justice Department is convinced that

11   those worries are substantial, they will send federal observers

12   down and they will appear at the polls on Election Day.  And

13   there is a history of their sending typically less than a

14   thousand, but several hundred observers primarily in the south,

15   I guess disproportionate number in Mississippi.  But if you're

16   not fortunate enough to live in a -- or vote in a precinct

17   where there is an observer there to make sure nothing untoward

18   happens, there's the possibility that something will.  And I

19   just can't -- I can't think of how the Justice Department or --

20   under the Voting Rights Act could make a quick move there that

21   would accomplish what has been accomplished under this consent

22   decree.

23   Q   Is it your opinion then that the consent decree in this

24   action has had a deterrent effect that is in some way different

25   from that in the Voting Rights Act?

 1    A   Yes, because it actually -- it's actually worked.

 2    Q   How so?

 3    A   It has -- in cases where vote caging was under way, and

 4    that was pretty clear as in 2004 it has enabled this Court to

 5    intervene quickly and to put an end to the process before it

 6    plays itself out.

 7    Q   In your research and your service on the National

 8    Commission, Professor, have you become aware of any criminal

 9    prosecution for voter suppression activities of the type

10    described in your work?

11    A   No, not offhand.

12    Q   And you spoke a moment ago about the civil litigation

13    option for voters to remedy Voting Rights Act violations.  I

14    believe you touched on this, but I just want to ask you again,

15    based on what you've observed through all of your research and

16    study, how quickly do actions like that move?

17    A   As I understand it, such actions would primarily fall under

18    Section 2 of the Voting Rights Act, and Section 2 is one of the

19    permanent features of the act, and it covers the entire United

20    States.  I don't believe there is a single case of Section 2

21    cases being filed in this kind of a vote suppression case.  And

22    typically a Section 5 case takes years or many, many months to

23    run its course.  And so it doesn't seem to me that that would

24    be a very effective deterrence for this kind of behavior.

25            THE COURT:  Well, would a preliminary injunction or

1    temporary restraining order be available under either of these

2    two sections?

3            THE WITNESS:  Your Honor, I don't know the answer to

4    that.  I don't think so, but I can't say for sure.

5            THE COURT:  All right.

6    Q   So to conclude, Professor, what are the merits of the

7    consent decree in this action as compared to remedies under the

8    Voting Rights Act?

9    A   They enable a rapid response to the kinds of vote

10   suppression activities that we have observed in 1981, and 1986,

11   and 2004.

12   Q   Thank you very much, Professor.

13           Before I conclude, your Honor, I just a wanted to let

14   you know, we looked up the quote from Justice Kennedy that

15   Professor Davidson made reference to, and it is from Bartlett

16   v. Strickland.  That's not me, that's another Bartlett.  129

17   Supreme Court 1231 at 1249, 2009.  And the quote that I believe

18   the Professor was referring to:  Racial discrimination and

19   racially polarized voting are not ancient history.  Much

20   remains to be done to ensure that citizens of all races have

21   equal opportunity to share and participate in our Democratic

22   processes and traditions.  Is that the --

23   A   Yes, sir, that's the quote I was referring to.

24   Q   Professor, thank you, very much.

25           THE COURT:  All right.  Cross examine, Mr. Burchfield.

1          MR. BARTLETT:  Your Honor, I just had a conversation

2     with Mr. Burchfield with regard to certain documents with which

3     he intends to refer in his cross examination of Professor

4     Davidson.  He's identified to me that a number of them have not

5     been produced in connection with this proceeding, and

6     identified, or stated that because they were going to be used

7     for cross examination purposes.

8          This is a plenary hearing with respect to the

9     continuation or vacation of this consent decree.  Your Honor

10    specifically provided us with protocol for the revelation

11    materials that each of us would intend to rely upon in this

12    proceeding.  We have not had the benefit of the documents that

13    Mr. Burchfield, or some of them, that he intends to rely upon.

14    So I would have an objection to his utilization of those unless

15    and until we're provided with copies of those and have an

16    opportunity to at least know what they say in preparation of

17    our witnesses or otherwise.  This is somewhat of an unique

18    proceeding.  Your Honor did not allow for discovery, you might

19    recall.  Initially in this proceeding you were going to be

20    relying on the papers and a request -- an appropriate request

21    was made for a plenary hearing for Third Circuit law which

22    provoked this proceeding.  And your Honor directed each of us

23    to provide documents to us on dates certain, and I think on

24    both sides we may have missed those days ago, but nonetheless

25    provided documents as they were identified.  So to the extent

1   that the RNC intends to rely on documents not yet produced, I

2   do have an objection.

3          THE COURT:  All right.  Well, I'll overrule the

4   objection.  These are being produced for cross examination

5   purposes, I take it.

6          MR. BURCHFIELD:  Your Honor, frankly we ought to see

7   how this goes.  I've got some documents I may use to refresh

8   this witness's recollection.  As your Honor knows from your

9   Honor's protocol, we received the list of witnesses and

10  documents on Friday of last week.  It would be a little

11  difficult, even fore a good lawyer, which I some day aspire to

12  be, to know fully what the defendants were going to do in this

13  hearing.  Should the need arise to refresh his recollection, we

14  may use other documents, but I do not intend to introduce them

15  into evidence unless the circumstances require.  That's the

16  situation, and I don't think we need to belabor the point

17  further.

18         THE COURT:  I think normally when a pretrial order is

19  issued, documents are listed.  But if additional documents are

20  needed for cross examination purposes, and they're frequently

21  permitted to be used, and I take it these are going to be used

22  for cross examination?

23         MR. BURCHFIELD:  Correct.

24         THE COURT:  Well then, if there's any prejudice

25  problems, Mr. Genova, you need some additional documents, I

Colloquy                    15

 1   welcome more paper, just feel free to send it in.  I'm
 2   collecting all and trying to absorb what it is as it comes in.
 3           MR. BURCHFIELD:  Thank you, your Honor.
 4           THE COURT:  Go ahead, Mr. Burchfield.
 5   CROSS EXAMINATION BY MR. BURCHFIELD:
 6   Q   Good morning, Mr. Davidson.
 7   A   Sir.
 8   Q   I take it from your testimony that you began working on the
 9   Republican ballot paper in the 1980s?
10   A   That's my recollection.
11   Q   Early eighties, mid eighties, late eighties.
12   A   I can't tell you.
13   Q   In any event, you worked on it off and on for about 20
14   years; is that right?
15   A   I think that's not quite right.  I did some work on it,
16   sometime in the eighties I put it aside.  I think I may have
17   said yesterday, I forgot about it, and a friend of mine
18   refreshed my memory.  And in 2003, and at that point I took it
19   up again.  But I don't want to give the impression that I was
20   working on it for 20 years.
21   Q   Well, in any event, your work on this from the eighties was
22   sufficiently well known, but it came to the attention of one
23   Robert Bauer in about 2003; is that right?
24   A   That's correct, sir.
25   Q   And who is Robert Bauer?

1   A   Robert Bauer is currently, as I understand it, the outside

2   counsel for the DNC.

3   Q   He holds the title of general counsel for the DNC, doesn't

4   he?

5   A   I will take your word for it.

6   Q   Wasn't he also the general counsel for Senator Obama?

7   A   Yes.

8   Q   And wasn't he with the Senatorial Committee throughout the

9   nineties and to this century?

10  A   I'm not aware of that, but I'll take your word for it.

11  Q   And were you aware he was with Senator Daschle in the 2004

12  campaign?

13  A   Yes.

14  Q   And he's represented committees for the last 20 years;

15  right?

16  A   I believe so.

17  Q   And you knew that when he came to you in 2003, when he

18  asked you to continue work on your voter suppression project;

19  right?

20  A   I didn't know all of that, but I certainly knew some of it.

21  Q   You knew he was a Democrat with a capital D?

22  A   I knew that.

23  Q   And probably the most prominent Democratic election lawyer

24  in the country?

25          MR. BARTLETT:   I object, your Honor, there have been

1    those that have said that about me.

2    Q   Present company accepted, the most prominent election

3    counsel in the country today?

4    A   Yes, sir.

5    Q   And were you paid for your work in 2003?

6    A   Yes.

7    Q   By whom?

8    A   By the Senator for Voting Rights and Protection.

9    Q   And what relationship does that entity have if any to the

10   Democratic National Committee?

11   A   I don't know.

12   Q   Have you ever inquired?

13   A   No.

14   Q   How much were you paid for your work?

15   A   I'm not sure, but I would say somewhere between 50,000 and

16   a $100,000, including research expenses and -- yeah, research

17   expenses.

18   Q   Now, you've been called by the Democratic National

19   Committee here as the leading expert in the country on voter

20   suppression; right?

21   A   Yes.

22   Q   And you were asked to complete this project by Mr. Bauer

23   who, as you know, has significant contacts with the Democratic

24   party; right?

25   A   Yes, sir.

1    Q    And did the Democratic party make available to you all its

2    files with regard to voter suppression?

3    A    No.

4    Q    Did you not ask the Democratic party for its files on voter

5    suppression?

6    A    No, sir.

7    Q    And so you were asked to do a comprehensive study by Mr.

8    Bauer, who you knew was affiliated with the Democratic party,

9    but you did not ask Mr. Bauer for whatever information he might

10   have on the very topic you were one to study?

11   A    That's correct.

12   Q    May I ask why?

13   A    The primary reason was, sir, that I wanted -- I knew he was

14   a Democrat.  I'm a Democrat.  And I wanted to ensure that the

15   center for voting rights and protection, and Mr. Bauer had as

16   little impact on the study that I was doing, aside from paying

17   me to do it, as possible.

18   Q    Well, you know that the Democratic National Committee

19   regularly accuses the Republican National Committee of voter

20   suppression efforts; right?

21   A    I know that now much better than I did then.

22   Q    But you knew it then too, didn't you?  Maybe not as well as

23   you know it now.

24   A    I guess I did, yes.

25   Q    And you knew about the consent decrees, Mr. Davidson?

Davidson-cross                              19

1   A   Yes.

2   Q   And you knew that the Democratic National Committee has

3   been accusing the Republican National Committee of voter

4   suppression at least since 1981; right?

5   A   Yes, I knew that.

6   Q   Yet, you did not consider it appropriate to ask the

7   Democratic National Committee to open its files to you to see

8   if there was any foundation for these extensive allegations, or

9   over the course of 27 years, 23 years at the time you began

10  your study, or at the time you concluded your study of voter

11  suppression?

12  A   Yes, sir.

13  Q   Now, you said that you -- you said that you did a lot of

14  research around the country, and you talked to a lot of people,

15  and we'll talk about your report in just a minute.  You talked

16  to a lot of people who were alleging voter suppression; is that

17  correct?

18  A   Some of them were, yes.

19  Q   Did you talk to any of the people who were accused of voter

20  suppression?

21  A   No.  No.  I believe that I talked -- nor do I believe that

22  I talked to any of the accusers.

23  Q   You didn't talk to any of the accusers?

24  A   I don't believe so.

25  Q   So you didn't talk to the Democratic National Committee

```
 1    about the basis for the application it's been making, and you

 2    didn't talk to any of the accusers about the foundation for

 3    their accusations?

 4    A   No, sir.

 5    Q   You also didn't talk to any of the people who were accused

 6    to see if they had denials or other information they wanted to

 7    provide to you about the substance or accuracy of the charges?

 8    A   No, sir.  We relied almost totally on press accounts.

 9    Q   Well, you know, don't you, Mr. Davidson, that during the

10    course of the heated political campaign, there are allegations

11    made both ways by campaigns and political parties?

12    A   Yes.

13    Q   And you know the standard for truthfulness on some of those

14    allegations is not necessarily the highest; right?

15    A   That's correct.

16    Q   Let's look at your exhibit, your Exhibit 2, the defendants,

17    DNC Exhibit 2, which is your study, Republican Ballot Security

18    Programs, December, 2004.  And this is the study we've been

19    talking about; correct?

20    A   Yes, sir.

21    Q   And did you show a draft of this to Mr. Bauer before you --

22    well, let me back up.  Has this been published anywhere?

23    A    No, sir.  We're going to revise it for publication,

24    University Press has expressed an interest, and we're hoping to

25    get it published.
```

1    Q    And is University Press a peer review publication?

2    A    Yes.

3    Q    And so this would be peer reviewed if this is published?

4    A    Yes, sir.

5    Q    And it hasn't been peer reviewed, has it?

6    A    No, it has not.

7    Q    Now, did you show a copy of this to Mr. Bauer before the

8    version that we have before us today was finalized?

9    A    Yes, sir.

10   Q    And did he make comments on it?

11   A    No, sir.

12   Q    And did he indicate to you that it was -- that it was -- it

13   met his expectations, didn't meet his expectations?

14   A    He said:  Go for the finished version of it.  I had made it

15   clear at the beginning of my relationship with Mr. Bauer that

16   if I did this, it would be done by us, by the scholars who

17   wrote it, and that we were not going to seek the approval of

18   anybody.

19   Q    Okay.

20        So you did this study beginning in 1980, the 1980s,

21   and took a sabbatical from it, and came back to it from 2003,

22   and came back in September, 2004; correct?

23   A    Yes, sir.

24   Q    And in the course of this, you found, by my count and the

25   number in your paper, you found a total of 13 cases of voter

1    suppression in the United States?

2    A   I believe there are 14 cases in all, and I would amend your

3    description of it.  Not all of the cases actually ended in vote

4    suppression, but there were a number of instances where it

5    looked clearly as though some form of voter suppression was

6    under way.

7    Q   Well, Mr. Davidson, Professor Davidson -- Professor,

8    Doctor?

9    A   Doesn't make a darn to me.  Call me Chandler, if you want

10   to.

11   Q   I think for purposes of these proceedings I will call you

12   Doctor.

13   A   That's fine, yes, sir.

14   Q   And, Dr. Davidson, as I look at your paper, I'm on page --

15   the page number is 87, which is the last case study that I see

16   in the version I've got, which runs from 87 to page 95, and

17   that is number 13.

18   A   Okay.

19        The study begins with events that occurred in

20   Louisville, Kentucky in 2003, and that is just a kind of an

21   introduction, kind of sets the tone for the remaining study.

22   So 13 studies follow that study, and I suppose therefore the

23   numbering is off in a sense.

24   Q   Well, very well.  The period -- the period that you covered

25   here is -- it looks like -- the introduction of your paper

1   says, on page 40, chapter 5, and is there more to this paper

2   than we've got here?

3   A   I don't know what you've got here.

4   Q   Look at your exhibit book, I'm behind 602.  Look at this

5   document and see if a full version of your paper has been

6   presented.

7   A   This starts with chapter 5, on page 40.

8   Q   Exactly.

9   A   But the report starts from page 1.

10  Q   And so at least the first 39 pages of it are not --

11  A   That's correct.

12  Q   And does it go beyond page 95, which is the last page that

13  I have?

14  A   I believe it does, sir.

15  Q   And so we have -- what we have here is a partial version of

16  the report that you worked off of?

17  A   Yes, sir.

18  Q   And did you have any role in determining which portions of

19  this report were going to be submitted in evidence at that

20  point?

21  A   No, sir.

22  Q   And it comes as a surprise to you today, the whole report

23  has not been submitted --

24  A   That what?

25  Q   It comes as a surprise to you this morning that the whole

 1    report was not submitted?

 2    A    Yes, sir.

 3    Q    And on page 40, the first page that we got in this report,

 4    it says -- it talks about Republican valid security programs

 5    from 1966 onward, and I take it that your study encompassed

 6    valid security programs going back to the mid sixties?

 7    A    I think we actually mentioned that they began, the ones

 8    that we could find, began in Phoenix in the 1950s, but I

 9    believe our first case study may have been 1962.

10    Q    You mentioned yesterday, that Chief Justice Renquest was

11    involved in a caging project in Arizona.  Am I recalling your

12    testimony correctly?

13    A    Yes, sir.

14    Q    And am I also correct that the -- you found that

15    information in the confirmation hearings of Justice Renquest

16    both when he was nominated as an Associate Justice by President

17    Nixon back in 19 -- I think 71, and also when he was nominated

18    for Chief Justice of the Supreme Court by President Reagan in

19    the mid eighties; is that correct?

20    A    Yes, sir.

21    Q    And you know, don't you, even in light of the information

22    that you saw in the confirmation hearings, Mr. Renquest was

23    confirmed both times by the Senate on a bipartisan vote within

24    excess of 60 votes each time?

25    A    Yes, sir.

1    Q    And let me -- let's look at these examples of vote

2    suppression that you have set forth here in your paper.  Case

3    number one on page 48 is the New Jersey gubernatorial election

4    of 1981; correct?

5    A    Yes, sir.

6    Q    And that's -- that is the incident that lead to the

7    original consent decree in this case; correct?

8    A    Yes, sir.

9    Q    And the second incident is page 55, case study number 2,

10   judges and warning signs on Dallas's southside, 1982.  Do you

11   see that?

12   A    Yes, sir.

13   Q    And you're aware that no consent decree litigation was

14   brought concerning that incident?

15   A    Yes, sir.

16   Q    And I don't see anywhere in your paper here where you make

17   a connection between that incident and the Republican National

18   Committee?

19   A    No, I don't.

20   Q    And case number 3, poll watcher controversy in Houston,

21   1984, you're aware that no consent decree litigation was

22   brought as a result of that?

23   A    That's correct.

24   Q    And I don't see anywhere in the paper here where it

25   connects that to the Republican National Committee?

1    A    I believe I'm correct in saying that the only connection

2    that we mention between the Republican National Committee and

3    one of these activities is the 1981 event that lead to the

4    consent decree, and the 1986 event in Louisiana.

5    Q    That lead to the amendment of the consent decree in 1987?

6    A    Yes, sir.

7    Q    And that was my reading of it, Dr. Davidson.  And I take it

8    that part of your project would have been to try to connect the

9    RNC to these incidents if you had seen evidence that the RNC

10   was involved?

11   A    If we had seen it, we would certainly have mentioned it.

12   Q    You're confident as you sit here today that the Republican

13   National Committee was not involved in any in voter suppression

14   that you found during your study, other than the two incidents

15   that lead to the consent decree here?

16   A    So far as the information that we had to go on, and in

17   writing up these case studies, that's correct.

18   Q    And did you run across any incidents of voter suppression,

19   any significant instances of voter suppression that you did not

20   recount in your report?

21   A    My recollection is that at an early stage in this project,

22   we looked at a lot of material, and there were some incidents

23   that suggested that possibly, if we had the information, it

24   would lead in that direction.  But we didn't have the

25   information, and we didn't want to go off half cocked.  So we

1    limited it to the cases that we thought exemplified some form

2    of vote suppression.

3    Q    Let's talk about the standard of proof that you used to

4    recount these incidents.  You relied primarily, you said, on

5    newspaper accounts; right?

6    A    Almost totally.

7    Q    Almost totally on newspaper accounts.

8         You didn't interview all of the principals involved,

9    even the people who were making the allegations, did you?

10   A    I don't believe that we interviewed any of them.

11   Q    You didn't interview anybody who you were accusing of voter

12   suppression?

13   A    That's correct.

14   Q    And you didn't check the DNC files for any evidence it

15   might have of voter suppression?

16   A    That's correct.

17   Q    You did not --

18        MR. GENOVA:  Your Honor, this is all asked and

19   answered.

20        THE COURT:  What is your problem, Mr. Genova?

21   Q    You did not come to the Republican National Committee and

22   ask if it had any responses to the allegations?

23   A    No, sir.

24   Q    And you would agree with me, Dr. Davidson, that the sort of

25   vigor that you use in this study of yours would not pass vigor

1    in the federal court in the standards of admissibility?

2    A   I don't know what the standards of any ability are.

3    Q   When Mr. Bauer read a copy of this report, did he say to

4    you, in words or substance:  You've policed a lot of instances

5    of voter suppression, I think you ought to go back and do some

6    more research?

7    A   No.

8    Q   And did anybody say that to you?

9    A   No, sir.

10    Q   And did lawyers for the DNC in this case say that to you?

11         MR. GENOVA:  Objection.

12         THE COURT:  I'll overrule the objection.

13    A   No, sir.

14    Q   So this is it, this is what you came up with in terms of

15    voter suppression?

16    A   This is what we were able to gather in a very short period

17    of time.

18    Q   You worked on it for a year, Dr. Davidson?

19    A   I don't believe we worked the entire year.  I believe it

20    was more like seven or eight months.

21    Q   Well, you're seeking publication of this study; right?

22    A   Not as it is now, we plan on expanding it.

23    Q   Well, how broadly disseminated is this paper?

24    A   I don't have a clue.

25    Q   Who have you given it to?

1    A    I've given it to a few friends.

2    Q    Including Mr. Bauer?

3    A    Certainly.

4    Q    Anyone else that you know that is affiliated with the

5    Democratic National Committee, other than counsel in this case?

6    A    No, sir.

7    Q    Now, you also referred yesterday on questioning to

8    Defendant's Exhibit 11, which I guess is in the second book,

9    and it has the inflammatory title:  The long shadow of Jim

10   Crow.  Do you see that -- do you have that in front of you?

11   It's behind tab 11, probably in the second part.

12   A    Which tab would that be, sir?

13   Q    I believe tab 11.

14   A    Yes.  You said that we refer to that in our report.

15   Q    Do you know what the date of this document is?  I could not

16   find the date.

17   A    I believe that it came out the same year that our report

18   was finished.  I'm not entirely sure of that, but I think so.

19   Q    Well, do you -- can you vouch for the accuracy or integrity

20   of this report?

21   A    I generally consider publications by people for the

22   American Way to be careful and accurate.

23   Q    But you don't know about this one?

24   A    About this particular research report?

25   Q    Exactly.  Let me withdraw that question and ask a different

1   one.

2   A   I can't honestly remember.  I think I at least looked at

3   it, but I'm not sure.

4   Q   So you don't know the date, and you don't know if you read

5   it or not, and you don't know the basis on which some of these

6   reports are being made?

7   A   This is 2004, and I have to tell you, sir, I've got a

8   memory problem.

9   Q   And let's talk for a minute about the Voting Rights Act.

10   Do you consider yourself an expert on the Voting Rights Act?

11   A   In some respects of it, yes.

12   Q   And you gave some testimony a few minutes ago about the

13   anti-intimidation provision of the Voting Rights Act, which is

14   Section 11B of the act.  It's codified 42 U.S.C. Sections 1972

15   through (i)(d).  And are you familiar with that section?

16   A   Yes.

17   Q   Now, you said that you didn't think that section had been

18   effective, deterring voting suppression and intimidation.  Is

19   that your testimony?

20   A   Let me see how I want to phrase that.  I personally only

21   know of one instance in which, perhaps two, but certainly one

22   instance in which it was invoked in order to put an end to a

23   vote suppression case, and that was the Jessie Helms campaign

24   in North Carolina in 1990.

25   Q   And, in fact, you're aware, aren't you, sir, that that

1    matter lead to a consent decree which is included, I believe,

2    in the defendant's set of exhibits between the United States

3    Department of Justice, Civil Rights Division, and the Helms for

4    Senate Campaign, and the Republican party in North Carolina.

5    You're aware of that, aren't you?

6    A    Yes, sir.

7              MR. BURCHFIELD:  And, your Honor, this document

8    is in the defendant's set of exhibits, but I have been unable

9    to ascertain the exhibit number.  If someone could give me the

10   defense exhibit number, we can refer to it.

11             MR. LEVINE:  Exhibit 7 to their brief.

12             MR. BURCHFIELD:  Exhibit 7 to their brief.

13   Q    In any event, Dr. Davidson, you're familiar with that

14   decree, I assume?

15   A    Yes.

16   Q    And you know that that consent decree contained the

17   following provision in paragraph 6.  This is the consent decree

18   executed on February 27th, 1992, by Judge James C. Fox in the

19   Eastern District of North Carolina.  "The Court shall retain

20   jurisdiction of this action to enforce the provisions of this

21   decree until December 1, 1996, at which time this decree and

22   all its provisions shall be terminated, unless the Court

23   determines it is necessary to extend any of the requirements

24   imposed by this decree, in which case these specific

25   requirements shall be extended."

1    A    I'll take your word for it.

2    Q    And do you know if this decree was ever extended?

3    A    No, sir.

4    Q    It wasn't, was it?

5    A    I just don't know.

6    Q    Have you looked at the Civil Rights Division website to

7    determine if there has been active enforcement of the

8    anti-intimidation provision?

9    A    I looked at it a few years ago.  I went through the web

10   site.  Actually several parts of it is rendered a complicated

11   kind of website, and I wasn't looking for that fact, and I

12   don't remember.

13            MR. BURCHFIELD:  May I approach the witness, your

14   Honor.

15            THE COURT:  Yes.

16            MR. BURCHFIELD:  Your Honor, I provided counsel with

17   Exhibit 68 and 69.  Let me provide copies of those exhibits.

18   If I may, your Honor, I will provide you with a copy as well,

19   and I'll try to do as best I can without a copy.  This was

20   presented May 5, 2009, cases raising claims of the Section 11B

21   of the Voting Rights Act.

22            THE COURT:  All right.  Exhibit 68 is a complaint

23   referred to on that website, United States of America vs. New

24   Black Panther Party for self defense and others.  And Exhibit

25   69, United States of America vs. Ike Brown, Carl Milkens,

1    Noxubee County Election Committee, Noxubee County, Mississippi.

2    A    Only two there?

3    Q    There were -- those are the two complaints I've given you.

4    A    Okay.  I was under the impression there were actually

5    three.  Two of them were brought by whites against blacks, and

6    the other is blacks against whites, as I recollect.

7    Q    Well, Mr. Davidson, you would agree with me, wouldn't you,

8    that voter intimidation can occur either way?

9    A    Oh, absolutely, yes.

10   Q    And, in fact, these complaints indicate that in one

11   instance Democratic officials had been intimidating white

12   voters?

13   A    Yes, sir.

14   Q    And in the instances of voter intimidation that you

15   studied, are you aware of instances that any of those examples

16   were referred to by the accusers to the Department of Justice

17   Civil Rights Division or Enforcement other than the Helms for

18   Senate matter?

19   A    I'm sorry, could you repeat that question?

20   Q    Sure.  It's a little laborious.  Other than the Helms for

21   Senate matter, are a you aware of whether any of the examples

22   of voter suppression and intimidation that you studied in

23   Defendant's Exhibit 2 were referred to the Civil Rights

24   Division?

25   A    I don't believe so.

1   Q   You don't believe any of them were?

2   A   Any of the 14 cases that I studied, that's what you're

3   talking about?

4   Q   Yes.

5   A   Well, the North Carolina case certainly was.

6   Q   Other than that one.

7   A   I don't believe so, sir.

8   Q   So the Justice Department at the point is one-for-one so

9   far as you're concerned, the one case there they took action on

10   and got a consent decree; right?

11   A   Yes.  I should add, however, that that took place after two

12   mailings had been sent by the Helms campaign to African

13   Americans presenting them with false information and it was

14   only -- it was only after that, very near the election, that I

15   recollect that the Justice Department was involved, and that

16   was after the damage had been done, I guess.

17   Q   Well, are you aware of -- well, you know that the

18   Democratic National Committee came to this court to see the

19   enforcement of the consent decree on that?

20   A   Yes.

21   Q   And you know that because the consent decree doesn't apply

22   to the North Carolina party, this Court did not take action

23   against the North Carolina Democratic party?

24   A   Yes, sir.

25   Q   And do you know if the Democratic party simultaneously went

1    to the Justice Department to ask the Justice Department to seek

2    a temporary restraining order against the North Carolina

3    Republican party?

4    A    I believe it did, but I can't vouch for it.

5    Q    You just don't know?

6    A    I don't know.

7    Q    Do you know if the Democratic National Committee considered

8    filing a separate lawsuit against the North Carolina Republican

9    party?

10   A    No, I don't know that.

11   Q    Yet you were in the courtroom when you heard Mr. Josefiak

12   testify?

13   A    Yes.

14   Q    And you heard about various voter suppression, such as tire

15   slashing in Wisconsin, physical violence in Pennsylvania, and

16   physical threats in Florida?

17   A    Yes, sir.

18   Q    And he indicated that there were state-level prosecution of

19   those activities.  Do you have any reason to disagree with

20   that?

21   A    No, sir.

22   Q    And have you done any research to see if the state-level

23   prosecution of voter intimidation has been in effect?

24   A    No.

25   Q    Mr. Davidson, just a few more questions.  You are familiar

1    with the preclearance provision of the Civil Rights Act;

2    correct?

3    A    Section 5.

4    Q    And under that provision, various states that have had --

5    that are deemed by Congress to have had a history of invidious

6    discrimination against minorities in the voting process are

7    subject to preclearance of any changes, any -- however minor in

8    their election process; is that right?

9    A    Yes, that's correct.

10   Q    Now, when Congress enacted that in 1965, do you know how

11   long that provision was to remain in effect?

12   A    I know that at least parts of the Voting Rights Act had to

13   be renewed in 1970, and again in 1975, some more jurisdictions

14   were brought under Section 5, and then it had to be renewed in

15   1982 for 25 years and has now been renewed again.

16   Q    And that's exactly right.  And Section 5 was included in

17   the renewal in 1970; correct?

18   A    I believe so, yes, sir.  Yes.  Yes, I know it is.

19   Q    And Section 5 also had to be renewed five years later in

20   1975; correct?

21   A    Yes.

22   Q    And Section 5 had to be renewed seven years later in 1982;

23   correct?

24   A    I'm not sure about that.  I don't know how long Section 5

25   was originally, after 1975, how many years.  But I know there

1    were some facets of the act that had to be renewed in 1982.

2    Q    In 1982, Section 5 was renewed for 25 years?

3    A    Okay.

4    Q    And you knew that recently in 2006, Section 5 and other

5    provisions were renewed for another 25 years; correct?

6    A    Yes, sir.

7    Q    And are you aware of any provision of federal law, other

8    than Section 5 of the Civil Rights Act, that requires

9    preclearance of anything bearing upon an American election?

10   A    No, sir.

11   Q    Do you know the legislative basis for periodic review and

12   renewal of the Section 5 preclearance procedure?

13   A    No.

14   Q    Well, isn't it that Congress made a determination that if

15   it was going to require preclearance of activities, it was

16   sensible to periodically revisit whether it was necessary to

17   maintain those preclearance provisions?

18   A    Sure, yes.

19   Q    You mentioned some research in racially polarized voting?

20   A    Yes.

21   Q    You did not do that research on racially polarized voting?

22   A    No, I did not.

23   Q    You're talking about racial and ethnic groups voting in

24   high percentages the same way?

25   A    That's correct.  Let me just amend what I said a minute

1    ago.  I have done a good deal of research on racially polarized

2    voting, and that has been an aspect of voting rights cases that

3    I have participated in, but not in recent years.

4    Q    But the research you were relying upon, or referring to in

5    your direct testimony, was not your research but it was the

6    research of other active admissions?

7    A    It was the research of people whose work I know and whose

8    work I respect.

9    Q    And you mentioned -- you mentioned a couple of examples in

10   the south, one of which was in Georgia, Milledgeville, I think

11   you said.

12   A    Yes.

13   Q    In which the African American mayor was elected, and then

14   the City Council changed the mode of governments from a mayoral

15   model to a city manager model?

16   A    Yes.

17   Q    And do you know what the composition of that City Council

18   was?  Was it predominantly Democratic or predominantly

19   Republican?

20   A    I don't even know whether it was an election.

21   Q    And any reason to suspect the Republican National Committee

22   had been involved in that change in government?

23   A    No, sir.

24   Q    And you also mentioned that the Department of Justice had

25   sent federal observers to observe elections in Mississippi a

1    number of times; correct?

2    A    Yes, that's correct.

3    Q    You're aware -- and those election observers were sent to

4    Mississippi in the 1960s; right?

5    A    I would say throughout the period that Section 5 has

6    covered Mississippi.

7    Q    Well, certainly in the sixties --

8    A    To the present.

9    Q    In the seventies, the eighties, and the nineties, and you

10   know don't you, being a student of the politics, that

11   Mississippi was pretty much a one-party state, up until about

12   the end of 1970s and early 1980s; right?

13   A    Yes, sir.

14   Q    And what party dominated?

15   A    That was a Democratic state, like many of the southern

16   states were.

17   Q    Thank you, Dr. Davidson, I have no further questions.

18          THE COURT:  Any redirect?

19          MR. BARTLETT:  One moment your Honor.

20   REDIRECT EXAMINATION BY MR. GENOVA:

21   Q    Dr. Davidson, I'm handing you a binder containing

22   Defendent's Exhibit 1 through 30.  If you could put that right

23   in front of you.

24   A    Okay.

25   Q    And I'm going to refer you to first -- first to Defendant's

Davidson-redirect                              40

1    Exhibit 2.  I'll use the Republican National Committee.

2    A    Okay.

3    Q    Now, this is the consent order and settlement agreement

4    that's entered in this action?

5    A    Yes, sir.

6    Q    And it's captioned:  Settlement agreement; is that right?

7    A    Yes, that's correct.

8    Q    And you had the opportunity to review this in the past in

9    connection with your research, have you not?

10   A    Yes, that's correct, some years ago.

11   Q    And you understood this to be the agreement by consent with

12   two parties?

13   A    Yes, sir.

14   Q    And two parties negotiated the terms of it, expected to be

15   bound by its outcome?

16   A    Yes, sir.

17   Q    And the Court incorporated its order; is that correct?

18   A    That's correct.

19   Q    Now, I'm calling your attention to Exhibit 3, Republican

20   National Committee, which is captioned:  Democratic National

21   Committee versus Republican National Committee Entitled

22   Stipulation and Order Of Dismissal.  Do you see that?

23   A    Yes, sir.

24   Q    And this is the 1987 modifications to the earlier decree?

25   A    Yes, sir.

1    Q   And, again, this is captioned as a settlement stipulation.

2    You have reviewed this in connection with your research?

3    A   Some years ago, yes.

4    Q   Right.  But did you understand at that time that today this

5    purports to be an agreement between two parties to the

6    litigation?

7    A   Yes, sir.

8    Q   Which is a result of their negotiation and consent to be

9    bound by its terms?

10   A   That's my understanding.

11   Q   Now, Mr. Burchfield asked you a series of questions

12   referring to Exhibit 67, 68, and 69, and I'll put those in

13   front of you to make your life easier.  The first refers to a

14   download of the U.S. Department of Justice Civil Rights

15   Division under cases arising out of Section 11B of the Voting

16   Rights Act?

17   A   Yes, sir.

18   Q   And the first entry refers to the action brought by the

19   United States against the New Black Panther Party, do you see

20   that, in Mississippi?

21   A   Yes.

22   Q   And it reports that the Justice Department had filed a

23   complaint in 2009?

24   A   Yes.

25   Q   And it appears in 68 --

Davidson-redirect                    42

1   A    This one is 67.

2   Q    This is the website download is 67, but the actual copy of

3   the complaint is 68.  Now, did you -- as Mr. Burchfield was

4   asking you questions, did you have an opportunity to review

5   this complaint?

6   A    No, sir.

7   Q    Do you want to take a moment to look at that complaint?

8   A    Okay.

9   Q    Calling your attention to paragraphs 8 and 9.

10  A    On November 4, 2008, during the federal general election,

11  the defendant Shamir Shabazz deployed at the entrance of a

12  polling location at 1221 Fairmont Street in the city of

13  Philadelphia.  The defendants wore military style uniforms

14  associated with the defendant New Black Panther Party.  These

15  uniforms included black berets, combat boots, black blouses,

16  dress pants, defendant New Black Panther Party for Self Defense

17  insignia and black jackets.

18  Q    And how about paragraph 9.

19  A    During his deployment at the polls, at the entrance to the

20  polling location at 1221 Fairmont Street, and in the presence

21  of voters, defendant Shamir Shabazz brandished a deadly weapon.

22  The weapon deployed was a night stick or baton.  The baton

23  included a contour grip and throughout the course of this

24  deployment at the polling location and while the polls were

25  open for voting, defendant Shamir Shabazz pointed the weapon at

1    individuals menacingly tapped his other hand or menacingly

2    tapped elsewhere.  This activity occurred approximately 8 to 15

3    feet from the entrance to the polling location.  Defendant

4    Shamir Shabazz was accompanied by defendant Jerry Jackson

5    during this activity, and the two men stood side by side in

6    apparent formation throughout most of this deployment.

7    Q    Now, these allegations, pretty ugly stuff, don't you think?

8    A    Yes.

9    Q    The kind of stuff that lends itself towards voter

10   suppression, would it not?

11   A    I would say that, yes.

12   Q    And the allegations assert that these things happened on

13   Election Day, do they not?

14   A    Yes, sir.

15   Q    And the website reports that the Justice Department very

16   quickly on January 7th, almost three months later, made the

17   application to allege violations of the Voting Rights Act; is

18   that correct?

19   A    That's correct.

20   Q    Justice Department didn't go in on Election Day to try to

21   restrain that behavior?

22   A    It doesn't look like it.

23   Q    The Justice Department didn't have the benefit to restrain

24   the behavior that then existed on Election Day that those white

25   voters in that district were confronted with; is that right?

1    A   That's correct.

2            MR. BARTLETT:  I have nothing further.

3            THE COURT:  All right.  Any recross?

4    RECROSS EXAMINATION BY MR. BURCHFIELD:

5    Q   You've reviewed the files for the Malone matter; right?

6    A   Yes, briefly.

7    Q   And did you see anything in there that was comparable to

8    the allegations that you just read about the Black Panthers at

9    the poll in Philadelphia?

10   A   No, sir.

11   Q   And there was no evidence of voter fraud by anyone in the

12   Malone matter?

13   A   Not that I recall, no, sir.

14   Q   And the allegation that there a potential for using "return

15   mail to" as a basis for voter challenges?

16   A   Yes, sir.

17   Q   And you know that -- you know that in most states, in all

18   states, return mail itself, alone, is not -- is not a basis for

19   excluding a vote?

20   A   That's correct.  That's correct.

21   Q   And it is -- it is evidence, but itself not sufficient

22   evidence to support a vote challenge?

23   A   Yes, sir.

24   Q   So --

25           THE COURT:  I think now we're getting beyond the

1    cross.  We'll stop.

2              MR. BURCHFIELD:  Nothing further than, your Honor.

3              THE COURT:  All right.  I guess we can let you go, Dr.

4    Davidson.

5              THE WITNESS:  Thank you, your Honor.

6              (Whereupon the witness is excused)

7              THE COURT:  Who is next?

8              MR. BARTLETT:  Your Honor, we call Lauren Minnite.

9              My colleague Mr. Parikh will conduct the examination.

10             THE COURT:  All right.  That's fine.

11             All right.  Lauren Carol Minnite, Sworn.

12   DIRECT EXAMINATION BY MR. PARIKH:

13   Q    Good morning, Professor.  How are you?

14   A    Good morning.  I'm fine.

15   Q    You already stated your name in the record.  Can you please

16   tell us a little bit of your academic background.

17   A    Currently I'm an assistant professor in the Department of

18   Political Science in Barter College, which is part of Columbia

19   University in New York.  I have a bachelor's degree in history

20   from Boston University, and I have masters degrees and a Ph.D.

21   in political science from the City University of New York.

22   Q    And can you please turn to tab 21 in binder number 2?  That

23   should be in front of you.

24   A    Okay.

25   Q    Do you recognize this document?

1   A   Yes.

2   Q   And this is your academic CV?

3   A   Yes.

4   Q   And it contains your educational background, writings, and

5   qualifications; is that correct?

6   A   That's correct.

7   Q   And what's your area of expertise that you were called to

8   testify about today?

9   A   My area of expertise is American politics.  Specifically I

10  have been doing a lot of work on the question of voter fraud in

11  American elections, so my sub-fields would include American

12  elections.

13  Q   And have you written publications regarding voter fraud?

14  A   Yes.

15  Q   And what's the most recent publications?

16  A   The most recent publication as of the March, 2007 report,

17  called the Politics of Voter Fraud, which was produced for

18  Project Vote, which is a national nonprofit organization that

19  has as its admission education and empowerment of low-income

20  people to bring them into the political process.

21  Q   And have you recently written a book on voter fraud?

22  A   My book extends that report quite substantially.

23  Q   And can you tell us a little bit about the book.

24  A   Do you want to know the substance of the book?

25  Q   Well, has the book been published yet?

1    A    The book has been accepted for publication by Cornell

2    University Press, which means that it has been peer reviewed,

3    it has been internally examined by the Press, and it has been

4    voted on by an academic board at Cornell University to accept

5    it for publication, and they've issued a contract for the book

6    to be published probably earlier 2010.

7    Q    And can you tell us or summarize for the Court the

8    substance of your book.

9    A    Yes.  The book looks at the empirical evidence for voter

10   fraud and draws conclusions from that data and that research.

11   And the conclusion of the book is that since the -- first of

12   all, I find that the incidents of voter fraud, and we can talk

13   about what the definition of voter fraud is, but the incidents

14   of voter fraud is rare in American elections.  That the

15   allegations of voter fraud need to be understood as politically

16   constructed to make voting harder.  And that's the basic

17   conclusion of the book.

18   Q    And are you aware of any other scholarly works that rebut

19   the conclusions you've reached in this book?

20   A    No.

21   Q    Can you please turn to tab 25 in your binder.  Can you

22   explain to the Court what this is.

23            THE COURT:  What document are you referring to?

24            MR. PERIQUE:  Tab 25.

25            THE COURT:  Twenty-five, thank you.

1    A    This is written testimony that I submitted to a Senate --

2    Senate Rules Committee for a hearing that they had in March of

3    last year called:  In-person Voter Fraud, Myth and Trigger for

4    Disenfranchisement?

5    Q    And can you read into the record paragraph 2 of this

6    letter.

7    A    "It is my view based on my record of academic research on

8    the subject, that in-person or polling place voter fraud is

9    rare in contemporary American elections.  As a problem or

10   threat, it cannot compare in seriousness or magnitude to other

11   resource, technology and personnel problems currently facing

12   state local election officials.

13   Q    And have you had other testimony before Congress?

14   A    Yes.

15   Q    And when was that testimony?

16   A    That testimony was in March, 2008, and that was before a

17   subcommittee of the House Judiciary Committee on the question

18   of voter suppression.  I'm sorry.  The hearing was on the

19   subject of voter suppression.

20   Q    And what was the content or substance of your testimony

21   related to?

22   A    The content was similar to this document, to this letter

23   that was sent to Senator Feinstein, in content.

24   Q    Okay.

25        And before we delve into your methodology of research,

1    can you explain to the Court how you define voter fraud?

2    A    Yes.  As some may know, there is no single law making

3    something called voter fraud illegal.  All states and election

4    laws, primarily state law, all states have laws that make

5    things like double voting or falsifying records to get onto the

6    registration rolls, and that sort of thing, illegal.  So the

7    acts that we would consider fraud because they corrupt the

8    electoral process are illegal in the statutes.  But when you

9    are your searching for the definition, it's my understanding

10   that the concept of fraud itself, broadly speaking, in English

11   and American law, is at that level.  It's the concept.  And the

12   concept importantly includes the intent to deceive.  So when I

13   adopted that to a definition, and I was trying to be as precise

14   as possible, and as a social scientist, what we need to do is

15   develop definitions for empirical phenomenon so we can measure

16   the empirical phenomenon.  That's in the back of my mind.  I

17   lean heavily on this legal concept of fraud.  That's the first

18   part.

19          The second part is that if we consider generally

20   election fraud, the process whereby the electoral process is

21   corrupted, we take the electoral process as the starting point,

22   and what I did was I looked at each part of the electoral

23   process and then I looked at what the political scientists

24   would call the abilities in the political process that would be

25   voters versus campaign officials, or campaign workers, party

1    officials, elected officials, election officials.  All of those

2    comprise the actors in the electoral process.  They come

3    together to produce an election.  I looked at what part of the

4    process those actors could corrupt, and I make a pretty clear

5    distinction between what voters can corrupt versus what

6    everybody else could corrupt.  That would include the other

7    groups that I mentioned, the election officials, or

8    politicians, or campaign workers.  And so if you think about it

9    that way, you can even imagine in your mind the kind of cross

10   tab where you have the faces of the electoral process going

11   across the top, and the perpetrators, if you will, at the top

12   going down the side.  And you'll see that voters can really

13   only corrupt part of the process that they have access to.  So

14   voters, for example, can't corrupt the count.  They don't count

15   the ballots, and they can't corrupt the count.  Voters can

16   potentially corrupt the registration process, meaning they

17   could, for example, falsify records, falsify their identity on

18   a registration form, and attempt to get on the rolls that way.

19   And then cast what would be an illegal ballot.  So that

20   analytical approach includes breaking up the electoral process

21   and trying to understand what part of the process the different

22   actors have access to and taking into consideration the

23   difference between voters and others who have more access and

24   more power to corrupt the process, and then my work focuses

25   primarily on voters.  And so my definition of voter fraud is --

1   would be the intentional corruption of the voting process by

2   voters, knowingly, willingly corrupting the election process or

3   corruption of the election process by voters.

4   Q   And that's the definition you've used in your book that's

5   to be published?

6   A   Yes, that's correct.

7   Q   And can you please turn to tab 22.

8   A   These are the March, 2007 study -- I actually think, there

9   is no date on it, but I can testify that I believe that's the

10   date that it came out.  And this is the politics of voter fraud

11   report that I produced for Project Vote.

12   Q   Would you mind turning to page 6.  I'm going to page

13   numbers that are on the bottom of the document.  Let me just

14   take a moment to look at paragraphs 2 and 3 please, page 6.

15   A   Okay.

16   Q   Can you just summarize for the Court what this is, what

17   you've written here?

18   A   This is a statement of the definition that I use in my

19   work, voter fraud.

20   Q   Now, is this -- is your definition of voter fraud the same

21   definition that other groups use?

22   A   I haven't found anyone else who's attempted to really make

23   a concise kind of definition, except for the Justice

24   Department, which I mentioned here.  They, over the years, I

25   believe as early as the early 1980s, maybe even in the late

1     1970s, have produced a manual, a training manual for U.S.

2     Attorneys on how to recognize election crimes.  And the

3     definition that you see here, I'm referring to as the U.S.

4     Department of Justice's definition, comes from that.  That was

5     a starting point for me as well.  But their definition is

6     broader, as you can see, because they include, for example, how

7     election results are canvassed and certified.  Since voters

8     don't canvas or certify the vote, I make that further

9     refinement of the definition.

10    Q    Now, in some instances under this broader umbrella that

11    other groups use for definition of voter fraud, would human

12    error fall into that category?

13    A    I've seen that, yes.

14    Q    And there are other errors that aren't contributed to

15    intent that would fall under this broader version?

16    A    Yes, certainly.

17    Q    And can you give us some examples of that?

18    A    I'll give you examples in this report.  There is a general

19    problem in the reporting on voter fraud and the repeating of

20    allegations of voter fraud in the media where there is this

21    lack of specificity about who's doing what.  And since the

22    reporting tends to be on the allegation and not so much on what

23    happens after the allegations are made, it's really kind of a

24    wide-open field in terms of what kinds of activities are

25    sometimes pointed to as potential fraud.  So, for example,

1    there have been allegations that later -- and I looked at this

2    in my box, allegations made that later turned out to be nothing

3    more than a mistake made by election officials in terms of the

4    spelling of the name, in terms of recording a person as having

5    voted on the wrong line of a polling book.  So all kinds of

6    errors, if you will, could be made by election officials in the

7    electoral process and produce what we might call irregularities

8    that then get seized upon but in fact are mistakes or other

9    kinds of -- they could be explained with other explanations,

10   can be awkward to explain these irregularities.

11   Q    Now, I want to turn to your qualitative and quantitative

12   research.  Can you explain to the Court what your analytical

13   approach to the subject matter is?

14   A    Well, in terms of expanding this report into the books, my

15   book is -- my most substantial -- it sums up everything and is

16   the most substantial research that I've done.  I've used I

17   guess what could be used as mixed method, social science is

18   fairly common.  I try to look at everything.  I do qualitative

19   research, which includes interviews, for example, and

20   quantitative research.  And in their case I've done -- I've

21   looked -- there is a data set that is produced by the

22   Administrative Office of U.S. Courts and available to

23   researchers through the ICPSR, which is a data archive in the

24   University of Michigan.  And it reports on an annual basis.  It

25   purports to be a complete report of all indictments brought in

1    federal court on an annual basis.  I've analyzed that data and

2    that's a basis for quantitative data that I used.

3    Q    And that has indictments nationwide in federal courts?

4    A    It claims to be a complete and total record.  It's not a

5    sample, it's a complete and total record of all indictments

6    brought in federal court.

7    Q    And you said you've done interviews.  Of what, as you call

8    them, have you done interviews of actors or other individuals?

9    A    Yes, I have interviewed prosecutors.  I've interviewed

10   defense lawyers.  I've interviewed election officials.  I've

11   interviewed voters.  I've interviewed other academics.  I've

12   interviewed people working on voter registration drives.  And

13   so I try to interview a range of people to supplement and

14   inform the book.

15   Q    Now, have you also done other research methods or other

16   things to collect information?

17   A    Yes.  I've done extensive archival research in newspapers.

18   And I should say, courts may look at research based on

19   newspaper accounts one way, and in social science there's

20   actually something called event analysis and event history

21   analysis, which relies on newspaper accounts to try to get a

22   sense of the occurrence of events that may otherwise -- there

23   may otherwise be no other data to cover.  And so, for example,

24   when I started my research, I began with newspaper accounts

25   because there was no data archive on election fraud.  Data at

1    the state and local level is very hard to come by.  There's no

2    comprehensive place that might be for election returns.  For

3    example, if you want to analyze trends and elections and

4    turnout, you could get that data to analyze.  For something

5    like fraud, there's no archive of records of fraud, so it has

6    to be constructed from a variety of sources.

7            So I began with the newspaper accounts.  The idea

8    behind something like event analysis is that you can use it if

9    the thing they're trying to study, there are no really other

10   good data sources, and also if you have reason to believe their

11   thing, that event would be news worthy, and certainly I think

12   we would expect voter fraud to be news worthy because

13   allegations of fraud are usually brought up in the context of

14   specific elections.  There's a contest.  It might have been the

15   close election.  The loser might believe that the election was

16   stolen and want a recount, and that gets covered by the news.

17   And in fact, non-controversial studies of the medial point to

18   the fact that things that get covered are things where there's

19   a controversy.  So we might anticipate that at least

20   allegations of fraud would arise in the context of controversy

21   and be covered.

22           So I began with archival newspaper accounts as well.

23   So the point of the mixed methods approach is to do the cross

24   checking to look at the same phenomenon, to look at a different

25   perspective, understanding that there maybe no one data set

1   that covers the entire phenomenon that you're interested in.

2   And so that initial analysis that I did, that was a little more

3   reliant on the newspaper accounts.  And also I did as best I

4   could, because I'm not a lawyer, I did the best I could with

5   the Lexus Nexus databases that are available to non-lawyers to

6   look for court cases, at least for federal court cases, with

7   the understanding that there was not necessarily representing

8   full coverage, but looking for a place to start and building on

9   that by doing these -- broaching the subject using these other

10  methods as well.

11  Q   Now, you were in the courtroom yesterday during Mr.

12  Josefiak testimony; correct?

13  A   Yes, that's correct.

14  Q   And do you recall Mr. Josefiak testifying about the

15  instances of voter fraud in Milwaukee or allegations of voter

16  fraud in Milwaukee?

17  A   I remember him mentioning it.  I don't exactly remember

18  what he said about it, though.

19  Q   And are you familiar with those instances?

20  A   Yes, I'm very familiar with Milwaukee.  I mentioned the

21  multiple methods and approaches.  And one of the chapters in my

22  book presents several in-depth studies, and I relied on the

23  interview materials heavily for those case studies.  And one of

24  the case studies is the Milwaukee case in 2004.

25  Q   And can you provide the Court with an illustrative example

1   from your research regarding the Milwaukee case?

2   A    Well, yes.  Between -- let me start first with another data

3   set that I constructed and tell you about it because it is --

4   it gives you the reason why I went to Milwaukee.  In 2001, the

5   spring of 2001, Attorney General Ashcroft announced a new

6   program that was going to be implemented, the ballot access.

7   It wasn't actually implemented, or what took place until just

8   before the 2002 election, and what the program purported to do,

9   and I got this from press releases and other documents from the

10   Justice Department, was to bring together the lawyers in the

11   civil rights section, and the lawyers in the criminal division,

12   primarily those lawyers in the public integrity section, which

13   is the criminal division, together for an Election Day program.

14   And the Attorney General launched this actually in his own

15   office.  And it consisted of pulling in all of the '93 U.S.

16   Attorneys and their designated election officers for annual

17   training on how to recognize election fraud and voter

18   intimidation was supposed to be part of it, and to operate on

19   Election Day a program where the U.S. Attorneys would send out

20   press releases and try to notify the public that they were

21   there, they were available to receive complaints from the

22   public if anybody saw anything that they would like to complain

23   about, they were worried about, with respect to fraud or

24   intimidation.  And this program consist -- continued on an

25   annual basis every year they held these trainings.  As a

1    result, I was able to obtain a -- I guess you call it docket

2    list, a list of all of the indictments that were brought under

3    that program for fiscal years 2002 through 2005, which were the

4    first three years of this program.

5           I can tell you also that I have issued freedom of

6    information requests to the Justice Department to four

7    different divisions in the Justice Department in which I -- I

8    could only say stonewalled.  It took them two years to respond.

9    And after repeated, repeated requests on my part for

10   information to try to understand this program and what was

11   going on, what kinds of complaints were they getting, and to

12   examine what might be produced by this initiative, which is in

13   my understanding, you know, unusual initiative in terms of

14   looking for voter fraud.  It wasn't something that the

15   department was doing consistently until this program was put in

16   place.  So I found this list of indictments, and it had been

17   actually entered into at a congressional hearing in 2006, and

18   it was on the Internet, and it came from the Justice

19   Department, and I cross checked it against their press

20   releases, and you saw yesterday, an excerpt from the Carter

21   Baker Commission that was citing X number of prosecutions and X

22   number of people convicted.  That information came from a

23   Justice Department press release on the outcome, if you will,

24   or the work of this program.  And I want to remind you have of

25   that because it's a little misleading.  The Justice

1    Department's press releases were a little misleading in terms

2    of the numbers.

3    Q    What did your research reveal about the numbers?

4    A    The research revealed -- that list contained 95 indictments

5    over the three-year period.  And I looked at every one of those

6    indictments and I applied my definition of trying to understand

7    who the perpetrators were.  Were these indictments voters who

8    were casting illegal ballots, or were these indictments of

9    elected officials who were engaging in vote buying, for

10   example, and I was able to categorize all 95 indictments.  Of

11   the 95 people indicted, only 40 of them were voters.

12            THE COURT:  Excuse me.  How many?

13            THE WITNESS:  Forty.  Forty of the 95 were voters.

14   And I was able to trace what came of those indictments, and of

15   those 40 voters who were indicted, only 26 were convicted.

16            Now, I went --

17   Q    Were they all convicted?

18   A    Some of them -- they were either convicted or pled guilty.

19   In most cases, they pled guilty.  I went to Milwaukee because

20   14 of the 40 indictments were brought by the U.S. Attorney in

21   the Eastern District of Wisconsin.  Another 17 were brought in

22   Florida.  So the majority of these voters were essentially --

23   it was three districts, two districts in Florida and one in

24   Wisconsin.  And so I actually interviewed the U.S. Attorney

25   and, among others, I interviewed two of the voters who had been

1    indicted in Milwaukee.  I had interviewed five lawyers, 8 of

2    the 14 who had been indicted.  And I should say, of the 14 who

3    were indicted, only five were convicted or pled guilty, which

4    my understanding is that's relatively low rate for the federal

5    government in terms of the conviction rate.

6    Q   So out of 14 voters who were indicted for election fraud in

7    Wisconsin, only five either pled guilty or were convicted?

8    A   That's correct.  I interviewed two of those voters, one

9    who's his case is dismissed, and another who had been convicted

10   in a trial.  And I can tell you those stories, if that's

11   relevant.

12   Q   Please.

13   A   I think I'm breathing into this microphone too much.  If

14   you hear that, I'm hearing that in my feedback.  The voter

15   whose case was dismissed, was someone who had recently served a

16   two- or three-year sentence on a state drug charge.  He was in

17   his forties.  He had said to me that he voted in every

18   election.  He was -- I would say indigent.  He did not have a

19   driver's license.  He tried to make a living by polling junk.

20   He was an African American man.  He was living with his aunt

21   after being released from prison.  And on Election Day his aunt

22   had gone to vote at a local school.  She had come home.  She

23   told him:  You need to go out there and vote, it's an important

24   election.  You need to bring I.D.  He said:  What I.D. can I

25   bring?  He remembered that he still had his prison I.D. card

1    from when he was in the prison.  He grabbed that and he took a

2    letter that had been sent to him by his parole officer at his

3    aunt's house to show that he lived there.  He took those two

4    documents and he walked over to the school and he had to

5    reregister.  And in Wisconsin, you can register on Election Day

6    if you bring proper identification.  So he presented these

7    things to the Election clerk and she filled out the

8    registration form for him.  And on the line where it says if a

9    person doesn't have a driver's license, or you don't have a

10   social security number, write in the number of another state

11   identification card of some kind.  She actually wrote in the

12   number on his prison I.D. card.

13        Now, in Wisconsin, you cannot vote if you are on

14   parole or probation.  So he, technically, he was not permitted

15   to vote.  The Election worker actually signed his vote.  He

16   cast his ballot and he went home.  And also my research in

17   Wisconsin, at this time the felony disenfranchisement laws in

18   Wisconsin were not being applied.  I talked to all five of the

19   lawyers, said they didn't know about it, they had never seen it

20   being used before.  There was testimony in some trials from

21   probation officers that indicated this was not something that

22   was emphasized when people were released from prison.

23        The second person identified had actually never served

24   any time in prison, she had been charged with felony battery

25   charge, and that also seems to be the case in Wisconsin, that

1    there are a large number of people who don't serve prison time.

2    This was all in the media.  Wisconsin disenfranchisement laws

3    are not enforced, so that was the context here.  A few months

4    later --

5            THE COURT:  Ms. Minnite, I think we're getting into

6    more detail.  Can we kind of boil this down?

7    Q    Professor, are these case studies articulated in your

8    research party?

9    A    Yes.  Actually the case study is described in the letter to

10   Senator Feinstein and they are explained in my book.

11   Q    Okay.

12           Now, you're -- you had previously testified that you

13   were here yesterday for Mr. Josefiak testimony?

14   A    Yes.

15   Q    And do you recall Mr. Josefiak testimony regarding the

16   RNC's desire to conduct certain Election Day operations?

17   A    I recall him discussing that.

18   Q    And do you recall that one of those observations was to

19   have challengers or observers in polling locations?

20   A    Yes.

21   Q    And given your research, what is your perspective on that

22   in terms of voter fraud?

23   A    Well, none of the cases that I looked at that were

24   prosecuted at the federal level were discovered by voter

25   challengers observing fraud.  I think that there maybe a role

1   for challengers or poll watchers, certainly, and state laws

2   provide for that.  I'm not so sanguine about the idea that

3   challengers can observe fraud in the polling place.  I think

4   it's also dependent on the information that poll watchers have.

5   And I also have a lot of concern about the production of lists

6   of people who may be ineligible to vote.  It is very difficult

7   to produce accurate lists by matching data sets that are

8   collected by different agencies at different times together to

9   produce mismatches.  And this is something that requires a lot

10  of skill, a lot of knowledge.  I do computer programming

11  myself, and I've tried matching lists.  And New York City voter

12  registration file is something I've worked with.  It's a very

13  difficult to produce a mismatch, where there's a lot of

14  accuracy in what you get in that mismatch in terms of looking

15  in this case for people who may be ineligible to vote.  So the

16  point here is just that if poll watchers are working off of

17  lists that have been produced by private agencies, whether

18  they're parties, journalists, sometimes even government

19  agencies don't do a good job of this, I would not feel god

20  about using that data as the basis for looking for fraud in a

21  polling place by an untrained volunteer poll watcher.

22  Q   Given your research nationwide on prevalence or

23  non-prevalence of voter fraud, what's the prevalence of voter

24  fraud in a polling location given the total number of --

25  A   It's statistically zero.  If you look at federal

1    prosecution in particular, I know that under the response to

2    that will be:  Well, there's all these local elections and

3    state elections where things can happen.  In terms of the

4    federal elections, especially where you had, as I mentioned,

5    this stepped-up effort on the part of the Justice Department to

6    observe fraud in the polling place, I think the outcome of that

7    suggests that it is -- what I say in all of my reports, that it

8    is a rare event.

9                THE COURT:  Well, isn't the purpose of the challenger

10   not primarily to prevent voter fraud, but it's to ensure that

11   the people who are voting are voting in the right district, or

12   eligible to vote, or frequently will just uncover the fact that

13   a person should not be voting either there, and that's the end

14   of the matter?

15               THE WITNESS:  I do.  There are states that require

16   that the person who is the challenger have personal knowledge

17   that the person they're challenging is not the person who they

18   say they are.  And in that sense, yes, the poll challengers may

19   be able to point to people they believe are ineligible to vote.

20   That's the basis of a claim that fraud has been committed.  So

21   I guess the prophylactic value of challenges for fraud is very

22   well.  That doesn't speak to the other uses --

23   Q  There are other purposes?

24   A   There may be other purposes for voter poll watchers,

25   certainly.  I'm not making a blanked statement against poll

1    watchers.

2    Q    Now, Mr. Josefiak also testified that the RNC would like to

3    have their own volunteers outside of the polling place; do you

4    recall that?

5    A    Yes.

6    Q    And given the number of votes that are cast annually,

7    what's the prevalence of voter fraud that was produced due to

8    this?

9    A    I wouldn't understand that program to be directed toward

10   fraud.  That's hard for me to understand how being outside the

11   polling place in order to advocate for a candidate or educate

12   voters has anything to do with fraud or looking for fraud.

13   Q    Do you recognize this document?

14   A    Yes.

15   Q    D-24.

16   A    Yes.

17   Q    And this is an article that you had written?

18   A    Yes.

19   Q    And would you mind turning to -- I think it was P numbers,

20   Roman numeral III, I believe is on page 5.  In paragraph 2,

21   that starts with:  Critics of EDR.  Can you read the second to

22   last sentence, please, of that paragraph.

23   A    "But across the nation, the most egregious though rare

24   types of election fraud involving voters are vote buying and

25   absentee ballot fraud.  Votes of election corruption, one,

1    before Election Day; and two, away from the polling place.

2    Q    And your research has indicated that these are the most --

3    from the research, you characterize these as the most egregious

4    forms of book fraud?

5    A    Yes.

6    Q    And what's their prevalence given the --

7    A    There certainly are cases of fraud involving the use of

8    absentee ballots, and I have documented those in some of these

9    reports.  Vote buying is an area that the federal government

10   has made -- has been prosecuting and investigating for a long

11   time.  And so in fact some of the indictments included in those

12   95 that I mentioned, most of the rest of them were for these

13   vote buying schemes.  And in the case of absentee ballot fraud

14   and vote buying, usually a conspiracy is required to execute a

15   scheme like that to steal an election.  When it's a conspiracy,

16   I won't say it's easier, but there are many points of access

17   for investigators to track into a conspiracy to find the fraud.

18   And that's what the federal government, as I said, until 2002,

19   its effort was looking for conspiracies that were serious, that

20   were corrupting the process, that are harboring voters, in

21   fact.  That's what I mean when I say they're egregious because

22   there have been cases like that, that have been serious, and

23   need to be policed.

24   Q    But you also say that these are rare?

25   A    Well, they're rare if you look at the number of votes that

1    are cast every year.  Americans cast millions and millions of

2    ballots every year.  We vote a lot in this country compared to

3    other advanced democracies around the world because we have

4    federal, a federal system.  We have elections at the federal,

5    state, and local level.  And so voters can be asked to vote

6    three, four, or at least five times a year.  If you look at the

7    election machinery, and you look at the incidents that we can

8    track, when I say rare in that sense, I don't necessarily mean

9    completely insignificant and not serious.  I mean the incidents

10   of it is rare.  And that we should pay attention to those forms

11   of fraud that do threaten democracy.  They threaten the

12   electoral process.

13   Q   And do you feel as though voter fraud threatens our

14   electoral process?

15   A   No.  The threat is not coming from voters, from ordinary

16   voters trying their hardest to cast ballots.  That's not where

17   the threat is coming from with respect to election fraud.

18   Q   Thank you, professor.  Thank you, your Honor.

19   A   You're welcome.

20          THE COURT:  All right.  Well, we might take a brief

21   recess, 20 minutes, and then cross examination.

22          (Recess)

23          THE COURT:  All right.  Have a seat.  Go ahead.

24   CROSS EXAMINATION BY MR. BURCHFIELD:

25   Q   Is it Dr. Minnite

1    A    Minnite.

2    Q    Good morning, for a little while.

3    A    Good morning.

4    Q    I want to start with your work for Project Vote.  You

5    worked with Project Vote for how many years?

6    A    I've never worked for Project Vote.  That report, they

7    approached me, I guess it was in the fall, 2006.  But I never

8    had any prior work with them or really knew them very well.

9    They asked me to write a report on voter fraud because they had

10   seen the earlier report that I did for the organization.

11   Q    And did they compensate you in any way?

12   A    No, they did not.

13   Q    We may come back to that in a minute, Dr. Minnite.  Let me

14   focus for now on your definition of voter fraud.  You have

15   defined voter fraud as the intentional corruption of the

16   election process by voters.

17   A    That's correct.

18   Q    And you were asked, I believe, whether your definition of

19   voter fraud is widely accepted.  And at least in my notes I

20   wrote down your answer as:  I haven't found anyone elsewhere

21   who tried to make a concise definition.  Then the Department of

22   Justice's definition is similar, but broad.  Is that correct?

23   A    Yes, that's accurately what I said.

24   Q    So you're unique, you are unique in your definition of

25   voter fraud?

1    A    I hope I offer the best definition.

2    Q    But nevertheless, you are unique in your definition?

3    A    Yeah, you could say that.

4    Q    And your definition is much narrower than other definitions

5    of voter fraud?  Correct?

6    A    It's narrower because it does focus only on fraud committed

7    by voters.

8    Q    But it is unique and narrower than other definitions?

9    A    It's narrower than the definition offered by the Justice

10    Department which I think probably would be the second best

11    definition, from my opinion.

12    Q    With regard to -- I want to follow up on a question that

13    his Honor asked you concerning your definition of voter fraud

14    versus poll watching or ballot security, which is the core of

15    this case.  You would agree, wouldn't you, that your definition

16    of the extent of voter fraud would not necessarily mean that

17    poll watching is unnecessary?

18    A    That's correct.

19    Q    In fact, poll watching can detect a lot of things other

20    than what you -- what you defined as voter fraud; right?

21    A    Yes.

22    Q    And it can detect broken equipment?

23    A    That's correct.

24    Q    And it can protect a candidate's or a party's interest in

25    the event that equipment breaks down during the day?

1    A   That's correct.

2    Q   And it can detect a party's or candidate's interest in that

3    a voting place becomes overcrowded?

4    A   Yes.

5    Q   Or that there's some disturbance in the voting place?

6    A   Yes.

7    Q   And it can protect a candidate's interest even after the

8    voters watch the polls be tabulated?

9    A   That's correct.

10   Q   And it can even protect, to some degree, against

11   inadvertent errors by voters?

12   A   I would be less emphatic in saying that's the case, because

13   poll watchers, for example, can't follow the voter into the

14   booth and watch how they're casting their ballot.

15   Q   Dr. Minnite, let me -- let me pursue this and I'll come

16   back to an issue.

17          Putting aside for the moment the accuracy of a list, a

18   ballot -- a poll watcher might have.  If a poll watcher had a

19   list of convicted felons in a precinct, he could challenge a

20   voter known to be a convicted felon; correct?

21   A   Yes, in some states.

22   Q   And in Wisconsin, that would be the case; right?

23   A   I couldn't tell you Wisconsin specifically.  I do know the

24   states differ on when a challenge could be logged.  Some want a

25   challenge to be there earlier, they have personal knowledge

1    that this person is ineligible.  Their rules are quite variable

2    across the states.  Theoretically, certainly if a poll watcher

3    has a list, and the lists are accurate, the poll watcher would

4    know who was voting, they could challenge that voter.

5    Q    And in your letter to Senator Feinstein, you recount the

6    stories of Derrick Little and Ethel Anderson?

7    A    That's correct.

8    Q    And if someone watching the polls had simply told them:

9    You're a felon, you're not allowed to vote; that maybe unfair,

10   you're not allowed to vote; that would have saved a lot of

11   trouble; right?

12   A    If the election official had told them that, they would

13   have saved a lot of trouble.

14   Q    And even if they were challenged, you know, under HAVA,

15   they could still cast a provisional ballot?

16   A    That's generally correct.

17   Q    And if they cast a provisional ballot, they could been

18   sorted out later?

19   A    That's how it's supposed to work, yes.

20   Q    Now, you would agree with me, wouldn't you, that there are

21   many categories of nefarious activities that go on that are not

22   encompassed in your definition of voter fraud?

23   A    That's correct.

24   Q    You mentioned vote buying, you mentioned absentee ballot

25   fraud.  Right?

1    A    Yes.

2    Q    And there are also Election Day activities, such as old

3    fashion ballot box stuffing?

4    A    This is the concern of those who follow the issue of

5    electronic machines so, yes, this issue has kind of come back

6    to us from the old days, the old kind of machine politics where

7    people are worried about electronic machines that can be rigged

8    to essentially add ballots or subtract ballots, which is ballot

9    box stuffing.

10   Q    You don't even need a pencil anymore?

11   A    That's correct.

12   Q    Other nefarious activities could include voter intimidation

13   at the polls?

14   A    That's correct.

15   Q    All of that is outside your definition of voter fraud?

16   A    That's right, yes.  Again, the distinguishing, and I think

17   it's very important, the distinguishing factor in the

18   definition is who is doing what?  And so -- and this is related

19   to public policy concerns about the kinds of changes in

20   election laws that we need as a result of problems.  I did that

21   for those reasons as well.  We understand if we have a problem,

22   how do we fix it.  I think it's a very important distinction to

23   make.

24   Q    Were you here yesterday when Judge -- the beginning of the

25   proceedings where Judge Debevoise suggested that I ought to

1    consult the New York Times from yesterday?

2    A    Yes.

3         MR. BURCHFIELD:  May I approach, your Honor?

4         THE COURT:  Yes.

5         MR. BURCHFIELD:  I did consult the New York Times.

6    Q    I'm handing the witness what we marked, which is an article

7    from May 5, 2009, which is:  ACORN charged in voter

8    registration fraud case in Nevada.  Dr. Minnite, did you see

9    this article in the New York Times?

10   A    Yes.

11   Q    And you know that ACORN has been accused in a number of

12   jurisdictions about various registration, voter registration?

13   A    Yes.

14   Q    And that that isn't encompassed in your definition of voter

15   fraud?

16   A    That's right.

17   Q    Would you agree with me that voter registration fraud, even

18   though not within your definition, does have a corrosive effect

19   on the confidence of the public in the election process?

20   A    I think public -- widely publicized allegations about any

21   kind of fraud raises concerns among the public.

22   Q    You mentioned that you have some personal knowledge about

23   the situation in Wisconsin.  And let me ask you to look, if you

24   would, at Defendant's Exhibit 29, and are our notebooks still

25   up there, the white notebooks?

1    A    No.

2              MR. BURCHFIELD:  May I approach, your Honor?  Your

3    Honor, may I approach the witness?

4              THE COURT:  Yes, certainly.

5    Q    I would ask you to look at Defendant's Exhibit 29 in this

6    notebook, which is the preliminary findings of the Task Force

7    investigating possible election fraud.  Are you familiar with

8    this document?

9    A    Yes.

10   Q    And let me ask you about one factual statement in the

11   document which appears on page 3 in paragraph 4 of the

12   document.  And this document, you'll understand, was prepared

13   by the Milwaukee Police Department, Milwaukee County District

14   Attorney's Office, and the Federal Bureau of Investigation and

15   the U.S. Attorney's Office?

16   A    Yes.  I spoke to the U.S. Attorney about this.

17   Q    Okay.

18             Let me ask you about page 3 of Defendant's Exhibit 29,

19   finding number 4, which is there at the top.  It says:  The

20   number of votes counted from the city of Milwaukee exceeds the

21   number of persons recorded as voting by more than four

22   thousand, five hundred.  Do you see that?

23   A    Yes.

24   Q    And do you have any reason to believe that's not an

25   accurate statement?

1    A    I think it's probably accurate.

2    Q    And how would you -- in the absence of some voting day

3    irregularity, how would you explain that?

4    A    Well, I also interviewed the head of the Milwaukee Board of

5    Elections who is a former police officer, who was installed by

6    the Mayor after this election because it had been found that

7    there were many errors in election administration.  In a sense,

8    the balancing of the books between people signing in to vote

9    and casting ballots was out of balance, which is what produced

10   this -- I will call it an irregularity.  And I haven't studied

11   this in every jurisdiction in the United States, but I've come

12   to the conclusion from my studies that as much as we all would

13   like elections to be perfectly run with not a single mistake,

14   and I say that sincerely, the problems like this are not

15   uncommon.  They're surfaced in investigation when there has

16   been a concern, they're surfaced when there's a close election

17   and every ballot has to be looked at.  I could say fairly

18   confidently that a margin of error, if you will, in this, where

19   you have an imbalance of the number of voters signing in and

20   the number of ballots cast, is not an uncommon event in

21   election administration in the United States today.

22   Q    Point taken.  But you would agree with me, wouldn't you,

23   that this is something that poll watchers can see and comment

24   on during the Election Day?

25   A    Certainly poll watchers observing the vote could notice if

1    in the intensity of voting, where there's large crowds in small

2    rooms, which is also common, when everyone is following all the

3    procedures.  And part of the problem again is that we have very

4    elaborate procedures to vote, and a mistake can happen at every

5    single point, whether it's the voter making the mistake or the

6    election official got busy, turned away, and the voter moved on

7    in the line and didn't fill out the card that was indicating,

8    that gets matched back to the list, or the voter signed the

9    wrong name because there are three John Smiths in that precinct

10   and they signed the polling book on the wrong line.  Those

11   kinds of mistakes are discovered in investigations like this.

12   Q   In terms of what would seem to me to be a fairly large

13   number, 4,500 more votes counted than people that signed in to

14   vote, that strikes me as being something that astute poll

15   watchers throughout the city could probably detect as they

16   watched people walk into the polling stations and sign in,

17   whether they're signing in or not, as they go back to the

18   voting booths?

19   A   It's possible to imagine that a poll worker could in fact

20   be helpful in that sense of observing where there were chronic

21   problems in an election polling place.  I mean, I should tell

22   you that the chief of the City Election Board lost her job

23   because of this, what I would characterize as a little bit of a

24   mess of an election in 2004.  And as I say, I had a very long,

25   long interview with the -- her replacement, who is a former --

1    a 20-some-year police officer who was put into the job to sort

2    of clean it up and make it work better.

3    Q    I hope the former director did not go from there to Wall

4    Street?

5    A    No.

6    Q    Let me turn back for a minute to your curriculum vitae

7    which is DNC Exhibit Number 21.  And I have asked you before if

8    you -- about Project Vote.  And I think you said you have never

9    had any affiliation with the Project Vote?

10   A    No, I did not work for them.

11   Q    I see.  You are a board member of Project Vote?

12   A    I joined the board in October, 2008.  Could you tell me

13   where that's located, Glenn, on the CV.

14   Q    On your CV, it is on page 8 under the community --

15   A    Which tab on the binder?

16   Q    Exhibit 21.

17   A    Twenty-one, okay.

18   Q    And did you know that Project Vote reports on its website

19   that in the 2007/2008 election cycle, it was a field partner

20   with ACORN?

21   A    Yes.

22             MR. BURCHFIELD:  Nothing further, your Honor.

23             THE COURT:  All right.  Any redirect?

24             MR. BARTLETT:  No, your Honor.

25             THE COURT:  All right.

1            (Witness excused)

2            THE COURT:  Do we have another witness?

3            MR. GENOVA:  Yes, your Honor, we'd like to call Justin

4    Levitt.

5            THE COURT:  All right.

6            JUSTIN LEVITT, Sworn.

7    DIRECT EXAMINATION BY MR. GENOVA:

8            THE COURT:  Go ahead, Mr. Genova.

9    Q   Mr. Levitt, why don't we start by briefly talking a bill

10   bit about your credentials.  If you'll go to Exhibit 12 in the

11   black binder.

12   A   Yes.

13   Q   I see that you're admitted to the bar.  What jurisdictions?

14   A   I'm a member of the bar in the District of Columbia, here

15   in New Jersey, New York and in California.

16   Q   Home grown New Jersey boy?

17   A   I am indeed, 40 minutes west.

18   Q   And your legal education's at the Harvard Law School?

19   A   Yes.

20   Q   And were you introduced to election law at Harvard Law

21   School?

22   A   I had occasion to work with Professor Lawrence Tribe,

23   T-R-I-B-E.

24   Q   And you were his research assistant for a time?

25   A   I was one of, yes.

1    Q    And this spawned an interest in election law and practice?

2    A    This, and the events of recent years, have spawned a very

3    great interest, yes.

4    Q    And what's your current position?

5    A    I'm currently counsel for the Brendan Center for Justice at

6    the New York University School of Law.

7    Q    And do you hold any faculty position with NYU Law School?

8    A    I have been an assistant adjunct professor of clinical law.

9    Q    Briefly, what is the Brendan Center?

10   A    It's a non-partisan institute.  It's a think tank in legal

11   advocacy, and it prides itself on the research it conducts, and

12   also advocates and assists both legislators and administrators

13   with various sorts of laws and procedures and policies.

14   Q    And among those law and procedures and policies, does it

15   have a special mission as it relates to voting rights and

16   elections?

17   A    One of its prominent projects deals with elections in very,

18   very restoration projects areas, all the way through the

19   aftermath, redistricting, and the like, both judicial, and

20   state, and federal elections, and all that.

21   Q    And I take it, does your work at the Brendan Center, is the

22   focus on the election side of the equation?

23   A    That's my focus, yes.

24   Q    And in connection with that focus, are you involved in any

25   capacity in each of the disciplines you've mentioned,

1    redistricting, campaign financing and the like?  Could you

2    describe briefly for the Court the disciplines which touch upon

3    your academic and counsel law?

4    A    They run the gamut.  Basically they have to do with

5    elections in some particular areas.  I do particularly a

6    tremendous amount of work on an election administrations of all

7    kinds and redistricting matters, all from, I should say, the

8    elections context, all from a non-partisan perspective.

9    Q    And have you undertaken any research in your capacity?

10   A    Plenty, yes.

11   Q    And do you undertake any writing in your capacity at the

12   Brendan center?

13   A    Also plenty, and that's been some spoken here.

14   Q    Again, calling your attention to your curriculum vitae,

15   again, Exhibit 12.  There's an identification of a group of

16   selective publications.  Is that all encompassing that group?

17   A    No.  Those are selections that are particularly relevant to

18   my current employment.  There are other publications that are

19   both popular and that are not listed in the CV.

20   Q    And calling your attention specifically, you were the

21   author of a publication called:  The Truth About Voter Fraud.

22   Is that cited on your resume here?

23   A    It is.

24   Q    And is that the document which appears behind Exhibit Tab

25   18?  Take a look at that.

1    A    Yes.

2    Q    There's reference to a publication called:  Making the

3    List.  Are you the sole author?

4    A    No.

5    Q    That's the Ettal?

6    A    Yes.

7    Q    And is a Professor Ettal at the Brendan Center?

8    A    Not yet, no.

9    Q    Now, specifically the -- what appears as Exhibit 18, The

10   Truth About Voter Fraud, has that publication found its way

11   into any judicial assistance, to your knowledge?

12   A    It has.  I believe that it's been cited in at least one

13   appellate court opinion, lower appellate court.  I know that it

14   was cited by both the lead opinion and the dissenting opinion

15   in the Supreme Court case concerning voter identification.

16   Q    And do you have the name of that case?

17   A    Crawford vs. Marion County Election Board.

18   Q    Now, has your research and work at the Brendan Center

19   afforded you the opportunity for testimony in the United States

20   Congress?

21   A    It has.  I was able to testify, and I was invited to

22   testify before the Senate Rules and Administration Committee in

23   March of 2008.  And I submitted written testimony to other

24   congressional people.

25   Q    And would that include the testimony that you provided in

1    March, 2008, reflected on your CV, involving or entitled:

2    In-person Voter Fraud, Myth and Trigure for disenfranchisement?

3    A    Yes, for which --

4    Q    And that would appear as Exhibit -- your testimony, the

5    text of that appears as Exhibit 19 of the DNC's exhibits; is

6    that right?

7    A    Yes, sir.

8    Q    Now, in terms of your methodology and how you approach your

9    work, are we talking about here legal analysis, or sociology

10   analysis, or both?  How would you --

11   A    It depends on the particular sort of publication.  For

12   some, they're legal analyses.  For some, they involve the

13   service through publications.  For some, they involve

14   interviews with -- or surveys of election officials or others.

15   And for some they involve statistical analyses.

16   Q    And how long have you been writing about election issues?

17   A    For the better part of the decade.

18   Q    For the better part of the day?

19   A    The decade.

20   Q    I would thought it would be a little bit more than today.

21   Thank you.

22        Do you have any works in the offering that aren't

23   reflected in your CV?

24   A    There are always works in the offering.  There is something

25   still pending review at the very top of the CV.

Levitt-direct                                  83

1    Q   And that's:  Lines at the Courthouse?

2    A   Correct.

3    Q   And have any of your writings been subjected to peer

4    review?

5    A   Yes.  That one is pending, not yet -- very recent.  The

6    publication with Professor Michael McDonald at George Mason

7    University was also submitted for -- submitted and accepted by

8    peer review publication on election law.

9    Q   And how is the Brendan Center funded?

10   A   It's funded by various sources.  It's funded by individual

11   grant making foundations.  It's funded by donations from law

12   firms and other legal institutions.  It's funded, I believe,

13   with contributions from individuals.  It's a nonprofit 501C3,

14   and has many of the same bases.

15   Q   And your testimony before the Congressional Committees that

16   is identified in your CV, did any of them, or any of them in

17   addition to the one you've highlighted to the Court, deal with

18   issues related to the assemblage of information under voting

19   databases and the like?

20   A   Yes.  I submitted actual testimony before the Elcetions

21   Assistance Commission and some of its constituent bodies that

22   actually deal extensively with voter databases, and

23   particularly one of the publications that I mentioned, Making

24   the List, the one produced by Professor Ettal was the first,

25   and still I think a premier national study of the

1   implementation of the statewide voter list required by the

2   American Voter Act.

3   Q   And so I take it then, do you have some familiarity with

4   the Help America Vote Act?

5   A   Yes.

6   Q   And how would you describe that, the source of the

7   knowledge of that law?

8   A   I would say it's been daily engagement of that.

9   Q   And it was adopted by Congress?

10  A   In 2002.

11  Q   And with respect to the National Voter Registration Act,

12  the Motor Voter Law, are you far familiar with that law?

13  A   Yes, very.

14  Q   And in the course --

15  A   The Motor Voter Law is significant law affecting voter

16  registration and it's necessary to be very familiar with it.

17  Q   Okay.

18          And you had occasion to hear Mr. Burchfield's opening

19  argument in this matter?

20  A   Yes.

21  Q   And you had occasion to hear the testimony of Mr. Josefiak?

22  A   Yes.

23  Q   Now, both the argument and the testimony, do you recall

24  both of them articulating a view that certain laws that have

25  been adopted by the Congress have heightened the need for a

1    concern of a voter fraud because those laws invite greater

2    access to voters?

3    A    Yes.

4         MR. BURCHFIELD:  Objection, your Honor,

5    mischaracterizes --

6    Q    What did you understand to be the argument advanced by Mr.

7    Josefiak in his testimony with respect to the implications of

8    the Help America Vote Act, the National Voter Registration Act,

9    and the Bipartisan Campaign Reform Act, as it relates to the

10   incidents of voter fraud?

11   A    What I understood was that -- and it proceeded along the

12   timeline that I believe it was spoken to by Mr. Josefiak, that

13   there were various points that he'd identified as substantial

14   expansion of access for opportunities for individuals to vote.

15   I believe there was a discussion, sort of outsourcing of that

16   activity, that was traditionally held by his perspective, and

17   it was held by the parties that made that sort of voter

18   registration a little less reliable.  And it was discussion

19   particularly with respect to Help America Vote Act about

20   provisional ballots, and to use provisional ballots in order to

21   avoid any trouble -- what would otherwise be interference at

22   the polls.

23   Q    Anything else that you recall about their arguments?

24   A    I've had the opportunity to review the briefing materials

25   in this case, and I remember in -- at least I recall from those

1   briefing materials that there was a certain, that those

2   expanded the opportunity.  I cannot recall if that was

3   mentioned in court or not.

4   Q   Now, do you have an opinion with respect to whether each or

5   all of these laws have contributed to a climate of increased

6   voter fraud?

7   A   I think they have -- I think they have not.  I think we can

8   do that one by one.

9   Q   Why don't we take them one at a time.

10          With respect to the National Voter Registration Act,

11   the Motor Voter Act, do you have an opinion as to whether its

12   operations or its terms have contributed to greater incidents

13   in voter fraud?

14   A   I think that the Motor Voter Act expanded the opportunity

15   for individuals to register, sorely needed at the time, and it

16   did so with safeguards to try to prevent that expansion of

17   opportunity from being realized with the equal incidents of

18   voter fraud.  So it was put in place in both intent and effect,

19   I think, was put in place to expand the opportunities for

20   eligible citizens to register to vote and to get registered to

21   vote without opening the door of voter fraud.

22   Q   And how do you believe, if at all, the Motor Voter Law,

23   contributes to enhancing voter fraud?

24   A   There are several ways in which the Motor Voter Law reduces

25   voter fraud or a potential for voter fraud.  The first in

1    establishing Motor Voter, the Congress was in part hoping to

2    drive applications to the process of -- hoping to drive voter

3    registration to the process of applying the vote through motor

4    vehicle agencies, and through social services agency, either of

5    which have their own requirements for identification and for

6    otherwise verifying the identity of an individual, some of

7    which have gotten quite restrictive over time.  For example,

8    with the passage of the I.D. Act, it has become necessary to

9    show increased documentation to get a driver's license.  As new

10   rules have come into effect for the Medicaid process, it's

11   become -- to receive Medicaid and other social services, and by

12   driving individuals who are not yet registered to register

13   through those agencies, and through those processes, Congress

14   was hoping to fund them in a way that we would both catch them

15   when they were interacting with an agency in order to bring

16   them into the process, but also to require documentation that

17   would cut down on many instances of fraud.

18   Q    So if I'm an individual and I can register to vote at my

19   local Social Security Administration Office while I'm making my

20   application for Medicaid, the challenges or obligations to make

21   this, to get my Medicaid, become part of the process as to

22   whether I can properly register?

23   A    They're necessary, if they're going to make that

24   application while you were applying for Medicaid then, yes,

25   those would all become wrapped up in the process to register to

1    vote.  They're not required across the board.  And they didn't

2    stop citizens to register, as they have -- it hoped to funnel

3    people through the process where they were being reviewed and

4    checked by other agencies.  There were several other provisions

5    as well as.

6    Q   Well, what other safeguards under the National Voter

7    Registration Act, the Motor Voter Law, that you observed were

8    adopted and executed to deter or eliminate the notion of voter

9    fraud?

10   A   The fraud unfortunately persists, but the actual reality,

11   the Motor Voter Act was, I believe, the first federal

12   requirement that states an act of general program, lists, voter

13   registration maintenance.  The National Voter Registration Act

14   require states to require a reasonable program of cleaning up

15   the rolls, both for the reason of death, and the reason that

16   the individual may have moved or changed residence.  And that

17   was really a quite significant step in directing states for the

18   first time in a mandatory requirement that they get that, both

19   states and locals.  At that point it was not largely pursued

20   that they get their voter registration resumes in shape.  It

21   prescribed certain ways by which states and locals could use

22   them.  But the general requirement was, I believe, for the

23   first time.  It also, I believe, created and certainly

24   enhanced, it both created and enhanced penalties, criminal

25   penalties for fraudulent use of the voter registration system.

1    And so it provided prosecutors with a new tool to confront any

2    alleged instances of voter fraud.

3    Q    So to summarize, are you telling us there three core

4    elements of the Motor Voter Law, which actually operates to

5    diminish concerns about voter fraud, would be one that the

6    bureaucracy, the other agencies at which locations individuals

7    register to vote, have their own demands with respect to

8    information that needs to be submitted, whether it's Medicaid

9    or the like, which would compel the registrant to make

10    disclosures they might feel uncomfortable about if they were

11    attempting the fraud; and the second, that each state was

12    required to clean or create centralized lists for registered

13    voters and the criminal penalties?

14    A    Just on the second point, they weren't, I'm sorry, states

15    weren't required to create statewide lists until the Help

16    America Vote Act, the third act that we've mentioned.  But any

17    jurisdiction holding a voter registration list through the

18    State Chief Election Officer was required to maintain the list

19    and regularly clean them.  And that was the first example of

20    that, that I'm aware of.  So, yes, those are three primary ways

21    in which the Motor Voter Act attempted to ensure that the lists

22    weren't only expanding, but expanding to include only eligible

23    voters.

24    Q    Okay.

25        The Help America Vote Act, has it contributed to voter

1    fraud, in your view?

2    A    No.  It's actually -- it has taken several steps to

3    decrease even the low instance of voter fraud.

4    Q    And we'll get into your opinions with respect to what

5    constitutes voter fraud momentarily.  But for purposes of the

6    notion, we'll refer to it as, how is it that you believe HAVA

7    has made it harder for those who would commit the kind of

8    nefarious activities or otherwise asked about of our last

9    witness?

10   A    I should say -- I should amend my answer.  It has both

11   already affected and continues to affect as states implement

12   it.  It was put in place in 2002.  Many of its provisions

13   weren't fully implemented in 2006, were still getting under

14   way.  It continues to be implemented, and continues to prove

15   implementation of election overall.  There are several ways in

16   which it does so.  The first, as we were discussing a moment

17   ago, it required statewide lists to be kept, and not only to be

18   kept statewide, but to be kept in an electronic form.  And that

19   in some ways resolves or should resolve the big problem of

20   individual elections jurisdictions, all keeping the same lists.

21   And that developed over time, a fair amount of dead wood or

22   duplicate entries that lived on the rolls for a period of time

23   and weren't cleaned off effectively.  Now, with the statewide

24   lists, those jurisdictions have been reconciled with each

25   other, and states have gone through it with varying degrees of

1    care and eliminated duplicate entries.

2    Q    And that's the subject of your -- in part, of your

3    testimony that we've cited earlier, which appears as Exhibit

4    819?

5    A    Yes, the Senate testimony, that's right.

6    Q    Right.  Right.

7    A    It also, the Help America Vote Act also increased the

8    degree to which states were required to rely on other forms of

9    data to clean the lists.  It not only generally again required

10   a program of list maintenance, it also required states to

11   coordinate with state and local records on death and diseased

12   individuals, and on convictions.  That was an expansion.  I

13   missed that from the National Voter Registration Act.  For the

14   first time it required federal criminal authorities to submit

15   information about convictions.  The Help America Vote Act

16   requires even greater coordination of records on convictions in

17   order to make sure that individuals who are disenfranchised by

18   convictions are not represented on the list of eligible voters.

19   And in general, it required again provisions of list

20   maintenance under the responsibility of each state's Chief

21   Election Officer to make sure that the lists are as clean as

22   could possibly be.

23   Q    And when you say clean as could possibly be, is this all

24   been list accuracy and voter eligibility list accuracy?

25   A    It's about making sure that only eligible voters are

1    represented on the lists, and that eligible voters can be found

2    when they go to the polls to vote in the right place.

3    Q    And do you see that as enhancing an environment for the

4    commission of voter fraud?

5    A    No, I see that as a safeguard against the commission of

6    voter fraud.

7    Q    And you talked about the execution OF HAVA.  You have, in

8    the course of your study, the opportunity to observe how it's

9    been implemented and executed in the variety of jurisdictions?

10   A    Yes, certainly.  And there's one other aspect, by the way.

11   I think it's very important, particularly to combat

12   registration irregularities or registration fraud.  In the Help

13   America--

14   Q    As opposed to voter fraud on Election Day?

15   A    That's correct.

16   Q    I am sorry.

17   A    There's a way that HAVA imposes, if it's not something that

18   I mentioned, it imposes a correction or a "check for" barrier,

19   or a safe guard between problems with the registration process

20   and problems on Election Day.  Since the act was passed, each

21   individual who submits a registration form is required to

22   submit with that form either a driver's license number, if they

23   have one, or the last four digits of their Social Security

24   number.  Or if they have none, they're required to say so.  And

25   states are required to match that information up, or try to

1    match that information up with driver's license databases or

2    Social Security data basis.  Those that can not be matched,

3    have to show at some point, whether they're voting in person or

4    by absentee ballot, a list, or one of the series of documents

5    contained in the Help America Vote Act.  What all of this

6    amounts to, since the act was passed, voters will at some point

7    before voting have to verify that they are who they say they

8    are.

9    Q    And does HAVA have any impact as it relates to the

10   opportunity for absentee ballot?

11   A    Yes.  And in particular, the provision that I just spoke

12   of, it -- it cuts down on the level of absentee fraud that's

13   possible.  In previous jurisdictions there were -- it was

14   possible to submit a fraudulent registration form, then apply

15   for an absentee ballot, if the State permitted it, without ever

16   verifying identity.  Without the Help America Vote Act, that's

17   no longer possible.  There are additional features of the

18   National Voter Registration Act that keeps coming to mind.

19   Another is the MBRA Act allowing states to require an in-person

20   voter voting for any individual who submits a registration form

21   by mail, and some considered that as well a form of safeguard

22   or security against voter fraud.

23   Q    And I take it then your opinion with respect to HAVA, there

24   were elements of that statute that made it harder for those to

25   engage in nefarious activities that Mr. Burchfield may refer

1    to?

2    A    And that was very clearly the intent of Congress in passing

3    throughout the -- all of the congressional record with the Help

4    America Vote Act.   There are repeated representations -- make

5    it easier to vote and harder to cheat in that latter portions,

6    which I believe are discussed.

7    Q    And is that your referencing to the legislative intent and

8    the like that appears in Exhibit 15?

9    A    I believe that 15 is the earlier, the National Voter

10   Registration Act.

11   Q    Excuse me, you're right.

12   A    I'm familiar with both there and --

13   Q    I take it in your work that you come to have some

14   experience in the content and the implementation of the

15   bipartisan Campaign Reform Act?

16   A    I have.

17   Q    And it's been argued here that the bipartisan Campaign

18   Reform Act has contributed to the prospect of voter fraud by

19   virtue of the reported outsourcing of the registration function

20   of the political party to an independent organization.   You've

21   heard that testimony from Mr. Josefiak?

22   A    I have.

23   Q    And you've heard that argument from Mr. Burchfield?

24   A    I have.

25   Q    Now, do you have an opinion in that regard?

1   A   I certainly have not seen that -- I have not seen evidence

2   of that practice, and don't believe that the structure of the

3   law creates any incentive in that regard.  The law changes,

4   it's entirely true, the types of money that the political

5   parties can take, and restrict both parties and individual

6   candidates to certain parties.  It does not appear to have

7   greatly affected the overall sums, particularly given the 2008

8   elections, and the campaign totals raised by both of the

9   parties, and the candidate committee fees.  And it has not in

10  any way, shape or form changed any of the fund raising

11  opportunities, or incentives, or structure affecting either 527

12  organizations which were discussed by Mr. Josefiak, or other

13  501C non-profits.

14  Q   Now, have you looked at this issue upon which -- upon what

15  do you base your opinion?

16  A   I have looked at this issue, yes, in both through my work

17  and elsewhere.

18  Q   And so you're saying that in the League of Women voters,

19  there's been no principal change in their activities as relates

20  to voter registration?

21  A   There's been an increase in voter registration activity in

22  general, but that's as far as I can tell across the board.  The

23  League of Women voters has been able to register people since

24  its inception, and has been able to draw -- those sources have

25  not -- with the exception of some changes in the tax code

1    unrelated to Bipartisan Campaign Reform Act.  Those changes are

2    not -- did not noticeably change in 2002.

3    Q    And so if we -- if I understand what you're saying, to the

4    extent that hard money became the fuel of party-level

5    organizations, whatever registration drives had to be paid for

6    with hard money?

7    A    That's correct.

8    Q    To the extent that soft money became a vehicle that was not

9    available to political parties, whether Democrat or Republican,

10   was not a resource anymore?

11   A    That's correct.

12   Q    And to the extent that there has been a proliferation,

13   that's been a function of politics, and public interest, and

14   elections and the like?

15   A    The same funding sources that were available to 527s and

16   the like before, state no change by the Bipartisan Campaign

17   Reform Act.

18   Q    And did your research reveal to you that any areas ceasing

19   voting registrations?

20   A    There is no evidence that I've seen of that.  At the very

21   least, the popular accounts that I have seen, the press reports

22   on, for example, the campaign, and both campaigns, both the

23   Obama campaign and the McCain Act, seems to indicate that each

24   was engaging in its own voter registration activities.

25   Q    And did you play any role in the last election cycle?

1   A   I did.  I was on leave from the Brendan Center beginning in

2   July of 2008, and engaged at the Democratic National Committee

3   as their national voter protection counsel.

4   Q   Your testimony that we've been -- I've been asking you

5   questions about are based on your work at the Brendan Center;

6   correct?

7   A   That's correct.  And I keep my research hat very separate

8   and distinct.  It's in that regard that I've been -- I've

9   spoken thus far.

10  Q   Now, the Exhibit 18, "The Truth about Fraud," your piece on

11  behalf of the Brendan Justice Center, the Brendan Center for

12  Justice, could you talk briefly about the methodology you

13  employed in that -- in your research in connect with that

14  piece?

15  A   Sure.  As has been mentioned several times, I think, there

16  are -- the press is sometimes inaccurate.  And there are many

17  allegations of voter fraud that turn out not to reveal voter

18  fraud upon further examination.  This is a topic where there's

19  an awful lot of -- what's really best described as hot air.

20  And aside from the work of Dr. Minnite, there were relatively

21  few individuals who were really closely looking behind some of

22  the allegations made to determine whether they in fact are now

23  true, whether they were based on fact, whether the facts proved

24  reliable.  And so I would follow an allegations of voter fraud.

25  Occasionally follow various -- as reporters fairly seldom do

1    follow up on these allegations, follow-up news stories to see

2    if there were follow-up reports, I have contacted election

3    officials to see if they have data or they have reviewed the

4    allegations themselves; and more generally, reviewed the

5    allegations to see whether there were any discernible evidence,

6    including submissions to court -- discernible evidence behind

7    the allegations and to what extent they proved true.

8    Q    And so that was the body of resources that you relied upon

9    to reach whatever conclusions were reached in this monogram?

10   A    That's correct.

11   Q    Now, what provoked this --

12   A    An awful lot of frustrations at allegations that it seemed

13   nobody was examining.  And unfortunately that carried through

14   into some work -- some more of the prominent judicial cases,

15   and in congressional considerations, and some legislative

16   considerations, where people were accepting on faith where

17   allegations had been made as actual examples of things that had

18   happened when in fact they had not happened.  And this was

19   borne of the need to both urge care and consideration for those

20   who would be looking into these circumstances in the future to

21   make sure that they would examine the incidents they looked at

22   with care and appropriate references, and also set some of the

23   facts.

24   Q    You were looking for the fire beyond the purported smoke?

25   A    I was trying to see whether there was in fact fire beyond

1    the purported smoke.

2    Q    And what did you find?

3    A    I found that there is, although extremely seldom, some

4    factual basis for most allegations of voter fraud, but that

5    those allegations are more often overstated.  And that further

6    they can lead to affirmative harm, that people can put in place

7    practices or procedures that actually harm real eligible voters

8    based on allegations that simply don't pan out of ineligible

9    voters.

10   Q    And what kinds of things would be -- did you observe, that

11   there were those that put in place to address concerns of voter

12   fraud that outweighed the real -- the real impact of this

13   alleged voter fraud?

14   A    And some of them have been legislative policies.  One

15   example cited quite commonly about The Truth about Voter Fraud

16   in the Senate testimony are pushing for extremely restrictive

17   identification laws.  And that primarily relies on an assertion

18   that there's either reasonable, to be concerned about

19   substantial voter fraud, or that there has been substantial

20   voter fraud.  And in these assertions, the factual basis really

21   does not exist to support those legislative conclusions.  In

22   other cases, there have been actions by private parties,

23   including challenges of voters.  Including calls to purge that

24   have then been acted on, including, I think, a general trend

25   of -- or attitude of intimidation.  As I said, these

1    allegations often amount to quite a bit of hot air, and that

2    hot air can actually keep people from wanting to engage in the

3    democratic process.

4    Q    And so if your conclusions are the concept or notion of

5    voter fraud is more about hot air, if it isn't voter fraud that

6    these allegations are grounded upon, there's no factual basis,

7    what did you find --

8    A    I should qualify.  It's not as Dr. Minnite.  There are some

9    forms of misconduct irregularity that are real.  Primarily vote

10   buying, she has the one very rightly mentioned, does actually

11   happen.  But far more often when allegations of fraud are

12   logged, they turn out to be either clerical errors by poll

13   workers, or by registrars, or other election officials, or

14   mistakes by the voter, or by those various poll workers.

15   Sometimes there's a flaw in the methodology that assumes voter

16   fraud exists when it doesn't, vote clerical error or mistake,

17   but just involves an inaccurate conclusion.

18   Q    Well, sometimes people make claims of double voting.  What

19   did you find in that regard?

20   A    So, for example, there are many different ways that double

21   voting is alleged and does not actually turn out to have taken

22   place.  It happens very seldom, but far more often one too many

23   is the comparison of lists from place to place, voter lists

24   from place to place.  These, as Dr. Minnite has said, these are

25   difficult operations to do well, and easy operations to do

1    poorly.  And they lead to a number of mistaken conclusions

2    about whether two people on two different lists are the same

3    individual.  Another common flaw is to assert or allege voter

4    fraud, which is a criminal act, without reviewing, for example,

5    actual poll signatures.  People are alleged to have voted

6    twice.  And you can see where you reviewed the actual poll

7    documents, that they simply signed in on the wrong line, that

8    they've been logged in on post election process with the wrong,

9    incorrect information.  These people were eligible, they showed

10   up and went to the polls, and they voted, as they should have,

11   or as they were entitled to, and alleged to have double voted,

12   or conducted -- been engaged in criminal activity because

13   they've been logged in at the polls under someone else's name,

14   or have been registered in the post election registration

15   process, whether they have in fact voted elsewhere.

16   Q    And did you conduct any review of allegations of fraudulent

17   addresses and reached any conclusion in that regard?

18   A    Yes.  And I would say that the methodological mistakes

19   there are both similar and different.  They're similar in the

20   respect that large database comparisons from place to place

21   lead to the same source of mistakes.  With respect to

22   fraudulent addresses, there's also underlying information that

23   also turns out to be inaccurate.  People will assume one

24   particularly notorious case because a list, someone's

25   residential address is a list in the mailbox, et cetera, or

1   United Postal Service that there must have been an act of

2   fraud.  The person that registered there was the office manager

3   who lived in a cot behind the main mail boxes.  And that were

4   her permanent residential address.  But the assumptions was

5   made that because it was a business or other male drop, that

6   this must have been an act of fraud.  There have been sums made

7   notoriously in New Jersey after the 2000 and election of

8   addresses that was later revealed, I believe by some of the

9   documents to be lots that actually had buildings on them, and

10   they were deemed to be vacant by means of a municipal address

11   database that simply had the wrong information.  These are some

12   beliefs, they're not certainly the entirety in ways that the

13   allegations maybe made, but the --

14   Q   And incidents of felons voting, did you reach any

15   conclusion in that regard?

16   A   They're the primary difficulty in this.  And this was seen

17   notoriously in Florida in 2000, attempting to match people from

18   place to place and coming up with the individual is not the

19   individual you think it is, or the individual is not someone

20   who's been disenfranchised by a felony.  Either the conviction

21   information is wrong, or a misdemeanor, which is not a

22   franchisee offense, where the rights have been restored, so

23   they have never lost their eligibility to vote; or the

24   individual who has voted is not in fact the individual who has

25   been disenfranchised.

1    Q    So applying those concepts to the reality of Election Day,

2    if they -- a poll watcher is relying on a list that is the

3    result of a caging effort, and you know what a caging effort

4    is?

5    A    I do.

6    Q    It's a mailing of an addressee unknown and returned, and

7    the accuracy of that list is suspect.  What impact does that

8    have on what can happen at a polling place?

9    A    There are several impacts that could have, particularly if

10   it's a widespread program, if it's designed to attempt to

11   review a large number of individuals.  Those sorts of lists are

12   often compiled using methodologies that are flawed, and contain

13   many of the same problems that we just spoke of.  Caging lists,

14   in particular, there are many reasons why mail may have been

15   returned as undeliverable that don't have anything to do with

16   the voter, many individuals who are eligible, legitimate

17   voters.  If poll watchers are only comprised with a list of

18   these individuals and told challenge X or Y person because

19   we've reviewed their information and their information appears

20   to be incorrect, there are I would say three substantial risks.

21   One, they will challenge that individual and cause that

22   individual to have to vote either a provisional ballot or not

23   vote a ballot at all.  Two, that they will slow up the process

24   too for that individual and anyone else in line.  And three,

25   that the general program of challenges will become known before

1    Election Day and serve as its only deterrent for people who

2    either can't afford to be slowed down in that level or who have

3    no desire to subject their voting to a barrage of questions

4    about their eligibility.  And we've seen -- unfortunately,

5    we've seen this sort of thing in the distant and also not

6    distant past.  There have been instances recently of massively

7    over-broad challenge lists that have affected real life

8    eligible voters in ways that I think have been very detrimental

9    and the voters have spoken out about it.

10   Q   In connection with your preparation and your expert

11   testimony in this case, did you review the record of the

12   proceedings and what we refer to as the Malone matter?

13   A   Yes.

14   Q   And is that illustrative of what you've described?

15   A   It's illustrative about the general atmosphere that

16   widespread programs can produce.  And also individuals, I

17   think, are sensible to avoid these sorts of concerns, and

18   feeling that they will themselves, will either be deterred from

19   going to the polls because of these programs, or that they will

20   risk either voting ballot that won't count, or they going to

21   polls --

22   Q   You talked about widespread dissemination of challenge

23   programs.  What does that mean?  What did your research reveal?

24   A   In order to have the general deterrent effect, it's

25   necessary to publicize the challenge program, 2004,

1    individually, through various means that the challenge program

2    alleged here, and was very widely publicized, including through

3    the New York Times.  Sometimes the publicity is sufficient, is

4    simply believable to the challenge materials, themselves, and

5    depending on the community, once new individuals have been

6    challenged unnecessarily, then word gets out very quickly.

7    Q    And do you have an opinion with respect to whether, aside

8    from the announcement of a challenge program, on the impact of

9    false allegations of fraud and their impact on real voters?

10   A    Yes.  And there are two potential impacts.  I mean, for the

11   voter themselves, as I've mentioned before, it is possible that

12   they will be forced to vote, and in some states required.  That

13   they will be forced to vote a provisional ballot, and that

14   provisional ballot could well not count.  There are various

15   circumstances under which there are -- that require additional

16   work by the voter.  And so for that individual, it's entirely

17   possible that the challenge program will deprive them of the

18   right to have voted a ballot that will have actually counted.

19   Q    Let's pause on provisional ballots for a moment.  Mr.

20   Josefiak referred to an exhibit, the Republican National

21   Committee December Exhibit 23.  It's entitled:  The 2006

22   Election Administration and Voting Survey.  Are you familiar

23   with that document?  Your Honor, Defendant's Exhibit 23.

24            THE COURT:  Pardon?

25            MR. BURCHFIELD:  Your Honor, it's Defendant's Exhibit

1   23 to be sure you had it.

2              THE COURT:  All right.  Let me see --

3              MR. BURCHFIELD:  There's two binders, I think, why

4   don't you have -- you have the Court's binder?

5              THE WITNESS:  It's 2006 election administration, same

6   one.  We're all set.

7   Q   Are you talking about provisional ballot and probability --

8   you're familiar with this election administration voting

9   survey?

10  A   I am.

11  Q   And to your knowledge, does this survey address the issue

12  of the percentage of times provisional ballots actually make

13  their way into the vote tabulation?

14  A   It does.  I believe that starting on around page 18,

15  there's a summary of both provisional balloting procedures and

16  the extent to which they counted.

17  Q   And the last column on the right tells us the incidents of

18  provisional ballots actually making their way into the vote

19  tabulation?

20  A   That's right.

21  Q   So I don't see among this anything that hasn't said a

22  hundred percent of all provisional ballots actually get

23  counted?

24  A   And you would expect that people do get confused, and they

25  end up at the wrong precinct, or the wrong polling place, and

1    some people think they have been registered, and some have not.

2    And you -- what is striking to me is the degree of variant

3    here.  On average, nationally, 80 percent of provisional

4    ballots are counted.  And that's, I would think, far from

5    ideal, twenty percent of people casting the ballot.  There is

6    no doubt that some of those should not be counted, but I

7    believe it to be a smaller percentage than 20.  But in states

8    like Michigan, according to this survey, with a fairly

9    substantial number of provisional ballots, only 19 percent, one

10    nine were counted.  And that I would not consider voting a

11    provisional ballot with 19 percent counting in a ninety percent

12    ballot, whatsoever.

13    Q    And so failsafe voting by way of provisional ballot,

14    available under the law, in HAVA currently, doesn't mean

15    failsafe in actually having your vote count?

16    A    That is correct.  It is certainly welcome.  It's a welcome

17    improvement over the alternative, which is essentially not

18    having your vote count at all and having to be turned away

19    entirely.  Depending on the location in which you reside, it is

20    in some states more secure, and in some states substantially

21    less secure than means of a failsafe.

22    Q    Let's try to stay what you said before to the provisional

23    ballots.  Do provisional ballots solve the problem in your view

24    that is attended to a publicized challenge program?

25    A    No, for several reasons.  Actually, one, this very problem

1    that I mentioned in some states, they have additional

2    evidentiary requirements to cast a provisional ballot.  And so

3    there is in one sense an impediment.  They're also, I should

4    say implementation of a provisional balance rule.  There are

5    still jurisdictions around the country that simply do not

6    require -- that do not provide a provisional ballot, even

7    though they are required by federal law to do so.  But more

8    importantly, the effect of a challenge lengthening program is

9    beyond the individual voter.

10             And if it is, specially, if widely publicized, the

11    deterrent effect -- in which case, there's no opportunity to

12    have counted provisional ballots.

13    Q    And if that program is announced at a point in time after

14    the period for an absentee ballot application is allowed, and

15    before the time of the polling place, it could have the

16    deterrent effect it could testify to?

17    A    That's correct.  There are a number of reasons why absentee

18    ballots are similarly not an adequate -- they are a welcome

19    alternative, but not an adequate alternative, to individuals

20    who would really rather not vote at the polls.

21    Q    Could you take a look at Exhibit 28 of the black binder.

22    That would be the DNC's Exhibit 28.

23             This is a document on the letterhead of Carmela

24    Sabaubh.  She's the clerk and register of deeds, Macomb County,

25    State of Michigan.  Do you see that?

1    A    I do.

2    Q    And what is this document?

3    A    As I understand it, in each place specifically she has some

4    responsibility for the vote counting.  And this is a press

5    release dated September 12, 2008, responding to allegations,

6    vigorously disputed allegations of challenge program in

7    Michigan generally, but particularly in Macomb County.

8    Q    And whether or not you agree with the veracity of the

9    challenge program, this public official announces that there's

10   a challenge program?

11   A    That's right.  Well, announces -- actually announces that

12   individual's votes would not be challenged, but it's in

13   response to several phone calls from -- in the first line,

14   several phone calls from concerned citizens who had seen

15   reports from a challenged program and were distressed by it.

16   Q    And what does this purport -- how does this purport to

17   describe that challenge program?

18   A    It's described as a -- a website disavowed by the

19   Republican Party but an article claiming the GOP will challenge

20   voters whose home have been foreclosed, potentially challenging

21   some citizens from voting.

22   Q    Foreclosed.  How does someone get information getting back

23   to this list issue?

24   A    I believe that this refers to personal property

25   foreclosures, and there are multiple ways to get that

1   information, including from legal newspapers and the like.  I

2   would think the most easily facilitated are through databases

3   that exist of properties that have been foreclosed upon.

4   Q    During the course of Mr. Josefiak's testimony, he talked

5   about alternative -- alternative enhancing voter access.  What

6   has been your observation in the research that you've done on

7   voter fraud and the like, about the utility of alternative

8   voting as a means for voters to avoid the impact of challenge

9   programs or other deterring efforts?

10  A    These alternative voting programs are, I would say, a

11  welcome alternative.

12  Q    Please let me know a number of reasons why they're not an

13  adequate alternative, if they are the only alternative relied

14  on.

15  A    The number of reasons include late breaking information.

16  So, for example, in this year's presidential primary, both John

17  Edwards and Rudy Guiliani had dropped out of the respective

18  primary after voters had cast absentee ballots individuals had

19  applied replied for because there are a waiting period and cast

20  absentee ballots for candidates who were not in the race on

21  Election Day at all to influence the person's choice of which

22  candidate to vote for.  And there are also, in some

23  jurisdictions, big concerns that absentee ballots will not be

24  counted through no fault of the voter, themselves.  And, for

25  example, Indiana, I believe, although I'm not entirely sure, in

1    2005 there was a mayoral election in which the decisive margin

2    of victory was determined by absentee ballots because an

3    election official had not countersigned the absentee ballots

4    before they went out.  There was no wrongdoing, and no way they

5    could possibly have known that their ballots wouldn't be

6    counted, but the ballots weren't counted because of a

7    procedural error, and it was a situation they had absolutely no

8    control over.  You see similar allegations in the -- similar

9    allegations in the now infamous Senate recount in Minnesota,

10   which featured allegations of absentee ballots that were

11   improperly turned away.  And that is not an uncommon occurrence

12   in my experience.

13         With respect to early voting, the same impulse to

14   avoid lines caused by challengers who challenge programs on he

15   Election Day may actually land someone in worse trouble.   In

16   particular, in 2008, some of the lines for early vote locations

17   because there are fewer of them and because they're open for

18   fewer hours, had actually stretched for 10, 11, 12, 14 hours

19   long, and some of them looking to avoid trouble on Election Day

20   by going through the early vote process may have run through

21   more trouble on the early vote.

22   Q   What about just receiving an absentee ballot.  Did you do

23   research or other experiences tell you anything about that?

24   A   Both research and other experiences, actually.  There are

25   perineal problems with the plans, and some individuals do not

1    receive absentee ballots probably even when they apply for

2    them.  And probably the latest election, my personal experience

3    fell very much in that category, although I consider myself an

4    experienced both election scholar and very well versed in the

5    election laws and rules, and I applied for an absentee ballot

6    in the last election well in advanced of the statutory

7    deadline.  When I had not received that absentee ballot at the

8    time I thought that I would receive it, I again made several

9    calls into the county clerk's office in order to determine

10   whether I can get that absentee ballot.  What I took was a far

11   more advanced than what I would consider normal for those

12   individuals.  And despite those efforts, I never received an

13   absentee ballot and was not able to vote in 2008.

14   Q   You've heard Professor Davidson's testimony where he

15   described his research on voter intimidation.  In your own

16   research and in the work you do at the Brendan Center, have you

17   formed any conclusions or opinions with respect to whether

18   there exists an opportunity for voter intimidation in any or

19   all of these alternative voters?

20   A   Actually there is a substantial concern, particularly with

21   absentee voting, that voters who vote absentee may either be

22   intimidated by either -- some have claimed that they've been

23   intimidated by spouses or family members into voting, or voting

24   for a particular candidate.  And there are -- again, it's

25   difficult to ascertain the veracity, but there are repeated

1    allegations of intimidation by nursing homes and the like of

2    people who vote absentee simply because the absentee ballot

3    process is less secret.  It's not the same as coming into a

4    voting booth and voting on Election Day and having officials

5    there in the polling place to supervise the process.

6    Q    Let's go back to databases.  You talked about HAVA creating

7    or requiring a statewide voter registration list, and

8    describing -- you already described that requirement to the

9    Court.  Do you have an opinion as to how or whether the

10   creation of these clean lists will affect the issue of caging,

11   voter caging in the future, if at all?

12   A    I think if the same degree of care or lack of care is

13   applied to the creation of the caging lists or other challenged

14   lists now, as has been in the past, then I think there's a

15   substantial concern that the new databases facilitate that sort

16   of over broad and poorly tailored sort of challenge.  Just as I

17   mentioned, these things are hard to do right and easy to do

18   wrong.  The scale and scope of the new databases, if they are

19   used by the private actors who are attempting to use them to

20   look for invalid voters, magnifies mistakes and magnifies the

21   over -- and so where previously, if there were the

22   opportunities to do jurisdiction-wide comparisons or challenges

23   in the county or the township, something like that, now the

24   same process can be used statewide, which only makes -- it

25   magnifies the scope of the mistakes.  It means many more

1    eligible voters would be affected --

2    Q    Why wouldn't a caging program predicated on a government

3    mandated list under HAVA be something more reliable as a

4    database for poll watcher, or challenger to challenge --

5    A    I feel that the voter registration databases are in fact

6    more reliable.  And I think they're becoming increasingly

7    reliable as states have implemented them.  The problem with

8    creating these caging lists is that they're used in comparison,

9    they're used to match up the reliable lists with lists that may

10   be far more full of garbage, or far more full of garbage.  That

11   doesn't mean what it appears to be -- they are familiar with

12   the term garbage in, garbage out.  You are essentially

13   infecting lists, a registration list that is reliable, because

14   of a lot of conclusions from another source that are not

15   reliable, and you end up creating a lot of garbage.

16   Q    And are you telling us in your opinion with the advent of

17   these statewide lists, it increases the potential for those who

18   would want to avoid mischief by way of a caging program on a

19   basis much grander than a local or county driven program?

20   A    I think that's right.  And I think we've seen it already.

21   There is both a potential, and in some respects been realized,

22   including in this last cycle.

23          MR. GENOVA:  Your Honor, I have a few more questions,

24   we'll be able to close for lunch with him.

25          THE COURT:  All right.

1    Q    Now, you've described in your testimony, and I think it's a

2    conclusion just by the title of your monograph "Truth about

3    Voter Fraud," it's much ado about little, hot air, I think was

4    your term.

5    A    Yes.

6    Q    And you've also talked a bit about -- by the way, do you

7    have a follow-up, a sequel to The Truth about Voter Fraud?  Is

8    that in the offing?

9    A    There's not a sequel to be planned.  We have done a lot of

10   research after that, including submission to the Supreme Court

11   in the Crawford vs. Marion County case using the same

12   methodology, including allegation by allegation in excruciating

13   detail, and coming to the same conclusions.  While there are

14   individual instances, the vast majority of the allegations

15   simply don't prove true.  We've released some of those

16   conclusions, and I don't know if we're planning a particular

17   published sequel part 2.

18   Q    And having offered your opinion that this notion of voter

19   fraud is a bit about how they're -- and you talked about --

20   what you characterize as the significant effect on announced

21   challenge programs and other voter intimidation activities, it

22   sounds like you're suggesting that those challenge programs are

23   a bit of a sledge hammer seeking the swat fly of the problem?

24   A    I think that's right.  And I think that if they didn't --

25   if the sledgehammer didn't meet anything on the other side of

1   the fly, it wouldn't be a problem.  In swinging the sliding

2   harm, you often do a lot of damage.  And the reason this is

3   specifically concerning to me, without a properly tailored

4   method and address, even the perception of fraud, you hurt a

5   lot of voters in the process.

6          MR. GENOVA:  I have nothing further.

7          THE COURT:  All right, Mr. Burchfield, would you like

8   to do cross examination now, or would you prefer to have lunch

9   and then take a moment to review all this material?

10          MR. LEVINE:  Actually, your Honor, Jason Levine, I

11   will be cross-examining Mr. Levitt.  We will be happy to take

12   the lunch break and conduct cross.

13          THE COURT:  We'll resume at about a quarter to two.

14          You can step down.

15          (Lunch recess)

16          THE COURT:  Here we are again.

17          MR. GENOVA:  Mr. Levine has indulged me with one more

18   question, if it meets with your Honor's approval.

19          THE COURT:  Yes, go ahead.

20   CONTINUED DIRECT EXAMINATION BY MR. GENOVA:

21   Q   Mr. Levitt, you testified to the development of new lists

22   under the National Voters Registration Act, and some of the

23   perils and challenges accompanying the creation of these

24   massive databases.  In your experience at the Brendan Center,

25   and your study and research, have you identified any

1    manifestations of the concerns that you've testified to?  And

2    if so, where and when?

3    A    As I mentioned, I believe in my earlier testimony there are

4    several specific examples of those concerns.  I don't -- I

5    don't want to go through all of them here.  I'm happy to.  I

6    don't know if it would be --

7         THE COURT:  Let's make it as brief as possible.

8    A    I could chose three to simplify the sort of concerns that I

9    have.  The first example from 2002 is a concern I have because

10   it unnecessarily uses, and in some cases abuses election

11   official time.  There is something put together by the

12   Republican National Committee in attempt to draw comparison

13   from jurisdiction to jurisdiction, to individuals who were

14   registered more than once.  And the allegation was made that

15   this provided the potential for double voting fraud.  And more

16   disturbing, the allegation was made that several thousands of

17   individuals across the country had in fact committed double

18   voting fraud because they were listed in multiple places, on

19   multiple databases.  And that was actually investigated, as is

20   normally the case.  There was a tiny grain of truth in some of

21   the allegations, but overall the list matching was, as is

22   usually the case, flawed.  And, for example, the Connecticut

23   Secretary of State reviewed the allegations as they pertained

24   to Connecticut and found that in none of the identified cases

25   was there actually any double voting going on.

1    Q    And is this the event that appears on page 25 of the

2    Exhibit 25, "The Politics of Voter Fraud," that Dr. Minnite

3    writes about?

4    A    I'm not -- I think I have the politics -- Exhibit 22.

5    Q    Twenty-two, I'm sorry.

6    A    Yes, page 25, yes, that's the incident I'm speaking about.

7    She actually -- I know she mentioned, and I did some research

8    on this myself, on the next page, three years later the

9    Republican Party of New Jersey submitted again the same sort of

10   list matching technique, taking voter registration lists and

11   matching it up to other sources, allegations that individuals

12   had voted twice.  The individuals had voted while ineligible

13   because of convictions, the individuals had voted while

14   diseased.  And those two turned out to be widely exaggerated.

15   Those were requests made of election officials to take action,

16   and so they used election official time.  But as I understand

17   it, thankfully the election officials didn't actually purge or

18   otherwise challenge voters in those two incidents.  In 2008,

19   however, this sort of list matching lead directly to challenges

20   of individual voters and that's, in my mind, the most serious

21   example.

22   Q    Where did that happen?

23   A    In Montana.  The Montana Republican Party issued six

24   thousand challenges to individual voters based, as I understand

25   it, largely on matching voter registration rules against the

1    postal service change of events list.  And, again, the matching

2    exercise was, I'd say, predictably, because this happens quite

3    a bit, flawed, including one example that sticks in my head

4    simply because it should have been obvious, because of the face

5    of the challenge itself, that it was -- it was based on

6    nothing.  Attempted to match the registration address of one, I

7    believe her name was Cynthia Green, as listed on the motor

8    rolls with the registration address listed in the postal

9    service change of address list.

10   Q    Would you take a look at Exhibit 27.  Is that the challenge

11   regarding Cynthia Green that you're speaking about?

12   A    That's the one.

13   Q    Why do you believe it was obvious that it was flawed?

14   A    Well, in looking at this, I think approximately, about the

15   fourth paragraph, beginning with "to substantiate this

16   challenge," it says that the challenger here respectfully

17   submits that Cynthia Green is registered to vote at 902 South

18   Fifth Street, West Missoula, Montana.  However, a search of

19   this other database, the postal service other database, 902

20   South Fifth Street West, Missoula.  That is the only difference

21   between the address at which she's registered.  And the address

22   on file with the postal service is a single comma, that at

23   least in my mind in no way, shape, or form, indicates even an

24   appearance of ineligibility.  And yet based on this list

25   matching exercise, I say not just this one voter, but six

1    thousand were challenged.  Those challenges were later

2    withdrawn, thankfully, but these were allegations that the

3    individual was not eligible and had to prove their eligibility

4    before they would be permitted to vote.  And that's an example

5    of this sort of over broad, and I think fundamentally flawed

6    approach that comes of an over zealous search for voter fraud.

7            MR. GENOVER:  Nothing further, your Honor.

8            THE COURT:  All right.  We are going to cross examine

9    by Mr. Levine.

10           MR. LEVINE:  Yes, your Honor.

11   CROSS EXAMINATION BY MR. LEVINE:

12   Q    Good afternoon, Mr. Levitt.

13   A    Good afternoon.

14   Q    I'd like to begin with your curriculum vitae, which is the

15   DNC Exhibit 12.  You have that in front of you?

16   A    Yes.

17   Q    I note that your education includes your undergraduate

18   degree from Harvard College?

19   A    It does.

20   Q    And am I correct that your major was something called

21   Visual Propaganda?

22   A    Yes.  It was the study of how IMAX affects people.  It was

23   a combination of sociology and politics and communication.

24   Q    It says under sub-design --

25   A    There's a program of special concentration where you create

1    a curriculum that parallels the curriculum that exists, and you

2    work with professors and tutors there in order to design that,

3    and that's what I did.

4    Q   And so you created your own curriculum?

5    A   Yes.  There are very rigorous requirements for having that

6    curriculum accepted, as one might imagine, an institution like

7    Harvard, and there are only like 40 people every year, if I

8    remember right, undergraduate class about 1,600 who are

9    permitted to do so, but yes.

10   Q   And in your testimony you referred numerous times to the

11   center as a non-partisan organization.  Do you recall doing

12   that?

13   A   Yes, and roughly.

14   Q   And it would be fair to say that that description doesn't

15   apply to you personally, does it, sir?

16   A   In my personal capacity I have both parties in interest,

17   and I have done other things.

18   Q   And professionally it wouldn't be fair to say that you

19   haven't been in professional endeavors?

20   A   That's certainly -- never at the same time that I have been

21   working for the Brendon Center, and I am very clear on that.

22   Q   And, for example, in 2003 to 2004, you worked for the

23   Leslie Hart for President campaign.

24   A   Yes.

25   Q   Two thousand four to 2005, you worked for a group called

1    ACT, A-C-T.  It had some familiarity with the Democratic party?

2    A    It was not affiliated with the Democratic party.

3    Q    And in 2008, you actually worked for the Democratic

4    Committee for the National Voter Protection Counsel?

5    A    I did.

6    Q    And the last line of your entry regarding that indicates on

7    DNC Exhibit 12, that you assisted in litigating cases and

8    monitored filing in many other cases during the final months of

9    the 2008 campaign; is that correct?

10   A    Yes.

11   Q    And you're familiar, I take it, with the lawsuits that the

12   DNC filed with the RNC under the consent decree in November,

13   2008?

14   A    Yes.

15   Q    And you're aware in fact that that lawsuit was dismissed,

16   and did not result in finding?

17   A    Yes.

18   Q    Were you personally involved in that litigation?

19   A    To some degree I was, yes.

20   Q    And what was your involvement?

21   A    In my role as National Voter Protection counsel, I was

22   responsible for ensuring that every eligible lawyer could vote.

23   And some of the allegations in that particular complaint

24   concerned, in times as we saw it, to ensure that eligible

25   voters were not able to vote.  And so I was involved in some of

1    the research and some of the foregoing events that lead to the

2    filing of that complaint.

3    Q   You also talked about your research conducted at the

4    Brendan Center, and its relationship to the Supreme Court case

5    of Crawford vs. Marion County Board of Elections.

6    A   Yes.

7    Q   And you actually were counsel for the Brendan Center as

8    amicus, were you not?

9    A   Yes, that's correct.

10   Q   And you represented the Brendan Center and several other

11   amica.

12   A   Yes.

13   Q   Just when I get the names correct.  This is not an exhibit,

14   your Honor.  I think the letter should be objectionable.

15        Mr. Levitt, this is the cover to the Supreme Court

16   amicus brief that you and other colleagues filed in the

17   Crawford case; correct?

18   A   Yes.

19   Q   And other amica, apart from the Brendan Center, included an

20   organization called Domos; is that right?

21   A   Yes.

22   Q   And it included your fellow witness here today, Lorraine

23   Minnite?

24   A   Yes.

25   Q   And those included Project Vote?

Levitt-cross                              124

1    A    Yes.

2    Q    And those included The People for the American Way

3    Foundation?

4    A    That's correct.

5    Q    Okay.

6         And you represented all of them as amica?

7    A    Yes.

8    Q    And in connection with that matter in the Crawford case,

9    your research that was compiled through the Brendan Center work

10   was presented to the Supreme Court; correct?

11   A    Yes, it was.

12   Q    And it was part of the amicus brief?

13   A    Yes.

14   Q    And your position was that the Voter I.D. Law in question

15   in that case should be stricken; correct?

16   A    Yes, correct.

17   Q    And it was unconstitutional?

18   A    Yes, correct.

19   Q    And in your view, the incidents of voter fraud was not a

20   sufficient ground for the Voter I.D. Law to be --

21   A    Correct.

22   Q    And obviously you're aware that the Supreme Court presented

23   that 6 to 3 and did uphold the Voter I.D. Law?

24   A    It upheld the Voter Law 6 to 3 vote.  That fractured the

25   opinion.  Some considered the evidence of fraud immaterial, and

1      some considered the evidence of the burden on the plaintiffs to

2      be shown insufficient.  I wouldn't say that all six -- I

3      wouldn't say that all six rejected, the 3 to 6.

4      Q    Nonetheless, six of the nine Justices took the position

5      that was contrary than what you abdicated, yes?

6      A    Yes.

7      Q    And in the main opinion in that decision, there was

8      discussion on the incidents of motor fraud, was there not?

9      A    Yes, there was.

10     Q    And would you agree that this discussion of voter fraud at

11     least in part formed the Supreme Court's decision to uphold the

12     Voter I.D. Law?

13     A    At least in part, yes.

14     Q    I'd like to put it on the record.  This is from RNC 58.

15     A    I do have the monitor.

16     Q    Very good.

17           And it included in part of page 1619 of the decision:

18     Remains true, however, the examples of fraud in other parts of

19     the country have been documented throughout this nation's

20     history.  Examples have surfaced in recent years, and Indiana's

21     own experience with fraudulent voting in 2003, Democratic

22     primary for each Chicago mayor, perpetrated using absentee

23     ballots and not in person fraud demonstrates that not only is

24     the risk of voter fraud real, but that it could affect the

25     outcome of a close election.

1        Did I read that correctly?

2     A   Yes.   There is a footnote that's not highlighted, that is

3     part of that passage that I think is important.

4     Q   There are several footnotes.   If counsel thinks it's

5     necessary to read it into the record, I'm sure we can read it

6     in  direct.

7          The Court also comments on the legitimacy of the

8     governmental evidence to try to curtail voter fraud.

9     A   It does.

10    Q   And, in fact, on the same page, the Court stated, and I

11    quote:  There is no question about the legitimacy or in

12    accordance with the state's interest in counting the eligible

13    voters.   Moreover, the interest in the voter administration and

14    accurate record keeping provides a sufficient justification for

15    carefully identifying all voters participating in the election

16    process may well be debatable.   The propriety of doing so is

17    perfectly clear."

18         Would you agree with that proposition?

19    A   I agree with the -- I didn't think that the justification

20    presented in this case was in fact sufficient.   That's in part

21    what our amicus brief said.   There's no question that is

22    legitimate.   There's no question in my mind that it's the

23    methods that are troublesome.   But the overall approach and the

24    overall wish list is absolutely legitimate.

25    Q   By the way, Mr. Levitt, you testified briefly about the

1    Malone matter in this case in 2004.  Do you remember that?

2    A    I do.

3    Q    Were you familiar with that matter?

4    A    I'm more familiar with the -- I was not familiar with the

5    matter at the time, but I'm familiar with it --

6    Q    You're familiar with it now?

7    A    Yes.

8    Q    You're aware of the fact that Ms. Malone admitted to

9    registering three different times to vote in one election?

10   A    It's very common to register multiple times.  Especially

11   Ohio now has a means to check your own registration on line.  I

12   don't believe they had such a method in 2004.  And given the

13   problems with registration, it's actually quite common to

14   register multiple times if you're not sure it's actually on the

15   list.  It should be reconciled by the county, that's reconciled

16   now by the state.  So there shouldn't be multiple registration

17   still on the rolls.  At the time that was fairly common.

18   Q    You would agree that multiple registration is problematic?

19   A    Yes.

20   Q    And it's not something you know.

21   A    In 2004, I condoned it.  That was the only way to be

22   certain, multiple cards if, for example, a call to the election

23   office didn't actually reveal it was on the rolls yet.  It's

24   not -- multiple registrations is not in and of itself I think

25   something to condone or not condone of the voter.  It's

1    understandable, if you don't know it's registered, you'll

2    submit another registration form.  It is not a good election

3    administration practice.  And so jurisdictions should do what

4    they can to resolve those multiple registrations.

5    Q   And you would agree that multiple registration can be a

6    means for voter fraud, not for your narrow definition of that

7    term, generally, by means of fraud in connection with voting in

8    the election?

9    A   It is theoretically possible.  It is extremely rare in my

10   research, yes, but it is theoretically possible.

11   Q   And in turning to your research, your Senate testimony

12   which you testified about, and also your paper for the Brendan

13   Center, utilized very specific definitions of the term "voter

14   fraud', correct?

15   A   Yes.  Those were focussed there on a particular type of

16   voter fraud, that's absolutely correct.

17   Q   So your Brendan Center, for example, was focussed only on,

18   by the way, of page 4 of your Brendan Center paper,

19   "individuals as casting ballots despite knowing they're

20   ineligible, and in an effort to defraud the election."  And

21   that's the kind of voter fraud you were talking about in the

22   Brendan Center paper?

23   A   That's the kind of voter I was talking about.  The research

24   encompassed more, that's correct.

25   Q   And when you tallied up incidents of voter fraud in that

1    paper, you were looking at this specific type of voter fraud?

2    A   Yes, that's correct.

3    Q   And your Senate testimony limited voter fraud by your

4    definition in the testimony to impersonation fraud; right?

5    A   It didn't limit voter fraud to that, but that's the type of

6    fraud that I'm talking about, that's the concern of the hearing

7    in question, that's correct.

8    Q   Neither of these definitions of voter fraud would capture

9    all methods of voter-related fraudulent conduct?

10   A   Yes.

11   Q   In direct testimony, you talked about voter absentee

12   ballots.  Correct?

13   A   Yes.

14   Q   And you said in vote buying, that it does happen?

15   A   Yes.

16   Q   And there's also a ballot tampering?

17   A   Yes.

18   Q   And there's ballot box stuffing?

19   A   Yes.

20   Q   And I think you also just agreed that reports of voter

21   fraud should, as a normative matter, be investigated?

22   A   Yes.

23   Q   In fact, you said so in your testimony?

24   A   Yes.  The caution is that it should be done in a way so as

25   to limit the chance that that investigation will actually hurt

1   eligible voters, but it's also the posture that the Department

2   of Justice has taken with respect to these investigations.  But

3   absolutely, it should be investigated.

4   Q   I'd like to make it a little more concrete, if necessary.

5   I invite you to look at the report when I'm discussing with you

6   on page 23.

7        THE COURT:  Can you remind me the tab number?

8        MR. LEVINE:  I believe it's DNC Exhibit 18.

9        THE COURT:  Yes.

10        MR. LEVINE:  I'll give you a moment.

11        THE COURT:  You said 23.

12        MR. LEVINE:  Eighteen.

13   A   I have 18, yes.

14   Q   So I just want to put on the record very clearly, your

15   research in your report for the Brendan Center did in fact find

16   in your view and your analysis a number of substantiated cases

17   on what you had in that report to find as voter fraud?

18   A   Yes.

19   Q   And in Missouri, in the 2007 election, your research

20   conclusively determined that in your view there were six

21   incidents of ineligible voters casting ballots?

22   A   There were six substantiated cases.  There were six cases

23   to be worried about.  I don't consider it conclusively

24   determined until it's prosecuted and there's a conviction.  I

25   would not dispute that there were six cases.

1    Q   You didn't follow them through to determine conviction

2    or --

3    A   Not all of these cases had completed prosecution by the

4    time the case was studied, and sometimes the prosecution might

5    not have been brought up.

6    Q   And you had agreed, and you're talking about substantiated

7    cases and prosecution, you had agreed -- you would agree,

8    wouldn't you, that it's very difficult to determine the actual

9    number of incidents of voter fraud in a given election?

10   A   Yes.

11   Q   And it could very well be that there are incidents of voter

12   fraud and they're simply not detected?

13   A   It is possible, but unlikely, depending on the type of

14   voter fraud you're discussing.

15   Q   They could go unreported?

16   A   Certainly unreported.  Although again, over this time

17   period, particularly the time period I'm referring to on page

18   23, these elections, there was an awful lot of tension paid to

19   voter fraud and an awful lot of tension to report them.

20   Q   Let's be clear.  The data that you -- that you're

21   discussing on page 23 of your report, only pertains to three

22   particular elections in three particular states; correct?

23   A   These are examples, that's correct.

24   Q   You did not profess to canvas all 50 states?

25   A   Yes.

1    Q    And you did not profess to canvas multiple election years?

2    A    I have done research over multiple years, the entirety of

3    any particular state's election history, but I have reviewed

4    multiple election years for particular states as case study.

5    Q    And you discussed -- let's go to New Jersey.  And you also

6    analyzed the New Jersey 2005 off year election and found eight

7    substantiated, as you put it, double voting?

8    A    Correct.

9    Q    And in Wisconsin, in the 2004 election, you found what you

10   considered seven substantiated incidents of improper felony

11   voting; right?

12   A    Yes, correct.

13   Q    Okay.

14        I'd like to turn to something else you testified

15   about, and that was the Motor Voter legislation that you talked

16   about.

17   A    Yes.

18   Q    One aspect in the Motor Voter Law is that it gives the

19   voter the opportunity to register by mail; correct?  And there

20   was investigation one by the Department of Justice into the

21   issue of registration by mail?

22   A    I don't recall that in particular, but I have no reason to

23   doubt that it happened.

24   Q    Let's go to DNC-15.  Do you have that?

25   A    I do.

1    Q    And what is this document, sir?

2    A    This is -- actually I believe this is the Senate report,

3    and I believe the latest report to a company before the

4    conference of the National Vote Registration Act, Motor Voter

5    Law.

6    Q    And this report would have reflected a summary of

7    legislation information about the legislation and views of

8    various Senators regarding the Motor Voter Law?

9    A    Yes.

10   Q    Okay.  Do you see that, sir?

11   A    I do.

12   Q    And do you see toward the middle of the page there's a

13   caption:  Minority views of Senator Stevens, Helms, Warner,

14   Dole, McConnell, and Cochran on the National Voter Registration

15   Act of 1993?

16   A    I do.

17   Q    Okay.

18        Now, please turn to page 44.  Can you see the heading

19   mail registration?

20   A    I do.

21   Q    And maybe this will refresh your recollection about the

22   Department of Justice's activities.  This minority view

23   statement is:  The National Voter Registration Act mandates

24   unsupervised registration by mail for all states, and for

25   precautions the states may take reducing the chance of the

1    unscrupulous taking advantage of the system.  The Department of

2    Justice wrote in 1991:  This proposal we impose a sweeping

3    requirement to allow mailing and registration by simultaneously

4    limiting significantly the ability of the states to use a

5    variety of techniques to verify the applicant's identity and

6    eligibility.  For this reason, the bills for registration by

7    mail would entail a substantial and prohibitive risk of

8    enhancing the opportunity for fraudulent registration in

9    voting.

10            Does that refresh your recollection of the Department

11    of Justice investigating the mail registration provision in

12    1991?

13    A    Yes.

14    Q    And further this document indicates that section 9(b)(3) of

15    the bill states that a mail registration form may not include

16    any requirement or other formal authentication.  Is that an

17    accurate statement?

18    A    That is an accurate statement.

19    Q    And further, they -- the next paragraph indicates:  Mail

20    registration and also prohibits a requirement that registration

21    applications be made in person."  Is that also an accurate

22    statement?

23    A    It's an accurate statement that you have said what the

24    record says here.

25    Q    I'm asking you, is it accurate to characterize mail

1   registration as one that eliminates a requirement, in-person

2   registration?

3   A   Except for states that permit Election Day registration,

4   which were exempted from the National Voter Registration Act,

5   that's accurate.   There were states that were exempted from the

6   National Voter Registration Act, including New Hampshire, which

7   still requires registration in person.   And so with the

8   exception of those states, and it's a limited number of states,

9   that's correct.

10  Q   And also talking about the Motor Voter Law and HAVA, you

11  testified at some length about what you considered the

12  safeguards that those pieces of legislation intended to reduce

13  the prospect of motor voter fraud?

14  A   Yes, correct.

15  Q   And that is to say, just so we could be clear about this,

16  reduce the prospects for motor fraud that might otherwise be

17  occasioned by the provisions of those bills?

18  A   I actually think it speaks more broadly than that.   I think

19  it maintains, one statewide list actually stops voter fraud

20  that the list did not, themselves, foster, that the bills did

21  not foster.

22  Q   It fixes the proposals to try to curtail voter fraud that

23  would have been precipitated by these pieces of legislation

24  being enacted?

25  A   I don't agree with that, actually.   I think there are

1    provisions, for example, the Help America Vote Act of 2002,

2    that stopped voter fraud that might have existed well before

3    the National Voter Registration Act was ever put in place.

4    Q    I guess the question was a little bit different.  Was

5    there -- are you saying that what you described as safeguards

6    against voter fraud was one of these pieces of legislation that

7    were somehow independently being pursued by Congress in the

8    Senate?

9    A    Yes.  I think that Congress and the Senate had two

10   objectives, particularly strong in the Help America Vote Act.

11   They wanted to make it easier to vote and harder to cheat.  And

12   that those were both independent and integrated.  That is, they

13   built some structures, some structures that made it easier to

14   vote, and they built some structures that made it harder to

15   cheat.  And the latter affected both the structures that made

16   it easier, and the structure that made it easier in the world.

17   Q    But at least in part, the harder to cheat aspect was

18   designed to address what might flow from the easier to vote

19   part?

20   A    In part, but also not in part.

21   Q    Sir, you're talking about a lot of safeguards in HAVA.

22   There's an awful lot of safeguards for a phenomenon that

23   doesn't really exist, isn't there?

24   A    To be clear, there are some types of voter fraud, and I

25   hope that I made this clear, that do exist.  There are others

1    that have been dramatically reduced by both of these

2    procedures, and there has always been a concern about it,

3    whether inherited or not.

4    Q   Why don't you make it clear for me then.  What are the

5    terms of voter fraud that you think exists?

6    A   I think in infinitesimal quantities, most of the forms of

7    voter fraud, there have been instances of voter fraud across

8    the spectrum, in the single digits.  I think that those that

9    still amount to significant concern include things like -- that

10   we discussed before, for example, things like vote coercion

11   involving absentee ballots, unfortunately, and there still --

12   in some places there are still machine politics from time to

13   time that result in larger schemes.  And those exist, those are

14   far more rarely exaggerated.  I think that most of the other

15   forms of voter fraud that exists in infinitesimal quantities,

16   that and the actual incidents are less than the public

17   perception.

18   Q   And just to be clear, your reference to other types of

19   voter fraud occurring in infinitesimal quantities is only based

20   upon the research that you conducted into actual reports of

21   voter fraud, those that have been fully substantiated to your

22   satisfaction, not the universe of potential motor fraud that

23   you have not been aware of?

24   A   It doesn't include the universe of voter fraud that I'm not

25   aware of.  I don't limit the incidents -- I don't limit that to

1    cases that have been substantiated to my satisfaction.  I think

2    that that's -- I think there is a very, very small number.

3    There is a slightly larger number of cases that possibly exist,

4    that possibly do not.  And there's a much larger number in

5    public perception that have been proven to be untrue.

6    Q   And despite your views on that subject, it is your

7    contention, is it not, that reports of voter fraud should be

8    investigated?

9    A   Yes, of course.

10   Q   And I'd like to turn to what you discussed about the

11   bipartisan campaign.  I think we may have gotten a little off

12   track.  I'd like to bring it back to that.

13        With respect to BCRA, you don't deny, do you, that it

14   changed its sources of funds that are available to political

15   parties for their get out to vote and voter registration

16   activity?

17   A   Of course, that's correct.

18   Q   Right.  They are no longer permitted to utilize and access

19   soft money for those functions?

20   A   Correct.

21   Q   And they have to use hard money?

22   A   Correct.

23   Q   And it's also the case after BCRA, not party organizations

24   such as ACORN and ACT, did not have any change made to their

25   ability to use so-called soft money?

1   A   Yes.  As it is before, they could take less money, yes.

2   Q   And so there was a substantial change imposed upon

3   political parties such as the RNC and DNC that did not carry

4   over to ACORN and ACT?

5   A   Yes.

6   Q   And ACORN and ACT was involved in voter registration that

7   were not depleting hard money, which is a precious commodity

8   for political parties?

9   A   Yes.  I think that's right.

10  Q   All right.

11          And I have a question that may seem a little out of

12  left field to you, but do you recall that during the 2004

13  presidential campaign, before the election, attending a meeting

14  with, among other people, the Republican National Committee's

15  Deputy Counsel Carolyn Hunter; Tom Josefiak, who testified

16  yesterday; and other individuals who asked for suggestions on

17  how the RNC could possibly work more closely with the DNC to

18  try to stamp down the charges and counter charges and see if we

19  could come up every election cycle regarding voter fraud and

20  voter intimidation?

21  A   In 2004, absolutely not.

22  Q   Do you recall some other meeting at some other time?

23  A   I do not recall that.  I was not involved in 2004 with the

24  Democratic National Committee.  I could possibly not have been

25  invited to any such meeting.

1   Q   Do you recall attending a meeting in 2008?

2   A   It may have happened, but I don't recall it.

3   Q   And I have a question about the DNC pertaining to your time

4   there in 2008.  The DNC uses voter challenge -- uses both

5   challenges, doesn't it?

6   A   As I am aware, and my awareness to this is most focussed on

7   2008.  The answer to your question is yes.

8   Q   The DNC uses poll watchers?

9   A   Yes, we do.

10   Q   The Obama campaign uses poll watchers?

11   A   Yes, they do.

12   Q   Why?

13   A   Largely to make sure that eligible voters could in fact

14   vote.  There was a great deal of concern that eligible voters

15   would not be permitted to vote.  However, that there would be

16   other attempts to either intimidate, or nastier word, suppress,

17   their votes or otherwise something would go wrong.  I believe

18   that's the reason.  I'm sure other people have different

19   reasons, but that would have been my reason for encouraging

20   poll watchers.

21   Q   Do you know that that is the national security reason for

22   having poll watchers?

23   A   If there was a statement for official reasons for having

24   poll watchers, I'm not aware of that official statement.  If I

25   were asked to explain why that were the case, that would have

1   been my answer.  I was never authorized to speak on behalf of

2   the Democratic National Committee.

3   Q   One last subject, in your capacity here as an expert

4   witness, have you been following news reports regarding

5   allegations of voter fraud, convictions, guilty pleas of motor

6   fraud recently since the 2008 election?

7   A   Yes.

8   Q   And you are having some such newspaper reports of these

9   occurring; correct?

10  A   Yes.

11  Q   And, in fact, one such event was reported today, are you

12  familiar with that?

13  A   I'm not familiar with today's reports, no.

14  Q   All right.

15          I think we're going to try to tell you what we're

16  talking about.  Oh, I apologize.  We are actually going to

17  refresh your recollection on April 29th.  Are you familiar with

18  a report of individuals pleading guilty to voting in the wrong

19  state intentionally as of April 29th, 2009?

20  A   Yes.

21  Q   And what do you know about that?

22  A   I know that there were three individuals who had moved to

23  Ohio several months before the Ohio election, and had

24  registered to vote there without the intent to remain.  It's my

25  understanding that they went through materials on voter

Levitt-cross                                      142

1    registration forms, they did not understand that to be -- the

2    intent to remain to be a requirement, for how long, that they

3    in fact registered to vote and that was unlawful.

4    Q    And they plead guilty to an offense?

5    A    They do.

6    Q    And, in fact, you're aware that they were fined a thousand

7    dollar apiece and given suspended jail sentences?

8    A    Yes.

9    Q    I have one last question, sir.  Would you agree that the

10   Democratic National Committee's publication of voter

11   suppression allegations typically made against Republicans,

12   whether or not they are true, could have the effect of

13   deterring voters from voting?

14   A    If they're made, whether or not they are true, yes.

15   Q    Well, if they're made in advance of the election, for

16   example, in a preemptive fashion, would you agree that they

17   could deter voters from voting?

18   A    It is certainly possible.

19   Q    And if they're made in an absence of knowing whether the

20   allegation is entirely true or false, could they have the

21   effect of deterring voters from voting?

22   A    If that were true, we're now, as I understand it, getting

23   into hypothetical situations, but if that were true, yes.

24   Q    We're getting into the situation where in the heat of the

25   campaign, right around Election Day, there might be information

1    that is questionable.  Based on that kind of information, the

2    testimony that voter suppression is about to occur and is

3    occurring, are you saying that it affected the voting?

4    A   Depending on how it's handled, yes, it could.

5    Q   Nothing further.

6           THE COURT:  Anything else?

7           MR. GENOVA:  Briefly, your Honor.

8           THE COURT:  Pardon?

9           MR. GENOVA:  Briefly.

10          THE COURT:  All right.

11   REDIRECT EXAMINATION BY MR. GENOVA:

12   Q   You were asked a series of questions about your role in the

13   Crawford case.

14   A   I was.

15   Q   And you recall the question -- first citation that Mr.

16   Levine pointed out to your attention appearing in that

17   decision?  You were referring to a footnote.

18   A   I was.  I know the footnote.

19   Q   And that would be footnote 12?

20   A   Yes.

21   Q   You want to turn to footnote 12?

22   A   I don't know if I still have that in front of me.  I

23   believe it was placed on the screen.  I'm quite familiar with

24   that one, though.

25   Q   Is that what you're referring?

1    A    That is.

2    Q    And what is that you want to testify that Mr. Levine chose

3    not to ask you about?

4    A    The main sentence in the opinion says that occasional

5    examples have surfaced in recent years and cites to record

6    evidence examined in this case that actually did not reveal

7    what it reported to reveal.  I know that because it was in part

8    on behalf of the Brendan Center that we examined each and every

9    allegation of fraud in the Crawford cases.  And in footnote 12

10   it actually acknowledges that the sentence reads:  The record

11   evidence of the in-person process is overstated.  And there

12   remains scattered incidents.  And it goes on to relate one

13   scattered instance.  And unfortunately, even the one scattered

14   incident, it comes -- as we've heard multiple times, there are

15   reasons to doubt those sorts of allegations without further

16   follow up.  So I wanted to -- it seemed to me misleading to me

17   to read just the sentence without the caveat that the Justices

18   have further in fact examined this issue.

19   Q    And Mr. Levine further showed you another section of that

20   decision which talked about the state's interest in counting

21   only the votes of eligible voters.  Do you remember that?

22   A    Absolutely.

23   Q    And you appeared amica in this litigation.  And throughout

24   the decision, the Court talks about the state's interest.  This

25   concept of the state's interest, I take it in your research,

1    there's a bureaucracy set up in every state designed to

2    administer the elections; is that right?

3    A    Yes.

4    Q    And am I to understand we're talking about the official

5    apparatus that's established for the purpose of administering

6    our elections fairly and openly?

7    A    They're talking about both the loss of the state and the

8    apparatus that is established.

9    Q    And you're not aware of any private entity, political party

10   or otherwise, who is endowed with the authority, legal or

11   otherwise, to be charged with the obligation to monitor

12   elections in the public interest, are you?

13   A    There are some states that actually give that authority to

14   individuals at the polls to some degree.  As we've heard much

15   testimony about, the degree to which those individuals

16   discharge their responsibility may either increase the

17   integrity of the elections or harm.

18   Q    As a general principle, is it fair to say that it is the

19   election and apparatus of each state who is charged with the

20   responsibility -- it's principally the responsibility of the

21   election apparatus in each state to ensure that our election

22   laws are fairly administered?

23   A    That's certainly right.  And I know in my research and

24   discussions with local election officials, they safeguard that

25   responsibility zealously, and in my experience, perform it to

1    the best of their ability.

2    Q   And it's anticipated that those election officials, whose

3    duty it is upon the day of the election to appear and

4    administer our laws, are charged with the responsibility of

5    themselves monitoring whether election fraud is occurring?

6    A   That is true.

7    Q   As however defined?

8    A   That is true.

9    Q   You were asked a series of questions you might recall with

10   respect to the maj -- actually the minority report, the

11   majority and minority report regarding the National Voters

12   Registration Act.  Do you remember those?

13   A   Yes.

14   Q   And that was Exhibit 15?

15   A   Yes.

16   Q   Now, Mr. Levine highlighted for you portions of the

17   minority report; correct?

18   A   Yes, that's correct.

19   Q   And do you remember who the minority Senators were on that

20   report?

21   A   I have a list of 42.  There may be a different list as

22   well.

23   Q   This would be Exhibit 15?

24   A   That's the same list.

25   Q   Okay.

Levitt-redirect                                                    147

1    A    The caption represents 42, and that was purported on 47.

2    Q    One of them was for Senator Jessie Helms?

3    A    Yes.

4    Q    And in your research, did you ever come across a case

5    involving the campaign of Senator Helms?

6    A    Yes, I did.

7    Q    And do you want to briefly share with us what your

8    recollections were?

9    A    I understand in part that was the subject of the

10   proceedings under this consent decree and independent

11   enforcement action by the Department of Justice with regard to

12   caging mailings distributed by that campaign.

13   Q    Arising out of his own candidacy?

14   A    Yes, correct.

15   Q    And could you turn to page 5 of the majority opinion, the

16   majority report.

17   A    Okay.

18   Q    Now, I've highlighted the section known as the driver's

19   license procedure as it relates to motor voter registration.

20   What is the import of this section?

21   A    This actually discusses the sort of safeguard that I think

22   was discussed on direct testimony, the fact that in an attempt

23   to move people toward a registration system where they

24   registered at an agency, a motor vehicle agency, or at a social

25   security agency, it has built-in safeguards because those

1    agencies have their own procedure to determine whether or not

2    an individual is eligible or not.

3    Q   Now, specific attention was given by Mr. Levine to the mail

4    registration as posing its own challenges.

5    A   Yes.

6    Q   Do you recall those questions?

7    A   Yes, I do.

8    Q   And what I'm putting on the screen is Roman numeral II,

9    which is the majority report portion dealing with mail

10   registrations.  Do you see that?

11   A   I do.

12   Q   Now, the first section that I've highlighted talks about

13   the form that has to include the statement that specifies each

14   eligibility requirement.  What is the import of that?

15   A   There is in effect a declaration, much like a declaration

16   in court, that the individual is who they say they are.  That

17   they are a citizen, that they're of voting age, and that

18   they're otherwise eligible to vote.

19   Q   Now, specifically the majority addresses the questions Mr.

20   Levine posed to you in the next highlight in the first

21   sentence, where some have expressed concern that mail

22   registration would increase the potential.

23   A   Yes.

24   Q   Do you see that there?

25   A   Yes.

1   Q   It sounds like the genesis.  In fact, it cites the Justice

2   Department letter that is recited in the minority report?

3   A   Yes.

4   Q   How does the majority appear to deal with that on page 11?

5   A   With facts, rather than potential or hypothetical.  They

6   have asked the states that actually had significant mail

7   registration efforts when the National Voter Registration Act

8   was enacted:  Do you actually have fraud in your elections?

9   And when they actually asked these states:  Do you have fraught

10  in your elections?  Had you examined them?  What do you see the

11  real risk to be?  The states essentially said:  It's not a

12  problem for us.

13  Q   And that's recited in the first light on the screen; is

14  that correct?

15  A   Correct.

16  Q   And so they've done -- they made an inquiry, and is it you

17  that collaborates your testimony here today with respect to how

18  real this concept of voter fraud is?

19  A   It is.  I'll also say that after the National Voter

20  Registration Act was enacted, that Help America Vote Act

21  provided what is in my mind an even more ironclad safeguard

22  against fraud in this sort of mail ballot procedure.  And that

23  is that now, after the Help America Vote Act, whenever any

24  voter must submit a registration form for the first time, they

25  must, through various means, prove that they are who they say

1    they are.  And that's a federal mandate that I believe -- I

2    believe this is true, applies to the same registration.

3              MR. GENOVA:  I have nothing further, your Honor.

4              THE COURT:  All right.  Anything else?

5              MR. LEVINE:  Three questions on cross, if you would

6    permit, your Honor.

7              THE COURT:  All right.

8    RECROSS EXAMINATION BY MR. LEVINE:

9    Q    Mr. Levitt, regarding Mr. Genova's questions regarding the

10   role of the state in protecting and preserving the integrity of

11   elections, you agree, don't you, and you understand that every

12   state, all 50 states of this union, allow poll watching;

13   correct?

14   A    Yes.

15   Q    And so nationwide the states do delegate to private

16   individuals the poll watching function for purposes of

17   assisting with ensuring the integrity of elections?

18   A    There are different functions within there.  Some require

19   challenges to be brought before Election Day, some on Election

20   Day.  All of them allow watchers at the poll itself.

21   Q    Last question.  I'd like you to turn back to the document

22   that Mr. Genova is just asking you about, the report regarding

23   the Motor Voter Law.

24   A    Certainly.

25   Q    And, in fact, let's look back at the page they were talking

1    to you about.

2    A    Okay.

3    Q    Do you recall that Mr. Genova was asking you about a survey

4    that was done in which the states were asked the extent to

5    which they thought voter fraud occurred within their borders.

6    Do you recall that?

7    A    Yes.

8    Q    And that testimony was that the State did not have voter

9    fraud problems?

10    A    Particularly, though, relying most heavily on mail

11    registrations, yes.

12    Q    And it's true, isn't it, just on the face of this report,

13    that this study referred only to voter registration officials

14    in 18 states for which they were available?

15    A    Certainly.

16    Q    Not all 50 states?

17    A    That's right.  Those include, for example, states like

18    Oregon, which have almost exclusively mail registration, and

19    later ballot voting procedure.  They focussed on the states,

20    not only, that had data available and had a very significant

21    mail order program.

22         MR. LEVINE:  Nothing further, your Honor.

23         THE COURT:  All right.  I take it you have no further

24    witnesses?

25         MR. LEVINE:  No further witnesses.  No further

1      questions, your Honor.

2              THE COURT:  All right.

3              What would your pleasure be?  Do you wish to have

4      short closing arguments, or put it all on paper?

5              MR. BURCHFIELD:  Your Honor, we would defer to your

6      preference.  We could make a short closing argument, or we

7      could submit something now briefly on paper.  It seems to us

8      you've got quite a bit of paper --

9              THE COURT:  I got plenty of paper.  It might be

10     helpful to have maybe 30 minutes summation with the evidence

11     you

12     presented, the significance of it, and why don't we limit it

13     strictly to 30 minutes, and we could have, let's see, Mr.

14     Burchfield go first for 30 minutes, and we'll take a

15     five-minute recess, and Mr. Genova.

16             MR. BURCHFIELD:  Could we take a five-minute recess

17     now?

18             MR. GENOVA:  Your Honor, while we're on house

19     cleaning, generally, are we -- will we be permitted to file

20     post hearing briefs?

21             THE COURT:  Yes.

22             MR. GENOVA:  And we can talk about after the closing

23     what the schedule is?

24             THE COURT:  Yes.  If we need a little bit more paper,

25     sum everything up.  Let's take a five-minute recess, and 30

1    minutes apiece.

2          (Recess)

3          THE COURT:  All right.  Mr. Burchfield, why don't we

4    go about 30 minutes each.

5          MR. BURCHFIELD:  Very well, your Honor.

6          THE COURT:  I'll give you a five-minute warning.

7          MR. BURCHFIELD:  And I may not use the entire 30

8    minutes, your Honor.  Once I get going, I may need a warning.

9          If it please the Court, your Honor, when we came to

10   court in this matter to seek vacatur or modification of the

11   consent decree, we emphasized that one reason that the

12   Republican party, the Republican National Committee believes

13   the consent decree is onerous and should be eliminated is

14   because of a perceived growing threat of voter fraud.  That is

15   not the only reason that this consent decree should be vacated.

16   But voter fraud is real, despite the protestations you've heard

17   from some of the witnesses.  Even when narrowly defined, as Mr.

18   Minnite and Mr. Levitt tried to define it, it is a significant

19   issue.

20         In exhibit -- in DNC Exhibit 25, which is Dr.

21   Minnite's letter to Senator Feinstein, she includes a chart at

22   the end, and that chart indicates from her review, this is DNC

23   Exhibit 25, from her review of federal election crime

24   prosecution from October, 2002, to September, 2005, a period of

25   just about three years, she found 26 convictions of voters who

1   had engaged in voter fraud.

2          Now, bear in mind what all the witnesses have agreed

3   to here, which is voter fraud, criminal voter fraud is very

4   difficult to prove.  It requires intent to vote when one knows

5   one is ineligible for the purpose of corrupting the election

6   process.  Twenty-six convictions during that period of time at

7   the federal level is not insignificant.

8          In addition, Dr. Minnite also has found 11 convictions

9   of government officials for voter fraud, 30 convictions of

10  party and campaign workers for election fraud, and three

11  convictions of election officials for voter fraud, for a total

12  convictions of 70 people.  That is not insignificant.  And that

13  is just at the federal level.  As we know, your Honor, many of

14  the prosecution for voter fraud occurred at the state level.

15  For example, the fact that Mr. Levine referred to a minute ago

16  was reported convictions in Ohio.  And this is that article

17  from the Columbus Dispatch.  We had, April 29th, 2009, vote

18  today, Ohio campaigners.  Apparently it was a photo from left,

19  Yolanda Imstel and Daniel Tate Houseman 32 voted here instead

20  of their home states to help Barack Obama in the fall election.

21  The three chose Ohio over the home states where Obama was

22  likely to win because they wanted to swing the electorate

23  Congress college vote.  He ordered a year's probation, a

24  thousand dollar find, and 60-day suspended jail sentence.  It

25  happens not only at the federal level, but at the state level.

1       And neither of the witnesses that came here to talk about voter

2       fraud, didn't look at the state level.  There was considerably

3       more evidence of voter fraud at this state level.

4            Second, there are other very important types of fraud

5       other than voters walking in.  There are also campaign workers.

6       There are also government officials who were engaged in voter

7       fraud.  And having poll watchers on the scene is a useful

8       anecdote to that.

9            Third, there are other valid reasons besides voter

10      fraud in order to have knowledgeable poll watchers at the polls

11      on Election Day.  Dr. Minnite admitted many of those.

12      Mechanical operations and breakdown of voting ballot, possible

13      ballot box stuff, poll worker misconduct, intimidation of

14      voters.  There are many reasons to have poll watchers.  And

15      that's why every state in the United States allows poll

16      watchers, and allows parties to have poll watchers at the polls

17      on Election Day.

18           THE COURT:  What in the decree precludes poll

19      watching?

20           MR. BURCHFIELD:  Well, your Honor, as we -- as Mr.

21      Josefiak testified, because of the decree and the way it has

22      been applied, the RNC does not put poll watchers in polling

23      places because it believes, in order to do so, it needs to go

24      through preclearance.  And, in fact, in 2004, your Honor

25      specifically said with regard to the order in that case, at

1    page 67, this and other evidence demonstrates quite clearly

2    coordination between the RNC and the Ohio Republican party, and

3    the Ohio voter fraud group.  And the answers at that time of

4    the RNC, while this is not in and of itself illegal, under Ohio

5    and federal law it was a clear violation of the 1987 consent

6    decree in that advanced court approval was not obtained.

7            I think Mr. Josefiak and his colleagues in the legal

8    department of the RNC are being quite prudent and quite

9    discrete in their role as lawyers for that organization in

10   telling the RNC that it is best in not involving themselves in

11   poll watching activities because it is not clear what they can

12   do, and what they can not do.

13           THE COURT:  As a practical matter.

14           MR. BURCHFIELD:  Absolutely, your Honor.

15           THE COURT:  Isn't this something that everything I've

16   seen and political activity has been the county and the

17   practice of the statewide office, the state, to put the poll

18   watchers in?

19           MR. BURCHFIELD:  I think Mr. Josefiak answered that

20   question, your Honor.  He said the RNC is intimately involved

21   in the 72-hour program leading up to the elections.  It

22   mobilizes the state and local parties and the candidate's

23   committees to put people on the ground in the states for

24   purposes of voter registration and get out the vote.  Then it

25   steps back and let's those groups do the poll watching because

1    of the reasons I've just stated, because the RNC does not know

2    how it -- in terms of poll watching activity.  And as was

3    suggested at least in the Malone decision, if the RNC works

4    with those groups, and one of those groups goes off the

5    reservation, the RNC may itself be held liable under the

6    consent decree.  Fairly or unfairly, that's a risk the RNC has

7    to take into account when it involves itself.

8            Now, I would also say that the decree, the consent

9    decree is deterring the RNC in getting involved in poll

10   watching activities, and involving itself with the state and

11   local parties.  I would submit to your court that that may not

12   be in the best interest of the election process because the RNC

13   is a very transparent organization.  It is a -- it is and will

14   always be held to account for whatever -- for whatever

15   allegations are made against it, and it would be a responsible

16   influence on the rest of the Republican party on Election Day

17   if it were allowed to participate to the full extent that it

18   would participate absent this consent decree.  It's our

19   submission, your Honor, that not only is this consent decree

20   preventing the RNC, it is also preventing the RNC from doing

21   things that would be beneficial to effective and responsible

22   poll watching activity on Election Day because the RNC knows

23   the state laws, it knows the federal law, and it does train the

24   state and local parties about these activities, and it should

25   be -- they should be involved all the way up through Election

Summations                                    158

1    Day.  That's our position.

2             THE COURT:  All right.

3             MR. BURCHFIELD:  Now, with regard to -- so we believe

4    that poll watching is important to the RNC.  Mr. Josefiak

5    explained, I think very persuasively and without contradiction

6    why it's important to the RNC.  The Democratic National

7    Committee works closely with the state parties and its

8    candidates in order to make sure the poll watching is done.

9    The RNC is put at a disadvantage in the sense that it is

10   restricted by the consent decree from doing so.

11            We also saw the RNC policy set forth in Mr.

12   Gillespie's letter which Mr. Josefiak referred to as a no

13   tolerance policy.  And that is that any voter intimidation or

14   minority voter suppression is not to be tolerated with the RNC.

15   Even more so now, that two of the top four officials of the RNC

16   are themselves minorities, Mr. Steele, the Chairman.  And as

17   for the Malone matter, and your Honor suggested at the outset

18   of this hearing that we were not here to relitigate this case.

19   But every time we talked about the necessity of this decree,

20   our colleagues, our friends from the other side of the aisle

21   here, have retreated to the Maloey matter and they said --

22            THE COURT:  I said we were going to rely on the record

23   in all these cases.  We're relying on the record of those

24   cases.

25            MR. BURCHFIELD:  Well, your Honor, we are -- we are

1    happy to do that.  But bear in mind with regard to the Malone

2    matter two things.  First of all, the passage I just read to

3    you does have a significant chilling effect on the RNC.  Even

4    if those activities are proper under federal and state law,

5    they're subject to the preclearance requirement and we believe

6    that's unfair.

7            Number two, the RNC also took that -- took that ruling

8    up to the Third Circuit where it was stayed, and then

9    ultimately the Third Circuit dismissed it as moot.  And under

10   Muntising Ware, it is no longer controlling.  We would have

11   gone forward with our appeal from that ruling in the Third

12   Circuit but it wasn't permitted when it became moot.  The

13   findings and its conclusions and the ruling in the Malone

14   matter, with all due respect, your Honor, are no longer

15   binding.

16           And the third thing about Malone, the Malone matter

17   is, at best, from the DNC's perspective, it involved -- it

18   involved some involvement by the RNC, which the RNC denies in

19   this operation out in Ohio.  But the fact of the matter is, the

20   plaintiff in that case was registered three times.  The voting

21   officials in that case had flagged her voter registration, and

22   she was going to be challenged on Election Day, even if there

23   was an RNC.  And the fact of the matter is, she did ultimately

24   vote.

25           Your Honor, we do not believe the Malone matter is

1     essential, but the most compelling evidence in this case is

2     that the Democratic party brought in the nationally recognized

3     expert on voter suppression, Dr. Davidson.  And he testified

4     that he had found 14 instances of voter suppression.  And but

5     for the two instances that were the foundation of this earlier

6     consent decree, he was not aware of any instance in which the

7     Republican National Committee had been involved in voter

8     suppression.

9            Now, that was their evidence.  That was the best they

10    could do.  And for all the talk about voter suppression in the

11    Republican National Committee being involved in voter

12    suppression, they do not have any contemporary evidence of

13    voter suppression by the RNC.  And that is a pivotal fact in

14    this case, your Honor.

15           Second major point.  The decrees are antiquated.  As

16    Mr. Josefiak explained, under the Motor Voter Act, the National

17    Voter Registration Act, and under HAVA, minority voter

18    registration and minority voting are as significant as a

19    percentage of the voting public as they have ever been, and

20    they appear to be trending upwards.  There is no objective

21    evidence of wide-scale effect of voter suppression on the

22    minority community in this country.  And that evidence was not

23    denied by any of the defendant's experts.

24           In addition, BCRA, the bipartisan campaign, the

25    Campaign Reform Act, I'm sorry, but I'm lapsing into jargon,

1    your Honor, also a problem that we in Washington have.  The

2    Bipartisan Campaign Reform Act has, as your Honor recognized in

3    the Malone decision in 2004, has caused groups like Act and

4    ACORN to take a much more active role in voter registration on

5    the Democratic side because they can do it with easily, more

6    easily obtainable soft money from corporate, union, and wealthy

7    individual sources, whereas the political parties cannot.  It

8    is not a question, it is not a question of these, as Mr. Levitt

9    tried to make it, it is not a question of the Bipartisan

10   Campaign Reform Act loosening the requirements on the outside

11   group.  It is a function of that act tightening the

12   requirements from the political parties which forced a lot of

13   these activities out into private, not very transparent, and

14   frankly not very well controlled entities that have been

15   involved in quite a bit of mischief, as we've seen repeatedly

16   from the press reports, from indictments and convictions with

17   people affiliated with ACORN and these other groups.  And that

18   is a concern, and that has happened since this decree and BCRA

19   was passed in 2002, and that has happened since both of the

20   decrees were in force, and that should bear upon whether the

21   consent decree remains in effect.  I'm talking too fast, am I

22   not?  I will slow down.

23          Finally, your Honor, the changes in voting procedures

24   at the state level are not to be against -- the increase in

25   early voting, the increase in absentee, no excuse absentee

1   voting, all of those activities have been seized upon by

2   voters, who for whatever reason, do not want to go to the polls

3   on Election Day.

4          Now, it is worth noting, Mr. Levitt's testimony just a

5   few minutes ago, that to the degree -- to the degree publicized

6   charges of voter suppression deter minority voters of going to

7   the polls, the Democratic National Committee can be as big a

8   culprit of keeping them away from the polls by publicizing not

9   well-founded charges.  If that is a problem, if minority voters

10  or any voters think they're going to have trouble with the

11  ballot box on Election Day, they can very well seek an absentee

12  ballot, and they never need -- they could vote early and go to

13  one of the designated poling places so that they're not going

14  to the polling place in which they think there may be

15  intimidation.  So the decrees are antiquated in light of

16  significant changes in the way we conduct the elections in this

17  country since 1982 and 1987.

18         And finally, your Honor, the decrees are antiquated --

19  the decrees are onerous.  The cost that Mr. Josefiak testified

20  about, not only in terms of the legal cost of having to come to

21  court and defend against these challenges, which is

22  significant, but also the legal cost of -- on the officials of

23  the RNC who are dragged into these proceedings, like the Deputy

24  Chairman of the RNC, Maria Cino, who spent the better part of

25  the week before the election in preelection activity; and Blaze

1   Hazelwood, the Senior Director of the RNC, who was also tied up

2   days before the election.  That's an oppressive burden to put

3   on those individuals in days leading up to the election.  It is

4   not lost in our political adversaries that they are able to tie

5   up senior staff members of the RNC with these election eve

6   challenges, and then who they want to depose, and then those

7   people should be doing other things that are more politically

8   useful.  And so that's a huge burden on the RNC.

9          The preclearance requirement, in particular, imposes a

10  very significant burden on the RNC.  As Mr. Josefiak explained,

11  and I do not think that this had been rebutted, in order to

12  obtain preclearance, the RNC needs to allocate 20 days.  And

13  the 20 days to the consent decree that's required to inform the

14  DNC, and then it needs to give this Court an opportunity to

15  consider the proposal, and then it needs to back up additional

16  time to allow implementation of the plan that it's going to

17  seek preclearance of.  The total amount of time that's required

18  in that effort, your Honor, is at least 30 days, and probably

19  closer to 45 days.

20         Mr. Josefiak again testified, without contradiction,

21  that 45 days out from an election, you can't even definitively

22  state what the battle ground states are going to be in a

23  presidential election.  You can't state what the battle ground

24  precincts are going to be in a more local election.  You look

25  at the polling data and within the last couple of weeks you

1    make those predictions.  Seeking that out, and providing the

2    brand to DNC is not practical.  In addition, it undermines the

3    whole notion of having strategy.  The strategy really isn't

4    going to be worth very much, and it is not -- it is not likely

5    that the strategies would be turned over to the DNC, and not

6    shared with other -- with these interest groups, ACORN and

7    these other groups, that might not have as much integrity as

8    the Democratic National Committee.  The preclearance process is

9    itself very honest.

10        And finally, your Honor, I would simply say the DNC

11    has recognized that there are provisions that the consent

12    decree should be modified in at least these respects.  The

13    first is, that intervenor's should not be allowed, that no

14    entity, other than the DNC and New Jersey party, should be

15    allowed to come in, and we quoted from their briefs, and Mr.

16    Genova conceded as much when your Honor asked him that in his

17    opening statement.

18        The second provision in their briefs that we believe

19    warrants modification of the consent decree is their statement

20    that a challenge or contest of a provisional ballots should not

21    be deemed to be -- should be deemed to be a normal poll watch

22    function, not subject to preclearance, and not subject to

23    injunction under the consent decree.  Both of those things,

24    your Honor, I believe had been conceded to modification of the

25    consent decree.  But that will not give the RNC the relief that

1    it needs in this case, and it will not recognized the changes

2    that have gone on, either factually or legally, over the last

3    27 years.  And, in fact, that would not constitute, in our

4    view, those two things -- those two things would not constitute

5    effective relief.  The process, itself, the very notion of the

6    RNC doesn't know how broadly normal poll watching activities

7    will be interpreted by this Court is a significant impediment

8    of the RNC, and conducted affairs in the way that it believes

9    as proper, and we believe it appropriate for the public

10   interest.

11          Unless your Honor has any further questions, I will --

12          THE COURT:  All right.  Well, you're commendably

13   concise.

14          MR. BURCHFIELD:  I try to be, your Honor.

15          THE COURT:  All right.  That's a virtue.  All right.

16          Mr. Genova.

17          MR. GENOVA:  In the interest of fairness and time, I

18   waive my five minute preparation period.

19          THE COURT:  Well, you've had it.

20          MR. GENOVA:  I trust that will engender some good

21   will.

22          Your Honor, I think the starting point for us is

23   something that apparently the RNC has either lost in the

24   translation or forgotten, but this is their application.

25   They're the movant under Rule 60B.  And it's clear, as a matter

1    of law in this circuit, that the burden resides with the RNC.

2    That's a legal burden.  It's not one we've imposed, it's one

3    the court rules have imposed.  And to argue in closing argument

4    or otherwise that we have failed to make certain proofs in this

5    case belies the fact that the burden resides with the RNC.  And

6    they've sought to meet that burden with the introduction of one

7    witness who has provided self-serving, highly biased evidence,

8    if you will, or statements.  This is a lawyer that has served

9    as counsel to the Republican National Committee in a variety of

10   different contents, but most importantly, has not even served

11   in the contention of the negotiation, its modification, or

12   indeed any of the litigation for enforcement which have arisen

13   from this.  So I find it not only peculiar, but I find that any

14   weight to be accorded to his observations because, as you know,

15   he was not submitted, other than to pontificate on his

16   observation as counsel to the RNC on matters which have proven

17   in the course of this proceeding to be relevant, issues of

18   voter suppression, issues of voter fraud.

19          THE COURT:  I think the vast amount of the evidence is

20   the documentary evidence, apart from Mr. Josefiak.

21          MR. GENOVA:  I would agree, your Honor.  Obviously

22   there's a good deal of documentary evidence.  But let's still

23   go back to the burden for a moment, and then I'd like to

24   highlight some of those documents for your edification.  Being

25   guided by the requirements of 60B, it's clear that 60B does not

1    contemplate either the vacatur or the dissolution, or even

2    modification of a consent decree when it's no longer convenient

3    for a party to live within its terms.  And I was struck by -- I

4    was almost taken aback by what I took from the testimony

5    presented by Mr. Josefiak, was that what is now being

6    characterized as prudence, struck me as the fact that, never

7    having been an overture to seek either clarification or

8    revisiting of a question, that its counsel's will as to the

9    scope and breath of the concept of ballot security,

10   particularly in the face of the 1987 order that gives the

11   definition about security and embraces the notion of moral poll

12   watching functions.  And I'll get to that in a minute.

13        But the point to this is, this consent decree has a

14   history, and it's a history that we cannot simply abandoned.

15   It has a genesis that we cannot simply abandoned.  And we have

16   to recognize that the consent decree is not only a final

17   judgment, but it's the result of a negotiation, not once, but

18   twice, between these two parties; and a serious negotiation, as

19   your Honor might recall, emanating from an important lawsuit

20   that was filed.  But the two parties sat down and duly

21   represented, and negotiated terms, and the RNC has to take some

22   ownership as one party to that in the structure of a settlement

23   agreement which found its way into an order of this Court.

24        And your Honor left it to the parties to negotiate

25   those terms, not only in 1981, but in 1987.  So they're an

1    equal partner in this.  And to come to this court and say:

2    We're not sure what this means, or it needs clarification, or

3    we want to undo the deal, obviously they can do that.  But

4    that's why they have a heavy burden, your Honor, and they have

5    an even heavier burden, in my view, because they were parties

6    to the negotiation of its content.  So that heavy burden has

7    been interpreted in this circuit as one that requires them to

8    prove, not only by a preponderance, but by clear and convincing

9    evidence, certain elements or things that happened since the

10   inception of the order.

11           Now, why is this a heavy burden?  Now, I think it's a

12   heavy burden as a matter of law because most often people seek

13   to modify orders, not to achieve the purposes of the order, but

14   to escape the requirements of the order.  And that exactly

15   appears to be what the RNC is seeking to do with this

16   application.

17           Now, specifically what they had a burden of proving

18   here was the following.  They had to show a significant change

19   in factual conditions.  They to show a statutory or additional

20   law change which would make legal what the decree was designed

21   to prevent.  They have to show that the decree is unworkable.

22   And they have to show that when the decree, or if the decree

23   remains unmodified, it would be detrimental to the public

24   interest.  That is their burden, and we believe that they

25   woefully failed in satisfying that burden.

1           First, beginning with the utilization of Mr. Josefiak

2      as their principal witness.  So let's go first to the times

3      have changed, and what evidence was produced of a change in

4      time?  Well, one of the things that struck me is if one of the

5      predicates for their claim was that the environment today,

6      whether by law or fact, has changed the propensity of voter

7      fraud, I saw no evidence introduced that says that the

8      challenges of voter fraud, whether you concede the description

9      they gave to voter fraud or not, whether they're any different

10     than they were in 1981 or 1982.  They argue off of statutes.

11     We rebutted that.  But we have the self-serving statements of

12     Mr. Josefiak interpreting laws, as creating an environment of

13     voter fraud.  But in reality, what those laws do is enhance

14     people's opportunity to participate and exercise the franchise.

15     That's all they do.  And if that leads one to a conclusion that

16     that enhances the opportunity of voter fraud because more

17     people are participating, then your Honor would have to draw

18     that inference.

19          There is no evidence in this Court's ruling that I saw

20     that said in 1982, this was the experience that we in America,

21     and in New Jersey, and elsewhere, experienced in the area of

22     voter fraud.  And here we are today, in 2009, and it's any

23     different.  There's been no significant factual change in that

24     regard.  And I would contest not only through my experts, but

25     on the face of the laws, themselves, that they cite for the

1    proposition that there's been a change, whether it be BCRA,

2    HAVA or the Motor Voter Law, that those offer no change.

3        Interestingly, neither did they show any change in the

4    underlying Voter Rights Act that would suggest that the body of

5    law upon which my clients relied in 1981 has in any way

6    changed.  And in that regard, your Honor, I would highlight

7    Defendant's Exhibit 26, which is the Carter-Baker report.

8    Their recommendation at 15.13 and 15.1 4.

9        While that's cooking up.  Your Honor, you might recall

10   that even in that report it was suggested by that Commission

11   that they relied upon, that we've yet to adopt legislation that

12   would ensure against the very kind of voter intimidation.  More

13   legislation is needed, were the words.  At 5.13, in addition to

14   the penalties set by the Voter Rights Act, they propose that

15   there have been certain felonies adopted as well.  The National

16   Voting Rights Act Commission, which Professor Davidson serves

17   on, which was introduced at this proceeding, says at page 103:

18   Efforts to suppress the minority vote, while not as systemic

19   and pervasive as those of the preact are still encountered in

20   every election cycle in many venues across the country.

21       It includes, in short, both the evidence from the

22   hearings, and additional data relied on in this report indicate

23   that what the Voting Rights Act has accomplished during the

24   first 40 years, much remains to be done in order to protect the

25   rights of racial and ethnic minorities to fully participate in

1    the electoral process.

2           Your Honor, if the change in the law doesn't reside in

3    BCRA or HAVA, or the Motor Voter Law, and it doesn't reside in

4    the change of law under the very theory on which this case was

5    advanced, it's inconceivable to me that they would have met

6    their burden to show either a factual or significant change in

7    the law that meets the first element, or at least one of the

8    elements that they're duty bound -- two of the elements that

9    they're duty bound to abide by.

10          Let me focus on the notion that -- and I found it

11   interesting, in Mr. Burchfield's closing, that we got a shift,

12   Judge.  This isn't just about voter fraud, it is an onerous

13   consent decree, and this is really a burden on us.  And it's

14   not workable for a variety of reasons, which I take has to be

15   their ultimate argument.  I don't believe they've been able to

16   establish by clear and convincing evidence the significant

17   changes.  This is a court of equity, and I understand that your

18   Honor can make certain judgments based on duration, based on

19   the length of it, based on some of the efforts that are

20   suggested to have been made in efforts to comply.

21          First, let me say that there's been some suggestions

22   that we have a few incidents, that Professor Davidson spoke

23   about the number of incidents that occur.  I view that as a

24   point of fact.  I view that as a fact that the consent decree

25   is working.  It strikes me that maybe, just maybe, you can draw

1    the same inference that the consent decree very much has had

2    the desired effect.  And maybe, just maybe, you can draw the

3    inference that the fact that the RNC hasn't been the subject of

4    this enforcement proceeding, other than the four or so that has

5    been brought here in the last 27 years, has everything to do

6    with the fact that the consent decree itself has served its

7    intended purpose.

8         Mr. Burchfield would have you make little of the Ebony

9    Malone matter.  I was in this courtroom, you were in this

10   courtroom, your Honor, Mr. Burchfield was in this courtroom.

11   We sat through depositions.  You made find -- we all know what

12   happened there.  And we live in an electoral environment where

13   we have elections every four years.  It is one election back,

14   your Honor.  So whether or not this is about the RNC behaving

15   itself, and there is a remote event that is only one election

16   back, your Honor, where this Court made a finding that the very

17   caging behavior, that there was a genesis for the original

18   behavior that occurred, and occurred at the hands of the RNC.

19        I was also struck by another comment made in Mr.

20   Burchfield's closing about, and I took it to mean that there

21   was a concern on the part of the RNC on the issue of

22   workability, about the behaviors of their various local

23   entities, whether it is their state party committees, or their

24   local party committees.  And I got the sense that maybe they

25   don't trust that the local committees will do what has to be

1    done to avoid either obligations under law or otherwise.  I

2    also got the sense by that statement that he was conceding that

3    the very compliance program that Mr. Josefiak talked about

4    wasn't working.

5         Your Honor, there's an 800-pound gorilla in this room

6    that I've struggled with, whether or not I've confronted with

7    the Court, but I think it needs to be confronted, and that is,

8    what is it that the RNC is seeking to modify?  If the order is

9    to be preserved, are they seeking to modify or clarify the

10   definition of ballot security as appears in the '87 order?  Or

11   are they seeking to modify, in a backhanded way, in not being

12   direct, the obligations that are attached under Section 2E,

13   which speak to both facially neutral programs which have a

14   disparate effect, and methods that have a purposeful,

15   intentionally discriminatory effect.

16        Now, why do I say that?  Well, at first I wasn't sure

17   why they were abdicating the fact that because an African

18   American is at the helm of their organization, there we should

19   impute to the RNC indifference or an absence of bias that would

20   motivate them to conduct such programs.  I don't know Chairman

21   Steele, but I think in and of itself is presumptuous to think

22   that the race of an individual is going to drive their very own

23   personal biases.  The reason we adopted and negotiated very

24   heavily over an effects test in the original settlement

25   agreement was to ensure there it is not just the conduct that's

1    at issue.  We could expand and modify this order in different

2    ways.  But I believe their application to vacate is designed to

3    unburden them from a test that exists in the 1982 order, and

4    that test is in Touhey, which says that they are to refrain

5    from undertaking any ballot security activity in polling places

6    where election issues, where the racial or ethnic composition

7    of such district is a factor in the decision to conduct or the

8    actual conduct of such activities there; and where a purpose or

9    significant effect of such activities is to deter qualified

10   voters from voting.

11            So candidly, your Honor, they can have poll watchers

12   at the polling place, but if they decide to pull their poll

13   watchers in only African American precincts in the city of

14   Detroit, then that is a problem under this order.  It isn't

15   just the conduct, but what appears might be the neutral ballot

16   security program, or an equal ballot, or if they can do it, we

17   can do it, whether they choose to place poll watchers only in

18   areas where the ethnic -- ethic composition or racial

19   composition is material, this order is violated.  And when I

20   asked that question directly of Mr. Josefiak about the factors

21   that would go into the programs that he believed they would be

22   deprived of --

23            THE COURT:  It would be your contention that they

24   could not put poll watchers in the minority district?

25            MR. GENOVA:  It would be our contention that if the

1    program had a disparate effect on minorities, whatever it might

2    be, it violates the consent decree.  And that is the heart of

3    this consent decree, your Honor, because it talks about the law

4    exists today that provides the protection of the consent

5    decree.  It does not.  If it's within your Honor's mind that

6    the duration of this, it has now had its life span with life in

7    a political climate that is more tolerant, we live in a legal

8    climate that is more tolerate.  I unleash -- what I'm saying is

9    the Voting Rights Act, if we have to rely on that, requires the

10    initiation of a new complaint with each occasion.

11         Your Honor asked the question of our expert:  Aren't

12    there injunctive proceedings?  Sure there are injunctive

13    proceedings.  Your Honor knows more than most that there are

14    always factual disputes.

15         THE COURT:  There would be factual disputes

16    implementing the decree.

17         MR. GENOVA:  There will be, your Honor.  But your

18    Honor has always -- I've never walked into this courtroom where

19    your Honor hasn't asked the same question with each occasion.

20    What are your proofs?  Show me where the RNC is involved.  Show

21    me where the RNC is involved.  You've asked every lawyer that's

22    walked in here.  And we've met the burden sometimes, and we

23    haven't met the burden other times.  But you've held us to a

24    burden to establish that nexus.

25         What I'm saying is, the standard of proof, our

1    obligations under this consent decree is to come to you and do

2    two things:  Show you that certain behavior has occurred, and

3    show you that they either intended to discrimination against

4    minorities by virtue of that behavior, or that, if we can't

5    prove intent, we can show that the program has a disparate

6    effect on the population and the protected class.  And this

7    isn't a novel theory.

8          THE COURT:  Why wouldn't the same burden exist in the

9    same opportunity if you were appearing before any other federal

10   judge, and in any other district, when you were making the same

11   contentions?

12         MR. GENOVA:  Well, your Honor, because I negotiated a

13   consent order that includes that provision that they knowingly

14   consented to and that I'm making an application to enforce.

15   I'm not starting a new cause of action, a new claim, and the

16   damage is done, your Honor.  The purpose of the order is to

17   deter the behavior prospectively, behavior that they engaged

18   in, in '81; they engaged in, in '86; they engaged in, in 2004.

19         THE COURT:  Well, I'm interested in the poll watchers.

20   They're concerned about the registration or regularities in the

21   minority district.  You mean that it would be voting rights for

22   them to put poll watchers in just the minority district?

23         MR. GENOVA:  The first thing I would say, your Honor,

24   is this.  There's a preclearance provision.  One of the things

25   they've never done, or at least over the last two days, is

1    they've argued that the preclearance gives a competitive

2    advantage, if you will, to the Democrats,

3            THE COURT:  Why isn't that perfectly likely to happen?

4            MR. GENOVA:  I've never in the 26 years under this

5    order heard any application for clearance, and nor have I ever

6    seen an application for preclearance for in camera inspection

7    for the court program to be done.  I've never seen an

8    application designed to protect those concerns and allow the

9    Court under the standards of the order to make an assessment as

10   to whether or not it does have a disparate effect or

11   intentional purpose.  On your question, your Honor, there could

12   be some cases.  We saw --

13           THE COURT:  It seems to me that you're not going to

14   put -- if you have limited number of challenges, you're going

15   to put them where you're expecting the vote to be against you.

16           MR. GENOVA:  Well, your Honor --

17           THE COURT:  Which apparently under this consent decree

18   the state committees, the minority district precincts with the

19   challenges, and it would not -- certainly wouldn't violate the

20   consent decree.  Is it your contention that that would violate

21   the law?  Say the Ohio State Republican Committee as well:

22   We're just going to put poll watchers where we can afford them

23   and where they're going to do the most good, which is Cleveland

24   and all the minority areas.  That violates the law as it now

25   stands.

1              MR. GENOVA:  Well, it certainly begs the question.  We

2     heard from our expert about the concept of racial polarization.

3     We heard about -- we heard about the fact that there's -- among

4     minorities, there's a higher incidence of Democrats than

5     Republicans.  That is what it is, your Honor.

6              THE COURT:  Well, so why can't they -- that is what it

7     is.

8              MR. GENOVA:  Right.

9              THE COURT:  So why wouldn't they put their challengers

10    in those districts?

11             MR. GENOVA:  The same reason why our law does not

12    allow one to choose, for instance, what appears to be an

13    objective criteria for a decision that has a disparate effect.

14    Let me give you a simple example.  Under Title 7, and the body

15    of law that has emerged under the portion of the Civil Rights

16    Act, we have cases that say high school diploma requirements in

17    certain jobs --

18             THE COURT:  I don't think it's comparable.

19             MR. GENOVA:  Your Honor, I think the other answer to

20    the question is, if that's the only place that they choose to

21    place their poll watchers, it is evidence or could be evidence

22    and the burden resides with us that they intended to have a

23    purpose of suppressing that vote --

24             THE COURT:  Why is it suppressing it?  They're just --

25    they can't enforce the law in this state so they're going to

1    enforce it where the -- where it's most likely to help them

2    politically.

3           MR. GENOVA:  Well, your Honor, first -- we're talking

4    about New Jersey, and it's about commission and resources to go

5    to a particular area.  Well, it is their decision to go to a

6    particular area, if announced, or even unannounced, that has

7    the effect on that population.  It's that community to whom

8    their efforts are being directed.  That's still discrimination

9    under our laws.

10          THE COURT:  I would question that.  All right.  I am a

11   political leader in New Jersey, so let's say I'm a Democrat.

12   I'm not going to put my challengers where I don't expect --

13   let's say I'm a Republican in New Jersey, I'm not going to put

14   challenges in Short Hills and Summit, I'm going to put them in

15   areas where they're liking to vote Democratic.  Why isn't that

16   a legitimate thing to do?

17          MR. GENOVA:  It's not a legitimate thing to do under

18   the consent decree.

19          THE COURT:  I'm asking you now under general law.

20          MR. GENOVA:  Under the Voting Rights Act or Civil

21   Rights Act our Juris Prudens Act, that facially neutral policy

22   that would seem to have that rational if they have a disparate

23   effect on the minority group nonetheless could be found to be

24   discriminatory.  It is not unique to the Voting Rights Act what

25   I'm talking about.  And I use the example, again, even though

1    you don't believe it's comparable, I use it by way of

2    illustration.  High school diploma has it.  If everything has

3    it applied to them, that's fine.  That's fair.  Going beyond

4    that, what does it mean?  It means if you look beyond it, there

5    is a high incidence among minority groups of not having a high

6    school diploma.  So this facially neutral policy of saying you

7    could put poll watchers in selective district sounds like it's

8    okay for political reasons, but it has a disparate effect

9    because of the choices that you made and the population that

10    it's affected by it.

11            And, your Honor, our brief would show you legions of

12    cases that talk about this concept and this notion, it starts

13    in the United States Supreme Court case.  That was the law at

14    the time of it's adoption.  And flowing from that, that is the

15    law of the land.  And as the law of the land, that concept

16    would apply in the circumstances you're talking about.  Even

17    these lists that we talked about, there are certain factors

18    that can go into how you generate a list, what the questions

19    are, foreclosures lists, for instance, whether a decision is

20    made to utilize a foreclosure list as the basis for voter

21    challenges at the polling lists.  What is it that they're going

22    to do at that polling place, they're going to challenge those.

23            THE COURT:  What they do is something else.  Just

24    being there to see that the lines are flowing smoothly, and if

25    they're not, election workers are being obstructionists.  On

1    those reasons, I would, as a former politician a long time ago,

2    my practical sense suggests that you ought to be able to put

3    your poll watchers where they're going to do the most good

4    without discriminating.

5         MR. GENOVA:  Your Honor, I would say that you've never

6    seen us come to court challenging the fact that there are

7    Republican poll watchers anywhere, and the order talks about

8    normal poll watch functions, so long as such persons do not use

9    or implement the results of any other ballot security effort.

10        THE COURT:  All right.  I'm going one step further.

11   They didn't put poll watchers in Short Hills, I just put them

12   in Newark, or I just put them in East Orange or Irvington, you

13   would consider that to be violative of the general law?

14        MR. GENOVA:  I would say -- you're talking about the

15   general law or we're talking about the consent decree?

16        THE COURT:  Not the consent decree, but just general

17   law.

18        MR. GENOVA:  I could make out the argument, depending

19   on the facts, and why the selections were made.

20        THE COURT:  The selections were made very clear.

21   Admittedly we think our challenges will do more good to us in

22   Newark than in Short Hills.  We don't want to challenge people

23   in Short Hills, the people that slip by, you probably vote for

24   me.

25        MR. GENOVA:  And, your Honor, we'll also get that

1    answer.  And the last time we had an admission to that effect

2    was in the 1986 litigation in Louisiana where there was an

3    e-mail, it said in the e-mail, you might recall a discussion

4    about a caging program to keep the black vote down.

5              THE COURT:  Well, that's different from keeping the

6    black vote down.  The objective is to keep -- keep the

7    procedures going legitimately in the particular area.

8              MR. GENOVA:  Your Honor, I guess your scenario, I'm

9    just saying to you, is one we'll always get.  If you -- when

10   you ask me the next time if this consent order eliminated --

11   were eliminated and I was held to an intent test, I will never

12   get a smoking gun or an admission from the Republican National

13   Committee or anyone else that the purpose that -- or that the

14   purpose of placing those poll watchers in those Newark

15   districts was to suppress the minority vote.  It will never

16   happen in a deposition or otherwise.  The effects test is the

17   bulwark against that, just as it is the bulwark against that,

18   under any discrimination law in our country.  It's the same

19   concept.  Because it's recognized, and the sophistications and

20   the environment we live in now is that you won't get someone

21   saying -- you won't get the adverse of what we heard here in

22   this hearing that Chairman Steele doesn't discriminate against

23   black people because he's black.  You're never going to get an

24   admission from Chairman Steele or anybody else that any

25   decision to place poll watchers anywhere is grounded on a

1    racial purpose.

2         THE COURT:  All right.  I think an interesting point

3    in your post trial briefs would be the hypothetical that poll

4    watchers do perform perfectly normal poll watching challenging

5    functions not designed is to scare people away or anything like

6    that, can't be placed in racially minority districts.  See,

7    that would be just an interesting point for each party to

8    address in the post trial briefs.  All right.  Well, I

9    interrupted you,

10        MR. GENOVA:  No, your Honor.  I hoped you found the

11   colloquy informative and I think the last points I'd like to

12   make in terms of the evidence in the case, I don't think that

13   clear and convincing evidence has shown that the consent decree

14   is unworkable because I don't think that they've attempted to

15   make it work by way of clarification or application to the

16   Court, or a discussion among the parties to the settlement

17   agreement to the extent that they feel that there are burdens

18   that are being imposed on them.  I think the interpretation of

19   poll -- of what's the normal poll watching function, at least

20   if they had concerns, at least they were warranted, they an

21   opportunity in 2004 to raise the issue, I suppose.  What is

22   clear I think from the evidence, the evidence that we produced,

23   is that this concept of suppressing minority voters is real.

24   It exists.  The RNC participates sometimes.  There are others

25   that participate in it.  We're not saying every occasion is a

1    RNC driven occasion, but the most recent occasion in a caging

2    circumstance that appear before your Honor is a finding.  It's

3    not my speculation, it's not my argument.  You found that.

4          THE COURT:  Well, it is a finding as a ruling in a

5    case because the case has been vacated, or is it just some

6    evidence which is part of the evidence, other evidence in this

7    case?

8          MR. GENOVA:  Well, your Honor, I did not think your

9    findings were returned by the Third Circuit.

10          THE COURT:  They didn't address them.

11          MR. GENOVA:  Exactly.

12          THE COURT:  But the judgment would have resulted from

13    thinking --

14          MR. GENOVA:  That is fair.  But I would -- even if I

15    were to concede that, at worst it is evidence under oath, and

16    we introduced a deposition of a Miss Cino, ran the court record

17    in that proceedings, and evidence introduced in that

18    proceeding, and it was accepted as evidence in that proceeding.

19    And even if we were here today having not made that

20    application, I would be introducing that evidence to support

21    that there was a violation of the consent decree.  So at a

22    minimum, it's evidence.

23          THE COURT:  All right.  Now, what more do you have?

24          MR. GENOVA:  The last point I make your Honor is on

25    this issue of voter fraud.

1           Reasonable people can debate this, but the point that

2      we've been trying to make is if the purpose of the RNC's

3      application is to escape the limitations of the consent decree,

4      and that results in the kinds of programs that are robust, as

5      we've seen in the past, to address their allegations of voter

6      fraud, which in our view is over inflated, then as I think the

7      colloquy of Mr. Levitt showed, it's like a hammer swatting at a

8      fly.  That's not to say that there aren't incidents of voter

9      fraud.  But equal and more weight should be given to the notion

10     that there are incidents of voter suppression, and that voter

11     suppression in and of itself is something that needs to be

12     addressed, as the consent decree addresses, and addresses in a

13     powerful way, and is still alive and well in our country.  And

14     the consent decree continues to serve a valuable public purpose

15     and interest in ensuring and mitigating against that occurring.

16          So with that said, your Honor, we'll address the

17     questions you had in our brief, and I appreciate the

18     opportunity of preparing before you for this argument.

19          THE COURT:  Mr. Burchfield.

20          MR. BURCHFIELD:  Your Honor I have three brief

21     rebuttal points and if I could rely upon my new reputation for

22     brevity --

23          THE COURT:  You have 15 minutes.  That does not mean

24     you have to use them.

25          MR. BURCHFIELD:  I do not intend.

1          Mr. Genova said a number of times that only a change

2     in the law that makes the prohibited conduct legal is

3     sufficient to vacate the injunction.  There is in fact not the

4     law.

5          What he is quoting, there is one instance that the

6     Supreme Court referred to in the Rufo case, which is cited in

7     his brief, and that instance is at page 388, and it says

8     follows.  A consent decree must be modified if, as it turns

9     out, one or more of the obligations placed upon the parties has

10    become impermissible under federal law.  But modification of

11    the consent decree maybe warranted when the statutory or

12    constitutional law maybe made legal what the consent decree is

13    designed to prevent.

14         Clearly if Congress could would have passed a law, the

15    consent decree would need to be vacated in that situation.  But

16    the Supreme Court is by no means setting forth the only

17    instance in which a consent decree can be dismissed.  The Third

18    Circuit directly addressed the argument that Mr. Genova is

19    making in the Henderson vs. Marone case, 214 Fed Appendix 209,

20    Third Circuit 207.  There need not be a conflict between a

21    consent decree and a subsequent change in the law, rather a

22    significant change with no intended conflict constitute

23    sufficient grounds for vacatur.  There proposition is

24    demonstrably not the law.

25         Second point, your Honor, Mr. Genova repeatedly said

1    that the Republican National Committee must come forward with

2    clear and convincing evidence to support a modification or

3    vacatur of the decree.  We look at his briefs and see no

4    citation of that proposition says.  That's not the law, as we

5    understand it.  The law, as we understand it, is set forth in

6    Rule 60, which says if enforcement of the decree becomes

7    inequitable, and we believe we put forth sufficient reasons for

8    why the enforcement of the decree would be inequitable, and the

9    other reasons that are allowable under Rule 60.

10           Thirdly, let me pick up on this disparate effects

11   issue that you were talking with Mr. Genova.  In due

12   recognition of the admonition, sometimes it's better not to say

13   anything.  I will take a risk here and simply say, your Honor,

14   the questions that you've asked are exactly the issues that

15   bear upon the RNC. It is a -- and I'll cite to you three things

16   that are pretty clear.  Number one, ACORN and its allies have

17   been operating predominantly in low-income and minority

18   communities.

19           Number two, that is where the -- that is where the

20   concern, much of the concern about voter registration fraud and

21   voter fraud arises.

22           Number three, if it is the case under this consent

23   decree that the RNC cannot place poll watchers in the districts

24   where it has reasonable suspicions that there maybe a problem,

25   without putting them in districts where there are -- where

1    there is no reasonable suspicion that there's going to be a

2    problem, then that is a deterrent to the RNC using poll

3    watchers, especially if it can delegate if that responsibility

4    can be undertaken by state and local parties who are going to

5    go to those minority districts and put poll watchers there any

6    way.  The law is not that they have to put poll watchers there,

7    anywhere.  This disparate impact test, it is evidence under the

8    decree, it is not dispositive under the decree.  The decree

9    says that disparate impact is relevant evidence, it doesn't say

10   that it's dispositive.  Yet, the Democratic National Committee

11   has always acted as though, and said exactly what Mr. Genova

12   says, disparate impact is enough.  The law in this country and

13   other contexts in the civil rights law is disparate impact

14   maybe relevant evidence, but it's not enough.  You've got to

15   show intent, and you've got to show a racial effect that that

16   was intended.  And under this consent decree, that is

17   ambiguous, and that's why the RNC is, to a large degree,

18   deterred from engaging in these activities, and why Mr.

19   Josefiak said it backs away from Election Day activities in

20   connection with the 72-hour program.

21            Unless your Honor has any further questions.

22            THE COURT:  No.  I must say that was one encouraging

23   thing that I noticed in the statistics you provided at the end

24   of one of your long notebooks.

25            (Matter concluded)

Summations                                    189

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25