**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEMOCRATIC NATIONAL COMMITTEE, ET AL.,

Plaintiffs,

v.

REPUBLICAN NATIONAL COMMITTEE, ET AL.,

Defendants.

Civ. No. 81-3876 (DRD)

**O P I N I O N**

*Appearances by:*

GENOVA, BURNS & VERNOIA
by: Angelo J. Genova, Esq., Peter J. Cammarano, Esq., and Rajiv D. Parikh, Esq.
494 Broad Street
Newark, NJ 07102

SANDLER, REIFF & YOUNG
by: Joseph Sandler, Esq.
300 M Street, SE
Suite 1102
Washington, DC 20003

   *Attorneys for Plaintiff*

DRINKER, BIDDLE & REATH
by: Mark D. Sheridan, Esq.
500 Campus Drive
Florham Park, NJ 07932

McDERMOTT, WILL & EMERY, LLP
by: Bobby R. Burchfield, Esq. and Jason A. Levine, Esq.
600 Thirteenth Street, NW
Washington, DC 20005

*Attorneys for Defendant*

**<u>DEBEVOISE, Senior District Judge</u>**

This matter comes before the Court on a motion by Defendant, the Republican National
Committee ("RNC") to vacate or modify a Consent Decree entered into by the parties as part of a
settlement for voter intimidation claims brought by the Plaintiff, the Democratic National
Committee ("DNC").  The Decree, which was entered on November 1, 1982 and modified on
July 27, 1987, imposes various requirements on any "ballot security" initiatives undertaken by
either the RNC or the New Jersey Republican State Committee ("RSC").  Such initiatives are
defined in the Decree as any efforts to prevent or remedy voter fraud.

In its pending request to modify or vacate the Consent Decree, the RNC argues that
intervening changes in state and federal election laws have significantly increased the danger of
voter fraud, thus making it essential that it be allowed to carry out ballot security initiatives
without complying with the requirements of the Decree.  Additionally, the RNC claims that the
Consent Decree (1) has been interpreted in a manner that impermissibly broadens its scope, (2) is
no longer necessary to prevent voter intimidation, and (3) is contrary to the public interest
because it imposes requirements only on the RNC, thereby creating an imbalance that adversely
affects the competition between political parties necessary to ensure fair elections.  In response
to those arguments, the DNC contends that the RNC exaggerates the danger of voter fraud,
which it claims is outweighed by the ongoing threat that Republican political groups will engage
in voter intimidation.  As proof that the protections contained in the Consent Decree remain
necessary, the DNC points to decisions made pursuant to that agreement by this Court, which

found that the RNC had engaged in impermissible voter challenges as recently as the 2004 election.

Both parties submitted mountains of documentary evidence in support of their arguments. The RNC produced thousands of pages of newspaper articles and other sources documenting alleged incidents of voter fraud over the past 27 years, while the DNC did the same with respect to voter intimidation.  The Court held an evidentiary hearing on May 5 and 6, 2009, at which the parties were permitted to make oral arguments and call witnesses in support of their claims. Following that hearing, the parties were each permitted to file an additional brief.

For the reasons set forth below, the Court finds that neither changed factual circumstances nor developments in state and federal election laws justify vacating the Consent Decree, but modification is required.  Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree.  However, while the Court finds that there is an ongoing need for the Consent Decree, the manner in which the RNC has interpreted its terms has rendered the Decree "unworkable" by precluding the RNC from engaging in several activities that are unrelated to voter fraud and do not have a disparate impact on minority voters.  Additionally, the fact that the parties did not include a date on which the Consent Decree will terminate has created an inequitable situation in which the RNC may be subject to the requirements of that agreement in perpetuity.  Therefore, the Decree will be modified in five ways: (1) as consented to by the DNC, the Consent Decree will be clarified to allow enforcement only by the parties to that agreement, (2) the time period by which the RNC must inform this Court of any proposed ballot security measures ("preclearance provision") will be shortened from 20 to 10 days, (3) the term "ballot

security" will be clarified to include only efforts that are aimed at preventing potential voters from casting a ballot, as opposed to programs meant to ensure the smooth functioning of the electoral process or increase the number of people participating therein, (4) the term "normal poll watch functions" will be defined in order to provide notice of the types of activities that do not fall under the Consent Decree, and (5) a termination date will be added so that the Consent Decree will expire eight years after the date of this ruling unless, at any point before that date, the DNC is able to prove by a preponderance of the evidence that the RNC has violated the Decree, in which case the termination date will be extended to eight years from the date of that violation.

## I. BACKGROUND

The 27-year history of the Consent Decree that is the subject of this ruling began when, during the 1981 New Jersey gubernatorial election, the RNC and RSC engaged in a ballot security program that the DNC claimed targeted minority voters in an effort to intimidate them in violation of the Voting Rights Act ("VRA") of 1965, 42 U.S.C. §§ 1971, et seq., and the 14th and 15th Amendments to the Constitution.  As part of that program, the RNC allegedly created a list of persons to be challenged at the polls by mailing sample ballots to individuals living in precincts where the majority of the registered voters were members of ethnic minorities.  The names of voters registered at an address from which a sample ballot was returned as undeliverable were then added to a list that the RNC asked to have removed from New Jersey's voter rolls.  In addition to the challenge list, the RNC allegedly intimidated voters on Election Day by posting off-duty sheriffs and policemen – some of whom were wearing equipment normally associated with law enforcement personnel such as two-way radios and firearms – at

polling places in minority precincts.  The officers involved in the program wore armbands emblazoned with a seemingly-official title: "National Ballot Security Task Force."

## A.  The Consent Decree

Faced with intense political pressure and scrutiny from local media, the RNC chose to settle the 1981 suit by entering into the Consent Decree.  Pursuant to that settlement, the RNC agreed that "in the future, in all states and territories of the United States," it would:

(a) comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice;

(b) in the event that [it] produce[s] or place[s] any signs which are part of ballot security activities, cause said signs to disclose that they are authorized or sponsored by the [RNC];

(c) refrain from giving any directions to or permitting their agents or employees to remove or deface any lawfully printed and placed campaign materials or signs;

(d) refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place;

(e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting; and the conduct of such activities disproportionately in or directed toward such districts that have a substantial proportion of racial or ethnic [minority] populations shall be considered relevant evidence of such a factor and purpose;

(f) refrain from attiring or equipping agents, employees or other persons or permitting their agents or employees to be attired or equipped in a manner which creates the appearance that the individuals are performing official or governmental functions, including, but not limited to, refraining from wearing public or private law enforcement or security guard uniforms, using armbands, or carrying or displaying guns or badges except as required by law or regulation, in connection with any ballot security activities; and

(g) refrain from having private personnel deputized as law enforcement personnel in connection with ballot security activities.

In 1987, the DNC sued the RNC for alleged violations of the Consent Decree during the previous year's Congressional elections in Louisiana.  Those purported violations, like the ones in the 1981 New Jersey gubernatorial election, involved the compilation of a voter challenge list by sending letters to African-American voters and recording the names of individuals for whom the mailing was undeliverable at the address where they were registered to vote.  While defending a suit brought in Louisiana state court by several of the voters on the list, the RNC responded to a discovery request by producing a memo from its Midwest Political Director to its Southern Political Director, in which the former stated that "I would guess that this program will eliminate at least 60,000-80,000 folks from the rolls … If it's a close race … which I'm assuming it is, this could keep the black vote down considerably."  See Thomas Edsall, Ballot Security Effects Calculated: GOP Aide Said Lousiana Effort "Could Keep the Black Vote Down," Wash. Post, Oct. 24, 1986 at A1.  After those statements came to light, the DNC – which was not a party to the Louisiana state action – instituted an action in this Court alleging that the RNC's ballot security activities were racially motivated, and thus violated the Consent Decree.

As in the prior suit, the RNC chose to settle the claims against it.  In exchange for the DNC dismissing its claims, the RNC agreed to a modification of the 1982 Consent Decree.  That modification defined "[b]allot security" efforts to mean "ballot integrity, ballot security or other efforts to prevent or remedy vote fraud," and added the preclearance provision, which prohibits the RNC from engaging in such efforts unless they are approved ahead of time by this Court by stating:

> [T]he RNC shall not engage in, and shall not assist or participate in, any ballot security program unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the Consent Order and applicable law. Applications by the RNC for determination of ballot security programs by the

Court shall be made following 20 days notice to the DNC, which notice shall include a description of the program to be undertaken, the purpose(s) to be served, and the reasons why the program complies with the Consent Order and applicable law.

As an exception to the preclearance requirement, the modification agreed to by the parties stated that:

[T]he RNC may deploy persons on [E]lection [D]ay to perform normal poll watch functions so long as such persons do not use or implement the results of any other ballot security effort, unless the other ballot security effort complies with the provisions of the Consent Order and applicable law and has been so determined by this Court.

## B. Subsequent Enforcement Actions

Since the modification of the Consent Decree in 1987, the DNC has brought two suits alleging violations of that agreement on the part of the RNC. In 1990 it instituted an action alleging that the RNC had violated the Consent Decree by participating in a program in which the North Carolina Republican Party ("NCRP") sent 150,000 postcards to residents of predominantly African-American precincts in that state. The postcards allegedly attempted to intimidate voters by warning that it is a "federal crime … to knowingly give false information about your name, residence or period of residence to an election official," and falsely stated that voters must have lived in the precinct in which they cast their ballot for at least 30 days prior to the election. In its decision, the Court found that the DNC had "failed to establish that the [RNC] conducted, participated in, or assisted in" the program.[1] It ruled, however, that the RNC, "by failing to include in ballot security instructions and informational guidance to state parties on unlawful practices under the consent decree or copies of such decree for their review, ha[d]

---

[1] The Court's ruling was based solely on the fact that the Consent Decree applies only to the actions of the RNC and RSC, and advanced no opinion as to the legality of the activities undertaken by the NCRP. Those activities were the subject of a separate action brought by the United States Department of Justice ("DOJ") against the NCRP and the campaign committee of Senator Jesse Helms, which resulted in a separate consent decree between those entities and the federal government.

violated said decree and shall in all such materials include such guidance or copy of the decree" in the future.

On November 3, 2008, the DNC brought a second action, in which it alleged that the RNC had violated the Consent Decree by hiring private investigators to examine the backgrounds of various New Mexico voters in preparation for challenging those individuals' right to cast a ballot in that year's election. As redress for that purported violation, the DNC requested a preliminary injunction ordering the RNC to refrain from using any information gathered by the investigators or carry out any ballot security initiatives in New Mexico during the election, which was scheduled to take place the following day. The Court held oral arguments on the petition, at which the RNC produced a sworn affidavit from the vendor accused of hiring the private investigators testifying that they had not been used for the purposes of gathering information or preparing for ballot security efforts. That testimony led the Court to conclude that, while there may have been misconduct on the part of the New Mexico Republican Party or other political operatives, the RNC did not direct or participate in the ballot security measures at issue, and therefore had not violated the Consent Decree.[2]

## C.  The Malone Suit

A third enforcement action – brought by an intervenor during the week before the 2004 general election – is also relevant to the question of whether the Consent Decree should be

---

[2] The RNC attempts to portray the Consent Decree as having led to multiple vexatious litigations. In doing so, it notes two actions that were not brought by the DNC, and did not name the RNC as a defendant: (1) a 2002 suit in which the New Jersey State Democratic Committee ("NJSDC") alleged that the RSC and a Republican Senate candidate had violated the Decree, and (2) a 2004 suit brought in South Dakota by the campaign of that state's then-Senator, Tom Daschle, alleging that his opponent, John Thune, and various other individuals had carried out ballot security initiatives which violated applicable laws. In the former action, this Court denied the NJSDC's claim. The United States District Court for the District of South Dakota granted Senator Daschle's request for a temporary restraining order in the latter action. Although Senator Daschle invoked the Consent Decree in that case, the District of South Dakota did not address that agreement in its ruling.

modified or vacated.  On October 28, 2004, an African-American resident of Cleveland, Ohio named Ebony Malone filed a Complaint alleging that the RNC had violated the Consent Decree by participating in the compilation of a voter challenge list that included 35,000 predominantly-minority individuals from that state.  As was the case in the actions that led to the initial Consent Decree and the 1987 modification, the list was assembled by sending letters to registered voters in precincts with a high concentration of minorities, in this case inner-city areas in Cleveland, and recording the names of those voters for whom the letter was returned as undeliverable.  An initial letter was sent by the RNC on August 10, 2004, while a second mailing was issued by the Ohio Republican Party ("ORP") on September 9th of that year.  Ms. Malone was a recently-registered voter and was included on the challenge list.

Ms. Malone contended that the challenge list posed a threat to her right to vote. Moreover, she asserted that any program involving challenges to the individuals on the list on Election Day would result in the disenfranchisement of other minority voters by overwhelming Ohio election officials and clogging the polls.  On the basis of those claims, she requested that the Court issue a preliminary injunction barring the RNC and any state organizations with which it was cooperating from carrying out poll challenges using the list.

The Court held an evidentiary hearing on the morning of November 1, 2004, at which it heard arguments relating to whether a preliminary injunction should be issued.  At that hearing, the DNC appeared in support of Ms. Malone.  The RNC opposed Ms. Malone's request for a preliminary injunction on several grounds.  As a threshold issue, it argued that Ms. Malone's suit was non-justiciable because irregularities in her registration would render her subject to challenge by the Ohio Board of Elections regardless of whether the RNC or ORP engaged in a separate challenge.  The RNC also claimed that it had complied fully with the Consent Decree,

asserting that the potential challenge to Ms. Malone fell within the "normal poll watch functions" allowed by that agreement.  Finally, it contended that any challenge would be carried out by the ORP – which was not subject to the Decree – and an injunction issued by this Court would therefore be ineffective in redressing Ms. Malone's claims.

At the conclusion of the hearing, the Court rejected the RNC's arguments and issued an Order in which it (1) barred the RNC from using the list to carry out voter challenges and (2) directed the RNC to instruct its agents in Ohio not to use the list for such purposes.  In doing so, the Court found that the RNC had violated both the procedural and substantive provisions of the Consent Decree.  In its Opinion, which was read into the record at the conclusion of the hearing, the Court first rejected the RNC's argument that Ms. Malone's claims were non-justiciable by ruling that she would suffer irreparable harm if forced to endure multiple challenges to her eligibility, as such challenges may delay her efforts to cast a ballot or result in congestion at the polling place that would prevent other voters from doing so.  It then held that:

> [T]he RNC violated the Consent Decree.  It engaged in a ballot security effort. …
> [F]rom at least the time of the RNC's August 10, 2004 letter until recent days the
> RNC participated with the Ohio Republican Committee in the devising and
> implementation of the program.
>
> Procedurally, the RNC is in clear violation inasmuch as it failed to obtain [a]
> determination that the ballot security program complies with the provisions of the
> Consent Decree.  Further, the program violates the substantive provisions of the
> Decree.  It undertook ballot security activities in polling places or election
> districts where the racial composition in such districts [factored] in the decision to
> conduct … such activities there, and where the purpose or significant effect of
> such activities is to deter qualified voters from voting.  The RNC's original
> mailing and the Ohio State Committee's September 9th mailing were directed to
> the counties having the State's major cities and largest concentration of minority
> voters.

Immediately after this Court issued its ruling, the RNC filed an emergent application to the Court of Appeals for the Third Circuit requesting a stay of the Order.  A panel of the Court of

Appeals met that afternoon and worked into the evening to address the application.  With fewer than eight hours remaining before the polls opened in Ohio, the panel issued an Opinion and Order denying the RNC's application for a stay and affirming this Court's decision.  In doing so, it stated that "we believe there is ample support for the factual findings of the District Court," and noted that "emails between the RNC and … Ohio Republican Party show collaboration and cooperation between the RNC and ORP."

Following that ruling, the RNC petitioned for rehearing en banc.  On the morning of Election Day, November 2, 2004, the Court of Appeals granted that petition, vacated its earlier ruling, and stayed this Court's judgment pending a decision on rehearing.  Before the case could be reheard, though, Ms. Malone cast her ballot without being challenged.  Based on that development, the Court of Appeals dismissed the appeal as moot.  In doing so, it did not address the merits of this Court's determination that the RNC had violated the Consent Order.  Thus, the substantive merits of the Court's ruling have never been refuted, and its factual determination that the RNC engaged in conduct prohibited by the Consent Order remains undisturbed.

**D.  Motion to Vacate or Modify the Consent Decree**

On November 3, 2008, shortly after the Court denied the DNC's Motion for a Preliminary Injunction based on the alleged violations in New Mexico, the RNC submitted the pending Motion to Vacate the Consent Decree.  In its opening and reply briefs, the RNC argued that it should be allowed to conduct ballot security initiatives without complying with the Decree because the enactment of various statutes since the Decree was last modified in 1987 – including (1) the National Voter Registration Act of 1993 (the "Motor Voter Law"), 42 U.S.C. §§ 1973gg, et seq., (2) the Bipartisan Campaign Reform Act of 2002 ("BCRA"), 2 U.S.C. §§ 431, et seq., and (3) the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301, et seq. – has

increased the danger of voter fraud and decreased the risk of voter intimidation.  Additionally, it contended that the Consent Decree (1) improperly extends to conduct that was outside the scope of the Complaints in the actions which led to its enactment, (2) has been interpreted in a broad manner that undermined the expectations of the parties at the time the 1982 and 1987 settlements were entered, and (3) violates the First Amendment by restricting communications between the RNC and state parties relating to ballot security initiatives.

In its brief in opposition to the Motion to Vacate, the DNC argued that, despite the statutes pointed out by the RNC, the danger of voter intimidation remains greater than that of voter fraud.  In doing so, it noted several recent incidents in which minority voters were reportedly subjected to illegal and abusive ballot security initiatives by Republican operatives, and pointed to several occasions during the past 15 years in which Republicans made allegations of voter fraud that were later revealed to be false.  Additionally, the DNC argued that the conduct prohibited by the Consent Decree – the implementation of ballot security initiatives in minority precincts as a means of deterring qualified voters from casting their ballots – remains illegal, and any action modifying or vacating the Consent Decree would give the RNC an opportunity to return to the very practices that agreement is meant to prevent.  With respect to the RNC's argument that the Consent Decree extends to conduct that was not at issue in the suits that led to its adoption and modification, the DNC set forth several precedents – including a case from the Supreme Court – holding that a party may enter into a settlement in which it consents to broader relief than the court may have granted if the case had been tried.

**E.  Evidentiary Hearing**

In keeping with the requirement that a district court hold an evidentiary hearing before modifying a consent decree in such a manner as to remove requirements previously imposed,

Mayberry v. Maroney, 529 F.2d 332, 336 (3d Cir. 1976), the Court heard two days of oral arguments on May 5 and 6, 2009. During that hearing, both parties were allotted time for opening and closing statements and were allowed to call witnesses in support of their respective arguments. The arguments articulated by the parties largely restated those in their briefs, and will not be repeated here. The relevant testimony of the witnesses is summarized below. For the sake of brevity, the Court will not revisit the portions of that testimony in which witnesses simply restated arguments laid out in the parties' briefs or opined on matters not directly pertinent to today's decision.

> **i.      Thomas Josefiak**

The only witness called by the RNC in support of its Motion was Thomas Josefiak, an expert in election law who served from 1985 until 1992 as a Commissioner of the Federal Election Commission ("FEC") after being appointed to that post by President Ronald Reagan. On leaving the FEC, Mr. Josefiak worked as Special Counsel to the RNC until 1995, at which time he assumed the duties of General Counsel to the Committee. He served in that capacity from 1995 until 2004 and again from 2005 until 2008, taking a brief interlude to work as General Counsel to the Committee to Re-Elect President George W. Bush from 2004-2005.

Mr. Josefiak's testimony largely echoed the arguments set forth in the RNC's briefs. He first stated as a general matter that he was familiar with the Consent Decree and that the RNC had made efforts throughout his tenure to inform state parties of that agreement's contents and requirements. In outlining the RNC's efforts to comply with the Decree, Mr. Josefiak focused particularly on the preclearance requirement added pursuant to the 1987 modification. He argued that the Consent Decree's requirement that the RNC serve 20 days notice and obtain the approval of this Court before engaging in any ballot security initiatives is inequitable and

disadvantages the RNC.  First, Mr. Josefiak stated that, due to the preclearance requirement and other provisions in the Consent Decree, the RNC does not coordinate with state and local party committees on Election Day efforts such as voter turnout drives or poll watching activities. (1 Hr'g Tr. 94:7-95:17, May 5, 2009.)  Although he admitted that the Consent Decree allows the RNC to engage in "normal poll watch functions," Mr. Josefiak claimed that, since those functions are not defined by the Decree, it is difficult to determine when poll watching crosses into the realm of ballot security.  Therefore, the RNC chooses to refrain entirely from participating in Election Day efforts.  (Id.)

Even if the RNC tried to engage in poll watching or ballot security initiatives, Mr. Josefiak contended that it would in all practical terms be unable to do so because the Consent Decree's requirement that it serve this Court with 20 days notice of such initiatives makes it impossible for the Committee to effectively allocate its resources on Election Day.  In a Presidential election, for example, the RNC may believe at the time it seeks preclearance that Missouri will be a hotly-contested state, only to find based on polls completed in the days just before the election that the margin separating the two candidates has widened, and the poll watchers that were to have been deployed in that state could be put to better use elsewhere.  See (Id. at 96:15-97:14.)

In addition to testifying about the RNC's efforts to comply with the Consent Order, Mr. Josefiak opined as an expert on the danger of voter fraud.  He argued that voter fraud remains a serious issue, especially in light of the close margins by which many elections have been decided over the past 15 years.  In support of that claim, he noted a report issued in 2005 by the Carter-Baker Commission on Federal Election Reform, a bipartisan panel headed by former President

Jimmy Carter and former Secretary of State James Baker.  In that report, which was titled

"Building Confidence in U.S. Elections," the Commission stated:

> While fraud is difficult to measure, it occurs.  The U.S. Department of Justice has launched more than 180 investigations into election fraud since October 2002. These investigations have resulted in charges for multiple voting, providing false information on their felon status, and other offenses against 89 individuals and in convictions of 52 individuals.  The convictions related to a variety of election fraud offenses, from vote buying to submitting false voter registration information and voting-related offenses by non-citizens.

(RNC Hr'g Ex. 26 at 45.)

Additionally, Mr. Josefiak cited the report of a Federal Bureau of Investigation ("FBI") task

force investigating allegations of voter fraud in Wisconsin during the 2004 election.  In its

preliminary findings, the task force found over 100 individuals had voted more than once in the

election, and more than 200 ineligible felons had voted.  (RNC Hr'g Ex. 29 at 2.)  Additionally,

the report stated that approximately 65 non-existent voters were registered by individuals

participating in registration drives that were paid based on the number of voters they signed up,

but specifically stated that those fictitious identities were not used to cast a ballot.  (Id. at 3.)  Mr.

Josefiak noted in his testimony that the number of individuals convicted of such offenses is often

a poor measure of the extent of voter fraud because prosecutors must prove that each defendant

knew that his or her activities were illegal and, despite that knowledge, willfully violated the law.

(1 Hr'g Tr. 91:21-92:6.)  He then went on to discuss other incidents in which voter fraud

allegedly took place, most notably in Florida and Missouri during the 2004 Presidential election.

(Id. at 92:8-93:19.)  After doing so, he again stated that the practical effect of the Consent Decree

has been to preclude the RNC from engaging in initiatives aimed at combating voter fraud.  (Id.

at 93:20-22.)

In his capacity as an expert witness, Mr. Josefiak also gave testimony on voter registration trends and changes to voting laws since the Consent Decree was enacted in 1982. In doing so, he noted two charts created using data compiled by the United States Census Bureau. The first showed that, while there was a 28.1 percent increase in the total number of registered voters between 1982 and 2006, there was an increase of only 13.2 percent in the number of new voters that were classified as "white." In contrast, there was a 41.6 percent increase in "black" voters, and a 201 percent increase in those categorized as "hispanic."[3] (RNC Hr'g Ex. 6.) The second chart, which included information on the number of individuals from each ethnic category that actually voted in the 1982 and 2006 elections, showed a similar trend: the number of "white" voters increased by 7.8 percent, while the number of "black" and "hispanic" voters went up 31.1 and 152 percent, respectively. (RNC Hr'g Ex. 7.)

According to Mr. Josefiak, the relatively-greater increases in "black" and "hispanic" registration between 1982 and 2006 were significant insofar as the RNC was aware of the trend, and sought to ingratiate itself with those communities in an effort to garner their votes. Moreover, the increase in minority registration and voter turnout during those periods, according to Mr. Josefiak, gave the RNC a strong incentive to refrain from engaging in any form of voter intimidation aimed at members of those communities. He testified that doing so "would be political suicide," and asked rhetorically, "[w]hy would the RNC make concerted efforts to reach

---

[3] The Court is aware that, given the fluid nature of ethnicity, the categories used by the Census Bureau are outdated and may at times result in confusion. For instance, an individual's family tree may include persons of several different ethnicities, thus resulting in a unique heritage that does not lend itself well to classification in any one category. Moreover, the very separation of individuals into ethnic categories is unhelpful; it serves only to foster the mistaken assumption that a person's ethnic heritage, rather than individual experience, can be used as a proxy for determining his or her values, beliefs, and political views. Therefore, the Court uses the labels outlined above only in an effort to summarize the evidence presented, and does not endorse the use of such partially outmoded categories.

out to the minority communities and then at the same time prevent those minority communities from voting?"  (1 Hr'g Tr. 58:14, 58:21-23.)

As further evidence that the RNC has no incentive to violate the Consent Decree by engaging in ballot security initiatives meant to intimidate minority voters, Mr. Josefiak pointed to the changing composition of both that Committee and the Federal Government.  In doing so, he pointed out that at least two members of the RNC's leadership – Chairman Michael Steele and Chief Administrative Officer Boyd Rutherford – are African-American, and are the first minority holders of their respective offices.  Additionally, he noted that two of the highest officials responsible for enforcing the VRA and other election laws prohibiting discrimination are themselves minorities, stating that "I find it very difficult to believe that with an African American President, and an African American Attorney General, that the laws that are already on the books regarding voter fraud, voter intimidation, and voter suppression are[n't] going to be actively pursued by this Justice Department."  (Id. at 65:22-66:2.)

In discussing changes to both federal and state election laws during the period since the Consent Decree was last modified in 1987, Mr. Josefiak noted that the Motor Voter Law has made it easier for individuals to register to vote and has contributed to a major increase in minority voting.  The main thrust of his testimony regarding changes to election laws, however, focused on the effects of the BCRA, the HAVA, and state laws relating to early voting.  With respect to the first, he noted that the BCRA prohibited the use of so-called "soft money" by both the DNC and RNC.  See 2 U.S.C. § 441i(a)(1) ("[N]ational committee[s] of a political party … may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.").  Prior to the enactment of that section, the

party committees were allowed to raise "soft money" – a term used to describe donations that could be made in unlimited amounts – from various sources and then use those donations to fund the campaigns of candidates, voter registration drives, or any other initiatives they saw fit.  Since the BCRA, however, the parties have been limited to funding their activities using "hard money" – individual contributions with varying limits depending on whether they are given directly to a candidate or political committee.  See 2 U.S.C. § 441a(a)(1) (limiting direct contributions to candidates to $2,000 per person and contributions to national committees to $25,000 per year).

Mr. Josefiak claimed that the BCRA's ban on the use of "soft money" by national committees, when combined with the restrictions in the Consent Decree, led to several developments that heightened the danger of voter fraud and gave the DNC a competitive advantage in both its voter registration and ballot security efforts.  First, he contended that the DNC had increasingly relied on various non-profit and community organizations to implement voter registration drives and get-out-the-vote efforts, noting as an example the Association of Community Organizations for Reform Now ("ACORN").  (1 Hr'g Tr. 75:5-12.)  Because the BCRA prohibits the national political committees from directly supervising or participating in voter registration drives funded by such entities, Mr. Josefiak contended that the "outsourcing" of those efforts had heightened the danger of voter fraud by creating a situation in which the number of organizations conducting registration drives proliferated to the point that it was impossible for the RNC to track their activities and hold them accountable for potential instances of voter fraud.  Additionally, he contended that the Court's interpretation of the Consent Decree – in allowing private individuals or groups (such as Ms. Malone during the 2004 election) to bring intervenor actions to enforce its restrictions – created an uneven playing field between the DNC and RNC.  In the event of such suits, the RNC would be forced to expend its limited "hard

money" resources defending against claims brought by groups that are not bound by the fundraising restrictions contained in the BCRA, while the DNC would not be subject to similar litigations because it is not bound by the Decree.  (Id. at 75:12-17.)  Moreover, Mr. Josefiak claimed that past actions such as the Malone suit had required the RNC to divert high-level officials in the critical days just before an election so that they could be deposed or otherwise involved in the litigation, whereas the DNC – which is not subject to such suits under the Consent Decree – is able to put such officials to better use in focusing on specific races.  (Id. at 99:4-25.)

In addition to contending that the restrictions contained in the BCRA might create an uneven playing field between the DNC and RNC by requiring the latter to use campaign funds to defend lawsuits brought by third parties pursuant to the Consent Decree, Mr. Josefiak also argued that changes to state and federal election laws had decreased the danger of voter intimidation.  His testimony to that effect focused on two developments: (1) the HAVA's requirement that individuals be allowed to cast a provisional ballot (which is later examined by election officials to determine its validity), see 42 U.S.C. § 15482(a), and (2) the adoption of alternative voting procedures by an increasing number of states.  According to Mr. Josefiak, the ability of individuals to cast a provisional ballot largely eviscerates the danger that voter suppression programs like the ones that led to the enactment and modification of the Consent Decree or the voter challenge list at issue in the Malone matter will result in the disenfranchisement of qualified voters.  He claimed that – since anyone can cast a provisional ballot regardless of whether their name appears on the voter rolls – the use of challenge lists and other ballot security provisions will not preclude a qualified individual from voting even in cases of egregious voter suppression such as an individual being wrongfully accused by an RNC poll

watcher of possessing some disqualifying characteristic, such as having committed a felony.  See (1 Hr'g Tr. 79:16-24.)

Similarly, Mr. Josefiak testified that the adoption of alternative voting procedures by an increasing number of states has largely alleviated the danger of voter suppression that led to the enactment and modification of the Consent Decree.  In doing so, he specifically noted the spread of two alternatives to the traditional model in which voters were required to visit the polls on Election Day: early voting and no-excuse absentee voting.  Under the former, a voter may visit one of several early voting polling places during a designated time period prior to Election Day. The latter procedure allows voters to submit their ballots by mail without being required to show that they will be out of the state or otherwise unable to vote in person on Election Day.  As of 2008, 31 states allowed early voting, while 28 permitted absentee voting.  See (RNC Hr'g Ex. 21.)  Mr. Josefiak testified that such procedures inject an element of "flexibility" into the voting process that was not present at the time the Consent Decree was enacted in 1982 or modified in 1987.  (1 Hr'g Tr. 82:1-9.)  He claimed that taking advantage of early voting would allow minorities who suspected that they might be subject to intimidation on Election Day to avoid harassment or delays by avoiding poll watchers deployed on Election Day or, if subjected to suppression tactics during their first attempt to vote, making repeated trips to the polls.  (Id. at 82:7-9.)  Moreover, Mr. Josefiak testified that "if it were rumored in the minority community that there was going to be an effort to suppress the minority vote," individuals who wished to avoid potential abuse at the polls could exercise their right to cast a mail-in ballot through absentee voting.  (Id. at 82:22-83:14.)  He admitted on cross-examination, however, that most states require voters to apply for an absentee ballot in advance of the election, and that requirement might preclude a voter from deciding to avoid the polls based on rumors of

intimation that may not come to light until just prior to Election Day.  (Id. at 144:2-10) (discussing requirement in New Jersey that a voter apply for an absentee ballot at least seven days prior to the election).  Additionally, Mr. Josefiak noted that, as of 2006, almost 80 percent of people still voted in person by visiting the polls on Election Day, while only 14.3 percent voted by absentee ballot and 5.6 percent took advantage of early voting.  See (RNC Hr'g Ex. 24.)

### ii.     Chandler Davidson

The DNC called three expert witnesses.  The first was Dr. Chandler Davidson, a retired Professor from Rice University and expert on the history of race relations, including the VRA and voter suppression.  Much of Dr. Davidson's testimony was drawn from the manuscript of a book he recently authored, titled "Republican Ballot Security Programs: Vote Protection or Minority Vote Suppression – Or Both?"  See (DNC Hr'g Ex. 2.)  That book, which Dr. Davidson initially began in the late 1980s, was completed in 2004 at the request of Bob Bauer, a prominent Democratic election lawyer who served as General Counsel to the 2008 Presidential Campaign of Barack Obama and was recently named White House Counsel.  The book details 14 ballot security programs undertaken by the Republican Party between 1982 and 2003 in which minority voters were allegedly intimidated.  In doing so, the book includes chapters on the 1982 program instituted in Newark, New Jersey that resulted in the Consent Decree and the 1986 initiative in Louisiana that led to its modification.[4]

Dr. Davidson testified that voter suppression efforts remain widespread, especially cases of what he referred to as "vote caging" – the process used in the Malone case – in which non-forwardable letters are sent to individuals at the address under which they registered to vote, and

---

[4] Dr. Davidson specifically noted in his testimony that his book is not a comprehensive account of Republican ballot security efforts.  To the contrary, he stated that the book only covered "the very worst cases," and that he did not mean to "suggest[] that all or most ballot security programs that are run by the Republican Party go askew in the way that [the programs detailed in the book] did."  (1 Hr'g Tr. 157:25-158:1-7.)

those whose letters are returned as undeliverable are added to a list of voters to be challenged at the polls on Election Day.  (1 Hr'g Tr. 159:7-161:21.)  He then noted that vote caging and other methods of voter suppression – such as disseminating misinformation on the time and place individuals should vote or posting challengers at the polls to harass potential voters – are overwhelmingly directed at minorities, and are usually perpetrated by Republican operatives. (Id. at 164:24-165:5.)  Dr. Davidson opined that the reason such programs are usually carried out by Republicans rather than Democrats may simply be a matter of statistics: minority voters – who are far more likely to be added to a challenge list because of irregularities in registration attributable to language barriers, lack of photo identification cards ("ID"), or changes of address – have historically tended to vote for Democratic candidates.  (Id. at 165:7-24.)

Additionally, Dr. Davidson testified on the efficacy of the Consent Decree in combating voter intimidation.  In doing so, he argued that existing federal statutes prohibiting voter suppression, most notably the VRA, do not sufficiently address the ongoing incentives for Republican operatives to intimidate minority voters.  He stated that actions under the VRA and other statutes are generally filed after individuals have already been disenfranchised through suppression efforts that frighten them away from the polls.  (2 Hr'g Tr. 9:25-10:22.)  In contrast, the Consent Decree creates a prophylactic solution in which individuals who suspect that they may be subjected to suppression efforts can obtain injunctive relief from this Court in order to stop those efforts before they begin.  (Id. at 11:1-6.)  Dr. Davidson noted, however, that he is not a legal expert, and stated that he is not aware of whether similar injunctive relief would be available under the section of the VRA prohibiting voter intimidation, 42 U.S.C. § 1973i(d).[5]

---

[5] It is unclear whether a private individual may bring suit against another private individual to redress violations of the prohibitions on voter suppression contained in 42 U.S.C. § 1973i. Another section of the statute, 42 U.S.C. § 1973j, grants the Attorney General of the United States the power to bring such actions, stating:

On cross-examination, Dr. Davidson admitted that, of the 14 incidents of voter intimidation discussed in his book, the RNC was involved in only two: the program in Newark, New Jersey that led to the enactment of the Consent Decree in 1982 and the initiative in Louisiana that resulted in its 1987 modification.  (2 Hr'g Tr. 25:1-26:17.)  Additionally, he stated that his report was compiled without speaking to any of the individuals who allegedly participated in suppression efforts.  (Id. at 19:13-24.)  In fact, the entirety of his book was based on press accounts.  (Id. at 26:3-13.)

### iii.    Lorraine Minnite

The second of the DNC's three expert witnesses was Dr. Lorraine Minnite, an Assistant Professor of Political Science at Barnard College who specializes in the study of voter fraud.  At the request of Project Vote – a non-partisan organization that works to mobilize low-income and minority voters – Dr. Minnite in 2007 completed a report titled "The Politics of Voter Fraud." See (DNC Hr'g Ex. 22.)  Over the next two years, she expanded that report into a book, which at

---

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section … 1973i … of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order.

However, the Supreme Court has held that private individuals may sue state or municipal entities under the preclearance provisions of § 5, Allen v. State Bd. of Elections, 393 U.S. 544, 554-55 (1969), and the provisions of § 10 prohibiting the use of poll taxes as a prerequisite for voting.  Morse v. Republican Party of Va., 517 U.S. 186, 234-35 (1996).  In doing so, it noted that another portion of the VRA, added in 1975, allows attorney fees to be granted to "the prevailing party, other than the United States," in any action "to enforce the voting guarantees of the fourteenth or fifteenth amendment." 42 U.S.C. § 1973l(e) (emphasis added).

The motion currently before the Court poses only the narrow question of whether the Consent Decree should be vacated or modified.  The DNC has conceded that it should be altered to limit enforcement actions to those brought by the parties to that agreement.  Therefore, the Court will refrain from wading into the interpretive briar patch and will advance no opinion on whether such suits can be brought directly pursuant to the VRA.

the time of the hearing had been peer-reviewed and accepted for publication by the Cornell

University Press.

The central thesis of Dr. Minnite's testimony was that the actual incidence of voter fraud

in US elections is quite rare, and the disproportionate amount of attention paid to voter fraud by

political parties and the media is generally due to the use of fraud allegations by Republicans in

order to place increased scrutiny on minority voters and make it harder for them to cast a ballot.

(2 Hr'g Tr. 47:9-17.)  In a March 2008 Senate Rules and Administration Committee hearing

titled "In-Person Voter Fraud: Myth and Trigger for Disenfranchisement?" she testified to that

effect, stating:

> It is my view based on my record of academic research on the subject that in-person voter fraud is rare in contemporary American elections.  As a problem or threat, it cannot compare in seriousness or magnitude to other resource, technology, or personnel problems currently facing state and local election officials.

(DNC Hr'g Ex. 25.)

According to Dr. Minnite, most media reports of voter fraud are attributable not to intentional

attempts by individuals to cast illegitimate ballots, but rather minor errors or irregularities in the

registration and voting process.  As an example, she noted that the misspelling of an individual's

name by elections officials at the time he or she registered to vote might be reported as "voter

fraud" in media accounts.  (2 Hr'g Tr. 52:18-53:10.)

In support of her general assertion that the problem of voter fraud is generally

exaggerated, Dr. Minnite noted a portion of her book in which she completed a case study on the

alleged fraud that took place in Wisconsin during the 2004 election.  By cross-referencing press

releases issued by the DOJ with court records and interviewing the majority of the attorneys and

individuals accused of wrongdoing in that case, Dr. Minnite ascertained that only 14 of the

individuals who were prosecuted as a result of that incident – which Mr. Josefiak referred to in his testimony and which was specifically cited by the Carter-Baker Commission in its report – were voters, and of those, only 5 were convicted or pled guilty.  The others who were indicted were comprised mostly of elected officials engaged in "vote buying" – a practice in which voters are paid to cast their ballot for a particular candidate.  A separate incident in Florida during the 2004 elections had similar results: the majority of those indicted were not voters, but elected officials and political operatives, and a relatively low number of the voters who were prosecuted were convicted or pled guilty.  (Id. at 59:4-15.)

As a final point, Dr. Minnite testified that she was unaware of any instance of attempted voter fraud discovered by a poll challenger that led to a criminal prosecution.  (Id. at 62:23-25.) She noted that the effectiveness of poll watchers is dependent on the information that is given to them – if the challengers use lists that were compiled through dubious methods such as "vote caging," they will be unlikely to discover specific instances of fraud, but may create a disruption that will result in the disenfranchisement of eligible voters.  (Id. at 63:2-21.)  She acknowledged, however, that ballot security initiatives can play a legitimate role in ensuring the integrity of the voting process as long as they are conducted carefully and do not preclude qualified individuals from voting.  (Id. at 64:24-65:1.)

On cross-examination, Dr. Minnite admitted that the definition of "voter fraud" used in her research – which includes only intentional attempts by voters to cast an illegitimate ballot – is narrower than the one used by the DOJ, and may not include some cases that might be detected by the use of poll watchers.  (Id. at 50:25-52:6, 69:4-11.)  That definition also does not include incidents in which individuals fill out a voter registration under a fraudulent name, or where workers paid to complete voter registrations by private groups such as ACORN register

individuals who do not exist.  (Id. at 73:11-21.)  Additionally, Dr. Minnite conceded that poll watchers may serve valuable purposes beyond the detection of fraud, such as detecting broken equipment, overcrowding, and irregularities in the tabulation of votes.  (Id. at 69:19-70:8.)

   *iv.*   ***Justin Levitt***

   The DNC's final witness, Justin Levitt, currently serves as counsel to the Brennan Center for Justice[6] and an Associate Professor of Clinical Law at New York University School of Law. His testimony focused on changes to federal election statutes since the Consent Decree was entered in 1982 and modified in 1987 – most notably the enactment of the Motor Voter Law, BCRA, and HAVA.  In doing so, he drew material from an article he authored titled "The Truth About Voter Fraud."  See (DNC Hr'g Ex. 18.)  In addition to that piece, Mr. Levitt's testimony drew on remarks he made before the same March 2008 Senate Rules and Administration Committee hearing at which Dr. Minnite spoke, along with other publications he has completed in the course of his work.

   The main theme of Mr. Levitt's testimony was that changes to federal election laws since the Consent Decree was enacted and modified have not heightened the danger of voter fraud.  To the contrary, he argued that the Motor Voter Law and HAVA have actually decreased the possibility that voters will be able to corrupt the electoral process through fraud.  According to Mr. Levitt, the former law includes three measures that significantly reduce the likelihood of voter fraud.  First, it allows the various government agencies with whom potential voters come in contact – such as vehicle licensing services and Medicaid administrators – to verify the identity of individuals in a more standardized way than was previously used.  In doing so, those agencies

---

[6] The Brennan Center describes itself as a "non-partisan public policy and law institute that focuses on fundamental issues of democracy and justice."  See The Brennan Center for Justice, "About Us," http://www.brennancenter.org/pages/about/.  Mr. Levitt's research for the Center focuses on the administration of federal elections, Congressional redistricting, and new developments in both state and federal elections law.  (2 Hr'g Tr. 80:4-8.)

must comply with the terms of the REAL I.D. Act of 2005, Pub.L. No. 109-13, which requires individuals to show documentation that they are United States citizens in order to register to vote.  (2 Hr'g Tr. 86:14-17.)  Thus, Mr. Levitt argued that the requirements for voter registration have actually become more restrictive and more reliable in preventing fraud since the enactment of the Consent Decree.

Mr. Levitt also noted that the Motor Voter Law was the first federal statute to impose uniform regulation on the maintenance and purging of voter rolls by the states.  In doing so, the law creates a procedure whereby states may remove voters from the rolls for several reasons, including criminal conviction or mental incapacity, death, or a change in address to a location outside the state's jurisdiction.  42 U.S.C. § 1973gg-6(a).  In order to verify a change in address, the states may send forwardable address verification cards to voters, and may remove from the rolls any individual who returns the card confirming a change of address.  42 U.S.C. § 1973gg-6(d)(2).  According to Mr. Levitt, those provisions have been used by states to maintain their rolls to a degree that was not possibly prior to the Motor Voter Law, and have resulted in increasingly accurate voter lists.  (2 Hr'g Tr. 88:10-23.)

Finally, Mr. Levitt pointed out that the Motor Voter imposed criminal penalties on three categories of individuals engaged in voter fraud: (1) those who submit false voter registrations, (2) individuals who knowingly cast a forged ballot, and (3) persons who manipulate the tabulation of votes.  See 42 U.S.C. § 1973gg-10(2).  In doing so, Mr. Levitt argued that the Motor Voter Law "provided prosecutors with a new tool to confront any alleged instances of voter fraud."  (2 Hr'g Tr. 89:1-2.)

According to Mr. Levitt, the HAVA also contains provisions that significantly decrease the likelihood of voter fraud.  Most significantly, the statute requires each state to aggregate its

voter lists – which were previously kept by disparate local agencies – into a single computerized database.  See 42 U.S.C. § 15483(a)(1).  In connection with its requirement that states compile an electronic list of all eligible voters within their borders, the HAVA imposed an obligation on state officials to maintain such lists by periodically removing the names of individuals who had become ineligible to vote due to criminal conviction, mental incapacity, or other factors, along with names that appeared to be duplicates of others on the list.  42 U.S.C. § 15483(a)(2)(A).  Mr. Levitt testified that the imposition of HAVA's requirements relating to the maintenance of voter rolls was the first time states had been required to remove such individuals, and claimed that those requirements created a safeguard against voter fraud by making the lists "as clean as [they] could possibly be."  (2 Hr'g Tr. 91:7-92:5.)

Additionally, Mr. Levitt testified that the HAVA imposes a "check for" provision that safeguards against fraudulent voter registrations.  That portion of the statute requires individuals who submit a voter registration to include either their driver's license number or the last four digits of their social security number.  42 U.S.C. § 15483(a)(5)(A)(i).  Those without either a driver's license or social security number may still register, but are automatically subject to a process whereby the state is required to verify their eligibility.  42 U.S.C. § 15483(a)(5)(A)(ii),(iii).  Based on those provisions, Mr. Levitt argued that the HAVA has significantly reduced the likelihood that ineligible voters will be allowed to cast a ballot.[7]  (2 Hr'g Tr. 92:17-93:8.)

---

[7] Mr. Levitt alluded briefly to the safeguards imposed on mail-in and absentee voting by the HAVA, but did not testify at length about those measures.  As stated by the Supreme Court:

> HAVA [] imposes new identification requirements for individuals registering to vote for the first time who submit their applications by mail.  If the voter is casting his ballot in person, he must present local election officials with written identification, which may be either "a current and valid photo identification" or another form of documentation such as a bank statement or paycheck.  §

Turning to the third statute cited by the RNC in support of its argument that changes in federal election law require the Consent Decree to be vacated or modified, Mr. Levitt argued that the BCRA had not, as contended by Mr. Josefiak, created an incentive for political parties to "outsource" voter registration activities to non-profit organizations.  In doing so, he noted community outreach organizations such as ACORN and the League of Women Voters were involved in voter registration drives prior to the BCRA, and the statute does not alter the funding sources that can be used by such organizations.  Additionally, he noted that both parties funded voter registration activities during the last several elections, either through their national committees or corresponding state and local entities.  In fact, the parties and various political candidates have increased their spending on voter registration activities over the life of the Consent Decree.  (2 Hr'g Tr. 96:1-13.)  On the basis of those facts, Mr. Levitt contended that the increased voter registration activities of groups such as ACORN were due not to "outsourcing" of such functions by the DNC, but rather to a general increase in such activities.  (Id. at 96:21-97:24.)

In addition to his testimony on changes to federal election laws during the period since the Consent Order was enacted and modified, Mr. Levitt spoke briefly regarding the prevalence of voter fraud.  Like Dr. Minnite, he claimed that voter fraud in modern elections is very rare, and allegations of fraud tend to be overstated.  (Id. at 99:3-8.)  In fact, Mr. Levitt argued that allegations of voter fraud are often indicative of an "attitude of intimidation" and are meant to deter individuals from participating in the electoral process.  (Id. at 99:14-100:3); see also (DNC

---

15483(b)(2)(A).  If the voter is voting by mail, he must include a copy of the identification with his ballot.  A voter may also include a copy of the documentation with his application or provide his driver's license number or Social Security number for verification. § 15483(b)(3).

Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1617-18 (2008).

Hr'g Ex. 18 at 3) ("[O]n closer examination, many of the claims of voter fraud amount to a great

deal of smoke without much fire. … [T]hese claims of voter fraud are frequently used to justify

policies that do not solve the alleged wrongs, but that could well disenfranchise legitimate

voters."). He also stated that, especially in the case of challenge lists compiled using "vote

caging" in which mail is sent to registered voters and those for whom the letter is returned are

confronted by poll watchers on Election Day, the very existence of anti-fraud programs may

deter eligible voters from going to the polls. (2 Hr'g Tr. 103:9-104:9). Voter who learn of such

programs ahead of time may decide that they are unwilling to withstand a barrage of questions

from a potentially-hostile challenger before casting their ballot, and may avoid the polls

completely. (<u>Id.</u> at 104:1-4.) Others may be prevented from voting due to the delays caused by

such challenges. (<u>Id.</u> at 103:23-24.)

**F. Post-Hearing Submissions**

Following the evidentiary hearing, both parties were permitted to submit supplemental

briefs outlining their arguments. They did so on June 27, 2009.

The parties' arguments in their post-hearing briefs largely tracked those outlined in their

prior submissions and developed through the testimony of their witnesses. The RNC made no

reference to its initial contention that First Amendment jurisprudence protects the conduct

prohibited by the Consent Decree, but emphasized Mr. Josefiak's testimony relating to the

increase in minority voters since 1982 in order to contend that the Consent Decree is no longer

necessary. The RNC also added allegations that the Decree is antiquated and unduly

burdensome, especially in its requirement that this Court be notified of any proposed ballot

security initiatives at least 20 days prior to the election in which those programs are

implemented. Finally, it the claimed that the Decree is onerous and contrary to the public

interest because it prevents the RNC from undertaking appropriate and necessary poll watch activities.

For its part, the DNC claimed that the RNC had failed to establish that the Consent Decree should be vacated pursuant to Federal Rule of Civil Procedure 60(b).  In doing so, the DNC argued that the RNC has not demonstrated changed factual circumstances which would justify vacatur for two reasons.  First, the RNC was found as recently as five years ago in the Malone matter to have violated the Consent Decree.  Second, the DNC claims that the VRA does not provide sufficient protection against voter suppression, and the Consent Decree remains necessary as a means of quickly redressing voter intimidation claims.  With regard to the RNC's claim that changes in federal election laws justify vacatur, the DNC pointed out that the new laws cited by the RNC – the Motor Voter Act, HAVA, and BCRA – did not alter the prohibition on voter intimidation contained in the VRA.  See 42 U.S.C. § 1973i(d).  Finally, the DNC contended that the Consent Decree is not contrary to the public interest, and proposed several modifications which it claimed would remedy the RNC's complaints.

## II.  DISCUSSION

As a preliminary matter, the RNC's argument that the Consent Decree is void because it "improperly extend[s] to … private conduct" and grants prospective relief beyond what the DNC could have achieved if the original 1981 action had been litigated, (Def.'s Br. Supp. Mot. Vacate 18), must be rejected.  It is well-established that, although "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction, … a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial."  Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland, 478 U.S. 501, 525 (1986).  To the contrary, parties

may "settle the dispute" over an alleged statutory or constitutional violation by "undertaking to do more than … a court would have ordered absent the settlement." Rufo, 502 U.S. at 389.

The DNC's Complaint in the original action alleged violations of the VRA and asserted claims under 42 U.S.C. § 1983, and its 1987 claims were premised on the same provisions. The Court had subject matter jurisdiction over both litigations because they arose out of federal law. 28 U.S.C. § 1331. The RNC agreed to the original version of the Consent Decree in exchange for the DNC dismissing its claims in the first suit, and acceded to the 1987 modification – including the imposition of the preclearance provision – as consideration for dismissal of the second. Having done so, it is barred from asserting in the pending Motion that the Consent Decree should be vacated because it provided a greater measure of relief than could have been achieved in those actions. See Local No. 93, 478 U.S. at 525; Rufo, 502 U.S. at 389. "[E]ven if [the RNC's] decision to settle was improvident in hindsight, the decision has been made and cannot be revisited." Coltec Indus. v. Hobgood, 280 F.3d 262, 275 (3d Cir. 2002). Therefore, the Court rejects the RNC's argument that the Consent Decree is void.

Similarly, any contention that the Consent Decree infringes on activity protected by the First Amendment is meritless. The RNC claims that this Court's interpretation of the Consent Decree is so broad as to restrict virtually all communications with state and local Republican organizations, and therefore constitutes a prior restraint on the RNC's rights to free speech and association under the First Amendment. That contention overlooks the fact that the Consent Decree applies only to "ballot security activities." Thus, the RNC is free to communicate with state and local organizations concerning any other subject, including the prospects of any of the party's candidates, fundraising, voter registration and poll watching activities, etc. Moreover, it is well-established that the First Amendment applies only to state actions. Cent. Hardware Co. v.

NLRB, 407 U.S. 539, 547 (1972) ("The First and Fourteenth Amendments are limitations on

state action, not on [private] action … for private purposes."); Green v. Am. Online (AOL), 318

F.3d 465, 472 (3d Cir. 2003) (stating that an internet service provider was not subject to the First

Amendment's free speech guarantees because it was a private company and not a government

entity).  Thus, nothing in the First Amendment prohibits private parties from agreeing to refrain

from engaging in certain types of speech or association pursuant to a settlement or contract

between themselves.  Ry. Employees' Dep't v. Hanson, 351 U.S. 225, 232 n.4 (1956) (holding

that court enforcement of a settlement entered into in a suit arising out of the National Labor

Relations Act was not a "state action.").  In fact, parties to a dispute routinely enter settlements,

such as the one in this case, that include confidentiality or non-disclosure provisions restricting

their speech, and such settlements are routinely enforced.  See Pansy v. Borough of Stroudsburg,

23 F.3d 772, 788-89 (3d Cir. 1994) (discussing enforcement of such agreements).

  As a final matter before turning to the merits of the RNC's other contentions, the Court

notes that the DNC has agreed that the Consent Decree should be modified in order to make

clear that its restrictions cannot be enforced by third parties.  See, e.g., (Pl.'s Br. Opp'n Mot.

Vacate 4, 23, 26); (Hr'g Tr. 26:17-27:1.)  Thus, there is no need to address the RNC's

contentions or Mr. Josefiak's testimony that allowing third parties a right of action under the

Decree leads to an inequitable situation in which it may be forced to expend its resources to

defend lawsuits brought by well-funded organizations that are not subject to the BCRA's

restrictions on "soft money" expenditures.  The RNC's remaining arguments in support of its

Motion to Vacate or Modify the Consent Decree must be viewed in light of the standard of

review applicable to such requests.

**A.  Standard of Review**

Under Federal Rule of Civil Procedure 60(b)(5), a court may modify a consent decree when "applying [the judgment] prospectively is no longer equitable."  The Supreme Court has noted, however, that such a judgment may not be rescinded or modified simply because "it is no longer convenient to live with the terms of a consent decree."  Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992).  "Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree."  Id.

The standard of proof necessary to meet that burden varies depending on whether the party requesting modification is the plaintiff or defendant.  A plaintiff may obtain modification by showing "that conditions have changed so that the basic purpose of the original consent decree has been thwarted, meaning that time and experience have demonstrated that the decree has failed to accomplish the result that it was specifically designed to achieve."  Holland v. N.J. Dep't of Corr., 246 F.3d 267, 283-84 (3d Cir. 2001) (internal quotations and citations omitted).  However, "[t]he Supreme Court has set a more rigorous standard for defendants seeking modification because defendants usually seek modification 'not to achieve the purposes of the provisions of the decree, but to escape their impact.'"  Id. at 284 n.16 (quoting United States v. United Shoe Mach. Corp., 391 U.S. 244, 249, (1968)).  Thus, a defendant seeking modification must demonstrate one of four factors by a preponderance of the evidence: (1) "a significant change in … factual conditions," (2) an intervening change in "statutory or decisional law … to make legal what the decree was designed to prevent" or make impermissible "one of the obligations placed upon the parties," (3) "unforeseen circumstances" that render the decree

34

"unworkable," or (4) that "enforcement of the decree without modification would be detrimental to the public interest."[8] Rufo, 502 U.S. at 384, 388.

As discussed above, the RNC asserts three main arguments in favor of its Motion to Vacate or Modify the Consent Decree. First, it claims that its attempts to comply with the Consent Decree, along with the fact that only two actions have been successfully brought against it for violations of the Decree (in 1987 and in the 2004 Malone case), constitute sufficient factual evidence to compel vacatur. Additionally, the RNC contends that changes to federal elections statutes as a result of the enactment of the Motor Voter Law, BCRA, and HAVA, have increased the danger of voter fraud while simultaneously decreasing the risk of the type of voter suppression that originally justified the Decree. As part of that argument, the RNC notes that a number of states have adopted alternative procedures such as early and absentee voting that may alleviate the need for individuals to visit the polls – where they might be subject to intimidation – on Election Day. Finally, the RNC claims that the Consent Decree is contrary to the public interest because its terms preclude the RNC from engaging in several legitimate enterprises that are not aimed at combating voter fraud, including the deployment of poll watchers on Election Day and the coordination of voter registration and "get out the vote" efforts with state and local party organizations.

For the reasons set forth below, the Court finds that the RNC has failed to demonstrate either a change in factual conditions or law that would justify vacating the Consent Decree.

---

[8] The DNC claimed during oral arguments that a defendant must demonstrate one of the four Rufo factors by "clear and convincing" evidence. (1 Hr'g Tr. 31:9-15); (2 Hr'g Tr. 168:6-10.) The Supreme Court does not appear to have used that heightened standard in Rufo, and the DNC has not submitted any caselaw from this circuit to support its claim. See (Pl.'s Post-Hr'g Br. Opp'n Mot. Vacate 18-19) (citing cases from other circuits utilizing the "clear and convincing" standard in dealing with motions for reconsideration under Rule 60(b), none of which involved a request to vacate or modify a consent decree.) Therefore, the Court will follow the "preponderance of the evidence" standard that is normally used in civil proceedings.

However, the Court agrees that the Decree has become "unworkable" and detrimental to the public interest insofar as (1) the RNC interprets that settlement as prohibiting a variety of legal activities that are unrelated to voter fraud and do not have a disparate impact on minority voters and (2) the 20-day preclearance provision contained in the current version of the Consent Decree does not allow the RNC to address voter registration fraud in states that impose a registration deadline of only 10 days.  Moreover, the Court finds that the failure of the parties to include an expiration date in the Consent Decree may impose an inequitable burden on the RNC by forcing it to comply with requirements that exceed those which Congress, in its good judgment, has seen fit to impose in the form of federal law.  Therefore, the Court will modify the Consent Decree in five ways: (1) it will be altered to make it clear that, as agreed to by the DNC, only the parties to the original agreement may bring actions to enforce it, (2) the preclearance deadline by which the RNC must give this Court notice of any proposed ballot security initiatives will be shortened from 20 to 10 days, (3) the term "ballot security program" will be clarified to include only efforts that are aimed at preventing potential voters from casting a ballot, (4) "normal poll watch function" will be defined in order to clearly demarcate the various actions in which the RNC may engage without subjecting itself to the requirements of the Decree, and (5) the Court will add a provision stating that the Decree will expire eight years after the date of this ruling – the amount of time used by the Department of Justice in its settlements arising out of voter suppression actions and cited by the RNC as a reasonable period.

## B.  Changed Factual Circumstances

The RNC cites three developments as evidence that factual conditions have changed in such a way that the Consent Decree is no longer necessary.  First, it contends that increases in minority registration and voter turnout have rendered the Decree unnecessary.  That argument is

based partially on Mr. Josefiak's testimony, in which he noted that there has been a 41.6 percent increase in the number of registered voters classified as "black" by the United States Census Bureau since 1982, and a 201 percent increase in those categorized as "hispanic."  See (RNC Hr'g Ex. 6.)  Mr. Josefiak also pointed out that the actual number of voters in each category has increased by 31.1 percent and 152 percent, respectively.  See (RNC Hr'g Ex. 7.)  According to the RNC, that data "belies any notion that the RNC or state Republican parties are suppressing or intimidating minority voters," and "statistically demonstrates the absence of an objective need for the Decree, [as] it shows that the RNC's incentive is to attract rather than repel minority voters."  (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 16.)

The RNC's argument that the increased participation of minority voters in the electoral process since 1982 alleviates the need for the Consent Decree is inapposite for several reasons.  To begin with, the statistical evidence included on the RNC's charts and in Mr. Josefiak's testimony ignores the fact that there was a marked increase in both "black" and "hispanic" population during the period between 1982 and 2006.  In fact, a closer examination of the Census Reports submitted by the RNC reveals that the voting-age "black" population increased from approximately 17,624,000 in 1982 to 25,722,000 in 2006 – a gain of 45.9 percent.  See (RNC Hr'g Exs. 4 at Table 2, 5 at 5.)  During the same period, the total number of "hispanics" eligible to vote grew from 8,765,000 to 28,945,000 – an increase of 229.9 percent.  See (RNC Hr'g Exs. 4 at Table 2, 5 at 5.)  Thus, it appears that the increases in voter registration and actual voting in both communities were outpaced by their total population growth.  Put differently, the increases pointed out by the RNC are attributable not to increased participation in the political process, but simply to the fact that both ethnic groups grew during the period between 1982 and 2006.

Moreover, it does not appear that the RNC's incentive to suppress minority votes has changed since 1982. According to the Pew Research Center, 76 percent of "hispanics" voted for Democratic candidates during the 2006 election.[9] Scott Keeter, Pew Research Center, "Election '06: Big Changes in Some Key Groups," (Nov. 16, 2006), http://pewresearch.org/-pubs/93/election-06-big-changes-in-some-key-groups. During that same election, 76 percent of "black" voters chose Ted Strickland, a "white" candidate running on the Democratic ticket for Governor of Ohio against an African-American Republican, while a similar percentage voted against Michael Steele (an African-American running against a "white" Democrat) in his attempt to become a Maryland senator. Id. In fact, 77 percent of "non-white" voters cast their ballots in favor of Democrats during the 2006 election. Id. Based on those statistics, it appears that the RNC has been largely unsuccessful in its efforts to attract minority voters. Until it is able to do so, it will have an incentive to engage in the type of voter suppression that it allegedly committed in the actions that led to the enactment and modification of the Consent Decree.

In another portion of his testimony, Mr. Josefiak claimed that changes in the Committee's leadership – specifically the appointment of African-Americans as both the Chairman and Chief Administrative Officer of that body – make it less likely that the RNC will engage in ballot security initiatives aimed at suppressing minority votes. (Hr'g Tr. 62:19-64:25); see also (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 17) (citing Mr. Josefiak's testimony.) That argument misinterprets the incentives faced by the RNC and other Republican committees; it is less likely that voter suppression is motivated by racial animus than by a simple calculation of who is voting for whom. As demonstrated by the aforementioned statistics, the appointment of minority

---

[9] Mr. Josefiak contended that the candidacy of Barack Obama for President during the 2008 election likely led to an African-American voter turnout significantly higher than normal in that contest. In order to avoid using anomalous statistics that may have resulted from that phenomenon, the Court will limit its discussion of minority voter trends to previous elections.

officials within the RNC has not coincided with an end to racially polarized voting.  Rather, minority voters continue to overwhelmingly support Democratic candidates.  As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years.  As Mr. Josefiak stated, the RNC is "all about … winning elections," (Hr'g Tr. 99:5-6), and given current voting trends, the intimidation of minorities at the polls would advance that goal.

Nor does the fact that the current President and Attorney General of the United States are African-American represent a change in factual circumstances that would alleviate the need for the Consent Decree.  In his testimony, Mr. Josefiak claimed that "with an African-American President, and an African-American Attorney General, [] the laws that are already on the books regarding voter fraud, voter intimidation, and voter suppression are going to be actively pursued by this Justice Department."  (Id. at 65:22-66:2.)  In addressing that argument, the Court as a preliminary matter notes the obvious: the fact that two of the highest officials charged with enforcing the VRA are members of an ethnic minority does not, in and of itself, necessarily mean that law will be executed more vigorously under this administration than in the past.  The RNC presented no evidence that the faithful enforcement of the law by the executive branch is somehow dependent on the race of the individuals that form its upper echelons, and the Court is aware of no support for that proposition beyond an unsubstantiated and offensive assumption that each ethnic group gives special priority to protecting the interests of its own members.

Even if true, the fact that the current administration may enforce the VRA more vigorously than previous ones would not justify releasing the RNC from the requirements it agreed to in negotiating the Consent Decree.  "Modification of a consent decree may be

warranted when changed factual conditions make compliance with the decree substantially more onerous." Rufo, 502 U.S. at 384.  Although the terms of the Consent Decree partially overlap with the portion of the VRA that prohibits voter intimidation, the RNC cannot argue that more active enforcement of that statute by the government will make the Consent Decree more onerous.  The RNC has no legally-cognizable interest in suppressing minority votes, and has repeatedly disavowed any such purpose.  Having done so, it may not argue that it would be harmed by the DOJ's actions in enforcing the anti-intimidation provisions of the VRA.  Such enforcement would simply be an effort to assure that all eligible individuals are allowed to vote – an objective that is compelled by both moral imperative and the public interest as determined by Congress in passing the VRA.

The fact that it was eminently foreseeable at the time that the RNC entered into the Consent Decree in 1982 and modified that agreement in 1987 that future administrations might take a more energetic approach in using the VRA to combat voter suppression forms a secondary basis for rejecting the RNC's argument that it should be released from the requirements of the Decree.  Although "[l]itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree … modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." Id.  Many commentators complained that the Reagan Administration, which was in power at the time the Consent Decree was enacted and modified, was too passive in enforcing the VRA.  See, e.g., Lani Guinier, Keeping the Faith: Black Voters in the Post-Reagan Era, 24 Harv. C.R.-C.L. L. Rev. 393, 402-403 (1995) (arguing that political appointees to the DOJ's Civil Rights Division under President Reagan "encouraged conservative policymakers of the Reagan Justice Department to launch a profound assault on Division policies and goals, and

upon those whom the Act was intended to protect"); Bernard Goffman, <u>Criteria for Redistricting:</u> <u>A Social Science Perspective</u>, 33 UCLA L. Rev. 77, 172-73 (1985) ("[I]n President Reagan's second term, voting rights enforcement under section 5 of the Voting Rights Act has come to a virtual standstill, with many changes precleared after only cursory review, in some instances over the objections of career staff in the Department of Justice."). Regardless of the veracity of those complaints, the RNC should have anticipated that some future administration would take a more active approach in pursuing voter intimidation claims.

As a final point in support of its contention that changed factual circumstances justify vacatur, the RNC claims that "it has strictly complied with the Consent Decree since 1987, and there is no evidence to suggest that its behavior will change if the Decree is vacated." (Def's Post-Hr'g Br. Supp. Mot. Vacate 16.); <u>see also</u> (Def's Br. Supp. Mot. Vacate 8) (stating that the RNC has made "extraordinary efforts" to comply with the Decree.) That claim is belied by the fact that this Court found a mere five years ago in the <u>Malone</u> matter that the RNC had engaged in conduct that violated both the substantive and procedural provisions of the Decree.[10] Moreover, there is no way of knowing whether the fact that the RNC has rarely engaged in conduct prohibited by the Consent Decree – the Court has found violations of that agreement only twice since it was enacted, in 1987 and 2004 – because it "does not and will not tolerate voter suppression," (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 17), or because the Decree itself has deterred such behavior. The DNC submitted evidence of widespread voter suppression efforts

---

[10] As discussed above, that ruling was affirmed by a three-judge panel of the Court of Appeals, but later vacated as moot by the Court of Appeals sitting en banc. The en banc decision did not address the merits of this Court's ruling that the RNC had violated the Consent Decree. Rather, vacatur was based on the fact that the intervenor in that case, Ms. Malone, had been allowed to vote without incident, and therefore no longer had standing. Thus, this Court's factual determination that the RNC violated the Consent Decree was never refuted and remains significant insofar as it rebuts the RNC's claims in connection with the pending Motion that it has not engaged in such activity since 1987.

undertaken by state and local Republican organizations.  See (Pl.'s Br. Opp'n Mot. Vacate 10-15.)  Although those initiatives are not attributable to the RNC, they are indicative of the fact that minority voters still face the prospect of widespread intimidation due to the incentives discussed above.  The Supreme Court has acknowledged that danger, stating that "racial discrimination and racially polarized voting are not ancient history.  Much remains to be done to ensure that citizens of all races have equal opportunity to share and participate in our democratic processes and traditions."  Bartlett v. Strickland, 129 S. Ct. 1231, 1249 (2009).  Therefore, in light of the continued incentive for the RNC to engage in voter suppression and the fact that it violated the Consent Decree as recently as five years ago, the Court finds that changed factual circumstances do not justify vacating that agreement.

## C.  Changes in Election Laws

As a second argument in support of its Motion, the RNC contends that it should be relieved of its obligations under the Consent Decree due to changes in election laws.  Such agreements must be vacated if "one or more of the obligations placed upon the parties has become impermissible under federal law," and may be modified or vacated if "statutory or decisional law has changed to make legal what the decree was designed to prevent."  Rufo, 502 U.S. at 388.  The RNC does not contend that any change to state or federal election laws since the Consent Decree was enacted in 1982 and modified in 1987 renders its obligations under that agreement illegal.  Nor does it argue that there has been any change in law that would make legal the activities the Decree is meant to prevent – attempts to prevent qualified voters from casting their ballots through intimidation or screening mechanisms based in whole or in part on their ethnicity.  To the contrary, Mr. Josefiak admitted in his testimony that the section of the VRA

prohibiting such activities, 42 U.S.C. § 1973i(b), has not been amended or modified since the Consent Decree was enacted in 1982.  (Hr'g Tr. 111:16-22.)

Rather than any change to the statute on which the Consent Decree is based, the RNC's argument is based on its contention that the enactment of other federal statutes regulating the registration and voting process have increased the danger of fraud while decreasing the likelihood that suppression programs will result in the disenfranchisement of qualified individuals.  In doing so, it points to three statutes in particular: the Motor Voter Law, BCRA, and HAVA.  Additionally, the RNC asserts that the increased adoption of alternative voting procedures – such as early and absentee voting – by the states has alleviated the need for the Consent Decree.

As a preliminary matter, the RNC's arguments relating to voter fraud must be put in proper context.  Under the Supreme Court's holding in Rufo, 502 U.S. at 384, 388, there are four circumstances in which vacating or modifying the Consent Decree would be justified: (1) "a significant change in … factual conditions," (2) an intervening change in "statutory or decisional law … to make legal what the decree was designed to prevent" or make impermissible "one of the obligations placed upon the parties," (3) "unforeseen circumstances" that render the decree "unworkable," or (4) that "enforcement of the decree without modification would be detrimental to the public interest."  As set forth above, the first and second factors do not apply to this case.  Thus, in order to show that the changes in state and federal election laws that have taken place since the Consent Decree was enacted in 1982 and modified in 1987 justify vacating or modifying that agreement, the RNC must demonstrate either (1) that those changes were "unforeseeable" and render the Decree "unworkable," or (2) that the continued enforcement of the Decree would be detrimental to the public interest.  Id. at 384.

### i.      Public Interest

Any claim that changes to election laws have increased the danger of voter fraud such that continued enforcement of the Consent Decree would be contrary to the public interest must be rejected.  To the extent that the RNC asserts such an argument, it asks this Court to perform a function for which it is ill-equipped: weigh the danger that the electoral process will be corrupted through voter fraud against the possibility that individual voters will suffer the irreparable harm of disenfranchisement as the result of efforts to prevent such fraud.  Such determinations – which require a broad inquiry into how the law should be structured in order to best serve the public interest – must be left to Congress, which has considered and balanced those concerns through the promulgation of the very statutes on which the RNC premises its claims.  See Bartlett, 129 S. Ct. at 1245 ("Though courts are capable of making refined and exacting factual inquiries, they are inherently ill-equipped to make decisions based on highly political judgments.") (internal quotations omitted).  Thus, the RNC's contention that the laws passed by Congress do not sufficiently address the danger of voter fraud asks this Court to review policy choices made by another branch of government, and must be rejected.  Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

Even if the Court were to consider the RNC's allegations that changes in federal elections laws have increased the danger of voter fraud those contentions would not justify vacating the Consent Decree.  The RNC's claimed interest in "deterring and detecting voter fraud" in order to "protect[] the integrity and reliability of the electoral process" is a valid one.  Crawford, 128 S.

Ct. at 1617.  In determining whether complying with the Consent Decree unnecessarily burdens

that interest, however, it is important to distinguish between the different types of voter fraud.  In

the first type, which the Court shall refer to as "voter registration fraud," an individual either

registers under a false or fictitious name, thereby adding an unqualified voter to the rolls.  A

second category of fraud, hereinafter designated "in-person fraud," involves individuals actually

casting ballots in cases where they are not legally permitted to do so, including multiple-voting

in various jurisdictions by otherwise-qualified individuals and voting by felons disenfranchised

under state law, non-citizens, and individuals registered under fictitious identities.  A final

grouping, "absentee ballot fraud," involves the submission of absentee or mail-in ballots in the

name of qualified voters by individuals other than those voters.  See Id. at 1637 (Souter, J.,

dissenting) (distinguishing between the various categories of voter fraud).  Nothing in the

Consent Decree prevents the RNC from effectively combating absentee ballot and voter

registration fraud.  The former would exist in the absence of the Decree, while the latter can be

addressed while complying with the terms of that agreement.

Absentee ballot fraud is an intractable problem that is not susceptible to pre-election

remedies.  Short of personally observing absentee voters in order to assure that their ballots are

not filled out by an individual other than themselves – an absurd proposition that would

compromise the privacy of voting by requiring voters to allow political operatives into their

private residences, vehicles, or any other location where they choose to complete their ballot –

there is no way the RNC or any other political party can prevent individuals from submitting

fraudulent absentee ballots.  Such fraud must, therefore, be redressed after the election in the

form of criminal penalties imposed on individuals found guilty of having completed an absentee

ballot on behalf of someone else.[11]  As discussed below, the Consent Decree prohibits the RNC

from engaging in pre-election ballot security initiatives, but does not prevent the Committee

from reporting suspected cases of absentee ballot fraud to state election officials – who may in

turn refer those cases to the proper authorities for investigation or prosecution – after an election

is complete.  Thus, the RNC has the same opportunity to remedy absentee ballot fraud as the

DNC or any other political committee, and that opportunity is not infringed by the Consent

Decree.

     In contrast to the submission of falsified absentee ballots – in which the fraudulent acts at

issue occur in a private setting and are not discoverable until after the election, when absentee

ballots are reviewed by state officials – voter registration fraud may come to light prior to

Election Day.  Although the law varies from state to state, there are three primary methods by

which an individual may register to vote: (1) by filing a registration card while visiting the

Department of Motor Vehicles or some other state office as provided by the Motor Voter Law,

42 U.S.C. § 1973gg-5, (2) by mailing a completed registration card to the proper state agency,

usually a subdivision of the office of the Secretary of State, or (3) in-person registration at the

polls on Election Day.

---

[11] An individual found guilty of absentee voter fraud faces federal penalties of up to five years in
prison and a fine of $10,000 for each ballot he or she wrongfully submitted.  42 U.S.C. §
1973i(e).  Most states impose additional penalties.  See, e.g., Ala. Code § 17-17-24(a) (1975)
(categorizing absentee ballot fraud as a "class C felony"); Conn. Gen. Stat. § 9-359(a) (1975)
(categorizing absentee ballot fraud as a "class D felony"); Ind. Code § 3-14-2-3(1) (2005)
(same).  Moreover, an individual who submits absentee ballots via mail – the only method by
which such ballots are accepted – may be charged with mail fraud under 18 U.S.C. § 1341, an
offense which carries a penalty of up to 20 years imprisonment.  United States v. Clapp, 732
F.2d 1148, 1152-53 (3d Cir. 1984).  The harsh nature of those penalties is an indication that both
Congress and state legislatures have attempted to deter absentee voter fraud in order to assure
that it does not compromise the integrity of elections.

From the evidence in the record, it appears that only the second method is conducive to fraud.  The RNC submitted evidence of several incidents in which groups such as ACORN engaged in voter registration drives have submitted mail-in registrations that included fictitious names, see (RNC Hr'g Exs. 40, 59 at 64, 70), and the DNC submitted an article authored by one of its witnesses, Mr. Levitt, acknowledging that such fraud occurs.  (DNC Hr'g Ex. 18 at 20-22.) There is no indication, however, that such fraud poses a threat to the integrity of modern elections, as the RNC has been unable to point to a single instance in which an individual actually voted using such a fictitious identity.  See (DNC Hr'g Ex. 18 at 20) ("[W]e are aware of no recent substantiated case in which registration fraud has resulted in fraudulent votes being cast.")  In fact, some of the cases pointed out by the RNC involved the registration of absurd names – such as "Jive Turkey" and "Mickey Mouse" – that no individual would use in an attempt to illegally cast a ballot unless he or she were looking for a speedy and efficient method of going to prison.  See (RNC Hr'g Ex. 40 at 2) (noting the conviction of ACORN worker Tyaira L. Williams); Jim Avila and Reynolds Holding, Mickey Mouse is Registered to Vote?  Former ACORN Employees Speak Out on Accusations of Fraud, ABC News, Oct. 10, 2008, http://abcnews.go.com/TheLaw/story?id=6074157&page=1 (detailing the case of Ms. Williams, who was convicted for submitting a registration on behalf of "Mickey Mouse.").

The lack of evidence that individuals have actually used the fictitious identities registered by groups such as ACORN using mail-in registration does not vitiate the RNC's interest in assuring that such registration fraud does not occur.  See Crawford, 128 S. Ct. at 1619 ("[T]he interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").  The realization of that interest does not, however, require that the Consent Decree be vacated.  Every state that allows

registration by mail imposes a deadline after which such registrations will no longer be accepted
for an election occurring in that year.  The shortest, which is used by Alabama, Iowa, Maine, and
New Hampshire, requires that such registrations are received by relevant state authorities at least
10 days prior to an election.  See United States Election Assistance Commission, "State Voter
Registration Deadlines," http://www.eac.gov/voter/Register%20to%20Vote/deadlines (last
visited November 19, 2009) (hereinafter "EAC Voter Registration Deadlines").  Thus, the RNC
should be able to effectively address fraudulent registrations submitted by mail while providing
some notice of its intent to do so to this Court and the DNC under the Consent Decree's
preclearance provision.  That provision currently requires 20 days notice.  In order to allow for
the possibility of fraud in states that allow mail-in registrations to be submitted fewer than 20
days before an election, the Court will modify the Consent Decree's preclearance provision to
require that the RNC serve 10 days notice of any ballot security initiatives.[12]  Such a notice
period will be sufficient to allow this Court time to make a decision regarding the propriety of
the RNC's proposed ballot security measures, even in cases where reports of the allegedly
fraudulent mail-in registrations do not come to light until the date after which such registrations
will no longer be accepted by any state.  In light of that modification, the RNC will also be able
to effectively combat fraudulent voter registrations submitted using the first of the three methods
outlined above, in-person registration at a state office pursuant to the Motor Voter Law, as long
as those registrations occur within 10 days of an election.

---

[12] That modification is not based on a determination that the Consent Decree as it currently
stands is contrary to the public interest.  As discussed above, such a judgment would involve a
review of policy choices made by Congress and the state legislatures in which this Court is
powerless to engage.  Japan Whaling Ass'n, 478 U.S. at 230.  Rather, the Court finds that the 20-
day preclearance provision is "unworkable" due to an "unforeseeable" development: the
extension of voter registration deadlines in some states to allow mail-in registration as few as 10
days before an election.  The "unworkable" nature of a consent decree forms an alternative basis
for vacating or modifying a consent decree, and involves an inquiry distinct from the assessment
of whether that decree is detrimental to the public interest.  See Rufo, 502 U.S. at 384.

On the other hand, in states that allow in-person registration during the 10 days immediately preceding an election or permit voters to register at the polls on Election Day, there is a possibility that news of potentially fraudulent registrations will emerge after the preclearance period has expired, and the RNC will thus be prohibited under the Consent Decree from taking ballot security measures to address the alleged fraud.  The danger to the electoral process posed by such fraud is de minimis, however, due to the fact that only a few states allow such registrations, and those that do impose safeguards that make it highly unlikely that unqualified individuals will be allowed to register.  Three states – Connecticut, Maine, and Wisconsin – allow voters to submit in-person registrations fewer than 10 days before an election.  Conn. Gen. Stat. § 9-17(a) (allowing in-person registration up to seven days prior to an election); Me. Rev. Stat. Ann. tit. 21-A, § 122(6) (allowing in-person registration at any time before the election); Wis. Stat. § 6.29(2)(a) (same).  Maine and Wisconsin, along with six other states – Idaho, Iowa, Minnesota, New Hampshire, North Dakota, and Wyoming – also allow voters to register at the polls on Election Day.[13]  Shelley de Alth, <u>ID at the Polls: Assessing the Impact of Recent State Voter ID Laws on Voter Turnout</u>, 3 Harv. L. & Pol'y Rev. 185, 193 (2009); Election Reform Information Project, "Election-Day Registration: A Case Study" (Feb. 1, 2007), http://www.pewcenteronthestates.org/topic_category.aspx?category=514.  In every state where either in-person registration at a state office or Election Day registration at the polls is allowed, individuals wishing to register are required to demonstrate that they are qualified by showing

---

[13] North Dakota has eliminated voter registration entirely, and requires all voters to verify their identity at the polls.  <u>See</u> N.D. Cent. Code §§ 16.1-01-04 (eligibility requirements), 54-01-26 (enumerating rules for determining "residence" of voters); North Dakota Secretary of State, Elections Division, "I.D. Requirements," (2004), http://www.nd.gov/hava/education/doc/id-requirements.pdf.  An additional state, Rhode Island, allows Election Day registration for the limited purpose of voting in national elections for President of the United States.  R.I. Gen. Laws § 17-1-3.  Montana allows voters to register on Election Day by visiting a county elections office, but does not permit such registration at the polls themselves.  Mont. Code Ann. § 13-2-304.

either a state-issued photo ID that includes their address or some form of privately-issued photo identification (such as an employee or university ID) and a document verifying their address within the precinct (such as a residential lease, bank statement, or utility bill). See Conn. Gen. Stat. § 9-20(a); Idaho Code Ann. § 34-408A; Iowa Code § 48A.7A; Me. Rev. Stat. Ann. tit. 21-A, § 122(4) (allowing for Election Day registration), 112-A (outlining ID requirements); Minn. Stat. § 201.061, subd. 3; N.D. Cent. Code § 54-01-26; N.H. Rev. Stat. Ann. §§ 654:7 (stating that voters registering at the polls must provide "proof of qualifications"), 654.12(II) (outlining acceptable "proof of qualifications"); Wis. Stat. §§ 6.55(2)(b) (stating that voters registering at the polls must provide "proof of residence"), 6.34 (outlining acceptable "proof of residence"); Wyo. Stat. Ann. §§ 22-3-104(f)(ii)(A) (allowing Election Day registration at the polls), 22-1-102(xxxix) (defining "acceptable identification" for the purposes of registration). Thus, a voter would have to go to great lengths to register under a fraudulent identity in person either prior to an election by visiting a state agency or on Election Day, including falsifying photographic identification and documents proving he or she resides within the precinct, and making false statements to election officials. Such registrations are best viewed as a form of in-person voter fraud, which, as discussed below, poses a minimal threat to the integrity of modern elections.[14]

### (a) The Prevalence of In-Person Voter Fraud

From the evidence before the Court, it appears that in-person fraud – the type the RNC claims it is prohibited from combating by preclearance requirement of the Consent Decree – is extremely rare. The sources cited by the RNC in support of its claim that developments since 1982 such as the enactment of the Motor Voter Law, BCRA, and HAVA have increased the potential for voter fraud do not appear to distinguish between the various types of election fraud.

---

[14] The RNC has not pointed to a single case in which an individual fraudulently registered fewer than 10 days prior to an election and proceeded to cast a vote under his or her assumed identity.

A close review of those sources reveals that the vast majority of what the RNC classifies as "voter fraud" is more appropriately viewed as absentee ballot or voter registration fraud, and can be addressed while complying with the terms of the Consent Decree.  That conclusion is supported both by the testimony of the DNC's witnesses – who claimed that the danger of in-person voter fraud has been exaggerated for political purposes – and recent statements on the subject by the Supreme Court.

In support of his testimony that voter fraud is widespread enough that it may tip the balance in a close election, the RNC's witness, Mr. Josefiak, noted a portion of the Carter-Baker Commmission Report.  That section states:

> While fraud is difficult to measure, it occurs.  The U.S. Department of Justice has launched more than 180 investigations into election fraud since October 2002.  These investigations have resulted in charges for multiple voting, providing false information on their felon status, and other offenses against 89 individuals and in convictions of 52 individuals.

(RNC Hr'g Ex. 26 at 45.)

Thus, the RNC contends that the Carter-Baker Commission Report supports its claim that it must be freed from its obligations under the Consent Decree so that it can effectively combat voter fraud.

That contention ignores the next sentence of the Report, which states that the purported instances of voter fraud "related to a variety of election fraud offenses, from vote buying to submitting false voter registration information and voting-related offenses by non-citizens."  (Id.)  Thus, it appears that only a small fraction of the alleged fraudulent activity involved in-person fraud.  In fact, another portion of the Carter-Baker Commission Report acknowledges that all forms of voter fraud are fairly rare, stating "[t]here is no evidence of extensive fraud in U.S.

elections or of multiple voting, but both occur, and it could affect the outcome of a close election." (Id. at 18.)

The other examples of purported voter fraud cited by the RNC are similarly deficient in their failure to distinguish between in-person fraud and other forms of illegal activity.  In support of its argument that voter fraud is widespread enough to compromise the integrity of a close election, the RNC submitted an FBI report on irregularities that occurred in Wisconsin during the 2004 election.  The report, which was published on May 10, 2005, stated that the FBI was in the process of investigating approximately 100 suspected instances of individuals either voting more than once or casting a ballot under a false name, and more than 200 persons who allegedly voted despite being ineligible due to prior felony convictions.  (RNC Hr'g Ex. 29 at 2.)  Additionally, the agency stated that "persons who were paid money to obtain registrations allegedly falsified approximately 65 names on registration forms," but noted that there was "no evidence … that votes were cast under those false names." (Id. at 4.)

The FBI report did not specify whether the 200 felons and 100 individuals who allegedly voted more than once or cast ballots under false names did so at the polls or through an alternative process such as absentee or mail-in voting.  However, the DNC presented testimony by Dr. Minnite – who completed an extensive study of the incidents referred to in the FBI report, including interviewing the accused individuals – in which she stated that only a few of the persons suspected of wrongdoing in that case were actually voters.  (2 Hr'g Tr. 59:4-15.)  Dr. Minnite's investigation of a similar incident, which occurred in Florida during the 2004 elections and was cited by Mr. Josefiak in his testimony on behalf of the RNC, yielded the same result: the majority of those accused of wrongdoing were elected officials and political operatives.  (Id.) Thus, the evidence submitted by the RNC includes only isolated incidents of in-person fraud.

The vast majority of the undifferentiated "voter fraud" cited by the RNC falls into the other two categories outlined above: voter registration fraud and absentee ballot fraud.

The Court's conclusion that in-person fraud is rare draws further support from the testimony of DNC witnesses.  Dr. Minnite stated that she was unaware of any circumstance in which an individual was prosecuted for voter fraud discovered by a poll challenger.  (Id. at 62:23-25); see also (DNC Hr'g Ex. 25 at 1) ("[I]n-person or polling place voter fraud is rare in contemporary American elections. … [P]artisans and the media have grossly exaggerated both the incidence of voters committing fraud by intentionally and illegally registering and voting, and the vulnerability of existing election procedures to this kind of fraud.") (internal quotations omitted).  Similarly, Mr. Levitt claimed that allegations of voter fraud are usually "hot air," and are motivated not by any evidence of widespread in-person fraud, but rather an "attitude of intimidation" that can result in the disenfranchisement of qualified voters.  (2 Hr'g Tr. at 99:14-100:17.)

In fact, the Supreme Court acknowledged the rarity of in-person voter fraud in Crawford. In that case, Justice Stevens, announcing the judgment of the Court in an Opinion joined by Justice Kennedy and Chief Justice Roberts, diverged sharply with Justice Souter, who was joined in his dissent by Justice Ginsburg, as to whether the danger of in-person voter fraud could justify an Indiana statute requiring voters to prove their eligibility by means of government-issued photo identification before voting.  Both sides agreed that the statute at issue dealt only with in-person voter fraud, and there was "no evidence of any such fraud actually occurring in Indiana at any time in its history." Crawford, 128 S. Ct. at 1619; see also 128 S. Ct. at 1637 (Souter, J., Dissenting) ("the State has not come across a single instance of in-person voter impersonation fraud in all of Indiana's history.") (citing Ind. Democratic Party v. Rokita, 458 F. Supp.2d 775,

792-93 (S.D. Ind. 2006)).  Justice Stevens found, though, that the danger of in-person voter

fraud, however theoretical, could justify the Indiana statute.  In doing so, he stated that:

> [T]hat flagrant examples of such fraud in other parts of the country have been
> documented throughout this Nation's history by respected historians and
> journalists, that occasional examples have surfaced in recent years, and that
> Indiana's own experience with fraudulent voting in the 2003 Democratic primary
> for East Chicago Mayor – though perpetrated using absentee ballots and not in-
> person fraud – demonstrate that not only is the risk of voter fraud real but that it
> could affect the outcome of a close election.

Id. at 1619 (footnotes omitted).

Included in that statement were three footnotes.  The first cited as an example of fraud

"documented by respected historians" voting shenanigans perpetrated by the infamous William

"Boss" Tweed during the 1868 New York City election.[15]  Id. at 1619 n.11.  The third elaborated

on the fact that, as mentioned in the excerpt above, the incident that occurred during the 2003

Democratic primary for East Chicago mayor did not involve in-person fraud, but rather

irregularities involving absentee ballots.  Id. at 1619 n.13.  Accordingly, two of the three factors

cited by Justice Stevens provide little support for his ruling that in-person fraud poses a danger to

modern elections – the first because it is an inapposite historical example and the third because it

did not actually involve in-person fraud.

    The second of the three footnotes included in the portion of Crawford quoted above is

especially relevant to today's ruling.  In it, Justice Stevens acknowledged that, of the "occasional

examples" of in-person fraud on which his ruling was based, all but one had been shown to have

---

[15] To that example this Court adds another: the 1873 trial of women's suffrage pioneer Susan B.
Anthony for voting in the previous year's national elections.  Of course, Ms. Anthony's illegal
activity was easily detected, as she made no effort to disguise her gender while casting her ballot.
See United States v. Anthony, 24 F. Cas. 829 (C.C.N.D.N.Y. 1873) (No. 14,459).

been "overstated because much of the fraud was actually absentee ballot fraud or voter

registration fraud."[16] Id. at 1619 n.12.  Justice Stevens stated, however, that:

> [T]here remain scattered instances of in-person voter fraud.  For example, after a
> hotly contested gubernatorial election in 2004, Washington conducted an
> investigation of voter fraud and uncovered 19 "ghost voters."   After a partial
> investigation of the ghost voting, one voter was confirmed to have committed in-
> person voting fraud.

Id.

In short, Justice Stevens was able to point to only one instance of in-person voter fraud occurring

in recent elections, and that example involved only one voter.

Justice Souter, who was joined in his dissent by Justice Ginsburg, also noted that in-

person voter fraud is extremely rare.  He stated that there is no "evidence whatsoever of in-

person voter impersonation fraud in the State" of Indiana, and a "dearth of evidence of in-person

voter fraud in any other part of the country."  Id. at 1637 (Souter, J., dissenting).  Moreover,

Justice Souter pointed out that "the lack of evidence of in-person voter impersonation fraud is

not for failure to search."  Id. at 1637 n.28 (citing Eric Lipton & Ian Urbina, In 5-Year Effort,

Scant Evidence of Voter Fraud, N.Y. Times, Apr. 12, 2007, p. A1 ("Five years after the Bush

Administration began a crackdown on voter fraud, the Justice Department has turned up virtually

no evidence of any organized effort to skew federal elections, according to court records and

interviews")).  He rejected Indiana's argument that "in-person voter impersonation fraud is hard

to detect," characterizing that assertion as being "like saying the 'man who wasn't there' is hard

to spot," and stating that "there is reason to think that impersonation of voters is the most likely

type of fraud to be discovered."  Id. (citations omitted).

---

[16] That finding was based on evidence submitted by the Brennan Center, which filed a brief as an
amicus curae.  Mr. Levitt, who appeared in this matter as a witness for the DNC, was involved in
drafting the brief and its factual assertions were based partially on his research.

Justice Souter went on to hold that, even though in-person voter fraud may theoretically occur, the practical realities of modern elections make it very unlikely:

> It simply is not worth it for individuals acting alone to commit in-person voter impersonation, which is relatively ineffectual for the foolish few who may commit it.  If an imposter gets caught, he is subject to severe criminal penalties.  And even if he succeeds, the imposter gains nothing more than one additional vote for his candidate.

Id. (citations omitted).

The rulings by Justices Stevens and Souter in Crawford refute the RNC's argument that in-person voter fraud poses a danger to the integrity of modern elections, and therefore requires that the Consent Decree be vacated so that such fraud can be addressed.  Five Justices – a binding majority of the Court – joined in those Opinions.[17]  Accordingly, it is settled that in-person fraud is extremely rare, and any argument by the RNC to the contrary must be rejected.

*(b) In-Person Fraud vs. Voter Intimidation*

Having established that the type of voter fraud the RNC argues it is prevented from combating by the Consent Decree poses only a minimal threat to the electoral process, the Court must weigh the danger of such fraud against that of voter suppression.  As discussed above, the evidence in the record demonstrates that voter intimidation continues to be a problem.  See, e.g., Bartlett v. Strickland, 129 S. Ct. 1231, 1249 (2009) ("[R]acial discrimination and racially polarized voting are not ancient history.  Much remains to be done to ensure that citizens of all races have equal opportunity to share and participate in our democratic processes and traditions."); (Pl.'s Br. Opp'n Mot. Vacate 10-15) (documenting alleged incidents of voter suppression).  The effects of ballot security initiatives such as the ones prohibited by the Consent Decree pose a far greater threat to the integrity of modern elections than in-person voter fraud.

---

[17] Justice Stevens was joined by Justice Kennedy and Chief Justice Roberts.  Justice Souter was joined in his dissent by Justice Ginsburg.

In fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers of than the instances of in-person fraud that may occur during any given race.  The only evidence submitted by the RNC in which it actually quantified the incidence of voter fraud in an election is the FBI report detailing irregularities in Wisconsin during the 2004 election.  That report stated that the FBI was in the process of investigating roughly 300 suspected instances of voter fraud – 100 in which individuals may have voted more than once, and 200 in which ineligible felons allegedly cast a ballot.  (RNC Hr'g Ex. 29 at 2.)  However, as set forth above, the FBI report does not indicate how many of those alleged cases of fraud occurred at the polls rather than through the submission of absentee ballots.  Furthermore, Dr. Minnite testified, that of the 300 alleged instances of voter fraud, only a few were perpetrated by voters.  (2 Hr'g Tr. 59:4-15.)

Even if the Court were to assume that all 300 of the alleged incidents of fraud involved in-person misconduct at the polls, the effects of such fraud pales in comparison to the damage that would likely result from allowing the types of ballot security initiatives that are currently prohibited by the Consent Decree.  The <u>Malone</u> matter involved a voter challenge list that included 35,000 predominantly-minority individuals.  If only one tenth of those individuals were deterred from voting by harassment at the polls, the effect would have been the disenfranchisement of 3,500 individuals – a number far greater than the 300 alleged incidents of voter fraud which the RNC points to in support of its claim.[18]

---

[18] In another attempt to quantify the prevalence of in-person voter fraud, Justice Stevens in <u>Crawford</u>, 128 S. Ct. 1619 n.12, pointed to an incident during the 2004 Washington gubernatorial election in which 19 so-called "ghost voters" were found to have cast ballots.  On further investigation, however, only one individual was confirmed to have committed in-person voter fraud.  <u>Id.</u>

Another case, which occurred in Montana during the 2008 election, demonstrates that the ongoing danger of voter suppression far exceeds the threat posted by in-person voter fraud.  In that incident, the Executive Director and Legislative Director of the Montana Republican Party ("MRP") filed over 6,000 challenges alleging that individuals residing in precincts that had historically supported Democratic candidates were not eligible to participate in the election because their residential addresses did not match those under which they registered to vote.[19] See Montana Democratic Party v. Eaton, 581 F. Supp.2d 1077, 1078 (D. Mont. 2008).  The United States District Court for the District of Montana found that those challenges were "frivolous," and had been filed with the "express intent to disenfranchise voters in counties that have historically tipped toward the Democratic party."  Id.  In doing so, it portrayed the MRP's argument that such challenges were necessary to combat voter fraud as disingenuous, stating:

> Determined to prevent the Hobbesian nightmare sure to ensue if voters' mailing addresses do not match their residential addresses, [MRP Executive Director Jacob] Eaton employed an auditor to pore over the United States Postal Service's change of address registry, and to compare the names in it to the names on voter rolls in some Montana counties.  A self-described guardian of the integrity of a political system designed to guarantee the right of the people to govern themselves, Eaton targeted counties with young and likely Democratic voters, who might have changed their mailing addresses without changing their voter registration information.  The challenge theory must be that such voters might compromise the democratic process by going off to college or serving in the military overseas, and forwarding their mail to their new location or to a family member – both examples of voters Eaton challenged.

Id. at 1079.

---

[19] There is no evidence that the RNC participated in the design or implementation of the ballot security program at issue in Eaton.  Therefore, that case does not fall under the purview of the Consent Decree.  It is used here not as an example of past violations by the RNC, but rather for the purposes of demonstrating that (1) Republican political operatives at both the state and national level have a continuing incentive to engage in voter suppression efforts aimed at segments of the population that generally support Democratic candidates, and (2) the danger of in-person voter fraud is outweighed by the risk that ballot security measures such as those prohibited by the Consent Decree will result in the disenfranchisement of qualified individuals.

The Court noted that, although the challenges were clearly meritless, they still might result in the disenfranchisement of qualified voters:

> [I]t is the procedural effect of Eaton's challenges that raises the issues here. Montana law provides that when a citizen challenges another citizen's right to vote prior to the close of registration, "the election administrator shall question the challenger and the challenged elector and may question other persons to determine whether the challenge is sufficient or insufficient to cancel the elector's registration." Mont. Code Ann. § 13-13-301(3). When a challenge is made after the close of registration or on election day, "the election administrator or, on election day, the election judge, shall allow the challenged elector to cast a provisional paper ballot." Id. One can imagine the mischief an immature political operative could inject into an election cycle were he to use the statutes not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote – the most precious right in a government of, by, and for the people – has been challenged. The mess created for those volunteers and elected officials dedicated to preserving the integrity of the system is nearly unimaginable in terms of the time and expense necessary to deal with such blanket challenges.

Id.

The Consent Decree is designed to guard against the implementation of precisely the kind of overbroad and politically-motivated ballot security measures that were used in Malone and Eaton. A quantitative examination of the potential harm caused by such measures demonstrates that the risks created by poorly-designed ballot security initiatives, undertaken with the ostensible purpose of safeguarding against fraud, are a greater threat to the electoral process than the in-person fraud they are meant to prevent.[20] The RNC has submitted evidence of, at most,

---

[20] The two examples of voter suppression included above are far from exhaustive. In fact, as part of the Court's research in preparing this ruling, it had occasion to visit the website maintained by the Alabama Secretary of State, on which the following statement is currently posted:

> The Secretary of State's Office has recently learned that a voter registration form has been mailed to some Alabama residents by a state political party. These registration forms have a return address for the Alabama Republican Party, rather than the local Board of Registrars.

300 instances of such fraud occurring in the United States since the Consent Decree was entered

in 1982, while the Supreme Court was able to find only one confirmed case during the past

century.  See (RNC Hr'g Ex. 29 at 2); Crawford, 128 S. Ct. 1619 n.12.  The disenfranchisement

of even one tenth of the voters selected for challenges in Malone and Eaton would have robbed

4,100 citizens of their right to vote.  Thus, it is clear that the potential harm of anti-fraud

measures such as those prohibited by the Consent Decree far outweighs the harm of in-person

voter fraud.

That conclusion draws further support from the fact that, in addition to the qualified

voters who may be disenfranchised due to erroneous or illegal objections to their own eligibility,

it is all but certain that anti-fraud initiatives in which challengers are deployed at polling places

will result in the disenfranchisement of many individuals whose eligibility is not in question.

Some voters – especially in minority districts where the legacy of racism and history of clashes

between the population and authorities has given rise to a suspicion of police and other officials

– may choose to refrain from voting rather than wait for the qualifications of those ahead of them

to be verified, especially if the verification process becomes confrontational.  See, e.g, (DNC

Hr'g Ex. 18 at 6) (quoting a former Political Director of the Republican Party of Texas, who

stated that photo ID requirements "could cause enough of a dropoff in legitimate Democratic

_____

Alabama Secretary of State, "Elections,"
http://www.sos.state.al.us/Elections/Default.aspx (last visited Nov. 20, 2009).

There is no indication that the RNC was involved in the program alluded to by the Alabama
Secretary of State, and the Alabama Republican Party has not been found guilty of illegal
activity based its actions in mailing the aforementioned form.  The use of such deceptive tactics
– which may represent an effort to trick voters into submitting their registration forms to an
improper recipient, thereby assuring that they will not be eligible to vote in upcoming elections –
is typical, however, of past ballot security initiatives (most of which are perpetrated by shadowy
state and local groups rather than the RNC itself).  The fact that such efforts apparently persist
serves as further illustration of the continuing incentive for Republican political committees to
engage in voter suppression.  See supra at II(B) (discussing minority voter trends and the
incentives that lead to voter suppression).

voting to add three percent to the Republican vote."); (RNC Hr'g Ex. 26 at 56) (portion of the Carter-Baker Commission Report on "Polling Station Operations," in which the Report acknowledged the perception among some minority communities that such measures may be "intimidating," and stated that during the 2004 election, "[p]roblems with polling station operations, such as long lines, were more pronounced in some places than others.  This gave rise to suspicions that the problems were due to discrimination or partisan manipulation…")  Others may be prevented from waiting by responsibilities such as school or work, or a physical disability.  See League of Women Voters v. Ohio, 548 F.3d 463, 478 (6th Cir. 2008) (upholding equal protection claim based on inconsistencies between polling places in Ohio during the 2008 election based partially on the fact that "[l]ong wait times caused some voters to leave their polling places without voting in order to attend school, work, or to family responsibilities or because a physical disability prevented them from standing in line.").  Still others might be kept from voting prior to the broadcast by media outlets of the projected election results – an occurrence which may convince voters that continuing to wait in line at their respective polling places is a futile exercise, as the election has already been decided.  See, e.g., Pamela S. Karlan, Nothing Personal: The Evolution of the Newest Equal Protection from Shaw v. Reno to Bush v. Gore, 79 N.C. L. Rev. 1345, 1360-61 (2001) (examining cases of two Florida residents who did not vote in the 2000 election because they heard media projections on their way to the polls and "became convinced that their votes would be meaningless"); Susan E. Seager & Laura R. Handman, Congress, The Networks, and Exit Polls, 18 Comm. Law 1, 30-31 (2001) (detailing several cases in which media outlets prematurely projected that a given candidate would win a race, and noting with respect to the 2000 election that, after news sources erroneously declared that Vice President Al Gore had won the state of Florida, "Republicans asserted that … the

illusion of an easy Gore victory chilled Republican voter desire in the West and in the Florida panhandle, causing GOP congressional candidates to lose to their Democratic challengers.").

*(c) The Effect of Recent Changes to Federal Election Laws*

Changes to federal election laws since the enactment of the Consent Decree have not altered that calculus.  The RNC claims that the Motor Voter Law, BCRA, and HAVA have increased the danger that the electoral process may be compromised by in-person voter fraud, while simultaneously alleviating the need for the Consent Decree by creating safeguards designed to counteract the types of voter suppression efforts it was intended to prevent.  That argument is without factual support, and ignores portions of those statutes that are specifically designed to combat such fraud.  In-person voter fraud remains exceedingly rare, while voter suppression efforts continue to pose a threat to the electoral process.

The RNC claims that the Motor Voter Law has alleviated the need for the Consent Decree by "mak[ing] it easier for all voters, including minority voters, to register to vote." (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 18.)  While the Court agrees that the Motor Voter Law has simplified the registration process and led to increases in the number of registered voters – doing so was the law's stated purpose, 42 U.S.C. § 1973gg(b)(1) – that development has no bearing on the continued efficacy of the Consent Decree.  As discussed above, minority voters remain susceptible to intimidation efforts, and there is a continued incentive for the RNC and other Republican political organizations to engage in such efforts.  See supra at II(B).  Moreover, while the number of registered minority voters has increased since the enactment of the Motor Voter Law, that increase has been outpaced by the growth of the minority population as a whole. In fact, voter registration as a percentage of total population has decreased among individuals classified as "black" and "hispanic" by the U.S. Census Bureau.  Between 1982 and 2006, there

was a 41.6 percent increase in "black" registered voters, but the total number of "black"

individuals eligible to vote increased by 45.9 percent.  <u>See</u> (RNC Hr'g Exs. 4 at Table 2, 5 at 5,

6.)  Similarly, there was an increase of 201 percent in the number of "hispanic" registered voters,

but a 229.9 percent increase in the number of "hispanic" individuals eligible to vote.  <u>See</u> (RNC

Hr'g Exs. 4 at Table 2, 5 at 5, 6.)  Thus, it appears that minorities in those categories are actually

participating in the political process at lower rates than they were when the Consent Decree was

enacted in 1982.  That conclusion is supported by the number of votes actually cast by "black"

and "hispanic" individuals in 2006 – despite population increases of 45.9 and 229.9 percent,

respectively, voter participation for those groups increased by only 31.1 and 152 percent.  <u>See</u>

(RNC Hr'g Exs. 6, 7.)

      The RNC's contention that the Motor Voter Law's simplification of the voter registration

process has led to increased minority participation in the political process is not only factually

inaccurate, it is also irrelevant.  The Consent Decree was not designed to encourage minority

voter registration, but rather to prevent voter suppression.  Consequently, the relevant inquiry is

not whether the Motor Voter Law has increased minority participation, but whether that statute

has created a greater danger of in-person voter fraud and/or decreased the risk that voters will be

disenfranchised through intimidation.  The RNC has presented no evidence that the statute has

had either of the latter effects.  To the contrary, as testified to by Mr. Levitt, the Motor Voter

Law significantly reduces the threat of voter registration fraud by (1) requiring that the

government agencies verify the eligibility of individuals attempting to register in-person at state

agencies, including the fact that they are United States citizens, before adding them to the rolls,

<u>see</u> Pub.L. No. 109-13 (REAL I.D. Act of 2005); (2 Hr'g Tr. 86:14-17), (2) creating standardized

requirements for the maintenance of state voter rolls and allowing for the removal of voters, <u>see</u>

42 U.S.C. § 1973gg(6)(a) (allowing removal on evidence of criminal conviction or mental incapacity, death, or a change in address to a location outside the state's jurisdiction); (2 Hr'g Tr. 88:10-23), and (3) imposing criminal penalties for voter registration fraud.  42 U.S.C. § 1973gg-10(2); (2 Hr'g Tr. 89:1-2.)  The statute does not, however, address the threat of voter suppression or the underlying incentives to engage in such efforts.  See supra at II(B).  Therefore, the Court finds that the Motor Voter law has not alleviated the need for the Consent Decree.

The RNC's arguments relating to the BCRA are similarly unavailing.  Its claims relating to that statute are twofold.  First, the RNC contends that the combination of that statute's ban on the use of "soft money" by national political committees, see 2 U.S.C. § 441i(a)(1), and the Court's interpretation of the Consent Decree to allow suits by intervenors (who are not bound by the BCRA's "soft money" restrictions) has given the DNC a financial advantage by requiring the RNC to defend such suits using its limited "hard money" resources.  That concern is alleviated by the fact that, as discussed above, the DNC concedes that the Consent Decree should be modified to prohibit enforcement of its terms by any party other than the signatories to that agreement.  See, e.g., (Pl.'s Br. Opp'n Mot. Vacate 4, 23, 26); (Hr'g Tr. 26:17-27:1.)

In the second of its two arguments relating to BCRA, the RNC claims that statute has increased the danger of voter fraud, stating:

> In recent elections, the DNC responded to the restrictions of BCRA by effectively outsourcing many of its voter registration and get-out-the-vote efforts to non-party organizations, such as ACORN.  Transferring these activities from the DNC to groups that lack its transparency and political accountability intrinsically increases the potential for voter fraud, because it removes the institutional and political disincentives to commit fraud.  Indeed, members of ACORN and related groups have repeatedly been indicted for, and pleaded guilty to, voter fraud in recent years.

(Def.'s Post-Hr'g Br. Supp. Mot. Vacate 19-20) (citations omitted).

The contention that such "outsourcing" justifies vacating the Consent Decree is inapposite for a number of reasons.  First, the RNC is free to engage in similar efforts.  Nothing in the Consent Decree prohibits the RNC from using outside organizations that are not subject to the BCRA's "soft money" restrictions to register voters or coordinate activities aimed at increasing voter turnout on Election Day.  Moreover, the RNC's argument does not distinguish between the different types of fraud.  See Crawford, 128 S. Ct. at 1637 (Souter, J., dissenting) (discussing various categories of voter fraud).  The instances of "voter fraud" on the part of ACORN and other groups that the RNC cites in support of its claim were limited to registering fictitious individuals to vote by means of mailed registration forms.  See (RNC Hr'g Exs. 40, 59 at 64, 70).  As discussed above, the RNC has not cited a single case in which an individual has actually voted using one of those identities.  Furthermore, every state imposes a deadline after which such mail-in registrations cannot be submitted, the shortest being 10 days before an election.  See EAC Voter Registration Deadlines.  In light of the fact that the Court will modify the Consent Decree in order to shorten the preclearance period to 10 days, the RNC should be able to effectively address such incidents.

The HAVA, the last of the three federal election laws on which the RNC bases its contention that the Consent Decree must be vacated, establishes a procedure in which an individual whose eligibility is challenged on Election Day must be allowed to cast provisional ballot, which is later examined by election officials to determine its validity.  See 42 U.S.C. § 15482(a).  Initially, the RNC contended without citing any support that the HAVA's provisional ballot mechanism has increased the danger of voter fraud by "eliminat[ing] the traditional safeguards against multiple registrations and multiple voting."  (Def.'s Reply Br. Supp. Mot. Vacate 5.)  Over the course of the proceedings, that argument evolved.  Mr. Josefiak testified

that, rather than increasing the risk of voter fraud, the HAVA's provisional ballot mechanism creates a safeguard that decreases the danger that voters will be disenfranchised due to poll challenges by ensuring that individuals whose eligibility is in question are not turned away from the polls.  (1 Hr'g Tr. 79:16-24.)  The RNC echoed that argument in its post-hearing brief. (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 9, 18.)

  Neither of the RNC's arguments relating to the HAVA is supported by the evidence.  The Committee's contention that the HAVA eliminates safeguards against multiple registrations and voting, and thus increases the risk of voter fraud, ignores several provisions of the statute that are designed to address precisely those issues.  Prior to the enactment of the HAVA, the various counties and municipalities within states usually maintained their own voter lists.  That circumstance created a situation in which individuals might register multiple times and, potentially, attempt to cast a ballot more than once by visiting the different polling stations within a state.  See, e.g., Daniel P. Tokaji, Voter Registration and Election Reform, 17 Wm. & Mary Bill Rts. J. 453, 471-72 (2008); (2 Hr'g Tr. 90:4-91:1).  The HAVA attempts to solve that problem by requiring that each state aggregate its voter rolls into a single computerized database. 42 U.S.C. § 15483(a)(1).  State officials are then required to periodically review that database and remove individuals who are ineligible due to criminal conviction, mental incapacity, or other factors, along with names that appear to be duplicates of others on the list.  42 U.S.C. § 15483(a)(2)(A).  In doing so, they must match all voter registrations against state motor vehicle records in order to verify the accuracy of the information in the state voter database.  42 U.S.C. § 15483(a)(5)(B)(i).

  In an additional safeguard against multiple registrations and voting, the HAVA imposes identification requirements on individuals attempting to register to vote.  New registrants must

include either their driver's license number or, if they do not have a driver's license, the last four

digits of their social security number.  42 U.S.C. § 15483(a)(5)(A)(i).  Those without either a

driver's license or social security number may still register, but are automatically subject to a

mandatory verification process.  42 U.S.C. § 15483(a)(5)(A)(ii),(iii).  Thus, the HAVA imposes

several measures that decrease the danger of voter fraud, including (1) standardizing the voter

rolls so that the eligibility of existing voters can be more easily verified, (2) eliminating

duplicative registrations and removing individuals who become ineligible, and (3) preventing the

registration of new ineligible or fictitious individuals by requiring that each voter's qualifications

by verified before they are added to the rolls.  In light of those requirements, the RNC's

conclusory statement in its initial brief that the HAVA removes traditional safeguards against

multiple voting is obviously erroneous, and must be rejected.

      The RNC's second argument – that HAVA has mitigated the threat posed by voter

suppression efforts by requiring that individuals whose eligibility is challenged on Election Day

be allowed to cast a provisional ballot, see 42 U.S.C. § 15482(a) – is unavailing for two reasons.

First, that argument does not take into account the problem of voters who are deterred from

casting any form of ballot, provisional or otherwise, by the presence of poll challengers or other

ballot security initiatives.  As discussed above, such anti-fraud efforts may create disruptions to

the voting process that have the effect of disenfranchising individuals whose eligibility is not in

question.  See supra at II(C)(i)(b) ("Some voters … may choose to refrain from voting rather

than wait for the qualifications of those ahead of them to be verified … Others may be prevented

from waiting by responsibilities such as school or work, or a physical disability. … Still others

might be kept from voting prior to the broadcast by media outlets of the projected election results

– an occurrence which may convince voters that continuing to wait in line at their respective

polling places is a futile exercise…") (citations omitted).

      The RNC's arguments relating to the HAVA also fail to take into account the inconsistent

manner in which that statute's provisional ballot mechanism has been implemented by the states

and the relatively small number of voters who have been allowed to benefit from that provision.

Roughly 1.6 million provisional ballots were cast in the 2004 election, the first in which states

were required to offer challenged voters that option, while just over 791,000 voters availed

themselves of that option in 2006.  (RNC Hr'g Ex. 26 at 15) (2004 election); (RNC Hr'g Ex. 23

at 20) (2006 election).  Of the 1.6 million provisional ballots cast in 2004, only about 64.5

percent – slightly under one million – were counted.  (RNC Hr'g Ex. 24 at 20.)  Thus, a voter

who cast a provisional ballot in that election faced a 35.5 percent chance that his or her vote

would not be tallied.  (Id.)  Data from the 2006 election shows a slightly improved picture: of the

791,000 provisional ballots cast, roughly 79.5 percent were counted – thus leaving a 20.5 percent

chance that a voter who cast a provisional ballot would not have his or her vote accepted.  (Id.)

Of the approximately 170,000 provisional ballots that were not counted in 2006, only 17,325

were rejected after it was verified that the voter was not qualified: 9,269 on the basis of

unspecified "ineligibility," 4,879 due to the fact that the voter had cast his or her ballot in the

wrong jurisdiction, 3,147 after the voter was found to have already voted, and 30 on the grounds

that the registrant was classified as "deceased."  (Id. at 21, Table D.)  In contrast, 26,631

provisional ballots were rejected because the individual had voted in the wrong precinct, (id.) – a

fact that had nothing to do with whether the voters were "eligible under State law to vote," and is

therefore not a valid basis under the HAVA for discarding a provisional ballot.  42 U.S.C. §

15482(a)(4).  Another 25,464 provisional ballots were rejected for unspecified reasons.  (RNC

Hr'g Ex. 24 at 21, Table D.)  Perhaps most troubling, 2,545 provisional ballots were rejected because the registrations of the voters casting them were wrongfully purged prior to the election. (Id.)

The unreliability of the provisional ballot mechanism is further demonstrated by fact that "[p]ractices for offering and counting provisional ballots … var[y] widely by state and by county."  (RNC Hr'g Ex. 26 at 15.)  The question of whether a voter who casts a provisional ballot will actually have that ballot counted depends largely on the state in which he or she resides.  During the 2006 election, Alaska counted 92.2 percent of such ballots, while Kentucky tallied only 6.7 percent.  (RNC Hr'g Ex. 24 at 19, Table C.)  The number of provisional ballots that were actually counted was widely divergent even in states such as Maryland and Virginia, which are located in the same geographic area, and in which the number of votes cast were roughly equivalent.  In the former, 87.1 percent of provisional ballots were counted, while only 36.3 percent were factored toward the election results in the latter.  (Id.)

Similar variations appear in the number of provisional ballots cast.  During the 2006 election, 1,168,856 Connecticut residents voted, yet there were no provisional ballots cast in that state.  (Id.)  In contrast, New Jersey – which, with 1,291,751 people casting ballots, enjoyed a voter turnout similar to that in Connecticut – saw 11,410 individuals cast provisional ballots. (Id.) A total of 2,370 provisional ballots were cast in Alabama, another state in which voter turnout was roughly equal to that in Connecticut, with 1,162,063 individuals voting.  (Id.)  While the Court does not wish to impugn Connecticut's voter registration and election process, it doubts that process functioned with such perfection that there was not a single case in which an individual attempted to vote in the wrong precinct or found, on appearing at the polls, that the name recorded on his or her voter registration card varied slightly from the correct spelling.  The

simpler, and much more likely, explanation is that statistical outlier states such as Connecticut

(in which the number of provisional ballots cast was lower than the norm for similar-sized states)

did not effectively implement the requirement that voters whose qualifications were in question

be offered provisional ballots.[21]   Thus, while the HAVA's provisional ballot mechanism could, if

effectively implemented, provide a means of assuring that ballots cast by voters whose eligibility

is wrongly challenged are counted, it currently does so only in certain states.  Therefore, the

RNC's claim that the HAVA eliminates the need for the Consent Decree must be rejected.

*(d) Alternative Voting Mechanisms*

The RNC also contends that the adoption of alternative voting procedures by an

increasing number of states has eliminated the need for the Consent Decree.  In doing so, it

focuses on two mechanisms which do not require voters to visit the polls on Election Day: the

submission of mail-in absentee ballots and early voting.  As a preliminary matter, the Court finds

that the use of such procedures, though increasingly prevalent, is not widespread enough to

justify vacating the Consent Decree.  According to the RNC's own statistics, only 14.3 percent of

the votes cast in the 2006 election were submitted by means of absentee ballot, while 5.6 percent

were made by means of early voting.  (RNC Hr'g Ex. 24.)  In contrast, 79.8 percent of voters

cast their ballots by visiting the polls on Election Day.  (Id.) (stating that 78.8 percent of voters

used traditional ballots, while just over one percent cast provisional ballots).  In light of those

statistics, vacating the Consent Decree due to the rise of alternative voting mechanisms would be

akin to "throwing the baby out with the bathwater" – such a decision would remove protections

---

[21] Connecticut is by no means the only state in which an abnormally low number of provisional
ballots were cast.  In another example, 983,795 votes were cast in Tennessee, none by means of
provisional ballot.  (Id.)  South Carolina, a state in which 1,012,410 people voted, saw 3,013 of
its citizens cast provisional ballots.  (Id.)

that remain applicable to 79.8 percent of the population due to the behavior of the other 19.9 percent.

Turning to the RNC's substantive arguments relating to alternative voting procedures, the Court notes that, as with its arguments relating to HAVA, the Committee's assertions have evolved over the course of these proceedings.  In its initial brief, the RNC claimed that the adoption of such procedures has increased the danger of voter fraud by "allow[ing] an individual to register to vote, request a ballot, and cast a vote without ever appearing before a county official to establish her existence."  (Def.'s Br. Supp. Mot. Vacate 14.)  That contention ignores the fact that, as discussed above, the HAVA requires all individuals registering to vote, regardless of whether they intend to do so by absentee ballot or any other means, to verify their eligibility by submitting their driver's license number or the last four digits of their social security number.  42 U.S.C. § 15483(a)(5)(A)(i).  Those who have neither form of identification are subject to a mandatory verification process.  42 U.S.C. § 15483(a)(5)(A)(ii),(iii).  Moreover, no state accepts mailed voter registrations fewer than 10 days before an election.  See EAC Voter Registration Deadlines.  In light of today's modification of the Consent Decree to require 10, rather than 20, days notice of any ballot security initiative, the RNC should be able to effectively address any rumors that fictitious or ineligible individuals are registering to vote by mail.

The problem of individuals actually submitting fraudulent absentee ballots, whether by filling out a ballot on behalf of someone other than themselves or by offering some form of remuneration to other voters in exchange for supporting given candidates, is of greater concern. As a practical matter, however, the RNC will not be prevented by the Consent Decree from combating such behavior for two reasons.  First, there is no evidence that absentee ballot fraud is perpetrated more often by minority voters than any other population.  Since the Consent Decree

only prohibits ballot initiatives that disproportionately target minority voters, the RNC is free to design measures aimed at addressing absentee ballot fraud as long as this Court verifies at least 10 days prior to the implementation of such measures that they do not unfairly target minority populations. More importantly, absentee ballot fraud takes place in settings removed from public scrutiny. The types of ballot security measures contemplated by the Consent Decree – such as compiling challenge lists through vote caging prior to an election and stationing confrontational challengers at the polls to verify individual voters' qualifications – have no efficacy in rooting out such fraud. In fact, there is no practical means by which the RNC (or any other political entity) could discover such fraud prior to the examination of absentee ballots by state officials. At that time, the RNC is free to report suspected instances of fraud to relevant officials, and can do so without disrupting the electoral process or deterring minority voters from casting their ballots.[22]

At the evidentiary hearing and in its later briefs, the RNC claimed that, rather than increasing the danger of voter fraud, absentee and early voting provide a safeguard against voter intimidation. In one articulation of that claim, the RNC stated that "in the event that a voter is concerned about encountering intimidating behavior on Election Day, that voter may very well be entitled to vote early or even cast an absentee ballot from the comfort of his or her own home." (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 19.) In making that assertion, the RNC makes the unsupportable assumption that voters will know of potential suppression efforts in advance. The evidence compels the opposite conclusion – the very danger of voter suppression efforts lies

---

[22] In order to assure that such challenges do not disproportionately target minority voters, the RNC should promulgate neutral criteria to determine which ballots will be challenged and submit those guidelines to the Court for approval pursuant to the Consent Decree's preclearance provision. Such a procedure will impose a minimal burden on the RNC, as any set of criteria used in a given race may be applied in subsequent elections without seeking further authorization.

in their ability to disrupt the electoral process by surprising voters with unexpected confrontation and delay at the polls.

Not only is there no reason to believe that voters will be able to learn of suppression efforts prior to Election Day and avail themselves of alternative procedures, there is no justification for requiring them to do so.  The right to vote is "one of the most fundamental rights of our citizens," Bartlett, 129 S. Ct. at 1240, and cannot be conditioned on the completion of any task unrelated to the fulfillment of voting qualifications.  See, e.g., Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 653 (1969) (invalidating ordinance that limited franchise in school board elections to owners of taxable property); Harper v. Va. State Election Bd., 383 U.S. 663, 670 (1966) (invalidating poll tax restrictions due to the fact that they had "no relation to voting qualifications").  Although minority voters may escape suppression efforts by utilizing alternative voting procedures, the choice of whether to do so or to exercise their right to vote in the traditional manner by visiting the polls on Election Day must be theirs, and theirs alone.  See Bartlett, 129 S. Ct. at 1249 ("[R]acial discrimination and racially polarized voting are not ancient history.  Much remains to be done to ensure that citizens of all races have equal opportunity to share and participate in our democratic processes and traditions.").  Therefore, the Court finds that the adoption by an increasing number of states of mail-in absentee voting cannot serve as the basis for modifying or vacating the Consent Decree.

### ii. Workability

Despite the fact that the continued enforcement of the Consent Decree is not detrimental to the public interest, the Court may vacate or modify that agreement if it finds that it has become "unworkable" due to "unforeseen circumstances."  Rufo, 502 U.S. at 384.  While the

Court finds no circumstances that would justify vacating the Consent Decree, four considerations weigh in favor of modification.

The first stems from the combined effect of the Court's interpretation of the Consent Decree, which allows intervenors to bring suit to enforce its terms, and the BCRA, which requires the RNC to defend such suits using only "hard money" resources.  Those developments have created the possibility of inequity by potentially subjecting the RNC to suits brought by organizations that are not subject to the BCRA's restrictions, while the DNC is not faced with such suits.  As discussed above, the DNC has agreed that the Consent Decree should be modified to allow enforcement only by the parties to that agreement.  See, e.g., (Pl.'s Br. Opp'n Mot. Vacate 4, 23, 26); (Hr'g Tr. 26:17-27:1.)  Since both the DNC and RNC are bound by BCRA's ban on "soft money," such a modification will effectively level the playing field between the DNC and RNC by requiring that any future litigation arising out of the Consent Decree be funded solely by using "hard money" donations.  See 2 U.S.C. § 441a(a)(1) (enumerating the limits on donations to national political parties).  Therefore, the Court will enact such a modification and in the future will entertain suits under the Consent Decree only if those actions are instituted by a party to that agreement.[23]

The second circumstance weighing in favor of modification concerns the RNC's ability to combat mail-in voter registration fraud.  Since the Consent Decree was entered in 1982, several states have adopted mail-in voter registration deadlines of that allow individuals to submit their applications after the 20-day time limit contained in the preclearance provision has expired, thus precluding the RNC from effectively combating fraudulent mail-in registrations in

---

[23] The 1987 Modification to the Consent Decree, which imposed the preclearance provision, arose out of an action brought by the DNC in which only the RNC was named as a Defendant. Therefore, only the DNC and RNC were parties to that modification, and only the DNC may enforce the preclearance provision.

those states.  See EAC Voter Registration Deadlines (noting that Alabama, Iowa, Maine, and New Hampshire impose a deadline of only 10 days on mail-in registrations).  As discussed above, the RNC has a valid interest in assuring the accuracy of voter rolls by preventing fraudulent registrations.  See Crawford, 128 S. Ct. at 1619 ("[T]he interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").  In order to reconcile that interest with the requirements of the Consent Decree, the Court will alter the preclearance provision to require that the RNC serve it with 10 – rather than 20 – days notice of any proposed ballot security measures.  See supra at II(C)(i).

The third development favoring modification concerns the vague nature of the terms "normal poll watch functions" and "ballot security" as used in the Consent Decree.  The RNC contends that the Consent Decree should be vacated because it prohibits a broad range of otherwise-legal activity.  See (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 20) ("[T]he Consent Decree … deters the RNC from working with its state and local parties to engage in legitimate poll watching activities on Election Day.").  Mr. Josefiak echoed that claim during his testimony by asserting that the Consent Decree effectively prohibits the RNC from engaging in poll watching or "get out the vote" efforts.  In doing so, he noted that the Consent Decree's failure to define "normal poll watch functions," had led the RNC to adopt a cautious approach, stating:

> [W]hen it comes to Election Day activities, [the RNC's cooperation with state and local party committees] stops because of the Consent Decree.  And even though there is a provision in the Consent Decree where we can be involved with normal poll watching activities, quite frankly where I sit, what is past security is a very, very difficult line.  And so as a result, as a practical matter, the RNC stays out of all Election Day activities.  So it causes that break from a team effort up to Election Day, and getting out the vote on Election Day to actually monitoring the polls themselves.

(1 Hr'g Tr. 94:5-14); see also (Def.'s Post-Hr'g Br. Supp. Mot. Vacate 22-23) ("Even though the RNC wants to take part in [voter turnout drives and poll watching] activities and has the ability to make them more professional, effective, and legally compliant, it refrains from doing so because the definition of "normal poll watching" under the Decree is unclear.").

The RNC has a valid interest in the orderly administration of elections, see Crawford, 128 S. Ct. at 1619, and there is no question that it should be allowed to engage in activities that are aimed at ensuring the voting process functions smoothly by stationing observers at the polls or increasing political participation through voter registration and turnout drives in cooperation with state Republican organizations. The fact that the Consent Decree was never meant to prohibit such activities is evidenced by the inclusion of an exception to the preclearance requirement for "normal poll watch functions." Unfortunately, the parties' failure to define that term has led the RNC to refrain from such activities altogether. In order to remedy that situation, the Court will modify the Consent Decree as set forth below in an effort to clearly demarcate the "normal poll watch functions" to which it does not apply, and will add a more extensive definition of "ballot security."

The final consideration weighing in favor of modification involves the fact that the Consent Decree does not include a date on which the obligations it imposes on the RNC will terminate. In failing to include such an expiration date, the parties have created a situation in which the RNC is, at least nominally, bound by those obligations in perpetuity, regardless of whether it continues to engage in voter suppression efforts or has any incentive to do so. That situation is inherently inequitable. For example, if at any point in the future the RNC succeeds in attracting minority voters in such numbers that its candidates receive the majority of votes cast by those populations, it will have no incentive to engage in anti-fraud measures that have the

effect of deterring those voters from casting their ballots.  Under the Consent Decree as currently

written, though, the RNC would be required to preclear any such measures with this Court, while

the DNC would be free to implement ballot security programs without doing so.  In an effort to

avoid similar situations, the Civil Rights Division of the DOJ – the government entity charged

with enforcing the VRA – imposes a time limit of eight years on its consent decrees, which may

be extended for good cause.  <u>See</u> (Def.'s Br. Supp. Mot. Vacate 10 n.6) (citing various

examples).  The Court believes that such a provision is justified in this case.  Therefore, the

Consent Decree will be modified to specify that it will terminate eight years from the date of this

ruling.  If in the interim the DNC proves by a preponderance of the evidence that the RNC has

engaged in further suppression efforts, the termination date will be extended to eight years from

the date of the last violation of the Consent Decree.

### III.  CONCLUSION

For the foregoing reasons, the RNC's Motion to Vacate the Consent Decree is denied.

The Consent Decree will be modified as follows:

(1) Only the parties to the Consent Decree may bring suit to redress a violation of that

agreement.

(2) The preclearance period shall be shortened from 20 to 10 days.  The RNC shall be

required to notify the DNC and this Court of any proposed ballot security measures at

least 10 days before instituting such measures so that this Court may determine their

legality and whether they comply with the other terms of the Consent Decree.

(3) "Ballot Security," as used in the Consent Decree, shall include any program aimed at

combating voter fraud by preventing potential voters from registering to vote or

casting a ballot.  Such programs include, but are not limited to, the compilation of

voter challenge lists by use of mailings or reviewing databases maintained by state agencies such as motor vehicle records, social security records, change of address forms, and voter lists assembled pursuant to the HAVA; the use of challengers to confront potential voters and verify their eligibility at the polls on either Election Day or a day on which they may take advantage of state early voting procedures; the recording by photographic or other means of voter likenesses or vehicles at any polling place; and the distribution of literature informing individuals at or near a polling place that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

(4) "Normal poll-watch function" shall include stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly-appointed state officials.  Such observers may report any disturbance that they reasonably believe might deter eligible voters from casting their ballots, including malfunctioning voting machines, long lines, or understaffing at polling places.  Such observers may not question voters about their credentials; impede or delay voters by asking for identification, videotape, photograph, or otherwise make visual records of voters or their vehicles; or issue literature outlining the fact that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

(5) The Consent Decree shall not apply to any initiative undertaken by the RNC that does not have as at least one of its purposes the prevention of either fraudulent voting or fraudulent voter registration.  Such programs include any effort undertaken by the RNC, or by any state or local Republican entity with which it coordinates, to increase

the number of individuals that cast a ballot in any election, including registering

voters pursuant to applicable state statutes or encouraging voters to visit the polls

("get out the vote") on either Election Day or a day on which they may take

advantage of state early voting procedures.

(6) The Consent Decree shall expire, and the entirety of its terms shall become null and

void, on December 1, 2017, eight years after the date of this modification.  If during

the period between today's Order and December 1, 2017, the DNC proves by a

preponderance of the evidence that the RNC has violated the terms of the Consent

Decree, the Decree shall be extended for eight years from the date of that violation.

The Court will enter an Order implementing this Opinion.


   **s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: December 1, 2009