PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4615
_____

DEMOCRATIC NATIONAL COMMITTEE;
NEW JERSEY DEMOCRATIC STATE COMMITTEE;
VIRGINIA L. FEGGINS; LYNETTE MONROE

v.

REPUBLICAN NATIONAL COMMITTEE;
NEW JERSEY REPUBLICAN STATE COMMITTEE;
ALEX HURTADO; RONALD C. KAUFMAN; JOHN
KELLY

Republican National Committee,
                                        Appellant
_____

APPEAL FROM THE JUDGMENT OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF
NEW JERSEY
(D.C. Civ. Action No. 2-81-cv-03876)
District Judge: Honorable Dickinson R. Debevoise
_____

Argued on December 13, 2010
_____

1

Before: SLOVITER, GREENAWAY, JR., and
STAPLETON, *Circuit Judges*.

(Opinion Filed:  March 8, 2012)

_____

John W. Bartlett
Angelo J. Genova (argued)
Rajiv D. Parikh
Genova Burns
494 Broad Street
6th Floor
Newark, NJ 07102
     *Counsel for Appellee, Democratic National
     Committee*

Bobby R. Burchfield (argued)
Jason A. Levine
Vinson & Elkins
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
     *Counsel for Appellant, Republican National
     Committee*

James R. Troupis
7609 Elmwood Avenue
Middleton, WI 53562
     *Counsel for Amicus Appellant, Republican Party of
     Wisconsin*

Karl S. Bowers, Jr.
Hall & Bowers
1329 Blanding Street
Columbia, SC 29201
> *Counsel for Amici Appellants, Karl S. Bowers, Jr.,*
> *Asheegh Agarwal, Esq., Roger Clegg, Esq.,*
> *Robert N. Driscoll, Eric Eversole and*
> *Hans A. Von Spakovsky*

———————

OPINION

———————

GREENAWAY, JR., *Circuit Judge*.

In 1982, the Republican National Committee ("RNC") and the Democratic National Committee ("DNC") entered into a consent decree (the "Decree" or "Consent Decree"), which is national in scope, limiting the RNC's ability to engage or assist in voter fraud prevention unless the RNC obtains the court's approval in advance. The RNC appeals from a judgment of the United States District Court for the District of New Jersey denying, in part, the RNC's Motion to Vacate or Modify the Consent Decree.[1] Although the District Court declined to vacate the Decree, it did make modifications to the Decree. The RNC argues that the District Court abused its discretion by modifying the Decree

———————

[1] Judge Dickinson R. Debevoise, a United States District Judge, has presided over all district court proceedings regarding the Consent Decree at issue in this case, beginning with the 1981 lawsuit through the Motion to Vacate in 2009.

as it did and by declining to vacate the Decree.  For the following reasons, we will affirm the District Court's judgment.

## I.   BACKGROUND

### A.  1981 Lawsuit and Consent Decree

During the 1981 New Jersey gubernatorial election, the DNC, the New Jersey Democratic State Committee ("DSC"), Virginia L. Peggins, and Lynette Monroe brought an action against the RNC, the New Jersey Republican State Committee ("RSC"), John A. Kelly, Ronald Kaufman, and Alex Hurtado, alleging that the RNC and RSC targeted minority voters in an effort to intimidate them in violation of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. §§ 1971, 1973, and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.  The RNC allegedly created a voter challenge list by mailing sample ballots to individuals in precincts with a high percentage of racial or ethnic minority registered voters and, then, including individuals whose postcards were returned as undeliverable on a list of voters to challenge at the polls.  The RNC also allegedly enlisted the help of off-duty sheriffs and police officers to intimidate voters by standing at polling places in minority precincts during voting with "National Ballot Security Task Force" armbands.  Some of the officers allegedly wore firearms in a visible manner.

To settle the lawsuit, the RNC and RSC entered into the Consent Decree at issue here.  The RNC and RSC agreed that they would:

[I]n the future, in all states and territories of the United States:

(a) comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice;

(b) in the event that they produce or place any signs which are part of ballot security activities, cause said signs to disclose that they are authorized or sponsored by the party committees and any other committees participating with the party committees;

(c) refrain from giving any directions to or permitting their agents or employees to remove or deface any lawfully printed and placed campaign materials or signs;

(d) refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place;

(e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting; and the conduct of such activities disproportionately in or directed toward districts that have a substantial proportion of racial or ethnic populations shall be considered relevant evidence of the existence of such a factor and purpose;

(f) refrain from having private personnel deputized as law enforcement personnel in connection with ballot security activities.

(App. at 401–02.)[2]  The RNC also agreed to, "as a first resort, use established statutory procedures for challenging unqualified voters."  (Id.)

---

[2] The RNC agreed that the RNC, its agents, servants, and employees would be bound by the Decree, "whether acting directly or indirectly through other party committees."  (Id. at 402.)

B. <u>1987 Enforcement Action and Consent Decree Modifications</u>

In Louisiana during the 1986 Congressional elections, the RNC allegedly created a voter challenge list by mailing letters to African-American voters and, then, including individuals whose letters were returned as undeliverable on a list of voters to challenge.  A number of voters on the challenge list brought a suit against the RNC in Louisiana state court.  In response to a discovery request made in that suit, the RNC produced a memorandum in which its Midwest Political Director stated to its Southern Political Director that "this program will eliminate at least 60,000–80,000 folks from the rolls . . . If it's a close race . . . which I'm assuming it is, this could keep the black vote down considerably." <u>Democratic Nat'l Comm.  v. Republican Nat'l Comm.</u>, 671 F. Supp. 2d 575, 580 (D.N.J. 2009) (citing Thomas Edsall, <u>Ballot Security Effects Calculated: GOP Aide Said Louisiana Effort "Could Keep the Black Vote Down</u>," WASH. POST, OCT. 24, 1986 at A1.  Although the DNC was not a party to the action in Louisiana state court, it brought an action against the RNC for alleged violations of the Consent Decree after this memorandum was produced.

The RNC and the DNC settled the lawsuit, this time by modifying the Consent Decree, which remained "in full force and effect." (App. at 404.)  In the 1982 Decree, the RNC had agreed to specific restrictions regarding its ability to engage in "ballot security activities," but that Decree did not define the term "ballot security activities."  (App. at 401.)  As modified in 1987, the Decree defined "ballot security activities" to mean "ballot integrity, ballot security or other efforts to prevent or remedy vote fraud."  <u>Democratic Nat'l Comm.</u>, 671 F. Supp. 2d at 581.  The modifications clarified

that the RNC "may deploy persons on election day to perform normal poll watch[ing] functions so long as such persons do not use or implement the results of any other ballot security effort, unless the other ballot security effort complies with the provisions of the Consent Order and applicable law and has been so determined by this Court."  (App. at 405.)  The modifications also added a preclearance provision that prohibits the RNC from assisting or engaging in ballot security activities unless the RNC submits the program to the Court and to the DNC with 20 days' notice and the Court determines that the program complies with the Consent Decree and applicable law.[3]

   C.  <u>1990 Enforcement Action</u>

---

[3] The modifications state that

> the RNC shall not engage in, and shall not assist or participate in, any ballot security program unless the program (including the method and timing of any challenges resulting from the program) has been determined by this Court to comply with the provisions of the Consent Order and applicable law.  Applications by the RNC for determination of ballot security programs by the Court shall be made following 20 days[sic] notice to the DNC . . .

(App. at 405.)

In 1990, the DNC brought a lawsuit alleging that the RNC violated the Consent Decree by participating in a North Carolina Republican Party ("NCRP") program. The DNC alleged that the RNC had violated the Decree in North Carolina by engaging in a program of the North Carolina Republican Party ("NCRP") in which 150,000 postcards were sent to residents of predominantly African-American precincts. This program allegedly attempted to intimidate voters by warning that it is a "federal crime . . . to knowingly give false information about your name, residence or period of residence to an election official." Democratic Nat'l Comm., 671 F. Supp. 2d at 581. The postcards falsely stated that there was a 30-day minimum residency requirement prior to the election during which voters must have lived in the precinct in which they cast their ballot.

The District Court found that the DNC failed to establish that the RNC conducted, participated in, or assisted in the postcard program. However, the Court also found that the RNC violated the Consent Decree by failing to give the state parties guidance on unlawful practices under the Consent Decree or copies of the Decree when the RNC gave them ballot security instructional and informational materials. The Court held that the RNC must provide a copy of the Consent Decree, or information regarding unlawful practices under the Consent Decree, along with any such instructional or informational materials that the RNC distributes in the future to any state party.

D. 2004 Enforcement Action (the "Malone enforcement action")

In 2004, the week before the general election for President, Ebony Malone ("Malone"), an African-American

9

resident of Ohio, brought an enforcement action against the RNC, alleging that the RNC had violated the Consent Decree by participating in the compilation of a predominantly-minority voter challenge list of 35,000 individuals from Ohio. Malone's name was on the list.  To compile the list, the RNC had sent a letter to registered voters in high minority concentration areas of Cleveland and the Ohio Republican Party sent a second mailing approximately a month later. Registered voters whose letters were returned as undeliverable were added to the challenge list.

Seeking solace pursuant to the Decree, Malone sought before the District Court a preliminary injunction barring the RNC and any state organizations with which it was cooperating from using the list in ballot security efforts.

On November 1, 2004, the DNC appeared before the District Court at an evidentiary hearing in support of Malone. The RNC argued that Malone's suit was non-justiciable due to irregularities in her registration which would result in her being challenged by the Ohio Board of Election regardless of any separate challenge brought by the RNC.  The RNC also claimed that it had complied with the Decree and that the potential challenge to Malone voting was a "normal poll watch function[]" allowed by the Decree.  (App. at 405.) Finally, the RNC asserted that the Ohio Republican Party, which was not subject to the Decree, would carry out any challenge to Malone's eligibility to vote.

Following an evidentiary hearing, the District Court issued an Order barring the RNC from using the list to challenge voters and directing the RNC to instruct its agents in Ohio not to use the list for ballot security efforts.  The District Court rejected the RNC's argument that Malone's

claims were non-justiciable because she would suffer irreparable harm if she had to endure multiple challenges to her eligibility to vote.  The District Court found that the RNC had violated the procedural and substantive provisions of the Consent Decree by participating with the Ohio Republican Party in devising and implementing the ballot security program and failing to obtain preclearance for the program.

The RNC requested that our Court stay the Order.  The panel denied the request for a stay and affirmed the District Court's Order, noting that emails between the RNC and the Ohio Republican Party showed collaboration between the two organizations sufficient to support the District Court's factual findings.

The RNC petitioned for rehearing en banc.  We granted the petition for rehearing en banc the next day, Election Day, November 2, 2004.  This Court vacated the panel's ruling and stayed the District Court's Order.  Before the entire Court could hear the matter en banc, Malone cast her ballot without being challenged.  After Malone voted without challenge, Justice Souter, in his capacity as Circuit Justice for the Third Circuit, denied Malone's application to the Supreme Court seeking reinstatement of the injunction. We dismissed the appeal as moot, without addressing the merits.

E.   2008 Enforcement Action

On November 3, 2008, the DNC alleged in a lawsuit that the RNC violated the Consent Decree by hiring private investigators to examine the backgrounds of some New Mexico voters in preparation for challenging those individuals' voting eligibility.   The DNC requested a

preliminary injunction to prevent the RNC from using the information gathered by private investigators in any ballot security efforts. The District Court denied the DNC's Motion for a Preliminary Injunction, concluding that the RNC did not direct or participate in any ballot security measures, and held that the RNC had not violated the Consent Decree.

F. <u>Motion to Vacate or Modify the Consent Decree</u>

On November 3, 2008, shortly after the District Court denied the DNC's Motion for a Preliminary Injunction, the RNC submitted the Motion to Vacate or Modify the Consent Decree that is currently at issue. The RNC submitted several arguments in support of its motion: (1) since the 1987 modification, the enactment of (a) the National Voter Registration Act of 1993 (the "NVRA" or "Motor Voter Law"), 42 U.S.C. §§ 1973gg <u>et seq.</u>, (b) the Bipartisan Campaign Reform Act of 2002 ("BCRA"), 2 U.S.C. §§ 431 <u>et seq.</u>, and (c) the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301 <u>et seq.</u> increased the risk of voter fraud and decreased the risk of voter intimidation; (2) the Consent Decree extends to types of conduct that were not included in the initial 1981 Complaint; (3) the Decree was interpreted too broadly and inconsistently with the parties' expectations at the time they entered the 1982 and 1987 settlements; and (4) the Decree violates the First Amendment by restricting communications between the RNC and state parties.

The District Court held an evidentiary hearing on the motion during May 5 and 6, 2009 and also received post-hearing submissions from the parties. On December 1, 2009, the District Court issued an opinion, denying the motion to vacate the Decree. First, the District Court rejected the RNC's argument that the Consent Decree was void because it

"'improperly extend[s] to ... private conduct' and grants prospective relief beyond what the DNC could have achieved if the original 1981 action had been litigated." Democratic Nat'l Comm, 671 F. Supp 2d at 595. The Court, instead, held the Decree was not void because parties can settle lawsuits by agreeing to broader relief than a court could have awarded otherwise. Furthermore, the Court held that the RNC was barred from asserting this argument because the RNC willingly entered the Decree as a means of settling the initial 1981 lawsuit and the RNC again consented to the Decree, as modified, in 1987. The District Court also held that the Decree did not violate the First Amendment because, under the Decree, the RNC is free to communicate with state parties about subjects other than ballot security. Additionally, the Court noted that the First Amendment applies only to state actions and does not prevent private parties from agreeing to refrain from certain types of speech.

Next, the District Court considered the RNC's arguments that the Decree should be vacated or modified due to changes in law, changes in fact, and the public interest in the RNC combating voter fraud. The Court found that neither the purported changes nor the public interest justified vacating or modifying the Decree. While the Court found that the Decree was not sufficiently unworkable to warrant vacating the Decree, the Court did find that four workability considerations justified modifying the Decree. Those considerations are that: (1) the potential inequity of the RNC being subject to suits brought by entities who were not party to the Decree when, under the BCRA, the RNC has to defend

lawsuits using "hard money,"[4] while the DNC would not have to spend any money on such suits because it would not be a party[5]; (2) the twenty-day notice requirement for preclearance prevents the RNC from combating mail-in voter registration fraud in a number of states with later mail-in voter registration deadlines; (3) the Decree lacked a clear definition of normal poll watching activities and the parties have not provided a definition, which has led the RNC to refrain from normal poll watching activities that the Decree was never intended to prohibit; and (4) the Decree lacked a termination date.

Thus, although the District Court denied the request to vacate the Decree, the Court granted the motion to modify the Decree. The District Court's modifications can be summarized as follows:

---

[4] "'[C]ontributions subject to [the Federal Election Campaign Act's (FECA), 2 U.S.C. §§ 431–55] source, amount, and disclosure requirements' came to be known as 'hard money,' while '[p]olitical donations made in such a way as to avoid federal regulations or limits' came to be known as 'soft money.'" Shays v. FEC, 528 F.3d 914, 917 (D.C. Cir. 2008) (quoting Shays v. FEC, 414 F.3d 76, 80 (D.C. Cir. 2005) ("Shays II"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1652 (4th Ed. 2006)).

[5] The RNC would have to spend "hard money" on any lawsuits because the "BCRA made a number of dramatic changes to campaign finance law . . . , including barring national political parties from soliciting soft money." Shays, 528 F.3d at 918 (citing 2 U.S.C. § 441i(a)).

1. Only parties to the Consent Decree, RNC and DNC, may bring an enforcement suit regarding a violation of the Decree.

2. The preclearance period is shortened from 20 days to 10 days.

3. "Ballot security" is defined to include "any program aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot." <u>Democratic Nat'l Comm.</u>, 671 F. Supp. 2d at 622. The modification also includes a non-exhaustive list of ballot security programs.

4. "Normal poll-watch function" is defined as "stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly-appointed state officials." <u>Id.</u> The modification includes a non-exhaustive list of activities that do and do not fit into the Decree definition of normal poll-watch function.

5. The Decree does not apply to any RNC program that does not have as at least one of its purposes the prevention of fraudulent voting or fraudulent voter registration.

6. The Consent Decree expires on December 1, 2017 (eight years after the date of the modification). If, before that date, the DNC proves by a preponderance of the evidence that the RNC violated the Decree, the Decree will

extend for eight years from the date of the violation.

The RNC filed a timely appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction over the litigation pursuant to 28 U.S.C. § 1331.  We have jurisdiction over the appeal from the Consent Order, which contained an explicit reservation of appellate jurisdiction over the enforcement of the settlement terms, pursuant to 28 U.S.C. § 1291.  See Keefe v. Prudential Prop. & Cas. Co., 203 F.3d 218, 223 (3d Cir. 2000); see also Halderman v. Pennhurst State Sch. & Hosp., 901 F.2d 311, 317 (3d Cir. 1990) (holding that courts have jurisdiction to enforce settlement agreements incorporated into orders).

We review the District Court's decision modifying and refusing to vacate the Consent Order for abuse of discretion. Delaware Valley Citizens' Counsel for Clean Air v. Pennsylvania, 755 F.2d 38, 41 (3d Cir. 1985).  To demonstrate that a district court abused its discretion, an appellant must show that the court's decision was "arbitrary, fanciful or clearly unreasonable."  Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 542 (3d Cir. 2007) (quoting Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002).

## III.  ANALYSIS

### A. Legal Standard

This Court has emphasized that, by signing a consent decree, signatories make a "free, calculated and deliberate

choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment." United States Steel Corp. v. Fraternal Assoc. of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979). Federal Rule of Civil Procedure 60(b) provides that a court may relieve a party from an order when "the judgment is void," "applying it prospectively is no longer equitable," or for "any other reason that justifies relief." FED. R. CIV. P. 60(b) (4), (5), (6). Rule 60(b) does not provide, however, that an order may be rescinded or modified merely because it is no longer convenient for a party to comply with the consent order. Rufo v. Inmates of the Suffolk County Jail, et al., 502 U.S. 367, 383 (1992); see Bldg. & Constr. Trades Council of Phila. & Vicinity, AFL-CIO v. NLRB ("BCTC"), 64 F.3d 880, 887 (3d Cir. 1995) (holding that Rufo's interpretation of Rule 60(b)(5) is a rule of general applicability and not limited to institutional reform litigation).

The Supreme Court interpreted Rule 60(b)(5) in Rufo, clarifying that "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Rufo, 502 U.S. at 383. Such a party must establish at least one of the following four factors by a preponderance of the evidence to obtain modification or vacatur: (1) a significant change in factual conditions; (2) a significant change in law; (3) that "a decree proves to be unworkable because of unforeseen obstacles"; or (4) that "enforcement of the decree without modification would be detrimental to the public interest." Id. at 384.

The Court elaborated on the change in law factor, holding that a decree must be modified if "one or more of the obligations placed upon the parties has become

impermissible" and that a decree may be modified if "law has changed to make legal what the decree was designed to prevent." Id. at 388. Typically, courts should not grant modification or vacatur "where a party relies upon events that actually were anticipated at the time it entered into a decree." Id. at 385. If a party agreed to the decree notwithstanding the anticipated change in conditions, "that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Id.

Although Rufo provides a general interpretation of Rule 60(b)(5), it does not provide a "universal formula" for deciding when applying a decree prospectively is no longer equitable. BCTC, 64 F.3d at 888. In addition to the Rufo standard, a court determining whether to vacate or modify a decree should respond to the specific set of circumstances before it by considering factors unique to the conditions of the case. Id. (noting that "equity demands a flexible response to the unique conditions of each case"); The additional factors a court should typically consider before modifying or vacating a decree under Rule 60(b)(5) include:

> the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; the length of time since entry of the injunction; whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and the likelihood that the conduct or conditions sought

>to be prevented will recur absent
>the injunction.

Id.

In weighing these factors, "the court must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction" and the court should also "determine whether the objective of the decree has been achieved." BCTC, 64 F.3d at 888. While the decree and changed fact or law need not be completely inconsistent with each other, for such a change to justify vacatur, it must be significant, meaning that it renders the prospective application of the decree inequitable. See BCTC, 64 F.3d at 888.

After a moving party has established a change warranting modification of a consent order, "the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." Rufo, 502 U.S. at 391. The modification "must not create or perpetuate a constitutional violation"; it "should not strive to rewrite a consent order so that it conforms to the constitutional floor"; and a court should not try to modify a consent order except to make those revisions that equity requires, given the change in circumstances. Id.

**B. Discussion**

The RNC asks that our Court vacate a decree that has as its central purpose preventing the intimidation and suppression of minority voters. When, as here, a party voluntarily enters into a consent decree not once, but twice, and then waits over a quarter of a century before filing a

motion to vacate or modify[6] the decree, such action gives us pause.  Further, the RNC, with the advice of counsel, twice chose to limit indefinitely its ability to engage in certain activities enumerated in the Decree by entering into a decree with no expiration date.

At present, Appellant seeks review of the District Court's order denying vacatur because it prefers not to comply with the Consent Decree at a critical political juncture — the upcoming election cycle.  See Rufo, 502 U.S. at 383.  However, we cannot disturb the District Court's opinion unless it abused its discretion, meaning that its decision was "arbitrary, fanciful, or clearly unreasonable," Moyer, 473 F.3d at 542, when it found that the RNC failed to demonstrate that prospective application of the Decree, with the Court's modifications, would not be equitable.

In reviewing the District Court's opinion and its modifications to the Decree, we do not take lightly Judge Debevoise's nearly three decades of experience presiding over all matters related to this Decree.  See Reconstruction Fin. Corp. v. Denver & R. G. W. R. Co., 328 U.S. 495, 533 (1946) (according special weight to a district judge's finding that a reorganization plan provided adequately for the equitable treatment of dissenters "[i]n view of the District Judge's familiarity with the reorganization"); Jenkins by Jenkins v. Missouri, 122 F.3d 588, 604 (8th Cir. 1997) (noting that a district judge had gained extensive knowledge

---

[6] Although the RNC's motion requested that the Court vacate or modify the Decree, the RNC has not referenced any modifications, short of vacatur, that would make applying the Decree equitable in the RNC's view.

of the conditions relevant to a specific lawsuit because the judge had presided over the litigation for twenty years, from the time of its inception).

We shall review whether the District Court abused its discretion by first holding that the Decree need not be vacated due to any First Amendment violation.[7]

Next, we shall review whether the District Court abused its discretion regarding Rule 60(b)(5). First, we shall analyze whether the District Court abused its discretion regarding the broad changed circumstances factors outlined in Rufo. Second, we shall analyze whether the District Court abused its discretion regarding the BCTC factors specific to the parties and Consent Decree at issue.[8] Third, we will inquire into whether the Court abused its discretion by

---

[7] It is not clear from Appellant's brief whether the RNC raises this First Amendment argument under Rule 60(b)(5) or Rule 60(b)(6); however, we would reach the same conclusion under either rule because we do not find a First Amendment violation.

We need not determine whether the District Court abused its discretion by holding that the Decree was not void due to its extension to private conduct and granting relief beyond that which the Court could order absent the Consent Decree because the RNC has not raised that issue on this appeal.

[8] Although the District Court opinion did not specifically reference any BCTC factors as such, the opinion did consider factors relevant to the specific circumstances of this Consent Decree, including the BCTC considerations that the parties raised.

holding that its prescribed modifications to the Decree were "suitably tailored to the changed circumstance[s]."[9]   Rufo, 502 U.S. at 393.

The RNC has not demonstrated, by a preponderance of the evidence, the circumstances necessary for vacatur or for modifications, other than those ordered by the District Court. For the reasons set forth herein, we find that the District Court did not abuse its discretion in declining to vacate the Decree or in making the modifications to the Decree that it ordered.

### 1. First Amendment

The RNC argues that the Consent Decree should be vacated because the Decree violates the First Amendment in two ways.  The RNC claims that the 2004 modifications to the Decree, which bar the RNC from engaging in ballot security activities absent District Court preclearance, serve as a prior restraint on the RNC's right to engage in political speech.   Additionally, the RNC alleges that the District Court's 1990 Order unconstitutionally forces speech by requiring the RNC to provide a copy of the Decree, or information regarding unlawful practices under the Decree, along with any ballot security instructional or informational materials that the RNC distributes to any state party.

---

[9] The District Court did not expressly state that the modifications it ordered were suitably tailored to the changes in circumstances, but the Court discussed in some detail how the modifications would address the specific workability concerns.

As the District Court correctly noted, in this context, the First Amendment applies only to state action. <u>Cent. Hardware Co. v. NLRB</u>, 407 U.S. 539, 547 (1972).  Under <u>Shelley v. Kramer</u>, 334 U.S. 1 (1948), court enforcement of certain private agreements constitutes state action. <u>Id.</u> at 19–20 (holding that a state court injunction to enforce a racially restrictive covenant against parties who did not wish to discriminate is state action); <u>Switlik v. Hardwicke Co., Inc.</u>, 651 F.2d 852, 860 (3d Cir. 1981) ("the state court's enforcement of an agreement between two private individuals can, in certain instances, constitute state action" (citing <u>Shelley</u>, 334 U.S. 1)).

Although a court's enforcement of a consent decree can constitute state action under <u>Shelley</u>, <u>Shelley</u>'s holding may not have sufficient reach to encompass the enforcement of this Decree.  The Supreme Court has declined to find state action where the court action in question is a far cry from the court enforcement in <u>Shelley</u>.  <u>See</u> <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004–05 (1982) (recognizing that state approval of or acquiescence to a private choice does not convert that choice into state action); <u>Lavoie v. Bigwood</u>, 457 F.2d 7, 11 (1st Cir. 1972) (noting the theory that, under <u>Shelley</u>, court enforcement of a private agreement may only be state action if, "in resorting to a state sanction, a private party must necessarily make the state privy to his discriminatory purpose").

Even if court enforcement of this Consent Decree constitutes state action, "speech rights are not absolute." <u>Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.</u>, 551 U.S. 291, 295 (2007).  "[C]onstitutional rights . . . may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the

party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." Erie Telecomm., Inc. v. City of Erie, Pa., 853 F.2d 1084, 1096 (3d Cir. 1988). Court enforcement of a private agreement to limit a party's ability to speak or associate does not necessarily violate the First Amendment. Ry. Emps. Dep't. v. Hanson, 351 U.S. 225 (1956) (holding that court enforcement of a union shop agreement, which would require all railroad employees to become union members does not violate the First Amendment right to association).[10]

The Supreme Court has long recognized that a party may waive constitutional rights if there is "clear" and "compelling" evidence of waiver and that waiver is voluntary, knowing, and intelligent.[11] "Such volition and understanding

---

[10] Furthermore, court orders can include limits on the ability of a party to speak, as occurs in confidentiality provisions regarding settlement agreements, and a party could bring an action for a court to enforce a private confidentiality agreement. See Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787-89 (3d Cir. 1994).

[11] See Edwards v. Arizona, 451 U.S. 477, 482 (1981) (waiver of right to counsel must be voluntary, knowing, and intelligent); Faretta v. California, 422 U.S. 806, 835 (1975) (same); D.H. Overmyer Co. of Ohio v. Frick Co., 405 U.S. 174, 185–86, (1972) (waiver of due process rights must be voluntary, knowing, and intelligent); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 145 (1967) (waiver of First Amendment rights must be shown by clear and compelling evidence); Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (waiver requires "an intentional relinquishment or abandonment of a known right or privilege").

are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations." Erie Telecomm., 853 F.2d at 1096.

"The question of waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." Brookhart v. Janis, 384 U.S. 1, 4 (1966). The Supreme Court has held that courts must "'indulge every reasonable presumption against waiver' of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1931)). Determining whether waiver was voluntary, knowing, and intelligent in any particular case rests "upon the particular facts and circumstances surrounding that case, including the background, experience and conduct" of the waiving party. Id.

Here, in 1982, the RNC, with the assistance of counsel, voluntarily entered into the Decree. In consideration of the DNC and other plaintiffs amicably resolving all matters that were or could have been raised in the 1982 lawsuit, the RNC signed a settlement agreement in which they committed, among other provisions,

> to refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there

> and where a purpose or significant
> effect of such activities is to deter
> qualified voters from voting . . .

(App. at 401–02.)   The RNC agreed that the terms of the Decree would bind the RNC, its agents, servants, and employees, "whether acting directly or indirectly through other party committees."  (Id. at 402.)

In 1987, the RNC once again entered into a settlement stipulation, with the assistance of counsel, agreeing to modify the 1982 Decree.  The Decree, as modified, clarified that "ballot security" efforts meant "ballot integrity, ballot security or other efforts to prevent or remedy voter fraud." Democratic Nat'l Comm., 671 F. Supp. 2d at 581.   The modifications allow the RNC to engage in normal poll watch functions on Election Day so long as the people it deploys do not use or implement the results of any ballot security effort without a determination by the District Court that the ballot security effort complies with the provisions of the Decree and applicable law.  In order to secure such a determination, the RNC must submit a description of the program to the District Court following twenty days' notice to the DNC.  Only with the District Court's approval secured in this fashion can the RNC engage, assist, or participate in any ballot security program.

A court can enforce an agreement preventing disclosure of specific information without violating the restricted party's First Amendment rights if the party received consideration in exchange for the restriction.  See Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1370 (4th Cir. 1975) (noting that executing a secrecy agreement can "effectively relinquish[] . . . First Amendment rights").

26

That the Decree and its 1987 modification resolved all issues that could have been raised by the DNC and other plaintiffs in that litigation was sufficient consideration to evidence a waiver.  See D.H. Overmyer Co. of Ohio v. Frick Co., 405 U.S. 174, 186-87 (1971) (holding that the presence of consideration constitutes some evidence of a waiver).

The Supreme Court has held that there is a valid waiver of constitutional rights where the party that waived "was a corporation with widespread activities and a complicated corporate structure; [the parties] had equal bargaining power; and [where the waiving party] did not contend that it or its counsel was unaware of the significance of the [instrument in which it waived notice]."   Erie Telecomm., 853 F.2d at 1095 (citing D.H. Overmyer, 405 U.S. at 186).   Here, the RNC has widespread activities, had equal bargaining power with the plaintiffs, and has not contended that it was unaware of the significance of the Decree, which it was free to decide not to enter into.  The RNC also received consideration— the plaintiffs in the 1982 and 1987 lawsuits relinquished all claims that could have arisen from those actions.  The RNC "may not now seek to withdraw from performing its obligations and from discharging its burdens, while it still continues to retain all of the benefits it received . . . as a result of the agreement[]."  Erie Telecomm., 853 F.2d at 1097.   The 1982 and 1987 settlement agreements, signed by counsel for the RNC, are clear and compelling evidence that the RNC voluntarily, knowingly, and intelligently waived certain First Amendment rights.

The RNC alleges that the District Court Orders from 1990 and 2004 violate its First Amendment rights.  However, neither order imposes limitations on the RNC's First

27

Amendment rights beyond those that the RNC voluntarily waived in 1982 and 1987.  In 1990, the Court held that the RNC must provide a copy of the Consent Decree, or information regarding unlawful practices under the Consent Decree, along with any ballot security materials that the RNC distributes to any state party.  Despite the RNC's arguments before our Court, any restrictions on the RNC's ability to communicate and associate with state and local parties are self-imposed and waived by the RNC entering into the Decree in 1982 and 1987.

In 2004, the District Court issued an Order barring the RNC from using a voter challenge list targeting precincts with large African-American populations that the RNC had compiled in coordination with the Ohio Republican Party. The District Court found that the RNC had violated the Decree both procedurally and substantively by participating with the Ohio Republican Party in devising and implementing the ballot security program and failing to obtain preclearance for the program.  The 2004 Order does not impose any additional limitation on the speech rights of the RNC beyond those present in the 1982 and 1987 Decree and modifications, in which the RNC consented and agreed to certain restrictions of its rights.  Hence, neither the 1990 nor 2004 Orders present a basis for a First Amendment challenge.

In 1982 and 1987, the RNC voluntarily agreed to create and abide by the very provisions that it now challenges as unconstitutional.  The District Court's enforcement of the Decree against the RNC does not result in a First Amendment violation.  The District Court did not abuse its discretion in denying the request to vacate the Decree on this basis.

2.  Rufo Factors

We now address the three <u>Rufo</u> factors in turn.

a.  *Changed Factual Circumstances*

The Decree and its 1987 modification aim primarily to prevent the RNC from "using, [or] appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud" and to neither "hinder[] [nor] discourag[e] qualified voters from exercising the right to vote."  (App. at 404–05.) Given these purposes of the Decree, only a change that decreases minority voter intimidation and vote suppression ex ante can be a "significant change [that] warrants revision of the decree."  <u>Rufo</u>, 502 U.S. at 383.

The RNC argues that the following factual changes warranted vacatur or modification of the Decree: first, the President and Attorney General of the United States and the President of the RNC (former) are African American; [12] second, that minority voter registration and turnout have

_____

[12] The only witness called by the RNC at the evidentiary hearing before the District Court  was Thomas Josefiak, an election law expert who was appointed by President Ronald Reagan to serve as the Commissioner of the Federal Election Commission from 1985 until 1992.  Josefiak testified that, since 1982, there has been a 41.6 percent increase in the number of registered voters classified as black and a 201 percent increase in the number of registered voters classified as Hispanic.  The District Court discounted this increase based on the concomitant increase in the overall population of blacks and Hispanics.  <u>Democratic Nat'l Comm.</u>, 671 F.Supp. 2d at 598-99.

increased; and third, that increased availability of alternative voting mechanisms such as early voting or permanent absentee voting are more widely available.  The RNC also presented testimony at the evidentiary hearing before the District Court that the appointment of African-Americans as the RNC Chairman and Chief Administrative Officer decreased the likelihood that the RNC would engage in ballot security programs resulting in minority vote suppression. Testimony presented by the RNC further claimed that "with an African–American President, and an African–American Attorney General, [] the laws that are already on the books regarding voter fraud, voter intimidation, and voter suppression are going to be actively pursued by this Justice Department." (Hr'g Tr. 65:22–66:2.)

The RNC argues that increases in minority voter registration and voter turnout are changes in factual circumstances rendering the Decree unnecessary because this data "demonstrat[es] that minority voters are not being suppressed." (Appellant's Br. 33.)  Furthermore, the RNC asserts that the availability of alternative voting methods, such as early voting or permanent absentee voting, allows voters who are worried about intimidation at precincts on Election Day to avoid such intimidation by voting from home or voting early.  It contends that records of voters using these alternative voting mechanisms undermine allegations of disenfranchisement and that "the availability of provisional ballots squelches any effort to disenfranchise a voter who appears at the polls." (Id. at 38.)

The RNC's argument that the fact that President Obama, Attorney General Eric Holder, RNC Chairman

Michael Steele,[13] and another RNC leader are minorities justifies vacatur or modification of the Decree hardly requires a serious response. The RNC posits that a minority President and Attorney General of the United States increase the likelihood of prosecution for violations of the Voting Rights Act ("VRA"), such as intimidation of minority voters. Are we to conclude that all issues that affect African-Americans will now get greater funding, greater attention, and more focus because of President Obama? Our jurisprudence cannot depend on such assumptions.

Even assuming that VRA violations will be more vigorously litigated by the current administration, that litigation would likely be brought after the VRA has been violated, so it will not prevent minority voter intimidation or vote suppression ex ante. Similarly, a handful of minorities temporarily[14] occupying leadership positions in the RNC does not mean that minority voter intimidation or suppression will decrease.

Contrary to the RNC's assertions, the increase in minority voter registration and voter turnout since 1982 does not demonstrate that "minority voters are not being suppressed." (Appellant's Br. 33.) The RNC has submitted no evidence to support its supposition. Voter registration and turnout data is not statistically relevant regarding the

---

[13] Michael Steele served as the first African-American chairman of the RNC from January 2009 until January 2011.

[14] Even if the racial background of the nation's or RNC's leaders makes voter intimidation and suppression less likely, it is illogical to vacate the Decree due to the racial makeup of the administration of the United States or the RNC.

argument that revision of the Decree is warranted.  Moreover, the increase in minority voter registration and voter turnout could be evidence that the Decree is necessary and effective. The RNC's data on minority voter registration and turnout demonstrates that, since the RNC consented to the Decree in 1982, minority voter registration and turnout have increased significantly.  The Decree's purpose is to help ensure that potential minority voters are not dissuaded from going to the polling station to vote, as they might be if the RNC were unfettered by the Decree.

Despite the RNC's bald assertion to the contrary, the availability of alternative voting mechanisms is not a factual change that prevents polling place voter suppression and intimidation.  The RNC has presented no evidence demonstrating how alternative voting mechanisms, such as allowing voters to vote prior to Election Day or to mail in their votes, would prevent the RNC from "using, [or] appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud" at polling stations.  (App. at 404–05.)  Furthermore, as the District Court notes, voters should not have to avoid voting at polling stations on Election Day in order to avoid voter intimidation.

None of these alleged factual changes renders the continuation of the Decree inequitable.  The District Court did not abuse its discretion by declining to vacate or modify the Decree based on the RNC's asserted factual changes.

*b.  Changes in Law*[15]

       The RNC's arguments regarding changes in law brought about by the enactments of the Motor Voter Law or NVRA, BCRA,[16] and HAVA are only relevant to our review if they render prospective application of the Decree inequitable.  To do that, they must have some bearing on the purpose of the Decree — decreasing the RNC's engagement in minority voter intimidation and suppression.  The RNC asserts that the Motor Voter Law, BCRA, and HAVA increase the risk of voter fraud and increase the ease with which eligible voters can register to vote, vote, and file a provisional ballot if they are challenged at polling stations.  Even if the RNC's assertions are true, which has not been established, the RNC has failed to carry its burden of establishing that a significant change in circumstances warrants revision of the Decree.  Additionally, none of the changes in law that the RNC puts forth make "one or more of the obligations placed upon the parties [] impermissible under federal law" or "make legal what the decree was designed to prevent."  Rufo, 502 U.S. at 388.

---

[15] We need not determine whether the alleged changes in First Amendment law raised by the RNC render prospective application of the Decree inequitable because we find that the RNC waived any relevant First Amendment rights by consenting to the 1982 and 1987 Decrees.

[16] Because the RNC's arguments regarding the BCRA center on the Decree's workability, the majority of our review of the District Court's opinion regarding the BCRA is included in the workability discussion infra.

"One of the NVRA's central purposes was to dramatically expand opportunities for voter registration and to ensure that, once registered, voters could not be removed from the registration rolls by a failure to vote or because they had changed addresses." Welker v. Clarke, 239 F.3d 596, 598–99 (3d Cir. 2001) (citing 42 U.S.C. § 1973gg(b)).[17]   The NVRA authorizes election officials to use mailings to update voter registration rolls.   Additionally, the NVRA imposes criminal penalties on individuals who submit false voter registration forms, knowingly cast a forged ballot, or

---

[17] In Welker v. Clarke, 239 F.3d 596 (3d Cir. 2001), we noted that

> To achieve this purpose, the NVRA strictly limited removal of voters based on change of address and instead required that, for federal elections, states maintain accurate registration rolls by using reliable information from government agencies such as the Postal Service's change of address records.   The NVRA went even further by also requiring the implementation of "fail-safe" voting procedures to ensure voters would not be removed from registration rolls due to clerical errors or the voter's own failure to re-register at a new address.

Id. at 599 (citing 42 U.S.C. § 1973gg-6(b)(1)).

manipulate the tabulation of votes, and it specifies criminal penalties for intimidating, threatening, or coercing any person who is registering to vote or voting.  42 U.S.C. §1973gg-10(1)(A), 10(2).

The RNC argues that the NVRA renders the Decree antiquated because it has led to significant increases in minority voter registration and turnout.  The RNC also asserts that the NVRA creates an increased risk of voter fraud.  This argument, that the enactment of a law that expands voter registration opportunities renders inequitable a Decree that aims to prevent voter intimidation and suppression, is unpersuasive.  The District Court correctly notes that any increase in minority voter registration or voter turnout caused by the Motor Voter Law is irrelevant to the Decree because "the Consent Decree was not designed to encourage minority voter registration, but rather to prevent voter suppression." Democratic Nat'l Comm., 671 F. Supp. 2d at 614. Additionally, the District Court cites evidence that the Motor Voter Law reduces the threat of voter registration fraud, but does not attempt to prevent voter suppression.  Id.

Nor does the NVRA "make legal what the decree was designed to prevent."  Rufo, 502 U.S. at 388.  The NVRA authorizes election officials, not the RNC, to use mailings to update voter registration lists.  42 U.S.C. § 1973gg-6(c)-(d). The NVRA does not authorize targeting such mailings at predominantly minority precincts nor does the NVRA authorize the presence of voter fraud security teams targeted at predominantly minority precincts on Election Day, both actions that the Decree is designed to prevent.

The NVRA provision that makes voter intimidation subject to a criminal penalty is not relevant to the purpose of

the Decree because it would not prevent minority voter intimidation or suppression.   The provision allows for criminal penalties to be imposed ex post, only after voters had been intimidated and had lost their opportunity to cast their ballots.   This provision does not render inequitable the application of the Decree, in which the RNC agreed not to "us[e], [or] appear[] to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud."  (App. at 404–05.)

The "central provisions" of the BCRA were "designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections." McConnell v. FEC, 540 U.S. 93, 132 (2003).   The "BCRA made a number of dramatic changes to campaign finance law to achieve these goals, including barring national political parties from soliciting soft money." Shays v. Federal Election Comm'n, 528 F.3d 914, 918 (D.C. Cir. 2008) (citing 2 U.S.C. § 441i(a)).   The BCRA also "barred state parties from spending soft money on 'federal election activity,' including 'get-out-the-vote activity' and 'voter registration activity.'" Id. (quoting 2 U.S.C. § 441i(b)(1)).

The RNC argues that the BCRA's prohibition on the spending of soft money by state parties for voter registration and get-out-the-vote activity has heightened the risk of voter fraud because it is difficult to track the voter registration efforts of the increased number of groups registering voters. As the District Court mentions, the Decree does not prevent the RNC from collaborating with non-party organizations to register voters and the RNC has not demonstrated that any ineligible voter registered by a non-party organization has ever actually cast a vote.  The RNC has not demonstrated that

this provision of the BCRA is a significant change in the law that warrants revision of the Decree.

"HAVA is concerned with updating election technologies and other election-day issues at polling places." <u>Gonzalez v. Arizona</u>, 624 F.3d 1162, 1184 (9th Cir. 2010). One purpose of HAVA was "to prevent on-the-spot denials of provisional ballots to voters deemed ineligible to vote by poll workers." <u>Sandusky County Democratic Party v. Blackwell</u>, 387 F.3d 565, 574 (6th Cir. 2004).[18]   HAVA also established complaint procedures to challenge alleged voting violations. 42 U.S.C. § 15512.   The RNC argues that HAVA increases the risk of voter fraud and reduces the risk of vote suppression by allowing voters to cast provisional ballots.

The provisional ballot portion of HAVA is not aimed at preventing voter suppression or intimidation and does not render the prospective application of the Decree inequitable. Despite the RNC's assertions, the fact that HAVA affords every voter the opportunity to cast a provisional ballot is only effective if those voters are not intimidated by voter fraud efforts, such as those targeted by the Decree.   As the District Court notes, voter intimidation could prevent voters from entering the polls to obtain a provisional ballot.   <u>Democratic Nat'l Comm.</u>, 671 F. Supp. 2d at 612–13, 616 ("Some voters .

_____

[18] "HAVA requires that any individual affirming that he or she 'is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office . . . shall be permitted to cast a provisional ballot.'" <u>Sandusky County Democratic Party v. Blackwell</u>, 387 F.3d 565, 574 (6th Cir. 2004) (citing 42 U.S.C. § 15482(a)).

. . may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified . . . Others may be prevented from waiting by responsibilities . . ." (citing DNC Hr'g Ex. 18 at 6; RNC Hr'g Ex. 26 at 56; League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008)). The opportunity to cast a provisional ballot is not relevant to the purpose of the Decree because it does not decrease minority voter intimidation or suppression.

The availability of complaint procedures for alleged voting violations under HAVA does not "make legal what the decree was designed to prevent." Rufo, 502 U.S. at 388. Moreover, the HAVA complaint procedures, unlike the Decree, do not aim to prevent the RNC from targeting its voter fraud efforts at precincts with higher populations of minorities.

The District Court did not abuse its discretion when it found that the Motor Voter Law, BCRA, and HAVA have "not altered [the] calculus" of in-person voter fraud or voter intimidation to an extent that justifies vacating or modifying the Decree due to a change in law. Democratic Nat'l Comm., 671 F. Supp. 2d at 613.

### c. *Public Interest*

The RNC argues that vacating the Decree would benefit the public interest by allowing the RNC to engage in programs attempting to prevent voter fraud, which the RNC alleges are hampered by the Decree. Additionally, the RNC contends that there is little need to prevent the intimidation and suppression of minority voters. Specifically, the RNC asserts that voter fraud is a danger and that "political parties, candidates, the Government, and the public all have an

38

undisputed interest in protecting the integrity of the election process." (Appellant's Br. at 50.)  Thus, the RNC argues that it should be permitted to address voter fraud free from the constraints of the Decree.

If the RNC establishes that "a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." Horne v. Flores, --- U.S. ----, ----, 129 S. Ct. 2579, 2595 (2009) (holding that the United States Court of Appeals for the Ninth Circuit employed a heightened standard for its Rule 60(b)(5) inquiry instead of the required flexible approach).  However, the RNC has pointed to no remedy other than the Decree that prevents the RNC from "using, [or] appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud." (App. at 404–05.)

The District Court declined to determine whether laws passed by Congress sufficiently address the dangers of voter fraud, recognizing that such is not the task of the federal court.  Bartlett v. Strickland, 556 U.S. 1, ----, 129 S. Ct. 1231, 1245 (2009) ("Though courts are capable of making refined and exacting factual inquiries, they 'are inherently ill-equipped' to 'make decisions based on highly political judgments' . . .") (quoting Holder v. Hall, 512 U.S. 874, 894 (1994) (Thomas, J., concurring in judgment)).  Instead, the Court noted that Congress is better equipped to make this determination by weighing the dangers of voter fraud against the dangers of voter intimidation.

The District Court rejected the RNC's argument that the Decree must be vacated or modified because the risk of voter fraud outweighs the risk of voter suppression and

intimidation.  As the District Court correctly points out, the Decree only requires preclearance for programs involving the prevention of in-person voter fraud.  Furthermore, the District Court has never prevented the RNC from implementing a voter fraud prevention program that the RNC has submitted for preclearance, at least in part, because the RNC has never submitted any voter fraud prevention program for preclearance.

Although the RNC pointed to charges that were noted in the Carter-Baker Commission Report against eighty-nine individuals and fifty-two convicted individuals to demonstrate the pervasiveness of voter fraud, those purported instances of voter fraud ranged "from vote-buying to submitting false voter registration information and voting-related offenses by non-citizens."  (RNC Hr'g Ex. 26 at 45.) Thus, only a fraction of that alleged fraudulent activity was related to in-person voter fraud, which is the type of fraud addressed in the Decree.

The FBI report that the RNC submitted regarding irregularities in Wisconsin during the 2004 election did not specify whether the voting irregularities under investigation involved votes cast in person or votes cast through absentee voting or some other alternative process.  In support of the notion that most alleged incidents of voter fraud are not related to in-person voting and are, thus, irrelevant to the Decree, the DNC submitted evidence of voting irregularities in Florida during the 2004 election, which was also cited by the RNC, that showed that "the majority of those accused of wrongdoing were elected officials and political operatives." Democratic Nat'l Comm., 671 F. Supp. 2d at 607.

The Supreme Court has also noted the rarity of in-person voter fraud. Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 194 (2008) (noting that there was "no evidence of any [in-person voter] fraud actually occurring in Indiana at any time in its history); see also id. at 226 (Souter, J., dissenting) ("[T]he State has not come across a single instance of in-person voter impersonation fraud in all of Indiana's history."); Democratic Nat'l Comm., 671 F. Supp. 2d at 609 ("Justice Stevens acknowledged that, of the 'occasional examples' of in-person fraud on which his ruling was based, all but one had been shown to have been 'overstated because much of the fraud was actually absentee ballot fraud or voter registration fraud.'" (quoting Crawford, 553 U.S. at 196 n.12)). Thus, the RNC has not established that in-person voter fraud is sufficiently prevalent such that applying the Decree prospectively is no longer equitable. Even if the public has an unmet need for the prevention of in-person fraud, the Decree does not prevent the RNC from combating in-person voter fraud if it obtains preclearance. If the risk of voter fraud is as great and consequential as the RNC alleges and an RNC voter security program is a significant part of efforts needed to prevent that voter fraud, it would seem that the RNC would have attempted to obtain preclearance for a voter security program at least once since 1987.

The RNC argues that "minority voters are not being suppressed," and, thus, the Decree does not serve public interest. (Appellant's Br. 33.) The District Court noted as an example, however, that the voter-challenge list in Malone included 35,000 registered voters who were predominantly minorities. Without the enforcement of the Decree provisions, these voter-challenge lists that are racially-

targeted, in intent or in effect, could result in the intimidation and deterrence of a number of voters.

When confronted with such targeted voter-challenge lists, some eligible voters may choose to refrain from voting instead of waiting for the verification of their own eligibility or that of others ahead of them in line.  (See, e.g., DNC Hr'g Ex. 18 at 6 (quoting a former Political Director of the Republican Party of Texas, who stated that photo identification requirements "could cause enough of a dropoff in legitimate Democratic voting to add three percent to the Republican vote."); RNC Hr'g Ex. 26 at 56 (portion of the Carter-Baker Commission Report on "Polling Station Operations," in which  the Report noted voter fraud security in some minority communities may be "intimidating" and that, during the 2004 election, "[p]roblems with polling station operations, such as long lines, were more pronounced in some places than others.  This gave rise to suspicions that the problems were due to discrimination . . .").)

The District Court did not abuse its discretion by finding that public interest concerns, including the prevention of voter fraud and the prevention of voter suppression and intimidation, do not justify vacatur or modification of the Decree.

### d.  Workability

The RNC argued before the District Court that there were workability issues that required modification of the Decree, as a practical matter.  The District Court held that there were four workability issues that weighed in favor of modification: (1) the potential inequity of the RNC being subject to suits brought by entities who were not party to the

Decree when,  under the BCRA, the RNC has to defend
lawsuits using "hard money," while the DNC does not have to
spend any money on such suits because it would not be  party
to them[19]; (2) the twenty-day notice requirement for
preclearance prevents the RNC from combating mail-in voter
registration fraud in a number of states with later mail-in
voter registration deadlines; (3) the Decree lacks a clear
definition of normal poll watching activities and the parties
have not provided a definition, leading the RNC to refrain
from normal poll watching activities, which the Decree was
never intended to prohibit; and (4) the Decree lacked a
termination date.

The District Court, accordingly, modified the Decree
in the following ways: (1) allowed only parties to the Decree,
the DNC and NJDSC, to bring an enforcement action under
the Decree; (2) decreased the preclearance notice requirement
from twenty days to ten days; (3) provided clearer definitions
and examples of "ballot security"[20] and "normal poll
watching"[21] activities; and (4) added an eight-year expiration

---

[19] The RNC would have to spend "hard money" on any
lawsuits because the "BCRA made a number of dramatic
changes to campaign finance law . . . , including barring
national political parties from soliciting soft money."
Shays, 528 F.3d at 918 (citing 2 U.S.C. § 441i(a)).

[20] "Ballot security" is defined to include "any program aimed
at combating voter fraud by preventing potential voters from
registering to vote or casting a ballot."   Democratic Nat'l
Comm., 671 F. Supp. 2d at 622.   The modification also
includes a non-exhaustive list of ballot security programs.

[21] "Normal poll-watch function" is defined as "stationing
individuals at polling stations to observe the voting process

date, December 1, 2017, to the Decree, allowing for an extension of the Decree for another eight years if the DNC proves by a preponderance of the evidence that the RNC has violated the Decree.

In addition to determining whether the District Court abused its discretion by declining to make more extensive modifications to the Decree than it did based on workability concerns, we analyze, also under the abuse of discretion standard, whether the District Court's "proposed modification is suitably tailored to the changed circumstance." Rufo, 502 U.S. at 391. As noted above, the modification "must not create or perpetuate a constitutional violation"; it "should not strive to rewrite a consent order so that it conforms to the constitutional floor"; and a court should not try to modify a consent order other than making those revisions that equity requires because of the change in circumstances. Id.

The District Court held that the Decree should be modified because the BCRA creates a potential inequity between the RNC and the DNC if third parties are allowed to bring suits to enforce the Decree against the RNC. Without modification, the RNC would have to defend such third-party suits with limited "hard money" because it cannot solicit "soft money" under the BCRA while the DNC, not a party to such suits, would not have to expend resources on these third-party suits. Accordingly, the District Court modified the Decree so

―――――――――――――――――――――

and report irregularities unrelated to voter fraud to duly-appointed state officials." Democratic Nat'l Comm., 671 F. Supp. 2d at 622. The modification includes a non-exhaustive list of activities that do and do not fit into the Decree definition of normal poll-watch function.

that only the DNC and NJDSC can bring an enforcement action under the Decree so that both parties would have to spend "hard money" on the enforcement action. This modification eliminates any potential BCRA-caused inequity in the prospective application of the Decree.

In this respect, the Court revised the Decree only to the extent required because of the change in circumstances brought about by the BCRA. Limiting the ability to bring Decree enforcement actions to parties to the Decree is a modification suitably tailored to the equitable concerns brought about by the "hard money" restrictions in the BCRA.

The RNC argues that this modification does not address the workability issues caused by the costly and distracting enforcement actions filed shortly before Election Days because the money the RNC would have to spend defending those suits takes money away from the RNC's political efforts, regardless of whether the DNC also has to spend money to bring those suits. The nature and timing of election cycles may cause the need to defend against Decree enforcement suits to arise at inconvenient times, but resolving those issues before Election Day is crucial to enforcing the Decree by ensuring access to the polls and preventing suppression of minority votes.

In effect, the RNC contends that the Decree should be vacated because it is unworkable for the RNC to spend any money defending itself in enforcement actions. This argument is not persuasive. When the RNC twice consented to the Decree and gained its benefits, it should have anticipated that it would likely need to spend money defending itself in future enforcement actions. Neither modification nor vacatur are justified "where a party relies

upon events that actually were anticipated at the time it entered into a decree." Rufo, 502 U.S. at 385.

The District Court noted that a number of states now have voter registration deadlines less than twenty days before the election and that the RNC has a valid interest in preventing fraudulent voter registration. The District Court modified the Decree by decreasing the notice requirement for preclearance from twenty days to ten days.

The RNC argues that the ten-day preclearance period should be eliminated because it forces the party to reveal its Election Day strategy to the DNC in order to combat voter fraud and is, therefore, unworkable. The RNC has requested zero days for preclearance or, at least, some decrease in the time period for the preclearance notice requirement.[22] The RNC asserts that "any preclearance requirement is tantamount to a prohibition on Election Day activities by the RNC" because it means that the RNC must foresee Election Day issues twenty to thirty-five days in advance of an election; "forc[es] the RNC to disclose its tactical thinking and Election Day strategy far enough in advance for the DNC and others to craft counter-strategies"; and it "requires the RNC to place equivalent numbers of poll watchers in all precincts, regardless of political or practical considerations." (Appellant's Br. at 52–54.)

The RNC's argument is wholly speculative. The RNC's supposed knowledge and experience of unworkability is mere conjecture because, since the preclearance provision

_____

[22] The RNC suggested two to three days for preclearance at oral argument, but could not articulate a basis for such a modification other than it would be better than ten days.

was added to the Decree in 1987, the RNC has never attempted to obtain preclearance. Contrary to the RNC's argument, the preclearance provision does not require the RNC to disclose its tactical thinking and Election Day strategy except with regard to ballot security activities. The RNC points to no statement of the District Court and no provision of the Decree that requires the RNC "to place equivalent numbers of poll watchers in all precincts." (Appellant's Br. at 52–54.)

On the contrary, the Decree does not require any preclearance for normal poll watching functions, so the Decree would in no way prohibit the RNC from placing different numbers of poll watchers in precincts. Further, there is no basis for any RNC argument that the preclearance provision requires the RNC to place the same number of voter fraud security team members at each precinct. The RNC does not know what level of program detail the District Court would require before granting preclearance.[23] The preclearance provision does not prevent the RNC from achieving its objective of normal poll-watching, carrying out approved ballot security programs, or implementing any other Election Day strategies that do not "us[e], [or] appear[] to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud." (App. at 404–05.)

---

[23] For example, perhaps the RNC could obtain preclearance for a voter fraud security program that instructs its normal poll watchers that, if they see a person who they believe is voting more than once, they can report that potential fraud to poll workers.

With no preclearance provision, the RNC could implement any ballot security program and would only be subject to enforcement of the Decree after potential minority voter intimidation and suppression had already occurred. Thus, the elimination of the provision would thwart the Decree's purpose of preventing minority voter intimidation and suppression ex ante.  The District Court shortened the preclearance time to allow the RNC to combat more of the potential voter registration fraud that might occur closer to Election Day, a modification suitably tailored to address the inequity the District Court identified.

Although the Decree was never intended to prohibit normal poll watching activities, the RNC claims that is has refrained from engaging in normal poll watching activities because the Decree's definitions of such activities are unclear and it fears it would unintentionally violate the Decree.  To address this workability concern, the District Court modified the Decree to provide clearer definitions and examples of "ballot security" and "normal poll watching" activities.  With the District Court's modifications, "[b]allot security" is defined to include "any program aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot,"[24] and "[n]ormal poll-watch function" is

---

[24] The modification includes a non-exhaustive list of ballot security programs:

> the compilation of voter challenge lists by use of mailings or reviewing databases maintained by state agencies such as motor vehicle records, social security records, change of address forms,

defined as "stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly-appointed state officials." Democratic Nat'l Comm., 671 F. Supp. 2d at 622.

The District Court's modifications more clearly define ballot security and normal poll-watch function under the Decree and provide lists of examples of both.[25]   The RNC

_____

and voter lists assembled pursuant to the HAVA; the use of challengers to confront potential voters and verify their eligibility at the polls on either Election Day or a day on which they may take advantage of state early voting procedures; the recording by photographic or other means of voter likenesses or vehicles at any poling place; and the distribution of literature informing individuals at or near a polling place that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

Democratic Nat'l Comm., 671 F. Supp. 2d at 622.

[25] The modification also includes a non-exhaustive list of activities that do and do not fit into the Decree definition of normal poll-watch function:

[O]bservers may report any disturbance that they reasonably

contends that it cannot engage in normal poll-watch functions because the definitions of the terms remain unclear.  Contrary to the RNC's argument that the District Court's definitions and non-exhaustive lists of examples "worsen the problem," (Appellant's Br. at 55), the modifications of adding specific definitions and examples of ballot security and normal poll-watch functions give both the RNC and the DNC more clarity regarding what types of activities require preclearance, which do not require preclearance, and which are prohibited by the Decree.

Given these modifications, any hardship to the RNC is not a product of the terms of the Decree.  Clarity allows the RNC to engage in normal poll watching activities while still

believe might deter eligible voters from casting their ballots, including malfunctioning voting machines, long lines, or understaffing at polling places. Such observers may not question voters about their credentials; impede or delay voters by asking for identification, videotape, photograph, or otherwise make visual records of voters or their vehicles; or issue literature outlining the fact that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

Democratic Nat'l Comm., 671 F. Supp. 2d at 622–23.

maintaining adherence to fulfillment of the Decree's purpose. The District Court's modification is suitably tailored to resolve the prior ambiguity and does not strive to conform to the constitutional floor by allowing the RNC to engage in all activities without preclearance.  See Rufo, 502 U.S. at 391. The modification clarifies the previous ambiguity.

The District Court agreed with the RNC that the lack of an expiration date in the Decree was "inherently inequitable." Democratic Nat'l Comm., 671 F. Supp. 2d at 621.  The District Court modified the Decree by adding an eight-year expiration date, December 1, 2017, and allowing for an extension of the Decree for another eight years if the DNC proves by a preponderance of the evidence that the RNC has violated the Decree.  The RNC argues that the District Court's December 1, 2017 expiration date is an abuse of discretion and that the appropriate Decree termination date is either eight years after the parties entered into the Decree in 1982, eight years after the Decree's modification in 1987, or, at worst, eight years after the Malone litigation.

Although a considerable number of years have passed since the RNC and DNC agreed to the Decree in 1982 and 1987, the parties entered the Decree voluntarily and for over a quarter of a century neither party objected to the duration of the Decree.  The District Court did not abuse its discretion by declining to vacate the Decree due to the length of time since its entry.  See BCTC, 64 F.3d at 889 (declining to hold that "the mere passage of time" is itself "sufficient to constitute the type of changed circumstances that warrant lifting of an injunction").  Thus, it does not follow that the original decision not to include an expiration date requires vacatur now that the Decree has an expiration date.

The District Court noted that it was imposing a termination date of eight years from its ruling because the Civil Rights Division of the Department of Justice, which is charged with enforcing the Voting Rights Act, also imposes consent decrees with time limits of eight years, which can be extended for good cause.  The RNC has not shown that the District Court's decision to set a termination date of eight years from the date of its order modifying the Decree with provisions allowing for an extension of that termination date for good cause is "arbitrary, fanciful or clearly unreasonable." Moyer, 473 F.3d at 542.

By adding an eight-year expiration date, December 1, 2017, to the Decree, the District Court modified the Decree to remedy the inequity that it perceived to be caused by the lack of expiration date.[26]   Accepting arguendo that the Decree

---

[26] Neither party argued before this Court that the District Court abused its discretion by imposing a formerly non-existent time limitation on the RNC's obligations under the Decree, thereby relieving the RNC of its burden to show a significant change of fact or law to secure release from those obligations.  Thus, this issue is not before this Court and we, accordingly, do not decide it.  The District Court decided to impose that time limitation based on a hypothetical situation that it speculated might well occur in the future.  The District Court held as follows with respect to this matter:

> The final consideration weighing in favor of modification involves the fact that the Consent Decree does not include a date on which the obligations it imposes on the

RNC will terminate.  In failing to include such an expiration date, the parties have created a situation in which the RNC is, at least nominally, bound by those obligations in perpetuity, regardless of whether it continues to engage in voter suppression efforts or has any incentive to do so.  That situation is inherently inequitable.  For example, if at any point in the future the RNC succeeds in attracting minority voters in such numbers that its candidates receive the majority of votes cast by those populations, it will have no incentive to engage in anti-fraud measures that have the effect of deterring those voters from casting their ballots.  Under the Consent Decree as currently written, though, the RNC would be required to pre-clear any such measures with this Court, while the DNC would be free to implement ballot security programs without doing so.  In an effort to avoid similar situations, the Civil Rights Division of the DOJ—the government entity charged with enforcing the VRA—imposes a time limit of

without a time limit is "inherently inequitable," the provision allowing for an extension of the Decree for another eight years if the DNC proves by a preponderance of the evidence the RNC has violated the Decree preserves the purpose of the

> eight years on its consent decrees, which may be extended for good cause. . . . The Court believes that such a provision is justified in this case.

Democratic Nat'l Comm., 671 F. Supp. 2d at 621-22.

This Court draws attention to this issue only to make clear that we have not resolved it by implication or otherwise. It is at least doubtful that a district court could decide to impose a time limitation within the bounds of its appropriate discretion while simultaneously concluding that the RNC retained an incentive to violate the Consent Decree and had shown no other existing and relevant change of circumstance. Passage of time alone is not normally regarded as a significant change of fact. *Building and Const. Trades v. NLRB*, 64 F.3d 880, 889 (3d Cir. 1995) ("[W]e are unwilling to hold, and BCTC cites no persuasive authority to the contrary, that the mere passage of time and temporary compliance are themselves sufficient to constitute the type of changed circumstances that warrant lifting an injunction."). Moreover, given that the obligations of a consent decree are necessarily subject to the limitations of Rule 60(b)(5) and terminable whenever prospective application would no longer be equitable, the District Court's characterization of the RNC's situation as "inherently inequitable" also seems questionable.

Decree so that the modification does not rewrite the consent order more than equity requires.  Moreover, we do not adopt the RNC's argument that the District Court abused its discretion by not starting the eight year period from the date of the entry of the Decree or from its 1987 modification, "thus requiring . . . immediate vacatur."  (Appellant's Br. 42.) The District Court concluded, with ample record support, that the purpose of the Decree had not yet been fulfilled and vacatur would not have been suitably tailored to its findings.

The RNC has not established by a preponderance of the evidence that any workability issues remaining after the District Court's modification are so acute that prospective application of the Decree is inequitable.  The District Court did not abuse its discretion by declining to vacate due to workability.

The RNC has not established that any of the District Court's decisions were "arbitrary, fanciful or clearly unreasonable."  Moyer, 473 F.3d at 542.  Thus, the District Court did not abuse its discretion by holding that the RNC did not establish by a preponderance of the evidence that any of the following four Rufo factors necessitated vacatur or modifications beyond those ordered by the District Court: (1) a significant change in factual conditions; (2) a significant change in law; (3) that "a decree proves to be unworkable because of unforeseen obstacles"; or (4) that "enforcement of the decree without modification would be detrimental to the public interest."  Rufo, 502 U.S. at 384.  Furthermore, the District Court's modifications were suitably tailored to the changed workability circumstances.

3.  BCTC Factors

We noted in <u>BCTC</u> that a court determining whether to vacate or modify a decree should respond to the specific set of circumstances before it by considering factors unique to the conditions of the case. <u>BCTC</u>, 64 F.3d at 888. The factors raised in the District Court that are unique to the circumstances of this case are whether the RNC has complied or attempted to comply in good faith with the terms of the Decree and the likelihood that the conduct sought to be prevented will recur absent the Decree. For any change to justify vacatur, it must be a significant change, rendering the prospective application of the Decree inequitable. <u>See</u> <u>BCTC</u>, 64 F.3d at 886.

The RNC claims that it has complied with the Decree since 1987 and that it is highly unlikely that the RNC will attempt to intimidate or suppress minority voters in the future if the Decree is vacated. The District Court did not abuse its discretion or err by considering the <u>Malone</u> finding that, in 2004, the RNC engaged in substantive and procedural violations of the Decree. Although the panel's decision was vacated as moot by this Court sitting en banc, that vacatur did not disturb the panel's factual determination that the RNC had violated the Decree. Furthermore, the District Court did not rely on <u>Malone</u>'s preliminary injunction as precedent, but, instead, merely considered its finding of fact regarding the Decree violation as instructive regarding the RNC's level of compliance with the Decree.[27]

---

[27] Because the District Court is not using the <u>Malone</u> judgment to "spawn[] any legal consequences" and the Court's consideration of the findings of fact has no impact on "relitigation of the issues between the parties," <u>United States v. Munsingwear, Inc.</u>, 340 U.S. 36 (1950), is inapposite. <u>Id.</u>

at 39–41 (holding that the practice for dealing with a judgment that "has become moot while on its way [to the Supreme Court] or pending [the Supreme Court's] decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss").

The RNC insists that the District Court's 2004 decision in the Malone proceeding has no "precedential effect." Here, however, the District Court did not give "precedential effect" to the judgment in another case. The issue of whether the RNC had violated the consent decree in Malone's situation was litigated before the District Court in this case and all of the evidence submitted by the parties with respect to that issue remains part of the record in this case. The Court referred to its factual finding of a consent decree violation in the Malone proceeding in response to the RNC's attempt to carry its burden by relying on the results in the enforcement litigation that had occurred since 1982. According to the RNC, the "slim record of enforcement success against the RNC demonstrates that it has strictly complied with the Consent Decree since 1987, and there is no evidence to suggest that its behavior will change if the Decree is vacated." RNC Proposed Conclusions of Law, App. at 1264. In this context, the Court did not err in referring to and relying upon its factual finding of a 2004 violation in the Malone proceeding. Contrary to the RNC's suggestion, it was clearly not surprised by the District Court's response to its argument. Evidence from the Malone proceeding was discussed by the witnesses at the evidentiary hearing and in the ensuing briefing of the parties. See, e.g., App. at 1081-82, 1234-35.

Furthermore, the RNC's position regarding <u>Malone</u> is contradictory. For purposes of determining RNC's compliance with the Decree, the RNC argues that the Court should not consider <u>Malone</u> in any way. However, for purposes of determining from which point the eight-year Decree expiration date should begin to run, the RNC has mentioned that the 2004 <u>Malone</u> decision could be an appropriate starting point. Even if the RNC had not violated the Decree since 1987, that fact alone is not necessarily sufficient to justify vacating the Decree because compliance is the purpose of the Decree. <u>See</u> <u>BCTC</u>, 64 F.3d at 889 (declining to hold that "temporary compliance" is itself "sufficient to constitute the type of changed circumstances that warrant lifting of an injunction"). As the District Court noted, any past compliance might have been "because the Decree itself has deterred such behavior." <u>Democratic Nat'l Comm.</u>, 671 F. Supp. 2d at 601.

Additionally, the District Court did not abuse its discretion by finding that the RNC had not produced evidence demonstrating a lack of incentive for the RNC to engage in voter suppression and intimidation. The racial and ethnic background of this nation's political leadership, the RNC's leadership, and the electorate do not decrease the likelihood that the RNC will suppress minority voters such that prospective application of the Decree is inequitable. If the RNC does not hope to engage in conduct that would violate the Decree, it is puzzling that the RNC is pursuing vacatur so vigorously notwithstanding the District Court's significant modifications to the Decree.

The RNC's decision not to engage in normal poll-watch functions or obtain preclearance for voter fraud security programs does not allow us to assume past or future

compliance.  On the contrary, the RNC's refusal to engage in normal poll-watch functions or to obtain preclearance may be because the RNC, as it has argued, is not sure of the difference between normal poll-watch functions and voter fraud security programs.  That the RNC has not engaged in a normal poll-watch function and has not presented a request for preclearance of a voter fraud security program that does not disproportionately target minority voters leaves open the possibility that the RNC, absent enforcement of the Decree, would not comply with the Decree terms in the future.  See BCTC, 64 F.3d at 890 (noting that a party deciding "not to picket at all" does not "show that [the party] has in fact learned how to picket without treading on the prohibitions against secondary boycott contained both in the law and the various negotiated consent decrees").

In light of the District Court's modifications, the RNC does not point to any significant change that renders prospective application of the Decree inequitable.  The District Court did not abuse its discretion by declining to vacate or modify the Decree because of BCTC factors.

## IV. __CONCLUSION__

For the reasons set forth above, we will affirm the judgment of the District Court.