**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

DEMOCRATIC NATIONAL COMMITTEE,
*et al.*

                           Plaintiffs,

      v.

REPUBLICAN NATIONAL COMMITTEE,
*et al.*

                        Defendants.

Civil Action No.: 81-3876

---

**MEMORANDUM IN SUPPORT OF ORDER TO SHOW CAUSE
WHY DEFENDANT REPUBLICAN NATIONAL COMMITTEE
SHOULD NOT BE HELD IN CIVIL CONTEMPT
AND WHY PRELIMINARY INJUNCTIVE RELIEF SHOULD NOT ISSUE**

---

**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777

**PERKINS COIE LLP**
700 13th Street, NW, Suite 600
Washington, DC 20005
(202) 654-6200

1 East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460

*Attorneys for Plaintiff,
Democratic National Committee*

<u>Of Counsel and On the Brief:</u>
Angelo J. Genova, Esq.
Marc E. Elias, Esq. (*pro hac vice admission pending*)
Rajiv D. Parikh, Esq.
Joshua L. Kaul, Esq. (*pro hac vice admission pending*)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................................. 3

ARGUMENT ............................................................................................................................... 5

      I.      THE RNC HAS VIOLATED THE CONSENT DECREE      5

      II.     THE COURT SHOULD ORDER THE RNC TO SHOW CAUSE WHY IT
             SHOULD NOT BE HELD IN CONTEMPT AND SANCTIONED TO
             ENFORCE COMPLIANCE WITH THE CONSENT DECREE      16

             A.     The Court Should Order The RNC To Show Cause Why It Should Not Be
                   Held In Contempt For Violating The Consent Decree ............................ 16

             B.     The Court Should Enforce The Consent Decree With Sanctions Designed
                   To Provide Plaintiff With Full Remedial Relief And To Ensure
                   Prospective Compliance......................................................................... 17

      III.    THE CONSENT DECREE SHOULD BE EXTENDED FOR ANOTHER EIGHT
             YEARS FROM THE DATE OF THIS VIOLATION      19

      IV.    PRELIMINARY INJUNCTIVE RELIEF SHOULD ISSUE      20

             A.     This Court Should Enjoin The RNC From Engaging In Voter Intimidation
                   In Concert With The Trump Campaign And Its Associates ..................... 20

CONCLUSION.................................................................................................................... 22

# TABLE OF AUTHORITIES

CASES

*Applewhite v. Commonwealth*,
No. 330 M.D. 2012, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014) ...............................8

*Arrowpoint Capital Corp. v. Arrowpoint Assett Mgmt., LLC*,
793 F.3d 313 (3d Cir. 2015)..................................................................................................21

*Brakebill v. Jaeger*,
No. 16-cv-00008 (DLH) (D.N.D. Aug. 1, 2016) ....................................................................8

*Council of Alternative Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997)............................................................................................21, 22

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008)................................................................................................................8

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
671 F. Supp. 2d 575 (D.N.J. 2009) (Debevoise, J.) .............................................................8, 9

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 1471 (2013) ............................... passim

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
No. 81-cv-3876 (DRD) (Nov. 1, 1982)........................................................................1, 3, 15

*Frank v. Walker*,
17 F. Supp. 3d 837, 848 (E.D. Wis.), *rev'd on other grounds*, 768 F.3d 744
(7th Cir. 2014)........................................................................................................................9

*Harris v. City of Philadelphia*,
47 F.3d 1311 (3d Cir. 1995)..................................................................................................16

*Harris v. Graddick*,
593 F. Supp. 128 (M.D. Ala. 1984) ......................................................................................23

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)..............................................................................................................19

*John T. ex rel. Paul T. v. Delaware. Cty. Intermediate Unit*,
318 F.3d 545 (3d Cir. 2003)......................................................................................17, 18, 20

*Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO*,
545 F.2d 1336 (3d Cir. 1976)................................................................................................19

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224, 246 (4th Cir. 2014) ..........................................................................................8

*Lee v. Va. State Bd. of Elections*,
    No. 3:15CV357-HEH, 2016 WL 2946181 (E.D. Va. May 19, 2016) ......................................9

*McDowell v. Phila. Hous. Auth.*,
    423 F.3d 233 (3d Cir. 2005)................................................................................................5

*Ne. Ohio Coal. for the Homeless v. Husted*,
    No. 2:06-CV-896, 2016 WL 3166251 (S.D. Ohio June 7, 2016) .............................................9

*One Wis. Inst. v. Thomsen*,
    No. 15-civ-324 (JDP), 2016 WL 4059222 (W.D. Wis. July 29, 2016) ..................................8

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945).............................................................................................................17

*Reynolds v. Sims*,
    377 U.S. 533 (1964).........................................................................................................22

*Roe v. Operation Rescue*,
    919 F.2d 857 (3d Cir. 1990)........................................................................................2, 17

*Spallone v. United States*,
    493 U.S. 265 (1990).........................................................................................................18

*United States v. Berks Cty.*,
    250 F. Supp. 2d 525 (E.D. Pa. 2003) ...........................................................................22, 23

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ........................................................................................8, 9

**STATUTES**

52 U.S.C. § 10307(b) .........................................................................................................10

**OTHER AUTHORITIES**

Statement of Organization, Trump Make America Great Again Committee, FEC-
    1074541, May 25, 2016 ...............................................................................................2, 12

## <u>PRELIMINARY STATEMENT</u>

Defendant Republican National Committee ("RNC") has violated the Final Consent Decree entered in *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 81-cv-3876 (DRD) (Nov. 1, 1982) ("1982 Consent Decree"), as modified by order of this Court on July 27, 1987 ("1987 Consent Decree"), and again on December 1, 2009 ("2009 Consent Decree") (collectively the "Consent Decree" or "Decree"), by supporting and enabling the efforts of the Republican candidate for President, Donald J. Trump, as well as his campaign and advisors, to intimidate and discourage minority voters from voting in the 2016 Presidential Election. Trump has falsely and repeatedly told his supporters that the November 8 election will be "rigged" based upon fabricated claims of voter fraud in "certain areas" or "certain sections" of key states. Unsurprisingly, those "certain areas" are exclusively communities in which large minority voting populations reside. Notwithstanding that no evidence of such fraud actually exists, Trump has encouraged his supporters to do whatever it takes to stop it—"You've got to get everybody to go out and watch . . . and when [I] say 'watch,' you know what I'm talking about, right?"—and has been actively organizing "election observers" to monitor polling stations in "certain areas." Trump has even encouraged his "watchers" to act like vigilante law enforcement officers.

Although certain RNC officials have attempted to distance themselves from some of the Trump campaign's more recent statements, there is now ample evidence that Trump has enjoyed the direct and tacit support of the RNC in its "ballot security" endeavors, including the RNC's collaboration on efforts to prevent this supposed "rigging" and "voter fraud." In a rally in Denver, Colorado, on August 3, 2016, Trump's vice presidential running mate, Indiana Governor Mike Pence, admitted that the RNC was directly coordinating with the Trump campaign on "ballot integrity" initiatives, stating that "the Trump campaign and the Republican National Committee

1

are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22-37 (last accessed Oct. 26, 2016). Following the third presidential debate, Trump's campaign manager told a reporter that the campaign was working to combat purported voter fraud by "actively working with the national committee, the official party, and campaign lawyers to monitor precincts around the country." These efforts are directly funded by the RNC through its joint fundraising committee established "to elect Republicans up and down the ballot," *see* Certification of Angelo J. Genova, Esq. (hereinafter "Genova Cert.") at Ex. 1 (*RNC & Trump Campaign Announce Agreements*, GOP.com, May 17, 2016), and specifically to fund the Trump campaign, *see* Genova Cert. at Ex. 2 (Statement of Organization, Trump Make America Great Again Committee, FEC-1074541, May 25, 2016). The RNC's support of Trump's efforts to recruit "watchers" who are intended to intimidate voters at their polling places violates this Court's Consent Decree as modified in 2009, which explicitly forbid the RNC from engaging in so-called "ballot security" measures directly, indirectly, or through its agents or employees. *See* Genova Cert. at Ex. 20 & 22 (1982 and 2009 Consent Decrees) The RNC's conduct also violates the Consent Decree under well settled law prohibiting defendants from evading court orders by acting in concert with third parties. *See, e.g.*, *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990) ("The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others.").

Accordingly, Plaintiff Democratic National Committee ("DNC") respectfully moves for an order directing Defendant RNC to show cause why the RNC should not be held in civil

contempt for violating the Consent Decree entered in this action, as modified, and why sanctions should not issue as a result of those violations.

Plaintiff also respectfully requests expedited treatment of this matter. The election will take place in less than two weeks, and early voting is already underway in many states—including New Jersey, where early voting began on September 24. Meanwhile, Defendants' ongoing violation of this Court's Consent Decree will continue unabated until this Court acts.

## FACTUAL AND PROCEDURAL BACKGROUND

The Consent Decree arose from the RNC's efforts in the early 1980s to interrogate and intimidate registered voters in predominantly African-American precincts in New Jersey. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196-97 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 1471 (2013). Pursuant to the Consent Decree, the RNC agreed, among other things, to refrain from organizing or directing similar efforts to investigate the qualification of voters at their polling places. Genova Cert. at Ex. 20 (1982 Consent Decree). Specifically, the Decree prohibits the RNC from "undertaking any ballot security activities" where "a purpose or significant effect of such activities is to deter qualified voters from voting." *Id.* "[T]he conduct of [ballot security] activities disproportionately in or directed toward districts that have a substantial proportion of racial or ethnic populations shall be considered relevant evidence of such a . . . purpose." *Id.*

That Decree was modified in 1987, when the DNC and RNC agreed to a stipulation arising from the DNC's suit over RNC activities in Louisiana. The stipulation was replaced with a Consent Decree entered on July 27, 1987, which prohibited the RNC from engaging in any kind of "ballot security program" other than "normal poll watch functions." Genova Cert. at Ex. 21 (1987 Consent

Decree). In 2009, following litigation in which the RNC sought to have the Consent Decree vacated, the Court ordered a modification of the Consent Decree at the DNC's suggestion, clarifying who could enforce the Decree and the definitions of its crucial terms. Genova Cert. at Ex. 22 (2009 Consent Decree). As the Third Circuit recognized, the Decree as modified retains "its central purpose [of] preventing the intimidation and suppression of minority voters." *Democratic Nat'l Comm.*, 673 F.3d at 203.

Relevant here, the 2009 Consent Decree defined "ballot security" to include:

> any program aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot. Such programs include, but are not limited to, the compilation over voter challenge lists by use of mailings or reviewing databases maintained by state agencies such as motor vehicle records, social security records, change of address forms, and voter lists assembled pursuant to the [Help America Vote Act of 2002]; *the use of challengers to confront potential voters and verify their eligibility at the polls on either Election Day or a day on which they may take advantage of state early voting procedures*; the recording by photographic or other means of voter likenesses or vehicles at any polling place, and the distribution of literature informing individuals at or near a polling place that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

Genova Cert. at Ex. 22 (2009 Consent Decree) (emphasis added). The Decree also binds the RNC's "agents, servants, and employees," regardless of whether they are "'acting directly or indirectly through other party committees.'" *Democratic Nat'l Comm.*, 673 F.3d at 197 n.2 (quoting 1982 Consent Decree).

After this Court modified the Consent Decree in 2009, the RNC appealed, arguing that the Decree violated its First Amendment rights, and that this Court had abused its discretion in declining to vacate the decree. The Third Circuit affirmed, rejecting the RNC's arguments. *Democratic Nat'l Comm.*, 673 F.3d 192.

The 2009 Consent Decree remains in effect until December 1, 2017. If, before that date, the RNC is found "by a preponderance of the evidence" to have violated the terms of the Consent

4

Decree, the Decree "shall be extended for eight years from the date of that violation." Genova

Cert. at Ex. 22 (2009 Consent Decree).

## ARGUMENT

## I.     THE RNC HAS VIOLATED THE CONSENT DECREE

The RNC's collaboration with Trump and his campaign's efforts to police and intimidate

eligible voters violates the 2009 Consent Decree. A consent decree "has the characteristics of a

contract," and thus "contract principles govern its construction." *McDowell v. Phila. Hous. Auth.*,

423 F.3d 233, 238 (3d Cir. 2005). "One of these principles is that an unambiguous agreement

should be enforced according to its terms." *Id.*

Under the terms of the 2009 Consent Decree, the RNC, as well as its agents and employees

acting directly or indirectly on the RNC's behalf, are legally obligated to refrain from "engag[ing]

or assist[ing] in voter fraud prevention" that takes the form of "ballot security activities."

*Democratic Nat'l Comm.*, 673 F.3d at 196. Yet the RNC has collaborated with the Trump

campaign to organize and engage in prohibited poll monitoring activities, including, at a minimum,

"the use of challengers to confront potential voters and verify their eligibility at the polls on either

Election Day or a day on which they may take advantage of state early voting procedures." The

Court should therefore order the RNC to show cause why it should not be held in civil contempt

for violating the Consent Decree, and issue sanctions to address the violations.

### A.  Trump Is Directing An Organized Campaign Of Voter Intimidation

Donald Trump and his campaign staff are actively organizing Trump's supporters to

engage in voter intimidation via aggressive poll monitoring in predominantly minority

communities. Trump has repeatedly made racially charged exhortations for his supporters to watch

voters in "certain sections" of states like Pennsylvania. In August, Trump declared that the election

was likely to be rigged, and that his supporters should "go around and watch other polling areas and make sure it's fine." While speaking in Ambridge, Pennsylvania, on October 11, Trump warned that it is "[s]o important that you watch other communities"—which, he clarified, meant Philadelphia—"because we don't want this election stolen from us. . . . And everybody knows what I'm talking about." Genova Cert. at Ex. 3 (Philip Bump, *Donald Trump Warns That 'Other Communities' Are Poised to Steal the Election*, Wash. Post, Oct. 11, 2016). Trump was referring in particular to stories he had publicized earlier in the summer of precincts around Philadelphia where Mitt Romney had received no votes in 2012. *Id.* "The places where that happened were, in the words of the Philadelphia Inquirer 'clustered in almost exclusively black sections of West and North Philadelphia.'" *Id.* Trump has made similar requests of his supporters in Ohio, Michigan and Colorado. *See* Genova Cert. at Ex. 4 (Trip Gabriel, *Donald Trump's Call to Monitor Polls Raises Fears of Intimidation*, N.Y. Times, Oct. 18, 2016); Genova Cert. at Ex. 5 (John Santucci, *Trump Repeats Call for Supporters to Watch Polling Places, Asks Obama Not to Pardon Clinton*, ABC News, Sept. 30, 2016, 7:39 P.M.); Genova Cert. at Ex. 6 (Jenna Johnson, *Donald Trump to African American and Hispanic Voters: 'What Do You Have to Lose?'*, Wash. Post, Aug. 22, 2016). Rudy Giuliani, a close Trump adviser and the former Republican Mayor of New York City, explicitly expressed in a nationally televised interview that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats," like "Philadelphia and Chicago." Genova Cert. at Ex. 23 (Eric Bradner, *Giuliani on Rigged Election: 'Dead People Generally Vote for Democrats'*, CNN, Oct. 16, 2016). In the midst of these comments, Trump rolled out a form on his campaign website for supporters to sign up to be "Trump Election Observers" and thereby "Stop Crooked Hillary From Rigging This Election!" *See* Genova Cert. at Ex. 7 ("Volunteer to be a Trump Election Observer," DonaldJTrump.com.).

Roger Stone, one of Trump's top advisors, has amplified Trump's message. Stone was a key advisor to the 1981 campaign of former New Jersey Governor Thomas Kean, in which a "ballot security" force wearing black armbands engaged in widespread voter intimidation in Newark, Camden, Paterson and other minority neighborhoods in the State, leading to this very action and the Consent Decree that Stone is helping to violate today. *See* Genova Cert. at Ex. 8 (Jeffrey Toobin, *The Dirty Trickster*, The New Yorker, June 2, 2008). Stone is currently running a website called "StopTheSteal.org" that is actively signing up Trump supporters to "volunteer" to fight "voter fraud." #StopTheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence. On October 23, 2016, Stone sent out a (now deleted) message via his Twitter feed deliberately designed to mislead Democratic voters by representing—using Secretary Hillary Clinton's likeness and logo—that supporters can "VOTE the NEW way on Tues. Nov 8th" by texting "HILLARY to 8888," after which voters would apparently "receive official confirmation." *See* Declaration of Marc E. Elias, Esq. at Ex. 1. Stone is also using social media to promote the common plan that Trump supporters—and particularly those who have agreed to engage in vigilante "ballot security" efforts—wear red shirts on Election Day. Further Stone is actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities with large minority populations. Genova Cert. at Ex. 9 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016). This "exit polling" serves no legitimate purpose: Stone does not run a polling operation. Rather, the plain purpose of this plan is to intimidate minority voters.

The notion of widespread voter fraud in modern American politics is itself a fraud. Every attempt to verify the presence of voter fraud has proven fruitless. *See generally* Lorraine C.

7

Minnite, The Myth of Voter Fraud (2010) (concluding that the notion of widespread voter fraud is a "myth"). One 2014 study found 31 credible incidents of in-person voter fraud over a 14-year period—*out of 1 billion ballots cast*. Genova Cert. at Ex. 28 (*A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, Wash. Post, Aug. 6, 2014).[1] Those statistics help explain why court after court has concluded that widespread voter fraud does not exist. For example, a federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent." Genova Cert. at Ex. 26 (Order Granting Plaintiffs' Motion for Preliminary Injunction, *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH) (D.N.D. Aug. 1, 2016)). A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst. v. Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222 at *2 (W.D. Wis. July 29, 2016).[2] Voter intimidation efforts aimed at suppressing minority voters have frequently been "ostensibly aimed at combatting voter fraud." *Ne. Ohio Coal. for the Homeless v.*

---

[1] In its opinion accompanying the 2009 modifications to the Consent Decree, this Court relied on testimony from Dr. Minnite and Mr. Levitt for its "conclusion that in-person [voter] fraud is rare." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 607-08 (D.N.J. 2009) (Debevoise, J.).

[2] *See also Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014) ("The parties are not aware of any incidents of in-person voter fraud in Pennsylvania and do not have direct personal knowledge of in person voter fraud elsewhere[.]"); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis.) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15CV357-HEH, 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

*Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016). As Judge Debevoise held in rejecting the RNC's 2009 request to vacate the Consent Decree, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013).[3]

The fact that widespread voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the RNC, Trump, and their surrogates such as Stone—from believing it is real. As a recent Washington Post-ABC poll showed, nearly 70% of Trump's supporters (but less than half of all voters) believe that voter fraud happens "very often" or "somewhat often." This widespread belief, despite a total lack of evidence to support it, has been stoked for decades by certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right" media ecosystem, such as the Breitbart website that was run until recently by Trump Campaign CEO Steve Bannon. In 2012, RNC Chairman Reince Priebus claimed that GOP candidates "need to do a [percentage] point or two better" than they otherwise would in order to overcome voter fraud. Genova Cert. at Ex. 29 (*RNC Chairman Priebus Alleges Rampant Voter Fraud*, May 30, 2012). In the last few months alone, Breitbart has run dozens of articles on supposed voter fraud, with ominous headlines about "Obama forces" and "Soros-backed" cover-ups, and Stone has appeared on "Breitbart radio" to echo Trump's fearmongering about a stolen election. Stone's "StoptheSteal" campaign has fanned these flames by widely distributing via social media and elsewhere the false claims that election will be "rigged" by

---

[3] *See also Veasey*, 830 F.3d at 237 ("[T]he record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity.").

"illegals." *See* Genova Cert. at Ex. 10 ("StoptheSteal" home page, last accessed Oct. 22, 2016)

(claiming that "the Democratic National Committee" and "the Clintons" "intend to flood the polls

with illegals" in "[l]iberal enclaves," and encouraging Trump supporters to "monitor for voting

fraud" in "targeted localities"). And, appearing on Face the Nation on October 23, 2016, RNC

Chairman Reince Priebus declared that voter fraud "is real," and that what Trump is doing is

"trying to also tell his folks to watch out for this fraud that might occur." Genova Cert. at Ex. 24

(*Face the Nation Transcript October 23, 2016: Priebus, Axelrod*).

Trump's supporters are responding. The *Boston Globe* has reported on Trump supporters

who are planning to engage in unlawful voter intimidation, and who understand themselves to be

doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb,
> a 61-year-old carpenter from Fairfield, Ohio. "I'll look for . . . well, it's called racial
> profiling. Mexicans. Syrians. People who can't speak American," he said. "I'm
> going to go right up behind them. I'll do everything legally. I want to see if they
> are accountable. I'm not going to do anything illegal. I'm going to make them a
> little bit nervous."

Genova Cert. at Ex. 11 (Matt Viser & Tracy Jan, *Warnings of Conspiracy Stoke Anger Among

Trump Faithful*, Bos. Globe, Oct. 15, 2016). Notwithstanding Mr. Webb's pledge not to do

"anything illegal," the conduct in which he plans to engage on Trump's behalf—deliberately

targeting minority voters via "racial profiling" in order to "make them a little bit nervous" while

they are attempting to vote—unequivocally violates federal law. *See, e.g.*, 52 U.S.C. § 10307(b)

(Section 11(b) of the Voting Rights Act of 1965). Similarly, Harry Miller, purportedly of Palm

Beach, Florida, tweeted in response to Trump's calls for election observers that he would be

"wear'n red at polls... We gonna be watch'n fer shenanigans...& haul ya away.." Genova Cert. at

Ex. 12 (@jackbgoode1, Twitter.com Aug. 19, 2016, 7:43 P.M.). The tweet included a picture of a

pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by

American flags. *Id.* Miller has over 20,000 Twitter followers and tweets almost exclusively about Trump, Secretary Clinton, and racially charged political themes such as deporting "Muzzys." A typical tweet asserts that "Our Muzzy Commander in Chief" is "shov'n Sharia Law down our throats…. & Crooked Hiltley follow'n his every move…" Genova Cert. at Ex. 13 (@jackbgoode1, Twitter.com, July 14, 2016, 9:14 A.M.).

### B.  The RNC Is Coordinating With The Trump Campaign

The RNC has coordinated with the Trump campaign in its unlawful "ballot security" efforts. Trump's running mate, Governor Mike Pence, has publicly confirmed that **both** the RNC and the Trump campaign are working directly with state Republican parties on so-called "ballot security" measures. At an August 3, 2016 town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Hillary Clinton from "steal[ing] this election." Pence responded:

> I will tell you that the Trump campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . .  We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America.

*8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 26, 2016).

On May 25, 2016, the RNC created a joint fundraising committee with the Trump campaign specifically to fund the Trump campaign and its operations, and to elect Republicans up and down the ballot. *See* Genova Cert. at Ex. 2 (Statement of Organization, Trump Make America Great Again Committee, FEC-1074541, May 25, 2016). On October 10, 2016, well after Trump had called upon his supporters to volunteer to be poll watchers and monitors in "other

11

communities," RNC Chairman Reince Priebus explained that the RNC and Trump campaign are completely coordinated: "I want to make it very clear that the RNC is in full coordination with the Trump campaign and we have a great relationship with them," and "we remain very much involved and together in all levels in making these decisions of how best to run the operation across the country." Genova Cert. at Ex. 14 (Leigh Ann Caldwell, *Lines Drawn: Reince Priebus Says RNC Will Stand By Trump*, NBC News, Oct. 11, 2016, 6:00 P.M.).

Last week, Trump's campaign manager Kellyanne Conway confirmed to Washington Post Reporter Robert Costa that the campaign's coordination with the RNC continues to extend to poll monitoring efforts. According to Conway, the Trump campaign is "actively working with ***the national committee, the official party, and campaign lawyers*** to monitor precincts around the country." Genova Cert. at Ex. 15 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016) (emphasis added); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com, Oct. 20, 2016, http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688 (last accessed Oct. 26, 2016). And just days ago, the Trump campaign distributed talking points to Republican Party surrogates directing that they "[m]ust make points on rigged system," and encouraging them to claim there has been "an increase in unlawful voting by illegal immigrants." Genova Cert. at Ex. 16 (Jonathan Swan, *Trump Campaign Encouraging Surrogates To Double Down On Ballot Fraud*, TheHill, Oct. 21, 2016).

The RNC has commingled its staff and resources with the Trump campaign in a manner that makes it impossible to separate one's allocated resources from the other's in the field. The RNC has more than one thousand paid employees spread throughout more than one hundred field offices in states including Colorado, Florida, Iowa, Michigan, Nevada, New Hampshire, North

Carolina, Ohio, Pennsylvania, Virginia and Wisconsin. The purpose of these employees and offices is to "send[ ] Donald Trump to the White House and solidify[ ] [Republican] majorities in Congress," as RNC Chairman Reince Priebus said in a September press release. Genova Cert. at Ex. 25 (*RNC Announces 392 New Field Staff*, GOP.com, Sept. 2, 2016). And while the RNC has attempted to distance itself from Trump's "ballot security" initiatives in recent public statements, those words cannot and do not separate RNC resources and personnel from the Trump campaign's efforts to organize poll watchers or other ballot security initiatives, nor do the RNC's empty words retract the violations that have already occurred and will continue to occur out of public sight.

Apart from its direct actions, the RNC has delegated substantial "ballot security" initiatives to its agents who simultaneously hold positions in various state parties in an effort to attempt to circumvent this Court's Consent Decree. For example, Rob Gleason, a member of the RNC and therefore the RNC's agent, who is also the chair of the Pennsylvania Republican Party, recently remarked that he was "glad to hear" that Trump had directed his supporters to "[g]o down to certain areas [in Pennsylvania] and watch and study" the voters there. Genova Cert. at Ex. 17 (David Weigel, *Trump Fires up Recruitment of Poll Watchers as He Warns of Election 'Cheating,'* Wash. Post, Aug. 13, 2016). Gleason responded to Trump's statements by initiating additional measures to recruit poll watchers in Philadelphia. Genova Cert. at Ex. 18 (David Weigel, *Pennsylvania Republicans Sue to Allow Poll Watchers to Cross County Lines*, Oct. 22, 2016). On October 22, the Pennsylvania Republican Party went further by filing a federal lawsuit to invalidate Pennsylvania state election law requiring poll watchers to be registered voters in the same county at which they monitor voters. *Id.* The express purpose of the lawsuit is to permit Trump's supporters from anywhere in the State to watch voters in Philadelphia—precisely as Trump directed in several rallies in Pennsylvania. In another example, on September 30, Trump appeared

13

at rally in Michigan and instructed his supporters to "go pick some other place and go sit there with your friends and make sure it's on the up and up. Because you know what, [voter fraud is] a big, big problem in this country and nobody wants to talk about it." Genova Cert. at Ex. 5 (John Santucci, *Trump Repeats Call for Supporters to Watch Polling Places*, ABCNews, Sep. 30, 2016). Just ten days later, the chair of the Michigan Republican Party, who is also a member of the RNC and therefore its agent, announced a "massive statewide anti-voter fraud effort" to prevent Hillary Clinton from "stealing" the election from Trump. Genova Cert. at Ex. 19 (Jonathan Oosting, *Michigan GOP On Guard Against 'Massive' Voter Fraud*, Detroit News, Oct. 19, 2016). In other words, RNC agents in at least two closely contested states have responded directly to Trump's public comments by directing resources and personnel to Trump-focused ballot security initiatives.

The collaboration between the Trump campaign and the Republican Party on ballot security activities extends to the commingling of assets, property, and personnel.  For example, on October 24, the Communications Director for the Ohio Republican Party reported that Trump campaign staffers "moved into Ohio GOP headquarters last week to help recruit and certify hundreds of Republican observers" and that the chair of the Ohio Republican Party "met with Attorneys for Trump, who will be mobilized for Election Day." Genova Cert. at Ex. 27 (Darrel Rowland et al., *Trump Backers Walking Shaky Legal Line In Monitoring Voters*, Columbus Dispatch, Oct. 24, 2016).

By acting in concert with Trump, including—as Kellyanne Conway confirmed to the Washington Post—collaborating on efforts to "monitor precincts around the country," the RNC has violated the 2009 Consent Decree's order that the RNC refrain from "the use of challengers to confront potential voters and verify their eligibility at the polls on either Election Day or a day on which they may take advantage of state early voting procedures," as well as the 1982 Consent

Decree's command that the RNC not undertake "any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting." Genova Cert. at Ex. 20 (1982 Consent Decree). Under the plain terms of the Consent Decree, the focus of RNC ballot security measures on areas in which a high proportion of minority voters live—or, as Trump likes to describe it, a focus on "certain areas"—is "relevant evidence of" a purpose to suppress minority votes that the Consent Decree forbids. *Id.* But Plaintiffs do not even need to prove that much in order establish a violation: the Consent Decree also prohibits the RNC and its collaborators from undertaking "ballot security" measures that have the *effect* of "deter[ring] qualified voters from voting." *Id.* The violation of the order is so clear that Benjamin Ginsberg, who served as National Counsel to Mitt Romney's Presidential Campaigns in 2008 and 2012, and is now a partner at the law firm serving as outside counsel to Trump's campaign, effectively admitted in a televised interview that the RNC's coordination with Trump constitutes a violation of the consent decree. (*Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com, Oct. 20, 2016, http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688 (last accessed Oct. 26, 2016).

Finally, the RNC has violated the Consent Decree's "preclearance" requirement, as modified by the 2009 Order of this Court. The 2009 Consent Decree provides that "[t]he RNC shall be required to notify the DNC and this Court of any proposed ballot security measures at least 10 days before instituting such measures so that this Court may determine their legality and whether they comply with the other terms of the Consent Decree." Genova Cert. at Ex. 22 (2009 Consent Decree). As detailed above, the RNC has been engaging in "ballot security measures" in

15

coordination with the Trump campaign and state Republican parties for some time, without notifying either this Court or the DNC. And although the RNC attempted to challenge this preclearance requirement, the Third Circuit affirmed it in *Democratic Nat'l Comm.*, 673 F.3d 192. The Court should enforce the preclearance requirement here, at minimum by holding that the RNC has violated that requirement and by extending the Consent Decree for another eight years according to its terms.

**II.    THE COURT SHOULD ORDER THE RNC TO SHOW CAUSE WHY IT SHOULD NOT BE HELD IN CONTEMPT AND SANCTIONED TO ENFORCE COMPLIANCE WITH THE CONSENT DECREE**

    **A.    The Court Should Order The RNC To Show Cause Why It Should Not Be Held In Contempt For Violating The Consent Decree**

The RNC is working in active concert with Trump, the Trump campaign, and Stone to intimidate and harass minority voters in violation of this Court's Consent Decree. The Court should use its inherent contempt powers to remedy those violations, and enforce future compliance with the Consent Decree, with sanctions.

To prove contempt, a court must find that "(1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995). These "*Harris*" factors must be proved by clear and convincing evidence. *John T. ex rel. Paul T. v. Delaware. Cty. Intermediate Unit*, 318 F.3d 545, 554 (3d Cir. 2003).

The *Harris* factors are clearly met with respect to the RNC's conduct. The RNC had knowledge of this Court's valid Consent Decree given that the RNC has been a party to every stage of this litigation, including the most recent modification to the Consent Decree, which the RNC unsuccessfully appealed to the Third Circuit. *See Democratic Nat'l Comm.*, 673 F.3d 192. And, as described in full above, the RNC has violated multiple provisions of the Consent Decree, including

the express prohibitions against engaging in various "ballot security" measures, as well as the Consent Decree's preclearance requirement. The violations are so plain that the RNC's own former counsel effectively admitted that the RNC had violated the terms of the Consent Decree in a nationally televised interview. *See supra* at 15.

The RNC's conduct also violates the Consent Decree because, under well settled law, a consent decree defendant may not sidestep the reach of court orders by acting in concert with third parties to engage in conduct that is prohibited by the terms of the order. *See, e.g.*, *Roe v. Operation Rescue*, 919 F.2d at 871 ("The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others."); *see also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) ("[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."). Even if RNC staff are not physically engaging in poll monitoring and voter challenge activities themselves, the RNC has violated the Consent Decree through its coordination, encouragement, and support of such activities by the third parties described above.

**B.** **The Court Should Enforce The Consent Decree With Sanctions Designed To Provide Plaintiff With Full Remedial Relief And To Ensure Prospective Compliance**

This Court is empowered with substantial authority and discretion to enforce the terms of its orders. As the Supreme Court has explained, "[i]n selecting means to enforce [a] consent [decree]," district courts are "entitled to rely on the axiom that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (internal quotation marks omitted). "District courts hearing civil

17

contempt proceedings are afforded broad discretion to fashion a sanction that will achieve full remedial relief." *John T.*, 318 F.3d at 554.

The Decree is intended to prevent the RNC from interfering with voters' constitutional rights to exercise the franchise. The purpose of the Decree would be eviscerated if the RNC were permitted to engage in precisely the same kinds of voter intimidation efforts for which it was previously sued, by funding and supporting campaign or state party entities to engage in the conduct that the RNC itself is prohibited from doing. Moreover, unless relief is granted quickly, the intent of the Consent Decree will be frustrated, as countless voters might be subjected to unlawful intimidation as a result of the RNC's continued support of ballot security activities.

In order to achieve "full remedial relief," this Court should exercise its discretion to sanction the RNC as follows:

- The RNC should be prohibited from allocating any money to fund, reimburse expenses for, or provide support for Trump's voter intimidation program or his supporters' plans to "watch" "certain sections" and "other communities";

- The RNC should be prohibited from allocating any money to fund, reimburse expenses for, or provide support for any state political organization's "ballot security" or "ballot integrity" measures;

- The RNC should be directed to seek reimbursement from the Trump Campaign and all state political organizations for any funds previously allocated to fund any prohibited "ballot security" measures, including staff salaries, overhead expenses, training costs and expenses, digital resource expenditures, or any other resources used in any way to promote or facilitate the Trump campaign or state political organization "ballot security" or "integrity" endeavors;

18

- The RNC should be required to distribute the Consent Decree and the relief awarded via this action to every RNC field office with instructions that no person employed by or affiliated with the RNC shall participate in any "ballot security" measures;

- The RNC should be required to report to the Court within 24 hours upon learning of any efforts by RNC agents, employees, or affiliates, including any agent or employee of the RNC who is simultaneously employed by a state political organization or the Trump campaign, to engage in prohibited "ballot security" measures.

Finally, whatever the nature of the Court's remedial relief, in order to enforce compliance with the Consent Decree on a prospective basis, the Court should exercise its discretion to fashion appropriate "coercive" sanctions directed at RNC to continue until they are in full compliance with the Consent Decree and this Court's additional remedial orders. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO*, 545 F.2d 1336, 1344 (3d Cir. 1976).

Nothing short of the requested measures will provide Plaintiff with the "full remedial relief" to which it is entitled. *John T.*, 318 F.3d at 554. At a minimum, this Court must order the RNC to unwind the violations of the Consent Decree in which it has already participated, and to take affirmative precautions to ensure that its supporters and affiliates do not continue to engage in such violations. *See* Docket Entry No. 25 (Nov. 1, 2004) (enjoining the RNC from violating of the Consent Decree, and ordering the RNC to instruct its members to refrain from engaging in the violation in question).

## III.   THE CONSENT DECREE SHOULD BE EXTENDED FOR ANOTHER EIGHT YEARS FROM THE DATE OF THIS VIOLATION

By its terms, the 2009 Consent Decree is set to expire on December 1, 2017. But, if "during the period between" December 1, 2009, and December 1, 2017, the DNC shows "by a

19

preponderance of the evidence that the RNC has violated the terms of the Consent Decree, the Decree *shall* be extended for eight years from the date of that violation." Genova Cert. at Ex. 22 (2009 Consent Decree) (emphasis added). That showing has now been made. Accordingly, Plaintiff DNC respectfully asks that this Court enter an order extending the 2009 Consent Decree for another eight years.

When it declined the RNC's request to vacate the Consent Decree, this Court "concluded, with ample record support, that the purpose of the Decree had not yet been fulfilled." *Democratic Nat'l Comm.*, 673 F.3d at 219. As the RNC's actions during this election cycle have demonstrated, that remains true. The Court should apply the unambiguous terms of the 2009 Consent Decree and extend the Decree another eight years from the date of this violation.

## IV.    PRELIMINARY INJUNCTIVE RELIEF SHOULD ISSUE

### A.    This Court Should Enjoin The RNC From Engaging In Voter Intimidation In Concert With The Trump Campaign And Its Associates

In light of the RNC's collaboration with the Trump campaign's voter intimidation efforts, as well as the pressing need to prevent voter intimidation from interfering with the right to vote for countless voters preparing to vote (or already voting) in the November 8 election, preliminary injunctive relief should issue. This Court should enter a preliminary injunction enjoining the RNC from engaging in voter intimidation and other forms of "ballot security" measures in concert with the Trump campaign and its associates by requiring the RNC to abide by the limitations described above. *See supra* at 18-19.

The "familiar" standards for granting a preliminary injunction require the party seeking relief to show "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to

20

the nonmoving party; and (4) that the public interest favors such relief." *Arrowpoint Capital Corp. v. Arrowpoint Assett Mgmt., LLC*, 793 F.3d 313, 318-19 (3d Cir. 2015).

Plaintiff DNC is likely to succeed on the merits. Defendant RNC has violated the clear terms of the Consent Decree by providing material support to, and acting in concert with, Donald Trump's efforts at ballot-box vigilantism and voter intimidation. The legal merits of these claims warrant an injunction directed at the RNC's participation in the Trump campaign's voter intimidation efforts in order to provide Plaintiff DNC with full remedial relief for the RNC's violation.

If Plaintiff DNC's claims on the merits are correct, "it clearly follows that denying . . . preliminary injunctive relief will cause [the DNC] to be irreparably harmed." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997). Where voting rights are at threatened, irreparably injury can result because an "infringement" on those rights "cannot be alleviated after the election." *Id.* In this case, with 13 days until the November 8 election, the more time Defendants are allowed to recruit for and build their voter intimidation program, the greater likelihood of irreparable harm to Plaintiffs and minority voters on Election Day. *See United States v. Berks Cty.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("The impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy, following trial.").

If an injunction is granted the only harm the RNC will suffer is a restriction on its ability to engage in prohibited conduct. The RNC has no legal right to engage in conduct that the Consent Decree expressly forbids. Moreover, every state has robust legal processes by which election officials ensure that only eligible voters cast ballots on Election Day—restricting Defendant's efforts to engage in "ballot security" conduct will not harm those processes, which exist separate

and independent from any candidate or political party. And the purported concern animating Defendant's efforts—conspiracy theories of "rigged" elections and widespread voter fraud—are at best unsubstantiated. *See supra*, at 8-9. On the other side of the ledger are Plaintiffs' rights under the Consent Decree, as well as the constitutional rights of all Americans to cast their ballots without fear of intimidation or harassment. Indeed, in some cases the injunction Plaintiff seeks may be the deciding factor as to whether certain voters are able to cast a ballot at all. This is therefore a case of a real, impending harm balanced against an imaginary one, and the balance of harms clearly favors granting the injunction.

Finally, the public interest also favors granting the injunction. "[U]ndoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). Granting an injunction in this case would serve the public interest "by reinforcing the core principles of our democracy," and ensuring that "all citizens may participate equally in the electoral process." *Berks Cty.*, 250 F. Supp. 2d at 541. "In cases such as the present one, where the continued presence of [barriers to equal participation in the political process] is strongly evident, the public interest commands all appropriate relief necessary to effect the immediate and complete removal" of those barriers. *Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984).

## CONCLUSION

Defendants have violated the terms of this Court's Order and Decree. Accordingly, and for the reasons set forth above, the Court should issue an order requiring the RNC to show cause why it should not be held in civil contempt, and why a preliminary injunction should not issue. Upon a finding that the RNC has violated the Consent Decree, this Court should issue an order extending the Consent Decree for another eight years, according to the terms of the Decree.

Respectfully submitted,


 /s/   Angelo J. Genova

Angelo J. Genova
Rajiv D. Parikh
**GENOVA BURNS LLC**
494 Broad Street
Newark, NJ 07102
(973) 533-0777
agenova@genovaburns.com
rparikh@genovaburns.com

Marc E. Elias (*pro hac vice admission pending*)
**PERKINS COIE LLP**
13th Street, NW, Suite 600
Washington, DC 20005
melias@perkinscoie.com

Joshua L. Kaul (*pro hac vice admission pending*)
**PERKINS COIE LLP**
1 East Main Street, Suite 201
Madison, Wisconsin 53703
jkaul@perkinscoie.com

*Attorneys for Plaintiff,*
*Democratic National Committee*


Dated: October 26, 2016