# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DEMOCRATIC | ) | |
| NATIONAL COMMITTEE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 81-3876 |
| | ) | |
| REPUBLICAN | ) | |
| NATIONAL COMMITTEE, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## THE REPUBLICAN NATIONAL COMMITTEE'S MEMORANDUM
## IN OPPOSITION TO ORDER TO SHOW CAUSE AND
## REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

Mark D. Sheridan
SQUIRE PATTON BOGGS (US) LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Newark, New Jersey  07102
Telephone: (973) 848-5681
Email: mark.sheridan@squirepb.com

Bobby R. Burchfield
Matthew M. Leland
KING & SPALDING LLP
1700 Pennsylvania Ave, N.W.
Suite 200
Washington, D.C.  20006
Telephone: (202) 626-5524
Email: bburchfield@kslaw.com

*Counsel for the Republican National Committee*

Dated: October 31, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................**Error! Bookmark not defined.**

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT .......................................................................................................................9

I.      THE RNC HAS COMPLIED FULLY WITH THE CONSENT DECREE. .......................9

II.     THE DNC HAS SUBMITTED NO PROBATIVE EVIDENCE OF ANY
        CONSENT DECREE VIOLATION..................................................................................14

        A.      The Trump Campaign's Activities Are Not Attributable to the RNC. .................15

        B.      The Undisputed Probative Evidence Rebuts Any Suggestion that the RNC
                Has Violated the Consent Decree. .......................................................................17

III.    NO RELIEF IS APPROPRIATE HERE. ........................................................................23

CONCLUSION...................................................................................................................27

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ........................................................................................................ 25

*AT&T v. Winback & Conserve Program, Inc.*,
   42 F.3d 1421 (3d Cir. 1994) .......................................................................................... 17

*Aviation Enters., Inc. v. Orr*,
   716 F.2d 1403 (D.C. Cir. 1983) ...................................................................................... 5

*Cal. Artificial Stone Paving Co. v. Molitor*,
   113 U.S. 609 (1885) .................................................................................................. 8, 15

*Colorado Republican Fed. Campaign Comm. v. FEC*,
   518 U.S. 604 (1996) ...................................................................................................... 20

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   671 F. Supp. 2d 575 (D.N.J. 2009) .................................................................. 4, 6, 24, 25

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   673 F.3d 192 (3d Cir. 2012) .................................................................................... 4, 6, 9

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   543 U.S. 1304 (2004) ...................................................................................................... 5

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. 04-4146, 2004 U.S. App. LEXIS 22689 (3d Cir. Nov. 2, 2004) ............................ 5

*Erie Telecomms., Inc. v. City of Erie, Pa.*,
   853 F.2d 1084 (3d Cir. 1988) .......................................................................................... 9

*Failla v. City of Passaic*,
   146 F.3d 149 (3d Cir. 1998) .......................................................................................... 18

*Fox v. Capitol Co.*,
   96 F.2d 684 (3d Cir. 1938) .............................................................................................. 8

*General Signal Corp. v. Donallco, Inc.*,
   787 F.2d 1376 (9th Cir. 1986) ..................................................................................... 8, 9

*Graden v. Conexant Sys. Inc.*,
   496 F.3d 291 (3d Cir. 2007) .......................................................................................... 17

*Harris v. City of Philadelphia*,
   47 F.3d 1311 (3d Cir. 1995) ..................................................................................... 9, 25

ii

*In re Sealed Case,*
   223 F.3d 775 (D.C. Cir. 2000) ............................................................... 20

*John T. ex rel. Paul T. v. Delaware Cty. Intermediate Unit,*
   318 F.3d 545 (3d Cir. 2003) .............................................................. 1, 8

*Keith v. Georgia Republican Party,*
   No. 1:14-CV-2159-CAP-AJB, Order at 41 (Dkt. No. 175) (Dec. 30, 2015) ........................... 20

*Kos Pharms., Inc. v. Andrx Corp.,*
   369 F.3d 700 (3d Cir. 2004) ................................................................... 8

*Littlejohn v. Bic Corp.,*
   851 F.2d 673 (3d Cir. 1988) ................................................................... 8

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ........................................................................... 8

*McConnell v. FEC,*
   540 U.S. 93 (2003) ........................................................................... 23

*McCutcheon v. Fed. Election Comm'n,*
   134 S. Ct. 1434 (2014) ........................................................... 16, 18, 19

*Menichini v. Grant,*
   995 F.2d 1224 (3d Cir. 1993) ............................................................... 17

*New York State Nat'l Org. for Women v. Terry,*
   886 F.2d 1339 (2d Cir. 1989) ................................................................. 9

*Oughton v. NLRB,*
   118 F.2d 486 (3d Cir. 1940) ................................................................. 20

*Quinter v. Volkswagen of Am.,*
   676 F.2d 969 (3d Cir. 1982) ................................................................... 7

*Republican Party of Minnesota v. Pauly,*
   63 F. Supp. 2d 1008 (D. Minn. 1999) ....................................................... 20

*Rivers v. Nat'l Assoc. of Ltr. Carriers,*
   No. 15-3070, 2016 WL 389983 (D.N.J. Feb. 1, 2016) ......................................... 17

*Salazar v. Buono,*
   559 U.S. 700 (2010) ......................................................................... 24

*United States v. Carbo,*
   572 F.3d 112 (3d Cir. 2009) ................................................................. 18

*United States v. Hamdi*,
   432 F.3d 115 (2d Cir. 2005) ........................................................................ 9

*United States v. Hernandez*,
   216 F.3d 1088, 2000 WL 797332 (10th Cir. 2000) .................................... 5

*United States v. ITT Cont'l Baking Co.*,
   420 U.S. 223 (1975).................................................................................... 8

*United States v. Munsingwear*,
   340 U.S. 36 (1950)...................................................................................... 5

**Statutes**

2 U.S.C. § 441a(8) ........................................................................................ 19

52 U.S.C.  § 30104 ........................................................................................ 17

52 U.S.C. § 30116(a) ..................................................................................... 16

**Rules**

Fed. R. Evid. 802 ........................................................................................... 15

Fed. R. Evid. 803 ........................................................................................... 15

**Regulations**

11 C.F.R. § 102.17(c)(5) ............................................................................... 19

11 C.F.R. § 109.21 ........................................................................................ 20

11 C.F.R. § 109.3 .......................................................................................... 17

**Other Authorities**

1982 Consent Decree ............................................................................... passim

1987 Consent Decree Order.............................................................................. 6

2009 Consent Decree Order ................................................................. 6, 7, 9, 19

Reno Berkely,
   *Sanders supporters in Washington allege voter suppression: wrong caucus forms sent?*,
   Mar. 24, 2016, available at http://www.inquisitr.com/2922631/sanders-supporters-in-
   washington-allege-voter-suppression-wrong-caucus-forms-sent/ ........................................... 26

Tony Brasunas,
   *Only Voter Suppression Can Stop Bernie Sanders*,

The Huffington Post, April 26, 2016, available at http://www.huffingtonpost.com/tony-
   brasunas/only-voter-suppression-can-stop-bernie-sanders_b_9780128.html............................ 25

Joint Stipulation of Dismissal,
   *Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   Civ. No. 81-3870, ECF Doc. 37 (Feb. 3, 2005)............................................................................. 5

Restatement (Second) of Torts.......................................................................................................... 18

11A C. Wright, A. Miller, & M. Kane,
   Federal Practice and Procedure (2d ed.1995) .............................................................................. 8

**INTRODUCTION AND**
**SUMMARY OF ARGUMENT**

For the third time in the last four presidential elections, the Democratic National

Committee ("DNC") has filed an election eve emergency motion claiming the Republican

National Committee ("RNC") is violating a 1982 Consent Decree (as modified).  In support, the

DNC relies almost exclusively on news accounts containing inadmissible double and even triple

hearsay.  None of those press accounts identifies any concrete steps by anyone covered by the

Consent Decree to engage in prohibited conduct and none of them identifies a single voter who

has been intimidated or deterred from voting by anyone, let alone the RNC. Even taken at face

value, these press accounts carry no weight, and are far from the "clear and convincing

evidence" the DNC concedes is necessary to prove civil contempt.  DNC Mem. at 16 (citing

*John T. ex rel. Paul T. v. Delaware Cty. Intermediate Unit*, 318 F.3d 545, 554 (3d Cir. 2003).)

Moreover, the DNC's request improperly attempts to extend the Consent Decree to

Donald J. Trump's presidential campaign, even though the Consent Decree states that "[i]t is

expressly understood and agreed that the RNC and the [New Jersey State Republican Committee

("RSC")] have no present right of control over other state party committees, county committees,

or other national, state and local political organizations of the same party, and their agents,

servants and employees." 1982 Consent Decree § 4. Further, the attached documentary evidence

and declarations from knowledgeable senior RNC personnel demonstrate that:

- the RNC and the presidential campaign of Donald J. Trump are legally and
  factually separate entities, and the Trump campaign is neither controlled by nor
  an agent of the RNC;

1

- the RNC Chief Counsel John R. Phillipe, Jr. makes compliance with the Consent Decree "a top priority" and provides regular, comprehensive and ongoing training to all RNC personnel to ensure compliance;

- even though state parties (other than the RSC) are not covered by the Consent Decree, the RNC informs state parties of the Consent Decree so that they are aware that the RNC cannot participate with them in their legitimate ballot security efforts;

- on August 13, 2016—ten weeks before the DNC's motion—Mr. Phillippe, on behalf of the RNC, expressly informed the Trump campaign, through its counsel, in no uncertain terms that the RNC will not participate in ballot security programs in any way, and has repeatedly instructed RNC personnel to avoid any involvement with the Trump campaign in ballot security efforts; and

- based on extensive ongoing due diligence, Mr. Phillippe and other knowledgeable personnel confirm that the RNC has in fact complied, and continues to comply, with the Decree.

This probative and admissible evidence presents a compelling case of the RNC's careful and full compliance with the Consent Decree, and fully refutes the DNC's allegations. No action by this Court is necessary or appropriate.

Accordingly, the DNC's motion should be denied for at least three reasons. *First*, the evidence shows that the RNC has complied with its obligations under the Consent Decree. The eight declarations submitted with this response, and their accompanying exhibits, establish that the RNC has provided extensive training and information to its members, employees, and contractors to ensure that they comply with the Consent Decree. And it has proactively alerted

other state political parties and candidate campaigns about the restrictions the Consent Decree imposes.  The RNC takes its obligations seriously and, as the declarations explain, is not aware of any conduct that would call into question its compliance with the Consent Decree's requirements.

*Second*,  the DNC's effort to hold the RNC responsible for statements made by the Trump campaign or certain state party officials reflects a misunderstanding of  the Consent Decree.  The only entities  bound by the Consent Decree are the RNC and the RSC.  *See* Consent Decree, 1982 Agreement, ¶ 4.  The DNC offers no probative evidence, much less clear and convincing evidence, to support its accusation that the RNC is acting in concert with the Trump campaign to engage in activities prohibited by the Consent Decree.  The unsubstantiated hearsay relied on by the DNC in many instances reflects nothing more than ordinary political activities — such as get-out-the-vote efforts, joint fundraising, and working with state and local election authorities to assure a smooth election — that are permitted under the Consent Decree.

*Third*, the Consent Decree was entered thirty-four years ago in response to concrete, specific allegations of election law violations.  It was never intended to regulate core political speech or to impose judicial sanctions based on unsubstantiated suspicions that something undesirable might be afoot.  In the absence of probative evidence that the RNC has engaged in some specific identifiable activities in violation of the Decree, the DNC's request for civil contempt, a preliminary injunction, and extension of the Decree must fail.

## BACKGROUND

As the Court recognized during the telephonic conference on October 27, 2016, the central issue in this dispute is whether the presidential campaign of Donald J. Trump (which is *not* covered by the Consent Decree) is coordinating with the RNC (which *is* covered by the Decree) in a way that violates the Consent Decree.  (10/27/16 Tr. at 12-13). Since entry of the

original Consent Decree in November 1982, it has excluded "other national . . . political organizations of the same party, and their agents, servants and employees." Consent Decree, 1982 Argument § 4.  The Consent Decree was  subsequently modified on July 27, 1987, and December 1, 2009, but this basic provision exempting candidates and their campaign has never changed.  On two occasions, in 1990 and in 2008, this Court has adhered to this limitation, and rejected the DNC's efforts to attribute the actions of other actors to the RNC.

The parties entered the Consent Decree, with no admission of wrong doing by the RNC, to settle a lawsuit brought by the DNC in 1981.  The DNC alleged that the RNC and RSC suppressed votes during the 1981 New Jersey state elections in violation of the Voting Rights Act of 1965 and the Constitution's Fourteenth and Fifteenth Amendments.  *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196 (3d Cir. 2012).

Over the years, the DNC has filed several actions claiming violations.  The last lawsuit to result in a binding judgment against the RNC occurred more than 25 years ago, in 1990, when the DNC claimed that the RNC participated in a program established by the North Carolina Republican Party.  Finding that the Consent Decree "applies only to the actions of the RNC" — and not to actions taken by other committees — the court concluded that the DNC had "failed to establish that the [RNC] conducted, participated in, or assisted in" the program.  *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 581 & n.1 (D.N.J. 2009).  In what the RNC believes was an unwarranted expansion of the Decree, however, the court found that the RNC should have given state party committees copies of the Consent Decree and provided them guidance on what practices are prohibited.  *See* 673 F.3d at 198.

Since then, this Court has considered other actions alleging violations.  In 2004, an intervenor, Ebony Malone, claimed that the RNC was preparing to participate in a ballot security

4

program established by the Ohio Republican Party.  Judge Debevoise ruled in the DNC's favor,

concluding that the RNC participated in devising and implementing the program, and entered a

preliminary injunction.  The RNC immediately appealed and sought a stay of the injunction.  On

Election Eve, a panel of  the Third Circuit declined to issue a stay, but on Election Day morning

the *en banc* Third Circuit vacated the panel's opinion and granted a stay. *Democratic National

Committee v. Republican National Committee*, No. 04-4146, 2004 U.S. App. LEXIS 22689 (3d

Cir. Nov. 2, 2004). On Election Day afternoon, then-Circuit Justice Souter denied plaintiffs'

petition to reinstate the injunction on the basis that Ms. Malone had – contrary to her allegations

of intimidation – already voted. *Democratic National Committee v. Republican National

Committee*, 543 U.S. 1304 (2004).  Following the election, the Third Circuit remanded  the case

as moot, with instructions for the District Court to consider whether further proceedings were

appropriate. On remand, the parties stipulated to dismiss the case as moot in accordance with

*United States v. Munsingwear*, 340 U.S. 36 (1950), rendering the prior ruling a legal nullity.  *See*

Joint Stipulation of Dismissal, *Democratic National Committee v. Republican National

Committee*, Civ. No. 81-3870, ECF Doc. 37 (Feb. 3, 2005) (citing *Munsingwear*).  *See also

United States v. Hernandez*, 216 F.3d 1088, 2000 WL 797332,at *4 (10th Cir. 2000) (ruling

vacated as moot is a nullity; citing cases); *Aviation Enters., Inc. v. Orr*, 716 F.2d 14 03, 1407-08

(D.C. Cir. 1983) (same).

Four years later, in 2008, the DNC claimed that the RNC was participating in a ballot

security program established by the New Mexico Republican Party.  Judge Debevoise rejected

that claim, recognizing that the RNC did not direct or participate in any ballot security program,

and that the Decree did not apply to the New Mexico Republican Party.  *See Democratic Nat'l

Comm.*, 671 F. Supp. 2d at 581-82.  In the wake of this decision, the RNC moved to vacate or

modify the Consent Decree, which resulted in certain modifications.  *See Democratic Nat'l Comm.*, 673 F.3d at 199-201.

The Consent Decree, as modified, contains three sets of provisions relevant to the issues before the Court.

*First*, the Consent Decree makes clear that it applies only to the RNC and the RSC, and to their agents, servants, and employees.  It does not apply or purport to apply to anyone else.  As a result, it does not restrict the activities of any political campaign, state committee (except the RSC), or other political organization.  Nor does it restrict the activities of individuals who do not work for the RNC.  Consent Decree, 1982 Agreement ¶ 4.

*Second*, the Consent Decree focuses on concerns relating to vote suppression that might result from actions taken to prevent vote fraud.  The Consent Decree thus recognizes (1) "the importance of encouraging citizens to register and vote and the importance of not hindering or discouraging qualified voters from exercising their right to vote," and (2) "the importance of neither using, nor appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud."  Consent Decree, 1987 Order, pp. 1-2.  The activities prohibited under the Consent Decree are supposed to serve these goals by prohibiting the RNC from participating in ballot security programs "aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot."  Consent Decree, 2009 Order, p. 2.

*Third*, the Consent Decree makes clear that it does not prevent the RNC from engaging in normal poll-watch functions or other ordinary political activities that do not involve ballot security.  The Consent Decree thus states that it does not apply to "any effort undertaken by the RNC, or by any state or local Republican entity with which it coordinates, to increase the number

6

of individuals that cast a ballot in any election, including registering voters … or encouraging

voters to visit the polls ('get out the vote') …." *Id.*, p. 3.

As explained in the attached declarations of Mr. Phillippe (RNC Chief Counsel) and

RNC National Political Director Chris Carr, the RNC has worked hard to comply with its

obligations under the Consent Decree.  Those efforts include:

- educating all of its members, employees, contractors, and volunteers about the Consent Decree's requirements through memoranda, webinars, and conferences as to the Decree's requirements, *see* Phillippe Decl. ¶¶ 16-24;

- directing all its members, employees, and relevant contractors and volunteers that they may not engage in conduct proscribed by the Consent Decree, *see id.* ¶ 22;

- reinforcing to its members that they may not use RNC resources or their RNC titles in connection with activities implicated by the Consent Decree, *see id.*; and

- informing the Trump campaign in no uncertain terms that the RNC and anyone acting on its behalf could not and would not be involved in any activities that could be considered a violation of the Decree, *see id.* ¶ 27.

After extensive due diligence, the RNC "is not aware of any RNC employee or contractor

involved in ballot security, voter fraud prevention, or other actions prohibited under the Consent

Decree."  Carr Decl. ¶ 7.

## STANDARD OF REVIEW

The DNC seeks civil contempt, a preliminary injunction, and extension of the Consent

Decree.  The DNC faces a "heavy burden" in seeking to hold the RNC in civil contempt.

*Quinter v. Volkswagen  of Am.*, 676 F.2d 969, 974 (3d Cir. 1982) (quoting *Fox v. Capitol Co.*, 96

F.2d 684, 686 (3d Cir. 1938)).  As the DNC concedes, *see* DNC Mem. 16, contempt must be

proven by "'clear and convincing' evidence."  *John T. ex rel. Paul T. v. Delaware Cty.*

*Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003).  Civil contempt  is a "severe remedy," *Cal.*

*Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885), and, as a result, it "should not

be granted where 'there is ground to doubt the wrongfulness of' the respondent's conduct."

*Littlejohn v. Bic Corp.*, 851 F.2d 673, 683-84 (3d Cir. 1988).  All "ambiguities must be resolved

in favor of the party charged with contempt."  *John T.*, 318 F.3d at 552.

 Likewise, the DNC must make a  "clear showing" of all the requisite elements to obtain a

preliminary injunction. As the Supreme Court wrote in *Mazurek v. Armstrong,* 520 U.S. 968, 972

(1997):

> And what is at issue here is not even a defendant's motion for summary judgment,
> but a plaintiff's motion for preliminary injunctive relief, as to which the
> requirement for substantial proof is much higher. "It frequently is observed that a
> preliminary injunction is an extraordinary and drastic remedy, one that should not
> be granted unless the movant, *by a clear showing,* carries the burden of
> persuasion." 11A C. Wright, A. Miller, & M. Kane, Federal Practice and
> Procedure § 2948, pp. 129–130 (2d ed.1995) (emphasis added; footnotes omitted).

To obtain a preliminary injunction, the DNC must show:  "(1) a likelihood of success on the

merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting

preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the

public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.

2004).

 Because consent decrees are "construed basically as contracts," *United States v. ITT

Cont'l Baking Co.*, 420 U.S. 223, 236 (1975), "substantial compliance with a Court order is a

defense to an action for civil contempt."  *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376,

1379 (9th Cir. 1986).  If a party "has taken 'all reasonable steps' to comply with the court order,

technical or inadvertent violations . . . will not support a finding of civil contempt."  *Id*. (citations

omitted).  As the Third Circuit has suggested, a contempt sanction is warranted only if the "party

did not diligently attempt to comply in a reasonable manner."  *Harris v. City of Philadelphia*, 47

8

F.3d 1311, 1324 (3d Cir. 1995) (describing holding in *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989)).

"Courts must be careful not to impose obligations upon the parties beyond those they have voluntarily assumed." *Harris*, 47 F.3d at 1350. In this case, the Court is required to construe the Consent Decree strictly for the additional reason that it has been interpreted as waiving the RNC's constitutional rights. *See Democratic Nat'l Comm.*, 673 F.3d at 206-07. Waivers of constitutional rights "are to be interpreted narrowly," *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (citation omitted), and must be established by "clear" and "compelling" evidence. *Erie Telecomms., Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1095 (3d Cir. 1988). The DNC's submission fails to prove any violation of the Decree, and is well short of the clear showing required for an injunction or for civil contempt.

**ARGUMENT**

**I.      THE RNC HAS COMPLIED FULLY WITH THE CONSENT DECREE.**

The RNC has scrupulously complied with its obligations under the Consent Decree. It has not organized, participated in, or supported any vote fraud prevention program or other ballot security activities. It has also ensured that all RNC agents, servants, and employees are aware of the Consent Decree, informed of the RNC's obligations thereunder, and instructed that they must personally comply with the Consent Decree at all times. Out of an abundance of caution, the RNC has restricted its activities even more than the Consent Decree requires, including by not participating in permissible poll-watching activities. *See* Consent Decree, 2009 Order, p. 3.

Eight months before the election — well before Donald Trump received the party's nomination — the RNC provided guidance and training to its members, employees, contractors, and volunteers concerning the Consent Decree. In March 2016, the RNC devoted a chapter of its updated 2016 "Legal Compliance Guide" to "Election Day Activities & the RNC Consent

9

Decree." Phillippe Decl., Ex. A-06. The guide stresses that "it is critical that all those affiliated with the Republican National Committee (RNC) in any way understand the restrictions imposed by the "Consent Decree." *Id.* In addition to describing the Consent Decree's provisions, the guide makes clear that "[a]ll RNC employees, officers, volunteers, and others acting on the RNC's behalf are subject to the restrictions of the Consent Decree." *Id.* ¶ 14. The RNC mailed this guidance to all department heads, state party executive directors, and state party chairs by early May. *Id.*

In conjunction with its updated Compliance Guide, the RNC Counsel's Office initiated an in-person legal compliance seminar for executive directors, state party legal counsel, and other staff, and certain RNC staff. As part of the March 2016 legal compliance seminar, RNC staff discussed with attendees the Consent Decree, its restrictions, and the information contained within the party's Compliance Guide. *See* Phillippe Decl. ¶ 6 & Ex. A-07. The seminar's presentation materials emphasized that "Caution is imperative" and that the RNC may not "engag[e] in any ballot security activities, including efforts to remedy or prevent vote fraud." *Id.*

Although the Consent Decree prohibits the RNC's participation in ballot security programs, it does not restrict the activities of state parties and Republican candidates, who may legally and appropriately engage in such actions. Prior Republican presidential campaigns have done so without any objection from the DNC. *See* Phillippe Decl. ¶ 35. Nevertheless, on August 19, 2016, after the Republican National Convention and after media reports that the Trump campaign intended to recruit election observers, the RNC Counsel's Office circulated a memorandum to all staff and independent contractors of the RNC's Political division and affiliates covered by the Consent Decree. That memorandum reiterated that "the RNC has no role and will not partake in" any voter fraud or poll watching activities and that "the RNC will

10

provide no resources (e.g., funding, office space, equipment) to be used for these activities." *Id.*
¶ 17  It unambiguously instructed: "Under no circumstances may any RNC employee or anyone
else acting on the RNC's behalf engage in the planning or conducting of these activities." *Id.*
All staff recipients, employees, contractors, and volunteers were directed that they "must strictly
avoid participation in any planning meeting, recruitment efforts, and other activities related to
[election day operations] and/or the prevention of voter fraud." *Id.*, Ex. A-09.

     The RNC also reminded the Trump campaign of the restrictions imposed on the RNC
under the Consent Decree.  In a letter to Donald F. McGahn II, the lead attorney for the Trump
campaign, RNC Chief Counsel Mr. Phillippe explained that the RNC is covered by, and strictly
complies with, the Consent Decree and thus would not engage in any ballot security efforts.  *See
id.* ¶ 27 & Ex. A-15.  Mr. Phillippe informed the Trump campaign that Donald Trump and
anyone associated with his campaign are *not agents* of the RNC.  *Id.* ¶ 27.  The RNC also
provided copies of the Consent Decree and RNC training materials to the Trump campaign,
further emphasizing that the RNC would not participate in any form of ballot protection
measures.  *See id.*

     In September and October, the RNC issued additional written guidance and conducted
mandatory training for RNC staff.  *See id.* ¶¶ 17-19.  The RNC circulated a detailed
memorandum and a one-page summary to all staff and independent contractors.  *See id.* ¶¶ 17-
18.  The memorandum identified the individuals covered by the Consent Decree, explained
which activities are prohibited, and emphasized that RNC resources may not be used to support
any form of ballot protection programs.  *See id.* ¶ 18.  For example, the memorandum explained
that covered individuals remain covered, even if their consulting fees or salary are paid for by
some combination of the RNC, the Trump campaign, or even a state party.  *See id.* ¶ 17

(individuals are "covered 24 hours a day and 7 days a week until your engagement with the RNC is complete").  The memorandum also prohibited the use of "RNC-leased offices" for "meetings, conference calls, planning sessions, recruitment efforts, trainings, or other activities by non-RNC actors that, if engaged in by the RNC itself, would violate the Consent Decree."  *Id.*, Ex. A-18.

In further correspondence, the RNC required all staff and independent contractors to return a signed affirmation form agreeing to comply with the RNC's obligations.  Among other things, individuals were required to agree not to participate in prohibited activities, including the following non-exhaustive list: "Participating in any 'Election Day Operations' or EDO program"; "Recruiting or training poll watchers"; "Preparing challenge lists"; "Making contact with voters at the polls"; "Taking pictures or recording video at poll sites"; "Making public statements (including on Facebook, Twitter, etc.) aimed at preventing vote fraud"; "Informing potential voters that vote fraud is a crime (verbally or in writing)"; "Defacing or removing campaign materials or signs"; "Campaigning within restricted polling areas"; "Assisting or advising others who are participating in any of these activities"; and "Recruiting others to participate [in] any of the above activities."  *Id.*, Ex. A-12 at 2; *see also id.* ¶ 19.  The memorandum made clear to RNC staff and contractors that no RNC resources — "such as funding or free office space" — could be used for such purposes, and they were instructed to "drop off" conference calls and ask to be removed from e-mail chains in which outside entities raise election day or voter fraud operations.  *Id.*, Ex. A-12 at 2, 5; *see also id.*, Ex. A-12 at 3. Importantly, all persons covered by the memorandum have returned signed affirmations of understanding and compliance to the RNC Counsel's Office.  Phillippe Decl. ¶ 22.

In September and October, the RNC held a series of telephone conferences — with staff in Iowa, Ohio, and Colorado — to provide an overview of the Consent Decree and answer

individual questions.  *Id.* ¶ 23.  The RNC conducted at least two mandatory webinar presentations, entitled "Legal Compliance Seminar: Consent Decree," for RNC political staff, field staff, and contractors.  *Id.* ¶ 21.  In a separate e-mail, the RNC's General Counsel, John Ryder, again urged RNC members to avoid engaging in ballot security activities "even in your personal, state party, or campaign capacity."  *Id.*, Ex. A-13 at 1; *see also id* ¶ 23.  The e-mail stressed that "the RNC in no way sanctions" such activity and "[y]*ou are not an agent of the RNC for any such purpose*."  *Id.*, Ex. A-13 at 1 (emphasis added).

This list of compliance efforts is extensive – and it is only a partial list:  Compliance with the Consent Decree is a "top priority" for Mr. Phillippe in his role as the RNC's Chief Counsel, and constitutes a significant part of the orientation materials for all new RNC members.  *Id.* ¶¶ 5, 18.  In addition to the training sessions, the Counsel's Office has had  numerous one-on-one calls and communications with staff.  *Id*. ¶ 25.  And, out of an abundance of caution, the RNC has provided similar guidance to state party officials and others who are *not* covered by the Consent Decree. .  *See id*. Ex. A-10 at 2 ("We do not want a campaign or state party employee to inadvertently cause a violation of the Consent Decree.").

These efforts have been successful.  RNC Political Director Chris Carr states that he is in daily contact with each of the RNC's six Regional Political Directors, that he has received no information suggesting activities in violation of the Consent Decree, and in response to direct inquiries after the filing of the DNC's motion: "Each of them confirmed unequivocally that he or she is not aware of any RNC employee or contractor involved in ballot security, voter fraud prevention, or other actions prohibited under the Consent Decree." Carr Dec. ¶¶ 5-7.

Indeed, since receiving the DNC's emergency motion, the RNC has investigated its allegations.  That investigation revealed no evidence that any RNC personnel or contractors have

engaged in prohibited activities.  *Id.* ¶ 7.  Much to the contrary, Mr. Phillippe and Mr. Carr

discovered no violations.  And all six of the RNC's Regional Political Directors have submitted

declarations stating:

> Neither I, nor anyone working for me, has taken or plans to take any actions
> prohibited by the Consent Decree.  Further, after due inquiry, I am not aware of
> any actions or plans by any employee or agent of the RNC to take any such
> action, or to collaborate with the Donald J. Trump campaign or any other entity or
> person, to take any action in violation of the decree.

Nelson Decl. ¶ 4; Kivett Decl. ¶ 4; Johnson Decl. ¶ 4; Jefferson Decl. ¶ 4; Graves Decl. ¶ 4;

Darnell Decl. ¶ 4.

The bottom line is that the RNC has taken abundant measures to ensure good faith

compliance with the Consent Decree.  The RNC has educated its members, employees, and

contractors, and volunteers.  It has instructed those individuals not only to comply but also to

take prophylactic measures.  It  has expressly, and proactively informed the Trump campaign and

other organizations that the RNC cannot and will not participate with them in any vote fraud

prevention measures, ballot security programs, or election day operations. And it has monitored

compliance with the Consent Decree to ensure that these directives are being followed.  These

actions are well in excess of the "substantial compliance" required of the RNC.  *See* pages 8-9

above.  The RNC is in compliance with the Consent Decree.

## II.   THE DNC HAS SUBMITTED NO PROBATIVE EVIDENCE OF ANY CONSENT DECREE VIOLATION.

The partial (yet still substantial) list of compliance measures discussed above

overwhelmingly indicates the RNC has complied with the Consent Decree.  In contrast to the

compelling probative evidence showing compliance, this Court correctly observed during the

telephonic hearing on October 27, that the DNC's motion is based almost entirely on press

accounts. 10/27/16 Tr. at 10:14-16. These accounts contain double and triple hearsay, and are

inadmissible and not probative. *See* Fed.R.Evid. 802 (excluding hearsay).[1]  As the Court also

observed on October 27, unlike instances in which Judge Debevoise granted relief under the

Decree, the news accounts currently cited by the DNC here before the Court reflect no "specific

examples of activities going on." 10/27/16 Tr. at 20:10. And, notably, for its allegation that the

RNC is working with the Trump campaign to engage in ballot security efforts, the DNC's

submission relies on reports of ambiguous statements by persons associated with the Trump

campaign—Mr. Trump, Mr. Pence,  and Ms. Conway, all of which are addressed below—not

statements by knowledgeable persons at the RNC.  Accordingly, for all these reasons, the DNC's

submission on its face falls far short of showing any violation of the Consent Decree.

### A.      The Trump Campaign's Activities Are Not Attributable to the RNC.

The DNC spends nearly six pages of its motion discussing statements purportedly made

by Donald Trump, his campaign, and his supporters (who not even Donald Trump has legal

control over) that allegedly relate to efforts *by the Trump campaign* to recruit poll watchers and

prevent vote fraud.  *See* DNC Mem. 5-11; *but see* DNC Ex. 4 (explaining that the Trump

campaign's alleged poll-watching program has "little to no organization" and "had generated

scant response").  Whatever one makes of the DNC's characterizations, the fact is that the Trump

campaign is not covered by the Consent Decree (and of course neither are his supporters), and its

statements and activities are not attributable to the RNC.  The Consent Decree applies only to the

"RNC, [the] RSC, their agents, servants and employees, whether acting directly or indirectly

---

[1]  In most if not all instances in which Judge Debevoise relied on news accounts, those accounts
were either arguably within a hearsay exception, such as the exception relating to government
reports, *see* Fed. R. Evid. 803(8), used by experts, or used as anecdotal examples to enhance
or explain findings based on other, admissible evidence. Further, rules of evidence are and
should be more strictly enforced when considering the "severe remedy" of civil contempt, *see*
page 8 above (citing *Cal. Artificial Stone Paving Co.*, 113 U.S. at 618), than when considering
whether to modify a consent decree. In any event, the RNC objected to the DNC's use of
hearsay in prior proceedings, and reiterates that objection here.

through other party committees."  Consent Decree, 1982 Agreement at 4.  It does not purport to

bind third parties.  And it expressly does not apply to any "other national . . . political

organizations of the same party."  *Id.* ¶ 4.  Indeed, because the slate of candidates changes every

election cycle, today's candidates could not possibly have agreed to be bound by the Consent

Decree at the time the parties executed and then later modified the Consent Decree.

The RNC has no right to control the Trump campaign.  Conversely, Mr. Trump has no

official voice in the RNC.  *See* Phillippe Decl. ¶¶ 7-9.  He is not an RNC member or officer, and

the RNC rules grant the presidential nominee no decision-making power within the RNC.  *See*

*id*.  In fact, under the Federal Election Campaign Act, the RNC and the Trump campaign are

completely separate entities, separately registered with the FEC and with distinct contribution

limits and reporting obligations.  *See id*. ¶ 10*;* see also 52 U.S.C. § 30116(a)(1)(B)(i), (ii)

(distinguishing between national political committees and candidates and treating each as

separate entities); *see also McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1440–43

(2014) (discussing separation between national party committees and nominees).  Each

organization has separate contribution limits, separate expenditure regimes, and separate

reporting obligations.  *See* Phillippe Decl. ¶ 12; *compare* 52 U.S.C. § 30116(a)(1)(A) (limiting

annual contributions to any candidate or authorized political committee),  *with id.* § 30116(a)(B)

(limiting annual contributions to national political committees, such as the RNC);  *see also id*. §

30104(a) (governing reporting obligations and treating national committees as separate from

candidates and their campaigns).

The RNC has likewise never authorized the Trump campaign to act on its behalf.  Just the

opposite.  The RNC has repeatedly informed its staff and the Trump campaign that neither

Donald Trump nor his campaign speaks or acts for or on behalf of the RNC.  *See* Phillippe Decl.

¶ 27.  The DNC must know this, because it does not argue that either Donald Trump or the Trump campaign are the RNC's agents.[2]  For good reason: An agency relationship exists only "when one party consents to have another act on its behalf, with the principal *controlling and directing* the acts of the agent."  *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434 (3d Cir. 1994)(citation omitted; emphasis added); *see also Menichini v. Grant*, 995 F.2d 1224, 1233 n.14 (3d Cir. 1993) ("Agency law recognizes the principal's ability to control and monitor agent behavior.").  Under the campaign finance laws, an "agent" must have "actual authorization, either express or implied" from a specific principal "to engage in . . . activities." 11 C.F.R. § 109.3(a)(b).  Not even the DNC would be so bold as to claim that the RNC "controls and directs" Donald J. Trump.

**B.    The Undisputed Probative Evidence Rebuts Any Suggestion that the RNC Has Violated the Consent Decree.**

When it comes to actions by *the RNC itself*, the DNC asserts in conclusory fashion that the RNC is "supporting and enabling the efforts" of the Trump campaign.  DNC Mem. 1, 2.  But the record disproves those allegations.  The declarations submitted by Mr. Phillippe (the RNC's Chief Counsel), Mr. Carr (its Political Director), and all six RNC Regional Political Directors — all individuals with firsthand knowledge of the RNC's political operations and compliance measures — explain that the RNC has not supported and is not supporting any ballot security measures by the Trump campaign.  *See* Phillippe Decl. ¶ 27; Carr Decl. ¶ 5-7; *see also* Nelson Decl. ¶ 4; Kivett Decl. ¶ 4; Johnson Decl. ¶ 4; Jefferson Decl. ¶ 4; Graves Decl. ¶ 4; Darnell Decl. ¶ 4.

---

[2]  *See Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 296 n.7 (3d Cir. 2007) (failure to raise an argument in an opening brief waives it); *Rivers v. Nat'l Assoc. of Ltr. Carriers*, No. 15-3070, 2016 WL 389983, at *2 (D.N.J. Feb. 1, 2016) (same).

Again, the DNC bears the burden to support its requests for civil contempt and a preliminary injunction.  Yet the DNC offers no evidence that the RNC has acted with requisite intent or pursuant to a common design with the Trump campaign — essential elements of any "acting in concert" theory.  *See, e.g.*, Restatement (Second) of Torts § 876 cmt. a ("Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result."); *see also United States v. Carbo*, 572 F.3d 112, 118 (3d Cir. 2009) (aiding and abetting requires "intent to facilitate"); *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998) ("an aider and abettor must 'willfully and knowingly' associate himself with another's unlawful act").  Instead, the DNC pads its motion with generic allegations of coordination between the RNC and the Trump campaign.  None withstand scrutiny.

The DNC emphasizes, for example, that the RNC has created a joint fundraising committee with the Trump campaign.  *See* DNC Mem. 11. The DNC's nationally prominent election counsel know better than to suggest that participation in a joint fundraising committee supports the allegations here.  Such committees are standard campaign practice, entirely appropriate, and not prohibited by the Consent Decree.  Indeed, the DNC has just such an agreement with Secretary Clinton. *See* Phillippe Decl. ¶ 14.  Indeed, as the Supreme Court discussed in *McCutcheon v. FEC*, 134 S. Ct. at 1455, "a joint fundraising committee is simply a mechanism for individual committees to raise funds collectively."  That is, they promote efficiency in fundraising by allowing for the participants to solicit the same individuals at the same time.  They do not create any new rights for the participants, and individuals who give remain subject to the same contribution limits.  Federal regulations govern how contributions received by a joint fundraising committee must be allocated among the participants.  *Id*. at 1455 (citing 11 C.F.R. [sec.] 102.17(c)(5)). .  Most importantly here, each entity receives, and gains

18

full control over, its share of net proceeds and how it subsequently spends them.  Joint

fundraising committees do not legally obligate participants to spend their receipts in any

particular way.  *McCutcheon*, 134 S. Ct. at 1455 (discussing prohibition on "earmarking" in 2

U.S.C. § 441a(8)); Phillippe Decl. ¶ 12.  The mere existence of a joint fundraising agreement

thus is irrelevant here.

The DNC quotes statements by the RNC's Chairman, Reince Priebus, that the RNC "is in

full coordination with the Trump Campaign," DNC Mem. 12, and has committed resources to

"send[] Donald Trump to the White House," *id.* at 13.  That is evidence of *politics*, not

*wrongdoing*.  As the DNC's exhibits show, the statements read in context have nothing to do

with ballot security.  *See* Consent Decree, 2009 Order, p. 3 (expressly permitting these types of

activities).  That the RNC works to help elect its presidential nominee is neither controversial nor

unlawful.  As this Court correctly recognized during the October 27 conference, the RNC

"clearly" is working with Mr. Trump, but "the question [is] how is the RNC working with Mr.

Trump *as it pertains to this particular issue [under] the Consent Decree*." 10/27/16 Tr. at 12: 5-7

(emphasis added).  The answer is simple:  it is not.

Citing no authority, not even a news article, the DNC next asserts that it is "impossible to

separate" the RNC's staff and resources from those of the Trump campaign.  Mem. 12.  Again,

the DNC knows better based on its own experience with the Clinton campaign, and offers no

support for this extreme assertion.  As shown above, RNC personnel are not involved in ballot

security efforts, and separateness is required by the election laws.  *See, e.g.*, 11 C.F.R. § 109.21;

*see also* Phillippe Decl. ¶¶ 10, 11.  Courts can and do distinguish the activities and expenditures

of one political organization from another.  *See, e.g., Republican Party of Minnesota v. Pauly*, 63

F. Supp. 2d 1008, 1015 (D. Minn. 1999) ("a reviewing court may not merely 'presume'

19

coordination between the candidate and the political party." (citing *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 621 (1996)); *see also In re Sealed Case*, 223 F.3d 775, 782 (D.C. Cir. 2000); *Keith v. Georgia Republican Party*, No. 1:14-CV-2159-CAP-AJB, Order at 41 (Dkt. No. 175) (N.D. Ga. Dec. 30, 2015) (distinguishing Georgia Republican Party from RNC).  The DNC's exhibits prove the point:  the Trump campaign's "Election Observer" web page states that it was "Paid for by Donald J. Trump for President, Inc." — not the RNC.  DNC-Ex. 7.

The rest of the DNC's evidence of so-called alleged coordination consists of press reports, media statements, "tweets," and other unsubstantiated and inadmissible hearsay.  *See*, *e.g.*, DNC Mem. 10 (quoting *Boston Globe* story reporting statements made by purported Trump supporter about what he believes he heard the candidate say); *see also Oughton v. NLRB*, 118 F.2d 486, 490 (3d Cir. 1940).  ("Unsubstantiated hearsay is not competent evidence of a fact").  The DNC has made no showing that any of these materials fall within a recognized exception to the hearsay rule.  Even if they did, they do nothing to establish a violation of the Consent Decree.

For example, the DNC plays fast and loose with an alleged statement by Trump campaign manager Kellyanne Conway (who is not employed by the RNC) that "the Trump campaign is 'actively working with the national committee, the official party, and campaign lawyers to monitor precincts around the country.'"  DNC Mem. 12 (citing DNC-Ex. 15). The DNC invokes  this statement three times, making it a centerpiece of the DNC's brief.  *See* DNC Mem. 2, 12, 14.  For multiple reasons, the statement is not probative.  To begin, it is *triple hearsay* – a published report of a statement by a reporter purporting to quote Mr. Conway. Although it is very hard to tell, the quote in the brief is not a direct quotation from Ms. Conway, but a paraphrase.  *See* DNC-Ex. 15.  More significantly, the DNC fails to inform the Court that

the very same article reports on the next page that Ms. Conway retracted her statement because she "was mistaken about the RNC's involvement."  DNC-Ex. 15.  And finally, the quotation, such as it is, fails to specify what the RNC was purportedly doing that might violate the Consent Decree.

The DNC also exaggerates statements by Governor Pence and former RNC lawyer Benjamin Ginsberg.  Governor Pence was responding spontaneously to a question from an audience member not long after being selected by Mr. Trump as his running mate.  The DNC rewrites Governor Pence's words to suggest that the RNC is "working directly with state Republican *parties* on so-called '*ballot security*' measures."  DNC Mem. 11 (emphases added). In fact, Governor Pence stated that the RNC is working with "*state governments* and secretaries of states all over the country to ensure *ballot integrity*."  *Id*. (quoting 8-3 Replay: Pence Denver Rally Town Hall, Trump Tube.tv) (emphasis added).  The notion that the RNC is colluding with state governments to violate the Consent Decree makes no sense.  As permitted by the Consent Decree, the RNC does work with state and local election officials to ensure candidates are properly listed on the ballot, that voting machines work properly, and that eligible votes are properly counted, for example.  To the extent Governor Pence's vague reference to "ballot integrity" could mean measures to prevent voter fraud at the polls, he either misspoke or was mistaken.  *See* Phillippe Decl. ¶ 32.  Indeed, in the nearly three months since Governor Pence purportedly made his statement, the DNC has not found any concrete evidence of the RNC's involvement in prohibited ballot security activities.  Again, that is because no such evidence exists.

The DNC also misinterprets Mr. Ginsberg's off-the-cuff statement during a live television broadcast on MSNBC.  Mr. Ginsberg addressed a hypothetical situation, saying only

that the RNC *might* violate the Consent Decree *if* it were to coordinate with the Trump campaign on ballot security measures.  DNC-Ex. 15.  He did not state that such coordination was actually occurring or that he had any first-hand knowledge on the subject.  *See also* Phillippe Decl. ¶ 31. And, once informed of the facts, Mr. Ginsberg made clear that he saw no violation.  *Id*. (transcript attached as Exhibit I).  Thus, contrary to the DNC's assertion, Mr. Ginsberg never stated that "the RNC's coordination with Trump constitutes a violation of the consent decree." DNC Mem. 15.

In fact, several of the very same articles that the DNC cites confirm that the RNC has *not* coordinated with the Trump campaign on voter fraud measures.  For example, one article concluded that the RNC "is taking any association very seriously, and making efforts to prevent its staff and members from doing anything that would give the appearance the RNC was involved."  DNC Mem., Ex. 15.  Another reported on the RNC's efforts to "remind[] committee members" of the Consent Decree and its requirements.  DNC-Ex. 27.  That evidence is consistent with the declarations and documentary evidence provided by the RNC and discussed above.

The DNC's other evidence concerns activities expressly *permitted* under the Consent Decree.  The DNC alleges that some state party officials have coordinated with the Trump campaign or engaged in other ballot security programs.  But the Consent Decree excludes state parties and makes clear that they are not agents of the RNC.  *See* Consent Decree, 1982 Agreement ¶ 4.  Relying again on hearsay contained in news stories, the DNC contends that two state officials in Pennsylvania and Michigan are agents of the RNC for this purpose.  DNC Mem. 13-14.  As a matter of law, this is wrong.  The Supreme Court has recognized that individuals such as state party officials and national party officials often wear multiple "hats" in the political process, and can be subject to different campaign finance strictures depending on which "hat"

22

they are wearing. *See McConnell v. FEC*, 540 U.S. 93, 139, 157 (2003) (noting differences for party officers acting "in their individual capacities" or as "officials of state parties"). Similarly here, the Consent Decree expressly excludes State parties and their employees, and recognizes that the RNC has "no present right of control over other state party committees, county committees, . . . and their agents, servants and employees." 1982 Consent Decree ¶ 4. Moreover, again going beyond the requirements of the Consent Decree, the RNC requested its members not to engage in any vote fraud prevention activities even in their personal or state party capacities, and told them they would not be acting as the RNC's agents if they did so. *See* Phillippe Decl. ¶ 23.. These hearsay accounts of the activities of two state party officials cannot possibly qualify as clear and convincing evidence that the RNC has violated the Consent Decree.[3]

## III.    NO RELIEF IS APPROPRIATE HERE.

This is the third time in the last four presidential elections that the DNC has filed an "emergency" election eve demand for relief under the Decree. It has yet to succeed, having been rebuffed in 2008 by this Court and in 2004 by the en banc Third Circuit. Even though the DNC failed to obtain the requested relief, it did succeed in imposing significant disruption and expense on the RNC at the most critical time of the election cycle. The weak evidentiary submission made by the DNC here suggests that, even if its case is unlikely to succeed, it recognizes the political advantage it can obtain by using the Consent Decree in this way. These equities are pertinent to the Court's consideration of whether to grant the requested preliminary injunction. Moreover, the DNC's tactical use of the Consent Decree flies in the face of the Supreme Court's admonition that courts must guard against allowing such decrees to be used as an "instrument of

---

[3] The DNC also refers to a "tweet" by Roger Stone, but does not even try to connect that incident to the RNC.

wrong." *Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (court should never ignore circumstances that would turn decree into an "instrument of wrong").

After more than three decades, the Consent Decree is set to expire next year.  And so it should, having long outlived its original purpose.  Because the RNC has gone to great lengths to comply with the Consent Decree, there is no justification for extending it or imposing sanctions.  This Court previously modified the Consent Decree to include an expiration date for precisely that reason.  As the Court recognized, it is "inherently inequitable" to require the RNC to comply with the Consent Decree's restrictions "regardless of whether it continues to engage in voter suppression efforts."  *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 621.  Indefinite oversight by the courts "may impose an inequitable burden on the RNC by forcing it to comply with requirements that exceed those which Congress, in its good judgment, has seen fit to impose in the form of federal law."  *Id.* at 598.

In this action, the DNC requests sanctions based not on conduct by the RNC itself, but on statements and actions of persons over whom the RNC has no control.  In doing so, the DNC invites this Court to oversee — and potentially prohibit — *any* coordination between the RNC and the party's presidential nominee.  Such an invasive level of oversight is wholly untethered to any federal election laws, and would interject the Court into the middle of an ongoing political process.  *Cf. Salazar*, 559 U.S. at 714 ("a court should be particularly cautious when contemplating relief that implicates public interests").  Moreover, granting relief would depart from this Court's previous rulings, all of which recognize that the RNC is not responsible for activities it does not direct and in which it does not participate.  *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 581, 582.  Neither the Consent Decree nor the federal election laws make the RNC responsible for conduct by other entities and individuals that are not agents of the RNC and that

the RNC does not control.  The RNC never agreed, and never would have agreed, to such an

impossible arrangement.  *See Harris*, 47 F.3d at 1350 ("Courts must be careful not to impose

obligations upon the parties beyond those they have voluntarily assumed.").

   Further, the news reports on which the DNC bases its claim specify no *actions*, but

merely report core political *speech* from which the DNC urges the Court to *infer* actions.  From

Mr. Trump's rhetoric that the election is "rigged" – whether by media bias, so-called

"Establishment" powers in both parties, or persons disrupting political rallies – the DNC urges

the Court to infer a call for illegitimate voter intimidation, warranting civil contempt and

injunctive relief not on Mr. Trump, but on the RNC.  This is a perilous course, at odds with the

guarantee of Free Speech.  *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("an

election campaign is an effective platform for the expression of views on the issues of the day,

and a candidate serves as a rallying-point for like-minded citizens").

   Of course, the integrity of this year's election process has been an issue of public

discussion on both sides at least since the Democratic primaries this past spring, when

*Democratic voters* accused *the DNC* of vote suppression and "rigging" the nomination process in

favor of Secretary Clinton.  *See, e.g.*, Tony Brasunas, *Only Voter Suppression Can Stop Bernie

Sanders*, The Huffington Post, April 26, 2016, available at http://www.huffingtonpost.com/tony-

brasunas/only-voter-suppression-can-stop-bernie-sanders_b_9780128.html (asserting that the

DNC has "actively worked to rig this primary for Hillary Clinton"); Reno Berkely, *Sanders

supporters in Washington allege voter suppression: wrong caucus forms sent?*, Mar. 24, 2016,

available at http://www.inquisitr.com/2922631/sanders-supporters-in-washington-allege-voter-

suppression-wrong-caucus-forms-sent/.  The point is that in today's political environment

questions about the process have arisen on both sides, and the DNC's call for this Court to infer

illegal *action* from these statements is ill-advised at the least.  In any event, these rhetorical flourishes cannot substitute for *evidence* of RNC involvement in prohibited activities.

*   *   *   *

The RNC has taken it obligations under the Consent Decree seriously and has made every effort to comply with the restrictions imposed.  The DNC has not proferred any credible evidence that the RNC has violated the Consent Decree, nor has it shown that any statements or actions of Mr. Trump or the Trump campaign are attributable to the RNC.  Because the RNC has not directed or participated in any prohibited activities, no relief is appropriate.

**CONCLUSION**

For the reasons set forth above and in the materials submitted with this brief, the

Republican National Committee respectfully urges the Court to deny all requested relief, and

dismiss the current claim with prejudice.

Respectfully submitted,


/s/ Mark D. Sheridan

Bobby R. Burchfield
Matthew M. Leland
KING & SPALDING LLP
1700 Pennsylvania Ave, N.W., Suite 200
Washington, D.C.  20006
Telephone: (202) 626-5524
Email: bburchfield@kslaw.com


Mark D. Sheridan
SQUIRE PATTON BOGGS (US) LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Newark, New Jersey  07102
Telephone: (973) 848-5681
Email: mark.sheridan@squirepb.com

*Counsel for the Republican National Committee*

Dated:  October 31, 2016

27