# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.* <br><br> Defendants. | Civil Action No.: 81-3876 <br><br> Judge John Michael Vazquez |

## DECLARATION OF JOHN R. PHILLIPPE JR.

I, John R. Phillippe Jr., state the following based on my personal knowledge:

1. I am the Chief Counsel of the Republican National Committee (RNC), and have served in this position since July 2009. During this time, I have become knowledgeable about the RNC's operations and activities, membership, officers, staff, and volunteers. I am a member of the bars of the Commonwealth of Virginia and District of Columbia.

2. As Chief Counsel, I am responsible for managing the RNC Counsel's Office and all of the RNC's day-to-day legal affairs, including ensuring its compliance with federal and state law.

3. Among the many laws regulating the RNC with which I am familiar, I am well-versed in the Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101–30146, and its implementing regulations, and I have regularly practiced before the Federal Election Commission (FEC).

4. I am also knowledgeable about the consent decree entered in *Democratic National Committee v. Republican National Committee*, No. 81-cv-3876 (DRD) (Nov. 1, 1982), and the modifications to that order by the U.S. District Court for the District of New Jersey (collectively, the "Consent Decree"). True and correct copies of the Consent Decree and its modifications are attached hereto as Exhibit A-01.

5. I am responsible for training all RNC personnel on compliance with the Consent Decree. I routinely advise RNC personnel and members on the Consent Decree's restrictions and the steps those individuals must take to ensure the RNC's compliance with the Consent Decree. I have consistently made RNC compliance with the Consent Decree a top priority. In August 2016, when I perceived that Mr. Trump was likely to emphasize vote fraud in his campaign, I started to put an even greater emphasis on training regarding the Consent Decree than in past cycles.

6. While the Consent Decree is binding only on the RNC, the New Jersey Republican State Committee, and their agents, the RNC proactively alerts other state political parties and candidate campaigns about the restrictions imposed on the RNC by the Consent Decree. I am typically involved in those communications.

**The RNC and Mr. Donald J. Trump's Campaign Are Separate Entities**

7. Although a core objective of the RNC is to support Republican candidates for elected office, the RNC is independently organized and operates separately from candidate campaigns. Candidate campaign committees, including

the campaign committee of the Republican Party's presidential nominee, are separately organized and operate autonomously.

8. The RNC is a political committee under Internal Revenue Code section 527 and is a "national committee" (one of three Republican Party national committees) under FECA. 52 U.S.C. § 30101(14). The RNC is created by *The Rules of the Republican Party*, and under those Rules, it consists of 168 voting members — three from each state, territory, Puerto Rico, and the District of Columbia. A true and correct copy of *The Rules of the Republican Party* is attached hereto as Exhibit A-02. The members from each state include a National Committeeman and National Committeewoman, who are elected specifically to their respective positions, and the chairman of the state Republican party, who serves on the RNC only by virtue of his or her state party chairmanship. RNC members do not receive compensation from the RNC for their membership.

9. The Republican Party's presidential nominee is *not* a voting member or officer of the RNC. In turn, he has no vote or formal role in the RNC's governance or decision-making. In the case of Donald J. Trump, he is not — and never has been — a member of the RNC.

10. The RNC is required to register and file reports with the FEC about its own fundraising and spending (52 U.S.C. §§ 30103–04; 38 C.F.R. §§ 102, 104). It is not, however, responsible for reporting the financial activity of any other entity, including that of either the Republican presidential nominee or any of the Republican state parties. Instead, federal candidates, including presidential

3

candidates, register their own campaign committees and report their financial activity to the FEC. Donald J. Trump for President, Inc., is registered with the FEC as Mr. Trump's principal campaign committee and thus has its own distinct reporting obligations. A true and correct copy of the Statement of Organization (FEC Form 1) for Donald J. Trump for President, Inc., filed with the FEC on June 29, 2015, is attached hereto as Exhibit A-03.

11. FECA establishes separate contribution limits applicable to national political party committee like the RNC and federal candidates like Mr. Trump (52 U.S.C. § 30116; 11 C.F.R. § 110). For example, individuals may contribute only $2,700 per election to a federal candidate, while they may contribute up to $33,400 per year to the operating account (and even greater amounts to certain segregated accounts) of a national committee. *Id.* A national committee, moreover, may directly contribute only up to $5,000 per election to a presidential candidate.

12. FECA also imposes strict limitations on "coordinated" spending by national political parties like the RNC on direct behalf of the party's candidates (52 U.S.C. § 30116(d); 11 C.F.R. §§ 109.21, 109.30, and 109.32). In 2016, the RNC may make only up to $23,821,100 of expenditures in coordination with the Trump presidential campaign. *See* 81 Fed. Reg. 7101, 7103 (Feb. 10, 2016) (attached hereto as Exhibit A-04). Of course, regular collaboration between the RNC and the party's candidates is typical. When the RNC makes expenditures that may directly benefit a candidate's campaign, it must assess whether those expenditures are "coordinated" under FECA or merely general party operating expenses. In light of

these restrictions, the RNC carefully monitors its direct spending on behalf of Mr. Trump, as well as other Republican candidates' campaigns.

13. National party committees commonly enter into written joint fundraising agreements to establish joint fundraising committees (the rules for which are set forth by the FEC at 11 C.F.R. § 102.17) with their presidential candidates. State party committees are also commonly parties to these agreements. A joint fundraising committee is simply a joint venture of separate participating committees — typically national party committees, campaign committees, and state party committees — that enables those participants to raise contributions more efficiently and share in the costs of fundraising. The contributions received by a joint fundraising committee are distributed by the joint fundraising committee to the bank accounts of the participating committees consistent with the federal contribution limits (i.e., a joint fundraising committee does not establish a new limit for any participant) and are required to be distributed in accordance with an allocation formula set forth in the written agreement or as otherwise directed by the donor. Once the proceeds are distributed by the joint fundraising committee to a participating committee's bank account, that participating committee has full title and control over those receipts, and each has its own reporting obligations to reflect its share of receipts. Participating in a joint fundraising committee does not in any way obligate a participant to spend its receipts a particular way.

14. As in past presidential election cycles, both the Democratic National Committee (DNC) and the RNC entered into joint fundraising agreements with

5

their respective presidential nominees. In September 2015, Hillary Victory Fund was registered with the FEC. It is a joint fundraising committee established by and consisting of the DNC, the Clinton presidential campaign, and many Democratic state party committees. True and correct copies of the Hillary Victory Fund's Statement of Organization (FEC Form 1), and subsequent amendments to it, are attached hereto as Exhibit A-05.

15. In May 2016, the RNC entered into two separate joint fundraising agreements with Mr. Trump's campaign. Those two committees — Trump Victory (which consists of not only the RNC and the Trump campaign but also various Republican state party committees) and Trump Make America Great Again Committee (which consists only of the RNC and the Trump campaign) — were registered with the FEC on May 25, 2016. These joint fundraising committees distribute fundraising proceeds to the RNC, the Trump campaign, and, in the case of Trump Victory Committee, the state party committees. The committees participating in these joint fundraising committees have no control or decision-making authority with respect to expenditures by the other committee(s).

**The RNC Complies With the Consent Decree**

16. As in previous election cycles during which the Consent Decree was in effect, the RNC has taken comprehensive steps to advise its personnel and members about the Consent Decree, and to instruct them to comply with it. For example, in early May 2016, my office, the RNC Counsel's Office, sent a legal compliance guide to all of the RNC's division heads, state party executive directors, and state party

6

chairmen. A true and correct copy of the relevant portion of the compliance guide that relate to the Consent Decree is attached hereto as Exhibit A-06. That portion of the compliance guide makes clear that "it is critical that all those affiliated with the Republican National Committee (RNC) in any way understand the restrictions imposed by the 'Consent Decree' which, *since 1982, has prevented the RNC from engaging in any ballot security or Election Day Operations programs designed to prevent any eligible registered voter from voting.*" It then goes on to state expressly that "[t]he Consent Decree prohibits the RNC from being **involved in any way** with certain Election Day and pre-Election Day (and to some extent post-Election Day) activities," and to note that such "activities include anything that would be aimed at trying to keep anyone from voting or trying to keep anyone's vote from counting based on vote fraud." The compliance guide further describes the Consent Decree's restrictions and specifies that "[a]ll RNC employees, officers, volunteers, and others acting on the RNC's behalf are subject to the restrictions of the Consent Decree." At a compliance seminar for RNC and state party employees and counsel held in March 2016, the RNC provided an overview of the Consent Decree and its restrictions. A true and correct copy of the overview is attached hereto as Exhibit A-07.

17. On June 5, 2015, October 16, 2015, January 29, 2016, March 4, 2016, and April 15, 2016, the RNC briefed staff from state parties and various campaigns from around the country attending RNC's "Campaign Management College" on the parameters and restrictions imposed on the RNC by the Consent Decree. Although

7

most of the school's attendees were not subject to the Consent Decree, the RNC made clear the importance of these individuals not attempting to involve RNC staff or volunteers in any activities that would be prohibited by the Consent Decree.

18. On July 22, 2016, the RNC provided an orientation for new RNC members. During this orientation, I provided — as I had done during all previous new-member orientations during my tenure — a briefing on the Consent Decree and explained that RNC members could not engage in any activities restricted thereunder in their capacity as RNC members. A true and correct copy of the orientation presentation is attached hereto as Exhibit A-08.

19. The compliance instruction and training continues throughout the election cycle. On August 19, 2016, the RNC Counsel's Office circulated an official memorandum to all RNC staff. A true and correct copy of the memorandum is attached hereto as Exhibit A-09. That memorandum expressly states that "the RNC has no role and will not partake in" any voter fraud or poll watching activities. It also states that "the RNC has no role and will not partake in" any ballot security efforts by other organizations, including Mr. Trump's presidential campaign. Finally, the memorandum instructs that: *"Under no circumstances may any RNC employee or anyone else acting on the RNC's behalf engage in the planning or conducting of these activities."* And the memorandum makes clear that *"the RNC will provide no resources (e.g., funding, office space, equipment) to be used for these activities."*

8

20. On September 22, 2016, the RNC Counsel's Office circulated guidance to all RNC staff and relevant independent contractors. A true and correct copy of the guidance is attached hereto as Exhibit A-10. That detailed five-page memorandum identifies covered individuals, prohibited activities, and permitted activities. It carefully explains that anyone receiving the guidance is subject to the restrictions of the Consent Decree, even if their consulting fees or salary are paid for by some combination of the RNC, the Trump Campaign, or even a state party. It also explains that anyone working with the RNC is "covered 24 hours a day and 7 days a week until your engagement with the RNC is complete."

21. Contemporaneously with the September 22, 2016 guidance, the RNC Counsel's Office also provided a separate one-page memorandum summarizing all of the activities prohibited under the Consent Decree and noting that the Consent Decree applies to the RNC and all of its employees, officers, volunteers, and others acting on the RNC's behalf. The one-page format was intended to assist RNC employees and consultants with compliance by serving as an easy reference document. A true and correct copy of the one-page memorandum is attached hereto as Exhibit A-11.

22. On October 17, 2016, the RNC Counsel's Office followed up with all RNC staff and independent contractors providing services to the Political and Finance divisions with another memorandum (again with a the one-page reference document). A true and correct copy of that memorandum is attached hereto as Exhibit A-12. The memorandum reviews the requirements of this Court's Consent

9

Decree and makes clear that the Consent Decree prohibits all RNC employees, consultants, and anyone else acting on behalf of the RNC from engaging in ballot security activities, including any efforts to prevent or remedy vote fraud. Attached to the memorandum was an affirmation form that recipients were required to sign and return, affirming that they had read the memorandum and would comply with its instructions. The vast majority of recipients complied with an October 21 deadline. The RNC received signed affirmation forms from all recipients (over 400).

23. In a separate, October 19, 2016 e-mail to the RNC's 168 members, the RNC's General Counsel, John Ryder, reminded the RNC's members that they are prohibited from using any RNC resources (including their titles) in connection with any activities that would be implicated by the Consent Decree. Mr. Ryder also urged the members to avoid engaging in any ballot security activities even if the participation was in either their personal capacities or roles as state party or campaign officials. Although federal campaign finance law recognizes that even high-ranking party officials (let alone committee members) may serve in various capacities for different organizations and thus do not always act in their capacity as party officials, *see McConnell v. FEC*, 540 U.S. 93, 157 (2003), out of an abundance of caution, Mr. Ryder reminded RNC members: "You are not an agent of the RNC for any such purpose." A true and correct copy of Mr. Ryder's email is attached hereto as Exhibit A-13.

24. All RNC political staff and independent contractors throughout the country were required to attend (or view separately and certify attendance —

10

including by passing a three-question quiz) a live in-person or webinar presentation entitled "Legal Compliance Seminar: Consent Decree," that I and my deputy prepared and presented live on October 21 and October 25, 2016, and that was recorded and made available for future viewing by all relevant employees and contractors who had not attended a live webinar. My deputy and I provided a PowerPoint slide presentation that again reiterated the RNC's obligations under the Consent Decree and the importance of strict compliance. All relevant contractors were informed that if they did not view the webinar, their contracts — which contains terms expressly requiring the contractors' strict compliance with the Consent Decree — would be terminated. To the best of my knowledge, all employees and contractors required to view the presentation have done so. A true and correct copy of the presentation is attached hereto as Exhibit A-14.

25. In addition to the formal actions described above, my staff and I have routinely answer questions from other RNC employees regarding the Consent Decree, and I have regularly briefed the RNC senior staff on the Consent Decree and urged them to remind their staffs of its restrictions.

26. I have consistently endeavored to be extremely cautious with respect to the Consent Decree. For example, I have disallowed RNC employees from even recruiting volunteers to perform "normal poll watch functions" allowed by the Consent Decree and have required all employees to affirm their intent to comply with the Consent Decree even when it is extremely unlikely they would be in a

11

position to violate it due to the nature of their employment (e.g., accounting, human resources).

27. On behalf of the RNC, I have made clear to the Trump Campaign that the RNC cannot and will not be involved in any way with ballot security activities or election day operations. On August 13, 2016, I sent a letter to Mr. Donald McGahn, Esq., counsel for the Trump Campaign, explaining that the RNC is covered by, and strictly complies with, the Consent Decree and accordingly would not engage in any ballot security efforts. I also reminded the campaign that Mr. Trump and anyone associated with his campaign are not agents of the RNC for this purpose. I also indicated to Mr. McGahn that I would send him the compliance materials the RNC would be preparing when they were complete (and followed through, including sending him the comprehensive 5-page memorandum on October 17 and a comprehensive set of materials — many of which he had already been provided) on October 28, 2016. A true and correct copy of my letter to Mr. McGahn is attached hereto as Exhibit A-15. Furthermore, both before and after I sent the letter to Mr. McGahn (dating back to at least late spring or early summer), I advised him of the limitations of the Consent Decree and that the RNC would not engage in any activities implicated by it. He regularly expressed his understanding of and sensitivity to the Consent Decree.

**The DNC Identifies No Evidence of Violations of the Consent Decree By the RNC**

28. I have read the DNC's October 26, 2016 brief, which contains several misstatements about the RNC's involvement with the Trump campaign's purported election day operations or ballot security efforts.

29. Irrespective of the generalized allegations in the brief, to the best of my knowledge, information, and belief, after extensive due diligence by me and my staff, both before and after receiving the complaint, the RNC is not engaged in, nor planning to engage in, any ballot security activities.

30. For example, the DNC relies on an October 21 article in *Talking Points Memo* in which Trump Campaign Manager Kellyanne Conway — who is not employed the RNC — is purported to have commented on efforts by the Trump campaign and "the national committee" to monitor voting precincts around the country (though it is not a direct quote from Ms. Conway). But the DNC fails to mention that the very same article states that Ms. Conway had retracted her statement and informed the reporter that "she was mistaken about the RNC's involvement." A true and correct copy of the *Talking Points Memo* article, printed on October 28, 2016, is attached hereto as Exhibit A-16.

31. The DNC also overstates the significance of remarks by attorney Ben Ginsberg — who is not employed by or on retainer with the RNC — on an MSNBC program. During that program, Mr. Ginsberg was asked about the notion of such coordination. Assuming the truth of the facts as presented to him, Mr. Ginsberg remarked only that it could lead to the DNC seeking to extend the Consent Decree.

13

Upon subsequently learning the facts, however, Mr. Ginsberg made clear that he was unaware of any violation of the Consent Decree by the RNC. *See MSNBC Presidential Debate Coverage*, TVEyes.com, http://mms.tveyes.com/MediaCenterPlayer.aspx?u=aHR0cDovL21lZGlhY2VudGVyL nR2ZXllcy5jb20vZG93bmxvYWRnYXRld2F5LmFzcHg%2FVXNlcklEPTM1MTcyMS ZNRElEPTY4MTQ2NDcmTURTZWVkPTY3MzgmVHlwZT1NZWRpYQ%3D%3D (last accessed Oct. 30, 2016).

32. The DNC also includes statements that Governor Mike Pence made during an August 3, 2016 event in Denver. Governor Pence, who Mr. Trump had just announced as his running mate only nineteen days earlier, appeared to be responding off the cuff to a question from the audience. Governor Pence has never been a member or employee of the RNC, and to the degree his statement suggested that the RNC is involved in actions that could violate the Consent Decree, he was simply mistaken for all the reasons detailed in this declaration.

33. The DNC also quotes RNC Chairman Reince Priebus as stating that the RNC and the Trump campaign are working together. Of course that is true. As in previous presidential election cycles, the RNC has been working with its presidential nominee on coordinated communications, as permitted by FECA (52 U.S.C § 30116(d)), and on perfectly legitimate voter contact activities, such as voter registration and get-out-the-vote programs that will impact the success of all Republican candidates, including the presidential nominee. But Chairman Priebus

never said — nor could he have said accurately — that the RNC is working with the Trump campaign on ballot security efforts as alleged in the DNC's papers.

34. I am not aware of any involvement by the RNC in — or any plan by the RNC to be involved in — voter suppression or intimidation, ballot security efforts, or any other actions that might violate the Consent Decree. To the contrary, in light of the extensive training on these issues that my office provides to RNC personnel, and the rigorous enforcement by the RNC of those guidelines, I am highly confident that the RNC has not engaged in, is not engaged in, and is not planning to engage in the actions alleged by the DNC — whether on its own or in collaboration with the Trump campaign or anyone else.

35. It is my understanding that, since entry of the Consent Decree in 1982, the Republican presidential nominee has worked with Republican state and local parties — not the RNC — on ballot security activities. I know from my personal knowledge that this was the case for Governor Mitt Romney's campaign in 2012, while I was RNC Chief Counsel. In light of the DNC's recognition that the Consent Decree does not cover the RNC's presidential and other nominees, and that the nominees and their campaign staffs are not agents of the RNC, to my knowledge the DNC has not raised any legal objection to these activities by the candidates and Republican state parties.

15

I declare under penalty of perjury that the foregoing is true.

Executed on October 31, 2016.

_____
John R. Phillippe Jr.