**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, et al., ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 81-3876 |
| REPUBLICAN NATIONAL COMMITTEE, et al., ) ) ) | |
| Defendants ) ) | |

**THE REPUBLICAN NATIONAL COMMITTEE'S**
**PROPOSED FINDINGS OF FACT**

Mark D. Sheridan
SQUIRE PATTON BOGGS (US) LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey  07102
Telephone: (973) 848-5681
Email: mark.sheridan@squirepb.com

Bobby R. Burchfield
Matthew M. Leland
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006
Telephone: (202) 626-5524
Email: bburchfield@kslaw.com

*Counsel for the Republican National Committee*

Dated: November 4, 2016

## PROPOSED FINDINGS OF FACT

1.      On October 26, 2016, the Democratic National Committee ("DNC") filed a motion claiming that the Republican National Committee ("RNC") is violating a 1982 Consent Decree, as modified.  In support of this motion, the DNC initially relied on press accounts that it alleges show that the RNC has coordinated with the presidential campaign of Donald J. Trump ("Trump Campaign") and State Republican parties in engaging in ballot security activities.

2.      The RNC has responded to the DNC's allegations by submitting numerous sworn declarations from among others its Chief Counsel; its Regional Political Directors; its Political Director; the Chairman of the Pennsylvania Republican Party; and the Chairman of the Michigan Republican Party.

3.      On October 31, 2016, the DNC claimed that the RNC was engaged in ballot security activities in Nevada and in support submitted three declarations from Democratic Party volunteers serving as poll observers in Nevada.  The DNC submitted three additional declarations from Democratic Party poll observers on November 2, 2016.

4.      In response to the DNC's allegations concerning alleged poll watching activities in Nevada, the RNC submitted additional declarations from its Chief Counsel; its Regional Political Director with responsibility for Nevada; its State Party Director; its State Director for Nevada; and a representative from Stampede Consulting, LLC ("Stampede"), a consulting company that recruits, hires, employs individuals for, and manages staffing for grassroots efforts for various clients.

5.      Based on the evidence submitted to the Court, I find that the evidence submitted establishes the following facts.

1

**The Parties**

5.      The RNC is a political committee under Internal Revenue Code section 527 and is a "national committee" under the Federal Election Campaign Act (52 U.S.C. §§ 30104(14), as amended.  A core objective of the Republican National Committee is to support candidates for elected office, including the Presidency of the United States.  Phillippe Decl. (10/31/2016) ¶¶ 7-8.

6.      The RNC is comprised of 168 voting members from each state and territory.  The members from each state include a National Committeeman and National Committeewoman and the chair of each state Republican party.  *See id.* ¶ 8.

7.      Donald J. Trump is a candidate for President of the United States.  On June 29, 2015, Mr. Trump registered his presidential campaign committee with the Federal Election Commission.  On July 22, 2016, Mr. Trump accepted the Republican Party's nomination for President of the United States.  Mr. Trump, however, has never been a member of the RNC.  *See id.* ¶¶ 9-10.

**The Consent Decree**

8.      On December 14, 1981, the DNC filed this lawsuit against the RNC and the New Jersey Republican State Committee ("RSC") alleging that the RNC intimidated voters in New Jersey and, in turn, suppressed votes in violation of the Voting Rights Act of 1965 and the Constitution's Fourteenth and Fifteenth Amendments.  *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196 (3d Cir. 2012).  On November 1, 1982, the RNC and DNC executed the Consent Decree, which was modified on July 27, 1987, and December 1, 2009 following subsequent litigation among the parties.

9.      Under section 4 of the Consent Decree, the only parties bound by its terms are the RNC and RSC.  The Consent Decree does not extend to other national Republican parties, state Republican parties, candidates for federal, state, or local elected office, or the campaign committees for those individuals.

10.      The Consent Decree expressly highlights (1) "the importance of encouraging citizens to register and vote and the importance of not hindering or discouraging qualified voters from exercising their right to vote," and (2) "the importance of neither using, nor appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud."  Consent Decree, 1987 Order, pp. 1-2.  The activities prohibited under the Consent Decree are supposed to serve these goals by prohibiting the RNC from participating in ballot security programs "aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot."  Consent Decree, 2009 Order, p. 2.

11.      Although the Consent Decree does not delineate these activities, it states explicitly that it does *not* extend to "any effort undertaken by the RNC, or by any state or local Republican entity with which it coordinates, to increase the number of individuals that cast a ballot in any election, including registering voters … or encouraging voters to visit the polls ('get out the vote') …." *Id*., p. 3.

**The RNC's Compliance With the Consent Decree**

12.      John R. Phillippe Jr., who is the Chief Counsel for the RNC responsible for managing all of the RNC's day-to-day legal affairs and compliance, documented several occasions throughout 2016 when the RNC provided comprehensive training and circulated guidance on the Consent Decree.  According to Mr. Phillippe, the RNC provided this guidance to RNC personnel,

3

volunteers, and members, as well as other state parties.  Phillippe Decl. (10/31/2016) ¶¶ 1-2, 5.

13.     In March 2016, the RNC provided RNC and state party employees and counsel an overview of the Consent Decree and its restrictions.  *See id.* ¶ 16.

14.     In May 2016, the RNC delivered a legal compliance guide to all of the RNC's division heads, state party executive directors, and state chairmen.  The compliance guide admonishes readers that "it is critical that all those affiliated with the Republican National Committee (RNC) in any way understand the restrictions imposed by the 'Consent Decree' which, since 1982, has prevented the RNC from engaging in any ballot security or Election Day Operations programs designed to prevent any eligible registered voter from voting."  The compliance guide also describes the Consent Decree's restrictions and specifies that "[a]ll RNC employees, officers, volunteers, and others acting on the RNC's behalf are subject to the restrictions of the Consent Decree."  *See id.* ¶ 16

15.     On June 5, 2015, October 16, 2015, January 29, 2016, March 4, 2016, and April 15, 2016, the RNC briefed staff from state parties and various campaigns from around the country attending RNC's "Campaign Management College" on the parameters and restrictions imposed on the RNC by the Consent Decree. According to Mr. Phillippe, the RNC explained to attendees the importance of not attempting to involve RNC staff or volunteers in any activities that would be prohibited by the Consent Decree.  *See id.* ¶ 17.

16.     On July 22, 2016, the RNC provided an orientation for new RNC members.  During this orientation, Mr. Phillippe provided  a briefing on the Consent Decree and explained that RNC members could not engage in any activities restricted thereunder in their capacity as RNC members.  *See id.* ¶ 18.

4

17.     On August 19, 2016, the RNC Counsel's Office circulated an official memorandum to all RNC staff warning that "the RNC has no role and will not partake in" any voter fraud or poll watching activities.  *See id.* ¶ 19.  The memorandum also states that:

- "the RNC has no role and will not partake in" any ballot security efforts by other organizations, including the Trump presidential campaign;

- "Under no circumstances may any RNC employee or anyone else acting on the RNC's behalf engage in the planning or conducting of these activities"; and

- "the RNC will provide no resources (e.g., funding, office space, equipment) to be used for these activities."  *See id.*; Exhibit A-09.

18.     On September 22, 2016, the RNC Counsel's Office circulated guidance to all RNC staff and relevant independent contractors explaining that anyone receiving the guidance is subject to the restrictions of the Consent Decree, even if their consulting fees or salary were paid for by some combination of the RNC, the Trump Campaign, or even a state party.  It also explains that anyone working with the RNC is "covered 24 hours a day and 7 days a week until your engagement with the RNC is complete."  The RNC Counsel's Office also provided a separate one-page memorandum summarizing all of the activities prohibited under the Consent Decree, and noting that the Consent Decree applies to the RNC and all of its employees, officers, volunteers, and others acting on the RNC's behalf.  *See id.* ¶ 20–21.

19.     On October 17, 2016, the RNC Counsel's Office contacted all RNC staff and all independent contractors providing services to the Political and Finance divisions and required each to sign an affirmation that they had read RNC guidance regarding the Consent Decree and

would comply with its instructions.  The materials describe the Consent Decree's requirements and warns all RNC employees, consultants, and anyone else acting on behalf of the RNC that they are prohibited from engaging in ballot security activities, including any efforts to prevent or remedy vote fraud.  Over 400 individuals, representing all RNC employees and contractors who would have involvement with matters covered by the Consent Decree, returned signed affirmations to the RNC's Counsel's office.  *See id.* ¶ 22.

20.     On October 19, 2016, the RNC's General Counsel, John Ryder, delivered an e-mail to the RNC's 168 members reminding them that they are prohibited from using any RNC resources (including their titles) in connection with any activities that would be implicated by the Consent Decree.  Mr. Ryder also urged the members to avoid engaging in any ballot security activities even if the participation was in either their personal capacities or roles as state party or campaign officials.  Finally, Mr. Ryder reminded RNC members:  "You are not an agent of the RNC for any such purpose."  *See id.* ¶ 23.

21.     Mr. Phillippe also explained that RNC political staff and independent contractors throughout the country were required to view a live in-person or webinar presentation entitled "Legal Compliance Seminar: Consent Decree," that the RNC Counsel's Office provided on October 21 and October 25, 2016.  All relevant contractors were informed that if they did not view the webinar, their contracts would be terminated.  According to Mr. Phillippe, all contractors who were required to participate had done so.  *See id.* ¶ 24.

22.     In addition to the aforementioned compliance efforts, Mr. Phillippe and his staff in the RNC Counsel's Office routinely answered questions from other RNC employees regarding the Consent Decree, and regularly briefed the RNC senior staff on the Consent Decree and urged

them to remind their staffs of its restrictions.  *See id.* ¶ 25.

**Separation Between the RNC and Trump Campaign**

23.     To support its motion, the DNC relies upon several press accounts in which speakers suggested the RNC was coordinating with the Trump campaign to engage in ballot security, but there are no eyewitness accounts or admissible evidence of prohibited conduct by the RNC.

24.     In response, the RNC has submitted two declarations from Mr. Phillippe, submitted on October 31, 2016 and November 2, 2016.

25.     In contrast to the press accounts, Mr. Phillippe recounted several occasions when he reminded the Trump campaign about the restrictions placed on the RNC by the Consent Decree. Most notably, on August 13, 2016, Mr. Phillippe delivered a letter to Mr. Donald McGahn, Esq., counsel for the Trump Campaign, explaining that the RNC strictly complies with the Consent Decree, that the RNC could not engage in any ballot security efforts, and that Mr. Trump and anyone associated with his campaign are not agents of the RNC for these purposes.  Mr. Phillippe also delivered RNC compliance materials to the Trump campaign.

26.     Several of the RNC's political personnel, including the RNC Political Director, also investigated the allegations by the DNC and found no evidence that any RNC personnel or contractors have engaged in prohibited measures.  All six of the RNC's Regional Political Directors signed declarations stating:

> Neither I, nor anyone working for me, has taken or plans to take any actions prohibited by the Consent Decree.  Further, after due inquiry, I am not aware of any actions or plans by any employee or agent of the RNC to take any such action, or to collaborate with the Donald J. Trump campaign or any other entity or person, to take any action in violation of the decree.

7

Nelson Decl. ¶ 4; Kivett Decl. ¶ 4; Johnson Decl. ¶ 4; Jefferson Decl. ¶ 4; Graves Decl. ¶ 4; Darnell Decl. ¶ 4.

27.    Mr. Phillippe personally inquired whether the RNC has any agreements whatsoever with Donald J. Trump or his presidential campaign related to voter fraud, ballot security, ballot integrity, poll watching, or poll monitoring activities.  He spoke with each official at the RNC who has authority to execute contracts on behalf of the RNC:  the Chairman; Chief of Staff; and Chief Operating Officer.  He also spoke with the RNC Chief Financial Officer, who must sign off on every RNC contract.  None of these individuals is aware of any such agreement or of any facts suggesting the RNC may be engaging in any activities implicated by the Consent Decree. Phillippe Decl. (11/2/2016) ¶¶ 5-11.

28.     Mr. Phillippe also spoke with all employees in the RNC's Political division who reasonably could be expected to know if the RNC and the Trump campaign had any agreement with respect to these activities:  the Political Director, Deputy Political Director, National Field Director, Operations Manager for the Political division, and all six Regional Political Directors. None of them is aware of any such agreement or of any facts suggesting the RNC may be engaging in any activities implicated by the Consent Decree.  *See id.*

29.    Mr. Phillippe also asked RNC personnel to review the RNC's electronic and hard-copy files for any agreement with Mr. Trump or his campaign related to voter fraud, ballot security, ballot integrity, poll watching, or poll monitoring activities.  Mr. Phillippe's staff in the Counsel's Office searched the locations where contracts are stored in hard copy and electronic, and did not locate any written agreements between the RNC and Trump campaign with respect to any of the activities identified by the Court in its Order.  *See id*.

8

30.     Mr. Phillippe also had a telephone conversation with Donald McGahn, general counsel of the Trump campaign.  Mr. McGahn is not aware of any agreements between the Trump campaign and the RNC with respect to any of these activities other than oral agreements between he and Mr. Phillippe recognizing an understanding that the RNC would not be involved in any such activities and that, to the extent it was involved in any of these activities, the Trump campaign would not receive any assistance from the RNC whatsoever.  Mr. Phillippe confirmed that Mr. McGahn has been consistently sensitive to the RNC's obligations under the Consent Decree. *See id*.

31.     It is standard practice at the RNC for the Chief Counsel's Office to draft and/or review all RNC contracts.  No one in the Chief Counsel's Office has reviewed, or been asked to review or advise about, any contract or agreement between the RNC and the Trump campaign addressing ballot security or any other matter covered by the Consent Decree.  According to Mr. Phillippe, if the Chief Counsel's Office had been asked to review or advise about such a contract, it would have rejected it.  *See id*.

32.     The weight of the evidence shows that there is no written or oral agreement between the RNC and Mr. Trump or his campaign with respect to voter fraud, ballot security, ballot integrity, poll watching, or poll monitoring activities.

33.     On November 1, 2016, at approximately 5:45 p.m., Mr. Phillippe spoke by telephone with Republican nominee for Vice President of the United States, Governor Mike Pence, concerning Governor Pence's reported remarks at an event in Denver, Colorado, on August 3, 2016. In answer to question about what the Trump campaign was doing to prevent its adversaries from stealing the election, Mr. Pence responded, "I will tell you that the Trump campaign and the

Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *See id*. ¶¶ 12-16.

34.     Governor Pence told Mr. Phillippe that he has no knowledge of any effort between the Trump campaign and the RNC to ensure ballot integrity.  Governor Pence reported that he has never been a part of, and is not aware of, any discussions between the Trump campaign and the RNC concerning efforts to ensure ballot integrity, and has no information suggesting any RNC involvement in such activities. *See id*.

35.     In the absence of any direct evidence that the RNC is collaborating with the Trump campaign on ballot integrity issues, and in light of the RNC's declarations from knowledgeable persons to the contrary, Mr. Pence's reported statement at the rally in Denver, Colorado, on August 3, 2016, does not establish that the RNC has directly coordinated with the Trump campaign on "ballot integrity" initiatives or "ballot security" measures.  *See id*.

36.     On November 2, 2016, at approximately 2:55 p.m., Mr. Phillippe spoke by telephone with Trump Campaign Manager Kellyanne Conway regarding remarks she reportedly made to a reporter that the RNC might be assisting the Trump campaign in monitoring voting precincts throughout the country.  These comments were reported in an October 21, 2016 article.  *See id*.

37.     The October 21, 2016 article upon which the DNC relies states that Ms. Conway retracted her statements to the reporter about the RNC's involvement because she had been mistaken.  Mr. Phillippe confirmed that Ms. Conway  has no knowledge of, and knows of no facts indicating, that the RNC is involved in any poll monitoring activities in any state.  *See id*.

38.     In light of the declarations submitted by the RNC to the contrary, Ms. Conway's reported

– and then retracted– statements in the October 21, 2016 article do not establish that the RNC has coordinated with the Trump campaign on any poll monitoring efforts.

39.     The weight of the evidence shows that the statements by Governor Pence and Ms. Conway were mistaken, and neither appears to have actual knowledge of any cooperation between the Trump campaign and the RNC in ballot security efforts.

**Separation Between the RNC and State Poll Watching Activities**

40.     In support of its motion, the DNC also relies on articles published in the *Washington Post* and *Detroit News* quoting the Chair of the Pennsylvania Republican Party ("Pennsylvania GOP") Robert A. Gleason Jr., and the Chair of the Michigan Republican Party ("Michigan GOP"), Ronna Romney McDaniel, about ballot security activities in their respective home states.  *See id*. ¶¶ 17-22.

41.     In response to the DNC's allegations based on the *Washington Post* and *Detroit News* articles, the RNC has submitted supplemental declarations from Mr. Phillippe and declarations from Mr. Gleason, Ms. McDaniel, and RNC State Party Director Matt Pinnell.  *See id*.

42.     As part of his inquiry into the DNC's allegations concerning the quotations in these articles and the RNC's alleged involvement in ballot security activities in Pennsylvania and Michigan, Mr. Phillippe contacted Lawrence Tabas, who has served as outside counsel to the Pennsylvania GOP for approximately 25 years;  Eric Doster, who has served as outside counsel to the Michigan GOP since the 1980s; Chris Carr, the RNC's Political Director; the RNC's national field director; and the RNC's six Regional Political Directors, including Sarah Nelson, who handles activities in Pennsylvania, and Mark Jefferson, who handles activities in Michigan.

11

Mr. Phillipe also reviewed the Declarations of Robert Gleason and Ronna Romney McDaniel, discussed below. *See id.*

43.     Mr. Phillippe confirmed that the RNC has had no involvement in poll watching programs by the Pennsylvania GOP, nor has there been a single occasion when the RNC has been involved with such activities in the Commonwealth of Pennsylvania.  Other than communications related to declarations submitted in this litigation, the RNC has not had any communications with the Pennsylvania GOP regarding poll watching for this election, nor has the RNC provided any financial or personnel resources to the Pennsylvania GOP, county, or local parties designated for poll watching in the Commonwealth of Pennsylvania.  The Pennsylvania GOP has not "targeted" voters in Philadelphia as part of its poll watching programs. *See id.*

44.     Likewise, Mr. Phillippe also confirmed that the RNC has not been involved with the Michigan GOP's various programs related to poll watching and ballot security. *See id.*

45.     Mr. Phillippe confirmed that the RNC has not provided any training materials with respect to any poll watching or poll observation efforts. *See* Phillippe Decl. (11/3/2016) ¶¶ 5-6.

46.     RNC State Party Director Matt Pinnell works directly and is in regular contact with State Party Chairs.  Through the regular training efforts of the RNC's Counsel's Office, he is familiar with the Consent Decree and the restrictions it imposes on the RNC, its employees, and its agents, with respect to certain election day operations or ballot security efforts.  He is also aware of and has reviewed guidance provided to State Party Chairs about the Consent Decree. *See* Pinnell Decl. ¶¶ 3-5.

47.     Mr. Pinnell confirmed that since the RNC entered the Consent Decree, State Party Chairs

have and do participate in election day operations, including designing and supervising poll

watching, in their state party capacities.  The RNC has had no involvement with the state party-

administered election day operations, and the State Party Chairs do not act on behalf of the RNC

in those activities.  *See id*.

48.     Mr. Gleason confirmed that he is a member of the RNC by virtue of Rules 1(a) and 3(b)

of The Rules of the Republican Party (the "Party Rules"), under which State Party Chairs

automatically become members of the RNC upon their selection as State Party Chairs.  Gleason

Decl. ¶ 3.

49.     The *Washington Post* article relied upon by the DNC refers to Mr. Gleason as State Party

Chair.  Mr. Gleason also confirmed that he made the comments referred to in that article in his

capacity as Chairman of the Pennsylvania GOP , that he did not make the comments on behalf of

the RNC, and that he did not intend his comments to be construed in any way that would indicate

the RNC's intent to participate in poll watching or the Pennsylvania GOP's lawsuit referenced in

the article.  *See id.* ¶ 5.

50.     The evidence shows that that the comments attributed to Mr. Gleason in the *Washington

Post* article were made in his capacity as State Party Chair.  *See id.*

51.     Mr. Gleason confirmed that the RNC has had no involvement in any poll watching

programs conducted in Pennsylvania, and has had no communications with the Pennsylvania

GOP regarding poll watching other than communications related to declarations submitted in this

litigation.  *See id.* ¶¶ 4-6.

52.     Mr. Gleason confirmed that he received the October 19, 2016 email from RNC General

Counsel John Ryder discussed above, and RNC members are not "agents" of the RNC, especially in terms of authorizing or carrying out ballot security or voter fraud prevention activities. *See id.* ¶ 3.

53.     The evidence does not support the DNC's allegation that the RNC has "delegated substantial 'ballot security' initiatives" to Mr. Gleason or the Pennsylvania GOP. *See id.*

54.     Ms. McDaniel confirmed that she is a member of the RNC by virtue of Rules 1(a) and 3(b) of The Rules of the Republican Party (the "Party Rules"), under which State Party Chairs automatically become members of the RNC upon their selection as State Party Chairs. McDaniel Decl. ¶ 2.

55.     The *Detroit News* article relied upon by the DNC refers to Ms. McDaniel as State Party Chair.  Ms. McDaniel also confirmed that she made the comments referred to in that article in her capacity as Chairman of the Michigan GOP , that she did not make the comments on behalf of the RNC or in her capacity as a member of the RNC, and that the RNC has not supplied any funding or had any involvement with ballot security activities in Michigan. *See id.* ¶ 5.

56.     Ms. McDaniel confirmed that the Michigan GOP is engaged in poll watching and ballot security activities for this election, but that all funding for these activities comes from the Michigan GOP's own accounts.  The materials used in connection with such activities make it clear to the reader that they are paid for by the Michigan GOP.  All training of volunteers for poll watching and ballot security activities in Michigan is conducted by Michigan GOP employees and volunteers, and that training is provided only in facilities leased or operated by the Michigan GOP.  No RNC employees are involved in recruiting or training volunteers for such activities. No training or meetings occur in facilities leased to or operated by the RNC.  Except for

communications related to declarations submitted in this litigation, the Michigan GOP has had no communications with the RNC about the Michigan GOP's poll watching and ballot security activities. *See id.* ¶¶ 3-4.

57.     Ms. McDaniel confirmed that she received the October 19, 2016 email from RNC General Counsel John Ryder discussed above.  She reviewed this email and understands that the Consent Decree bars RNC members acting in their capacity as RNC members from engaging in ballot security activity, which includes, but is not limited to, efforts to prevent or remedy vote fraud.  She understands that the RNC does not participate in any ballot security activities, and that accordingly, RNC members are not "agents" of the RNC for purposes of ballot security endeavors.  *See id.*

58.     Based on this evidence, it appears that that the comments attributed to Ms. McDaniel in the *Detroit News* article were made in her capacity as State Party Chair.

59.     The evidence does not support the DNC's allegation that the RNC has "delegated substantial 'ballot security' initiatives" to Ms. McDaniel or the Michigan GOP.

60.     The DNC also relies on three declarations from Ellyn Lindsay, Scott Forstall, and Michael Lieberman submitted on October 30, 2016, and three declarations from Melissa Alessi, Irasema Garza, and Helen Lauderdale submitted on November 2, 2016.  All of the declarations relate to alleged activities in Nevada.  Four of the six declarants are attorneys and all of the declarants purport to report on conversations they had with other poll watchers.  Several of the declarations contain hearsay.

61.     In response to the six declarations submitted by the DNC regarding alleged activities in Nevada, the RNC has submitted a second supplemental declaration from Mr. Phillippe; the RNC Regional Political Director with responsibility for Nevada, Peter Graves;  the RNC's State Party Director, Matt Pinnell; the RNC's State Director for Nevada, Robert Talbot; and Holly Turner of Stampede.

62.     The RNC, including Mr. Phillippe, Mr. Graves, and Mr. Talbot reviewed the declarations and conducted an inquiry regarding the allegations.  They confirmed that the RNC has no poll watching operation in Nevada at all, and plans no such operations in Nevada or anywhere else in Mr. Graves's region.  Phillippe Decl. (11/3/2016) ¶¶ 4, 9-17; Graves Decl. (11/3/2016) ¶¶ 4-5; Talbot Decl. ¶¶ 6-13.

63.     Mr. Graves and Mr. Talbot additionally confirmed in their declarations that, as a result of regular training by the RNC Counsel's Office, they are each aware of the Consent Decree and the restrictions it imposes on the RNC, its employees, and its agents with respect to certain election day operations or ballot security efforts.  *See id.*

64.     The RNC's Counsel's Office also investigated whether the RNC employed any of the individuals mentioned in the DNC's declarations, recruited any of them as volunteers, or has any record of contacts with them.  It electronically searched the RNC's emails, reviewed personnel files, and researched payroll records for the names "Kashanna Holland," "Charlene Stamp," and "Onita Petersen," including variations of the name "Onita Petersen."  Those searches did not produce any "hits" on any of the names searched.  Except for "Charlene," who appears to be Charlene Stamp based on information from Stampede Consulting as discussed below, the individuals listed in the declarations by first name only – "Brenda" and "Joanne" – could not be

searched.  *See* Phillippe Decl. (11/3/2016) ¶¶ 9-17. The declaration submitted by the DNC states that "Brenda" works for the Trump campaign.

65.     Holly Turner is a Partner at Stampede  Consulting, LLC, responsible for supervising Stampede projects on behalf of clients, including clients in Nevada.  She has reviewed the declarations submitted by the DNC.  She confirmed that Ms. Holland was hired by Stampede to serve as a poll observer for another Republican organization and that Ms. Holland was not hired on the RNC's behalf.  Ms. Turner also confirmed that the RNC has not retained Stampede to conduct any activity whatsoever in Nevada this election cycle.  Stampede has conducted poll-watching activities in Nevada for another entity.  It has hired individual employees, including Ms. Holland, to conduct lawful poll-watching in the following locations in Nevada:  the Arroyo Market Square early voting location at 7200 Arroyo Crossing Pkwy in Las Vegas and the W. Harmon Avenue early voting location on the Las Vegas Strip.  Stampede directed Ms. Holland to do poll-watching at the Arroyo Market Square location.  Ms. Turner submitted with her declaration documents confirming Ms. Holland's employment status with Stampede.  She also confirmed that Ms. Holland was not conducting any work on behalf of the RNC. *See id.* ¶¶ 6-13.

66.     Ms. Holland has an internet website (http://www.kishannaholland.net/) that indicates that she is a fashion entrepreneur, brand and public relations consultant, and media personality who grew up in Brooklyn and later worked on Wall Street, and has been a resident of Nevada since at least 2014.  The website does not suggest that she is or ever was a "law student from New York [who] would be staying in Las Vegas until November 10," as claimed in the Declaration of Ellyn Lindsay.  *See id.*; Exhibit A.

67.     Ms. Turner searched Stampede's list of poll watchers for the name "Charlene," which

returned the name Charlene Stamp.  Ms. Stamp is an employee with Stampede.  Stampede directed her to do poll-watching at the W. Harmon Avenue early voting location.  Ms. Turner submitted with her declaration documents confirming Ms. Stamp's employment status with Stampede.  Ms. Turner confirmed that Ms. Stamp was not conducting any work on behalf of the RNC. *See* Turner Decl. ¶¶ 11-12.

68.     Stampede also requires all employees conducting poll-watching to sign an acknowledgement form that they will follow the law at all times while acting in a professional manner.  Ms. Turner submitted signed acknowledgement forms from Kishanna Holland and Charlene Stamp with her declaration. *See id.*; Exhibit Q-1.

69.     Ms. Turner personally reviewed Stampede's list of poll watchers for any individuals resembling the names identified in the DNC's declarations: "Onita Petersen," "Brenda," and "Joanne."  Stampede's lists did not include any of these individuals.  Ms. Turner stated that she is confident that none of these individuals is employed by Stampede. *See id.* ¶ 13.

70.     The evidence shows that none of the individuals referenced in the six declarations submitted by the DNC concerning alleged activities in Nevada serves in any capacity as an RNC member, employee, contractor, or volunteer, or has any affiliation or involvement with the RNC.

71.     The evidence does not support the DNC's allegation that the RNC has engaged in ballot security initiatives utilizing poll watchers in Nevada.

Respectfully submitted,


/s/ Mark D. Sheridan
Bobby R. Burchfield
Matthew M. Leland
KING & SPALDING LLP
1700 Pennsylvania Ave, N.W., Suite 200
Washington, D.C.  20006
Telephone: (202) 626-5524
Email: bburchfield@kslaw.com

Mark D. Sheridan
SQUIRE PATTON BOGGS (US) LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Newark, New Jersey  07102
Telephone: (973) 848-5681
Email: mark.sheridan@squirepb.com

*Counsel for the Republican National Committee*

Dated:  November 4, 2016

CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2016, I caused the Republican National Committee's Proposed Findings to be filed through the ECF system, a copy of which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent by United States Mail to those indicated as non-registered participants.

/s/  Mark D. Sheridan
Mark Sheridan