# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

<u>**Not for Publication**</u>

|  |  |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, et al., | Civil Action No. 81-03876 |
| *Plaintiffs*, | <u>**OPINION**</u> |
| v. | |
| REPUBLICAN NATIONAL COMMITTEE, et al., | |
| *Defendants*. | |

<u>**John Michael Vazquez, U.S.D.J.**</u>

Plaintiff Democratic National Committee ("DNC") alleges that Defendant Republican National Committee ("RNC") violated a consent decree ("Consent Decree" or "Decree") between the parties.  The Consent Decree was originally entered in 1982 and was subsequently modified in 1987 and 2009.  The RNC denies that it is in violation of the Decree.  The DNC seeks the following relief:  a finding that the RNC is in contempt, enforcement of the Consent Decree with sanctions, injunctive relief, and an extension of the Consent Decree.  For the reasons that follow, the Court denies the DNC's motions for injunctive relief, for contempt, and for sanctions.  The Court denies, at this time, the DNC's request to extend the Consent Decree, but the Court will hear the parties after Election Day as to additional discovery on this point in order to develop a full record to determine whether an extension is warranted.

This opinion will first review the current posture of this matter before turning to the background of the Consent Decree and the positions of the parties.  The Court will then analyze the DNC and RNC's arguments in light of the Decree and the applicable law.

## I. BACKGROUND

### A.  Procedural History of the Current Dispute

On October 26, 2016, the DNC requested that the Court issue an order requiring the RNC to show cause why the relief sought by the DNC should not be granted.  D.E. 95.  The DNC included a brief and numerous exhibits in support of its position.  The matter was assigned to the Court[1] on October 27 and, in lieu of issuing the order to show cause, the Court held a telephone conference with counsel for both parties the same day.  Following the conference, the Court issued a scheduling order, which addressed the dates for briefing, discovery requests, and oral argument.  D.E. 102.  The Court also denied the DNC's request for temporary restraints, instead indicating that the Court would rule on the request for injunctive relief following full briefing and argument.  *Id.*

As to discovery, the DNC filed a request on October 27, 2016, seeking one category of agreements and understandings, and six areas of "communications."  "Communications" was to have the "broadest possible meaning and include without limitation, emails, text messages, written correspondence, and any other form of communication, electronic or written."  D.E. 103.  The RNC filed its objections the next day, essentially arguing that the DNC's requests would result in voluminous discovery, were improperly seeking competitive intelligence, and would be unduly burdensome in light of the time constraints due to the approaching Election Day.  D.E.

---

[1] From the inception of the matter in 1981 through the final modification to the Consent Decree in 2009, the case was overseen by the Honorable Dickinson R. Debevoise, U.S.D.J.  Judge Debevoise passed away in August 2015.

107.  On October 31, 2016, the Court held another conference call to address discovery.  The

Court agreed with the RNC that the DNC's broad requests were unworkable in light of the

timeframe in which the Court had to render its decision (i.e. before November 8),[2] but did order

the RNC to produce affidavits from the person or person(s) with knowledge of the events set

forth in the DNC's motion.  D.E. 103.  After reviewing additional submissions from the DNC,

(D.E. 114), the Court ordered additional discovery as to the RNC's purported use of poll

observers.  D.E. 118.

The RNC filed its opposition brief and exhibits on October 31, 2016, to which the DNC

replied on November 3, 2016.  The Court then held oral argument the next day, November 4**.**

## B.  Background of the Consent Decree

The original Consent Decree was entered in 1982.[3]  The Decree was the result of the

settlement of a lawsuit which claimed that, in connection with the 1981 New Jersey

Gubernatorial election, the RNC and the New Jersey Republican State Committee attempted to

intimidate the minority voters, in violation of the Voting Rights Act, 42 U.S.C. §§ 1971, *et seq.*

*Democratic Nat'l Comm., v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009),

*aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013).  Specifically, the RNC

sent sample ballots to areas where a large portion of the voters were ethnic minorities, then asked

that the name of each voter whose ballot was returned as undeliverable be removed from New

---

[2] The Court denied the DNC's discovery requests without prejudice, D.E. 113 at 2 n.2., permitting the DNC to renew its requests after Election Day when the constrained timeframe would no longer be an issue.

[3] The plaintiffs to the 1982 Consent Decree included, besides the DNC, the New Jersey Democratic State Committee, and Virginia L. Peggins.  In addition to the RNC, the defendants were comprised of the New Jersey Republican State Committee, Alex Hurtado, Ronald C. Kaufman, and John A. Kelly.

Jersey's voter rolls.  *Id.*  In addition, in an alleged effort of intimidation, the RNC hired off-duty

law enforcement officers to patrol polling places in minority precincts.  *Id.*  The officers wore

armbands that read:  "National Ballot Security Task Force," and some carried two-way radios

and firearms.  *Id.*

The Consent Decree was filed on November 1, 1982.  Section Two of the Decree set

forth the activities of the RNC that were required or prohibited by the agreement.  Among other

things, the RNC agreed that it would it would "in the future, in all states and territories of the

United States":

> (d) refrain from giving any directions to or permitting their
> employees to campaign within the restricted polling areas or to
> interrogate prospective voters as to their qualifications to vote prior
> to their entry to a polling place;
>
> (e) refrain from undertaking any ballot security activities in polling
> places or election districts where the racial or ethnic composition of
> such districts is a factor in the decision to conduct, or the actual
> conduct of, such activities there and where a purpose or significant
> effect of such activities is to deter qualified voters from voting; and
> the conduct of such activities disproportionately in or directed
> toward districts that have a substantial proportion of racial or ethnic
> populations shall be considered relevant evidence of the existence
> of such a factor and purpose[.]

1982 Consent Decree at ¶ 2(d)-(e).

The DNC and RNC also agreed that they would, "as a first resort, use established

statutory procedures for challenging unqualified voters."  *Id.* at ¶ 3.  The Consent Decree

recognized that the RNC did not have a "right of control over other state party committees,

county committees, or other national, state and local political organizations of the same party,

and their agents, servants and employees."  *Id.* at ¶ 4.  Nevertheless, the Decree was binding on

the RNC, and its "agents, servants, and employees, whether acting directly or indirectly through other party committees."[4] *Id.*

In 1987, it came to light that in the previous year's election in Louisiana, a voter challenge list was compiled by sending letters to African-American voters and recording the names of individuals for whom the letters were undeliverable. *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 580. Discovery uncovered the fact that the RNC's Midwest Political Director had remarked that the voter challenge list could "keep the black vote down considerably." *Id.* (citation omitted). As a result, the DNC and RNC agreed to modify the 1982 Consent Decree. First, both parties recognized "the importance of neither using, nor appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud[.]" 1987 Modified Consent Decree. In addition, the Decree was modified to include a definition of "ballot security" and a preclearance provision. *Id.* at ¶¶ A, C.

"'Ballot security' efforts" were expressly defined as "ballot integrity, ballot security or other efforts to prevent or remedy vote fraud." *Id.* at ¶ A. The RNC was allowed, to the extent permitted by the 1982 consent order, to deploy persons for normal poll functions on election day so long as those deployed did not "use or implement the results of any other ballot security effort[.]" *Id.* at ¶ B. There was an exception for ballot security efforts that complied with the Decree and the law, and had been precleared by the Court. *Id.* at ¶ C. Otherwise, the RNC could not engage in, assist with or participate in, any ballot security program unless the program was first determined by the Court to comply with the provisions of the consent order and the

---

[4] *See also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 197 n.2 (3d Cir. 2012) (observing that the "RNC agreed that the RNC, its agents, servants, and employees would be bound by the Decree, 'whether acting directly or indirectly through other party committees.'" (citation omitted)), *cert. denied*, 133 S. Ct. 931 (2013).

applicable law. *Id.* Any preclearance decision by the Court was to be determined following twenty days' notice to the DNC. *Id.*

In 1990, the DNC alleged that the RNC violated the Decree by participating in a program with the North Carolina Republican Party ("NCRP"). *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 581. In an alleged attempt to intimidate voters, the NCRP sent 150,000 postcards to predominantly African-American precincts warning that giving certain false information to an election official was a federal crime. *Id.* In reviewing the DNC's allegations, the Court first determined that the evidence failed to demonstrate that the RNC participated in the NCRP program. *Id.* Nevertheless, the Court determined that the RNC violated the Consent Decree by failing to inform state parties of unlawful practices under the Consent Decree and by failing to provide state committees copies of the Decree. *Id.* The Court further ruled that the RNC had to provide a copy of the Consent Decree or proper guidance (on how to comply with the Decree) to state parties in the future. *Id.*

In 2004, Ebony Malone, an African-American resident of Cleveland, brought an enforcement action pursuant to the Decree. *Id.* at 582. Malone's claim was that the Decree was violated when letters were sent to voters in precincts with a high concentration of minorities and then a voter challenge list was compiled based on letters that were returned as undeliverable. *Id.* Following an evidentiary hearing, the Court barred the RNC from using the list for voter challenges and instructed the RNC to inform its agents in Ohio not to use the list for such purposes. *Id.* at 583. The Court reasoned that the RNC violated the Consent Decree because it failed to receive preclearance for the voter challenge program, the program targeted areas based on the percentage of minorities in those areas, and a consequence of the program was to deter qualified voters from casting ballots. *Id.* Following an emergent application, the Third Circuit

6

Court of Appeals denied the RNC's request for a stay of the order. *Id.* The Third Circuit then granted the RNC's petition for a rehearing *en banc* and stayed the Court's order. *Id.* However, before the rehearing could occur, the matter was dismissed as moot because Ms. Malone cast her ballot without challenge. *Id.* at 583-84.

In 2008, the DNC brought another enforcement action in light of the hiring of private investigators in New Mexico to examine the backgrounds of various voters in preparation for challenging those individuals' right to vote. *Id.* at 581. The Court rejected the challenge, finding that that the RNC had not participated in, or directed, the ballot security program in question although there may have been misconduct by the New Mexico Republican Party. *Id.* at 582.

The RNC then moved to vacate or, alternately, modify the Consent Decree. *Id.* at 578. Pursuant to Fed. R. Civ. P. 60(b)(5), and following a full evidentiary hearing, the Court declined to vacate the Decree but did agree that modifications were in order. In doing so, the Court carefully reviewed three different types of voter fraud: voter registration fraud, absentee ballot fraud, and in-person fraud. *Id.* at 603. The Court explained that voter registration fraud concerned an individual registering under a false or fictitious name, in-person fraud applied to persons actually casting ballots when they were not legally permitted to do so, and absentee ballot fraud involved the submission of such ballots by a person other than the person qualified to do so. *Id.* Absentee ballot fraud, the Court found, was not readily addressable by pre-election remedies (due to the inability to personally observe the voters casting their absentee ballots) and that the Consent Decree did not prevent the RNC from reporting suspected cases to the appropriate election officials. *Id.* at 603-04.

The Court likewise observed that voter registration fraud normally only occurred in the context of mailing a registration card to the appropriate state agency. *Id.* at 604. Although the

RNC was unable to cite to even one instance of such fraud, the Court recognized that the RNC still had a legitimate interest in ensuring that such fraud did not occur. *Id.* As a result, the Court reduced the preclearance period from twenty to ten days to account for states that permitted registration up to ten days before an election. *Id.* at 604-05.

The Court next turned to in-person fraud, finding that such cases were "extremely rare." *Id.* at 606. In support, the Court pointed to both the majority opinion and dissent in *Crawford v. Marion Cty. Election Bd.,* 128 S. Ct. 1610,[5] 1611 (2008), which involved a challenge to Indiana's requirement that voters prove their eligibility through the production of government-issued photographic identification. *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 608. In short, although the Supreme Court was deeply divided as to the proper outcome, all Justices agreed that there was not even one example of in-person voter fraud in the history of Indiana. *Id.* (citing *Crawford*, 128 S. Ct at 1619 (majority opinion); 128 S. Ct. at 1637 (Souter, J., Dissenting)). The Court concluded that, in the balance, the threat of voter intimidation posed a far greater and real threat to disenfranchising legitimate voters when compared to in-person fraud. *Id.* at 610-13. One example of the scope of the threat of disenfranchisement, pointed to by the Court, was the 2004 case involving Ms. Malone in which the voter challenge list included 35,000 predominately minority persons. *Id.* at 610.

Following its analysis, the Court agreed that modifications to the Consent Decree were appropriate, including the following: (1) only the parties to the Decree could bring an action to redress a violation of the agreement; (2) a reduction in the preclearance period from twenty to ten days; (3) a better definition of "ballot security"; (4) a definition of "normal poll-watch function";

---

[5] The United States Reports citation for *Crawford* is 553 U.S. 181. The Court is citing *Crawford* as Judge Debevoise did before the United States Reports citation was available.

and (5) a definitive expiration date of December 17, 2017, unless the DNC proved in the interim that the RNC violated the Decree, in which case the Decree would be extended an additional eight years.  *Id.* at 622-23.

The term "ballot security" is defined in the 2009 modification as follows:

> (3) . . . any program aimed at combatting voter fraud by preventing potential voters from registering to vote or casting a ballot.  Such programs include, but are not limited to,[6] the compilation of voter challenge lists by use of mailing or reviewing databases maintained by state agencies such as motor vehicle records, social security records, change of address forms, and voter lists assembled pursuant to the HAVA[7]; the use of challengers to confront potential voters and verify their eligibility at the polls on either Election Day or a day on which they may take advantage of state early voting procedures; the recording by photographic or other means of voter likenesses or vehicles at any polling place; and the distribution of literature informing individuals at or near a polling place that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

*Id.*  "Normal poll watch function" is defined as:

> (4) . . . stationing individuals at polling stations to observe the voting process and report irregularities *unrelated to voter fraud* to duly-appointed state officials.  Such observers may report any disturbance that they reasonably believe might deter eligible voters from casting their ballots, including malfunctioning voting machines, long lines, or understaffing at polling places.  *Such observers may not question voters about their credentials; impede or delay voters by asking for identification, videotape, photograph, or otherwise make visual records of voters or their vehicles; or issue literature outlining the fact that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.*

*Id.* (emphases added).

---

[6] In addition to the unambiguous language used in defining ballot security and normal poll-watch function, the Third Circuit has made clear that the examples used are "non-exhaustive" lists. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 201 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013).

[7] HAVA is an acronym for the Help America Vote Act of 2002, 42 U.S.C. §§ 15301 *et seq.*

On appeal, the Third Circuit upheld the decision.  *Democratic Nat'l Comm.*, 673 F.3d 192.  The Third Circuit first observed that the "central purpose" of the Consent Decree was to prevent "the intimidation and suppression of minority voters."  *Id.* at 203; *see also id.* at 207, 209.  Judge Greenaway, writing for the court, further noted that since the inception of the preclearance provision in 1987, the RNC has "never submitted any voter fraud prevention program for preclearance."  *Id.* at 212; *see also id.* at 215.  The Court of Appeals then indicated that the Decree was intended to address in-person voter fraud, which was a rare occurrence that the RNC could nevertheless address, so long as it abided by the preclearance provision.  *Id.* at 212-13.  Finally, as to the proximity of actions concerning the Consent Decree to elections, the Third Circuit noted the following:

> The nature and timing of election cycles may cause the need to defend against Decree enforcement suits to arise at inconvenient times, *but resolving those issue before Election Day is crucial to enforcing the Decree by ensuring access to the polls and preventing suppression of minority votes.*

*Id.* at 215 (emphasis added).

## C.  Positions of the Parties

**The DNC's Motion**

The DNC's position is essentially that the campaign of Donald J. Trump, the Republican candidate for President (the "Trump Campaign") has encouraged action that would violate the Consent Decree.  The RNC in turn breached the Decree through its general support of the Trump Campaign and its specific assistance to the campaign regarding voter fraud, according to the DNC.  Moreover, the DNC alleges that certain persons who are both members of the RNC and state parties have promised action that would violate the Decree.

As to the Trump Campaign, the DNC claims that the campaign, including the candidate himself, has directed his supporters to engage in voter intimidation.  DNC Br. at 5.[8]  As to the candidate, the DNC indicates that on October 11, 2016, Mr. Trump told a crowd in Pennsylvania that it is "[s]o important to watch other communities because we don't want this election stolen from us . . . . And everybody knows what I'm talking about."  *Id.* at 6, DNC Ex. 3.  The DNC claims that Mr. Trump was referring specifically to Philadelphia, with a focus on African-American sections of the city.  *Id.*  The DNC indicates that Trump advisers have made similar public pronouncements.  For example, former New York City Mayor Rudolph Giuliani reportedly indicated on October 16, 2016, that voter fraud is concentrated in "inner cities" such as Philadelphia and Chicago; areas in which supporters back Democrats according to Mr. Giuliani.  DNC Br. at 6, DCR Ex. 23.  The DNC points to a posting on the Trump Campaign's website titled "Trump Election Observers," as well as the website StopTheSteal.org, as further evidence that the Trump Campaign is intent on voter suppression efforts.  DNC Br. at 6-7.  StopTheSteal.org is supposedly run by Roger Stone, an alleged advisor to Mr. Trump who was also involved in the 1981 New Jersey Gubernatorial campaign that led to the Consent Decree in the first instance.  DNC Br. at 7, DNC Exs. 8 & 9, DNC Elias Ex. 1.

The DNC additionally cites press reports and social media posts which indicate that certain supporters of Mr. Trump have interpreted the Trump Campaign's statements as a call to engage in voter intimidation.  For example, one gentleman from Ohio indicated that he was

---

[8] The DNC's initial brief in this matter will be referred to as "DNC Br."  The supporting exhibits to the brief, attached to a certification of Angelo Genova, Esq., will be referred to as "DNC Ex." except for those submitted by Marc Elias, Esq., which will be referred to as DNC Elias Ex."  The RNC's opposition brief will be referred to as "RNC Br.," and its exhibits will be referred to as "RNC Ex."  The DNC's reply brief and its exhibits, attached to the certification of Mr. Genova, will be referred to as "DNC RBr." and "DNC REx.", respectively.

planning on going to voting precincts to engage in "racial profiling" to make those voters "a little bit nervous." DNC Br. at 10, DNC Ex. 11. Another man posted on Twitter that he was going to be watching for "shenanigans" and "haul [] away" certain voters. DNC Br. at 10, DNC Ex. 12. The tweet included a picture of a pickup truck with a cage built into the bed. *Id.*

The DNC also asserts that the claim of widespread voter fraud is actually a myth that has been debunked. DNC Br. at 7-8 (citing Lorraine C. Minnite, *The Myth of Voter Fraud* (2010)). The DNC further points to decisions in which courts have ruled, in regard to the state in which the action is brought, that voter fraud is extremely rare and normally used as a pretext for voter intimidation. DNC Br. at 8-9 (citing *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH) (D.N.D. Aug. 1, 2016) (North Dakota); *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222 at *2 (W.D. Wis. July 29, 2016) (Wisconsin); *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251 at *28 (S.D. Ohio June 7, 2016) (Ohio)).

As to the RNC's involvement, the DNC makes four arguments: (1) the RNC believes that voter fraud is real; (2) the RNC is working with the Trump Campaign in lock-step; (3) high-level officials in the Trump Campaign indicated that they are working with the RNC as to ballot security; and (4) certain state political officers (who are also members of the RNC) indicated that they will combat perceived voter fraud. DNC Br. at 10-14. As to the RNC's position on voter fraud, the DNC points to the 2012 comments by the RNC's Chairman Reince Priebus which indicated that Republican candidates needed to be one to two percentage points better to offset voter fraud. DNC Br. at 9, DNC Ex. 29. More recently, on October 23, 2016, Mr. Priebus apparently stated on the television news program *Face the Nation* that voter fraud "is real." DNC Br. at 10, DNC Ex. 24.

Concerning the RNC's general synchronization with the Trump Campaign, the DNC again cites to Mr. Priebus' comments. In October 2016, Mr. Priebus reportedly stated that the RNC is "in full coordination" with the Trump Campaign and that the RNC "remain(s) very much involved and together [with the Trump Campaign] in all levels in making these decisions of how best to run the operation across the country." DNC Br. at 12, DNC Ex. 14. The DNC also points to the joint fundraising committee between the RNC and the Trump Campaign and additionally argues that the RNC has commingled its staff and resources with the campaign. DNC Br. at 11-12.

Regarding the RNC's specific coordination with the Trump Campaign on ballot security initiatives, the DNC points to comments made by Vice Presidential candidate Michael Pence during a rally on August 3, 2016. DNC Br. at 11. In response to a question concerning the Democratic Presidential nominee Hillary Clinton "stealing" the election, Governor Pence reportedly indicated that the Trump Campaign and the RNC were working "very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *Id.* (citing *8-3 Replay: Pence Denver Rally Town Hall,* TrumpTube.tv). In further support of its position, the DNC notes that the Trump Campaign manager, Kellyanne Conway, allegedly stated that the RNC and the campaign (along with others) were working together to "monitor precincts" throughout the United States. DNC Br. at 12, DNC Ex. 15.

The DNC contends, moreover, that the Consent Decree is being violated because two members of the RNC, who are also the heads of their respective state party committees, publicly indicated that they are initiating voter fraud programs. The first is Rob Gleason, the chair of the Pennsylvania Republican Party, and the second is Ronna Romney McDaniel, the chair of the Michigan Republican Party. DNC Br. at 13-14. Mr. Gleason reportedly initiated efforts to

13

recruit poll watchers to work in Philadelphia.  DNC Br. at 13, DNC Exs. 17 & 18.  Ms. Romney McDaniel has apparently announced a "massive statewide anti-voter fraud effort" in Michigan. DNC Br. at 14, DNC Ex. 5.

In light of the foregoing, the DNC contends that the RNC is violating several provisions of the Decree.  DNC Br. at 15.  First, the DNC claims that the RNC has not sought preclearance, as required by the Consent Decree, for any of the stated voter fraud efforts.  *Id.*  The DNC next argues that the Decree has been breached because the voter fraud efforts target areas based on the racial and ethnic composition of the relevant population.  *Id.*  Finally, the DNC asserts that the proposed measures have the effect of deterring qualified persons from voting, thereby running afoul of the Decree.  *Id.*

**The RNC's Opposition**

The RNC responds that it is in compliance with the Consent Decree and that the DNC's arguments lack merit.  *See* RNC Br.  First and foremost, the RNC contends that it has not "organized, participated in, or supported any vote fraud prevention program or ballot security activities."  RNC Br. at 9.  In support of its position, the RNC submitted the declarations of its Political Director, Chris Carr, and six Regional Political Directors.  RNC Exs. B – H.  Mr. Carr states that he received training as to the Consent Decree, that those working for the RNC are aware of the Decree, and that he is unaware of any activities that would violate the Decree.  RNC Ex. B.  All six of the regional directors make declarations in accord with Mr. Carr.  RNC Exs. C – H.

The most detailed description of the RNC's efforts in connection with the Decree is found in the Declaration of John R. Phillippe Jr., the Chief Counsel of the RNC.  RNC Ex. A. Mr. Phillippe notes that the RNC has 168 voting members, including the chairperson of each

state Republican party.  *Id.* ¶ 8.  Mr. Trump has never been a member of the RNC, according to

Mr. Phillippe.  *Id.* at ¶ 9.

      Mr. Phillippe indicates that he is "responsible for training all RNC personnel on

compliance with the Consent Decree."  *Id.* ¶ 5.  Mr. Phillippe sets forth the steps that he has

taken to educate RNC representatives.  Among other things, Mr. Phillippe states that the RNC

has done the following:  (1) May 2016 – the RNC's Counsel Office provided a legal compliance

guide, which included information on the Decree, to "all of the RNC's division heads, state party

executive directors, and state party chairmen," *id.* ¶ 16 & A-07; (2) June 5, 2015 to April 15,

2016 – the RNC conducted a total of five sessions at its "Campaign Management College" for

staff from state parties and various campaigns on "the parameters and restrictions imposed on the

RNC by the Consent Decree[,]" *id.* ¶ 17; (3) July 22, 2016 – the RNC provided an orientation for

new members, which included a briefing on the Decree, *id.* ¶ 18 & A-08; (4) August 19, 2016 –

the RNC's Counsel's Office sent a memorandum to all RNC staff indicating that the RNC would

not engage in any ballot security efforts nor provide any resources for such activities, *id.* ¶ 19 &

A-09; (5) September 22, 2016 and October 17, 2016 – the RNC Counsel's Office sent guidance

to RNC staff, independent contractors, and volunteers as to the parameters of the Decree, *id.* ¶¶

20-22 & A-10 – A12;[9] and (6) October 2016 – webinar training on the Consent Decree for all

RNC political staff and independent contractors, *id.* ¶ 24 & A-14.

      Of note, several of the documents attached to Mr. Phillippe's declaration indicate that the

RNC was not, and would not be, participating in any poll watching functions.  *See id.* & A-10,

---

[9] The October 17, 2016 memorandum to "all staff and independent contractors" reviewed the
requirements of the Consent Decree. *Id.* ¶ 22.  The recipients were required to sign and return an
"affirmation form" indicating that they read the memorandum and would abide by it.  *Id.*
According to Mr. Phillippe, over 400 recipients did so, which Mr. Phillippe characterizes as the
"vast majority" of the recipients.  *Id.*

A-ll, A-12, A-13.  Yet, according to the information submitted by the DNC, the RNC is currently engaging poll observers.  D.E. 114-1 – 114-3.  This information is discussed further below.

Mr. Phillippe also recounts that on October 19, 2016, John Ryder, the RNC's General Counsel, sent an email to all 168 members that reminded the recipients that they could not use RNC resources for any activities prohibited by the Decree.  *Id.* ¶ 23 & A-13.  Mr. Ryder also encouraged members not to engage in any ballot security activities in any other capacity, for example, as a state party official, but warned that if the members did so, they were not acting as agents of the RNC.  *Id.*

Moreover, Mr. Phillippe attests that once he learned that Mr. Trump was "likely to emphasize voter fraud in his campaign," Mr. Phillippe enhanced his training vis-à-vis the Decree.  *Id.* ¶ 5.  In addition, he wrote an August 13, 2016 letter to counsel for the Trump Campaign advising that the RNC strictly complies with the Consent Decree and would not engage in any ballot security actions.  *Id.* ¶ 27 & A-15.  The letter also warned that the Trump Campaign was not an agent for the RNC regarding any ballot security initiatives.  *Id.*

The RNC submits that the foregoing efforts, as reflected in Mr. Phillippe's declaration and supporting exhibits, demonstrate that it has "taken abundant measures to ensure good faith compliance with the Consent Decree."  RNC Br. at 14.  In support, the RNC asserts that it educated the necessary RNC representatives as to the Decree and its contours, took prophylactic measures to ensure compliance, expressly and proactively informed the Trump Campaign that it will not partake in any voter fraud measures, and monitored compliance with the Decree.  *Id.*

The RNC further decries the evidence submitted by the DNC, arguing that the press accounts relied upon "contain double and triple hearsay, and are inadmissible and not probative." *Id.* at 14-15.  The RNC asserts that the DNC cannot point to any current, specific prohibited

activities. *Id.* at 15.  The RNC stresses that neither Mr. Trump, his campaign, nor his supporters are subject to the Consent Decree. *Id.* at 15-17.  Mr. Trump, the RNC continues, is not a member of the RNC and has never been authorized to act on behalf of the RNC. *Id.* at 16.

Regarding the joint fundraising committee with Mr. Trump, the RNC responds that it is merely a vehicle by which both can collectively raise money. *Id.* at 18.  Importantly, according to the RNC, each entity receives and gains full control over its share of the proceeds without obligation to spend the funds in a certain manner. *Id.* at 18-19.  The RNC also denies that it is sharing any staff or resources with the Trump Campaign vis-à-vis voter fraud efforts and points out that the DNC provided no evidence to the contrary. *Id.* at 19.

As to Mr. Priebus' comment that the RNC is in "full coordination" with the Trump Campaign, the RNC asserts that is merely evidence of politics rather than misconduct. *Id.* at 19. As to the other comments alleged, the RNC claims that Kellyanne Conway's comments were triple hearsay from a media article. *Id.* at 20.  Moreover, the RNC continues, the DNC failed to indicate that the same article stated that the reporter to whom Ms. Conway made the comments also indicated that Ms. Conway later said that she had been mistaken. *Id.* at 21.  Regarding Governor Pence's statement concerning "ballot integrity," the RNC asserts that it was a spontaneous remark in response to an audience question, it was mischaracterized by the DNC, and that, in any event, Governor Pence was simply mistaken if he was referring to voter fraud efforts with the RNC. *Id.*  Turning to the statements made by the state party chairs in Pennsylvania and Michigan, the RNC represents that such activities are permissible so long as the chairs are acting in their state party capacity as opposed to as an RNC member. *Id.* at 22-23. In support, the RNC argues that the Supreme Court of the United States has made clear that persons may assume different "hats," such as being a national party official while also occupying

a position within the state party.  *Id.* (citing *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 139, 157 (2003), *partially overruled on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)).

The RNC concludes that the DNC fails to establish its right to any of the relief sought. *Id.* at 23-26.

### The DNC's Declarations

After the RNC filed its opposition, the DNC supplemented the record with declarations from three Democratic poll observers.  D.E. 114-1 – 114-3.  The three Democratic observers consisted of a retired Assistant United States Attorney, an engineering and tech consultant, and an attorney who also serves as a judge *pro tem*.  *Id.*  The three indicated that they were assigned to observe early voting in two locations within Nevada at the end of October 2016.  *Id.* Republican poll observers, from the RNC, also worked at the same time as the Democratic observers.  *Id.*  The first Democratic poll observer declared that the Republican observer, K.H., showed her an email indicating that K.H.  was not obligated to tell anyone that she was working for the Republicans.  D.E. 114-1 at 3.  K.H. further noted that she had been trained on poll monitoring rules, and the Democratic watcher saw K.H. take copious notes and fill out an election incident report.  *Id.* at 2-3.  The two other Democratic observers indicated that their Republican counterparts, O.P. and K.H. again, initially stated that they were "Independent" poll observers before finally admitting that they worked for the RNC.  D.E. 114-2 & 114-3.  K.H. also reportedly said that she was told to lie about whom she worked for.  D.E. 114.  In addition,

the two observers also worked with additional Republican observers, C. and J.,[10] who stated that they too worked for the RNC.  *Id.*

The DNC then submitted three additional declarations from Democratic poll watchers. D.E. 122-1 – 122-3.  The poll watchers consisted of two lawyers and a consultant.  *Id.*  The three observers also worked in Nevada at the end of October 2016, in connection with early voting. *Id.*  The first Democratic observer identified a Republican observer, O.,[11] who indicated that the O. gave wrong information to a potential voter concerning voting by paper ballot.  D.E. 122-1 ¶¶ 4-5.  The Democratic observer was also informed that O. provided erroneous information concerning where a person could vote early.  *Id.* ¶ 6.  The second Democratic observer attested that O.P. twice gave voters wrong directions – once concerning a voting location and once regarding voter identification.  D.E. 122-3 ¶¶ 4-5.  The final Democratic observer noted that she worked with a Republican poll observer, B., who admitted that the RNC -- as opposed to the Trump Campaign -- was running the poll watching operations.  D.E. 122-2.  As noted, the information from all six Democratic observers conflicts with the RNC's claim that it is not involved in any poll watching functions.

**The RNC's Discovery**

In response to the Court's discovery orders, the RNC produced three declarations on November 2, 2016 and five additional declarations the following day.  The November 2 production was comprised of declarations of Mr. Phillippe, Ronna Romney McDaniel, and Robert A. Gleason, Jr., as well as attached exhibits.  D.E. 120 – 120-3.

---

[10] C. and J. are the initials for the observers first names as the declarants did not indicate surnames for either.  The same is true for any other observer who is identified by a single letter.

[11] Due to the unique nature of O.'s name, the Court assumes that she is O.P.

Mr. Phillippe addressed whether the RNC had any agreements with the Trump Campaign concerning voter fraud, the press statements reportedly made by Governor Pence and Ms. Conway, and remarks by Ms. Romney McDaniel and Mr. Gleason.  D.E. 120-1.  As to the agreements, Mr. Phillippe attested that none had been located and, to his knowledge, none existed.  In completing his due diligence, Mr. Phillippe spoke to each RNC official who had authority to enter into contracts, certain high-ranking members of the RNC's Political Division, and the general counsel of the Trump Campaign.  *Id.* ¶¶ 6-7, 9.  Mr. Phillippe also performed a search of the RNC's electronic and hard copy files for any such agreements, but none were found.  *Id.* ¶ 8.

Turning to Governor Pence and Ms. Conway, Mr. Phillippe personally spoke with each and both indicated that they had no knowledge of any involvement between the RNC and the Trump Campaign as to ballot integrity or poll monitoring activities.  *Id.* ¶¶ 12 – 15.  As to Ms. Romney McDaniel and Mr. Gleason, Mr. Phillippe contacted counsel for both the Pennsylvania and Michigan Republican Parties.  *Id.* ¶¶ 18 – 19.  Counsel for each state indicated that the RNC has no involvement in the state committee's poll watching efforts.  *Id.*

Ms. Romney McDaniel's declaration indicated that she is the Chairwoman of the Republican Party of Michigan and, by virtue of that position, a member of the RNC.  D.E. 120-2 ¶ 2.  Ms. Romney McDaniel acknowledged that the state party is engaged in poll watching and ballot security efforts but said that all funding, materials, and training come from the state party, rather than the RNC.  *Id.* ¶ 3.  Ms. Romney McDaniel stated that the RNC is not involved in the state committee's efforts.  *Id.*  Mr. Gleason, the Chairman of the Republican Party of Pennsylvania and also a member of the RNC, made attestations similar to those of Ms. Romney

20

McDaniel. Specifically, to the extent that the state committee is engaged in poll watching activities, Mr. Gleason stated that the RNC is not involved. D.E. 120-3 ¶¶ 5 – 6.

Pursuant to the Court's November 2, 2016 discovery order, and in response to the six declarations of the Democratic poll observers, the RNC submitted five declarations, along with exhibits, on November 3, 2016. D.E. 128 – 128-5. The declarations were from Mr. Phillippe; Peter Graves, the RNC's Regional Political Director in the region covering Nevada; Matt Pinnell, the State Party Director for the RNC; Robert Talbot, the Nevada State Director for the RNC; and Holly Turner, a partner with Stampede Consulting, LLC ("Stampede"). *Id.*

Mr. Phillippe said that it "stood out" to him that the DNC has many attorneys working as poll observers in a particular areas of Nevada. D.E. 128-1 ¶ 9. Mr. Phillippe believes that the Democratic observers are aware of the Decree and are questioning other poll workers in an attempt to find an association with the RNC. *Id.* Mr. Phillippe further attested that his due diligence, including an electronic search of the RNC's emails, failed to reveal any names matching K.H., O.P. or C.[12] *Id.* ¶¶ 11-14. As to Stampede, Mr. Phillippe confirmed that the RNC has contracted with the consulting firm but solely for get-out-the-vote activities limited to a different state in another part of the country. *Id.* ¶ 15. Mr. Phillippe also opined that, in his experience, it is not uncommon for individuals who work or volunteer for a political organization to be confused as to the nature of the organization with whom they are working. *Id.* ¶ 17.

Mr. Graves, Mr. Pinnell, and Mr. Talbot confirmed that the RNC has no poll watching activities underway in Nevada. D.E. 128-2 ¶ 5, D.E. 128-3 ¶ 5, D.E. 128-4 ¶ 7. Ms. Turner acknowledged that Stampede is undertaking poll-watching in Nevada but not in conjunction with

---

[12] Since neither the DNC or RNC knew C.'s last name, the RNC searched for a person named C.S. based on her first name. Ms. Turner's declaration refers to the same C.S.

the RNC.  D.E. 128-5, ¶¶ 7-8.  Ms. Turner added that both K.H. and C.S. are employed with

Stampede.  *Id.* ¶¶ 8-12.  Ms. Turner could not locate anyone named O.P., B., or J. working for

Stampede.  *Id.* ¶ 13.

### The DNC's Reply

The DNC replies that its evidence clearly shows that the RNC is involved in ballot

security efforts prohibited by the Consent Decree.  DNC RBr. at 2.  The DNC first notes that five

separate poll workers in Nevada indicated that they are working for the RNC.  *Id.*  The DNC

further claims that while Stampede denies working for the RNC in Nevada, the RNC admits that

Stampede is working for it in some capacity as a contractor.  *Id.  See also* RNC REx. 1 (October

18, 2016 FEC filing by the RNC reflecting that has paid Stampede a total of $1,305,000).

According to the DNC, the RNC's use of Stampede as a contractor establishes a violation of the

Decree, assuming that K.H. and C. are actually working for Stampede rather than the RNC.

DNC Br. at 2-3.

In further support, the DNC again points to the statements of Governor Pence, Ms.

Conway, and Mr. Priebus.  *Id.* at 2-3.  The DNC emphasizes the high rank of each in either the

Trump Campaign or the RNC, and indicates that it is highly unlikely that all three are actually

"mistaken."  *Id.*  The DNC also points to new evidence, that of a high-ranking officer of the

Republican Party of Virginia, who during a poll-watching training session referred to the

involvement of the RNC only to immediately correct himself, reportedly to laughter in the

crowd.  *Id.* at 4, DNC REx. 2.  The DNC claims that another "mistaken" reference to the RNC's

involvement is simply not plausible.  DNC RBr. At 4.

The DNC also argues that the Trump Campaign is acting as an agent of the RNC because

the RNC is running the campaign's ground game and supplying it with voter data.  DNC RBr. at

5, DNC REx. 3.  At a minimum, according to the DNC, the Trump Campaign is an agent of the

RNC through either apparent authority or authority by estoppel.  DNC RBr. At 7.  As to the state

chairs of Pennsylvania and Michigan, the DNC claims that they are bound by the Decree since

both are also RNC members.  *Id.* at 7-9.  The DNC also points to a memorandum from counsel

for the RNC to all political staff and independent contractors indicating that they can never

remove their RNC "hat" regardless of whether they are working in another capacity.  *Id.* at 9.

## II. ANALYSIS

Consent decrees are generally interpreted pursuant to principles of contract construction.

"[C]onsent decrees are judicial acts, [which] have many of the attributes of contracts voluntarily

undertaken and are construed according to traditional precepts of contract construction."  *Fox v.*

*U.S. Dep't of Hous. & Urban Dev.*, 680 F.2d 315, 319 (3d Cir. 1982) (internal citations omitted);

*see also Miles v. Aramark Corr. Serv., Inc.*, 321 F. App'x 188, 191 (3d Cir. 2009) ("Consent

decrees are analogous to contracts, and thus we interpret them with reference to traditional

principles of contract interpretation." (internal quotation marks omitted)).  Courts "discern the

scope of a consent decree by examining the language within its four corners."  *Harris v. City of*

*Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998).  A court's "first task in interpreting a consent

decree . . . is to determine whether its terms unambiguously cover the dispute in question."

*United States v. State of New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999).  "In so doing, [the judge]

must not strain the decree's precise terms or impose other terms in an attempt to reconcile the

decree with [the Court's] own conception of its purpose."  *Harris*, 137 F.3d at 212.  Thus, "[t]he

parties are bound by the 'objective definition of the words they use to express their intent.'"

*United States v. State of New Jersey*, 194 F.3d at 430.  The Court will only look to extrinsic

evidence in interpreting a consent decree when a term is ambiguous, in other words, when "it is reasonably susceptible to at least two different interpretations." *Id.*

At the outset, it is important to emphasize that the Trump Campaign is not subject to the Consent Decree unless it acted as an agent or representative of the RNC. The DNC clarified in its reply brief and at oral argument that it was advocating two positions in this regard: first, that the Trump Campaign was an agent of the RNC, and, second, that the RNC was acting in concert with the Trump Campaign. As to the agency claim, the Court finds that the DNC has submitted insufficient evidence to support its position. In addition, the RNC produced documentary evidence from its counsel's office to the general counsel for the Trump Campaign which indicated that the campaign was not an agent of the RNC vis-à-vis ballot security measures. The Court views the actual issue in this case as whether the RNC is working in concert with the Trump Campaign on voter fraud programs. The question is not whether the RNC is working with the Trump Campaign on other campaign strategy and events? They clearly are. Instead, the primary inquiry is whether the campaign and the RNC are operating together in a manner that would violate the Decree. Of course, the RNC's overall relationship with the Trump Campaign may be relevant as to whether they are coordinating on ballot security measures.

For this reason, comments by persons within the Trump Campaign are relevant to the Court's analysis. The Trump Campaign has clearly emphasized voter fraud efforts. Mr. Trump himself has publicly encouraged his supporters to actively fight voter fraud. If the RNC acted in concert with the Trump Campaign on these activities, the RNC would be in violation of the Consent Decree for a number of reasons, chief among them being that the RNC did not seek preclearance of such efforts. The DNC also submitted evidence indicating that at least certain supporters of the Trump Campaign have interpreted the campaign's remarks to take action in a

manner that would violate the Decree, whether it be engaging in racial profiling, making potential voters nervous, or hauling voters away in a cage attached to a pickup truck.[13]

As a result, the Court disagrees with the RNC's claims that Mr. Priebus, Governor Pence, and Ms. Conway's statements are not probative.  In addition, as the head of the RNC, Mr. Priebus' statements are not hearsay.  *See* F.R.E. 801(d)(2).  The statements are also important because of the stature of the speakers – the Vice Presidential candidate, the lead manager of the Trump Campaign, and the head of the RNC.  While the RNC argues that such higher-ups may naturally be mistaken because they are removed from the granular details of the day-to-day operations of the campaign, the Court finds this explanation lacking.  The Trump Campaign has made combatting voter fraud a central issue, and it is implausible to believe that such high level personnel are unaware of this call to action and any corresponding plans to implement it.

Governor Pence stated that the RNC and the Trump Campaign are working with state committees on "ballot integrity."    The RNC's own internal guidance acknowledges that such a term implicates the Consent Decree.  *See* RNC Ex. A ¶ 20 & A-10 at 2 ("You may have heard [that] the Consent Decree prohibits the RNC from participating in Election Day Operations (or "EDO"), 'ballot security', or *'ballot integrity'* activities.  Whatever the name given to such

---

[13] The Court notes that, unfortunately, such calls for uninformed, vigilante enforcement of voting laws carries with it the very real possibility of subjecting the adherents to legal violations. Among other laws, the Voting Rights Act provides, in part, that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]"  52 U.S.C. § 10307(b).  From the evidence submitted by the DNC, it appears that some individuals who plan on "watching" polls in "certain areas" are not even aware of the law or its contours.  Moreover, such broad calls to action, without specific training as to what is legally permissible, creates untrained watchers with no credible guidance.  What are they to watch for?  Who are they to watch?  Where are they to watch?  How are they to act when watching?  What action are they to take?  What action are they to refrain from?  To whom are they supposed to report?  What is legally permissible?  What is unlawful?  Without specific guidance, the "watchers" are left to answer these critical questions for themselves.

programs, *RNC employees, consultants, and volunteers are strictly prohibited from engaging them."* (emphases added)).

Ms. Conway's statements were somewhat different. She said that the RNC and the Trump Campaign were working together on precinct monitoring. Such monitoring could implicate the Decree if it involved a ballot security or had a voter fraud component. However, such monitoring could also be entirely permissible if it was comprised solely of normal poll watching functions.

As to Mr. Priebus, he publicly stated in October 2016 that the RNC and the Trump Campaign were working in "full coordination [with the RNC]" at "all levels." The RNC dismisses this statement as mere politicking at a time in which the RNC's commitment to the campaign was being questioned. The RNC may be correct. Yet, if taken literally, such a claim could also indicate that the RNC and Trump Campaign are working in lock-step on all matters, including ballot security initiatives. Mr. Priebus' statement also came *after* Governor Pence's comments concerning ballot integrity. Adding to the mix is Mr. Priebus' statement later in October 2016 that voter fraud "is real." The Court cannot overlook the fact that Mr. Priebus is the Chairman of the RNC. In light of the Consent Decree's prohibitions, the Court finds the foregoing statements probative, both individually and collectively.

However, the critical issue remains whether the RNC has in fact acted in coordination with the Trump Campaign to prevent voter fraud in light of the statements. Putting aside the activity in Nevada, which is discussed separately below, the DNC has been unable to demonstrate such coordination. The Court realizes that given the timing of the motion and

Election Day, only limited discovery was permitted.[14]  However, the discovery thus far produced

by the RNC reflects that it is not working with the Trump Campaign on ballot security measures.

First, no agreements between the two exist as to voter fraud efforts.  In addition, the RNC's

Chief Counsel, Mr. Phillippe, personally confirmed with Governor Pence and Ms. Conway that

neither were aware of any activities with the RNC pertaining to ballot integrity.  Further, the

RNC's counsel informed the Trump Campaign that it will not engage in any such efforts on

Election Day.  Moreover, Mr. Phillippe set forth in great detail, with corresponding exhibits, his

efforts to continually educate representatives of the RNC as to the Decree and its prohibitions.

The Court is aware that recipients of sound legal advice do not always follow the given advice,

but it does appear that Mr. Phillippe has undertaken extensive efforts to ensure that the RNC

does not violate the Consent Decree.

      The DNC also points to the actions of the RNC members, Ms. Romney McDaniel and

Mr. Gleason, who are also the state party chairs of their respective states.  To be clear, if Ms.

Romney McDaniel or Mr. Gleason were engaging in the reported activity on behalf of the RNC,

the RNC would be in violation of the Decree because Michigan and Pennsylvania's voter fraud

measures received no preclearance approval.  Moreover, the press accounts indicate that the

Pennsylvania effort is focused on Philadelphia, at least in part, due to its racial and ethnic make-

---

[14] Due to the limited discovery, and as is discussed further below, the Court is permitting the
DNC to return after Election Day to seek additional discovery.  For example, the DNC posits that
if Mr. Priebus advised the Trump Campaign on ballot security efforts, then the RNC would be in
violation of the Consent Decree.  This is a fair point.  However, based on the evidence currently
before the Court, Mr. Priebus merely stated that he was aware of the Trump Campaign's position
on voter fraud.  Mr. Priebus did not add that he was also advising the campaign how to stop such
perceived fraud.  That being said, the DNC may be permitted to take additional discovery after
Election Day on this issue among others.

up.  However, the crucial issue is whether either state director is also acting in his/her capacity as RNC members.

The Court finds, as a matter of law, that neither Ms. Romney McDaniel nor Mr. Gleason are subject to the Consent Decree if they are acting solely in their capacity as state party chairs. The Court notes that the 1982 Consent Decree stated that it was binding on the RNC, and its "agents, servants, and employees, whether acting directly or indirectly through other party committees." *Id.*  At first glance, this sentence appears to support the DNC's reading because Ms. Romney McDaniel or Mr. Gleason could be acting as agents of the RNC through their positions in their state committees.

However, the provision is immediately followed by a recognition that the RNC did not have a "right of control over other state party committees, county committees, or other national, state and local political organizations of the same party, and their agents, servants and employees." *Id.* at ¶ 4.   All state party chairs are, by virtue of their position, automatically members of the RNC.  Thus, the practical effect of the DNC's argument, if accepted, would be that all state party committees are bound by the Consent Decree due their chairs being RNC members.  This conclusion would mean that the express acknowledgement that the RNC had no right of control over other "state party committees" would be, at best, meaningless, and at worst, misleading.  *See Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) (noting that "a contract should be read so as to give meaning to all of its terms" and "a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions" (internal quotation marks omitted)). Moreover, at the time of the 1982 Decree, only the New Jersey state committee was a party and bound by its parameters.  No other state committee has since been added to the Decree.

Importantly, the fact that one state committee was bound also supports the conclusion that by using the word "other" to modify state committees, the Consent Decree meant no state committees other than New Jersey.

Notably, Judge Debevoise, who oversaw the Decree from its inception through its 2009 modification, *see* note 1, never interpreted the agreement in the manner proposed by the DNC. First, in 1990, Judge Debevoise found that the RNC was not responsible for the questionable mailings of the North Carolina Republican Party. Instead, Judge Debevoise found that the RNC violated the Consent Decree because it failed to educate the state committees on the terms of the Decree. Similarly, in 2008, Judge Debevoise determined that the RNC was not responsible for the actions of the New Mexico Republican Party. It does not appear that the DNC contested either finding. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 509 (3d Cir. 2005) (explaining that when interpreting a contract courts give "'great weight' to the parties' course of conduct in discerning the intent of the parties"). Thus, the Consent Decree has been interpreted, on at least two occasions by Judge Debevoise, to not apply to state committees even though their chairs were also members of the RNC. *See Democratic Nat'l Comm.*, 673 F.3d at 203 ("In reviewing the District Court's opinion and its modifications to the Decree, we do not take lightly Judge Debevoise's nearly three decades of experience presiding over all matters related to this Decree.").

The RNC also represented that when the 1982 Consent Decree was entered, the rule that state chairs automatically became members of the RNC was in effect. D.E. 132-1 ¶ 3. This evidence lends further support to the Court's interpretation. As noted, the Court views the DNC's position, if taken to its logical extreme, to mean that all fifty state chairs are automatically subject to the Decree because they are also members of the RNC. The Court finds

no support in the Decree, or opinions discussing it, for such a broad reading.  To the contrary, as noted, Judge Debevoise expressly rejected this interpretation on at least two occasions.[15]

The issue then becomes a factual inquiry – were either Ms. Romney McDaniel or Mr. Gleason acting in their capacity as RNC members when announcing and engaging in voter fraud efforts in their respective states?  The Court finds that the DNC has not demonstrated that either were acting in their roles as RNC members.  In fact, the DNC's brief merely states that both are RNC members without further analysis.  The RNC, however, presented declarations from both Ms. Romney McDaniel and Mr. Gleason in which they state that they were acting in their capacity as state party chairs, not RNC members, regarding ballot security efforts in their states. In addition, Mr. Phillippe spoke with counsel for both state parties and each indicated that any state voter fraud effort was separate and distinct from the RNC.  Finally, the RNC presented evidence that its general counsel warned all 168 members, including state chairs, of the parameters of the Decree, encouraged the members not to act contrary to the Decree while wearing a different hat, and notified the members that if they engaged in ballot security efforts while acting in a different capacity they were not doing so on behalf of the RNC.[16]

---

[15] The RNC also noted that the Supreme Court's decision in *McConnell*, 540 at 139, 157, as well as the Federal Election Commission's Advisory Opinion 2003-10 expressly recognize that a person may lawfully assume different roles, and depending upon the role he/she is in, undertake different activities.  The RNC states that both the Supreme Court decision and the Advisory Opinion recognize that the same person may lawfully solicit certain monies if he/she is acting in her state committee role, although the same solicitation would be prohibited if he/she was acting in her national committee role.

[16] As to the DNC's point that the RNC warned its members that it could not wear different hats, the memorandum in question was sent to RNC political staff and independent contractors, persons essentially working full-time for the RNC.  RNC Ex. A ¶ 20 & A-10.  This memorandum was not sent to RNC members.  As noted, different notice was sent to members. RNC Ex. A ¶ 23 & A-13.

The final area of inquiry concerns Republican poll watchers at early voting sites in
Nevada.  The RNC first questions the backgrounds of the Democratic poll observers who
submitted the declarations.  As noted, four were attorneys, with one being a retired federal
prosecutor and the other also holding the position of judge *pro tem*; one was an engineering and
tech consultant; and one was an unspecified consultant.  The RNC suggests that such
backgrounds are somewhat suspect, particularly as to the lawyers.  The Court finds this argument
to be, at a minimum, unpersuasive and at odds with the RNC's own position.  The RNC in large
part relies upon the submissions of its Chief Counsel, Mr. Phillippe.  If the Court accepted the
RNC's argument, it appears that the Court would also have to view Mr. Phillippe's
representations with a jaundiced eye, perhaps even more so since he is in-house counsel to an
actual party in the dispute.  More importantly, it appears to the Court that having persons with
professional legal training acting as observers is commendable for several reasons.  When
compared with laypersons, attorneys should certainly have a better understanding of the relevant
law, of the distinctions between different political committees (such as a national party as
opposed to a state party), and of the responsibility and consequences of submitting sworn
declarations to the Court.

Turning to the poll watchers, two inquiries arise:  (1) is the RNC engaging persons to
engage in poll observations and, if so, (2) are the observers engaging in activity related to voter
fraud?  The former is permissible under the Decree so long as it meets the definition of normal
poll-watch functions, while the latter is forbidden.  The suspicions of the DNC were heightened
because the RNC submitted many exhibits which indicated that the RNC was not involved in any
poll watching activities whatsoever.  *See* RNC Ex. A ¶¶ 20-23 & A-10 – A-13.  To be sure, the
RNC emphasized that some of the actions it was internally prohibiting were permissible under

the Decree, but it nevertheless directed that no poll observations be undertaken.  Of course, the RNC is free to put greater restrictions upon itself, in an abundance of caution, than those required by the Consent Decree.  Yet, if certain RNC employees or representatives are not following the clear advice of its Chief Counsel, the concerns are obvious – not only as to poll watching but potentially also as to other areas in which legal instruction has been provided.

As to the first inquiry, the DNC presented credible evidence that the RNC is engaging in poll observations in Nevada.  The DNC poll observers identified five separate Republican watchers who stated that they were working for the RNC:  K.H., O.P., C., J., and B.  Importantly, it appears that subterfuge was involved.  O.P. and K.H. first identified themselves as "Independent" observers before acknowledging that they were present on behalf of the RNC.  On another occasion, O.P. stated that she was with a grassroots organization.  B. stated that she was working for the RNC although she had been told to say that she was there on behalf of Trump Campaign.  K.H. further indicated that she was instructed that she did not have to indicate for whom she worked and also stated that she was told to lie about representing the RNC.  As noted, the backgrounds of the Democratic poll watchers inures to the benefit of the DNC.

As to the second question, the DNC presented evidence that at least one of the Republican poll observers, O.P., engaged in conduct that could be construed as related to voter fraud.  O.P. reportedly gave incorrect information to voters on four separate occasions.  The bad advice concerned paper ballots, voting locations, and voter identification.  However, outside of O.P., the only other potentially questionable act arose when K.H. filled out an election incident report.  If the report concerned voter fraud, then it would also violate the Decree.  On the other hand, the Democratic poll watchers did not indicate that the remaining three RNC watchers – C., J., and B. – engaged in any conduct that could be construed as related to ballot security.

The Court first reviews the foregoing analysis and findings in light of the injunctive relief sought.  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, LLC, 793 F.3d 313, 318 (3d Cir. 2015) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994)).  To obtain a preliminary injunction, the party seeking relief must show "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Id.* at 318-19 (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004)).  A preliminary injunction will not issue unless all four elements are satisfied.  *Id.*

As to the second element, irreparable harm, the United States Supreme Court has recognized that the right to vote is a "fundamental political right."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (internal quotation marks omitted).  Accordingly, courts have consistently found that a "person who is denied the right to vote suffers irreparable injury."  *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1082 (N.D. Fla. 2004); *see also Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (same); *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (explaining that infringement on the fundamental right to vote causes irreparable injury that cannot be remedied through monetary damages).  That is so because infringement on the right to vote "cannot be alleviated after the election."  *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *see also United States v. Berks*

33

*Cty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("The impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy[.]").

The third and fourth elements also appear to inure to the benefit of the DNC. As to potential harm to the RNC if the Court enjoined the RNC from engaging in poll watching activities involving voter fraud, the RNC would merely be prohibited from doing what the Consent Decree already forbids. No additional harm, except perhaps reputational, would come to the RNC. And the public interest certainly favors the enforcement of consent decrees and the prevention of potential voter suppression.

Yet, in the Court's view, the injunctive relief sought turns on the first element, that is, the DNC's likelihood of success on the merits. For the reasons stated above, in light of the evidence currently in the record, the Court finds that the DNC has not demonstrated a likelihood of success concerning action taken by the RNC in light of the statements by Mr. Priebus, Governor Pence, Ms. Conway, Ms. Romney McDaniel, or Mr. Gleason. The poll watching activity in Nevada is not as clear. However, assuming that the DNC has shown a probability that it will succeed in demonstrating that the RNC is engaged in poll watching, the DNC has not done the same concerning whether such activity is related to voter fraud or ballot security, which is what the Decree prohibits. As noted, normal poll-watch functions are expressly permitted under the Consent Decree, so proving this fact alone would not entitle the DNC to relief. The Court is sensitive to the DNC's position that such activity is suspicious in light of the RNC's position that it is not engaging in any poll watching, but the Court's only focus is whether the Decree itself is being violated.

At best, the DNC shows a possibility, not a probability, that the poll observers' activities were related to voter fraud. The strongest evidence concerns the statements of O.P., who

34

allegedly gave potential voters materially wrong information on four occasions. Even this evidence, however, turns on O.P.'s intent when she provided the erroneous advice – did she do so intentionally or was she unintentionally mistaken? More importantly, even if O.P.'s statements were intentionally misleading, the Court is unable to infer an overarching program based on the actions of one person. Outside of the O.P. examples, the DNC's submissions on activities related to potential voter fraud are scant. K.H. reportedly filled out an incident report, but the Court would have to speculate as to whether the report related to alleged voter fraud. Critically, three observers who indicated that they worked for the RNC did not engage in any activities that could be deemed related to ballet security or voter fraud. As a result, the DNC has not demonstrated a probability of success on the critical issue – a program related to voter fraud – and its motion for injunctive relief is denied.

For similar reasons, the DNC's motion for contempt also fails. Regarding contempt, a "plaintiff has a heavy burden to show a defendant guilty of civil contempt." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 974 (3d Cir. 1982) (quoting *Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir. 1938)). "To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995). "Those elements must be proven by 'clear and convincing' evidence, and ambiguities must be resolved in favor of the party charged with contempt." *John T. ex rel. Paul T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003). "Substantial compliance with a court order is a defense to an action for civil contempt." *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (quoting *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir.1986)). Because the DNC has not shown a reasonable likelihood of success on the merits, it, by definition, has not shown

an actual violation of the Consent Decree by the more exacting standard of clear and convincing evidence. For similar reasons, the Court will deny the DNC's request for sanctions.

Finally, as to the breach of the Consent Decree, the DNC similarly has not met its burden of showing a violation by a preponderance of evidence. Again, the evidence currently in the record at most demonstrates a possible violation. Yet, the Court is cognizant that neither party was permitted to engage in full discovery. The DNC has made a colorable showing of a possible breach. As a result, the Court will deny the DNC's motion to extend the Consent Decree without prejudice at this time. Following the election, the Court will hear the parties as to whether additional discovery[17] is justified and, if so, the scope of the discovery.

### III. CONCLUSION

For the foregoing reasons, the Court denies the DNC's motion for injunctive relief, denies the DNC's motion to hold the RNC in contempt, denies the DNC's request for sanctions, and denies without prejudice DNC's motion to extend the Consent Decree.[18]

An appropriate Order follows.

Dated: November 5, 2016                    s/ *John Michael Vazquez*
At Newark, New Jersey                      JOHN MICHAEL VAZQUEZ
                                           United States District Judge

---

[17] To be clear, the Court is not limiting post-election discovery requests to the events described in Nevada. Based on the evidence currently before the Court, it cannot find that certain statements about coordinated efforts between the Trump Campaign and the RNC were actually implemented. However, the Court is aware that the reason that the evidence is so limited is due to the time constraints that the parties were operating under due to the approaching Election Day and, as a result, limited the discovery that could reasonably be provided. The Court made this point clear in its October 31, 2016 Order. D.E. 113 at 2 n.2.

[18] Although the Court is denying the DNC's current motion for injunctive relief, for a contempt finding, and for sanctions nothing herein prohibits the DNC from making similar motions in the future if, in its view, the DNC believes that such motions are warranted in light of additional information revealed during post-election discovery.