```
 1                                 THE UNITED STATES DISTRICT COURT
                                   FOR THE DISTRICT OF NEW JERSEY
 2                                 CIVIL ACTION NO. 81-3876 (JMV)
         - - - - - - - - - - - - - - - - - x
 3                                          :
         DEMOCRATIC NATIONAL COMMITTEE,      :
 4       et al.,                             :        TRANSCRIPT
                        Plaintiffs,          :           OF
 5                 -v-                        :        PROCEEDINGS
                                             :         (MOTION)
 6       REPUBLICAN NATIONAL COMMITTEE,      :
         et al.,                             :
 7                     Defendants.           :
         - - - - - - - - - - - - - - - - - x
 8                           November 4, 2016
                             Newark, New Jersey
 9
         B E F O R E:   HONORABLE JOHN MICHAEL VAZQUEZ, U.S.D.J.
10
         A P P E A R A N C E S:
11
                         GENOVA, BURNS, ESQS.,
12                       BY:  ANGELO J. GENOVA, ESQ.,
                              RAJIV D. PARIKH, ESQ.,
13                       Attorneys for the Plaintiffs

14                       PERKINS, COIE, ESQS.,
                         BY:  JOSHUA L. KAUL, ESQ.,
15                       Attorneys for the Plaintiffs

16                       SQUIRE, PATTON, BOGGS, ESQS.,
                         BY:  MARK C. ERRICO, ESQ.,
17                       Attorney for the Defendants

18                       KING & SPALDING, ESQS.,
                         BY:  BOBBY R. BURCHFIELD, ESQ.,
19                            MATT LELAND, ESQ.,
                         Attorneys for the Defendants
20       ANYONE INTERESTED IN PURCHASING A COPY OF THIS TRANSCRIPT
         MAY CONTACT JOHN STONE 973 824-4483 - jkstoneage@verizon.net
21       _____
         Purusant to Section 753 Title 28 United States Code, the
22       following transcript is certified to be an accurate record
         taken stenographically in the above entitled proceedings.
23
         s/ John K. Stone
24       _____
         JOHN KEVIN STONE,
25       Official Court Reporter
```

```
 1                  THE CLERK:  All rise.

 2                  THE COURT:  Good morning.

 3                  Please be seated.

 4                  Okay.  We're on the record in the matter of the

 5       Democratic National Committee versus the Republican National

 6       Committee, Civil Action Number 81-3876.

 7                  Can I please have appearances of counsel, starting

 8       with plaintiff.

 9                  MR. KAUL:  Your Honor, on behalf of the plaintiffs,

10       I'm Josh Kaul, I'm joined at counsel table by Angelo Genova

11       and Raj Parikh.

12                  THE COURT:  Good morning.

13                  MR. GENOVA:  Good morning, Your Honor.

14                  MR. PARIKH:  Good morning, Your Honor.

15                  THE COURT:  All right.  Good morning, counsel.

16                  All right.  For the RNC.

17                  MR. BURCHFIELD:  Morning, Your Honor.

18                  Bobby Burchfield, King and Spalding for the RNC.

19                  I believe I'm the only one speaking this morning,

20       but I'll let my colleagues introduce themselves.

21                  MR. LELAND:  Morning, Your Honor.  Matt Leland for

22       the RNC.

23                  MR. ERRICO:  Morning, Your Honor.  Mark Errico, of

24       Squire Patton Boggs, also on behalf of the RNC.

25                  THE COURT:  All right.
```

1          Good morning, counsel.  Thank you.

2          Before we start, for folks who have not been in the

3    District Court of New Jersey before, I just want to remind

4    you that you're not permitted to take any photographs, no

5    video or audio recordings, and no live feeds.  The general

6    rule is the press, those that have been pre-approved, are

7    premitted to take notes, and they can do so on their

8    laptops, if you feel appropriate.  Of course, we are having

9    a transcript made today, and an official transcript of the

10   proceeding will be available.

11         In preparation for today's argument, the Court

12   reviewed all the submissions of the parties.  That includes

13   not only the initial brief and opposition brief and reply

14   brief, but also the other evidence submitted therewith,

15   whether it be exhibits to the briefs or the separate

16   declarations and exhibits that have been submitted.

17         The way I would like to proceed this morning is

18   that I'd like to give each side approximately ten minutes to

19   summarize their arguments at the outset, starting with the

20   DNC.  Because I do have a lot of questions that I'd like to

21   get to.

22         And at the end, if you think you need to put

23   something else on the record or respond to something that

24   your adversary said, you will have that time to make a

25   complete record.  So you will not be prohibited.

```
 1              But to start out, why don't we start with the DNC,
 2    again, whoever is arguing, approximately ten minutes to
 3    summarize your position.
 4              MR. KAUL:  Thank you, Your Honor.
 5              THE COURT:  You're welcome.
 6              MR. KAUL:  Good morning, Your Honor.
 7              THE COURT:  Good morning.
 8              MR. KAUL:  Your Honor, I'd like to start by
 9    focusing on what I think is important here, which is the
10    facts of this case.
11              We've laid out in our briefing in some detail the
12    efforts that the Republican nominee for President, Donald
13    Trump, has made repeatedly to encourage his supporters to
14    engage in vigilante type efforts at the polls by targeting
15    certain communities, by which he clearly means communities
16    with large minority populations, for watching, for
17    surveillance, for poll monitoring.
18              Mr. Trump has aggressively tied that effort to
19    claims about voter fraud, which the undisputed record here
20    demonstrates is virtually non-existent.  So the only purpose
21    in this targeting can be to target and harass people based
22    on race.
23              Now, the RNC and the Trump campaign have
24    inextricably tied themselves together in a variety of ways.
25    The RNC is running Donald Trump's ground game, the get out
```

1          the vote operations, because as multiple reports have shown,
2          the Trump campaign has very limited on the ground
3          organization, and so it's relying on the RNC to do a lot of
4          its work.  They have all sorts of agreements that tie
5          themselves together, and while that's normal in the course
6          of presidential campaigns, it's unusual in the course of a
7          situation where one party is prohibited from engaging in
8          certain conduct, and the other party is being asked entirely
9          to replace the campaign on the ground.

10              They've just recently explained that their
11          relationship is airtight.  The RNC Chairman Reince Priebus
12          responded to Mr. Trump's calls for targetted poll watching,
13          not by condemning them, not by say ing the RNC has nothing
14          to do with that, but instead by defending Mr. Trump's
15          statements, saying voter fraud is real, and what Mr. Trump
16          is doing is trying to tell his folks to watch out for this
17          fraud that might occur.

18              I think one of the most important exhibits in this
19          case is actually Exhibit 24 to our original filing, that is
20          the transcript of Reince Priebus' statement on Meet the
21          Press, in which he defends the Trump campaign and links the
22          RNC, in the public's eyes, to these efforts.  And in fact,
23          the RNC help laid the groundwork for the false claims of
24          voter fraud that Mr. Trump is now relying on.

25              In 2012, Mr. Priebus, who was then the Chair of the

1          RNC, claimed that Republican candidates need to do a point

2          or two better than Democratic candidates to overcome voter

3          fraud.

4                    What the evidence shows, Your Honor, is that

5          Republicans on the ground are responding to these calls.

6          Including RNC members.  That includes Rob Gleason in

7          Pennsylvania, one of the 168 RNC members, and also the Chair

8          of the Pennsylvania Republican party, who was glad to hear

9          Trump's statements, and who responded by taking additional

10         measures to recruit poll workers in Philadelphia, and

11         actually even sued the state of Philadelphia over its rules

12         restricting cross counting poll observer work, because it

13         wanted to win Philadelphia.

14                   Rhonda Romney McDaniels from Michigan, shortly

15         after Trump's speech, announced a statewide voter fraud

16         effort, purportedly to prevent Hillary Clinton from stealing

17         the election.

18                   So what we have are clear statements from Donald

19         Trump about ballot security efforts.  We have close

20         integration between the Trump campaign and the RNC.

21         Including statements from the RNC's Chair, approving of Mr.

22         Trump's assertions.  And then we have actions on the ground

23         from RNC members to put those agreements in place.

24                   So, given that background, the RNC's attempt to

25         distinguish Mr. Gleason's statement and Miss McDaniels'

1     statement as actions taken just in their state capacity is

2     difficult to credit.  And in fact, the RNC didn't discourage

3     those efforts.  It didn't disclaim them.  Only in Court is

4     it doing so.

5          And those aren't actions taken to further the

6     interest of a Pennsylvania candidates or some Pennsylvania

7     election.  Those are actions taken to further the national

8     candidate, whose election's the RNC's top priority in this

9     election.  So those are actions in furtherance of the RNC's

10    goals.

11         As our brief points out, the RNC's own memo

12    supports that view, saying you can't just take your RNC hat

13    on and off at whim, because if you could, it would make the

14    consent decree essentially unenforceable.  Because any RNC

15    member could be acting in their personal capacity or a

16    different capacity at any time.

17         There's also direct evidence of the RNC's

18    involvement in ballot security efforts.  There's the Mike

19    Pence statement, of which the Court is well aware.  There's

20    the Conway statement.  There's now a new statement from a

21    high ranking official in the Virginia party.  And I

22    acknowledge that all three of these individuals claim that

23    they made mistakes, but it's remarkable that the same

24    mistake keeps getting made over and over again.  And that

25    mistake apparently been compounded by several individuals in

1         the field, who understand themselves to be working for the
2         RNC.

3                  And so while we're onto the RNC may or may not have
4         been very careful on paper to try to distinguish these
5         relationships, to make sure the money was going one way, for
6         get out the vote operations, while related efforts for
7         funding voter fraud efforts or voter fraud reduction efforts
8         are therefore or being funded through contractors, it's
9         clear that that's not the understanding that people have in
10        the field.

11                 And Reince Priebus, that's part of the reason why
12        the Face the Nation statement is so interesting.  He's
13        explaining what Donald Trump thinks about these things.  In
14        that interview he says a couple times, "I know what his mind
15        is on this."  So it's clear that he was coordinating with
16        Mr. Trump discussing these efforts, discussing strategy.

17                 Stampede, Your Honor, the contractor whose been
18        involved in at least some of these efforts, has received a
19        huge sum of money from the RNC.  1.3 million dollars for
20        quote, G-O-T-V consulting.

21                 Now, while the RNC and Stampede assert that that
22        work only happens in Florida, we don't have the agreement
23        between those companies, even though that could have easily
24        been provided.  And I think it's important to look at what
25        the RNC said in its original filing in this case.

1            It said, at page 11, that all contractors, among
2    other people, were directed that they must strictly avoid
3    participation in activities relating to election day
4    operations or the prevention of voter fraud.  Their
5    memoranda explained, as I mentioned before, that covered
6    individuals are covered 24/7.  And the RNC required all
7    contractors to sign an affirmation form agreeing to comply
8    with the RNC's obligations.

9            So everybody did that.  So presumably Stampede did
10   as well.  And yet Stampede engaged in these apparently
11   ballot security efforts.

12           I will acknowledge we haven't taken discovery into
13   precisely what Stampede has been up to.  But it's clear that
14   they are engaging in poll watching, in which the RNC has
15   said it has no relationship.  The RNC said its investigation
16   has revealed no evidence of RNC personnel or contractors
17   that have engaged in prohibited activities.

18           But the RNC's originally didn't mention Stampede's
19   poll watching efforts.  And if you look at the declaration
20   from Holly Turner from Stampede, there's no indication in
21   there that the activities that Stampede has taken would be
22   in compliance with the consent decree in this case.

23           So -- and it's important to remember last that the
24   RNC's original brief asserted that all staff employees,
25   contractors and volunteers, were directed that they must

1     strictly avoid participation in any activities related to

2     election day fraud.  And that's because of the language of

3     the consent decree.  Which applies to agents, servants and

4     employees of the RNC, acting directly or indirectly, through

5     other party committees.

6           So, Your Honor, given all that evidence, I would

7     submit, first of all, that plaintiffs have established a

8     likelihood of success on the merits.  I would also argue

9     that we have established that there's at least some

10    violation of the consent decree.

11          So with respect to these preliminary injunctive

12    relief we're requesting, that -- that finding of likelihood

13    of success on the merits is critical, because the balance of

14    the equities clearly favor plaintiffs here.

15          Plaintiffs are working to make sure that the right

16    to vote is unimpeded, that there is no interference or voter

17    intimidation at the polls.  On the other hand, it's not per

18    whatever interest the RNC has in engaging in these

19    activities, given the absence of voter fraud, the fact that

20    there are other entities, in New Jersey activities, and that

21    the RNC hasn't done so for 30 years, and of course the

22    public interest supports people voting.

23          So because of those reasons, we think the

24    injunctive relief we've requested is appropriate.

25          We asked in our original order for further

1        equitable relief the Court deems appropriate.

2              In light of the agreement with Stampede, and the

3        fact that Stampede is engaging in some sort of ballot

4        security program, we think some sort of order that's

5        tailored to breaking the relationship between the RNC and

6        these contractors who are engaged in poll watching is

7        useful.  Or that these contractors be told by the RNC not to

8        engage in poll watching activities anywhere as long as

9        they're in contract with the RNC.

10             And we believe that it's appropriate at this time

11       to find that -- and this is to be judged by a preponderance

12       of the evidence, to find that there's a violation of the

13       consent decree, and to extend the consent decree.  At the

14       very least on that score, we think that much more broader

15       discovery, post election, is appropriate on that topic, in

16       light of the facts that have been revealed.

17             And again, what we've demonstrated so far is based

18       on not a shred of discovery other than in affidavits from

19       the RNC, which we think is compelling of the fact that the

20       case is already is so compelling, we think is significant.

21             THE COURT:  Okay.

22             Thank you, Mr. Kaul.

23             MR. KAUL:  Thank you, Your Honor.

24             THE COURT:  Okay.

25             Mr. Burchfield.  Well, I shouldn't assume -- is it

```
 1      Mr. Burchfield?

 2                  MR. BURCHFIELD:  Yes, Your Honor.

 3                  THE COURT:   Thank you.

 4                  Mr. Burchfield.

 5                  MR. BURCHFIELD:  Good morning, Your Honor.

 6                  THE COURT:  Good morning.

 7                  MR. BURCHFIELD:  May it please the Court.

 8                  I'd like to say initially that the Republican

 9      National Committee and the lawyers working with me, and we

10      personally appreciate the attention this Court has given the

11      matter on short notice.  And you have plainly demonstrated

12      that you are reading materials and reading them carefully,

13      and your questions in the phone conferences at least have

14      been quite probative.

15                  THE COURT:  Thank you.

16                  MR. BURCHFIELD:  We applaud that.  And we think

17      that's the sort of careful and rigorous analysis that will

18      ultimately vindicate the RNC in this matter.

19                  I would like to cover four points.

20                  Number one, what does this consent decree mean.

21                  Number two, what does the evidence show.

22                  Number three, what is the DNC's case for a

23      violation.

24                  And number four, has the RNC -- has the DNC

25      justified any relief.
```

1           I may not get through all that in ten minutes, Your

2    Honor, but I'll summarize at the end if I don't.

3           First, what does this consent decree mean.

4           This consent decree has been in effect for 34

5    years.  This Court and the parties know what it means.  It

6    prohibits the RNC from engaging in anti-fraud efforts and

7    its purpose is to prevent intimidation and suppression of

8    minority voters.

9           In the 2009 opinion, Judge Debevoise wrote, quote,

10    "The consent decree shall not apply -- shall not apply to

11    any initiative undertaken by the RNC that does not have as

12    at least one of its purposes the prevention of either

13    fraudulent voting or fraudulent voter registration."  That's

14    at 671 F. Supp. 2d at 623.

15           The Third Circuit wrote that the decree, quote,

16    "Has as its principal purpose preventing the intimidation

17    and suppression of minority voters," unquote.  That's at 673

18    F. 3rd at 203.

19           The evidence which I'll discuss, including the

20    questionable tactics the DNC is using to gather its

21    materials, overwhelmingly shows that the RNC is engaged in

22    no such activities.  The DNC offers no evidence of

23    anti-fraud efforts by the RNC, or voter intimidation or

24    suppression.  At best, it suggests that the RNC might be

25    minimally involved in normal poll watching activities, which

1      the consent decree since 1987 has explicitedly allowed.

2      That's in the 1987 decree, paragraph B at page 2.

3            Rather, with just a year left before the decree

4      expires, and in an effort to extend it for eight more years,

5      the DNC now advocates several radical reinterpretations of

6      the consent decree that conflict with the wording of the

7      decree, the settled law of the case, and more generally, as

8      well as common sense.

9            Let me give you four examples.

10            First, since the consent decree was signed in 1982,

11      it has explicitedly distinguished in paragraph 4, between

12      the RNC and state parties and candidates.  Two times, in

13      1990 with regard to North Carolina, and in 2008 with regard

14      to New Mexico, this Court has held that the actions of state

15      party committees cannot be attributed to the RNC.

16            Every election year, state and local party

17      committees run poll watching and ballot integrity programs.

18      The DNC agreed to exempt those 34 years ago, and has known

19      about those programs ever since, with no objection.

20            Now the DNC argues state parties are covered by the

21      decree, solely because state party chairs, by virtue of

22      being state party chairs, are members of the RNC, and thus,

23      their activities are attributable to the RNC.  The DNC has

24      known that since 1982, and the Court has twice rejected

25      efforts to bring those employees under this decree.

1          The ability of individuals to wear multiple hats is

2    a well-settled and critical principle of election law.   As

3    the DNC knows, this drastic expansion will eliminate

4    virtually all Republican poll watching activity.

5          Now, I should note, Your Honor, that an advisory,

6    Federal Election Commission advisory opinion, 2003-10, dated

7    June 16, 2003, the Federal Election Commission explicitly

8    said, state party officials, this is quote, "State party

9    officials who also serve on national party committees may,

10   quote, 'wear multiple hats,' unquote, and quote 'raise

11   non-federal funds for their state party organizations

12   withoug violating the prohibition against non-federal

13   fundraising by national parties.'"  As I've emphasized,

14   again and again, it is a felony for a national party

15   official to raise non-federal money.  But state party

16   officials wear a different hat and can do so.  This confirms

17   that.  And this advisory opinion, there are many like it, is

18   addressed to one Marc Elias, Counsel for the DNC in this

19   case.

20         Second, the DNC is attempting to rewrite the law of

21   coordination between the parties and their nominees.   In

22   every election since 1982, Republican presidential nominees

23   and nominees for other offices have participated in poll

24   watching operations, usually with state and local Republican

25   party committees.  This is no secret.  The DNC has always

1    known it.

2          Separately, the RNC, like the DNC, has coordinated
3    with its presidential nominees on certain activities, such
4    as advertising, within statutory limits; voter registration,
5    get out the vote activities and scheduling.  There are
6    certain activities, such as independent advertising, that
7    the parties can't coordinate on.  That's illegal under the
8    election laws.  In addition to those covered by this consent
9    decree.

10         Now the DNC contends that this legitimate
11   coordination is so close, and it's no closer on  -- between
12   the RNC and Trump, than it it with the DNC and Secretary
13   Clinton, that the coordination on these activities means
14   that they're coordinating on everything.  And that has never
15   been the law.  It has never been the law under this consent
16   decree.  And it's not the law under the election law.  If it
17   were, the independent spending that the DNC is doing on
18   behalf of its candidates would be illegal.

19         Further, and this is frankly, one might think the
20   intention here, if that -- if the consent decree is extended
21   to cover all, to encompass all coordination between the RNC
22   and its candidates, the RNC is completely emasculated in the
23   election process.  And that's never what the consent decree
24   has been interpreted to mean.

25         Third, rewriting the law of interagency.  Political

1    consultants for fundraising, political strategy,

2    advertising, get out the vote, and many other activities,

3    typically represent multiple clients in any particular

4    election cycle.  The DNC advocates an interpretation of the

5    decree that would make a consultant used by the RNC in one

6    specified state, for one specified activity, the agent of

7    the RNC in every state for every activity.  The decree does

8    not say that, and but for the DNC's 11th hour effort to find

9    a violation, it has never been interpreted that way.

10    The DNC's view also would pervert settled

11    principles of agency law in which an agency's authority is

12    defined by its contract with its principal.  And if the

13    agent works outside that specified area of contract, it's

14    not considered the agent of the principal.  And that's an

15    important point here.

16    Your Honor, in my few remaining moments I'd like to

17    just emphasize a few of the factual points from the

18    evidence.  And that is what does the evidence show.

19    This evidence shows, we think, compellingly,

20    through the 16 declarations submitted by the RNC from 13

21    different people -- and in fact, it's 17 declarations now

22    from 14 different people, because we have this morning

23    submitted a declaration for Mr. Marston, who can be heard on

24    the surreptitiously recorded audio tape, that was done under

25    false pretenses, by the Democratic Executive Director of the

1        Fairfax County Democratic Committee, Mr. Marston confirms
2        that there is no coordination or activity of the Republican
3        National Committee in the poll watching efforts for which he
4        was training Fairfax County, Virginia volunteers.

5             The RNC's evidence also shows that not only are the
6        training and compliance programs extensive, but, frankly, we
7        have turned over every stone in the last week, Your Honor,
8        through all levels of the Republican Party, to confirm that
9        there is no violation here.  For every time the DNC has
10       thrown up some allegation, we have promptly gone forth,
11       investigated it, and responded to it, just as we've done
12       with Mr. -- with the allegation about Mr. Marston that we --
13       that I just referred to.

14            Next, what is the DNC's best case of a violation.
15            Now here, I mentioned -- I mentioned Mr. Anderson's
16       tactics of under false pretenses joining a volunteer call
17       for the Fairfax County Republican Party, and then
18       surreptitiously, and we -- and we think at least
19       unethically, if not illegally, recording that call for use
20       in this court proceeding.  When he e-mailed to participate
21       in that, he quote, "Confirmed his volunteer commitment to
22       the Fairfax County Republican Committee."  That was a lie.

23            So there is that, and there are the lawyers that
24       the DNC brought in, experienced trial lawyers they brought
25       into Las Vegas, Nevada to question poll workers and come in

1    with declarations after they claim they say that the other

2    poll workers there said they were working with the RNC.

3         We've gone in and looked at all the poll workers

4    they mentioned, to the degree they had last names, and for

5    every single one we've confirmed they were not anywhere

6    involved with the RNC.  So those poll workers, they may have

7    said it, they were wrong.  And the evidence clearly

8    indicates they were wrong.

9         The RNC's claim on the four categories as to

10   coordination with the Trump campaign, that used to be their

11   principal argument, they've now more or less moved away from

12   that.  As this Court has recognized, just because there's

13   some coordination with the Trump campaign doesn't mean the

14   RNC is coordinating in every instance.  And that's what the

15   evidence shows.

16        The DNC also argues that the poll watching

17   activities by state Republican parties should be attributed

18   to the RNC, because the state chairs are members of the RNC.

19   I've addressed that already.  They can wear two hats and

20   they are wearing two hats as demonstrated in the

21   declarations of Mr. Gleason and Miss McDaniels.

22        With respect to -- with respect to the third DNC

23   argument, the six declarations about poll watching in

24   Nevada, I just addressed that.  We've addressed every single

25   one of those.

1           And, finally, with regard to the declaration from

2    the Executive Director of the Virginia Democratic Party,

3    we've addressed that with the recent declaration from Mr.

4    Marston.

5           Now, the DNC has not justified any relief here.

6    The Third Circuit and this Court have made clear what the

7    purpose of this consent decree is.  They have not shown any

8    evidence of a single voter claiming intimidation or of a

9    single voter saying he or she was deterred from voting.

10   That's what this consent decree is about.

11          Even if the RNC were involved in poll watching

12   activities, that is explicitedly allowed under the consent

13   decree.  The RNC doesn't do it because of the sorts of

14   allegations you've seen here.  And I think it's prudent for

15   the RNC not to do it.  But if it did, it would be legal

16   under the consent decree.

17          At best, what we have here, Your Honor, is a

18   technical violation of the consent decree.  We don't think

19   it's a violation, even if this all proved to be true, that

20   would not justify any relief.  But it certainly wouldn't

21   justify, Your Honor, I would submit, intervention by a

22   United States Federal District Court Judge on the Friday

23   before an important national election, into the political

24   process.  For that reason, Your Honor, we urge the Court to

25   deny any and all relief.

1                    THE COURT:   Okay.

2                    Thank you, Mr. Burchfield.

3                    You can stay there, because before we start going

4          topic-by-topic, there are a couple questions I had for the

5          the RNC.

6                    MR. BURCHFIELD:   Sure.

7                    THE COURT:   In light of last night's submission.

8          And this goes more to the basic scope of the consent decree.

9          And it follows up on some of the statements that you put

10         forward today.

11                   You argued today, and it was also submitted in the

12         RNC's supplemental memorandum in response to the Court's

13         November 2nd, 2016 order, which was filed last night, that

14         the DNC has not identified any evidence of any single voter

15         deterred from voting as a result of any RNC activities.

16                   Now is the RNC interpreting the consent decree to

17         mean that it can engage in ballot security activities so

18         long as it's not successful in doing so?  Because that's the

19         way I interpreted that statement.  You said, well, nobody's

20         been deterred.  But I didn't find in the consent decree that

21         you have to show success, that is you can take a shot and if

22         it doesn't work you're not violating the consent decree.

23                   MR. BURCHFIELD:   Your Honor, excellent question.

24         Let me answer it in a couple ways.

25                   Number one, the order by Judge Debevoise in 2009

1      expressly defines normal poll watching activities in a

2      fairly detailed way.  That's allowable, and the RNC --

3                THE COURT:  Hold on.  But not if it's related to

4      voter fraud.

5                MR. BURCHFIELD:  I'm sorry?

6                THE COURT:  Not if it's related to voter fraud.

7                MR. BURCHFIELD:  Exactly.  Exactly.

8                THE COURT:  The normal poll watching functions

9      outside of any related to voter fraud.  Correct?

10               MR. BURCHFIELD:  Your Honor -- Your Honor, if the

11     RNC were to engage in normal poll watching, it could have

12     people standing there making sure that -- making sure that

13     the machines were working, making sure that people were in

14     the right precinct, making sure that the -- that there was

15     no -- that there was no long lines, and if there were long

16     lines, that we report it to election authorities.

17               But we could not, the RNC volunteers or

18     representatives could not, even if we saw a person come in

19     and vote three times, as we read the decree, we couldn't

20     report that.  You know, that's  -- we think that's a bit

21     overboard, but that's our interpretation of the decree.

22               But the point is, Your Honor, the RNC knows that

23     that's a slippery slope, and we know that if there's a

24     person standing there from the RNC, you're going to get the

25     sort of allegations you got in this case.  And that's why

1        the RNC aggresively doesn't do it.

2                THE COURT:  Okay.

3                The second question I had, and I know -- and I just

4        want to pronounce the name right of the chief counsel.  Is

5        it Mr. Phillippi or Mr. Phillippe.

6                MR. BURCHFIELD:  Phillippe.

7                THE COURT:  Phillippe.

8                MR. BURCHFIELD:  He's here this morning, Your

9        Honor.

10               THE COURT:  Oh, good morning, Mr. Phillippe.  How

11       are you?

12               I think I know you, because I read all your

13       declarations this week.

14               The one thing, I note on footnote one on page 3,

15       excuse me, let me make sure I get the right footnote.  Page

16       5 of this submission last night, footnote two, the RNC takes

17       -- took issue with some of the language in the Court's

18       November 2nd order.  And then I also read Mr. Phillippe's

19       declaration that accompanied the RNC submission, which

20       likewise took issue with the Court's language in the order.

21       And, basically, the position is that that language was too

22       broad and it went beyond that prescribed by the consent

23       decree.

24               Now, I did this for a specific reason, which I'll

25       tell you.  But do you know where the Court got that

1     language?

2          MR. BURCHFIELD:  You may have gotten it from some

3     of the RNC's proactive instructions to its people not to

4     engage in activities.

5          THE COURT:  I got it from Mr. Phillippe.

6          And the reason I used the party's own language,

7     when we're under the gun like this, I know lawyers have a

8     tendency, and I'm not saying anybody here did so, to say,

9     well, Judge, we didn't understand what your order meant, it

10    was ambiguous, and I get a lot of, what does this ballot

11    integrity mean type of questions.  And we don't have the

12    time for it in this type of case.  If I can use the parties

13    language, I find it easier to say, okay, you used the

14    language, let me use the same language.  But I know you've

15    taken issue with it.

16         But if you look at Exhibit 810 to the declaration

17    of Mr. Phillippe, that is Declaration A, that was his first

18    declaration, on page 3, on the second -- well, the first

19    full paragraph.  I just basically used --

20         MR. BURCHFIELD:  Your Honor, 810 from the

21    submission last evening or from --

22         THE COURT:  No, last night -- I think you were very

23    good in keeping your declarations in order.  They started at

24    A.  I think there's only one Declaration A.  And that would

25    have been the one that was submitted on October 31st, this

1    Monday.

2              MR. BURCHFIELD:   Thank you.

3              THE COURT:   Okay.

4              So while I understand the RNC's now objecting, if

5    you look at page 3 of the first full paragraph, in the

6    description -- and by the way, for the record, this is a

7    September 22nd, 2016 memo from RNC's Counsel's Office to RNC

8    political staff and independent contractors.

9              The first full paragraph on page 3 refers to EDO

10   programs, which are election day operations, and says, "such

11   monitoring typically takes place during early voting,

12   election day at the polls, at the counting of the

13   vote-by-mail/absentee ballots and during post election

14   canvassing."

15             Now, the reason the Court used those words was

16   because I didn't want to get into an argument over what do

17   you mean, Judge?  I figured if the RNC is using those words,

18   it's best just to use the same words so we don't have to get

19   into a battle of semantics in our short time frame.

20             But what I did focus on is the next paragraph that

21   said, "These are exactly the type of activities the consent

22   decree prohibits the RNC from participating in.  While

23   preventing fraud is typically not the only aim of an EDO

24   program, it is almost always one of the purposes and

25   therefore the consent decree prohibits RNC," i.e., your

 1      interpretation.

 2              So I understand the RNC has taken issue with the

 3      the Court's order, but I really think, the way I viewed it,

 4      the RNC should be taking issue with its own reading of the

 5      Court's -- of the consent decree.

 6              MR. BURCHFIELD:  Your Honor, may I respond?

 7              THE COURT:  Sure.

 8              MR. BURCHFIELD:  It is -- there is no question

 9      we've talked about normal poll watching activities, which

10      the consent decree specifically allows, but which the RNC

11      instructs its people to not engage in.

12              Your Honor has observed a number of times during

13      our conference call, that you appreciate the fact that an

14      in-house lawyer often gives advice that walks a broad

15      perimeter around the minimum requirements.

16              THE COURT:  As you like to say, err on the side of

17      the caution.

18              MR. BURCHFIELD:  Exactly.

19              And I think the RNC has done that, certainly in its

20      instructions to its people.

21              The one thing, if I'm looking at the correct -- if

22      I'm looking at the correct provision in your order, I'm

23      looking at the October -- the November 2nd, 2016 order,

24      footnote one, which -- where the Court wrote, "Poll watching

25      and poll observation includes any such efforts concerning

1    early voters -- early voting, election day at the polls, the

2    counting of vote-by-mail absentee ballots and the post

3    election canvassing where there may be disputes about

4    counting the ballots of particular individuals."

5         The one thing that's missing from that footnote,

6    which I think is very material, is any notion of voter fraud

7    prevention.  And that's what -- that is mentioned in Mr.

8    Phillippe's, in the advice here.  The last sentence says,

9    "Monitor the polls for irregularities, including potential

10   voter fraud, engage in other off the record research or to.

11   stop or defer voter fraud from occuring."

12        So implicit in that paragraph, Your Honor, we think

13   is the essential message of the decree, which is the RNC

14   understands it's not supposed to be involved in any efforts

15   to prevent voter fraud.  And that can occur, you know, that

16   could potentially occur, as I think this memorandum says,

17   post the ballots being cast.  It could occur when you're

18   challenging -- when you're challenging whether a particular

19   ballot, you know, of long dead John Doe should be counted.

20   That I think is encompassed within this paragraph.

21        But I do that think -- I do think that there has to

22   be some component of voter fraud in there for the consent

23   decree to apply to it.

24        THE COURT:  I think we're in agreement there.  And

25   I think the DNC is in agreement there.  But we'll find out.

 1          I just, at that point we were just trying to
 2  determine if there was poll watching function going on.
 3  Then the second question is, if there is, is it related to
 4  voter fraud.
 5          MR. BURCHFIELD:  Precisely.
 6          THE COURT:  So you're right, but I just wanted to
 7  make clear that the Court did not mean and did not want the
 8  RNC to interpret that the Court was taking, you know, for
 9  lack of a better word, a cheap shot.  I was just trying to
10  use language so we didn't get into a dispute later on as to
11  "we don't know what you're talking about, Judge."
12          MR. BURCHFIELD:  No, we appreciate that, Your
13  Honor.  And we -- we want, you know, this consent decree has
14  been really a burden.  I think you appreciate that more
15  today than you did maybe a week ago.  This consent decree
16  has been really a burden on its express terms and we are
17  very vigilant about trying to make sure it's not expanded
18  and certainly not extended.
19          THE COURT:  Okay.
20          And last question about last night's submission,
21  and then I'm going to turn to specific topics, and I'll
22  start with the DNC.
23          Is there was a representation on page 6 that giving
24  inaccurate information is not the sort of alleged
25  intimidation or suppression that the consent decree was

1       intended to address.

2              And my question to you is, if giving inaccurate

3       information is done with the intent to prevent somebody from

4       voting, wouldn't that be covered by the decree?  Whether it

5       be giving misinformation about paper ballots, about voting

6       location, about voter ID requirements, if that's done with

7       the intent to prevent somebody from voting, wouldn't that be

8       covered as a voter suppression effort under the decree?

9              MR. BURCHFIELD:  Let me answer that in two ways.

10             The first is you're referring to the statement, the

11      actions attributed to this Oneida --

12             THE COURT:  Right.

13             MR. BURCHFIELD:   -- Petersen.

14             THE COURT:  But specifically, but let's put her

15      aside.  I'm just saying, if you intentionally go out and

16      give inaccurate information -- you're right, we're going to

17      get her to her, I promise.

18             MR. BURCHFIELD:  So we -- so we, that first point

19      is, we deny any connection with her and we can't even

20      confirm she exists.

21             The second point I would make, Your Honor, it's

22      kind of a lawyer's answer, but it depends.  I mean it's --

23      this decree is focused on the suppression and deterrence of

24      minority voting.  That's what it's always been focused on.

25             And it is certainly conceivable, we don't have to

1        litigate this now, because I don't think there's any

2        evidence before the Court that this has happened in a way

3        attributable at all to the RNC, but it is conceivable at

4        least, that you have a person who either intentionally or

5        unintentionally informs a person of a wrong polling place or

6        the wrong voting procedure, who is, you know, who is Bobby

7        Burchfield, you know, a non-minority I think middle-aged,

8        some would say beyond, white male.  And that's not -- we

9        don't think that's the sort of thing this consent decree is

10       intended to cover.

11              But I would certainly envision situations where

12       misinformation was used in a way that would -- that was

13       directed to the minority community, or directed to

14       particular individuals who were in minorities, to deter them

15       from voting and or impede their ability to vote.  And we

16       think that would be covered by the consent decree.

17              And so the answer, long answer, I apologize, but

18       the answer is it depends.

19              THE COURT:  Thank you, Mr. Burchfield.

20              Okay.  The first --

21              MR. BURCHFIELD:  And if -- if I may, Your Honor,

22       there's no indication that the person here, in the Oneida

23       Petersen situation, if she exists and if it's true, were

24       minorities.

25              THE COURT:  Okay.

1           All right.  Thank you, Mr. Burchfield.

2           We're going to talk about Nevada at length, but let

3     me kind of take the issues in order and let me start with

4     the DNC.

5           I want to ask some question about, and just to give

6     the parties an idea of the topics I want to discuss today.

7     I want to discuss first the Trump campaign.

8           The second, I want to discuss the allegations of

9     the connection between the Trump campaign and the RNC.

10    Subsumed within that is also the allegations concerning the

11    state chairs from Penn and Michigan.

12          I also, against that backdrop, have to discuss the

13    RNC submissions that Mr. Phillippe -- Mr. Phillippe?  Did I

14    say it wrong?  I apologize.  Mr. Phillippe provided, and

15    then we get to the questions about the Nevada submissions.

16    At least that's how I'm deeming them.

17          And so let's start first with the Trump campaign.

18    I want to thank the DNC last night for clarifying that its

19    position was that the Trump campaign is acting as an agent

20    of the RNC.  Because the first question I had today, I

21    wasn't clear, is whether your position was, is the Trump

22    campaign acting as an agent, or are you alleging that the

23    Trump campaign is acting in connection with the RNC and

24    that's where the violation is.

25          But now that the DNC has taken the position that

1        the Trump campaign is an agent of the RNC, Mr. Kaul, can you

2        explain to me your basis for that position?

3                MR. KAUL:  Yes, Your Honor.

4                I should, first, I guess, clarify we're taking both

5        positions.  We're saying they're both acting in concert and

6        that Mr. Trump is an agent for the RNC.  And the reason is,

7        Mr. Trump undertakes all sorts of activities in connection

8        with and on behalf of the RNC.

9                First of all, he's the putative leader of the RNC.

10       I know he doesn't have a formal position.  But the fact

11       remains that the party nominee is widely and consistently

12       considered to be a party leader.

13               Secondly --

14               THE COURT:  Do you take the same position that

15       Secretary Clinton is an agent of the DNC?

16               MR. KAUL:  I think the same logic applies, Your

17       Honor.  You do have to look at the facts, obviously, in the

18       case, to confirm.  But I think there's a strong case for

19       that, yes.

20               And so Mr. Trump does fundraising on behalf of the

21       RNC, jointly with them.  He appears of course at RNC events

22       consistently.  He's been coordinating his activities with

23       the RNC.  Some of that goes to in concert more than agency,

24       I acknowledge.  Those are obviously overlapping concepts.

25               But, you know, the RNC has had calls, there's been

```
 1     press reports from people about whether they're, you know,
 2     not going to support Donald Trump anymore, and they've
 3     consistently affirmed that they are, and that he's their
 4     candidate and he's running to support the principles of the
 5     RNC, you know, established --
 6              THE COURT:  Isn't there a significant difference
 7     between supporting the Republican nominee and then taking
 8     the additional step and saying the Republican nominee is
 9     actually the agent of the RNC?
10              MR. KAUL:  I agree there's a big difference, Your
11     Honor.  And this I guess ties into one of my broader
12     responses to Mr. Burchfield.
13              I don't, obviously, disagree with a lot of legal
14     points he makes.  But I disagree with the application of
15     those points to this case.  And this is a great example.
16              You can certainly be a supporter of the RNC without
17     being its agent necessarily.  But that's not the situation
18     that Mr. Trump is in.  He is integrally tied with the RNC.
19     Once you start fundraising for the RNC, for example, you're
20     in a very differenct place than you'd be in if you were
21     just, you know, a supporter.
22              THE COURT:  Well, I want to talk to you about the
23     joint fundraising in a second.
24              But what about the fact that the RNC's Chief
25     Counsel specifically wrote a letter to the Trump campaign's
```

1        General Counsel, indicating we are, we, the RNC, are under

2        this consent decree, we are not going to violate it.  And

3        any actions you take concerning -- I'm going to use the word

4        "ballot security," you are not doing as an agent of the RNC.

5        So they expressly disavowed any agency as to the issue

6        that's critical here today.

7                MR. KAUL:  If that were the only pertinent fact, I

8        think that would be significant, Your Honor.

9                But the issue here is the facts on the ground are

10       just not consistent with that representation.  So it's

11       standard practice for lawyers to write those letters to make

12       sure their bases are covered and that's appropriate.

13               But if you look at Reince Priebus's interview, for

14       example, he's relaying exactly what Donald Trump's

15       understanding of the rigged election claims mean.  You know,

16       he says, "I know where he's at on this.  And I'm explaining

17       where he's at on this."  He talks about, you know, when

18       exactly Trump is going to claim that the election is rigged

19       or not.  These are actions of two people who are working

20       very closely together.

21               So it's fine for the RNC to send memos out in the

22       field to say we're not doing this.  But if it's head is

23       actually closely involved in conversations with Donald Trump

24       about these issues, the letter is meaningless as a factual

25       matter, we think.

```
 1            And I would note we don't have a declaration from
 2    Reince Priebus, even though this statements were clearly
 3    discussed.
 4            THE COURT:  Well, okay.
 5            I wanted to get to Mr. Priebus's statements along
 6    with Mr. -- Governor Pence and Miss Conway's a little bit
 7    later.  But I'll certainly consider them in conjunction.
 8            Truthfully, the Court didn't really view this as an
 9    agency case.  It viewed it as, are they acting in concert.
10    But I'll definitely consider the argument when I rule.
11            But let me ask you, do you have any hard evidence
12    that the Trump campaign is acting as an agent of the RNC as
13    to ballot security?
14            I know we have general statements that we're in
15    full coordination, voter fraud is real.  But I'm looking
16    for, you know, the one that applies to this case, which is
17    what would come afterwards.  Voter fraud is real, the Trump
18    campaign's combatting voter fraud and the RNC is fully
19    engaged with the Trump campaign on that issue.  That last
20    portion is where it seems those facts are not necessarily
21    present from the RNC's point of view.
22            MR. KAUL:  I would answer that in I guess two ways.
23            The direct answer, which I think the Court is most
24    interested in is, I can't point to a statement where the RNC
25    said, we want you to make this statement about voter fraud,
```

```
 1      and Trump went out and made that statement.  We don't have

 2      that evidence.  Of course, we haven't had discovery.

 3                 But it was also true --

 4                 THE COURT:  And see, obviously, there's very

 5      limited discovery.  I understand.

 6                 MR. KAUL:  I don't say that as a complaint.

 7                 THE COURT:  No, no.  I thought we wouldn't get this

 8      case settled until next May if we did the full discovery

 9      route.

10                 MR. KAUL:  No.  I understand.

11                 But the broader point, which I think is also

12      important here is, there is an extremely lengthy history of

13      engagement by all sorts of Republican party actors in this

14      false statement that there's widespread voter fraud.

15                 Reince Priebus himself, as I mentioned before, just

16      in 2012, said Republicans need to do a pointer or two better

17      than they would otherwise to overcome the results of fraud.

18                 That is completely false.  And Donald Trump is

19      absolutely exploiting that backdrop and making these claims

20      that the election is going to be rigged, that there's

21      something wrong with the system.  Without that context, his

22      comments may very well have much less import with his

23      Republican party supporters who have been receiving messages

24      for a long time from the RNC and others.

25                 THE COURT:  Well, there's certainly a different
```

1          standard from when you're on the stump from when you're in a

2          court of law presenting evidence.  I mean I agree with you

3          there.

4                    But whether the claims of widespread voter fraud

5          are accurate or not, and I understand from reading the past

6          opinions, that, particularly in-person voter fraud, seems to

7          have very little evidence to support the claim.  Which is

8          what we're concerned with here.

9                    But political speech, which is the most protected

10         speech we give, one in the context of an election, is an

11         entirely different issue.

12                   I guess, let me ask you this, Mr. Kaul, and then I

13         want to turn to Mr. Burchfield.

14                   Just on the Trump campaign.  Why are Mr. Trump's

15         comments, if they were adopted by the RNC, or if the RNC

16         worked in conjunction with him, why would his comments lead

17         to the conclusion that the Trump campaign's actions would be

18         violating the consent decree?

19                   MR. KAUL:  Because, Your Honor, he is encouraging

20         his supporters, of which there are many, to go out and

21         target particular communities based on the race of the

22         people in the communities.  That itself is a violation.

23         If it's done, if it's attributable to the RNC.

24                   He is encouraging people to target voter fraud,

25         which again would be a violation if done in connection with

1        the RNC.  And these are people who are acting at his behest,

2        and in response to his comments.  The two state party chairs

3        and RNC members are very good examples of that.

4                But we include all sorts of sort of on the ground

5        observations in our -- in our briefing as well.  I mean

6        those people are at acting at his behest and they are more

7        classic agents, I would acknowledge.

8                THE COURT:  You also mentioned the joint

9        fundraising committee, and that is the RNC pointed to in

10       their response, they said basically, look, the DNC has a

11       joint fundraising committee with Secretary Clinton.  It's a

12       way to raise money for the parties.  But after the money is

13       raised, the money is segregated, RNC gets its share, the

14       Trump campaign gets its share, and we have no obligation to

15       spend the money we get on anything the Trump campaign may

16       want.  So I was trying to understand the joint fundraising

17       committee argument.

18               Are you trying to say that just shows a general

19       connection between the two, or are you trying to say it

20       shows they're acting in concert in violation of the consent

21       decree?

22               MR. KAUL:  Specifically on the joint fundraising,

23       in and of itself, that's not a violation.  I agree with Mr.

24       Burchfield on that.  That's a good example of a point where

25       I agree with the point he made.  But I think you need to

1     consider it in context.

2              And here the context is, first of all it's one of
3     many factors that establishes a tight relationship between
4     the Trump campaign and the RNC.  And what we have here that
5     is unusual is, Mr. Trump isn't doing standard get out the
6     vote field operation.  He has the RNC filling in for him
7     here.

8              What is clearly not permissible under the consent
9     decree, would be for the RNC and the Trump campaign and the
10    state parties to divvy up the funds they have in a way that
11    permits ballot integrity or ballot security efforts to go
12    on.  So the RNC says, we'll cover the get out the vote
13    operations and you cover, you know, challenging voters at
14    the polls.  And so it's one of the many pieces of evidence
15    that establishes this close connection.

16             Similarly, with the points about agency law and
17    contractors or the state officials, it's certainly true that
18    state officials can wear multiple hats.  We don't dispute
19    that.

20             THE COURT:  Let's hold on that.  Because I'm going
21    to come back to that.

22             MR. KAUL:  Okay.

23             THE COURT:  I understand they're all related.  So
24    I'm not segregating them necessarily to silos.  The facts
25    overlap.  But I want to kind of just stay on one topic.  Let

```
 1        me just talk to Mr. Burchfield about the Trump campaign, and
 2        then we'll come back to statements made by certain folks as
 3        well as the state chairs.
 4                   MR. KAUL:  Thank you, Your Honor.
 5                   THE COURT:  Okay.  So thank you.
 6                   So, Mr. Burchfield, the first question is, is the
 7        Trump campaign an agent of the RNC?
 8                   MR. BURCHFIELD:  Your Honor --
 9                   THE COURT:  At least insofar as the consent decree
10        is concerned?
11                   MR. BURCHFIELD:  No.  Absolutely not.
12                   It's -- and the consent decree, paragraph 4 of the
13        1982 decree is clear on that.  That the agents of state
14        parties and of other national organizations, which is
15        phrased that a way to encompass presidential campaigns, is
16        not -- and the other national political parties of the
17        Republican party, are not agents of the RNC.  That's been
18        the law of this case forever.
19                   Second thing I would say,  Your Honor, going back
20        to first year agency law, agency requires control.  Is the
21        DNC really contending that the RNC has control over Donald
22        Trump?  That would be a news flash.  And they've shown
23        nothing to indicate that.
24                   What they've done is they've shown -- they've shown
25        the sort of coordinated activities that are customary and,
```

1       indeed, central to the American political process.

2       Everything except voter integrity programs, the RNC is

3       entitled -- is allowed to do and it's doing them.

4                   THE COURT:  Okay.

5                   So just so I'm clear, and I got that from your

6       papers.  But the position of the RNC, as I understand it, is

7       the Trump campaign is not an agent of the RNC, certainly not

8       as to issues that would concern the consent decree, and

9       similarly, that while the RNC and the Trump campaign are

10      working closely together in certain areas, and maybe all

11      other areas, they are not working together on any form of

12      ballot integrity.  I mean that's the bottom line position.

13      Correct?

14                  MR. BURCHFIELD:  Bottom line position, Your Honor,

15      and that has been the case, that division of responsibility

16      has been the case ever since this consent decree was entered

17      in 1982, as Mr. Phillippe's affidavit says.  And declaration

18      says.

19                  THE COURT:  Okay.

20                  Now, would you view the conduct encouraged by Mr.

21      Trump to certain of his supporters as being in violation of

22      the consent decree if Mr. Trump were subject to the consent

23      decree?

24                  MR. BURCHFIELD:  Your Honor, big if -- big if.  And

25      I haven't really thought about it from that perspective.

 1             I do think there's -- I do some First Amendment

 2      work.  You may know that.  And it troubles me to think -- it

 3      troubles me to think that someone speaking on the stump can

 4      be held accountable to a court for merely saying words.  And

 5      so that would bother me.

 6             But we -- you know, the predicate is we do deny

 7      that the RNC is chargeable with the words of Mr. Trump, in

 8      that those words alone were in violation of the consent

 9      decree.

10             THE COURT:  Fair enough.

11             I mean I just, when I read some of the remarks made

12      by certain folks who seem to interpret Mr. Trump's remarks

13      in a manner, it just -- it always concerns the Court, having

14      been a former practicing lawyer, that it seems as though

15      people are making statements which indicate they may be

16      violating the Voting Rights Act.  And it may just simply be

17      because they don't know the law.

18             You know, one gentleman said, I'm not going to

19      violate the law, but I'm going to make them nervous.  And

20      I'm like, that's like saying, I'm not going to murder

21      somebody, but I'm going to shoot that guy.

22             You're like well -- if I, you know, there are legal

23      distinctions there that maybe a lay person should at least

24      be informed on.  But that's not the issue before the Court.

25      I just, you know, you always get concerned that people may

1    run afoul of the law just because they're not aware of the

2    parameters.  But that's an issue for another day.

3           Okay.  While I have you up here, Mr. Burchfield,

4    let's talk about the comments of the DNC and then I'm going

5    to let the DNC respond.

6           The DNC points to Mr. Priebus's comments in October

7    of this year in which he talked about full coordination of

8    the Trump campaign.  And then this is in October of this

9    year, and then shortly thereafter does note that in Mr.

10   Priebus's view is voter fraud is real and does discuss what

11   the Trump campaign's position on it is.

12          Now, one of the issues, let me ask you some basic

13   questions.  Some of the objections to the statements that

14   was submitted was one of hearsay.  Since that -- since Mr.

15   Priebus is the chairman of the RNC, would you take the

16   position that his statements are hearsay?

17          MR. BURCHFIELD:  Your Honor, I think his -- I think

18   an accurately report -- an accurate report of his statement

19   would typically be an admission by the RNC.  I would concede

20   that.

21          THE COURT:  Okay.

22          So I just want to get the parameters.  So you're

23   talking more about certainly Governor Pence and Miss

24   Conway's being hearsay --

25          MR. BURCHFIELD:  Right.

```
 1              THE COURT:   -- as to the RNC.  Right?

 2              MR. BURCHFIELD:  And the people in Nevada and the

 3    other press reports that have been relied upon.  There have

 4    been many.

 5              But as to Mr. Priebus, Chairman Priebus, I think we

 6    would take that point.

 7              THE COURT:  Okay.

 8              Now, you've also indicated that that at least --

 9    well, I don't know if that statement, but wouldn't that

10    statement be probative of the issue before the Court, which

11    is if the RNC is working in quote, "full coordination with

12    the Trump campaign," wouldn't that be probative as to

13    whether they are working on ballot security, which I don't

14    think anybody can dispute the Trump campaign has indicated

15    they're very interested in.

16              So those words "full coordination."

17              MR. BURCHFIELD:  Your Honor, full coordination is

18    understood in the election law context, the political

19    context to be full coordinate within the bounds of the law.

20              You know, we know that the RNC can coordinate with

21    the Trump campaign on advertising, but only up to a

22    specified statutory limit.

23              I don't think you can interpret that statement by

24    Mr. Priebus as saying, we're going to blow through that

25    limit and do coordinated advertising beyond the federal
```

1       statutory limit.

2               I don't think you can use that statement to -- to
3       attribute to the RNC any activity the Trump campaign is
4       involved in.  You know, that's a political statement.

5               And I would ask the Court to remember the context
6       in which that statement was made.  That statement was made
7       at a time when many persons in the Republican party were
8       questioning the extent of the RNC's commitment, and the
9       extent of its appropriate commitment to the Trump campaign.
10      And I think that was a reassurance given in that context,
11      and it cannot -- I think it would be seriously
12      misinterpreting it to interpret it that way.

13              The other thing I would say, Your Honor, is in Mr.
14      Phillippe's second affidavit, this is document number 120,
15      actually it's document number 120-1, filed on November 2.
16      Mr. Phillippe did address Mr. Priebus.  He says, "I spoke
17      with each official at the RNC who has authority to execute
18      contracts on behalf of the RNC," meaning the chairman.  "He
19      said none of these individuals were aware of any such
20      agreements or any facts suggesting the RNC may be engaging
21      in any activities implicated by the consent decree."

22              THE COURT:  No, I recall the declaration.

23              I took the DNC's objection as well, Mr. Priebus
24      himself didn't say that, but I certainly read that Mr.
25      Phillippe said that he conducted a due diligence and didn't

1    find anything to support an agreement with the Trump

2    campaign.

3         MR. BURCHFIELD:  And, Your Honor, I might say, the

4    due diligence Mr. Phillippe conducted in that November 2nd

5    declaration was guided by the Court's -- by the discussion

6    we had on the conference call.  And I think the DNC lawyers

7    were on that call, and they did not object to the details

8    that you laid out.  You laid it out again in the order that

9    you issued, and I think Mr. Phillippe tried to follow the

10   guidance the Court gave him there.  Which did not include

11   obtaining declarations from everyone in the RNC, including

12   Mr. Priebus.  Nor did it include obtaining declarations from

13   Governor Pence or Miss Conway.

14         THE COURT:  I understand.

15         Hey, listen, I understand the realities of what

16   everybody is facing right now.  You know, I'm sure Mr.

17   Priebus is very busy at the current time.  I would imagine.

18         MR. BURCHFIELD:  I suspect you're right.

19         THE COURT:  You know, I understand the last thing

20   -- if it would be necessary we'd have to do it.  But the

21   last thing he'd want to hear is a Judge up in New Jersey

22   wants him to come to court.  And I am cognizant that both

23   parties are working very hard on the election at this time,

24   and rightfully so.

25         Now, one last question about Mr. Priebus's comment.

1       Do you know -- I think the DNC, at least the way I

2       interpreted, when he took that additional step and said

3       "voter fraud" is real, you know, do you know what his basis

4       was for that comment?

5              Let me just step back.  I think everybody, at least

6       the way I read the papers, everybody said listen, there's no

7       degree of voter fraud.  Nobody is denying it.  They said,

8       bascially, it's so minute that it never affects an election.

9       So this, I think the DNC's words of myth of voter fraud, and

10      how it moves elections by one or two points, is just

11      unsupported by the evidence.

12             So do you know what -- so I don't think people are

13      saying look it, we're not saying there's a handful of cases

14      here and handful of cases there.  But when you're talking

15      about an election of this magnitude, they're just

16      immaterial.

17             Do you know what Mr. Priebus was referring to when

18      he said voter fraud is real?

19             MR. BURCHFIELD:  Your Honor, I do not know what was

20      -- what specifically he was referring to there.  Other than

21      to say that there is an ongoing debate in this country about

22      about the significance of voter fraud.

23             I believe Your Honor put your finger on it.  That

24      there are, I think everyone acknowledges, I heard James

25      Carville quote the other day, as  saying there are going to

```
 1      be a hundred million people voting in this election.  Of
 2      cousre there's going to be some degree of fraud, we just
 3      don't think it's going to be material.
 4              THE COURT:  I think historically that's been proven
 5      out.  I'm talking about evidence in court.
 6              MR. BURCHFIELD:  Right.
 7              THE COURT:  I'm not talking about political
 8      beliefs.  I'm just talking about there's just never been
 9      evidence presented to a court that there's massive voter
10      fraud that swung an election.  At least not nationally.
11              MR. BURCHFIELD:  Right.  We certainly --
12              ( Laughter ).
13              THE COURT:  Some local elections --
14              MR. BURCHFIELD:  There is that.
15              Well, Your Honor, the point -- the point I would
16      make is, that we are not, you know, we are not defending
17      this case on the grounds that we are -- that we are taking
18      actions inconsistent with the consent decree to prevent
19      voter fraud.  That was a -- we argued in 2009 before Judge
20      Debevoise that poll watching was appropriate because there
21      was the risk of voter fraud.  He disagreed with us.  We're
22      not rearguing that now.  Which is not to stay -- which is
23      not to say that the Chairman of the Republican National
24      Committee has to believe there's no voter fraud out there.
25              I think he, you know, he has his views.  I don't
```

JOHN KEVIN STONE, CSR

1      know what his specific basis for that is, but that again

2      comes under the category of free speech.

3              THE COURT:  You know, I'd like to follow-up with

4      Governor Pence and Miss Conway's statements, and then I'm

5      going to go back to the DNC.

6              As to Governor Pence's statement, it was the August

7      3rd, 2016, in response as to a question in Colorado, where

8      he talked about ensuring ballot integrity, and how the Trump

9      campaign and the RNC were working very closely with state

10     governments and secretaries of state.

11             Why isn't this statement probative as to

12     coordination between the Trump campaign and the RNC as to

13     ballot integrity?

14             MR. BURCHFIELD:  Well, Your Honor, as we discussed

15     in our telephone call earlier this week, what Governor Pence

16     said, and I think the DNC misquoted it in their original

17     brief, what he said -- and we viewed the tape, is that

18     the -- that the RNC and the Trump campaign were working

19     together with state officials.  And, you know, there's a

20     debate about whether that would be a violation of the

21     consent decree.

22             I think working with state officials to make sure

23     ballot machines work and that there are enough poll workers

24     on election day and those sorts of things, are not -- are

25     not in violation of the consent decree.

1          Your Honor noted that his answer came up in the

2    context of someone asking him about the Clinton campaign

3    stealing the election.  I take that point.

4          Mr. Phillippe went back to Mr. -- to Governor Pence

5    and asked him about it.  And I think it is the case, you

6    know, candidly, he is -- he is at the top of the ticket, in

7    a nationwide campaign.  He is not a lawyer, at least he's

8    not a practicing lawyer today.  And the fact that he did not

9    understand the obligations or the restrictions on the

10   Republican National Committee under this consent decree is

11   not surprising.

12         Given the degree of coordination between the Trump

13   campaign and the RNC, we're talking about the coordinating

14   of advertising; the RNC ran the convention at which Governor

15   Pence was chosen the Vice Presidential nominee.  He has seen

16   a lot of activity between the Trump campaign and the RNC.

17         He has been man enough to admit that he made a

18   mistake.  And I think Your Honor noted in one of our

19   conference calls, and I can even give you the page number

20   for this.  This is the October 31 teleconference, and

21   page -- page 11.  You know, you noted sometimes the

22   disconnect between the higher-up's and the lower downs.  And

23   that's what we've been -- I don't think -- I don't think

24   it's -- I don't read much significance into it, having

25   represented a number of political campaign party officials,

1        public officials and corporate executives.  I don't think

2        that they -- I think it's not unusual that they don't get

3        all the details right about what's going on.

4                THE COURT:  Although he did use the specific term

5        "ballot integrity."  Right?  There's sort of -- a slip of

6        the tongue you can understand, but that's a term that seems

7        to go right to the heart of the consent decree.

8                MR. BURCHFIELD:  And, Your Honor, it was a slip of

9        the tongue, or it was -- it was a statement, I'm not sure I

10       would call it a slip of the tongue.  I think it was just a

11       mistake.

12               THE COURT:  Okay.

13               MR. BURCHFIELD:  In order -- in order to address

14       that, the RNC has gone, has done extensive due diligence to

15       show that there is no such coordination.  And the DNC has

16       come forward with nothing.

17               If Mr. -- if Governor Pence had made that statement

18       and there were any evidence here to show that there is some

19       active coordination going on, I think it would be both

20       probative and quite significant.

21               But he has, as I've said, he's been -- he's been

22       man enough to admit that he made a mistake, and the other

23       evidence in this case I think overwhelmingly shows that

24       there is no such coordination between the Trump campaign and

25       the RNC on these ballot integrity efforts.

1           THE COURT:   Same question as to Miss Conway and the

2      precinct monitoring.

3           Why wouldn't that be probative of whether the --

4      specifically, the RNC and the Trump campaign are working

5      together?  And I'm paraphrasing on precinct monitoring.

6           Why wouldn't that be probative as to whether that

7      was a potential violation?

8           MR. BURCHFIELD:  Your Honor, essentially, the same

9      answer.

10          Miss Conway -- Miss Conway is very high up in the

11     campaign, and she does not know the day-to-day's of what's

12     going on.  She is not aware of the consent decree, and she

13     is not aware that the RNC is fully complying with the

14     consent decree.

15          She corrected herself shortly thereafter.  And

16     again, there's no evidence to show -- there's no evidence to

17     show that either of those statements actually bears itself

18     out in the real world.  They were inaccurate statements.

19          THE COURT:  And then finally, what about the

20     jaundiced eye that the DNC is looking at and says, you

21     know,, every time a high ranking member of the Trump

22     campaign, whether it be the vice presidential candidate

23     himself, the campaign manager herself, the issue of what

24     arose in Virginia, every time they talk about the RNC acting

25     with them it's an, oops, sorry, mistake, slip of the tongue.

1    I mean, how many times can you people make these mistakes

2    before you start saying, you know, maybe they're not

3    mistakes.  Or you start getting this cumulative effect.

4         MR. BURCHFIELD:  Well, Your Honor, you tried a lot

5    of cases I know, and what I'd say is those statements are

6    good color, they're great P-R.

7         But admittedly, the cases are decided on the facts.

8    And the facts here are, and, frankly, I don't know what else

9    we could do to show that the facts disprove any allegation

10   that the RNC is working with the Trump campaign or with

11   anyone else, on poll watching or ballot integrity.

12        We've talked to everyone up-and-down the chain in

13   the R -- up-and-down the chain in the RNC, we've submitted

14   certifications, we've obtained certifications for 406 people

15   that the RNC identified in Mr. Phillippe's declaration.  And

16   there is no -- there's just no evidence of it.

17        And so I think the case needs to be decided on the

18   facts.  Not on the basis of some statements that are

19   completely inconsistent with the facts.

20        THE COURT:  Well, I think the statements themselves

21   are facts.  The question is what do they say about

22   additional facts.  And as a former trial lawyer talking to a

23   current trial lawyer, I think you also know there's only so

24   many times you can tell a jury, well, that witness made a

25   mistake.  There comes a point where they're not all

1    mistaken.

2             ( Laughter ).

3             MR. BURCHFIELD:  We've all dealt -- we've all dealt

4    with bad documents, Your Honor, in our careers.  And I think

5    the real -- I think, frankly, the only way to deal with a

6    bad document or in this instance a couple of statements that

7    we think are untrue, is just to show that underneath it the

8    facts are simply not there to support it.

9             And as I say, it's -- it was big of Miss Conway and

10   Governor Pence to say that they were mistaken.  They've done

11   that, it's in the record, and we think that's -- we think

12   that's sufficient.

13            THE COURT:  And I'm -- I should acknowledge,

14   because you keep referring to it.  But I do understand, and

15   this is even more of a question for the DNC, the due

16   diligence that was not only done in response to the Court's

17   orders, but also that was submitted before the Court order,

18   along with your October 31st opposition brief, which is Mr.

19   Phillippe's first declaration.  That Declaration A, in which

20   he went through, at least in my view, the extensive training

21   his Counsel's Office provided in connection with the consent

22   decree.

23            So I understand that when you say you checked it

24   out, I believe you're referring to those efforts, among

25   others, on the long list of that exhibit, showing this is

 1    what we've told everybody during the course of the election.

 2              MR. BURCHFIELD:   Your Honor, I would say we know

 3    that the DNC has been expending extensive efforts to

 4    investigate whether the RNC is violating this consent

 5    decree.

 6              You know, they brought in a team of lawyers from

 7    California, New York and Maryland into Las Vegas to try to

 8    obtain evidence.

 9              They had the Executive Director of the Fairfax

10    County Democratic Party surreptitiously record a telephone

11    call.  They're trying to find the evidence here  and they

12    haven't found the evidence.

13              Let me address that Virginia situation for a

14    moment, and that's Mr. Marston, if you look at the context

15    for his quotation, he was talking about voting machine

16    technology.  He wasn't talking about poll watching there.

17    He was talking about voting machine technology.

18              That would not -- that would not -- he was talking

19    about the Dominion voting machines, if you recall.  That

20    would not be a violation of the consent decree, even if Mr.

21    Marston was accurate that the DNC was providing expertese

22    somwhere.  But as he corrected himself, and his declaration

23    says, slip of the tongue.  These things happen.

24              THE COURT:   Yes, I would suffice it to say given of

25    the obligation, there's a healthy level of distrust between

```
 1      RNC and DNC.  I think that's another area that the parties
 2      could agree on.
 3              All right.  Listen, folks, why don't we -- let's
 4      see.  It's 11:18.  I'd really like to have about, hopefully,
 5      just about another hour of argument.  Because I do have to
 6      get an opinion out and take all of this into account.
 7              So why don't we take a break until 11:30.  We'll
 8      start with the DNC responding on the issues of Governor
 9      Pence and Miss Conway, as well as Mr. Priebus, and then the
10      state chair issue.  Okay?
11              MR. KAUL:  All right.
12              THE COURT:  Thank you.
13              MR. BURCHFIELD:  Thank you, Your Honor.
14              MR. PARIKH:  Thank you, Judge.
15              ( After a brief recess court resumed ).
16              THE CLERK:  All rise.
17              THE COURT:  Thank you.
18              Please be seated.
19              Mr. Kaul -- am I pronouncing that right?
20              MR. KAUL:  Kaul.
21              THE COURT:  Kaul.  I'm sorry.
22              Like "call me," maybe?
23              MR. KAUL:  Exactly.
24              THE COURT:  Okay.
25              Mr. Kaul, we left off with Mr. Burchfield
```

1        addressing the statements of Mr. Priebus, Governor Pence and

2        Miss Conway.

3                I understand your argument as to why those

4        statements are probative.  But where I see the distinction

5        is you also are indicating to the Court that those

6        statements are dispositive, for lack of a better term.

7        Meaning not only are they evidence, they're conclusive

8        evidence of a violation, or at least partially conclusive

9        evidence of a violation of the consent decree.

10               Can you just explain that to me a little bit more?

11       And you can take them in any order you like.

12               MR. KAUL:  No, thank you, Your Honor.

13               I think they're actually appropriately considered

14       collectively, so I'll address them all at once.  If you have

15       a specific question, I'll be happy to address that.

16               While you were discussing with Mr. Burchfield the

17       nature of the evidence, I was reminded of when I was a new

18       AUSA, the rule of thumb we had for charging somebody with a

19       crime, was if three people said something, it was probably

20       true.  And that's of course for proof beyond a reasonable

21       doubt.

22               Here we now have --

23               THE COURT:  I'd like to dispute that, because I

24       have a wife and two daughters, and they always agree on

25       things that I don't necessarily agree with, but for purposes

1      of charging a case I'll go with that.

2                ( Laughter ).

3                MR. KAUL:  Well, if they're coordinated statements,

4      Your Honor, they can be called into question.

5                ( Laughter ).

6                THE COURT:  Because I'm on the receiving end of

7      there conclusions.  Okay.  Go ahead.

8                MR. KAUL:  But I mean it's unbelievable here how

9      many misstatements there are.

10               You've got the Conway statement.  You've got the

11     Pence statement.  Now we've got this one from the guy in

12     Virginia.  That's putting aside all the evidence other

13     evidence which I'll come back to.

14               THE COURT:  Let me ask you specifically about Mr.

15     Priebus's statement.

16               As Mr. Burchfield points out, it was supposedly

17     made at a time when there was some concern about whether the

18     RNC would be falling behind the Trump campaign.  He uses the

19     word "full coordination."  But isn't it somewhat reasonable

20     or understandable that when you're trying to show you're

21     backing a candidate, it's hard to say full coordination,

22     except of course for ballot security.  I mean there's a

23     reasonableness there where, you know, you're not going to

24     want to start saying, well, we're not backing him here

25     because we're under a content decree, it kind of muddies the

1      message.

2             MR. KAUL:  I think -- I think that's a good point,

3      Your Honor.  Our position is, I'm sorry.

4             THE COURT:  I'm good.  Thank you.

5             MR. KAUL:  You know, I want to be clear, our

6      position is definitely not that anyone of these pieces of

7      evidence on its own should be considered dispositive.

8             THE COURT:  Okay.

9             MR. KAUL:  It's the broad picture that is painted

10     by all this evidence.  And so if -- if he had said that but

11     the evidence showed that there actually wasn't close

12     coordination between the RNC and Mr. Priebus, you know, that

13     would be I think a fair criticism of it.

14            But it's clear that there's extensive, deep

15     coordination, the conversation of their relationship is

16     airtight on that same call, and the evidence shows that the

17     RNC is doing a field operations around the country for get

18     out the vote and that sort of thing, and actually the people

19     on the ground.  So it's telling a consistent story and all

20     this evidence is pointing to the same conclusion.

21            The other thing about Mr. Priebus is, again, going

22     back to that Face the Nation interview, and here's one of

23     the quotes.  "I know where he's at on this.  And where he's

24     at is exactly as I'm explaining to you."  So Mr. Priebus is

25     actually Mr. Trump's mouthpiece on these issues that we're

 1        talking about.  You know, rigged elections, ballot security.

 2              So they can't just -- I don't think it's fair,

 3        given his statements in public, to try to completely, to

 4        suggest that there's some, you know, wall of separation on

 5        ballot integrity issues.  And I  --

 6              THE COURT:  But even if Mr. Priebus believes voter

 7        fraud is real, maybe extensively, and even if he is aware of

 8        Mr. Trump's position on it, while it may be probative,

 9        doesn't -- don't we need that additional step is that Mr.

10        Priebus is going to permit the RNC to work in conjunction

11        with Mr. Trump on ballot security efforts?

12              MR. KAUL:  I think if Mr. Priebus himself is work

13        ing -- talking with Mr. Trump, advising him on these issues,

14        I mean he's the top ranking official at the RNC, I think

15        that alone is a really significant fact.

16              THE COURT:  I didn't read that he said he was

17        advising Mr. Trump on the issue, I thought he said he

18        understood where Mr. Trump's position was on this issue.

19              That's an interesting point, I mean it may be

20        different if Mr. Priebus said Mr. Trump is very concerned

21        about ballot security and I'm advising him how to deal with

22        that.  I didn't read that statement.

23              I read that I understand what Mr. Trump's concerns

24        are.

25              MR. KAUL:  It's true, he didn't say I'm advising

1    him.  But read in the context of this interview I think it's

2    very -- I think that's the obvious conclusion to draw, that

3    they're having discussions about this issue.  I doubt Mr.

4    Priebus was just passively receiving information from Mr.

5    Trump, let me put it that way.  He's indicating that they've

6    spoken directly about this.

7        I do also want to just briefly talk about the

8    nature of the evidence.  Because there's been some

9    discussion about that.  Certainly from an sister point,

10   as a legal matter, the Court is perfectly entitled to

11   consider hearsay evidence in a P-I matter.  Particularly

12   given the circumstances of this case, where we're all

13   rushing to get into court.

14       I wish we had conducted over extensive, a

15   pre-filing investigation as Mr. Burchfield was suggesting.

16   But the truth of the matter is a lot of these things that

17   have come -- come across our desk, without our solicitation,

18   like the Virginia statement, for example, was just sent to

19   us.  The AUSA, you know, I never heard of until we learned

20   about this, for example.

21       And so that's all stuff that has happened largely

22   organically in the last week or so.  Partly because this

23   case has gotten some attention, and so I think people read

24   about it in the news, and so they realized they could send

25   in relevant evidence.

```
 1              Briefly, on the First Amendment, certainly Mr.
 2    Trump has a First Amendment right, and Mr. Priebus has.  But
 3    the RNC has long history that has resulted in this consent
 4    decree, of using ballot security to deny the right to vote,
 5    which is also a constitutional protection.  And that's what
 6    led to the consent decree.  And so there have been rights
 7    that have been forfeited by that, and that's been upheld by
 8    the Court of Appeals of course.
 9              THE COURT:  Yes, I didn't mean to suggest
10    otherwise.  I read both the interpretation of Judge
11    Debevoise and the Third Circuit.  I meant more Mr. Trump's
12    First Amendment rights.  I understand the constitutional
13    challenge is to the consent decree have been considered and
14    rejected.
15              MR. KAUL:  And then the statements, Your Honor, the
16    Pence and the Conway, and the Virginia statement, first
17    again, we actually still don't have sworn statements from
18    Miss Conway or Mr. Pence.  We have indirect representations.
19              We also have, I think the argument about Mr. Pence
20    perhaps not knowing the details on its own would be a
21    reasonable argument.  But certainly Miss Conway who's the
22    campaign manager is going to know what's going on with the
23    campaign at all levels.
24              THE COURT:  Let me ask you about her.  Because her
25    comments were a little different.  She didn't say ballot
```

1          security, she said precinct monitoring.

2                  Now, let's assume she's right.  Would precinct

3          monitoring necessarily run afoul of the consent decree?

4                  MR. KAUL:  I don't have the statement in front of

5          me, Your Honor.  But my impression is she was talking about

6          doing particularly the types of election day operations that

7          have been prohibited.  Certainly, Mr. Ginsberg, who was the

8          RNC's lawyer, suggested that what she was saying would have

9          violated the consent decree.  She's walked the statement

10         back in light of her understanding.

11                 So I think -- I think clearly she would concede

12         that what she was talking about is the type of activity that

13         would have violated it.

14                 The Virginia statement I think is interesting too.

15         Because, first of all, just taken at face value, when I

16         listen to that recording, it sort of -- I don't know if the

17         Court actually had a chance to listen to the audio, but I

18         think it's worth while.  It sounds like somebody who's

19         saying and somebody is going in the background, you know,

20         don't do that.

21                 With respect to Mr. Burchfield's point that the

22         types of activities being discussed would be lawful, in some

23         ways that -- if what he was saying originally were true,

24         that the Republican party was doing this, but then he felt

25         the need to all of a sudden disclaim it, that in some ways

```
 1       would be more telling than if he was going to say it was
 2       actually a slip of the tongue.  Because it would indicate
 3       that people felt like there was a need to be untruthful
 4       about exactly what was happening.
 5              And then again, we've got all of these statements
 6       are being corroborated by what's going on in the field.
 7       We've got five different declarants saying their
 8       understanding is that they're working, the fact that
 9       different people are saying their understanding is the --
10              THE COURT:  Before we get to the Nevada issue,
11       let's deal with the action or the statements by the state
12       committee chairs from Pennsylvania and Michigan.
13              Now, let's assume for purposes of this discussion
14       that what they've indicated, meaning the state chairs, if
15       implemented, would violate the consent decree.  At a minimum
16       because there's been no pre-clearance sought, and in
17       Pennsylvania because there's been an indication they may be
18       focusing on areas due to the ethnic -- the ethnic and or
19       racial make up.
20              So let's take that as given.  And I'm not saying it
21       is a given.  But I just want to get to the key question as
22       whether the RNC is bound solely because these folks are
23       members.
24              And what was telling to me was that when Judge
25       Debevoise, who really, you know, until his passing was the
```

```
 1      person who rode over this case from its inception, that we
 2      did have two prior issues.  The 1990 issue with the North
 3      Carolina Republican Party and the 2008 issue with the new
 4      Mexico Republican Party.  Judge Debevoise did not find that
 5      those state parties were working in conjunction with the RNC
 6      merely because the head of those parties were members of the
 7      RNC.  So that's very telling to me as to how Judge Debevoise
 8      interpreted the consent decree.
 9              MR. KAUL:  And, Your Honor, I guess two points.
10              First, at some point today, if it's okay with the
11      the Court, I would ask that Mr. Genova be able to give a
12      better background of the consent decree and Judge
13      Debevoise's decisions, because he was at all those hearings.
14              THE COURT:  Certainly.  Would you like to do that
15      right now?
16              MR. KAUL:  I have some other substantive response
17      that I'd like to --
18              THE COURT:  No, I'd like to hear him, because as
19      Mr. Genova has pointed out he's been with this since the
20      inception.  Judge Debevoise, unfortunately, is no longer
21      with us.  But I'd be happy to hear him.
22              MR. GENOVA:  Your Honor, do you mind if I address
23      the Court from counsel table?
24              THE COURT:  Can you hear okay, John?
25              Yes.  Okay.
```

```
 1                    THE REPORTER:  ( Indicates affirmative ).

 2                    MR. GENOVA:  Thank you, Your Honor.

 3               Your Honor, I've had the pleasure of litigating

 4          this matter with Mr. Burchfield through the 2009 order, so I

 5          know that he has some appreciation for the litigation

 6          history, the litigation legacy.

 7               But I must say in terms of the characterization of

 8          the purpose of the consent order, obviously it starts with

 9          its own words.

10               But there is some context to it that I'd like to

11          share with the Court, from my observations, dating back to

12          its inception, that might inform how we approach it.

13               I would agree with Mr. Burchfield that the central

14          question is do the facts that we've alleged them to be

15          violate the consent order?  And that --

16                    THE COURT:  I have to ask the question that

17          everybody want to know.  How old were you, like 11 years old

18          when you started with the --

19                    ( Laughter ).

20                    MR. BURCHFIELD:  I wish I was 11 years old when I

21          started.

22                    THE COURT:  All right.  Go ahead.

23                    MR. GENOVA:  Thank you.  That's a compliment.

24               But I think I was 28.

25                    ( Laughter ).
```

```
 1                    MR. KAUL:  Can we go a transcript of that?

 2               ( Laughter ).

 3               THE COURT:  I'm sorry.

 4               Go ahead.

 5               MR. BURCHFIELD:  I had hair then, I'm sure.

 6               ( Laughter ).

 7               The point I was getting to, Your Honor, is that at

 8      its core, and at its inception this consent order was

 9      derived from some pretty serious behavior that took place in

10      our state.  And I think Judge Debevoise recognized and the

11      litigation recognized, and it did lead to a mutual agreement

12      between the parties, recognized that behaviors that were not

13      only designed and intended to have an effect, or intended to

14      result in a suppression of the minority vote, and of voters,

15      were offensive, but the parties incorporated a concept at

16      the time that was novel but has become part of our

17      jurisprudence since that time, that is essentially an

18      effects test.  And you may know in the context of employment

19      law or housing discrimination.

20               But in Section 2 E of this agreement, it talks

21      about and suggests in my view it was the intent of the

22      parties that what might otherwise be facially neutral

23      practices, can nonetheless be discriminatory, and in this

24      case could nonetheless result in impermissible voter

25      suppression under this order.
```

1          So when the order talks about behaviors that are

2     not going to be permissible, it's up to the Court in

3     evaluating those behaviors.  Not just to look at what do the

4     parties intend.  What do they intend by the behavior.  But

5     what does this behavior result in.

6          Here -- here, I would maintain, and we would

7     maintain, that there are a number of behaviors that are now

8     self-evident from the declarations that have been submitted

9     here, beginning whim Mr. Trump's statements about where

10    these activities should be undertaken.  We have to look at

11    his statement in Altoona, we have to look at his statements

12    during the whole course of October, where he talks about,

13    you know what I'm talking about, where he talks about

14    cities, and specific cities in the case of Philadelphia.

15         So I would ask the Court to be mindful that when

16    you evaluate the evidence here, it's not about what does the

17    RNC intend to do by these behaviors, but what is the effect

18    of the conduct that's at issue here.  That's issue one.

19         My colleague here, Mr. Parikh pulled up on the

20    computer some of the affidavits that were filed in the 2004

21    litigation.  It was remarkable to me as I was reading them,

22    and I'll commend the Court to read it if you choose to in

23    the docket, and particularly document number 20, it almost

24    virtually looked like a template of the certifications that

25    we have seen in this proceeding.  It's as if it was kept in

1      a file somewhere to be pulled out on the next application

2      that the Democratic National Committee would seek to bring

3      to enforce this order.

4           The point I'm making, Your Honor, is that this kind

5      of evidence, the denial evidence I'll call it, is more

6      powerful for the absence of what's not in the submissions

7      then for that the fact that there's a denial.  In fact, we

8      should expect a denial.

9           Now rolling the clock a head to 2009, what is it

10     that Judge Debevoise attempted to do.

11          Mr. Burchfield and I litigated a number of the

12     questions that Your Honor is raising today, and that Court

13     started with, Judge Debevoise started with the whole notion

14     of voter fraud.

15          I would suggest to you, Your Honor, that Judge

16     Debevoise rejected the idea that there is voter fraud.

17     Embraced the evidence that was submitted in the modification

18     litigation, and in fact that's reflected in how he deals

19     with the definitions of ballot security and normal poll

20     watching functions.  Because if you read them carefully,

21     first of all, when he talks about ballot security, he refers

22     back to the original consent order.  He says "ballot

23     security as used in the consent decree shall include any

24     program aimed at combatting voter fraud," and then goes on,

25     "the use of challengers to confront potential voters and

1     verify their eligibility at the polls, either on election

2     day or d day on which they may take advantage of state early

3     voting procedures."

4                I would suggest to you that the several

5     declarations that we've submitted identify contemporaneous

6     conversations that took place with those at these polling

7     places do exactly that.  It's the use of challengers who are

8     confronting potential voters, we have the misinformation,

9     conversations with voters, and verify their eligibility at

10    the polls with  -- or a day in which they may take

11    advantage.

12               Then when you go to normal poll watching functions

13    which Mr. Burchfield would have the Court view as a safe

14    harbor here, interestingly, there's a distinction in that

15    paragraph.

16               The paragraph, and I believe this reflects what

17    that litigation was about was, the RNC wanted to come out of

18    there with some understanding that hey, there are things we

19    can do.  We're a political party.  Our people should be able

20    to go to a polling place and do certain things.  I think

21    this Court gets that.  We get that.

22               But when Judge Debevoise crafted, carefully crafted

23    his definition of normal poll watching function, he said it

24    "shall include stationing individuals at polling stations to

25    observe the voting process and report irregularities

1    unrelated to voter fraud to duly appointed state officials."
2    And then he goes further to draw a distinction between
3    process and voter.  Because he goes on to say, "such
4    observers may not question voters about their credentials,
5    impede or delay voters by asking for identification,
6    videotape, photograph or the like."

7            Now, what is the evidence that supports the idea
8    that these are programs that are in the offing that address
9    voter fraud.  Well, one piece of evidence, and I'll leave it
10   to my colleague to point out others, but I will pull some,
11   is in the certification and declaration of Frank Anderson,
12   the Executive Director of the Fairfax County Democratic
13   Committee, where he appends what he received, having signed
14   up for the public invitation that it was extended to anybody
15   that wanted to participate through the internet, just simply
16   by signing up and acquiring a password.

17           And in one of the first bullets on the training
18   materials, the election officer and poll watcher is told,
19   we're going to teach you about, quote, "what to look for to
20   stop fraud and what to do about it."

21           So the point to all this, Your Honor, is that when
22   you read these orders in para materia, when you come to
23   understand and appreciate that this whole notion of voter
24   fraud was highly suspect and Judge Debevoise said that, he
25   wanted to help fashion an order that was workalbe, because

1     you go back to his decision, and his principal concern was

2     workability, and he tried to craft it where he didn't want

3     voter fraud to be  the -- the allegations of voter fraud to

4     be the predicate for the kinds of facially neutral practices

5     that would have a disparate effect on minority groups and

6     minority locations.

7          A lot of evidence was put up in that case -- was

8     developed in that case on -- on the whole question of

9     whether or not the Republican National Committee through its

10    programs were selecting areas because of their Democratic

11    registration or concentration, or because it happened to be

12    where a large degree of minorities, African-Americans and

13    the like, lived.  There was a lot of evidence on that.  And

14    Judge Debevoise understood that history and understood that

15    evidence, and nonetheless, did not abrogate, did not modify,

16    did not change the notion that a facially neutral practice

17    can nonetheless have a discriminatory effect.

18         The evidence, I think Your Honor knows, and not to

19    steal my colleagues thunder, but the standard here in a

20    preliminary injunction is not conclusive evidence.  We know

21    -- we know we have a burden, but we're here for a

22    preliminary injunction.  And Your Honor has great latitude

23    in terms of allowing for hearsay and allowing for the kind

24    of evidence that took place here.

25         If you go back in the record of this case, there

1          were different approaches that were taken.  There were

2          different approaches that were taken.  I'm sure my colleague

3          will identify for you the litany of evidence.

4               But I will just say to you that the burden that we

5          have, the docket in this case, the kind of evidence that has

6          been presented here, quite frankly, I think is stronger than

7          what I've seen in the prior -- in the prior matters.  You

8          alluded to New Mexico, and I'll end on this.  My

9          recollection that was two competing affidavits.  That's what

10         it was, two competing affidavits.

11              THE COURT:  But when I read Judge Debevoise's

12         opinion, in the 2009 opinion where he kind of laid out the

13         history of the case and that it was now in response to the

14         motion to vacate or modify filed by the RNC, what I focused

15         in on is he said there may have been -- he doesn't say there

16         was, but he said there may have been misconduct by the New

17         Mexico Republican Party.  And in fact, in the North Carolina

18         case, he thought that if they were subject, if the state

19         party was subject to the consent decree, it would have

20         violated it.

21              But what I'm trying to distinguish here is right

22         now we have allegations that the state chairs of the

23         Pennsylvania and the Michigan party are taking actions that

24         would violate the consent decree.  And the argument that the

25         DNC has forwarded is that, you know, they are members of the

1     RNC, so by definition they're bound.

2            RNC says they're members, but they're not acting in
3     their capacity as members.  And they point to the fact that
4     when the state committees in North Carolina and New Mexico
5     may have taken action that would violate the consent decree,
6     Judge Debevoise did not hold the RNC accountable for those
7     state parties' actions.  I mean the footnote is that he, in
8     the North Carolina case Judge Debevoise required the RNC to
9     send out notice to all the state parties about the consent
10    decree.

11           But putting that aside, we have the issue that it
12    seems as though this very argument has been raised by the
13    person who presided over the matter from the beginning, and
14    Judge Debevoise did not accept that the state parties were
15    automatically bound by the consent decree.

16           MR. GENOVA:   I think part of the starting point, to
17    answer that question, is that that assessment by Judge
18    Debevoise in the New Mexico matter, I think that Mr.
19    Burchfield, it preceded our litigation by weeks.  Right?
20    You initiated the modification application shortly weeks
21    after that.

22           And we didn't have the benefit of the analysis of
23    Judge Debevoise 92 page opinion and his greater
24    appreciation.  He had two affidavits there at the time.  But
25    great appreciation of what I'll call the depth of the issue

```
 1      and the problem.

 2              And then we also didn't have the benefit of Judge

 3      Greenaway's Third Circuit opinion, where he expressly

 4      recites and reinforces a notion that is contained in the

 5      order itself.  And at footnote two of the Third Circuit's

 6      opinion he says, "The NRC -- RNC agreed and the RNC --that

 7      the RNC's agents, servants and employees would be bound by

 8      the decree, whether acting directly or indirectly through

 9      other party committees."

10              Now, if the argument of the RNC is that the mere

11      fact that, and I believe my colleague referenced this

12      earlier but I'll reinforce it, that the mere fact that I

13      hold -- I hold a position as a state party official renders

14      me immune from being an agent of the RNC, I don't think

15      that's is in the contemplation of the order.

16              There is even a reference in the original order, if

17      my recollection serves me, there's an affirmative statement

18      that says at the RNC does not, I think the word is

19      "presently," if I can pull it up.

20              THE COURT:  Sure.

21              MR. GENOVA:  But that the order says that -- it's

22      in the original order.

23              And there's a representation that's made.  My

24      colleague is going to find it for me.

25              But there's a representation that's made that the
```

1      order doesn't bar -- doesn't include present party

2      committees.  Here it is.  It's in paragraph four.  "The

3      settlement agreement and the terms of the consent order be

4      entered into pursuant thereto shall bind the DNC, the New

5      Jersey Democratic State Committee, the RNC, and the New

6      Jersey State Republican Committee, their agents, servants

7      and employees, whether acting directly or indirectly through

8      other party committees.  It is expressly understood and

9      agreed that the RNC and RSC have no present right of control

10     over other state party committees."

11            It doesn't say that they may not in the future.  We

12     have evidence here that is contrary to our claims that is

13     being presented.  But this is not a bar to the notion that

14     they could.  And in fact, the language in the order that

15     talks about indirect activities, look, the reality of it is

16     Mr. Trump gets on television every other day, encourages and

17     enthusiastically people to monitor polling places.

18            There's admitted endorsements of his candidacy by

19     party leaders, whether he's communicating on Fox News or

20     communicating over the internet or communicating through

21     Twitter, they're very much aware of what his agenda is, what

22     does it mean to indirectly be involved in the coordination

23     of an effort to have an effect that this consent order is

24     designed to address.

25            So that's how I would answer Your Honor's question.

1                    THE COURT:  All right.

2                    Thank you, Mr. Genova.

3                    MR. KAUL:  And, Your Honor, I was hoping to address

4         the distinction between the facts of this case and the --

5         what happened previously.  Just to follow what Mr. Genova

6         said.

7                    THE COURT:  Sure.

8                    MR. KAUL:  The -- there's a tension here I think

9         which is clear, which is there are some prior cases where

10        state party activity was not found to be a basis for

11        liability for the RNC, and we understand that.

12                   On the other hand, you have the language in the

13        contract, the consent decree, which Mr. Genova just referred

14        to, which says that the RNC is liable for people who are

15        it's agents, or whether, whatever hat they're wearing is

16        essentially what it says.

17                   But what's unique about this case and what

18        distinguishes it from a run of the mill case where you have

19        some state action to suppress votes, here you have a top

20        down national effort involving the national candidate of the

21        Republican Party, Trump, who is the number one priority for

22        the election of the National Republican Committee.  I mean

23        you have the RNC justifying, explaining his efforts on the

24        news.

25                   So we're not just saying it's surely based on the

1           facts that the person happens to be an RNC member that the

2           RNC is liable.  We're saying if you look at the totality of

3           the facts here, it's clear that at least in part he's

4           wearing his RNC hat in conducting these efforts, because

5           he's directly furthering the goals of the RNC and of the

6           Trump campaign, which is the national campaign.

7                    THE COURT:  But that's where you have, it wasn't

8           Mr. Phillippe, it was the other, the General Counsel from

9           the RNC, that sent out the memo to all members.  Not to the

10          RNC folks, but to all RNC members, indicating this is the

11          consent decree, we, I'm paraphrasing, we urge you not to do

12          anything contrary to the consent decree.  But if you do so

13          in your capacity as a state party person, you are not

14          representing us.

15                   So there's a clear disclaimer by the RNC that those

16          activities will be done in your capacity as a state

17          representative as opposed to an RNC representative.

18                   I mean what else -- what else can the RNC do at

19          that point to prohibit the state committee members or state

20          committee chairs from taking action, if they want to take it

21          in their capacity as state committee chairs?

22                   MR. KAUL:  Well, there are several things, Your

23          Honor, I think I would say.

24                   First of all, it's clear the letter doesn't

25          immunize them, particularly when their chair is going on

1    television and contradicting that to some extent.

2         But, for example, they could very easily have told

3    Mr. Gleason he's no longer a member of the RNC and disavowed

4    any connection with what's going on there.

5         On the contrary --

6         THE COURT:  That doesn't even get you where you

7    want to be though, because it still leaves Mr. Gleason free

8    to do what he wants to do as state party chair.

9         What I'm trying to say is the way you're reading

10   -- the way the DNC is reading it seems -- well, first of all

11   it doesn't seem that Mr. Gleason or Miss Romney McDaniel,

12   you know, were like elected to the RNC.  Instead, by virtue

13   of their state position they're automatic members.

14        And my concern with the way the DNC is reading this

15   issue now it seems as though the DNC is now going to

16   effectively request that the Court say that it applies to

17   every state party, and I guess territorial parties as well,

18   because they're automatically members of the RNC.  I mean

19   that seems well beyond the scope of what the initial consent

20   decree contemplated.

21        MR. KAUL:  I agree with Your Honor, and that's not

22   our position.

23        If -- so let me give you an example where I think

24   there would be liability if the R -- if Gleason was involved

25   in suppression activities.

1            If there was a state senate race in Pennsylvania,
2       and the state party was concerned about fraud and they
3       wanted to initiate some sort of fraud based effort, and
4       Gleason was involved in that because he's the head of the
5       state party, I think the RNC would have a strong argument
6       there that it has nothing to do with that.  That's him
7       acting purely in his state party capacity.

8            Here though, he's acting in a national capacity, in
9       the context of specifically a national election.  Remember,
10      he's not talking about fraud in general.  He's talking about
11      the Trump election specifically.  And again, you've got the
12      statements from Priebus that are justifying it.  If you had,
13      you know, in the contrary scenario, you had Priebus going
14      on-line saying, we have nothing to do with this, we want to
15      be clear, I think they would be in a perfectly safe harbor
16      position.

17           The fact that he is a member of course is another
18      fact that the Court can consider.  There are only 168 RNC
19      members, and 50 of them are state party chairs obviously.  So
20      it's a pretty small group.

21           And the RNC acts through its members and its
22      employees, and so if you send out a letter saying you can't
23      do this, but then you keep engaging in the activity, it's a
24      problem -- you know, I had, you know, a similar situation,
25      would be a company that sends out a sexual harassment memo,

1    you can't commit sexual harassment.  But then it learns a

2    bunch of people working for it are involved in harassment.

3    Even if it's off the job, if it keeps those people on and

4    bring them into the workplace, you know, it's sending

5    contradictory messages.

6         And so here, although all the messages, other than

7    the counsel letter are pointing, are supportive of these

8    sorts of efforts.

9         THE COURT:  Okay.  Thank you, Mr. Kaul.

10        Let me hear from Mr. Burchfield on this issue

11   concerning the state chairs of Pennsylvania and Michigan,

12   and then we'll finish up with the Nevada issue.

13        MR. BURCHFIELD:  Very good.  Thank you, Your Honor.

14        Let me -- let me begin with the --

15        THE COURT:  You know, Mr. Burchfield, one thing I

16   didn't know, it wasn't in the papers, is when this consent

17   decree went in place in 1982, was it the practice of the RNC

18   at that -- or I shouldn't say the practice, the rules or

19   regulations of the RNC at that time that the state party

20   chairs were automatically members of the RNC?

21        MR. BURCHFIELD:  I am told by Mr. Phillippe that

22   the answer to that is yes.

23        THE COURT:  Okay.  Can I ask, I know we're under

24   tight time constraints, but if we could, as soon as after

25   court is over, if I can get something from you, indicating

1      that that was the case.  I'm accepting your representation.

2      I just want a full record as -- I didn't know if the rule

3      changed over time, or they said this came into place in 2000

4      and it's no longer.  Okay?

5                  MR. BURCHFIELD:  Right.

6                  We have become rather adept in turning around those

7      requests.

8                  THE COURT:  I can tell.  Okay.

9                  MR. BURCHFIELD:  Your Honor, let me -- on this

10     state party chair issue, I think it's pivotal to note that

11     the public articles that the DNC cites for this, and this is

12     Document Number 96-18, it quotes Mr. Gleason, and it

13     identifies him as State GOP Chairman Rob Gleason.

14                 On the other article, which is Document Number

15     96-19 regarding Michigan, it identifies Rhona Romney

16     McDaniel in the second paragraph, nevertheless, Michigan

17     Republican Party Chairman, Rhona Romney McDaniel.

18                 In a quick scan of this, I don't see any indication

19     that they're even a member of the RNC.  They're speaking

20     there and they're acting in their capacities as state

21     chairs.  Which -- which under the law they're allowed to do.

22     That's the first point.

23                 The second point, Your Honor is, and this kind of

24     makes the point I make earlier.  But in the Federal Register

25     notice regarding the rules that Mr. Elias read to the Court

1    on the other day about agency, in the Federal Register

2    Notice, it's 67 Fed Reg 49063 at page 49083, July 29, 2002,

3    the regulations say, this is FEC regulations.  "Individuals

4    such as state party chairmen and chairwomen who also serve

5    as members of their national party committees can,

6    consistent with BICRA," that's the McCain-Feingold Act, the

7    Bipartisan Campaign Reform Act of 2003, "can, consistent

8    with BICRA wear multiple hats and can raise non-federal

9    funds for their state party organization without violating

10   the prohibition against non-federal fundraising by national

11   parties."

12             The law on this is clear.  It's also --

13             THE COURT:  That was 2003-10 was it?

14             MR. BURCHFIELD:  It is federal -- it is the Federal

15   Registry cite, Your Honor, is that what you're looking for?

16             THE COURT:  Yes, what cite, could you give me --

17   you said that's the FEC --

18             MR. BURCHFIELD:  Yes, this is the Federal Registry

19   notice for FEC's regulations that Mr. Elias read to you on

20   the phone the other day.

21             THE COURT:  Okay.  Got it.

22             MR. BURCHFIELD:  The other thing I'd say, Your

23   Honor, is we know -- we know as people that -- that we

24   operate in separate capacities all the time.

25             My mentor, one of my mentors, who I clerked for,

1    Judge Aldisert, was a Judge of this Court for many years.

2    And he served as a Trustee of the University of Pittsburgh.

3    And when he was serving in his capacity as a trustee of the

4    University of Pittsburgh, he was not a federal judge.  He

5    was not doing that in his capacity as a federal judge.  He

6    wasn't issuing rulings.  When he was on the bench he wasn't

7    serving in his capacity as a trustee.

8              This is a distinction that not only is

9    well-recognized in the law, in election law, it is

10   well-recognized in daily life, and there are judges, and you

11   may be one of them, who teach courses at law schools.  They

12   are doing that in their individual capacity, not as judges.

13             It is a distinction that is well-recognized.

14             The final point I'll make Your Honor is, you hit

15   the nail on the head.  And that's exactly what this is

16   about.  If the DNC prevails on this argument that the state

17   chairs of Michigan and state chair of Pennsylvania are

18   agents of the RNC for the purposes of this consent decree,

19   they will have completely shutdown any Republican poll

20   watching efforts in the country.  Because every state chair

21   is by virtue of the fact that they're a state chair, a

22   member of the RNC.  And they have to operate from different

23   capacities by holding those -- by holding those positions.

24             THE COURT:  Okay.  Thank you, Mr. Burchfield.

25             Let's talk about the Nevada submissions.

1           I note one area is, you started out with, and Mr.
2      Phillippe noted, you seem to have concerns over the
3      qualifications or the backgrounds of the Democratic poll
4      watchers, can you explain that to me?

5           MR. BURCHFIELD:  Well, Your Honor, it's -- it has
6      occurred to us, both with regard to that and with regard to
7      the declaration that was filed yesterday by Mr. Anderson,
8      that there is an effort by the DNC here to educate people
9      about the consent decree and then to put them into positions
10     where they are actively looking for violations, but maybe
11     even precipitating people to say things that are in
12     violation.

13          That certainly wasn't the case in listening to this
14     telephone call.  He was just -- he was just rethink -- and
15     was surreptitiously and improperly under false pretenses on
16     that call.  Having said -- having qualified for the call by
17     saying he was committing to be a volunteer, and then
18     participating in it simply to gather evidence for this case.

19          But -- but the six election observers in Las Vegas,
20     one of whom is a retired AUSA from Los Angeles, one of whom
21     is a Judge Pro Tempe from San Francisco, operating in an
22     individual capacity no doubt, are questioning poll workers.
23     And those poll workers have made, as we indicated,
24     misstatements about who they're affiliated with.  That just
25     strikes us as, you know, it's aggressive gathering of

1    evidence at the very least.

2        THE COURT:  Without saying the obvious, you are
3    also a lawyer, should I apply that argument to your
4    arguments or Mr. Phillippe's declarations?

5        I mean if I'm going to look with a jaundiced eye
6    because lawyers are involved, I don't know how far I'm going
7    to get in this case.

8        MR. BURCHFIELD:  Well, that's a fair point, Your
9    Honor.

10       THE COURT:  Seems to me you would want somebody
11   with legal training out there.  I think you'd have, I could
12   imagine you could make a very strong argument that these
13   person aren't even trained in the law and they're look for
14   violations.  I'm not -- it seemed to me more of a prudent
15   maneuver as opposed to a reckless one.  Let's put it that
16   way.

17       MR. BURCHFIELD:  Well, Your Honor, I would say, the
18   last point I make this on this, and I don't -- I don't want
19   to belabor the point, but it is -- one of the texts that
20   were sent back to the Democratic National Committee, and
21   this is by -- the text by -- well, one of the texts that
22   were sent, I can't locate it right now, but it was by one of
23   the affiants, who said I think this may violate the consent
24   decree.  So in any event, I've made the point and it is
25   there for what it's worth.

1                    THE COURT:  Let me ask you another question.

2                    You stated this in your opening arguments.  Where

3          you said, listen, to the Court, in so many words, we are not

4          engaging in poll watching functions.  But even if the Court

5          were to find that we were, that's not prohibited, we're

6          allowed to do normal poll watch functions as long as it's

7          unrelated to voter fraud.

8                    If the Court were to find that the RNC was engaging

9          in poll watch functions, I'm not saying I am, I'm just

10         trying to put out hypotheticals here, how should I take into

11         account that that, if that occurred, it occurred in direct

12         violation of the internal counsel's admonitions?

13                    Again, recognizing it may not be a violation of the

14         consent decree, but we're erring on the side of caution,

15         we're not doing poll watching functions.

16                    MR. BURCHFIELD:  Your Honor, that would be -- to

17         answer your question, that would be in violation of the

18         internal procedures of the RNC, subject to disciplinary

19         procedures by the RN -- internally of the RNC, but it would

20         not be a judicial issue.

21                    THE COURT:  So your clear position is unless it

22         crosses the line of the consent decree I really shouldn't

23         give it any weight.

24                    MR. BURCHFIELD:  Exactly.

25                    Exactly, Your Honor.  This is analogous to the old,

```
 1      you know, remedial measures issue that courts address
 2      frequently, and that is, you don't want to incentivize
 3      people to be less than aggressive in enforcing the law,
 4      because if -- if we set standards that are higher than the
 5      law, and we therefore raise our legal obligations by those
 6      standards, then we're not going to set standards that are
 7      higher than the law.  So we should be, I would submit, Your
 8      Honor, the RNC should be applaud for the efforts its taken
 9      to comply with this consent decree, and Mr. Phillippe, who's
10      sitting back here, he has taken, he's gone well out of his
11      way to draw a broad parameter around this --
12               THE COURT:  And I'm not smiling at your request, I
13      just don't know if I can order applause for the RNC.
14               ( Laughter ).
15               That may not be within my jurisdiction.  But your
16      argument is taken.
17               MR. BURCHFIELD:  Okay.
18               Well, in any event, I think it would be -- I think
19      if the advice, internal instructions of the RNC are
20      violated, but the consent decree is not, that is not an
21      issue for this Court, it's an issue for internal discipline
22      appropriate, internal discipline at the RNC.
23               THE COURT:  Okay.
24               MR. BURCHFIELD:  And my colleague has just handed
25      me the declaration I was just referring to also, which is
```

1          the declaration of Eresima Garza, it's Docket Number 122-2,

2          and the text attached to that as Exhibit A, says, "The

3          Republican observer told me she is with the Trump campaign

4          but that really the RNC is running the program.  I mention

5          this because of the consent order and the DNC lawsuit in

6          Florida.

7                    THE COURT:  Okay.

8                    Thank you, Mr. Burchfield.

9                    Let me hear from the DNC as to the Nevada issue and

10         then I'll give the parties an opportunity to make any final

11         comments they want on the record.

12                   Okay.  Mr. Kaul, as to the Nevada issue, I mean

13         what I'm trying to distinguish is, let's assume just for

14         purposes of argument that, you know, I find that the RNC is

15         engaging in poll watching functions.  That doesn't violate

16         the consent decree in and of itself, unless it's related to

17         voter fraud.  Voter fraud efforts, let me make that a little

18         clearer.  Okay.

19                   Let's assume that I accept the representations.

20         Why do you think what is going on in Nevada is related to

21         voter fraud efforts or ballot security.  However you want to

22         term that phrase.  But the actions that would be prohibited

23         by the consent decree, put it that way.

24                   MR. KAUL:  I'll make a few points, Your Honor.

25                   I agree with the point that in of itself the fact

1    that somebody did something in violation of the internal

2    instructions wouldn't be significant unless it violated the

3    order.

4         But the RNC's defense here is, we couldn't have

5    done anything wrong, because we sent out this memo,

6    everybody complies with them and they've certified they do.

7         So the defense has started crumbling already as

8    this certification established.  And so once -- so it's

9    relevant not because in and of itself proves a violation,

10   but it's relevant because it shows the defense is flawed in

11   terms of the information that the Court is receiving.

12        Secondly, Mr. Burchfield made a comment earlier

13   about maybe -- maybe the people who are being misdirected

14   were -- were, you know, white males of at least middle age,

15   I think was the comment.  It's possible that that happened,

16   but it's not probable.  Given the history of this

17   litigation, the reason for the consent decree, the -- just

18   the nature of this.

19        And then the other thing is we know that people

20   said that they were either told to misrepresent who they

21   worked for or felt that they were supposed to misrepresent

22   who they worked for.  And the only reason that that would

23   make sense is if they were violating the consent decree.

24        The -- again, the Stampede declaration doesn't say

25   we're doing activities that are consistent with the consent

1    decree.  It doesn't make that representation although it

2    easily could have.

3              THE COURT:  Look, your points, I understand the

4    point I think, about there's a spectre of suspicion here,

5    people -- based on your efforts.  Obviously, the RNC

6    submitted evidence to the contrary.

7              Based on your evidence people are not supposed to

8    say they work for the RNC and so forth, and they're saying

9    they're independent, and then they're saying I work for the

10   RNC.  But when I really get to the nub of the issue, the

11   question I have is, let's assume all that's true, just for

12   purpose of the argument.  Unless there's engaging in

13   functions that are related to ballot security or voter

14   fraud, that to me seems where the consent decree is

15   implicated.  Right?

16             And I'm trying to see where your argument is, what

17   facts support that there's a program by the RNC, at least in

18   Nevada, to engage in poll watching related to voter fraud

19   efforts or ballot security.

20             MR. KAUL:  Well, first of all, there's the

21   misleading statement that the Court was referring to.

22             Secondly, the Kashana Holland exhibit, the

23   attachment, showing that she signed, that she acknowledged

24   her responsibility.  That's called Election Watcher

25   Briefing.

1           Now, we don't know what that briefing was, but it

2    certainly sounds like they're monitoring the people who are

3    voting, presumably for voter fraud.

4           And again, I can't think of a reason, if -- if the

5    RNC was engaging in legitimate poll watching efforts, why

6    they wouldn't just say that.

7           Also, to the extent they had an obligation to

8    pre-clear what they were doing with this Court.

9           So the most likely inference from all of this

10   evidence, again, considered with the totality of everything

11   else from the top on down, is that, you know, the activity

12   they're engaging in and concealing is activity that they're

13   not allowed to engage in.

14           THE COURT:  Well, what about, I thought there were

15   three other folks identified as working for the RNC, but

16   what I looked for in the declarations was there was no

17   indication that those three did anything related to voter

18   fraud or ballot security.

19           I saw two -- the way I interpreted is, there's two

20   allegations of -- that could be construed as related to

21   voter fraud.  One was the one you just mentioned.  Which is

22   that you filled out an election incident report.  Without

23   knowing more, I don't know.  But there's a potential that

24   needs to be explored.

25           And the other one is the woman who supposedly on

1    four occasions gave wrong information to voters.  Again,
2    depending on whether she was just mistaken or intentionally
3    mistaken, but there's some evidence there.

4         But then you also have three other people who they
5    just said, well, I work for the RNC, but there was that
6    follow-up that there was any activity taken by them other
7    than they were poll watching.

8         MR. KAUL:  Yes, but it's a question then of why
9    would they then feel a need to not be forthcoming who they
10   work for in that circumstance.  And I don't have a good
11   answer for that other than they were doing it for reasons
12   they weren't supposed to be.

13        And with respect to the point about how the RNC
14   doesn't condone violations of their agreements, I don't know
15   that Stampede, Stampede presumably filed the certification
16   saying that, you know, they were completely complying with
17   all the requirements.  My understanding is that Stampede
18   remained a contractor.  We haven't seen anything suggesting
19   anything otherwise or any remedial action with respect to
20   Stampede.  So I don't know that.  We certainly haven't seen
21   any internal investigation declarations.

22        THE COURT:  Well, wouldn't the Stampede -- I mean I
23   don't think they contested Stampede worked for them.  They
24   said Stampede is working for us in a different state, in a
25   different part of the country, on get out the vote, we're

1      paying them.

2                But Stampede's position was that we're also working

3      in Nevada but we're jsut not working for the RNC in Nevada.

4                MR. KAUL:  Right.

5                But so the certifications, for example, there's a

6      memo that we cite in our declaration where they say you

7      can't just take your RNC hat on or off.  Your RNC, you know,

8      if you're working for us you're working for us 24/7.  And

9      you're representing us.  You know, there's the memo about if

10     you're working for us as a contractor and employee, you

11     cannot undertake any activities that touch on -- there's no

12     limitation to, you can't do this while were you're working

13     as contractor for us in this capacity, but go ahead and do

14     it elsewhere.

15               And, frankly, the fact that, even assuming it's

16     right that they're retained by the RNC to do get out the

17     vote operations, and they're retained by the state party or

18     somebody else to do poll watching, is exactly the sort of

19     divvying up that funding of activities that demonstrates

20     that an effort in concert to undertake all these efforts.

21               THE COURT:  All right.  Thank you, Mr. Kaul.

22               MR. KAUL:  Thank you, Your Honor.

23               THE COURT:  Mr. Burchfield, I didn't give you an

24     opportunity to address the Stampede issue.  If you'd like to

25     do it now, I'm going to give both parties an opportunity to

1         kind of give me their final version.  If you'd like to do it

2         then that's fine too.  Okay.

3                   MR. BURCHFIELD:  I have nothing to add.

4                   THE COURT:  Okay.

5                   Mr. Kaul, the floor is yours if you'd like to give

6         me any final thoughts, put anything to the record, and then

7         I'll let Mr. Burchfield have an opportunity.

8                   MR. KAUL:  I'll just be very you brief, Your Honor,

9         because I think that this has been very comprehensive, and

10        if the Court had any questions, I'm happy to --

11                  THE COURT:  No, you answered all my questions, I

12        can tell you that.  I had a number but you guys have

13        answered them.

14                  MR. KAUL:  You know, the evidence here is that

15        there are two very senior Trump campaign officials, one of

16        whom is managing the campaign, who made, what are now

17        claimed to be misstatements, saying that the RNC was

18        involved in prohibited activities.

19                  There's a statement from a high level Virginia

20        official suggesting they were, and again, I commend the

21        audio recording because I think it's telling.

22                  And then we've got corroboration on the ground that

23        people think that they are acting on behalf of the RNC, and

24        a lot of people do.

25                  And you know, we've got the RNC chair acknowledging

1          that he's talking to Mr. Trump about ballot security issues,

2          or about voter fraud issues at least, and defending Mr.

3          Trump's statements.  And then you've got these actions on

4          the ground by state party chairs.  Again, we're not saying

5          that just because they're state party chairs the RNC is

6          responsible.  But these are state party chairs who are

7          specifically taking these actions they say in the context of

8          the national election.  And it's specifically in response to

9          Mr. Trump's calls for these efforts.

10              And so when you take all that evidence together, it

11         paints a consistent picture that the RNC is at least working

12         in coordination with these other groups to violate the

13         rules.  And it now has contractors who appear to be,

14         although we don't know.

15              And this is I guess the point I would add.  We have

16         not had any discovery yet as I mentioned before.  So this is

17         all essentially, pre-discovery evidence.  And given that

18         background, it's a mound of evidence we think.

19              The RNC's defense has been representations that it

20         just doesn't do this and it sends out legal memos.  Some of

21         those representations have already started to breakdown

22         based on the evidence.

23              And I would say this, with respect to preliminary

24         injunction, the other factors that the Court has to

25         consider, which we haven't focused on today, are the balance

1          of the harms and the public interest.  Here, those all point

2          very powerfully in one direction.  And, you know, we made

3          the argument in our papers, I'm not going to belabor it.

4          Where as what we're asking for is fairly narrow and limited

5          preliminary relief.  In terms of --

6                    THE COURT:  Let me just ask this.  I know you've

7          asked for preliminary relief.  Obviously the RNC is already

8          under the consent decree.

9                    Basically, if I was going to grant the relief I'd

10         be enjoining them from something they say they're not doing

11         anyway.  So they say fine.  I mean they wouldn't say fine

12         because if they don't enjoin us.  But they say, if you did,

13         practically speaking if you enjoin us, we're not changing

14         anything because we're not doing it.

15                   Does it get -- does it move the ball forward at

16         all, you know, they are under the consent decree, and based

17         on their position, you know, they're going to say, okay,

18         we'll stop any poll watching related to voter fraud, but

19         we're not doing it anyway, so there's no reason to stop it

20         at this point.

21                   I understand why you want the preliminary

22         injunction, I'm trying to think of what's the practical

23         effect.  Usually, preliminary injunction you have somebody

24         about to leave the port with the goods, I know if I stop it

25         that goods are going to be here.

1         In this case the RNC doesn't want a preliminary

2     injunction, but they're say, the way I interpret it, if you

3     enter a preliminary injunction, we're not going to change

4     anything we're doing, we're not breaking the consent decree

5     at this point.

6         MR. KAUL:  Yes. I will say a couple points on that.

7         One is I think a fresh order from this Court making

8     very clear they can't violate the terms of the order is

9     likely going to have an different impact on RNC officials in

10    the state.  Any good lawyer would make a very firm point to

11    everybody working for the RNC that they better take this

12    very seriously, because if we come back here in a month and

13    it turns out you didn't follow it, the Judge is not going to

14    be happy about it.

15        Secondly, some of the relief we're requesting is

16    additional.  We think they should resend this to all their

17    staff and saying we're resending this because a court has

18    ordered us to because it's found a likelihood of success on

19    the violation means something different I think than your

20    standard legal memo.

21        Third, next, severing the ties from the contractor

22    we mentioned before, Stampede, I think is -- would be

23    valuable given the issues.

24        And then making clear that any coordinated efforts

25    to permit, you know, the Trump campaign or state party to

         1          engage in ballot security efforts while the RNC is funding

         2          get out the vote efforts are a clear violation of the order,

         3          so that that can't go on either.

         4                  With respect to the permanent relief, we certainly

         5          think there's a lot of evidence here that would be

         6          appropriate to find a violation.  But certainly if the Court

         7          doesn't, we think that permitting sort of full discovery

         8          into what the RNC has been doing and what it does in this

         9          election is also warranted.

        10                  Thank you, Your Honor.

        11                  THE COURT:  Thank you, Mr. Kaul.

        12                  Mr. Burchfield.

        13                  MR. BURCHFIELD:  Thank you, Your Honor.

        14                  I'll try to be -- I'll try to be brief but I do

        15          want to make sure that Your Honor has the opportunity to ask

        16          any final question that may occur to you.

        17                  Let me begin by just emphasizing the point that I

        18          made when I began this morning, which is what does this

        19          consent decree mean.

        20                  For the entire history of this decree the state

        21          parties have been engaging in ballot integrity efforts and

        22          the DNC has never challenged that explicitedly.  They've

        23          tried on two occasions to tie the RNC into that in 1990 in

        24          North Carolina and 2008 in New Mexico, when the court found

        25          that the RNC wasn't explicitedly involved, that was the end

```
 1      of the matter in terms of the RNC's involvement in a

 2      violation of the consent decree.

 3              I know in 1999 the Judge required us to send

 4      materials to the state parties, which you know the RNC is

 5      now doing.

 6              The second thing I would say is since 1992 it has

 7      been the case that presidential campaigns have been involved

 8      in ballot integrity efforts, often in league with the state

 9      parties.

10              Mr. Phillippe's affidavit shows that that was the

11      case in 2012 with the Romney campaign.

12              This has been -- this has been very high profile

13      transparent activity.  The DNC has known about that, both of

14      those sorts of activities throughout the term of this

15      consent decree.

16              So why is this year different.  We've heard nothing

17      about that other than the rhetoric of Mr. Trump.  Nothing

18      that changes the legal effect of those two entities, the

19      presidential nominee and the state party engaging in ballot

20      security efforts.  And so it would be inappropriate, Your

21      Honor, for the Court to extend the decree to cover those

22      activities.  It's not what the RNC agreed to, it would have

23      very significant effects on the RNC's ability to function as

24      a major political party in this country.  And that point I

25      think is not lost on my adversaries.
```

```
 1                 The second thing I would say, Your Honor, in terms
 2       of the quality of the evidence, the DNC has said, I also
 3       want to address the Stampede thing.  Let me address that
 4       now.
 5                 Stampede is a vendor.  It is not -- it is not a
 6       contractor for the RNC.  In other words, Stampede, as we've
 7       indicated, has a number of different clients in -- in
 8       Nevada.  It has a client in the other state the RNC uses it
 9       for GOTV it has a client.
10                 The RNC can't tell Stampede to comply with the
11       consent decree throughout its activities because, you know,
12       it's not subject to the consent decree.
13                 What the RNC does do --
14                 THE COURT:  Let me just ask you there then, because
15       I think you made the distinction between a vendor and an
16       independent contractor.  When the memos went out to the
17       independent contractors, hwo were the independent
18       contractors different than what you're deeming a vendor?
19                 MR. BURCHFIELD:  The independent contractors, as I
20       understand it, and I just asked Mr. Phillippe about this,
21       are independent contractors that are working exclusively or
22       almost exclusively for the RNC.
23                 The RNC doesn't really have the capability to tell,
24       you know, a vendor like Stampede, that you could -- you have
25       to comply with the consent decree 24/7, because it's doing
```

```
 1    things for other parties, other clients on some -- part of

 2    that time.

 3          But what the RNC did do with Stampede, and I think

 4    it does it with the other vendors as well, is that it states

 5    in the engagement that they are not authorized by the RNC to

 6    do anything other than what the contract says they are to

 7    do.  And for Stampede, that's to get out the vote efforts

 8    and that implicitedly says that on behalf of the RNC they're

 9    not to be involved in ballot integrity issues.

10          Let me turn, if I could, to the quality of the

11    evidence --

12          THE COURT:  You remember I asked you to do, I know

13    you've already done that submission about --

14          MR. BURCHFIELD:  When the RNC --

15          THE COURT:   -- whether in 1981, 1982 actually,

16    whether the state chairs automatically became members.

17          MR. BURCHFIELD:  Yes, yes.

18          THE COURT:  Could you also include something

19    pertaining to the way the RNC views the difference between

20    independent contractors and vendors as well?

21          MR. BURCHFIELD:  We'll be happy to do that.

22          THE COURT:  Okay.  Do you need an order for that or

23    can you do it on oral request?

24          MR. BURCHFIELD:  We don't need an order, we believe

25    it is in our best interest to do it.
```

1               THE COURT:  All right.

2               Because I think the way the DNC was reading it when

3       they considered Stampede to be an independent contractor

4       subject to that memo, and you're saying we view it

5       differently.

6               MR. BURCHFIELD:  Correct.

7               THE COURT:  All right.

8               MR. BURCHFIELD:  And I was going to say, Your

9       Honor, with regard to the quality of the evidence, the DNC

10      knows, and it is true that in a preliminary injunction

11      context hearsay can be used.

12              As I read those decisions, and in my experience,

13      the hearsay is the use of affidavits other than live

14      testimony.  It is not the use of, you know, media accounts

15      and other, what I would consider to be second, third hand

16      hearsay.

17              But even if hearsay were allowable for this Court

18      to look at and rely on here, we would ask the Court to

19      evaluate the quality of the evidence that's before the

20      Court.

21              You have first hand, under oath submissions by 17

22      people now on behalf of the RNC, indicating, top to bottom,

23      that there is, that we have found no indications that the

24      RNC is violating this decree and that the RNC is making

25      every effort it can to comply with the decree.

1        Qualitatively, the evidence, I submit to the Court,

2    indicates that there's no violation of this consent decree.

3    And that goes for the Nevada submissions as well.

4        The final thing I would say, Your Honor, is relief.

5    The RNC submits there's no basis for any relief.  The

6    evidence is not, does not represent a clear showing of a

7    violation here.  It does not indicate a substantial

8    violation of the consent decree, which would be necessary

9    for contempt or preliminary injunction.  And it's certainly

10   not clear and convincing evidence that would be necessary

11   for civil contempt, which the DNC has asked for.

12       Nor is there a substantial violation sufficient, we

13   submit, to continue the decree beyond when it expires, is

14   scheduled to expire next December.

15       But I think Your Honor made a very good point with

16   regard to relief here.  What in the world, additionally, can

17   the RNC be expected to do to comply with this decree.  If

18   you were to enter an injunction, I think you would leave Mr.

19   Phillippe scratching his head about exactly what he's

20   supposed to do, other than what he has already been doing on

21   a monthly, and even sometimes weekly basis, to inform his

22   people to comply with this decree.  And it would be -- t

23   would be, part -- part of the formula for use of judicial

24   power is using your judicial power in a way that it's

25   meaningful.  Here I think Your Honor put your finger on it.

105

         1        Which is, what more can an injunction do to get the RNC to

         2        comply with this decree than it's already doing.  And I

         3        think in that respect there is nothing.

         4               Thank you, Your Honor.

         5               THE COURT:  Thank you.

         6               Counsel, I really -- I'm sorry, did you want to

         7        answer Mr. Kaul?

         8               MR. KAUL:  Yes just very brief.  I don't want to

         9        rebutt, I'm fine with that.

        10               I did want to note, Your Honor, to my knowledge we

        11        didn't know until about three minutes that Stampede is a

        12        vendor and not a contractor.  I, perhaps foolishly, had

        13        assumed contractor meant somebody you contract with.  But --

        14               THE COURT:  I thought you made a plausible

        15        argument.  But I understood that the RNC was looking,

        16        there's a distinction.  Look, I completely understand why

        17        the lack of discovery has hindered both parties to a certain

        18        extent.

        19               MR. KAUL:  And here's what I'm going to ask, Your

        20        Honor, for the time being.

        21               A lot of the statements, representations that the

        22        RNC made about its due diligence had to do with who it was

        23        surveying to ask about information.  So I don't know whether

        24        vendors were treated differently or were within the scope of

        25        that due diligence, or if they were parcelled out.  But to

```
 1          the extent that the RNC, when it does this other submission,

 2          can make some sort of representation about whether it's

 3          statements already provided to the Court relative to vendors

 4          are different, I think that would be valuable.

 5                    THE COURT:  Well, I thought Mr. Burchfield, at

 6          least what I heard, he said when they hire vendors, my

 7          understanding of the difference is the independents

 8          contractor for the most part were solely for the RNC, and

 9          for the most part whereas vendors work for a number of

10          different people.  And I thought what Mr. Burchfield said,

11          the way they work with their vendors is in their retention

12          agreement, where they clearly set out this is what you can

13          do for us.

14                    Am I wrong about that, Mr. Burchfield?.

15                    MR. BURCHFIELD:  Your Honor, just to clarify, the

16          independent contractors are most frequently individuals.

17                    THE COURT:  Right.

18                    MR. BURCHFIELD:  Who we can get commitments to --

19          to comply with the decree.

20                    The vendors tend to be larger organizations like

21          Stampede who are not only representing multiple clients, but

22          they're multiple people.

23                    THE COURT:  This appears to be an important

24          distinction.  When you address the independent contractor

25          versus the vendors, as I requested.  If you could also
```

 1      address the issue this issue raises, this is how we deal
 2      with our due diligence with vendors.  I understood you to
 3      say if it's a contract there's what they can and can't do
 4      for us.  If that's accurate, fine.
 5              But to the extent if we can get an indication how
 6      the vendors know what they're supposed to do on behalf of
 7      the RNC, can you do that?
 8              MR. BURCHFIELD:  We'll address that.
 9              MR. KAUL:  I would just note, I guess, whether it's
10      a vendor or contractor doesn't change whether it's an agent,
11      particularly to the extent it's acting within the same realm
12      of sort of field operations for a political campaign.
13              THE COURT:  Right, I mean you've made the argument
14      if you're an agent in this state or an agent everywhere,
15      they've said no, they're a limited agent in that area
16      subject to the contract we have with them and that's what we
17      they can do.  I mean I understand.
18              I mean but taking your argument to the extreme, if
19      you hired one of these big I-T folks, Oracle, you're saying,
20      well if Oracle is contracting for us in Massachusetts, and
21      they're also bound by whatever they're doing for somebody
22      else in California, that does seem to be a kind of a broad
23      interpretation.
24              MR. KAUL:  And as I said to the Court, I think
25      several times, several of our arguments that I think have

```
 1        been challenged about, but I think it's the totality of the

 2        evidence here that's relevant.

 3                   THE COURT:  Okay.  Fair enough, Mr. Kaul.

 4                   MR. GENOVA:  Your Honor, may I be heard for one

 5        moment?

 6                   THE COURT:  Can you what?

 7                   MR. GENOVA:  May I be heard for one moment?

 8                   THE COURT:  Oh, certainly.

 9                   MR. GENOVA:  Thank you.

10                   I never thought I'd get to use this expression in

11        the context of this kind of litigation, but when I heard Mr.

12        Burchfield speak about what more, if you were to impose an

13        injunction, what more could be done.  And it's the fox and

14        the chicken coop concept here.  Emphasis on fox.

15                   That the reality is is that this is moved to

16        another level, in the sense that this agency issue and this

17        indirect capacity to accomplish what the party can't

18        accomplish, the Republican National Committee, is at stake

19        here.

20                   And the reality of it is, is they will tell you

21        that they are not engaging in the activities that are

22        prohibited, and hide behind the shield of those kinds

23        self-serving statements which are replete in the 17

24        declarations that are here.

25                   So it really does beg the question, ultimately for
```

1    the Court, as to whether or not we provided sufficient
2    evidence to draw the Court's suspicion, as we have our own
3    suspicion, as to whether or not there are those in the
4    context of this election, given the consistency that my
5    colleague speaks about, Mr. Kaul, that there are those
6    acting out this voter fraud program.

7         So, Your Honor, I think the measure for you is
8    whether or not the evidence that we've presented, without
9    the benefit of discovery, which calls into question the
10   veracity of what's been said on these 17 self-serving
11   declarations, warrants you to send a message not only to the
12   Republican National Committee, but those who would act on
13   its behalf, that breach of this consent order is not going
14   to be tolerated on the eve of an election.  And that's a
15   compelling public purpose at stake here, that's what this
16   order was designed to address, and that's why we're making
17   that application ultimately.

18        THE COURT:  I appreciate it.  I think Mr.
19   Burchfield characterized it appropriate.  It seems like it's
20   always an important issue, I never want to say it's not, but
21   it seems like it's a pressing issue because it has been a --
22   at least apparently, a very important part of the Trump
23   campaign's mantra this year.  And Mr. Burchfield said, you
24   know, maybe that's the distinction as opposed to the Romney
25   campaign.  I won't speculate as to that.  But I understand

```
 1    both.  Listen, I observe both parties take it very
 2    seriously, as does the Court.
 3          What I want to say is I want to thank both parties.
 4    In my view you acted very professionally.  You got a lot of
 5    information to the Court in a short period of time.
 6    Certainly not as much information as the DNC had hoped, but
 7    nonetheless a lot of information.
 8          It really is the Court's hope to get a decision out
 9    today.  That may not be possible in light of the amount of
10    information that has to be processed.
11          ( Conferring ).
12          THE COURT:  Okay.  If today is not possible there
13    will be a decision on the docket by tomorrow.  But you will
14    be getting one either today or tomorrow.  And I'm going to
15    consider everything that was submitted, as well as the
16    additional submissions I've asked from the RNC.
17          But, I from a professional standpoint, I want to
18    thank all counsel involved.  There's been vigorous advocacy
19    and excellent advocacy.  And the Court appreciates it.  And
20    you've answered my questions directly.
21          So if there's nothing else we're going to adjourn
22    for today so I can go back and consider what's been said
23    today in light of the other submissions.
24          But thank you very much.
25          MR. KAUL:  Thank you, Your Honor.
```

```
 1              MR. BURCHFIELD:   Thank you, Your Honor.

 2              MR. GENOVA:    Thank you, Your Honor.

 3              ( Court adjourned ).

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```