# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-4707
Tel: +1 202 737 0500
Fax: +1 202 626 3737
www.kslaw.com

Bobby R. Burchfield
Direct Dial +1 202 626 5524
Direct Fax: +1 202 626 3737
bburchfield@kslaw.com

June 26, 2017

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
U.S. Courthouse and Post Office Building
50 Walnut Street, Courtroom PO 03
Newark, New Jersey 07101

**Re:** ***Democratic National Committee, et al. v. Republican National Committee, et al.,***
 ***Civil Action No.: 81-3876 (JMV) (JBC)***

Dear Judge Vazquez:

Pursuant to the Court's Order dated June 7, 2017 (ECF No. 161), the Republican National Committee respectfully submits this supplemental response in opposition to the Democratic National Committee's discovery requests. This response addresses the specific issues raised by the DNC in the joint letter filed by the parties on June 19, 2017 (ECF No. 162).[1]

**The RNC's Production:**

In compliance with the Court's Order dated January 4, 2017 (ECF No. 146), the RNC is producing documents regarding the specific factual allegations in the DNC's motion for an order to show cause. To the extent any are identified, the RNC is producing non-privileged documents and communications involving:

(1)    Coordination between the RNC and the Trump Campaign on ballot security activities (DNC Request No. 1) (*see* RNC Objections to DNC Requests attached as Exhibit A);

(2)    Comments by former-Governor Mike Pence and Trump Campaign Manager Kellyanne Conway about RNC coordination with the Trump Campaign on ballot security activities (Nos. 2 and 3);

(3)    RNC staff, consultants, and volunteers conducting ballot security activities in the State of Nevada (Nos. 8, 9, 13, 14, 15, 18, and 20); and

(4)    Commentary by attorney Benjamin Ginsberg on MSNBC about whether the RNC's involvement in ballot security activities would violate the Consent Decree (No. 10).

---

[1] The RNC has fully explained its position on competitively sensitive information (Issue 2) in the joint letter dated June 19, 2017 (ECF No. 162).

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
June 26, 2017
Page 2

Disregarding the Court's instructions, with which it expressly agreed, concerning the proper scope of discovery, the DNC seeks numerous categories of documents set forth below that are unrelated to any fact-based allegations before the Court. The DNC further seeks to expand discovery by trying to create disputes about credibility that, whichever way those disputes are resolved, would not demonstrate a violation of the Consent Decree. Thus, the DNC's plea for broad discovery on collateral issues would impose significant costs and burden on the RNC, but would not assist the Court in resolving any material issue.

**Relevant Time Period (DNC Issue No. 3) (All Document Requests):**

The DNC seeks documents from as early as March 1, 2016, even though the earliest factual allegation identified by the DNC was from August 3, 2016. *See* DNC Mot. 1, 11 (ECF No. 95-1) (relying on former Governor Mike Pence's retracted comments from a campaign rally on August 3, 2016). The DNC's only basis for requesting documents from this early in the election cycle is that Donald Trump had won several primary elections by March 2016.

Although some polls showed Donald Trump as the Republican frontrunner in March 2016, the DNC ignores several facts, including that: (1) multiple candidates remained in the race for the nomination in March 2016 (*see Delegate Tracker*, Chicago Tribune, last updated July 25, 2016, attached as Exhibit B);[2] (2) the RNC did not declare then-candidate Donald Trump to be even the "presumptive" nominee for the Republican party until May 3, 2016 (*see RNC chairman: Trump is our nominee,* Politico, May 3, 2016, attached as Exhibit C); and (3) the Republican Party did not nominate him until the Republican National Convention on July 19, 2016. Lacking any fact-based allegation of coordination before August 2016, and any basis for claiming that Donald Trump was the presumptive nominee before May 2016, the DNC's request for discovery in March and April 2016 is overbroad.

Similarly, the DNC identifies no support for its claims that the RNC and Trump campaign discussed ballot security matters as late as December 31, 2016. The DNC merely asserts that "[t]here is little doubt that in late November and December, the RNC was still engaged in communications about what happened on Election Day (or just before Election Day.)" (ECF No. 162 at 3). The RNC, the DNC, and the news media are continuing to this day to discuss what happened in the 2016 election, and discussions about Mr. Trump's upset victory will undoubtedly continue for decades, but those communications are highly unlikely to have anything to do with the allegations in this case. Accordingly, the RNC has agreed to produce documents spanning from May 1, 2015 (3 months before the DNC's earliest allegation) to November 15, 2016 (a week after the polls closed and any prospect of voter interference had expired). This date range is reasonable to address the DNC's allegations.

---

[2] By March 1, 2016, Donald Trump had earned 334 delegates – only 27-percent of those needed to secure the Republican Party nomination (1,237 delegates). *See* Ex. B. By May 1, he had earned 996 delegates (80-percent). *See id*. He surpassed the threshold by May 26. *See id*.

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
June 26, 2017
Page 3

**Poll Watching and Voting Machines (Issues 1 and 5) (Request Nos. 1, 4-9, 12, 14, 16, and 18-19)**

There are at least four flaws in the DNC's requests for documents "relating to" poll monitoring and voting machines. *First*, the Consent Decree explicitly allows poll watching and does not prohibit RNC consultation with state parties regarding the functioning of voting machines. The Consent Decree provides that "the RNC may deploy persons on election day to perform *normal poll watch functions* so long as such persons do not use or implement the results of any other ballot security effort[.]" Consent Decree ¶ B (July 27, 1987) (ECF No. 96-21) (emphasis added). The 2009 amendment to the Consent Decree explains that poll monitors may "report disturbances that they reasonably believe might deter eligible voters from casting their ballots, *including malfunctioning voting machines*, long lines, or understaffing at polling places." *Id*. ¶ (4) (Dec. 1, 2009) (ECF No. 96-22) (emphasis added). Discovery into these permissible activities will not help the Court determine whether the RNC violated the Consent Decree.

*Second,* the DNC has not connected those requests to any fact-based allegation before the Court. The RNC is willing to produce documents, if any exist, relating to poll watching in Nevada because the DNC has made specific factual allegations (which the RNC believes are inaccurate and immaterial) regarding certain poll watchers in Nevada purportedly acting on behalf of the RNC, but a search for documents involving poll watching everywhere else in the country would be unduly burdensome and not relevant to any allegation. As for documents regarding voting machines, the DNC's allegation regarding the surreptitiously taped comments of Mr. Marston in Virginia was quite vague and speculative, but seemed to rely on the suggestion that Mr. Marston was speaking about RNC assistance with voting machines as some euphemism for an unspecified illicit activity. We do not understand the DNC to be suggesting that RNC assistance to state parties with regard to voting machines is improper in any way, and thus discovery on that issue would not assist the Court in determining if the Decree has been violated.

*Third*, the Consent Decree does not have an "effects test;" it prohibits only activities by the RNC that are purposefully undertaken to combat voter fraud. By its terms, the Consent Decree does *not* apply "to any initiative undertaken by the RNC that does *not* have as at least one of its *purposes* the prevention of either fraudulent voting or fraudulent voter registration." *See id*. ¶ (3) (Dec. 1, 2009). To emphasize this point, the Consent Decree distinguishes ballot security activities from normal poll watching activities; "ballot security activities" involve "any program *aimed* at combatting voter fraud by preventing potential voters from registering to vote or casting a ballot." *See id*. (emphasis added). Retention of poll observers or voting machine experts in collaboration with state parties does not meet that definition.

*Fourth*, the DNC's requests are not limited to poll monitoring and voting machine activities by the RNC, but instead extend to documents "relating to" such activities by other actors. *See* Exhibit A (DNC Request Nos. 1, 4-9, 12, 14, and 19). This request is too broad and vague, and production of responsive documents would not relate to any fact-based allegation in the case.

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
June 26, 2017
Page 4

**Ballot Security Efforts in the States (Issue 4) (Request Nos. 4-7):**

The DNC claims it is entitled to documents regarding ballot security efforts by state parties "to test the RNC's assertion that the relevant Republican state party chairs were not acting in their RNC capacity in conducting ballot security efforts" and "to assess whether the RNC in any way facilitated the state parties' ballot security efforts." *See* Jt. Ltr. 3 (ECF No. 162). But although the DNC contended in its motion to show cause that two state parties were engaged in ballot security programs on behalf of the RNC, it failed to make any specific factual allegations supporting these assertions. The DNC instead relied on press reports stating only that the Michigan and Pennsylvania Republican parties were engaged in voter fraud prevention efforts with the Trump campaign. *See* Mot. 13-14 (ECF No. 95-1). Those articles did not implicate the RNC; instead, the DNC's theory with respect to activities in Michigan and Pennsylvania was not that the RNC was itself involved in these activities but that the state Republican parties are inherently agents of the RNC as a matter of law – a theory at odds with the explicit language of the consent decree and with two prior interpretations of the decree. This Court soundly rejected that legal theory. *See* Opinion 27-30 (Nov. 4, 2016) (ECF No. 138). The DNC has alleged no facts indicating RNC involvement in the state party ballot security programs, and therefore, the discovery the DNC now seeks is precluded by the Court's January 4, 2017 Order.

In any event, the RNC already provided ample evidence that those parties were *not* acting as the RNC's "agents." On October 31, 2016, the Court ordered the RNC to produce declarations from knowledgeable individuals who could explain that normal poll watching programs and ballot security programs in Pennsylvania and Michigan were *not* on behalf of the RNC. In their Declarations, both Pennsylvania Republican Party Chairman Rob Gleason and Michigan Republican Party Chairwoman Ronna Romney McDaniel verified that the RNC had not participated in or assisted with state poll watching and ballot security programs. They also confirmed that they had not acted as RNC agents when administering these programs in their respective states. *See* Romney McDaniel Decl. ¶¶ 3-6 (ECF No. 120-2), Gleason Decl. ¶¶ 3-6 (ECF No. 120-3). Virginia Republican Party Executive Director Chris Marston also confirmed that the RNC was not involved in the Virginia Republican Party's election day activities. *See* Marston Decl. ¶ 6 (ECF No. 130-1). Finally, RNC Chief Counsel John Phillippe investigated the DNC's allegations of RNC involvement in these programs and did not find any evidence of such participation. *See* Phillippe Decl. ¶¶ 17-22 (Nov. 2, 2016) (ECF No. 120-1). *See also* Order § 6 (Oct. 31, 2016) (ECF No. 113) (requiring affidavit regarding investigation into DNC allegations and verification that no responsive information exists).

Although the Court placed some limits on this discovery last fall, the RNC conducted a sufficient investigation into the allegations made in the motion. And, as the Court made clear on October 31, full discovery would be permitted only if the DNC identified additional evidence of a violation. *See* Hr'g Tr. 44:5-25 (Oct. 31, 2016) ("And after election day, *depending upon if there's any evidence or further* [sic], we can always revisit this issue as to full discovery on the issue . . . .") (emphasis added) (attached as Exhibit D). The DNC has not done so.

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
June 26, 2017
Page 5

**Stampede's Actions Outside of Nevada (Issue 6) (Request Nos. 9 and 20):**

The DNC's allegations about Stampede are limited only to Nevada, and the RNC has agreed to produce documents (if it has any) regarding the contractor's ballot security activities in that state. Nevertheless, the DNC contends it must investigate Stampede's work in other states so that it can "test" the RNC's verification that Stampede did *not* perform ballot security services for the RNC in Nevada.

The DNC's position must fail for two reasons. First, it has made no fact-based allegation that Stampede was involved in any ballot security activities for the RNC in any other state. Because the DNC can only speculate about the nature of Stampede's services, the RNC urges the Court to reject the DNC's fishing expedition into these issues. *See Atkinson v. Middlesex Cty.*, No. CIV.A 09-4863FLW, 2010 WL 398500, at *3 (D.N.J. Jan. 28, 2010) ("[T]he Third Circuit Court of Appeals has held, 'discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action.'") (quoting *Zuk v. E. Pennsylvania Psychiatric Inst. of the Med. Coll. of Pennsylvania*, 103 F.3d 294, 299 (3d Cir. 1996)).

Second, the DNC is once again trying to expand discovery dramatically by purporting to test the "credibility" of statements made by the RNC, without first coming forward with any evidence to question those statements. As shown in the RNC's June 19, 2017, letter (ECF No. 162 at 8-9), the DNC cannot prove the allegations in its case simply by creating a dispute about credibility on a collateral issue. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In other words, even if discovery showed, for example, that Stampede did get-out-the-vote work for the RNC in Texas, that showing would not prove that Stampede worked on *ballot security* for the RNC *in Nevada*.

**Documents Containing Specific Words or Phrases (Issue 7) (Request Nos. 11 and 12):**

For the same reasons, and also because Rule 26(b)(1) requires discovery requests to be proportional to the needs of the case, the DNC's "search term" request is an abuse of discovery procedures. Through these requests, the DNC seeks *every* RNC document that contains any one of fifteen different terms "*or variations of these terms.*" The RNC repeatedly asked the DNC to narrow the request to the allegations before the Court, but it refused to do so. The DNC has come forward with no fact-based allegations supporting such a broad fishing expedition, and makes no attempt to restrict the scope of documents to the issues at stake in the case. In short, with no factual basis, the DNC would require the RNC to bear the substantial cost of searching for documents, which very well may not exist, but that in any event do not relate to its fact-based allegations before the Court. The DNC's requests should be rejected as irrelevant, disproportionate, and unduly burdensome.

Honorable John Michael Vazquez, U.S.D.J.
United States District Court for the District of New Jersey
June 26, 2017
Page 6


**New Allegations (Issues 8 and 9) (Request Nos. 17, 19 and 20):**

As the Court ruled on January 4, 2017, the DNC's discovery must be "tied to the allegations that have been made" in its motion to show cause. *See* Hr'g Tr. 20:6-23 (Jan. 4, 2017) (attached as Exhibit E). At no time before the Court's hearing on the DNC's motion did the DNC allege that (1) the RNC granted employees leaves of absence to assist the Trump campaign with ballot security activities (Issue 8 / Request 17) or (2) Stampede worked with JTD Strategies (but not the RNC) on voter fraud prevention (Issue 9 / Requests 19 and 20). Moreover, the DNC did not identify either issue when seeking post-election discovery on January 4. Accordingly, the DNC's late and unsupported "agency" theory regarding JTD Strategies and RNC employees does not warrant discovery.

Respectfully submitted,


/s/ Bobby R. Burchfield
Bobby R. Burchfield


cc:     DNC Counsel (by ECF)