# Exhibit A

Case 2:81-cv-03876-JMV-JBC   Document 206-1   Filed 12/14/17   Page 2 of 139 PageID: 7240

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 81-cv-03876 (JMV)(JBC)

———————————————————————————

DEMOCRATIC NATIONAL COMMITTEE,           )

et al.,                                  )

             Plaintiffs,           )

    v.                                   )

REPUBLICAN NATIONAL COMMITTEE,           )

et al.,                                  )

            Defendants.           )

———————————————————————————             )

*** CONFIDENTIAL ***


DEPOSITION OF SEAN SPICER

Washington, D.C.

December 6, 2017


Reported by:  Mary Ann Payonk

———————————————————————————————————————

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1                        December 6, 2017

2                        1:34 p.m.

3          CONFIDENTIAL deposition of SEAN SPICER,

4     held at the law offices of King & Spalding,

5     1700 Pennsylvania Avenue, N.W., Suite 200,

6     Washington, D.C., pursuant to Rule 30 and Rule

7     45 of the Federal Rules of Civil Procedure and

8     Notice of Deposition, before Mary Ann Payonk,

9     shorthand reporter and notary public of the

10    District of Columbia, Commonwealth of Virginia,

11    and State of New York.

12

13

14

15

16

17

18

19

20

21

22

```
                                                          Page 3

 1    APPEARANCES:

 2    ON BEHALF OF PLAINTIFF DEMOCRATIC NATIONAL

 3    COMMITTEE:

 4          JOSH L. KAUL, ESQUIRE

 5          PERKINS COIE LLP

 6          1 East Main Street, Suite 201

 7          Madison, WI 53703-5118

 8

 9    ON BEHALF OF DEFENDANT REPUBLICAN NATIONAL

10    COMMITTEE:

11          BOBBY BURCHFIELD, ESQUIRE

12          MATTHEW LELAND, ESQUIRE

13          BARRETT R.H. YOUNG, ESQUIRE

14          KING & SPALDING LLP

15          1700 Pennsylvania Avenue, N.W., Suite 200

16          Washington, D.C. 20006

17

18    ALSO PRESENT:

19          John R. Phillippe, Chief Counsel

20             Republican National Committee

21          Christina Schaengold, Associate Counsel

                   Republican National Committee

22          Curtis Roginski, videographer
```

Page 4

1                  I N D E X

2              - INDEX TO WITNESSES -

3    WITNESS                                PAGE

4    SEAN SPICER

5          Examination by Mr. Kaul        9, 130

6          Examination by Mr. Burchfield    128

7

8           - INDEX TO EXHIBITS -

9    NO.            DESCRIPTION          MARKED

10   Exhibit No. 1 Court order dated        8

11        November 29, 2017

12   Exhibit No. 2 Court order dated        8

13        December 5, 2017

14   Exhibit No. 3 Car service receipt     28

15   Exhibit No. 4 Photo                   51

16   Exhibit No. 5 Politico article        87

17   Exhibit No. 6 GQ article             105

18

19

20

21

22

Page 5

1              THE VIDEOGRAPHER:   This is tape

2        number 1 of the videotaped deposition of

3        Sean Spicer taken by the plaintiff in

4        the matter of the Democratic National

5        Committee et al. v. the Republican

6        National Committee et al. in the

7        United States District Court for the

8        District of New Jersey, Case Number

9        81-CV-03876-JMV-JBC.

10             This deposition is being held at

11       the law firm of King & Spalding, located

12       at 1700 Pennsylvania Avenue, Northwest,

13       Suite 200, Washington, D.C. 20006, on

14       December 6, 2017.  The time on the video

15       screen is 1:34 p.m.

16             My name is Curtis Roginski and I'm

17       the videographer from Digital Evidence

18       Group.  The court reporter is Mary

19       Payonk in association with Digital

20       Evidence Group.

21             Will counsel please identify

22       yourselves and state who you represent.

Page 6

1          MR. KAUL:  I'm Josh Kaul.  I'm an

2     attorney at Perkins Coie, and I

3     represent the DNC.

4          MR. BURCHFIELD:  I'm Bobby

5     Burchfield, a partner at King &

6     Spalding, and I represent the RNC.  And

7     I think I'll be the only one speaking

8     today.

9          There are others present:

10     Mr. Phillippe, the chief counsel of the

11     RNC; Ms. Schaengold, his deputy;

12     Mr. Leland, my partner; and Mr. Young,

13     my colleague.

14          Before we begin, let me just note

15     that the -- we're here pursuant to a

16     court order which instructs Mr. Spicer

17     to appear to testify related to his

18     presence on Trump Tower on Tuesday,

19     November 8, 2016.  We had previously

20     produced the results of our search of

21     the emails that the court ordered us to

22     produce in that same order.  This is the

Page 7

1    order dated November 29, 2017.  And

2    if -- if I may, let's -- can we mark

3    that as an -- this as an exhibit?

4         MR. KAUL:  Sure.

5         MR. BURCHFIELD:  As Exhibit 1,

6    Spicer Exhibit 1.  And then also, as an

7    exhibit, we should mark the order

8    entered this morning by the Court --

9    actually, it's dated yesterday but I

10   received it this morning -- relating to

11   confidentiality.

12        And just to make sure that -- that

13   everyone here is aware, that the Court

14   has instructed that the -- that the

15   Spicer deposition may be video recorded

16   provided that the video recording or any

17   portion thereof cannot be released to

18   any third party or entity or made

19   public -- part of the public record

20   unless the Court first orders such

21   disclosure is appropriate upon a showing

22   of good cause and notice to all counsel.

Page 8

1           And it is further ordered that the

2      prohibition on the release of any video

3      recording of the Spicer deposition

4      includes counsel, the parties, the

5      deponent, the videographer, the

6      stenographer, and any other persons

7      present for the deposition.

8           And then it gives me time to review

9      the transcript and it has other

10     procedures there, but for today's

11     purposes, I think the videographer and

12     the stenographer need to be aware that

13     this is confidential by court order.

14     And we can mark this as Exhibit 2.

15     (Spicer Exhibit No. 1 was marked for

16     identification.)

17     (Spicer Exhibit No. 2 was marked for

18     identification.)

19  SEAN SPICER,

20          called as a witness, having been duly

21          sworn, was examined and testified as

22          follows:

Page 9

1                    EXAMINATION

2    BY MR. KAUL:

3        Q.    All right.   Mr. Spicer, my name is

4    Josh Kaul.   You just heard me introduce myself.

5    I'm one of the attorneys for the DNC in this

6    case which involves the DNC and the RNC.

7             Are you generally familiar that

8    there's a case involving a Consent Decree

9    between the DNC and the RNC?

10       A.    I am.

11       Q.    Okay.   And who are you represented by

12   here today?

13            MR. BURCHFIELD:   I am representing

14        Mr. Spicer.   This is Bobby Burchfield.

15        He is -- he is testifying today about

16        events that occurred while he was an

17        officer of the RNC and so I am

18        representing him in -- in his capacity

19        as an officer of the RNC and in his

20        personal capacity.

21            MR. KAUL:   Okay.

22       Q.    And, Mr. Spicer, have you been

Page 10

1    deposed before?

2         A.    No.

3         Q.    Okay.  I'm going to go over some

4    basic deposition ground rules that just relate

5    to the how questions are asked and answered.

6         A.    Okay.

7         Q.    And the main point of that is

8    actually to make a clean transcript, among

9    other things.

10          So the first thing I'll tell you is

11   since somebody is recording this, it makes it

12   much easier to take a transcript if we don't

13   talk over each other.  So I will do my best to

14   wait until you're done answering a question

15   before I ask the next one, and it would also be

16   helpful if you could wait until I'm done [sic]

17   answering a question before you answer the next

18   question.

19          Does that make sense?

20        A.    It does.

21        Q.    People have a tendency, rather than

22   saying "yes" and "no," to say things like

Page 11

1    "uh-huh" or "huh-uh."  That's hard for the

2    court reporter to get down, though.  So if you

3    could do your best to say "yes" and "no,"

4    that's helpful.

5              Does that make sense?

6        A.   Yes.

7        Q.   The court reporter can only type so

8    fast.  I occasionally speak too fast on the

9    record, so I work to speak at a reasonable

10   pace.  If you could also do your best to speak

11   at sort of an even pace, that's always helpful.

12             If at any point during the deposition

13   you need to take a break, please just let me

14   know and happy to take a break.  This isn't

15   meant to be an endurance test.  The only thing

16   I would ask is that if I have a question

17   pending, that you first answer the question,

18   and then we take a break.

19             Does that make sense?

20        A.   Yes.

21             MR. BURCHFIELD:  And that -- and

22        that -- obviously, if there's a question

Page 12

1          of -- of privilege or scope of the order

2          that might be involved that he wants to

3          consult with counsel, even if the

4          question is pending, that -- that would

5          be appropriate.

6               MR. KAUL:  That's right.

7          Q.   And I don't doubt that your counsel

8     will jump up if he needs to, but -- but if you

9     need to consult with him at any point, just let

10    us know and we'll let you do that.  Okay?

11         A.   Yes.

12         Q.   Is there any reason that you'll have

13    any trouble testifying today?

14         A.   No.

15         Q.   And you understand you just took an

16    oath to testify truthfully, and that's the same

17    oath that would apply if you were in court?

18         A.   I do.

19         Q.   You have -- you have a college

20    degree; correct?

21         A.   Yes.

22         Q.   Do you have any education past

12/6/2017   Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 13

1     college?

2          A.    Yes.

3          Q.    What's that?

4          A.    I have a master's degree from the

5     United States Naval War College.

6          Q.    Okay.  Anything besides that or is

7     that the end of your education?

8          A.    That's the end of my formal

9     education.

10         Q.    Okay.  And you have been involved in

11    politics in a variety of capacities throughout

12    your career; correct?

13         A.    Correct.

14         Q.    And what I'd like to focus on today,

15    as Mr. Burchfield talked about before, is your

16    time at the RNC, and specifically on Election

17    Day from 2016, the day that Donald Trump was

18    elected president.

19              On that day, do you recall what your

20    formal title was at the RNC?

21         A.    Yes.

22         Q.    And what was that?

Page 14

1       A.   Communications director and chief

2   strategist.

3       Q.   And can you just at a high level

4   summarize what your duties were at the RNC at

5   that point?

6       A.   I managed a staff that oversaw the

7   messaging and communications, i.e., press

8   releases and other electronic and written

9   communications, surrogate operations, etc.,

10   that communicated the party's principles,

11   priorities, and candidates.

12       Q.   And that -- was that in your role as

13   communications director that you did those

14   things?

15       A.   Yes.

16       Q.   And what did being chief strategist

17   entail?

18       A.   Thinking more broadly about the

19   positioning of the party when it came to

20   defining an electoral strategy, as well as

21   positioning itself within the -- more broadly,

22   in terms of imaging.

Page 15

1      Q.    Who did you report to?

2      A.    To the chief of staff and the

3  chairman.

4      Q.    And who was the chief of staff at

5  that time?

6      A.    Katie Walsh.

7      Q.    And the chairman was Reince Priebus?

8      A.    Correct.

9      Q.    And did Ms. Walsh report directly to

10  Mr. Priebus?

11      A.    To my --

12          MR. BURCHFIELD:  Objection.

13      Q.    If you know.

14      A.    I -- I -- it's outside of my scope.

15      Q.    So who -- do you consider yourself as

16  having reported to either Ms. Walsh or

17  Mr. Priebus, or was it both of them?

18      A.    Both.

19      Q.    Okay.  Do you know how many people

20  reported directly to Mr. Priebus?

21      A.    I do not.

22      Q.    Do you know if it was more than, say,

Page 16

1    five?

2         A.   It's outside of my -- I -- I -- it's

3    a -- not a question that I'm -- was in my

4    purview.

5         Q.   Okay.  Do you know anybody else who

6    reported directly to Mr. Priebus?

7         A.   The chief of staff.

8         Q.   Okay.  Anyone besides that?

9         A.   Again, it's -- wasn't really within

10   my purview to -- to understand who else

11   reported directly to him.

12        Q.   How many people did you have

13   reporting to you at that time?

14        A.   When you say "at that time," do you

15   mean -- can you be specific with respect to the

16   time frame?

17        Q.   Yes.  As of Election Day, 2016.

18        A.   Plus or minus 70 individuals, both at

19   headquarters and working at various -- working,

20   you know, out in the field.

21        Q.   Okay.  And just so the record's

22   clear, that's 70, seven-zero?

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page 17

1         A.    Seven-zero.

2         Q.    Do you know how many employees there

3    were at the RNC at that time?

4         A.    I do not.

5         Q.    Did the RNC have people who were

6    designated as senior management or something

7    along those lines?

8         A.    There was a meeting of senior staff

9    usually once a week.

10        Q.    And were you one of the senior staff

11   members?

12        A.    I was.

13        Q.    How many senior staff members were

14   there?

15        A.    Again, that's something that should

16   be addressed -- it's outside of my purview.

17        Q.    Okay.  You were at the meetings;

18   right?

19        A.    Correct.

20        Q.    Did you see how many people were at

21   the meetings?

22        A.    I did.

Page 18

1    Q.   How many were there typically?

2    A.   Again, sometimes the meetings --

3    again, not everyone in the meeting was

4    designated as a senior staffer.  Sometimes

5    people had representatives or would bring other

6    folks, so -- but I would say that roughly 15 to

7    20 people.  But I -- I would -- just to be

8    clear, it is -- I -- it would be inappropriate

9    for me to suggest who was specifically

10   designated among that group.

11   Q.   Inappropriate, meaning you don't

12   know, or that's --

13   A.   It wasn't inside my purview.

14   Q.   Okay.  When you say not inside your

15   purview, what does that mean?

16   A.   Well, I believe that the chairman and

17   the chief of staff specifically would designate

18   who had that -- who was sort of, as you put it,

19   senior staff.  So -- so just because someone

20   was at a meeting doesn't necessarily denote

21   that that's -- that they were given that --

22   that would be more of their -- within their

Page 19

1    purview to decide who -- who fit that

2    definition.

3        Q.    Sure.  So besides yourself is there

4    anybody who you know for certain was designated

5    as senior staff?

6        A.    Yes.

7        Q.    Who's that?

8        A.    The political director, the finance

9    director, the chief counsel, the chief digital

10   officer, the head of administration, the chief

11   of staff, the co-chair.

12       Q.    Who was the co-chair?

13       A.    Sharon Day.

14       Q.    Sorry, did I interrupt you?

15       A.    I -- I -- again, I'm just mentally --

16   that -- that -- that's who I would -- I believe

17   unequivocally was part of that group.

18       Q.    Did you have any devices, electronic

19   devices assigned to you as part of your work

20   for the RNC?

21       A.    Yes.

22       Q.    Okay.  What were those?

Page 20

1       A.    The RNC assigned me a -- a laptop.

2       Q.    Did you have any mobile devices?

3       A.    Personally?

4       Q.    Let's start with the RNC assigned.

5       A.    No.

6       Q.    Did you have any personal mobile

7    devices?

8       A.    Yes.

9       Q.    Okay.  What were those?

10       A.    At that time, I possessed an iPhone

11    and an iPad.

12       Q.    And I apologize.  If I don't specify

13    the time period, I mean as of Election Day

14    2016.  Fair enough?

15       A.    Yes.

16       Q.    All right.  And did you have an RNC

17    email account?

18       A.    Yes.

19       Q.    Were you able to access your RNC

20    emails on your iPhone?

21       A.    Yes.

22       Q.    Okay.  What about your iPad?

Page 21

1      A.   It was -- with the exception of

2   making phone calls, the iPad pretty much

3   mirrored the iPhone.

4      Q.   Okay.  And the iPhone was your

5   personal phone; is that right?

6      A.   Correct.

7      Q.   Did you have an RNC phone?

8      A.   I think I answered that question.

9      Q.   What was the answer?

10     A.   No.

11     Q.   Okay.  All right.  So you would use

12  your -- did you use your personal iPhone to

13  make work-related calls?

14     A.   Yes.

15     Q.   When you would send RNC-related

16  emails, did you always use your RNC account?

17     A.   I can't say that I've never --

18  generally speaking, yes.  And for the most

19  part, most -- I would say almost all outbound,

20  if you will.  But if someone were to email me

21  on a personal -- I can't say that that never

22  happened is probably the best way to say it.

Page 22

1      Q.   Okay.  And just so the record's

2   clear, I guess, so you have a personal email

3   account; right?

4      A.   Correct.

5      Q.   And sometimes people would email you

6   on that account about -- about RNC-related

7   matters?

8      A.   Well, I --

9           MR. BURCHFIELD:  Object to form.

10   You may answer.

11      Q.   Is that correct?

12           THE WITNESS:  I'm sorry?

13           MR. BURCHFIELD:  You may answer.

14      A.   I can't recall a specific instance

15   but I'm sure it's possible.

16      Q.   Okay.  And did you send RNC-related

17   emails from your personal account?

18      A.   I'm sure it happened, but I can't

19   recall a specific instance.

20      Q.   Okay.  Did you have any sort of

21   regular note-taking process that you engaged

22   in?

Page 23

1       A.    Could you be more specific by what

2   you mean by that?

3       Q.    Sure.  Do you take notes as a regular

4   practice?

5               MR. BURCHFIELD:  As of Election Day

6       2016.

7               MR. KAUL:  Yes.

8       A.    I would write down -- I -- I get --

9   with -- you know, again, I would ask you to be

10   more specific because -- would I write down

11   incoming calls or -- or messaging points?  I

12   didn't -- if you are asking did I, like -- what

13   the definition of "notes" is -- actually is, I

14   think, important.

15       Q.    Okay.  Do you have some sort of

16   notebook or journal that you regularly keep

17   with you, as of Election Day 2016?

18       A.    I had a book that would maintain

19   phone numbers, you know, record -- you know,

20   calls to return, notes about an interview, so

21   here are the messaging points for this

22   particular interview, here's a reporter I need

Page 24

1   to follow up with.

2          But if you're getting at did I diary

3   at the end of the day here's what happened, no.

4      Q.   Okay.  So you had a -- a book that

5   you kept with you regularly; right?  A notebook

6   that you kept with you regularly?  Or what was

7   the form of that book you're discussing?

8      A.   I had a notebook in which I would

9   note down, you know, calls that I had to

10  return, issues that I had to address, or

11  messaging points that we wanted to communicate

12  or -- or -- of that nature.  Is that --

13     Q.   Okay.  You didn't have any means of

14  sort of keeping track of what was discussed at

15  meetings and that sort of thing?

16     A.   If in a meeting somebody -- you know,

17  again, as it related to my job.  So if we were

18  having a meeting about what message points do

19  we want to get out, then I might write down,

20  you know, here are the three things that we

21  want to communicate, or I need to follow up

22  with this individual.  But it wasn't an attempt

Page 25

1    to memorialize as a stenographer would do.

2         Q.   All right.  Let me sort of -- what

3    I'd like to do next is sort of walk through

4    your day on Election Day 2016.  So let me start

5    with do you recall when you began your work day

6    on Election Day?

7         A.   I do not.

8         Q.   Okay.  Do you know approximately what

9    time of day it was?

10        A.   I would assume, you know, 7, 8 a.m.

11        Q.   Okay.  And do you know where you went

12   for work that day?

13        A.   Yes.

14        Q.   Where was that?

15        A.   Trump Tower.

16        Q.   Okay.  And when you -- I guess what

17   I'd like you to do is sort of walk me through

18   the process of what happens when you get to

19   Trump Tower.

20             So you first enter some sort of lobby

21   or atrium; correct?

22        A.   Correct.

Page 26

1       Q.    And then how do you actually access

2    the upper floors of the building?

3             Do you have to go through security

4    first of all?

5       A.    So primarily we would work out of the

6    14th floor.  You would take the elevator to 14.

7    There was a elevator operator who -- you know,

8    he would generally know who you were.  You'd

9    get out at 14 and then walk into the work area.

10      Q.    Okay.  And so 14 is where the RNC's

11   offices were located in Trump Tower?

12      A.    There were no RNC offices as far as I

13   know.

14      Q.    Okay.  What was located on 14?

15      A.    The campaign work area.  It was a --

16   and various offices of campaign officials.

17      Q.    Did you regularly work out of Trump

18   Tower prior to Election Day?

19      A.    Yes.

20      Q.    And the 14th floor is where you would

21   regularly work?

22      A.    Yes.

Page 27

1      Q.   Did you -- first of all, when you get

2   to the elevator, was there any sort of sign-in

3   book or place where you had to put your name

4   down?

5      A.   No.

6      Q.   All right.  So on Election Day when

7   you took the elevator, did you go to the 14th

8   floor?

9      A.   I can't recall specifically but I

10   think that's a safe assumption.

11      Q.   Okay.  Was -- is there any sort of

12   check-in on the 14th floor?

13      A.   No.

14      Q.   Is there security on the 14th floor?

15      A.   By "security," can you please --

16   what -- what do you mean by that?

17      Q.   Is there a security officer?

18      A.   If there was a protectee on the

19   floor, there would be Secret Service, but

20   otherwise, no.

21      Q.   Okay.  There are no metal detectors?

22      A.   No.

Page 28

1       Q.   Okay.  All right.  Let me show you --

2            MR. BURCHFIELD:  And again, we're

3       all talking as of Election Day.  I think

4       things may be different today.

5            MR. KAUL:  Right:  Let me show you

6       a document.

7            THE REPORTER:  I've marked

8       Exhibit 3.

9            MR. BURCHFIELD:  This was number 3.

10      (Spicer Exhibit No. 3 was marked for

11      identification.)

12  BY MR. KAUL:

13      Q.   All right.  There's a document in

14  front of you, Mr. Spicer.  It's marked as

15  Exhibit 3.  And this is a document that was

16  produced to the DNC by the RNC shortly before

17  your deposition.

18           And this -- does this appear to you

19  to be a receipt from a personal car service

20  that you utilized?

21      A.   Yes.

22      Q.   Okay.  And there's a date and a time

Page 29

1    on this that indicates that it was used at

2    about 10:06 a.m. on Tuesday, November 18, 2016.

3              Do you see that?

4        A.    I do.

5        Q.    Based on that, is it your

6    understanding that you likely arrived at Trump

7    Tower sometime around 10 a.m.?

8        A.    No.

9        Q.    Okay.  Do you know what this would

10   have related to?

11       A.    Yes.

12       Q.    What's that?

13       A.    An interview on NB -- MSNBC.

14       Q.    Okay.  So -- so prior to this

15   interview were you at Trump Tower?

16       A.    I can't -- I -- I think that's a safe

17   assumption.

18       Q.    Okay.  Before leaving for MSNBC do

19   you know if you were on the 14th floor the

20   entire time you were at Trump Tower other than

21   as you were entering and exiting the building?

22       A.    I can't recall specifically.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page  30

1         Q.    Okay.  Do you have any recollection

2   of going to the 5th floor during that period of

3   time?

4         A.    I do not.

5         Q.    Do you remember who was on the 14th

6   floor that day?

7         A.    I do not.

8         Q.    Okay.  Are there specific people who

9   you remember seeing on the 14th floor that day?

10        A.    So I think obviously later towards

11  election night, absolutely there was --

12  that's -- there was a lot of people gathered.

13  The president-elect, the vice president-elect,

14  most of the campaign staff, supporters.

15             I'd be glad to kind of walk you

16  through.  I mean, deputy campaign manager Dave

17  Bossie was there.  Kellyanne Conway, the

18  campaign manager.  Steve Bannon.  Jason Miller,

19  the senior advisor for communications.  Hope

20  Hicks, campaign communications.  Dan Scavino,

21  director of social media.

22             There was family members and

Page  31

1   supporters as the evening wore on.  Most of the

2   rest of the communications staff was there at

3   one point or another.  Bryan Lanza was deputy

4   communications director.  Jessica Ditto, deputy

5   communications director.  Cliff Sims was one of

6   our rapid response guys.  Andy Surabian was

7   director of our war room operations that

8   monitored the news.  Kaelan Dorr was Jason

9   Miller's assistant.  He was there.

10          Bill Stepien, the political director,

11   was on 14.  Governor Chris Christie was on 14.

12   As I mentioned, the vice president with

13   Mrs. Pence was on 14.  Ivanka Trump, Jared

14   Kushner were on 14.  Don Jr. and Eric Trump

15   were on 14, as were their wives, I believe.

16          I'm just trying to go through.  Brad

17   Parscale, the director of digital affairs or

18   whatever.  I'm trying to remember his specific

19   title.  Cassidy Dumbauld, who worked for Steve

20   Bannon.  Giovanna Coia, who worked for

21   Kellyanne.  You know, I -- I think most of the

22   campaign staff at some point was -- was there.

Page 32

1   Reince Priebus, the chairman of the RNC.

2          Again, I'm just trying to rack my

3   brain for additional names.  But most of the

4   campaign staff at one point or another would

5   have probably been on 14.  My assistant,

6   Vanessa Morrone, was there.  Jason Chung, who

7   worked for the RNC.  Andy Hemming, who worked

8   for the RNC.  Alex Stroman, who worked for the

9   RNC, was there as well.  Kelly Love, who was

10  one of the communications staff, was there.

11         Again, I -- I think there was a

12  variety of campaign staff and supporters that

13  at some point had come through 14.

14     Q.   Okay.  And the people you just

15  listed, those are people you recall seeing the

16  evening of Election Day; is that right?

17         MR. BURCHFIELD:  Object to form.

18     A.   It depends on -- I mean, you asked me

19  who was on 14, so they were all there at

20  different points.

21         MR. BURCHFIELD:  Could you read the

22     original question back before he gave

Page  33

1       the long list of names?  I thought it

2       referred to a different time of day.

3       (The reporter read from the record as

4       follows:  "Are there specific people who

5       you remember seeing on the 14th floor that

6       day?")

7   BY MR. KAUL:

8       Q.   And your answer began with "So I

9   think obviously later towards election night."

10  Do you recall that?

11      A.   I do.

12      Q.   So -- okay, so -- but the people you

13  described, I just -- I want to make sure the

14  record's clear.  Those are people you saw

15  throughout the day on the 14th floor?  And I'm

16  not saying you saw an individual all day long

17  on the 14th floor, but --

18      A.   Correct.  The --

19      Q.   -- the -- over the course of the day.

20      A.   Correct.  The answer -- those

21  individuals' named were on 14 at some point

22  during that time.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page  34

1       Q.    Okay.  All right.  So -- so you went

2    to MSNBC a little bit after 10 a.m.; is that

3    right?

4       A.    That -- according to that document,

5    yes.

6       Q.    Does that sound correct to you?

7       A.    It does.

8       Q.    Was that the first place you went

9    aside from Trump Tower that day?

10      A.    I can't be certain.

11      Q.    Okay.  To the best of your memory?

12      A.    I can't be certain.

13      Q.    Well, I'm asking for what the best

14   memory you have is.

15      A.    I -- I don't remember a lot of that

16   day.  It's Election Day.  It's a very busy day.

17   I -- I -- it -- I know I went there.  I went to

18   a lot of places that day, met with reporter --

19   you know, meeting with reporters and doing

20   television hits.  I don't believe, but I -- I

21   would have to check.  I don't -- I don't recall

22   an early morning TV hit, but it's very

Page 35

1    possible.

2         Q.    Okay.  And so for the interview at

3    MS --

4         A.    I mean, I think that could be -- it

5    should be searchable.

6         Q.    For the interview at MSNBC, did you

7    go to Rockefeller Plaza?

8         A.    I did.

9         Q.    Okay.  Do you recall where you went

10   after that?

11        A.    Yes.

12        Q.    Where was that?

13        A.    Fox News.

14        Q.    Okay.  And did you do another

15   interview there?

16        A.    Yes.

17        Q.    And where did you go after that, if

18   you remember?

19        A.    I don't recall.

20        Q.    Do you remember approximately what

21   time of day you went to Fox News?

22        A.    Shortly after the MSNBC hit.

Page 36

1        Q.    All right.

2        A.    So remember, this is just what time

3    the car picked up, so I can't recall what time

4    I was actually on or not, but that should all

5    be easily searched on the Internet.

6        Q.    After -- what was the Fox News

7    appearance, an interview?

8        A.    It was a Fox Business interview, and

9    then I met with executives from Fox to discuss

10   the state of the race.

11       Q.    Okay.  And that was near the Fox

12   studios?

13       A.    It was at the Fox studios.

14       Q.    And do you recall approximately when

15   you left Fox studios?

16       A.    I do not.

17       Q.    Okay.  Would it have been in the

18   afternoon?

19       A.    Again, I would suggest to you that --

20   that I went from 30 Rock to Fox, I did an

21   interview on Fox Business, I met with

22   executives.  I think if you were to search

Page  37

1    that, you would -- you know, the -- the meeting

2    with the executives happened immediately

3    following the appearance, so that should give

4    you a timeline.

5         Q.   All right.  After the meeting with

6    the executives at Fox News, what did you do

7    next?

8         A.   I don't recall.

9         Q.   Did you get lunch at some point in

10   there?

11        A.   I'm sure I did.  As you can -- as I

12   stated, it's an election day.  It's very busy,

13   very hectic.  I'm sure I got something to eat

14   at some point but I can't be -- you know, I

15   can't remember what I ate or where.

16        Q.   Right.  Do you know if you returned

17   to Fox -- or, I'm sorry, to Trump Tower after

18   you were at Fox News?

19        A.   I'm sure at some point that

20   afternoon, yes.

21        Q.   Did you have any other media

22   appearances that you recall after the Fox

Page  38

1    News --

2         A.    Yes.

3         Q.    -- appearance?

4              Did you have any other media

5    appearances before you returned to Trump Tower?

6         A.    I don't recall.  Again, I think

7    that's a fairly searchable -- I would suggest

8    searching CNN.  That would seem -- seems likely

9    because it's -- you know, we coupled the

10   beginning, and then CNN's more up at Columbus

11   Circle, but I think all of that's searchable.

12        Q.    Okay, yeah.  And to be clear, I'm

13   sort of just trying to sketch out a timeline of

14   what your day looked like.  And so I realize

15   you don't remember all the media appearances to

16   the precise, you know, minute or detail.  Okay,

17   but -- so after the Fox News appearance and the

18   meeting with executives, you went back to Trump

19   Tower; is that right?

20        A.    At some point.

21        Q.    Okay.  Do you remember approximately

22   when you got back to Trump Tower?

Page 39

1        A.    I do not.

2        Q.    Do you remember if it was after noon?

3        A.    I know I was there in the afternoon,

4    yes.

5        Q.    And once you returned to Trump Tower,

6    where did you go?

7        A.    I would have been on the 14th floor.

8        Q.    Okay, okay.  And after you returned

9    to Trump Tower on Election Day, did you leave

10   the building for other media interviews that

11   day?

12       A.    I -- I don't -- I don't recall.

13       Q.    Okay.  And once you returned to the

14   14th floor on Election Day, do you remember

15   what you did?

16       A.    No.

17       Q.    Okay.  What were your sort of

18   overall --

19       A.    I did have an interview on PBS at

20   approximately 6 p.m.

21       Q.    And was that interview conducted at

22   Trump Tower?

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 40

1     A.   Yes.

2     Q.   Did you have any specific assigned

3   duties on Election Day?

4     A.   No.

5     Q.   Okay.  What did you -- you -- I mean,

6   you were working for the RNC that day; correct?

7     A.   Correct.

8     Q.   What did you regard as your role that

9   day?

10     A.   Two things.  As I said, I met with

11   Fox executives.  I met with other reporters at

12   NBC as well to communicate what the party had

13   done to get out the vote, the investment that

14   we'd made in data and digital over the -- from

15   the previous cycle.

16          And so my first and foremost priority

17   was to communicate the efforts that the RNC had

18   made to grow our vote, to encourage people to

19   get out and vote, the message that we'd sent,

20   the tactics that we were using to get out the

21   vote, early vote, you know, late vote, and how

22   the investment in data and digital had enhanced

Page 41

1    that effort, and then obviously why I thought,

2    you know, we were going to be successful up and

3    down the ballot.

4        Q.   And where did the PBS interview at

5    6 p.m. take place?

6        A.   In the Trump Towers, in the

7    television studio that the campaign had set up.

8        Q.   Okay.  So you said that when you

9    returned to Trump Tower you were on the 14th

10   floor.

11       A.   Correct.

12       Q.   Do you recall at what point you left

13   the 14th floor?

14       A.   Not -- not specifically.

15       Q.   Okay.  The television studio at Trump

16   Tower, what floor is that on?

17       A.   5.

18       Q.   So certainly for the 6 p.m. PBS

19   interview you would have gone down to 5; is

20   that right?

21       A.   Correct.

22       Q.   Do you know if you went down to 5

Page 42

1  prior to the period immediately preceding that

2  interview?

3      A.   I do not.

4      Q.   You don't know one way or the other?

5      A.   Correct.

6      Q.   So between returning from the Fox

7  News interview and the PBS interview, do you

8  have any recollection of what you did?

9      A.   I do not.

10      Q.   Okay.  You remember you were on 14

11  for part of that window at least; right?

12      A.   Correct.

13      Q.   And you're not sure whether you were

14  on 5 for part of that window?

15      A.   I know the interview happened, so I

16  would have gone to -- then.  I don't recall

17  going down prior to that.

18      Q.   Okay.  So it's possible you were on

19  5.  You don't know.

20      A.   It's possible that I went -- sure,

21  anything's possible.  I don't recall going down

22  prior to that interview.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page  43

1      Q.    Okay.   So the interview took place at

2    6 p.m. you said; is that right?

3      A.    Again, I think it's in that time

4    frame.   It's -- the PBS NewsHour, I believe

5    that's when it airs.   It aired live.   But

6    again, all of that's verifiable by a simple

7    search.

8      Q.    Okay.   And after the PBS interview,

9    do you know what you did next?

10     A.    I don't.   I mean, I -- I can't --

11   I -- I don't know -- no, I don't know what -- I

12   mean, I headed back up to 14, which is where

13   our work space was.

14     Q.    Okay.   So after returning to 14, do

15   you know approximately how long you were on the

16   14th floor?

17     A.    I don't.   I know at some point I went

18   and changed clothes, you know, at my hotel, so,

19   you know, I would have -- to -- to have gone

20   and freshen up, so I -- I -- at some point I

21   left the building, you know, and I -- I can't

22   say precisely how long it took, but I -- my

Page 44

1   hotel was four or five blocks maybe away and,

2   you know, so I -- at some point, I left after

3   that interview and changed and then came back.

4        Q.   Do you remember how long you were

5   away from the building?

6        A.   I have no idea.

7        Q.   Okay.  Would it be fair to put it at

8   something like half an hour?

9        A.   I -- again, I -- you can go -- you

10  could walk the distance and then give some time

11  to change and get -- you know, and then come

12  back.  There was no urgency to rush back, if

13  you will, so I -- I don't know.  I think it's

14  safe to say a minimum of half an hour.

15       Q.   Okay.  Would it be fair to say it's

16  less than an hour?

17       A.   I -- no, it wouldn't.  I don't know

18  and I don't -- I mean, I -- I -- just in terms

19  of travel time, I think it's fair to say a

20  minimum, but if it's -- you know, again, I -- I

21  don't -- I don't want to say it's fair or not

22  but it's -- I -- I know that it's -- it took a

Page 45

1    while to walk there, I changed clothes, I got

2    ready, came back so, you know.

3         Q.   Okay.  And now, do you remember -- so

4    just to go back a step, you did the PBS

5    interview.

6         A.   Uh-huh.

7         Q.   And then you went up to the 14th

8    floor to work for a while?

9         A.   Well, I -- I mean, I went back -- I

10   mean, there was no work space at that time on 5

11   so you would have -- I mean, you would have

12   done your hit and gone back up would have been

13   the normal pattern.

14        Q.   Okay.  So you went up to 14 and then

15   after some period of time you went to change

16   clothes?

17        A.   Correct.

18        Q.   Do you remember how long you were on

19   the 14th floor between the PBS interview and

20   going to change clothes?

21        A.   I do not.

22        Q.   Okay.  Do you have an approximation

Page 46

1    of how long it was?

2         A.    I do not.

3         Q.    Do you know if it was under an hour?

4         A.    It had to be.

5         Q.    Okay.  So you would have left then to

6    change clothes somewhere in the ballpark of

7    about 7 o'clock; is that right?

8         A.    Again, I think, knowing what time

9    the -- the PBS hit was, you know, it depends on

10   when that was.  I can't -- I mean, it's an

11   hour -- I think it's an hour-long show.  So if

12   it was at 6:30, I can't -- I honestly can't

13   remember what time it was, but went up

14   probably, and then I -- I know that I didn't --

15   I went, like I said, changed or whatever at the

16   hotel, came right back and was back in time for

17   poll -- you know, for -- as all the polls

18   started to close.  So, you know, there --

19   there's a range within, say, a couple hours,

20   but that's the best I can do.

21        Q.    Okay.  Do you know approximately what

22   time you returned?  Well, I guess let me first

Page 47

1    ask you a foundational question.

2           After changing your clothes did you

3    then return to Trump Tower?

4           A.   Yes.

5           Q.   Okay.  Do you know approximately what

6    time that was?

7           A.   7:30, 7, 7:30, 8 o'clock.  So again,

8    it was a quick, you know, it -- somewhere in

9    that -- that -- that ballpark.

10          Q.   The ballpark being roughly 7 to

11   8 o'clock?

12          A.   Yeah, I think -- yes.

13          Q.   Was it before polls started closing?

14          A.   I can't recall.

15          Q.   Okay.  All right.  And when you

16   returned to Trump Tower at that time after

17   changing your clothes, where did you go?

18          A.    In all likelihood, straight to 14.

19          Q.   And do you remember what you did on

20   the 14th floor after you returned?

21          A.   No.

22          Q.   Are there any things you remember

Page 48

1    doing after you returned to the 14th floor at

2    that point?

3         A.   No.  I mean, again, you're -- it's

4    Election Day of -- so I think -- I'm sure I was

5    monitoring, you know, media reports and -- and

6    getting calls from reporters or emails.  But, I

7    mean, that's -- that's -- there's a -- you

8    know, anyone who's been around elections knows

9    that around poll closing people are calling,

10   what are you hearing.  So I'm sure I had a

11   variety of phone calls, but -- or emails, but

12   I -- I can't recall anything specific.

13        Q.   Okay.  After returning to the -- the

14   14th floor, at that point, do you recall how

15   long you stayed on the 14th floor?

16        A.   No.

17        Q.   Do you remember if it was more than

18   an hour?

19        A.   I -- that doesn't seem right.

20   Somewhere -- I mean, it's -- I -- no, I don't.

21   I don't specifically recall.

22        Q.   Do you remember where you went next?

Page 49

1       A.    Yes.

2       Q.    Where was that?

3       A.    To a utility room on the 5th floor.
No, I'm -- that's best way to describe it but
it was sort of a oversized utility room.

6       Q.    Okay.  And why did you go there?

7       A.    So the political director, Bill
Stepien, had set up a projector that on a
screen had live results coming in.  The RN --
let -- let me step back.  The RNC had provided
a program, I guess you could call it, that
showed -- and I think they subscribed to a
service, whether it's the Associated Press or
what have you, I can't recall specifically --
that sort of was -- was showing live results as
polls closed, you know.  So he had it on a
screen so that you could look at different
battlegrounds.  And within that room was sort
of a senior group of folks watching the --
the -- the live results come in as the polls
closed.

22      Q.    Okay.  And do you know approximately

Page 50

1    what time you --

2         A.    About the --

3         Q.    -- went down there?

4         A.    I remember that this is probably

5    somewhere between 8:15 and 8:30.

6         Q.    So this would have been -- you're

7    talking Eastern Time; right?

8         A.    Correct.

9         Q.    So polls would have still been open

10   in a lot of the country at that point; right?

11        A.    I don't -- I mean, I know for the

12   battleground states that we were specifically

13   monitoring, Florida closes at 7, 8 in the

14   panhandle.  That would have closed.  I think

15   North Carolina had closed.  Virginia had

16   closed.  Pennsylvania probably had closed.

17   Most of the states that -- that were among the

18   battleground states I believe closed.

19        Q.    Wisconsin would have been later;

20   right?

21        A.    I -- I -- off the top of my head I

22   can't remember what time Wisconsin polls

Page 51

1   closed.

2        Q.   Colorado would have been later?

3        A.   Again, that's a easily -- I -- I can

4   tell you, as I mentioned, I was there between

5   8:15, 8:30.  I think it's -- it's public

6   knowledge what time polls closed.

7        Q.   Okay.  So you said you were in an

8   oversized utility room?

9        A.   Correct.

10        MR. KAUL:  I want to show you a

11        picture.

12        (Spicer Exhibit No. 4 was marked for

13        identification.)

14   BY MR. KAUL:

15        Q.   All right.  You're looking at what's

16   been marked as Exhibit 4.  And I'll just tell

17   you, this is a photograph that I found online.

18        A.   Uh-huh.

19        Q.   Is this the room that you're talking

20   about?

21        A.   No.

22        Q.   Okay.  Is -- do you recognize this

Page 52

1    room?

2         A.   It appears to be a, for a lack of a

3    better word, the open space area of the 5th

4    floor.

5         Q.   Okay.  Can you just sort of, so I

6    understand, describe how that 5th floor is laid

7    out?

8         A.   There's an open space area as

9    pictured here.  I'm -- unfortunately, I can't

10   really tell the angle, but on one end of the

11   room is the television studio.

12        Q.   Okay.

13        A.   And then kind of -- as you can see in

14   this picture, there's a flat wall; right?  On

15   the opposite end would be sort of offices, if

16   you will.  And I only say that because

17   they're -- they're -- I don't think they're

18   intended for people to work in, but there's --

19   there's rooms.

20        Q.   Makeshift offices?

21        A.   Correct.

22        Q.   Okay.  That would be off to the left

Page 53

1    here?

2        A.   Again, I -- the orientation of this

3    picture, I'm not entirely sure what angle it's

4    taken from.  But, as I said, on one far end of

5    the room is the television studio.  It's --

6    there's a separate -- I mean, there's a, you

7    know, a door that -- a makeshift door that was

8    made, a closed-off area for a studio.  You've

9    got this open area that's depicted here in the

10   picture.  And then around the edges are a

11   handful of, as you put it, makeshift offices.

12       Q.   Okay.  And then you described before

13   the utility room.

14       A.   Uh-huh.

15       Q.   Where would that have been?

16       A.   On the opposite -- so, as I said, one

17   end of the room had a television studio.  The

18   end closest to the staircase up was -- was

19   where the utility closet was.  So I don't --

20   I -- I'm not looking to -- but I'm -- I'm -- in

21   this picture that you have in front of me, at

22   one end would have been the television studio.

Page 54

1    On the other end closest to the staircase would

2    have been this utility closet area.

3        Q.   Okay.  And just so the record's

4    clear, so there's -- you see the exit sign in

5    that picture?

6        A.   I do.

7        Q.   So just to make sure I'm

8    understanding correctly --

9        A.   So if I --

10       Q.   I'm sorry.

11       A.   Yeah, I would -- I -- I believe,

12   based on this, that that exit sign, right

13   through there would have been the television

14   studio.  And at the far end of the picture, the

15   opposite end of that would have been the

16   staircase that would have come down, and the

17   utility room right there.

18       Q.   Okay.  All right.  So you talked

19   earlier today about going down to the 5th floor

20   for an interview with PBS.

21       A.   Correct.

22       Q.   When you would go from the 14th floor

Page 55

1    to the 5th floor, how did you -- did you -- did

2    you take an elevator?

3         A.    No.

4         Q.    Okay.  How did you get down?

5         A.    Stairs.

6         Q.    Okay.  All right.  And where did the

7    stairs lead to on the 5th floor?  I can clarify

8    that question if that's not clear.

9         A.    Please do.

10        Q.    When -- when -- after you've taken

11   the stairs down to the 5th floor, where within

12   the 5th floor do you come out?

13        A.    To this -- as we're looking at -- as

14   we're looking at the picture, it appears as

15   though it's on this far right end where I --

16   where I -- on our -- for all of us who have the

17   picture, on that far right end.  I -- I -- I'm

18   pretty sure on the orientation of this picture

19   now that this is -- I mean, there's two ways in

20   which this photo could be taken, and I'm --

21   I'm -- based on what I believe is the -- the

22   depiction of it, you would -- the stairways

Page 56

1    would have come right out here on the far right

2    part of the picture.

3         Q.   Okay.  And that's where the -- near

4    where the utility room you were describing is?

5         A.   Correct.

6         Q.   Okay.  And after you come down the

7    stairway, do you open a door that leads

8    immediately into the utility room, or is there

9    something in between?

10        A.   No.  So you would walk down the

11   stairway, turn left, walk against the wall 10

12   strides, and there's a door.

13        Q.   Another door?

14        A.   To this utility room.

15        Q.   Okay.  Was there any signage on that

16   door?

17        A.   On what door?

18        Q.   The door that you would open to enter

19   the utility room.

20        A.   No.

21        Q.   Was there any signage as you got to

22   the 5th floor?

Page 57

1        A.    Let me take that back.

2        Q.    Go ahead.

3        A.    It's very possible there was a Trump

4   campaign sign.

5        Q.    Okay.  Was there -- so was there any

6   signage -- signage as you got to the 5th floor?

7        A.    That said -- there was -- as you can

8   imagine, it's a campaign headquarters.  There

9   was signage all over the place, Vote Trump,

10  Trump-Pence, you know, Veterans for Trump.  So

11  there was signage, yes.

12       Q.    This is inside the utility room

13  you're talking?

14       A.    I'm sorry, you -- can you -- where --

15       Q.    So --

16       A.    Where were --

17       Q.    So once you take the last step --

18       A.    Yeah.

19       Q.    -- that lands you on the 5th floor,

20  you said you walked down a hallway that goes

21  about 10 feet?

22       A.    No, I did not.

Page 58

1       Q.   Okay.  Can you correct me?

2       A.   You can -- I will.  So when you walk

3    out of the stairs, you're in this open room

4    that you see in this picture.

5       Q.   Okay.

6       A.   Okay?  You bear left, and against the

7    far -- against the -- the -- so you walk down

8    the stairs, you turn left, you're in the room

9    that you see here, and the door to the utility

10   closet is roughly 10 to 15 paces down, right

11   about, you know, to the far end of the photo,

12   if you will, on the -- on the right side.

13      Q.   Okay.

14      A.   But you can clearly see throughout

15   the photo that you've handed me that there's

16   plenty of signage throughout that room.

17      Q.   Okay.  So the stairwell leads

18   directly into this large --

19      A.   That's correct.

20      Q.   -- open room.  Okay.

21      A.   The stairwell would come down.  If

22   you -- if I'm looking at the picture correctly,

Page 59

1    where this photo cuts off, there's a -- there's

2    a little -- the room jets out a little and the

3    stairway is right there.

4         Q.    Okay.  And is there a door between

5    the stairs and this large open room?

6         A.    I believe so.

7         Q.    Okay.  Did that door have any signage

8    on it?

9         A.    I -- it might have had a -- I don't

10   know that the door was ever closed.  It was

11   generally open so you could walk up and down.

12        Q.    Okay.

13        A.    It may have had some -- I -- I don't

14   recall.

15        Q.    All right.  Is there another way to

16   enter this space on the 5th floor?

17        A.    Yes.

18        Q.    Have you entered the 5th floor that

19   other way?

20        A.    Over the course of the campaign, yes.

21        Q.    And how do you go about entering this

22   space at that --

Page 60

1    A.   So if you -- what appears to be -- if

2   you see where that exit sign is, there's a bank

3   of elevators that the elevator -- the elevators

4   technically can drop off on 5.  Earlier in the

5   campaign that was utilized, but that had pretty

6   much been entirely shut off by the Secret

7   Service.

8         So the answer is without Secret

9   Service personally utilizing the elevator or

10   the escalators up to 5, you couldn't get

11   through.

12    Q.   Okay.

13    A.   Stairs were the only practical --

14   were the only normal way of getting on the 5th

15   floor.

16    Q.   Okay.

17    A.   That make sense?  For security

18   reasons, after Candidate Trump became the

19   nominee, they made it very arduous to -- to

20   utilize anything but the stairs.

21    Q.   And you said the door that led from

22   the stairs to the 5th floor was regularly open?

Page 61

1      A.    I did.

2      Q.    Okay.  And that's so people could go

3   back and forth easily?

4      A.    I would assume so.

5      Q.    Okay.  What was -- what campaign

6   activity was set up on the 5th floor on

7   Election Day?

8      A.    So you had a studio that was set up.

9   Obviously, that was fairly regular.  The

10   area -- then you have the utility room that I'd

11   previously described where later in the evening

12   we gathered to watch the -- the results as

13   reported by, I think it was the AP, as they

14   were finalized.  We gathered in that room.

15          And then on the main floor there were

16   some campaign staff that liaised on with the --

17   with the state field staff.  But that's kind of

18   outside of my purview.  I didn't -- that was

19   a -- more of a political function.  So in other

20   words, they had tables with staff that was like

21   liaisoning with state field staff.

22      Q.    Okay.  And that was Trump campaign

Page 62

1    staff?

2         A.   I -- I got to be honest.  I don't --

3    I don't know who all of them were.

4         Q.   Okay.

5         A.   They could have been volunteers, they

6    could -- I -- I don't know.

7         Q.   Do you know any -- whether any of the

8    people there were RNC staff?

9         A.   No.

10        Q.   Sorry, let me ask that in a clear

11   way.  No, you don't know, or no, they were not?

12        A.   No, they were not.

13        Q.   Okay.  And then you mentioned there

14   were some makeshift offices along this wall as

15   well.

16        A.   Yes.

17        Q.   What campaign activities were going

18   on there?

19        A.   I have no idea.  I don't even know

20   that they were utilized.

21        Q.   Okay.  Were there -- were there

22   people in those offices?

Page 63

1          A.    I don't know.

2          Q.    Okay.  And so you said that in this

3     big open space in the middle there were tables

4     set up on Election Day?

5          A.    Yes.

6          Q.    Okay.  So when you would come down to

7     5, you would walk through the -- this big open

8     area and then out by that exit sign to where

9     the studio is; is that right?

10         A.    Correct.

11         Q.    Okay.  Do you know what campaign

12    activities were taking place in the utility

13    room on Election Day?

14         A.    Well, up until -- I don't know what

15    may or may not have happened before I went

16    there, but it was, as I mentioned,

17    approximately 8 o'clock-ish, that was where the

18    results came in.  The -- the -- you know, as --

19    as the -- as I previously described, as polls

20    closed, we would -- you know, whatever feed, I

21    believe, as I mentioned, I believe it's the

22    Associated Press, we -- we -- we had subscribed

Page 64

1    to that feed to say here's where -- here's

2    what's closed and what's in.

3        Q.   All right.  And so you said you went

4    to that utility room around -- something --

5    slightly after 8 p.m.; is that right?

6        A.   Somewhere in that ballpark.

7        Q.   Okay.  And how long were you there?

8        A.   40 minutes, an hour, somewhere in

9    there.  Obviously, I can't recall specifically.

10       Q.   All right.  And who was in the room

11   at the time?

12       A.   As I mentioned, Bill Stepien, who was

13   the political director.  Eric Trump, Lara

14   Trump, Ivanka Trump, Jared Kushner, Steve

15   Bannon, who was the campaign's chief

16   strategist.  Vice -- Governor Mike Pence at the

17   time.  I believe his wife Karen came down at

18   some point, but I can't be certain of that.

19   Governor Chris Christie.  Hope Hicks, who was

20   one of the communications staffers.  Reince

21   Priebus, the chairman of the RNC.  I think Dan

22   Scavino, who was running social media, was down

Page 65

1    there at some point.  Dave Bossie, who was the

2    deputy campaign manager.  I'm sure there was a

3    few others but I wasn't -- I mean --

4         Q.   Do you know whether Brad Parscale was

5    there?

6         A.   I don't.  He would have been hard to

7    miss, but I don't.

8              MR. BURCHFIELD:  Could you read

9         that question back, please?  I'm sorry,

10         I missed it.

11         (The reporter read from the record as

12         follows:  "Do you know whether Brad

13         Parscale was there?")

14    BY MR. KAUL:

15         Q.   All right.  And so can you walk

16    through what happened while you were in the

17    utility room?

18         A.   So on the wall, as I -- was a

19    projector, or, excuse me, was a -- a image

20    that -- from a projector, the -- that was

21    hooked up to a computer.  The RNC had -- and

22    again, I -- I -- I don't recall.  I think it

Page 66

1    was the Associated Press had paid for a feed

2    from one of the services that, when polls would

3    close, sort of give you the, you know, the --

4    the number of people who had voted when -- when

5    a county or a state reported it in.

6              And it was projected so they -- they

7    would -- Bill Stepien, the political director,

8    would kind of just keep flipping it state by

9    state, you know, Florida, North Carolina.  I

10   think -- I'm sure there were a few other

11   battleground states.  And just kind of looking

12   at what -- what counties had come in, what

13   counties hadn't come in and, you know, what

14   we -- what we thought we -- how we had done

15   based on what had been -- what the Associated

16   Press or whoever this service was reported that

17   had -- you know, the -- what vote had been

18   reported being, you know, final.

19        Q.   And so you said you were there for I

20   think somewhere in the range of 40 minutes to

21   an hour; is that right?

22        A.   Correct.

Page 67

1    Q.   And during the time you were there, I

2    think you said you saw results coming in.  Was

3    somebody narrating what you were seeing?

4    A.   No.  As I'd mentioned, there's a --

5    there's a computer program.  The image is on

6    the screen, and so as -- and again, for the

7    sake of this can we just assume it's the

8    Associated Press?  I'm not trying to --

9    Q.   That's fine.

10   A.   But whatever service we had would

11   sort of take that vote and put that image up;

12   right?  So if it was Florida and the Associated

13   Press said Broward County's in, it would show

14   Broward County, you know, is in, and it would

15   have the vote total, you know, X votes in,

16   Broward County, Miami-Dade, X number of votes.

17   You know, as polls closed, how many votes had

18   come in.

19   Q.   And were you having conversations

20   during this time period?

21   A.   Yes.

22   Q.   Okay.  Do you recall what you were

Page 68

1    discussing?

2        A.    Yes.

3        Q.    Okay.   What was that?

4        A.    What counties were in, what counties

5    weren't.

6        Q.    Who were you talking to?

7        A.    I -- I previously mentioned the --

8    the folks in the room.  It was sort of a, for

9    lack of a better term, a collective

10   conversation where you would see something come

11   in and say, you know, is that good for us or is

12   that bad for us, i.e., you know, wow, a high

13   vote total there, do we think that benefited

14   us.  Hey, we really made an effort in this

15   county.  That looks like it might have paid

16   off.  So we were just sort of -- we would

17   discuss as these vote totals were finalized

18   whether or not -- what was out, what was not

19   out, and how that portended for how the state

20   might go.

21       Q.    Okay.  You mentioned before that you

22   were in the utility room and that Mr. Priebus

Page 69

1   was.   Do you recall whether anybody else who

2   worked for the RNC was in that room?

3       A.   No.

4       Q.   Okay.   You were the only two RNC

5   employees you remember being there?

6       A.   Yes.

7       Q.   Okay.   Did you have any instructions

8   not to go to the 5th floor that day?

9       A.   No.

10      Q.   Okay.   Do you know whether the RNC

11  sent out any instructions not to go to the 5th

12  floor that day?

13      A.   I do -- I -- I do know, and the

14  answer is no.

15      Q.   Okay.

16      A.   So just to be clear, the RNC did not

17  send out any instructions regarding the 5th

18  floor of Trump Tower that day.

19      Q.   Okay.   How do you know that?

20      A.   Because I have double-checked with

21  counsel to ensure that I didn't miss anything.

22      Q.   Okay.   Besides Mr. Priebus and

Page 70

1   yourself, did you see anybody from the RNC on

2   the 5th floor on Election Day?

3        A.    No.

4        Q.    Okay.  Do you have any understanding

5   as to why there were no RNC employees on the

6   5th floor if they didn't have instructions not

7   to be there?

8        A.    I can only assume that because there

9   was -- the chairman and myself were the only

10  two sort of senior RNC officials there.

11       Q.    Okay.

12       A.    Generally speaking, people who are

13  familiar with elections would recognize that

14  where there's sort of -- that -- that the --

15  the sort of nerve center, if you will, or

16  sometimes where votes are being tabulated and

17  you -- you try to limit people who don't need

18  to be in a particular -- and in this case, as I

19  mentioned, it was a utility room.  It was

20  rather small.  So I don't -- I don't know why

21  they weren't there, but I would assume that

22  they weren't all -- that it wasn't -- they

Page 71

1   weren't senior.

2        Q.   And, I'm sorry, and I -- my question

3   may not have been clear.  You're -- you're

4   focusing on the utility room right now and I

5   guess my -- my questions with respect to the

6   entire 5th floor that day.  I know you walked

7   through earlier to go to the television studio,

8   for example.

9             Did you see anyone in any part of the

10  5th floor other than Mr. Priebus or yourself

11  who were RNC employees?

12       A.   I did not.

13       Q.   Okay.  Do you know why, even in the

14  other parts of the 5th floor, such as the big

15  open room we talked about, there were no RNC

16  employees that day?

17       A.   There was only a handful of employees

18  at any point ever at Trump Tower on Election

19  Day, and I don't believe any of them -- while I

20  can't obviously speak for the other few that

21  were there, none of their jobs were political

22  per se in terms of that.

Page 72

1        Q.    What do you mean?

2        A.    In other words, there was someone

3    coordinating some media booking.   There was

4    someone doing some coalition work.   There --

5    the -- the activities on that floor were

6    political in nature, talking to -- so the -- it

7    wasn't within the purview of the people who

8    were there.

9        Q.    The activities on the 5th floor

10    were --

11        A.    Correct.

12        Q.    -- political in nature?

13            So the RNC engages in activities that

14    are political in nature also; right?

15        A.    Correct.

16        Q.    Do you know why the people at the RNC

17    who engaged in those activities were not on the

18    5th floor?

19            MR. BURCHFIELD:   Objection,

20        foundation.

21        Q.    If you know, you can answer.

22        A.    I don't -- it's -- they were at the

Page 73

1   RNC.  We -- we ran the field program out of the

2   RNC.

3        Q.    Okay.  So you mentioned before there

4   were tables set up in the big open room.

5        A.    Yes.

6        Q.    Do you know approximately how many

7   people you saw at those tables?

8        A.    I don't.

9        Q.    Do you know if it was over 20?

10       A.    That sounds about right.

11       Q.    That it was about 20?

12       A.    I -- no, that it's -- I'm sorry, more

13   than 20.  I -- I didn't -- can't say that I

14   spent a ton of -- that I -- I was looking so

15   I -- I don't know.

16       Q.    You didn't do a headcount.

17       A.    No.

18       Q.    Right.  Roughly in the 20 to 30

19   range?  Does that sound about right?

20       A.    It -- I don't know.  I -- I -- again,

21   I was not -- that was not a focus of mine, so I

22   don't know.

Page 74

1      Q.   Okay.  I'd asked you earlier about

2   whether you signed a sign-in sheet when you

3   went to the 14th floor.

4           Was there any sign-in sheet on the

5   5th floor?

6      A.   No.

7      Q.   Okay.

8      A.   Not that I'm aware of.

9      Q.   How does the press access the part of

10   the 5th floor where the studio's located, if

11   you know?

12      A.   I don't believe they ever did.

13      Q.   Sorry.  The -- you mentioned you did

14   a -- a PBS interview on the 5th floor.

15      A.   Correct.

16      Q.   Oh, was that -- I see.  You were on

17   camera but the press wasn't there; is that

18   right?

19      A.   Yeah, it's a satellite studio.

20      Q.   I understand.

21           Did you take any pictures on Election

22   Day?

Page 75

1      A.   Yes.

2      Q.   Did you take them from your personal

3  device?

4      A.   Yes.

5      Q.   Did you take any pictures while you

6  were on the 5th floor?

7      A.   Yes.

8      Q.   Do you recall what you took pictures

9  of?

10     A.   Yes.

11     Q.   What was that?

12     A.   The utility room and the -- the votes

13  being -- you know, as -- as the results came

14  in, I took some shots of that.  And then I took

15  photos on the 14th floor later that evening

16  as -- as states were called for -- for

17  President-elect Trump.

18     Q.   Prior to the time when you were in

19  the utility room did you take any pictures on

20  Election Day?

21     A.   Yes.

22     Q.   What were those of?

Page 76

1      A.   Various staffers throughout the day,

2   just pose -- I mean, I -- I don't know.  I have

3   one of the cowboy who was playing outside of

4   Trump Tower.  I have some of the staff that

5   were on the 14th floor during the day.

6      Q.   Do you have any pictures from the 5th

7   floor prior to the time you were in the utility

8   room?

9      A.   No.

10         MR. BURCHFIELD:  I'm sorry.  Prior

11     to the time he was in the utility room?

12     Okay.

13         THE WITNESS:  Of the 5th floor.

14         MR. BURCHFIELD:  Of the 5th floor?

15         MR. KAUL:  Pictures taken from --

16         THE WITNESS:  I don't --

17         MR. KAUL:  -- the 5th floor.

18         THE WITNESS:  I don't -- I don't --

19     I don't believe so.

20         MR. BURCHFIELD:  Okay.  All right.

21     I -- I thought any pictures prior to the

22     time you were in the utility room.  But

Page 77

1      your question was limited to any

2      pictures of the 5th floor prior to the

3      time you were in the utility room.

4           MR. KAUL:  Taken on the 5th floor,

5      right.

6           MR. BURCHFIELD:  Okay.  And so

7      you're -- you're okay with that?

8           THE WITNESS:  I believe so.  I

9      think there's a photo of me doing a TV

10     interview, but I believe that's a later

11     interview.

12 BY MR. KAUL:

13     Q.   Okay.

14     A.   And you know what I mean?  There --

15 there's one in the studio with the -- with the

16 backdrop, but I think that's -- I believe that

17 was a later interview that night.

18     Q.   Okay.  On Election Day did you have

19 any communication with any Republican state

20 chair, man or woman?

21     A.   I don't believe so.

22     Q.   Did you have any communications with

Page 78

1   a person named Joe Dozier?

2       A.    I don't believe so.

3       Q.    Did you take notes on Election Day?

4       A.    I don't believe so.

5       Q.    Okay.  I think you mentioned before

6   you would get calls sort of throughout the day

7   from press.

8       A.    That would be typical of an election

9   day.

10      Q.    Did -- were you making and receiving

11  phone calls with people besides the press on

12  Election Day?

13      A.    I am -- I'm -- I think it would be

14  typical for that to occur.

15      Q.    Okay.

16      A.    I cannot recall any specific call or

17  email, though.

18      Q.    Okay.  And that was my next question.

19  Did -- did you send outgoing and incoming

20  emails throughout Election Day?

21      A.    I think it would be typical.

22      Q.    Outside of the press, do you remember

Page 79

1    what you were emailing about, if anything?

2        A.  I -- I don't, no.

3          MR. KAUL:  Okay.  All right.  Why

4      don't we take a quick break and then --

5          THE WITNESS:  Can we keep going?

6          THE REPORTER:  Well, I would

7      appreciate a comfort break.

8          MR. KAUL:  We'll take a quick

9      break.  It'll take 5 minutes.  But we'll

10     finish and get you out of here by --

11     before 5.  Okay?

12         MR. BURCHFIELD:  Great, thank you.

13         THE VIDEOGRAPHER:  This marks the

14     end of videotape number 1.  Going off

15     record.  The time is 2:42 p.m.

16     (Recess taken.)

17         THE VIDEOGRAPHER:  This marks the

18     beginning of videotape number 2.  Going

19     back on record.  The time is 2:58 p.m.

20         MR. KAUL:  Thank you.  We will go

21     back on the record.

22   BY MR. KAUL:

Page 80

1    Q.   Mr. Spicer, I just wanted to follow

2  up on a couple of questions that I'd -- couple

3  lines of questioning I'd started before.  One

4  is I asked you about whether you'd spoken to a

5  few people on Election Day.  I want to ask you

6  about a few others.

7    A.   Okay.

8    Q.   Did you speak to Brad Parscale on

9  Election Day?

10    A.   I have to believe I did.  I can't

11  recall, like, a specific conversation but

12  clearly, as the night went on and it looked

13  good I'm sure at some point our paths crossed.

14  But I don't recall any, like, specific

15  conversation.

16    Q.   Okay.  What's your understanding of

17  what his role was with the Trump Campaign?

18        MR. BURCHFIELD:  Object.  And what

19    is the -- what is the reason for that

20    question?

21        MR. KAUL:  To inform what they may

22    have discussed that day.

Page 81

1              MR. BURCHFIELD:  Why don't you just

2         ask him what they discussed that day?

3              MR. KAUL:  Well, he said he doesn't

4         remember so I'm going to try to refresh

5         this way.

6              MR. BURCHFIELD:  I think you're

7         beyond the scope here.  Clever question,

8         but I think it's beyond the scope.

9              MR. KAUL:  Well, I'm trying to

10         think of a way to get at how we can

11         refresh his memory.

12    BY MR. KAUL:

13         Q.   Thinking about -- let me try to

14    rephrase in a way that won't cause a dispute.

15    Thinking about this, his duties for the

16    campaign -- I will tell you I believe it's been

17    reported that he was involved in digital

18    operations for the campaign.  Did you have any

19    discussions with him about digital operations?

20         A.   I don't believe so.

21         Q.   Okay.  Did you have any discussions

22    with him about turnout?

Page 82

1       A.   No.   I mean, just to be clear, I -- I

2  don't recall that, and I would not have --

3  that's not who I would have talked to about

4  turnout.

5       Q.   Okay.   Who would you have talked to

6  about turnout?

7       A.   Someone on the political team.

8       Q.   Okay.

9       A.   We held regular calls with the media

10  to talk about our turnout operation, and -- and

11  that was a -- a function that -- that the RNC

12  largely led in terms of early vote, absentee

13  vote.   We did a lot of get-out-the-vote

14  efforts.   And so that would have been something

15  that I would have talked to, you know, our

16  political team about.

17       Q.   Okay.   Do you know if you would have

18  had any conversations with Mr. Parscale other

19  than pleasantries?

20       A.   I doubt it.

21       Q.   Did you talk to anybody from

22  Cambridge Analytica on Election Day?

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 83

1        A.    I don't believe I've ever spoken to

2    anybody from Cambridge Analytica --

3        Q.    Okay.

4        A.    -- ever.  That's employed by them.

5        Q.    I understand.  You mentioned earlier

6    that there were some employees who worked out

7    of the 14th floor regularly.

8            Do you recall that?

9        A.    I do.

10        Q.    Other than yourself, did anybody who

11    worked for the RNC work out of the 14th floor

12    with any regularity?

13        A.    Yes.

14        Q.    Who was that?

15        A.    At what time?

16        Q.    Let's say Election Day, first of all.

17        A.    So my assistant, Vanessa Morrone,

18    would travel with me so she would have been

19    there.  There's a gentleman named Jason Chung,

20    who ran some coalition -- some of the coalition

21    work.  He worked -- I -- I don't know what --

22    with what frequency but I believe, you know,

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 84

1    off and on would travel up -- and I think -- he

2    was -- I'm pretty sure he was there on Election

3    Day.

4        Q.   Well, I'll -- and I'll come back to

5    this, but what does coalition work mean?

6        A.   Different various groups in support

7    of the Republican party, our -- and -- and, you

8    know, our candidates up and down the ballot.

9    So, for example, veterans or small business

10   owners or different --

11       Q.   I understand.

12       A.   -- ethnicities.  So -- but he would

13   help coordinate with the campaign, so on a

14   regular basis was there.  I think he was there

15   on Election Day.

16            Andy Hemming I mentioned did some

17   rapid response work, and I believe he was there

18   on Election Day.  A gentleman named Alex

19   Stroman, who helped book Republicans on

20   television that I believe was there on Election

21   Day, so he would help on cable television and

22   radio find Republicans that wanted to go out

Page 85

1    and talk about the Republican efforts.  So

2    he -- he was a regular, I'm fairly certain,

3    on -- there on Election Day.  I don't know that

4    there was anybody else.

5         Q.    Okay.  Is there anybody else who was

6    regularly there who may have been there on

7    Election Day?

8              MR. BURCHFIELD:  Object to form.

9         Q.    You can answer.

10        A.    I -- I -- it -- it was -- it was a

11   very small group of people.  The -- as I -- as

12   I just mentioned, I'm just trying to think

13   of -- Lindsay Walters, who was our press

14   secretary, had come up a few times.  I don't

15   believe she was there on Election Day, though.

16   Raj Shah, who did -- ran our research division,

17   had come up a few times.  I don't believe he

18   was there on Election Day, though.  But that --

19   it was a very small group.

20        Q.    And do you know why those folks were

21   stationed on the 14th floor rather than the 5th

22   floor?

12/6/2017   Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 86

1        A.   Because that's -- up until election,

2    I mean, that -- that's where -- that's where

3    the offices were.

4        Q.   Okay.  That includes Trump Campaign

5    staff?

6        A.   Uh-huh.

7        Q.   That's a yes?

8        A.   I'm sorry.  Yes, that is a yes.

9        Q.   There was not campaign activity on

10   the 5th floor prior to that?

11       A.   As I've mentioned before, there was a

12   studio there that was utilized, and I do

13   believe some of the data folks worked down

14   there as the election grew closer.  But I

15   didn't interact with those folks so I -- I know

16   there were -- as we got closer to Election Day,

17   people would utilize the 5th floor more, but I

18   can't say who and for what.

19       Q.   Did you have an understanding as to

20   whether you were permitted to communicate with

21   the data folks on the 5th floor?

22       A.   No one had told me don't talk to a

Page 87

1  particular individual, but I don't know that I

2  ever talked to any of them.  I mean, so it's

3  sort of a moot point.

4       Q.   All right.

5       A.   I mean, I -- just to be clear, as I

6  mentioned, I don't know that I would have known

7  who worked down there to begin with so your

8  assumption that there were data folks on the

9  5th floor is something that I'm not willing to

10 stipulate was -- was accurate.

11      Q.   Yes, sir.  I got that, I think, from

12 your testimony.  You said data folks worked on

13 5 as the election approached; is that right?

14      A.   Right, as they -- but -- but I

15 wasn't -- I -- I said as I -- I -- from what I

16 understood.  Like, I didn't interact with those

17 individuals so what they exactly did, I don't

18 know.

19           MR. KAUL:  Let me show you another

20      document.

21      (Spicer Exhibit No. 5 was marked for

22      identification.)

Page 88

1    BY MR. KAUL:

2        Q.   All right, this has been marked as

3    Exhibit 5.  This document is an article that

4    was published in Politico about a week ago.

5              Do you see that?

6        A.   I do.

7        Q.   Have you reviewed this article?

8        A.   Yeah.  Actually, I think you're

9    wrong, though.  I think it was published a

10   month ago.

11             MR. BURCHFIELD:  November 10.

12             THE WITNESS:  November 10.

13       Q.   Oh, I apologize.  I was looking at

14   the date on the bottom.

15       A.   No problem.

16       Q.   Okay, thank you.  Okay.  But you've

17   read this article before?

18       A.   Yes.

19       Q.   And that reminds me.  Did you review

20   any materials in preparation for today's

21   deposition?

22       A.   I did.

12/6/2017   Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 89

1     Q.   What did you review?

2     A.   I reviewed this article.  I reviewed

3  the PBS interview that I did, the

4  aforementioned 6 o'clock hour interview.  I

5  looked at the receipt for the car that you've

6  previously shown me.  There was an email that

7  had been provided to you of a -- that I had

8  received regarding -- I believe it was

9  television appearances or media, alerts of

10  some -- some -- something like that.  I -- I

11  looked at that.  And then I'd -- I also

12  reviewed notices, if you will, that -- that

13  counsel's office of the Republican National

14  Committee had provided to staff.

15     Q.   And the notices related to the

16  Consent Decree; is that right?

17     A.   That is, yes.

18     Q.   Had you seen those prior to seeing

19  them in preparation?

20     A.   I would think it's -- I -- I -- I

21  don't -- I mean, I worked at the RNC for six

22  years.  I can't recall with specificity whether

Page 90

1    I saw those documents, but they looked

2    familiar.

3        Q.   Anything else you reviewed in

4    preparation for the deposition?

5        A.   I looked back at text messages that

6    I -- with the Republican National Committee

7    chairman, Reince Priebus, on the advice of

8    counsel.

9        Q.   And were those from Election Day?

10       A.   There was one, so it's not they.  And

11   yes.

12       Q.   Okay.  And do you recall what the

13   topic of that text message was?

14       A.   I do.

15       Q.   What was that?

16       A.   It was at 9:59 p.m., the chairman

17   sent me the exit poll results in terms of the

18   Hispanic vote that had been reported,

19   President-elect Trump -- well, I was -- it's

20   10 o'clock at night so I'm not sure -- I don't

21   believe it had been called at that time, but

22   where the exit polls showed the Hispanic share

Page 91

1   of the vote in key states versus where it had

2   been for Romney.

3       Q.   Okay.  Any other communications by

4   text message at that time?

5       A.   I can't say I reviewed -- I -- you --

6   as you know, you -- I looked at my

7   communication with the chairman, and that was

8   what I covered.

9       Q.   Okay.  Okay.  Did you speak to

10  anybody about the deposition other than your

11  attorneys?

12      A.   I think I let my wife know where I

13  was going to be today.

14      Q.   Okay.  You don't have to tell me

15  about those conversations either.  Aside from

16  your wife, anybody else?  Your wife and your

17  lawyers.

18      A.   I don't think so.

19      Q.   Okay.

20      A.   I don't -- I mean, I'm pretty sure

21  no --

22      Q.   Okay.

Page 92

1      A.    -- but I --

2      Q.    All right, so let me ask you about a

3  few aspects of this article.

4      A.    Yeah.

5      Q.    So first let me direct your attention

6  to the second page of the article.  The second

7  paragraph on page 2 -- well, it makes a few

8  points.  I'll go through them one by one.

9           First, it refers to the 5th floor as

10  the nerve center of the Trump Campaign's poll

11  monitoring operation and data war room on

12  Election Day.

13          Do you see that reference, first of

14  all?

15     A.    Yes.

16     Q.    Okay.  Do you know whether it is --

17  that is an accurate description of the 5th

18  floor of Trump Tower on Election Day?

19     A.    In terms of the activities?

20     Q.    Yes.

21     A.    I believe that's accurate.

22     Q.    Okay.

Page 93

1       A.   I can't -- again, I -- I was not

2   specifically involved in what they did, but

3   I -- I've read that that's what happened.  I

4   wasn't part of that operation.

5       Q.   Okay.  As of Election Day did you

6   know that that's what it was?

7       A.   I -- yes.  I knew that that -- I --

8   I -- I mean, I -- I had an -- a strong

9   understanding of what was -- you know, that

10  that's where the people in the states would be

11  interacting with headquarters to call in

12  election results, etc.

13      Q.   Okay.  And what's your understanding

14  of what the Trump Campaign's poll monitoring

15  operation entailed?

16      A.   I don't know.  I wasn't -- we had

17  been -- it had been abundantly clear for the

18  six years that I worked at the RNC that the RNC

19  and its employees were prohibited from engaging

20  in Election Day activities, including poll

21  watching, so I intentionally stayed away from

22  all of that.

Page 94

1    Q.   Okay.  What's your understanding of

2 what the Trump Campaign's data war room efforts

3 were?

4    A.   I don't -- I don't -- I don't know

5 that they -- I'm not really sure what that

6 references.  Most of the data was RNC-driven so

7 I think they -- they utilized RNC data.  I'm

8 not sure that they -- I'm not sure what that

9 references.

10    Q.   Okay.  Do you know whether the Trump

11 campaign utilized RNC data in connection with

12 its poll monitoring operation?

13    A.   I don't.

14    Q.   Okay.  The end of this paragraph says

15 that party employees were given strict

16 instructions prohibiting them from going there.

17       Do you see that?

18    A.   I do.

19    Q.   And so you testified earlier that

20 your understanding is that that is incorrect;

21 is that right?

22    A.   Correct.

Page 95

1      Q.   To your knowledge, no RNC employee

2   received any instructions telling them not to

3   go to the nerve center of the campaign's poll

4   monitoring operation and data war room that

5   day; is that right?

6           MR. BURCHFIELD:   Object to form and

7        foundation.   You may answer.

8      A.   I only know what I was -- I was

9   never -- that I was never told anything.  And I

10  know that the RNC never instructed the, you

11  know, few employees that were there for that --

12  the -- the -- so I can't speak to what someone

13  else may or may not have been told or why.

14     Q.   Okay.  But I think you testified

15  before that your understanding from

16  conversations in preparation for the deposition

17  was that there was no instruction given; is

18  that right?

19     A.   That's correct.

20     Q.   All right.

21     A.   Right.  That's what I said.

22     Q.   Do you know who was on the 5th floor

Page 96

1    during the portions of the day when you were

2    not present there?

3        A.    No.

4        Q.    Okay.  Do you know who the four

5    people referred to who spoke to Politico in

6    this article are?

7        A.    I do not.

8        Q.    Okay.  But the people who were at

9    Trump Tower are the people you named.  The RNC

10   employees who were at Trump Tower were the

11   people you named before?

12       A.    Correct.

13       Q.    The next paragraph of this article

14   refers to sources who recalled seeing large

15   signs on one of the doors leading to the 5th

16   floor reminding RNC staffers to keep out.

17           Do you see that?

18       A.    I do see it.

19       Q.    Okay.  Do you recall seeing such a

20   sign?

21       A.    No.

22       Q.    Is it possible that there was one and

Page 97

1    you missed it?

2          A.   Of course it's possible.

3              MR. BURCHFIELD:  Objection,

4          foundation.  You may answer.

5          A.   Of course it's possible.  But I went

6    down there, you know, to do a television

7    inter -- I mean, at -- no, it -- it -- it is --

8    yes, it is possible.  No, I did not see one.

9          Q.   Okay.  And actually, you said the

10   door that connected the 14th -- the stairwell

11   that connected the 14th floor and the 5th floor

12   was propped open that day; right?

13         A.   There's no door at the top.  There's

14   a door at the bottom.

15         Q.   Bottom, meaning 5th floor?

16         A.   Correct.

17         Q.   Okay.  And I -- you talked about the

18   Secret Service before.  Is there -- having to

19   enter -- or having shut down the elevator

20   entrance.  Other --

21         A.   I -- yeah, go ahead.

22         Q.   Well, I was going to say, other than

Page 98

1   going through the stairwell through the door

2   you -- you went through, is there a way to

3   enter the 5th floor, or was there on Election

4   Day?

5        A.    Not that I -- as I mentioned, there

6   were three ways that you could theoretically

7   get to the 5th floor.  One is the stairwell;

8   two is escalators that would have gotten you up

9   there; three is the elevator.

10            To my understanding, the escalator

11  and elevator routes had been shut down entirely

12  so that the only viable option would have been

13  the -- the stairway.

14       Q.    Okay.  So if there had been any sign

15  reminding RNC staffers to keep out of the 5th

16  floor, that would have had to have been on the

17  door that you were going in and out of?

18       A.    I --

19            MR. BURCHFIELD:  Object to

20            foundation.

21       Q.    You can answer.

22       A.    I -- I don't know what -- what -- I

Page 99

1    mean, it would seem to be the case.  But again,

2    I never saw one so I don't know -- I don't -- I

3    think -- so I don't know.

4        Q.   I'm -- and I'm just trying to

5    understand.  If you're putting up a sign that's

6    discouraging people from coming into the 5th

7    floor, that's the only place one would have

8    reasonably put it because the other entrances

9    are shut down at that time; right?

10           MR. BURCHFIELD:  Object to form and

11       foundation.

12       Q.   You can answer.

13       A.   That would seem to be the case.  I

14   think there's an issue with -- there -- there

15   were a handful of RNC employees.  It doesn't

16   make any sense that there would have been a

17   sign specifically targeting RNC employees

18   because no one would have even -- that, on its

19   face, it's ridiculous.

20       Q.   Okay.

21       A.   Right?  You -- you realize -- because

22   I just mentioned there's four or five people

Page 100

1    there, so the idea that you'd put up a sign

2    specifically targeting four or five people

3    doesn't really, you know, on its face make a

4    ton of sense.

5         Q.    Okay.  Now, the next paragraph refers

6    to a statement made by an unnamed RNC employee

7    who said that the directive to RNC employees to

8    steer clear of the 5th floor was given out of

9    an abundance of caution.

10         Do you see that?

11         A.    Yes.

12         Q.    Do you know who the RNC employee who

13    made that statement is?

14         A.    I do not.

15         Q.    Okay.  This paragraph then refers to

16    the Consent Decree between the RNC and the DNC.

17         A.    Uh-huh.

18         Q.    What's your understanding of that

19    Consent Decree?

20         MR. BURCHFIELD:  Object to form and

21         foundation.

22         Q.    You can answer.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 101

1          A.    My understanding is that as part of a

2     legal agreement, the RNC has agreed to pro --

3     to not engage in certain Election Day

4     activities.

5          Q.    Okay.  And do you know what types of

6     activities they are?

7          A.    Poll watching, intimidation, anything

8     that would -- that would lead somebody not to

9     vote or to misdirect them in any way, shape, or

10    form.

11         Q.    Okay.  And what, if any, impact on

12    your activities did that Consent Decree have?

13         A.    None.

14         Q.    Okay.

15         A.    Well, to the extent that we -- we had

16    made it -- over the course of six years the

17    counsel's office had been vigilant in informing

18    both senior staff and subordinates on the --

19    on -- on the importance of the Consent Decree

20    and the activities that we were clearly not --

21    should not be engaged at or be even perceived

22    as engaging in.  And so we had grown accustomed

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 102

1    to being -- to -- to not even coming to close

2    to a line that would in any way, shape, or form

3    lead one to believe that we were engaged in

4    those activities.

5              So in terms of your question, we

6    would never -- it didn't -- we had just -- that

7    was part of how we engaged, was to ensure that

8    we didn't do anything that was questionable.

9        Q.   Okay.  All right.  Let me direct your

10   attention to page 4 of the article.

11       A.   Okay.

12       Q.   The first full paragraph, the second

13   paragraph on the page refers to a former Trump

14   campaign official who said that "We knew there

15   was a strong emphasis that the RNC staff

16   couldn't participate on the 5th floor."

17             Do you see that?

18       A.   I do.

19       Q.   First of all, you don't know who the

20   Trump campaign official who said that is, do

21   you?

22       A.   No.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page 103

1      Q.    Do -- and I -- this is probably going

2    over something you covered, but is it -- is it

3    your understanding that there was a strong

4    emphasis that the RNC staff couldn't

5    participate -- participate on 5th floor

6    activities?

7      A.    No.

8      Q.    Okay.

9      A.    No, it is not my -- right?  So we are

10   clear, I just want to make sure I'm answering

11   that correctly.

12     Q.    Yeah, that -- that's fair.  Let me --

13   in your view, based on your experience, was

14   there a strong emphasis that RNC staff couldn't

15   participate on the 5th floor?

16     A.    No, there wasn't an emphasis on RNC

17   staff --

18     Q.    Thank you.

19     A.    -- in any way, in any way having to

20   do with the 5th floor.

21           Are we done with Politico?

22     Q.    Yes, I think so.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 104

1      A.    Okay.

2            MR. BURCHFIELD:   We are so done

3      with Politico.

4      Q.    So that Politico article references

5   an interview that you gave with GQ.

6            Do you recall that?

7      A.    I do.

8      Q.    When you gave the -- well, first of

9   all, when did you give the GQ interview,

10  approximately?

11     A.    A week before it came out?  Somewhere

12  last week of October.  I think that it was

13  published like the -- the -- November 8 or

14  something.

15     Q.    7th, but yeah.

16     A.    So I think it would have been the

17  last week of October maybe, or the first couple

18  days of November, but somewhere in that

19  ballpark.

20     Q.    Okay.  And when you were being

21  interviewed, were you the only person being

22  interviewed or were there multiple people being

Page 105

1   interviewed?

2        A.    Just me.

3        Q.    Okay.  Were you aware that other

4   people who were involved in the 2016 campaign

5   were also being interviewed?

6        A.    Yes.

7        Q.    Okay.  And have you reviewed the GQ

8   article?

9        A.    I don't -- I don't -- I'm sure --

10  I've seen it.

11       Q.    I'll mark it as an exhibit.

12       A.    Yeah, yeah.  I mean, I'm not looking

13  to be difficult here.  I just can't recall

14  which document.  But I am familiar with the

15  article.

16       Q.    Right.

17       (Spicer Exhibit No. 6 was marked for

18       identification.)

19            THE WITNESS:  Yes, I have seen it.

20  BY MR. KAUL:

21       Q.    Okay.  So this is --

22       A.    So, I mean, recent, I -- I just

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 106

1    hadn't seen the color version.  Sorry.

2         Q.   That's okay.  So this is marked as

3    Exhibit 6; correct?

4         A.   It is.

5         Q.   All right.  And that's a copy of the

6    GQ article that we were talking about?

7         A.   It is.

8         Q.   So let me direct your attention to --

9    this is a little tricky because the pages are

10   not numbered -- by my count, it's the 13th

11   page, and I'll show you what it looks like.

12        A.   Okay.

13             MR. BURCHFIELD:  This one?

14             MR. KAUL:  Yes.

15             MR. BURCHFIELD:  Okay.

16        Q.   All right.  Now, about two-thirds of

17   the way down, there's a paragraph in which

18   you're quoted.

19        A.   Uh-huh.

20        Q.   Do you see that?

21        A.   I do.

22        Q.   Have you -- so you said you reviewed

Page 107

1    the article.  Have you reviewed your -- the

2    statements that you're quoted as having given

3    in this article?

4         A.   I -- I -- I read it, yes.

5         Q.   Did -- were any of the quotes of you

6    inaccurate?

7         A.   I don't believe so.

8         Q.   Okay.  So the reason I asked you

9    about how the interview was conducted is you

10   see how it has a quote from you followed by a

11   quote from Matt Mowers, and it -- there are a

12   number of different people who are quoted, and

13   the quotes are sort of interspersed?

14          Do you see all that?

15        A.   I do.

16        Q.   Okay.  So those -- is it your

17   understanding that these were each from

18   separate interviews?

19        A.   I -- I would assume so.

20        Q.   Okay.  So first of all, in your

21   quote, you talk about a group of people

22   gathering on the 5th floor in Trump Tower, as

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 108

1    we talked about before; right?

2         A.    Correct.

3         Q.    And here, you refer to at least

4    through 7:30, 8 o'clock it being an optimistic

5    view of the results.

6         A.    Uh-huh.

7         Q.    Okay.  And so is it fair to say that

8    your understanding is that you were in the

9    utility room you described before by at least

10   7:30?

11        A.    No, it's not.

12        Q.    Okay.

13        A.    There were two separate questions,

14   what was going on, and what was the mood like.

15        Q.    Okay.  What -- so your understanding

16   is that you were not there by 7:30?

17        A.    I don't think so, no.

18        Q.    Okay.

19        A.    I think it was -- as I -- I think

20   I -- I -- much closer to -- probably closer to

21   8:30, but well into -- but, you know, I think

22   easily 8.

Page 109

1    Q.   Okay.  So this, just to go through

2  this paragraph, the first sentence refers --

3  says "A group of us gathered on the 5th floor

4  of Trump Tower in what could be -- be described

5  as basically an oversized utility room."

6        Do you see that?

7    A.   I do.

8    Q.   All right.  So then there's reference

9  to Stepien going through key counties.

10       Do you see that?

11   A.   I do.

12   Q.   And that's a reference to what was

13  going on in the utility room; right?

14   A.   Correct.

15   Q.   And then there's a sentence about

16  what's in, what's not.  Do you see that?

17   A.   I do.

18   Q.   All right.  And that's also a

19  reference to what's going on in the utility

20  room?

21   A.   It is.

22   Q.   Okay.  And then there's a sentence,

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page 110

1    "I would say at least through 8:30 -- 7:30,

2    8 o'clock, it was a very cautiously optimistic

3    view."

4            And what you're saying is that's not

5    a reference to what happened in the utility

6    room?

7        A.    Correct.

8        Q.    Okay.  What was the basis for that

9    optimistic view through 7:30 or 8 o'clock?

10       A.    I think that we had seen -- I -- I --

11   again, if you remember, around -- I'm trying to

12   go back in time and remember what was happening

13   at when, but somewhere around 8 o'clock is when

14   the first couple polls closed, or that we

15   started to get some stuff in, and it looked --

16   you know, again, I -- I'm not -- it -- it

17   was -- on election night when -- when that

18   happened and there were a couple counties that

19   they were looking and saying wow, that's --

20   that's over-performing what we traditionally

21   do, considering where the mainstream media had

22   thought we would be.

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 111

1          As you recall, many folks in the

2    media said this is, quote, going to be a early

3    night.  We'd seen some quick counties that came

4    in that suggested it might not be as bad as --

5    or -- or at all like what the mainstream media

6    and -- and others had predicted.

7          Q.    Okay.  And when that was happening,

8    you were on the 14th floor?

9          A.    When what was happening?

10         Q.    The -- what you just described, the

11    early counties coming in.

12         A.    It was a combin- -- again, I -- I

13    went down to 5 around -- between 8 and 8:30.

14    So he was asking me what the mood was like

15    early on in the night.  I said between like

16    7:30, 8, 8:30, it started to get cautiously

17    optimistic.  I -- I wasn't -- I didn't have the

18    privy of data at the time of this interview so

19    I was -- you know, said to him, he -- as early

20    counties came in, I just couldn't recall at the

21    time of the interview.  I wasn't -- I couldn't

22    be specific with what time.  And I think that's

Page 112

1    an accurate reflection of when -- when polls

2    were -- were going to be closing.

3         Q.    Okay.   The next paragraph quotes Matt

4    Mowers.

5         A.    Yes.

6         Q.    Who was the -- well, who was Matt

7    Mowers?

8         A.    I don't know who Matt Mowers is.

9         Q.    Oh, okay.   So whoever Matt Mowers is,

10   he refers to --

11        A.    I should -- just so we're clear, I --

12   I can't recall.   I may have interacted with

13   him.   I -- he's not somebody who I consider a

14   colleague or a friend or anything like that,

15   but I -- I -- the name isn't completely

16   unfamiliar; it's just not someone I'm -- I

17   can -- I -- I cannot tell you who -- what he

18   did on the campaign or if he was on the

19   campaign.

20        Q.    Okay.   He refers to certain people in

21   that paragraph.   I think he uses the phrase

22   being in there.

Page 113

1      A.    Uh-huh.

2      Q.    And he specifically mentions -- well,

3  I'll tell you what question I'm going to ask at

4  the end of this so you know why I'm going

5  through these names.  At the end of this what

6  I'm going to ask you is, are these all people

7  you recall seeing in the utility room on the

8  5th floor.

9          So he refers to Dave Bossie, Jared

10  Kushner, Reince Priebus, Chris Christie,

11  Mr. Stepien, Justin Clark.

12      A.    Uh-huh.

13      Q.    Himself, Mr. Mowers, and then Wells

14  Griffith and Brian Jack.

15      A.    Uh-huh.

16      Q.    So are those all people you saw in

17  the utility room that day, on Election Day?

18      A.    Can we go through them?

19      Q.    Yes.

20      A.    Dave Bossie, as I've testified prior,

21  yes.  Jared Kushner I testified previously

22  was -- was there.  RNC chairman Reince Priebus,

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 114

1    I've testified earlier he was there.  Governor

2    Chris Christie, I've testified he was there.

3    Bill Stepien, the political director, I

4    testified previously that he was there.

5            I know who Justin Clark is.  I can't

6    recall him being in the room or not.

7        Q.   Okay.

8        A.   I vaguely recall Wells Griffith being

9    in the room but I -- I can't say for certain

10   that it would occur.  And I'm not sure who

11   Brian Jack is.

12       Q.   Okay.  Who's Wells Griffith?

13       A.   He used to work at the RNC, and he --

14   he was doing -- he was -- he had done some

15   state work, I believe, for the campaign, but

16   I -- I don't know what he exactly did for the

17   campaign.

18       Q.   Okay.  As of Election Day he was

19   working for the campaign?

20       A.   I believe so, but I -- I don't -- I

21   can't say for certain.  I don't -- I don't

22   specifically recall.

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 115

1    Q.   Let me ask it a different way.  Do --

2    do you know whether on Election Day he was

3    working for the RNC?

4    A.   I don't believe so, but no, I don't.

5    Q.   Okay.  All right.  Let me direct your

6    attention to the next page.

7    A.   Okay.

8    Q.   There are two paragraphs in which

9    Matt Mowers is quoted.

10    A.   Yeah.

11    Q.   The first one he says, "At one point,

12    Florida looked like it was going to be really

13    close.  And then Don McGahn, Stepien, Mike

14    Roman were all wondering whether we're going to

15    have to take the plane to Florida to prepare

16    for a recount."

17         Do you see that?

18    A.   I do.

19    Q.   Did you see Mr. McGahn on Election

20    Day?

21    A.   I have to assume I did, but I don't

22    recall seeing him, no.

Page 116

1      Q.    Okay.  You know who he is; right?

2      A.    I do.

3      Q.    Okay.  Did you see Mr. Roman on

4    Election Day?

5      A.    I don't know who he is.

6      Q.    Okay.  You've never met him?

7      A.    I --

8      Q.    Sorry.

9      A.    I -- I don't -- I don't -- I do not

10   know -- I could not pick him out.  I could

11   not -- I don't recall ever meeting him, knowing

12   him.  I can't say that I've never met him, but

13   I could not tell you what he looked like, what

14   he did, or whether he was part of any effort,

15   but -- so --

16     Q.    Okay.  So you don't know whether you

17   saw him on Election Day or not?

18     A.    I wouldn't know what he looks like to

19   tell you if I saw him.

20     Q.    Okay.  Do you recall discussion on

21   Election Day about Florida looking like it was

22   going to potentially head to a recount?

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 117

1    A.   I know -- no, I don't -- I -- I --

2  I -- I know early when some of the results come

3  in, we -- we said that it would be close, but I

4  don't recall any specific discussion about a

5  recount.

6    Q.   Okay.  The person in the second

7  paragraph, Mr. Mowers, refers to having a

8  flight booked to New Hampshire at one point.

9  Do you recall any discussion about people going

10 to New Hampshire for a recount?

11   A.   I do not.

12   Q.   Going back to the timeline for a

13 minute, we talked earlier about what time you

14 went to the utility room on the 5th floor.

15   A.   Uh-huh.

16   Q.   Did you -- did you do a TV interview

17 that evening after being in the utility room?

18   A.   Yes.

19   Q.   Okay.  Do you recall when that was,

20 approximately?

21   A.   I think it probably was in like the

22 10 o'clock hour.

Page 118

1      Q.    Okay, so the --

2      A.    It was on ABC News, so again, it's

3   all -- it's -- it's fairly easy to look up.

4      Q.    Okay.  Do you recall how long you

5   were in the utility room on the 5th floor?  I

6   think you said 40 minutes to an hour.  I may

7   have gotten that wrong, so --

8      A.    No, it's about an hour.  I think

9   somewhere between 8 and 8:30 when we got down

10  there.  By 9:20, I'm up on the 14th floor.

11     Q.    Okay.  So the next subsection in that

12  article quotes both you and Kellyanne Conway.

13  And in the paragraph that quotes you, it talks

14  about the move from the 5th floor to the 14th

15  floor as you were just discussing.

16     A.    Uh-huh.

17     Q.    Was it -- did all of the people who

18  were in the utility room with you go up to the

19  14th floor?

20     A.    I can't account for everyone's

21  whereabouts, but the -- but I believe, yes, I

22  believe that everyone seemed -- that I was

Page 119

1    aware of that did go up.

2         Q.    Okay.

3         A.    That I had mentioned previously.

4    Again, I can't account for people that I don't

5    know.

6         Q.    Right.  Okay, all right.  So you

7    talked before about following turnout patterns

8    I guess when you were in the utility room, or

9    watching results come in, I guess.  Is that a

10   fair --

11        A.    Correct.

12        Q.    Yeah.  Was there discussion of what

13   was causing the turnout patterns you saw?

14        A.    No.

15        Q.    Did you have an understanding that

16   evening of what was causing the turnout

17   patterns that you saw?

18        A.    Disgruntled voters at the

19   establishment.

20        Q.    Okay.

21        A.    I mean, I -- I -- I -- we weren't

22   really doing a ton of analysis, it was -- that

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 120

1    was -- we were monitoring, you know, election

2    returns, which is what any campaign operative

3    does.  You usually wait until after you win or

4    lose to do a lot of analysis.

5         Q.   Did you on Election Day become aware

6    of complaints that either the RNC or the Trump

7    Campaign received about events that were

8    occurring at the -- at the polls in the

9    country?

10         MR. BURCHFIELD:  Object to form and

11    foundation.

12         Q.   You can answer.

13         MR. BURCHFIELD:  You can answer.

14         A.   I'm sure -- there's always, like,

15    stories on television about this line being

16    long or this -- but I -- I was not directly

17    brought information about voting

18    irregularities --

19         Q.   Okay.  Do you --

20         A.   -- beyond media stories that, you

21    know, would have been on television or in a

22    news story or -- or a tweet or something of

Page 121

1    that nature.

2         Q.   Okay.  Did you receive any

3    information about claims of voter fraud on

4    Election Day?

5         A.   Did I?  No.

6         Q.   On Election Day.

7         A.   No.

8         Q.   Okay.  Did you have any conversations

9    about whether there was any voter fraud on

10   Election Day?

11             MR. BURCHFIELD:  Object to form and

12        foundation.  And also, it's beyond the

13        scope.  If you're talking about did he

14        have discussions on Election Day as

15        covered by the order for him to testify

16        about election fraud, he can answer that

17        question.

18             MR. KAUL:  That was the question.

19             MR. BURCHFIELD:  Okay.

20   A.   No.

21             MR. KAUL:  Okay.  All right.  Why

22        don't we take a break very quickly.  Go

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 122

1      off the record.

2           THE VIDEOGRAPHER:  Off record.

3      Time is 3:37 p.m.

4      (Discussion held off the record.)

5           THE VIDEOGRAPHER:  Going back on

6      the record.  The time is 3:49 p.m.

7  BY MR. KAUL:

8      Q.   Mr. Spicer, just a few more questions

9  for you and we'll get you out of here.

10     A.    Thank you.

11     Q.   Some of these are -- are ones you may

12  have covered before so I just want to make sure

13  I -- I've touched base.

14          We talked earlier in the session

15  about your emails.  Do you recall if you sent

16  emails from your personal email account on

17  Election Day?

18     A.   I doubt it, unless -- it's possible

19  that like, you know, my parents sent me a "Good

20  luck" or something like that, but not with

21  respect to committee or campaign business.

22     Q.   Okay.  Do you know if you sent any

Page 123

1    emails on your RNC account that had any

2    connection to voter fraud?

3         A.   No.

4         Q.   No, you did not; right?

5         A.   I -- thank you.  No, I did not.  As

6    I've stated previously, we had been vigilantly

7    schooled about Election Day activities in -- in

8    areas like voter fraud that we were not to in

9    any way, shape, or form neither be involved

10   with nor even be perceived as being involved in

11   those issues so that would have been strictly

12   prohibited.

13        Q.   Okay.  There's been substantial

14   public discussion about the topic of voter

15   fraud over the last year.  Was there anything

16   that you communicated about or observed on

17   Election Day that informed your understanding

18   of whether there's voter fraud or what amount?

19        A.   So why -- I -- I -- can -- my --

20   you're asking about my personal views?

21        Q.   I -- I'm asking about what you

22   observed on Election Day or communicated about

Page 124

1    on Election Day.

2            MR. BURCHFIELD:  Well, and -- and

3        consistent with the order, while you

4        were at Trump Tower, right, was there

5        anything that you observed there that

6        informed -- that -- that was evidence of

7        voter fraud?  Is that the question?

8        Q.   Was there anything you observed on

9    Election Day that informed your understanding,

10   your personal understanding, as to the

11   existence or the scope of voter fraud?

12           MR. BURCHFIELD:  Object to form and

13       foundation.

14       A.   Again, I -- I -- I'm still trying to

15   understand if you're asking my personal

16   beliefs.

17       Q.   Was there anything you observed on

18   Election Day that -- that --

19       A.   There's nothing I observed on

20   Election Day with respect to -- that -- that --

21   that I saw at Trump Tower with respect to voter

22   fraud.

Page 125

1    Q.   Okay.  I asked you before if you had

2    any communications about voter fraud.

3         Did you have any communications

4    relating to poll monitoring on Election Day?

5    A.   No.

6    Q.   Did you hear any communications about

7    poll monitoring on Election Day?

8    A.   I --

9         MR. BURCHFIELD:  Object to form and

10        foundation.

11   Q.   Go ahead.

12   A.   It's possible that I was in the same

13   room as someone, but I was not actively in --

14   part -- part of any conversation that had to do

15   with, in any way, shape, or form, poll

16   monitoring.

17   Q.   You were talking before about who was

18   present in the utility room on the 5th floor

19   when you were watching results --

20   A.   Correct.

21   Q.   -- come in.

22        Did some of the people who were in

Page 126

1    that utility room come from the bigger open

2    room on the 5th floor?

3         A.   In order to get into that room, as

4    I've previously described, that would be the

5    only way to access that utility room.

6         Q.   Were some of the people who came into

7    the utility room people who were working that

8    day in the big open room on the 5th floor, if

9    you know?

10        A.   I don't.

11        Q.   Okay.  And you mentioned, I believe,

12   that you knew some of the people who were in

13   the utility room, but not all of them; is that

14   right?

15        A.   No, that's not what I said.

16        Q.   Okay.  There are some people whose

17   names you don't know; is that right?

18        A.   No, I -- I mentioned to you who I

19   knew was in that room.

20        Q.   Okay.

21        A.   You pointed out in a story that there

22   were other people who claimed to be in that

Page 127

1    room.  I don't recall some of those names,

2    mostly because I don't know who they are.  So

3    I'm sure it's possible that they ducked in

4    or -- but I relayed to you the people who I

5    knew were in that room.

6        Q.   Okay.  So let me break that down

7    then.  Do you know that there are people who

8    were in that room whose identity you don't

9    know?

10       A.   According to published stories, there

11   are people who claim to be in that room that I

12   don't know, nor do I recall seeing, but they

13   claim that they were there.

14       Q.   Okay.  You don't know one way or the

15   other whether they were, in fact, there; is

16   that right?

17       A.   I don't know who they are so it would

18   be impossible to know whether or not they were

19   there.  I named to you the people that I knew

20   were in that room.

21       Q.   Okay.  So my question is, are there

22   people who were in the room who you saw whose

12/6/2017   Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 128

1  identity you did not know?

2      A.   Not that I can recall.

3      Q.   Okay.  And you said that there were a

4  number of people in the larger room on the 5th

5  floor whose identity you didn't know; correct?

6      A.   Correct.

7      Q.   Who -- do you know who would know the

8  identity of those people?

9      A.   People on the campaign that were

10  responsible for that.

11      Q.   Okay.  So someone like Mr. Stepien?

12      A.   It's possible.

13      MR. KAUL:  Okay.  Okay, those are

14  all the questions I have.  Thank you,

15  Mr. Spicer.

16      THE WITNESS:  Thank you.

17      MR. BURCHFIELD:  Okay.  Let me just

18  ask a couple.

19          EXAMINATION

20  BY MR. BURCHFIELD:

21      Q.   Mr. Spicer, I have a very few number

22  of questions.  And I'm asking you these

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page 129

1    questions from your personal knowledge.

2        A.    Okay.

3        Q.    Are you aware -- were -- did you

4    personally participate in any acts that were

5    intended or might have had the effect of

6    intimidating voters on Election Day 2016?

7        A.    Never.

8        Q.    Are you aware of anyone else at the

9    RNC who engaged in such activities?

10       A.    No.

11       Q.    Were you -- were you involved in any

12   activities that were intended or may have had

13   the effect of suppressing votes during the

14   election cycle 2016?

15       A.    No.

16       Q.    Are you aware of anyone else at the

17   RNC that was involved in any such activities?

18       A.    No.

19       Q.    Were you involved in any way in any

20   ballot security activities during the election

21   cycle of 2016?

22       A.    I was not.

Page 130

1       Q.   Are you aware of anyone at the RNC

2   who was?

3       A.   I am not.

4       Q.   Were you involved in any activities

5   of poll monitoring, of watching voters vote for

6   the purposes of detecting fraudulent activity

7   during the 2016 election cycle?

8       A.   No.

9       Q.   Are you aware of anyone at the RNC

10  who was?

11      A.   No.

12           MR. BURCHFIELD:  Thank you.

13           MR. KAUL:  All right.  I'm going to

14      ask a little rebuttal there on that.

15                   EXAMINATION

16  BY MR. KAUL:

17      Q.   You were asked a few questions about

18  what you knew during the election cycle of

19  2016.

20      A.   Okay.

21      Q.   Do you recall?

22      A.   I do.

Page 131

1          Q.    You are aware that during the

2     election cycle of 2016, now-President Trump

3     made some statements about voter fraud; right?

4          A.    I am aware.

5          Q.    Do you know whether Reince Priebus

6     had any communications with Mr. Trump about

7     voter fraud in the 2016 election cycle?

8          A.    I do not.

9          Q.    You don't know one way or the other?

10          A.    Correct.

11          Q.    Do you recall that Mr. Priebus

12     appeared on, I believe, Face The Nation at one

13     point and discussed Mr. Trump's views on voter

14     fraud?

15          A.    I do not.

16          Q.    Okay.  Did you have any

17     communications with Mr. Trump during the 2016

18     election cycle about voter fraud?

19          A.    No.

20          Q.    Are you aware of anybody at the RNC

21     who had any communications with him about voter

22     fraud?

Page 132

1        A.    No.

2        Q.    Are you aware of any communications

3   at the RNC about voter fraud during the 2016

4   election cycle?

5             MR. BURCHFIELD:   Object to form and

6        foundation, and also beyond the scope.

7        But you may answer.

8        A.    No.  And I would further state again

9   that I think we, being not just the senior

10  staff but everyone down to the lowest levels at

11  the RNC, had been conditioned repeatedly about

12  the scope and extent of the Consent Decree and

13  what was prohibited activities, and what could

14  even be perceived as a prohibited activity with

15  respect to poll watching, voter fraud, etc.

16             So not only did it not happen, but --

17  but I think there was a level of vigilance to

18  ensure that -- that it wasn't even perceived to

19  even -- to -- to -- to come up.

20       Q.    Just to follow up on Mr. Priebus, as

21  part of your duties as communication director,

22  did you regularly follow the press appearances

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page 133

1    that Mr. Priebus had?

2         A.    I did.

3         Q.    Okay.  Do you have a recollection of

4    any interview he gave in which he discussed

5    Mr. Trump's statements about voter fraud?

6         A.    No, but I -- we engaged in a rather

7    large number of interviews both during and

8    after the campaign, so I -- as much as I

9    oversaw it, I can't recall many specific

10   interviews, including my own.

11        Q.    Okay.  Did Mr. Priebus ever talk to

12   you about having spoken to Mr. Trump about

13   voter fraud?

14        A.    No.

15             MR. KAUL:  Okay.  Okay, that's all

16        I have.  Thank you very much.

17             THE WITNESS:  You bet.

18             MR. BURCHFIELD:  Thank you.

19        Nothing further here.  The witness will

20        read and sign, and we can talk off the

21        record about delivery.  Thank you.

22        Thank you to the reporter and the

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 134

1       videographer and Mr. Spicer.

2            THE VIDEOGRAPHER:   This concludes

3       the videotaped deposition of Sean

4       Spicer.   This is tape 2 of 2.   Going off

5       the record.   The time is 3:59 p.m.

6       (Deposition adjourned at 3:59 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

12/6/2017   Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 135

```
1    C E R T I F I C A T E

2    DISTRICT OF COLUMBIA:

3         I, MARY ANN PAYONK, shorthand reporter,

4    do hereby certify that the witness whose

5    deposition is hereinbefore set forth was duly

6    sworn, and that such deposition is a true,

7    correct, and full record of the testimony

8    given.

9         I further certify that I am not related

10   to any of the parties to this action by blood

11   or by marriage, and that I am in no way

12   interested in the outcome of this matter.

13        IN WITNESS WHEREOF, I have hereunto set

14   my hand this 8th day of December, 2017.

15

16

17

18

19

20

21   _____

22   MARY ANN PAYONK, Shorthand Reporter
```

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 136

1       Sean Spicer c/o

        KING & SPALDING LLP

2       1700 Pennsylvania Avenue, N.W., Suite 200

        Washington, D.C. 20006

3

4       Case: Democratic National Committee, et al. v. Republican National

        Committee, et al.

4       Date of deposition: December 6, 2017

5       Deponent: Sean Spicer

6

7       Please be advised that the transcript in the above

8       referenced matter is now complete and ready for signature.

9       The deponent may come to this office to sign the transcript,

10      a copy may be purchased for the witness to review and sign,

11      or the deponent and/or counsel may waive the option of

12      signing. Please advise us of the option selected.

13      Please forward the errata sheet and the original signed

14      signature page to counsel noticing the deposition, noting the

15      applicable time period allowed for such by the governing

16      Rules of Procedure. If you have any questions, please do

17      not hesitate to call our office at (202)-232-0646.

18

19

20      Sincerely,

        Digital Evidence Group

21      Copyright 2017 Digital Evidence Group

        Copying is forbidden, including electronically, absent

22      express written consent.

12/6/2017     Democratic National Committee, et al. v. Republican National Committee, et al.   Sean Spicer
Confidential

Page 137

1     Digital Evidence Group, L.L.C.

      1730 M Street, NW, Suite 812

2     Washington, D.C. 20036

      (202) 232-0646

3

4     SIGNATURE PAGE

      Case: Democratic National Committee, et al. v. Republican National

4     Committee, et al.

5     Witness Name: Sean Spicer

      Deposition Date: December 6, 2017

6

7     I do hereby acknowledge that I have read

      and examined the foregoing pages

8     of the transcript of my deposition and that:

9

10    (Check appropriate box):

      (  ) The same is a true, correct and

11    complete transcription of the answers given by

      me to the questions therein recorded.

12    (  ) Except for the changes noted in the

      attached Errata Sheet, the same is a true,

13    correct and complete transcription of the

      answers given by me to the questions therein

14    recorded.

15

16    _____          _____

17     DATE                     WITNESS SIGNATURE

18

19

20

21    _____          _____

22     DATE                         NOTARY

12/6/2017    Democratic National Committee, et al. v. Republican National Committee, et al.    Sean Spicer
Confidential

Page  138

1      Digital Evidence Group, LLC

2      1730 M Street, NW, Suite 812

3      Washington, D.C.   20036

4      (202)232-0646

5

6                          ERRATA SHEET

7

8      Case: Democratic National Committee, et al. v. Republican National

       Committee, et al.

9      Witness Name: Sean Spicer

10     Deposition Date: December 6, 2017

11     Page No.    Line No.       Change

12

13

14

15

16

17

18

19

20

21     _____      _____

22     Signature                             Date