```
                              THE UNITED STATES DISTRICT COURT
                              FOR THE DISTRICT OF NEW JERSEY
                              CIVIL ACTION NO. 81-3876 (JMV)

- - - - - - - - - - - - - - - - - x
                                  :
DEMOCRATIC NATIONAL COMMITTEE,    :        TELEPHONIC
et al.,                           :        TRANSCRIPT
              Plaintiffs,         :           OF
          -v-                     :        PROCEEDINGS
                                  : (TELEPHONIC CONFERENCE)
REPUBLICAN NATIONAL COMMITTEE,    :
et al.,                           :
                                  :
              Defendants.         :
- - - - - - - - - - - - - - - - - x
                         September 29, 2017
                         Newark, New Jersey

B E F O R E:   HONORABLE JOHN MICHAEL VAZQUEZ, U.S.D.J.


A P P E A R A N C E S:

                GENOVA, BURNS, ESQS.,
                BY:  ANGELO J. GENOVA, ESQ.,
                     BRETT PUGASH, ESQ.,
                          &
                PERKINS, COIE, ESQS.,
                BY:  JOSHUA L. KAUL, ESQ.,
                Attorneys for the Plaintiffs

                KING & SPALDING, ESQS.,
                BY:  BOBBY R. BURCHFIELD, ESQ.,
                     MATT LELAND, ESQ.,
                     BARRETT YOUNG, ESQ.,
                Attorneys for the Defendants
```

NOTE:  ANYONE WISHING TO PURCHASE A COPY OF THIS TRANSCRIPT CONTACT JOHN K. STONE, CSR - Tel. No. 201-341-6742 or jkstoneage@verizon.net

_____

Purusant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record taken stenographically in the above entitled proceedings.
s/ John K. Stone

_____

JOHN KEVIN STONE,
Official Court Reporter

( Via telephone ).

( In chambers ).

MR. KAUL:  Morning, Your Honor.

MR. BURCHFIELD:  Morning, Your Honor.

THE COURT:  Good morning, counsel.

Before I put the appearances on the record, is everybody on the line right now or are we waiting?

MR. LELAND:  Everybody is from defendants' side, Your Honor.

THE COURT:  How about plaintiff?

MR. KAUL:  No, I apologize, Your Honor, this is Josh Kaul.  I have haven't heard from Raj and Angelo on the line but I don't --

THE COURT:  All right.

We'll give them a minute to join, okay, and then I'll put the appearances on the record.  I'm just going to put you on mute for right now until I hear them buzz in.  Okay?

MR. KAUL:  That's fine.  If the Court wants to get started, I certainly don't want to delay Your Honor, so...

THE COURT:  Let's give them a minute, and if not, we'll get started.  Okay?

MR. KAUL:  Thank you.

THE COURT:  All right.

( After a brief recess the conference resumed ).

THE COURT:  Okay.  Counsel?

MR. KAUL:  Yes, Your Honor.

THE COURT:  Okay.

Has Mr. Genova and Mr. Parikh, have they joined?

MR. KAUL:  They have not, Your Honor.  I just got an email from them saying they're calling in now.  So I think they'll be here momentarily.  But we're ready to announce the appearances and move on.

THE COURT:  Okay.

So why don't we go ahead and start.  They can put their appearance as soon as they join.

So we're on the record in the matter of the Democratic National Committee, et al versus the Republican National Committee, the Docket Number is 81-3876.

Can I please have the appearances of counsel, starting with the DNC.

MR. KAUL:  Your Honor, for the DNC, this is Josh Kaul.

THE COURT:  Hello, Mr. Kaul.

MR. KAUL:  Morning, Your Honor.

THE COURT:  Good morning.

And for the RNC?

MR. BURCHFIELD:  Your Honor, this is Bobby Burchfield, and with me is Matt Leland, who will be doing most of the talking today, and Barrett Young.

THE COURT:  Okay.

MR. LELAND:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Burchfield, Mr. Leland and Mr. Young.

MR. BURCHFIELD:  Thank you, Your Honor.

Good morning to you.

THE COURT:  All right.

So the reason we're having this call, in light of our last call, I believe it was in early September, I believe it was September 7th of 2017, is to address the issue of whether there should be further discovery at this time.

The RNC's position is that they produced a great deal of documents and there's no evidence indicating that further discovery is necessary.  The DNC takes the contrary position.

What I have reviewed in preparation for today's call is the September 13th, 2017 letter from Mr. Genova, which is Docket Entry 176.  It also has five exhibits which I've reviewed.

I then reviewed Mr. Burchfield's opposition dated September 20th, 2017, which is Docket Entry 177.  That has one exhibit attached, which I reviewed.

And then finally, I've also reviewed the September 25th, 2017 reply by Mr. Genova, which is Document Entry 180.

So, several issues are raised by the DNC.  And I'm just going to briefly state them on the record.

First, is the deposition of Tommy Knepper, that's K-n-e-p-p-e-r.

Second is requested additional discovery as to Stampede and the Nevada poll watchers who are identified in the papers, four individuals, last name, Petersen, Holland, Stamps and Santiago.

There is also a request to depose Mr. Priebus.

And then, finally, there is a count for -- I'm sorry, a request for additional interrogatories as to a recount memorandum that's attached as Exhibit 5.

So let me start with Mr. Kaul and we'll take it issue by issue.  But Mr. Kaul, one of the questions I had --

THE ANNOUNCER:  Joining the meeting.

MR. GENOVA:  Angelo Genova.

THE COURT:  Okay.

MR. GENOVA:  I apologize.  I had the wrong number.

THE COURT:  No problem.  All right.

So, Mr. Genova, this is Judge Vazquez, we have Mr. Kaul on the line, we have Mr. Burchfield, Mr. Leland, Mr. Young.

Is Mr. Parikh with you, Mr. Genova?

MR. GENOVA:  No, he's not, Your Honor.  Brett Pugash of my office is with me.

THE COURT:  Okay.  All right.

We just started, and I just reviewed what I've reviewed for today's telephone conference, which is essentially all the submissions of the parties with exhibits.

Before we go issue by issue, the one question I had is, and I know this came up in the earlier submissions, Mr. Parikh had argued it earlier, about the scope of discovery. And I just wanted to get the DNC's view.

Because there's been several references, again, as to the scope of discovery, and why it should be much broader than what's been permitted by the Court.

And the reason I ask that is because I went back, reviewed the opinion that was entered before the election, I clearly state in -- clearly stated, I thought, that following the election the Court will hear from the parties as to whether additional discovery is justified and, if so, the scope of discovery.

Now, obviously, after the election I did hear the parties on it.  I made rulings and there has been discovery permitted.

But I'm just confused as to the DNC's position as to why the discovery should be much broader than what has been permitted.  I mean there's references -- because this is really an allegation that there's been a violation of the

consent decree.  I've looked at those allegations and fashioned the discovery as I thought appropriate in light of the allegations and the evidence presented.

But I know that the DNC's been taking a position now, it's come up again in these papers, as to why the discovery should be much broader than permitted.  Can I just get the DNC's position on that?

MR. KAUL:  Yes, Your Honor.

In -- I think it's Docket Entry 165, which was our supplemental filing regarding the scope of discovery from -- those were the papers that preceded the last conference we had, where we discussed how broad the document request should be.

THE COURT:  Hhmm-hmm.

MR. KAUL:  You know, the case law that we were pointing to indicated, and I acknowledge I haven't looked at it recently so I'll have to let the file speak for itself, largely.  But my recollection is it indicates that the scope of discovery in post judgment proceedings should be comparable to the scope of discovery in an ordinary proceeding where parties are allowed to seek discovery on, you know, issues of relevance and issues -- and to seek discovery that may encompass, that will lead to discoverable evidence.  And so in a typical proceeding that would be much broader I think than what we've had the opportunity to do

hear.  I think certainly there are some depositions we would be permitted to take without question.

I mean I don't want to suggest, we understand the point the Court has made in the Court's orders, and it's always been working within that framework.  But that's our view as to the legal backdrop for the scope of discovery in this sort of proceeding.

MR. GENOVA:  And, Judge -- Judge, Angelo Genova here.

And what's somewhat evidential of that is if you go back to Judge Debevoise's order back in the 80's, it's the '85 or '86 order -- '87, actually.  He actually, in the recitals, which was the first application I believe on an enforcement proceeding, or an alleged violation of the order, in the second recital he refers to the fact that the parties have engaged in extensive discovery from each other and third parties, and indicates that more than 50 depositions had been taken, and thousands of documents have been examined.

So at least in the first enforcement proceeding -- in the first enforcement proceeding we do have some indication that in that matter there was extensive discovery.

Admittedly, different facts, different circumstances that might have precipitated the application.

But nonetheless, more consistent with the idea that typical discovery is available to the parties.

THE COURT:  Well, but in this case, first of all, the consent decree itself has been modified twice since then.  Right.

So we have the 1987 modification and we have the 2009 modification.  And that's the document I'm working off of in light of the allegations.

And what I'm struggling to understand is, this is not a new case, in the sense that a new lawsuit was filed alleging violations of the law.  This is a lawsuit that was filed alleging violations of the consent decree.  So there I see it focused on what the allegations as to the violations of the consent decree are.

And then secondly, what -- what judgment are you referring to as far as post judgment discovery?  There I'm having a hard time.

I made a ruling denying injunctive relief and motion for contempt.  But what judgment is the DNC relying upon to say this is the judgment that entitles us to post judgment discovery?

So, for instance, this is not a case where you've won a verdict and it's a ten million dollar verdict and the defendant is saying, well, I don't have any assets and we're saying, okay, you can take discovery as to the defendant's

assets.

I'm trying to understand the DNC's argument as to the post judgment discovery in the facts of this case.

MR. KAUL:  Your Honor, it's -- the judgment is the consent decree itself.  This is about an original judgment from the original case, and it applies.  And I think it is actually comparable to a case where you filed a suit alleging a violation of the law.  For purposes of the parties in the case, the consent decree effectively is the law.

And so what we've alleged, you know, a violation of that agreement.  And so our view's we're entitled to discovery on it.

It's post judgment in the sense, I believe the cases we cited, and again I haven't looked at that right before this hearing, but I believe they indicate that within the scope of discovery in this sort of enforcement proceeding is comparable to the sort of discovery as if you're trying to reach a judgment, which is broad in either case.

THE COURT:  Okay.

MR. GENOVA:  And the judgment, Your Honor, as modified by the subsequent orders that you identified, the '87 order and then the 2009 order, I mean those -- it's essentially conversions of all three, the original and the

JOHN KEVIN STONE, CSR

two subsequent.

And notable, Your Honor, is -- you know, in the first introduction of the pre-clearance requirement, which is somewhat relevant to what we're talking about here, was actually introduced in '87 for the first time and subsequently modified in 2009.

THE COURT:  Okay.  All right.  I understand your argument.

I just don't understand how it fits in the facts of this case.  I mean, you know, we understand that if it was just a regular lawsuit you would have to make plausible pleadings, and to the extent I found that there was evidence to support or at least raise a concern as to your positions, I attempted to permit discovery in those areas.

But I didn't -- I never meant to indicate in either my opinion or afterwards, that this meant we're going to have wholesale discovery after the election.  Unless the DNC had a good faith basis to seek it.

So -- okay.  So we just have a different view as to the scope.  But I certainly never -- I don't think I indicated that in my opinion.  I thought I made it clear it's going to be based on the showing made by the DNC, and that we're going to have discovery as appropriate and proportionate to those showings.

In any event, the first issue is Mr. Knepper.  What

I wanted to basically ask the DNC is, I read the emails. They certainly refer to poll watching, and there is the reference to integrity. Of course, that's in an email chain where Mr. Knepper is just included at the last email. He's not on those discussions until the very end.

But clearly, they're saying the poll -- the emails are, we're having poll watching, and the email is contemplated at four locations, and it was to gauge turn out. I mean that's clearly what's stated in the email.

Now, I read the conclusion from the DNC that quote, "there is a strong chance that Mr. Knepper and the RNC at least facilitated prohibited ballot security efforts."

So can you explain to me, how, in light of those emails, you're reaching that logical inference that this shows there's a strong possibility there was a violation of the consent decree?

MR. KAUL: Yes, Your Honor.

The -- I think there's no dispute that the Pennsylvania Republican Party was in -- was planning to conduct ballot security efforts in this election.

And to the extent that the RNC was working with the Pennsylvania Republican Party on its procedures for watching the polls in any way, you know, it -- if there are already Pennsylvania GOP people going out to do ballot security it would have had to have been helping that effort, and the

fact that the person refers to ensuring integrity in response to the written email about poll watching, we think is evidence that that's part of what the Pennsylvania GOP poll watchers were planning do in this effort that was being facilitated by the state party.

And again, this is contrary to the representations that the RNC made, that its employees were not involved in poll watching in any way, which raises a suspicion.

And again, we're not asking, and this is I think the critical point here. We're not asking the Court to conclude that there is any sort of improper activity based on these documents. We're just asking for the opportunity to conduct a deposition of Mr. Knepper.

THE COURT: No, I understand the request.

All right. Let me hear from Mr. Leland.

Mr. Leland, you're going to be arguing for the RNC on this?

MR. LELAND: Yes, please, Your Honor.

THE COURT: Okay.

And what's your view?

MR. LELAND: Well, I start rff, Your Honor, with the fact that last fall we had extensive evidence that the RNC took a lot of measures to ensure that its employees were not engaged in ballot security.

We've done our document production. The documents

show that they actually understand those guidelines from counsel's office and had been following them.

There's no evidence here that there's any involvement in ballot security measures.

And, Your Honor, we read the email that the DNC is relying upon I think the same way that you do.  I count at least four references in this email chain where individuals who are not part of the RNC, but are with the Pennsylvania GOP, are discussing voter turnout monitoring.  And get out the vote activities.

So we don't see that there's a reasonable basis here for concluding at all that somehow the fact that the RNC is working with the Pennsylvania State GOP, that they're engaged in ballot security activities.  I think that's clear on the document.

I also note --

THE COURT:  I guess that -- okay.

Go ahead.  I'm sorry, Mr. Leland.

MR. LELAND:  I didn't mean to cut you off, Your Honor.

THE COURT:  I was just going to ask you, the DNC's position is, well, that may not be the reasonable inference that I have to draw at this time, that there was prohibited activities.  Their position is, it's enough to give them a deposition at this time.  I just want to get your views on

JOHN KEVIN STONE, CSR

that.

MR. LELAND:  We don't think that -- we don't think that they're -- in fact, just the opposite.  You saw with our fileing, you saw many emails from Mr. Knepper where he's explaining to folks who are affiliated with the RNC, that we can't be involved in not only ballot security activities, but poll monitoring activities.

You have something there that's very different.  You have the RNC engaged in get out the vote activities.  Monitoring voter turnout at precincts is a critical component of that.  It's a very dynamic process.  You need to know how you're going to be allocating your own personnel to ensure that your voters get to the poll that day.  If you see low voter turnout in your precinct, you better get your people mobilized to get your voters to the polls.

So this is not ballot security activities.  This is not poll monitoring.  And other than this document, we don't see any basis for the R -- or the DNC to request the deposition of Mr. Knepper.

THE COURT:  Okay.

DNC like to respond?

MR. KAUL:  Just briefly, Your Honor.

We -- and this is a point we made multiple times, but we keep hearing the defense is, you know, the RNC put out these guidelines and everybody complied with them.

But this -- these emails are evidence that they're not being complied with.  This is poll watching by, you know, as described.

We've already got evidence from Nevada also indicating they weren't being complied with.

And again, what we're asking for is pretty limited.  It's just to test exactly what Mr. Knepper was involved with and what he wasn't.  I mean he's got some emails saying he can't be involved in poll watching, and then we've got these emails showing he was helping to coordinate that.  So that's what we want to be able to probe.

THE COURT:  Well, let me ask you something.

MR. LELAND:  Your Honor --

THE COURT:  Hold it, let me just ask Mr. Kaul a question.

You know, when I went back and looked at the most recent consent decree, obviously, ballot security as defined is prohibited.  Normal poll watch function is permitted.

Now, it's defined as stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly appointed state officials.  So that's permitted under the consent decree.

But this seems to say poll watching related to voter turnout, which wouldn't be prohibited under the

consent decree, but doesn't even seem to be contemplated by the consent decree. Because it's not dealing with irregularities, it's looking to see what is the voter turnout in each particular station.

So, I'm trying to get the DNC's position here. I don't even see this as -- normal poll watching function would be prohibited -- I mean permissible, as long it doesn't relate to voter fraud. But here it's poll watching to see voter turnout. Which doesn't seem to be a concern that was ever raised during the proceedings.

MR. KAUL: Your Honor, there are three things.

One, I agree with you that if there's poll watching just to monitor turnout and it's not violating the effect test in some way, that's not a violation of the consent decree.

But I don't think that's what we have here.

First of all, we've got specific references to monitoring for integrity in one of these documents. And I think the RNC's position that monitoring for integrity as to turnout is implausible, as we set forth in our filing.

THE COURT: Well, that -- hold on, Mr. Kaul. That's not -- that's not my reading of the statement.

The reading of the statement is we are going to do poll watching at these four areas for turnout, and they said that's not going to be enough for integrity.

Now, the question is what do they mean by "integrity."

But I never saw them saying we're watching those four for integrity. The question is should we do more for integrity, and the question becomes, what do you mean by integrity. And I understand RNC's position, integrity of are we getting out the vote, and your position is ballot integrity.

But I don't even see a reference saying they're watching those four areas for voter turnout for integrity purposes. I see them saying, we may do more for integrity. And then the question is, what do you mean by "integrity." But I don't see that in the email exchange.

MR. KAUL: Well, the point we're making, Your Honor, is -- and I think it's important to sort of step back and the look at the broader context. We've drawn very fine legal distinctions between what the national GOP is doing and what the local GOP is doing.

But -- and I think, as this document evidences, the local activists, who are going to the poll to be doing this poll watching, clearly view themselves as being involved in election integrity efforts. And that's not surprising, given that the presidential candidate for the Republican party was talking about this, given that the local Republican party was talking about this.

So these activists were going out to the polls, clearly view themselves, as this email we think indicates, as doing integrity work.

And so when the RNC is helping to coordinate, to get watchers to the polls, if some of those watchers ended up doing integrity work, and that's one of the things we want to press Mr. Knepper about, that's a violation of the consent decree. Whether or not the RNC is sending emails that just describe it as just for turnout purposes, they're still facilitating the monitoring at the poll, inappropriate monitoring.

THE COURT: Okay. I understand your position.

All right. Stampede and Nevada poll watchers. The second issue.

One thing that Exhibit 4 talks about the possibility of assigning a contract from the Trump -- between the Trump campaign and Stampede to -- from Trump, the Trump campaign to the RNC. So the assignment would be from the Trump campaign to the RNC. And the Trump campaign had the contract with Stampede.

Again, for the DNC, there's a discussion about the possibility of assigning the contract. But how do those discussions violate the consent decree?

We can talk about the substance of the contract, but I don't know if we have to get there if it's just a

discussion about assiging as opposed to an actual assignment.

MR. KAUL:  Your Honor, we -- the discussions of an assignment, I agree with you, wouldn't violate the consent decree.

But again, this is a point where I think we're being, you know -- this is a great of example of why we should be permitted to have discovery on this.  Because we don't know what happened.  We don't know what conversations the RNC had with the Trump campaign about this assignment.  Except -- we don't know what Trump's campaign's agreement was with Stampede.  We just don't know because we haven't any discovery in these areas.

And so what we've tried to do -- I shouldn't say we haven't had discovery, we haven't had full discovery beyond the scope of the limited document requests.

But, you know, we've identified a place here where, you know, if there were conversations with -- between the RNC and the Trump campaign and they related to ballot security in Nevada, that would be a violation.  We don't know.  But we have no idea what's going on with this contract and the assignment based on the discovery so far.

THE COURT:  Now, let me ask you.  The consent decree clearly is focused on deterring voters under the guise of voter fraud.  And the Third Circuit subsequently

recognized minority voters.

Then you take a look at the actual contract itself, and what I'm trying to see where in the contract, and I don't see anything that jumps out at me that says that's what was going to occur, even between this contract, I'm sorry, involving this contract between the Trump campaign and Stampede.  There's a list of targetted households, they want to canvas and interface, the goal is 171,000 targetted households, to get out the vote.  You know.  They're going to targetted maps, scripts, collateral materials and so forth.

What's the DNC's position, when you read the actual contract itself, it seems to be more focused on a get out the vote effort than it does to be deterring people from voting.

MR. KAUL:  Your Honor, my understanding, and the RNC may need to help us with this, but my understanding is that the email that was produced had two documents attached to it.  One was a proposed contract assignment, and one was a contract that was a contract for a separate party from Stampede.

So my understanding, and again the RNC would know better, but my understanding is we don't actually have the contract between the Trump campaign and Stampede right now.  Because we --

THE COURT: Okay. I got you.

Because this is the September Group. This is the agreement between the September Group and the Trump campaign?

MR. KAUL: That's my understanding. This is just based on the RNC's filing. So they can be more helpful on that then I can. We haven't done any discovery on that though.

THE COURT: Okay. Let me ask the RNC.

Let's start with that first question. There is a reference in the email to an assignment between -- involving Stampede and the Trump campaign to the RNC. The attachment referred to the September Group, LLC; a Wyoming limited liability corporation. Is there another document that has Stampede as opposed to the September Group, LLC?

MR. LELAND: Your Honor, this is Matt Leland.

That is correct.

This is a September Group contract that I believe the RNC did eventually sign. I believe, we have produced that too, although I can't be certain.

The September Group contract is really, just as you pointed out, for voter canvassing. It has nothing to do with ballot security or even poll monitoring.

I don't believe, Your Honor, that I have seen a draft of a Trump campaign-Stampede contract. But in any

event, we have produced the contracts that Stampede actually executed with the RNC, and none of them involve work in Nevada.  And that is verified in the declarations from last fall from Holly Turner, who is, I understand to be the Chief Financial Officer of Stampede, as well as John Phillipi, the Chief Counsel of the RNC.

THE COURT:  Okay.

But just so I'm clear, Mr. Leland, the RNC's position is based on your review of the documents, this email notwithstanding, which discusses a potential assignment, that to the extent there either was an actual assignment from the Trump campaign to the RNC, or independently, there were agreements between the RNC and Stampede in the first instance, they have been produced?

MR. LELAND:  If there were copies of contracts between the Trump campaign and the -- and the Stampede entity, and they're within our production, and they were responsive to terms that it should have been produced or logged, if they were at all privileged, I don't recall Your Honor seeing copies of those contracts.

THE COURT:  Okay.

MR. LELAND:  I do know that we have produced our -- the RNC's contracts with Stampede and none of them involves work in Nevada.

THE COURT:  Okay.

MR. LELAND:  As I recall, the only contract was for work done in Florida, again, for voter canvassing.

THE COURT:  Okay.  All right.

And what's your view on these documents substantively, Mr. Leland?  What's -- and for the purposes of the record I'm referring to the documents to Exhibit 4 in the DNC's submission to the Court.

MR. LELAND:  In our opinion, Your Honor, they don't form a basis for additional discovery regarding Stampede.  I think there's been a pretty voluminous record that's been provided with -- on RNC's work with Stampede.  And again, its isolated to Florida.

Whether there was some deliberation or discussion at some point about the RNC taking out a contract with Stampede in Nevada is irrelevant.  It never happened.  We don't have any record of it.

What the DNC seems to be suggesting is just because there may have been some discussion, which is not even clear from the face of this document, Your Honor, we have an unsigned draft contract assignment with really nothing more, and certainly nothing indicating that there's ballot security or even poll monitoring activities involved.

But the suggestion seems to be from the DNC that this one document provides some sort of a platform for us to dig into additional discovery regarding Stampede, a

deposition of Stampede, as well as the poll monitors that were identified from last fall.

So again, there's no reasonable basis we see here for additional discovery on the Stampede issue.

THE COURT:  Okay.

And let me go back --

MR. LELAND:  Then again --

THE COURT:   -- and DNC can respond, but also can address, because they also wanted the other depositions as well.

So the DNC --

MR. LELAND:  Would you like me to address those now, Your Honor, or would you --

THE COURT:  Sure.  You can give me your view and then I'll hear from the DNC.

MR. LELAND:  Well, the ball has not been advanced for any additional discovery on the alleged poll watchers from last fall.

As Your Honor pointed out in January, we were going to see what the documents provided before any depositions of these individuals took place.  We haven't seen any additional evidence that indeed any of these folks were working for the RNC.

In fact, the evidence has now shown that some of these individuals were actually employed by the Democrat

Party in the State of Nevada.

So we haven't seen any documents indicating that these individuals were operating under the direction or the control of the RNC.

So based on the record that we have from last fall, which clearly was not enough to point to a violation, we see the Stampede issue as basically closed.

THE COURT:  Okay.

And the DNC's view?

MR. KAUL:  Your Honor, first of all, with respect to the document itself, you know, the document is not alone in isolation in this case.  It's in the context of Nevada, where we've had some documentary evidence, as Your Honor found at the P-I stage, we presented credible evidence that the RNC was engaging in poll observations in Nevada, and it appears that subterfuge was involved.

And now we add to that that the RNC was contemplating taking on a contract assignment from the Trump campaign in Nevada with Stampede.  We don't know what's in that contract or what the RNC was contemplating, or why it was contemplating taking that on.

And, you know, it's true that we've got a declaration from Miss Turner, but this is again the same point we've been talking about.  That hasn't been tested in anyway in this case.  And so to draw conclusions from it I

think is premature, absent even depositions of the people who we know were at the polls, and we know were monitoring. And we just haven't been able to ask them a question yet of what they were looking for, whether they were there for Henry purposes, why they believe they were working for the RNC, that sort of thing.  So we think depositions here are entirely appropriate.

THE COURT:  Okay.

Mr. Priebus, is the RNC correct that outside of what the Court was already aware of, prior to the election, that there is no additional evidence submitted by the RNC?

I'm happy to take judicial notice that obviously Mr. Priebus became Chief of Staff.  He is no longer Chief of Staff, replaced by Mr. Kelly.  But as to the coordination between the RNC and the Trump campaign before the election as to ballot security measures, is there any new evidence in that regard?

MR. LELAND:  From the RNC -- go ahead.  I'm sorry.

MR. KAUL:  There --

MR. LELAND:  I'm sorry, Your Honor, was that directed to the RNC or DNC?

MR. KAUL:  The DNC.

I've read the RNC's position, essentially, Judge it's the same information you had when you made the decision.  I just wanted to see if I missed anything in that

regard.

MR. KAUL:  Your Honor, that -- you're correct.  You may recall we discussed at the hearings just before the P-I ruling, you know, we think that Mr. Priebus knew, says he knows where Donald Trump's head is on these issues, that they must have had some conversation about it.  And in which the RNC, we think it could be inferred, and the  -- I know the Court found otherwise, the evidence wasn't strong enough, but we think it could be inferred that he was advising him on voter fraud efforts, anti-voter fraud efforts and poll monitoring efforts, which in and of itself would be a violation.

So we think that deposing him to ask him what they discussed, and we obviously are happy to limit the scope of the deposition to whatever topics are directly relevant to that.  But we think a deposition is appropriate.

THE COURT:  RNC's view?

MR. LELAND:  We disagree, Your Honor.

Obviously, there hasn't been any documentary evidence that the DNC can point to to show that there was some sort of coordination with the Trump campaign on ballot security.

They're relying on a quote about recount activity from a Face the Nation interview from around the time of the election.

So given the process that Your Honor has laid out for discovery, and as you commented back in January, let's see what the documents show.  There is -- there is really no evidence warranting additional discovery in the form of, especially a deposition of Mr. Priebus.

THE COURT:  Okay.

Now, the last issue is the recount memorandum.

Couple questions I have for the DNC.  I know you just wanted interrogatories on this.  Here's my issue with the request.

First, it deals with the recount.  And it -- well, it deals with absent -- the integrity of absentee ballots and provisional ballots.  And in the first instance, you know, when Judge Debevoise clarified later on, I thought he made clear that the consent decree's concerned with in-person voter fraud intimidation efforts.  And seemed to clearly say, this is not directed at absentee ballots.

So my first question is, is this even activity contemplated by the consent decree?  And then, second of all, do you have any proof that this activity even occurred?

I mean this seemed to be a provisional document. If this happens, you know, then you're supposed to do the following.  If this happens, then you're supposed to do the following.  And also seemed to make clear that, you know, where necessary, and the other side is going to be able to

have two people present, we're going to have two people present, you know, this is how they're supposed to count the ballots, this is how they're supposed to store the ballots, this is how soon they're supposed to submit the ballots, if there is a recount necessary, this is how we secure the machines, we may need a court order and so forth.

So I have a two tiered question for the DNC.

First of all, is this memorandum even directed toward activity by the consent decree?  Because I thought Judge Debevoise made it clear it wasn't absentee ballots or provisional ballot -- well, I guess provisional ballots could be.  And then, second of all, do you have any evidence that this actually occurred, other than preparing for what might happen?

MR. KAUL:  So, Your Honor, if you have the document Exhibit 5 in front of you.

THE COURT:  I do.

MR. KAUL:  So if you go to page -- it's the third -- well, internal page 2 of the document.

THE COURT:  Hhmm-hmm.

MR. KAUL:  So the third page from kind of the exhibit cover sheet.

THE COURT:  Right.

MR. KAUL:  Which refers to election day.

THE COURT:  Right.

MR. KAUL:  Under the second bullet -- I'm sorry, I mean the first bullet.  It talks about the number of polling places in counties, and it says, we've identifed 12 counties as high risk.  And then the next bullet talks about our poll watchers are to be at the covered polling places.

So it's clearly identifying, we think, potential ballot security activities, at the very least poll watching activity which the RNC says it's not engaged in.  And this is a template for, presumably, for states around the country.  And it's clear from these emails that the states were trying to prepare these and put them into place with a template prepared by the RNC.  Because they were absolutely asking for help getting this ready.

So, you know, the -- our view is that the RNC doesn't get to design a poll monitoring process or template and send it out to the states and have them call it their effort and get to avoid liability under the consent decree that way.

We don't know what happens at the state level based on these templates or who filled out these templates, but that's because we haven't had any discovery into it.

MR. GENOVA:  Judge, Angelo here, if you would indulge me to just supplement Mr. Kaul's comments.

THE COURT:  Sure.

MR. GENOVA:  You asked a question as to whether

this kind of thing is contemplated by the consent order.

There is a provision in the original consent order at Section 2 E, which talks about refraining from undertaking any ballot security activities in polling places.

Now, I know at least in New Jersey, and I think this is true throughout the country, that the location of the counting of absentee ballots for instance at the board of elections is considered a polling place under most state election laws.

The methodology employed in the selection of which counties are high risk, which are medium risk, as reflected in this memo, we don't really know what "risk" means, and how that process is undertaken could have implications under 2 E of the consent order. Because that provision talks about how that selection process for the undertaking of ballot security measures, what proportion, the proportionality between those choices and the concentration of minority voters. So --

THE COURT: Yes.

But Mr. Genova, that overlooks what was later said by Judge Debevoise, and I'm going to paraphrase, but he essentially said, absentee ballot fraud was not readily addressable by pre-election remedies due to the inability to personally observe the voters casting their absentee ballot,

and that the consent decree did not prevent the RNC from reporting suspected cases to the appropriate election officials.

So later on Judge Debevoise seemed to address the issue of absentee ballot fraud head-on.  And essentially said, first, that's not what I'm contemplating by the consent decree, and if the RNC thinks there's impropriety in the absentee ballots, then they can report it as they deem appropriate.

MR. GENOVA:  And, Judge, I'm not disaverring that. I'm maybe mixing apples and oranges unintentionally.

I don't -- I'm not reading this section that was cited by Mr. Kaul in the memo as being specific to absentee ballots.

I'm pointing out that to the extent that there is a selection process underway or comtemplated by that template, it has implications under 2 E, given how those choices are made, where to identify poll watchers or otherwise.

THE COURT:  Okay.

So the RNC, you've heard the DNC's view as to this provision in the memorandum, page 2 of this actual memorandum, page 3 of the exhibit when you include the page, the Exhibit 5 for the record.

And you know, the concern is when you point to 12 counties as high risk, an additional ten as medium risk,

that can be reasonably inferred as addressing potential ballot security efforts.

MR. LELAND:  Your Honor, I would first point out that this one is a Trump campaign document, not an RNC document.

Two, the only reference in here is to poll watching.  And that's not a violation of the consent decree.

Three, the terms "high risk" and "medium risk," that requires a lot of speculation as to whether or not that actually triggers some sort of ballot security activity. I do not read it that way.  I'm not sure exactly how it would be implicating a ballot security activity.  But there's certainly nothing else in this memorandum that I can see that indicates that the RNC, or even the Trump campaign, is going to be working to prevent what they suspect would be voter fraud at the polls.

And lastly, I would say regarding the consent decree itself, we agree that it does not apply to activities such as absentee ballot counting, and certainly not recount activities.

And I look at the 2009 amendment where it defines ballot security as a program that's aimed at combatting voter fraud, like preventing potential voters from either registering to vote or casting their ballot.  In the case of an absentee ballot that vote has been cast.

So we view this memorandum as irrelevant and certainly not a basis for additional discovery.

THE COURT:  Okay.

Let me address the issues that have been raised.

As we've indicated, the consent decree, which is the basis of this lawsuit, was entered in 1982, was modified in 1987, and then again in 2009.

Originally, before the election, the DNC made a motion for injunctive relief and contempt.  I did deny the requested relief, but I did indicate that depending upon what -- well, first, what had already been shown and then what may come up during the election cycle itself could be shown afterwards, discovery could be appropriate.

And then following the election, based on the information presented, there were disputes over the scope of discovery, I ruled on those disputes.  But I did permit discovery.

And I know that -- because I keep going back to the opinions, I know Judge Debevoise lived with this case for decades.  Or I should say the consent decree for decades.  And unfortunately for the parties, I did not.  Because I just don't have that institutional knowledge.

But what I do have is the ability to go back and read everything available from the prior cases.  And what I turned to was what was the most recent discussion, even the

one that went up to the Third Circuit.  And of course, this comes from the 2008 attempt by the DNC -- DNC brought the enforcement action concerning New Mexico, and then the court rejected the challenge, but thereafter the RNC moved to vacate or modify the consent decree.  And that had a full evidentiary hearing before Judge Debevoise, and then Judge Debevoise made certain findings and did modify the consent decree.

Because I've already noted that at the time, the way I read Judge Debevoise's opinion, is that he did not envision the consent decree to address absentee ballot fraud.  And he said it's just for the practical reason is that you're not going to be able to witness a person when they actually cast their absentee ballots.  So as a result, he had ruled that the consent decree did not prevent the RNC from reporting suspected cases to the appropriate election officials.

What Judge Debevoise did emphasize is in-person fraud, which he noted is extremely rare.  And I believe he cited to the Indiana Supreme Court case, where even though the justices were strongly divided, they all agreed that neither side could point to one instance of voter -- of in-person voter fraud in Indiana's history.  And that was just to underscore how extremely rare in-person voter fraud is.

And as a result, Judge Debevoise said, in the balance, the threat of voter -- and I'm paraphrasing, the threat of voter intimidation posed a far greater and real threat to disenfranchising legitimate voters when compared to in-person fraud.

He then made the definitions -- well, he revised the definitions as to what was permitted and prohibited. He defined ballot security as any program aimed at combatting voter fraud by preventing potential voters from registering to vote or casting a ballot.

He then gave examples that were not exhaustive, and it was challenge lists by use of a mailing, or reviewing databases maintained by state agencies, such as the motor vehicle records, Social Security records, change of address forms, voter lists assembled pursuant to the HAVA, the Help America Vote Act of 2002, and so forth. So he gave -- oh, and the use of challengers to confront potential voters and verify their eligibility at the polls on either election day or a day in which they may take advantage of early voting.

Similarly, he pointed out recording by photographic or other means of voter likenesses or vehicles at any polling place, and the distribution of literature informing individuals at or near a polling place that voter fraud is a crime, or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

What was permitted was normal poll watching functions. And that, I'm going to again in part said, stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly appointed state officials. They were permitted to report any disturbance that they reasonably believe might deter eligible voters from casting their ballots, including malfunctioning voting machines, long lines, or understaffing at the polling places. But they were not allowed to question voters about their credentials, impede or delay voters by asking for identification, videotape, photograph, or otherwise make visual records of voters or their vehicle, or issue anything outlining the fact that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

The Third Circuit, when they took it up on appeal, in Judge Greenaway's opinion, observed that the central purpose of the consent decree was to prevent the intimidation and suppression of minority voters.

Now, we turn to the facts in this case. As of, according to the RNC, as of August 21st they've reviewed 27 custodians, over 24,500 documents, comprising of over 5,600 pages of documents, and they have produced 641 documents comprised of over 13,000 pages.

Now, going into this analysis I cannot overemphasize enough that the DNC has presented no evidence to this Court, -- no evidence to this Court of any improper ballot security efforts on election day, or around that time.  I know that the DNC had persons employed.  Those persons submissions to the Court formed the basis of a lot of what occurred in Nevada.  But critically to this Court, is following election day, the DNC has not produced any evidence of any improper ballot security efforts that they were aware of, much less that those efforts were tied to the RNC.  And that's critically important.  Because I need to know, are we discussing were there any real efforts to engage in prohibited ballot security efforts at or around election day, and to date I do not have any information in front of me on this record that it actually occurred.

I then turned to the request by the DNC in this case for additional discovery.  First, there's the request as to Mr. Knepper.

The reason why this request, according to the RNC -- DNC, excuse me, should be given a jaundiced eye, is that although the RNC was permitted to engage in normal poll watching functions as defined by Judge Debevoise, the RNC has represented that they declined to do so out of an abundance of caution.  And I looked at each email.  So we have Exhibit 1, it was a delegate list and poll watchers for

Trump.  Okay.  Which was given to Mr. Knepper.  So you have an email where he is provided a list of poll watchers for Trump.  Again, no indication of ballot security efforts, but poll watching.

We have Exhibit 2, which is a long email chain, the end of which, Cody Harbaugh, H-a-r-b-a-u-g-h, on October 3rd, 2016, forwarded to Mr. Knepper, and indicates, "Lance then emailed me this morning, asking if I could hop on a call regarding our plans for G-O-T-V," which I assume is Get Out The Vote, "and election day, Cody."

Now, before that in the email chain, if we start at the beginning, by Ryan Stevens, on October 2nd, there's a reference to the PA GOP, which again I assume is the Pennsylvania Republican Party, has identified targetted polls where we would need poll watchers on election day to be inside and let us know turnout numbers throughout the day.  And there's four listed areas.  Two in Dunmore, Pennsylvania; one in Summit, Pennsylvania; and one in Old Forge, Pennsylvania.  I'm honestly not familiar with those sections of Pennsylvania, but even if I were, I wouldn't rely upon my personal knowledge, I'd have the parties.

But importantly, the DNC has not come forward with any evidence that these are high minority areas that would be improperly targetted.  It's not Philadelphia, where there was indications that the -- by the Pennsylvania head of the

GOP before election that they were going to be doing what can be certainly construed as improper activities under the consent decree performed by the RNC.

So what I first looked for was an indication that these were areas where, as the Third Circuit says, you know, this is to prevent voter intimidation of minority voters, and that representation has not been made or put in the record.

There then, you know, references to outside poll working, but inside instead, and identified these four precincts as good indicators of turnout, again voter turnout.  The response is, "I think it's not enough for proper guarantee of integrity.  We will be covering more."  You know, and again, that is in response, "I agree, our need is to guarantee integrity across the board."

But the issue I'm having is, while the word "integrity" certainly if it's dealing with ballot integrity as defined under the consent decree would raise serious concerns for this Court, the email chain itself just doesn't read that way.  The whole beginning of the email exchange is to get poll watchers to monitor turnout.  Which I don't even see as contemplated as a concern by the Court in the consent decree.  See what the turnout is; see if we need to get out the vote; if it's a high Republican area, I assume, or an area where it might be close but Republicans can put them

over the edge, do we need to get more registered Republicans out to vote, certainly nothing prohibited with that, and certainly nothing prohibited with the Democrats doing the same thing on the get out the vote efforts.

But while the word "integrity" is there, I just don't see anything in the context of the email itself indicating it's other than get out the vote or poll watching for voter turnout.

And then finally, in Exhibit 3, again, Tommy Knepper's, in an email chain, and Jenny Geesey is in it, and that's G-e-e-s-e-y, on October 25th, but it says, "do you have any information specific for poll watchers, to explain the rules and where you want them to call turnout numbers in."  And later, you know, "who they are calling turnout numbers to.  You know, can you circle with Ali and figure out best way to report poll turnout on election day."

So I understand the DNC's concern.  Right.  So there's a representation by the RNC that we're not doing poll watching functions.  Certainly, this seems, at least a reasonable inference is, that Tommy Knepper, who's the Pennsylvania State Director, is aware of poll watching activities vis-a-vis turnout on election day.  So I understand the DNC's concern.  Clearly, there's a representation we're not doing it, here's emails in the limited discovery I gave, indicating that Mr. Knepper is not

only aware of poll watching, but at least in Exhibit 3, at a minimum, could be saying he's actively involved in giving advice on it.  But poll watching is not prohibited under the consent decree, and poll watching as to turnout numbers doesn't even seem to have been an issue that was a concern in the consent decree.

So I understand the DNC's concern.  I think it is a real concern.  But given what the evidence is, I don't find an additional deposition of Mr. Knepper is necessary.

If there were different emails that were sending people out, and there was some indication, some reasonable inference that they were going to be engaging in prohibited ballot security efforts, I would permit  the deposition of Mr. Knepper.  But this is more one off of -- I shouldn't say one off, but this is more of an argument, well, they said they weren't going to do what was permitted, now it looks like certain people are doing what's permitted, so we want to take their deposition.  And I'm going to deny that request.

As to the Stampede and Nevada poll watchers, again, I did find that they made a credible showing, meaning the DNC, beforehand, that they were engaging in poll watching. If what the individual said was true, in other words, they were actually working for the RNC as opposed to for Stampede or some other organization.

But I can't -- but again, poll watching is permitted.  And we know that the DNC had folks on the ground there.  And there was certainly one woman who was very difficult to identify who was giving incorrect information to people who wanted to vote.  But that didn't seem to be tied back to any systemic instruction.  And the other folks who were there were merely watching and observing, and then indicated they worked for the RNC.  But they're allowed to watch and observe, whether they're working for the RNC or for somebody else.  Again, as long as they don't interfere in any of the ways prohibited by the consent decree with a person's right to vote, and that just wasn't shown, and I just don't find any email talking about an unsigned assignment between the Trump campaign and the RNC as sufficient to change that landscape.

As to Mr. Priebus, you know, it's remarkable, just as an aside, as to how far we've come since this case originated with me, where he was the head of the RNC, and then Chief of Staff, and now no longer Chief of Staff.  It's just a reflection as to how quickly things are moving.

But there really is no new information other than what he had said originally, I'm going to paraphrase, but that the RNC was in full agreement with the -- or knows what the Trump campaign is doing, and is working with the Trump campaign fully and so forth.  But no indication specifically

that they were working on any ballot security efforts that would be prohibited by the RNC.  And truthfully, the Court would be blind to the reality that it would be difficult for the head of the RNC to say anything other than he's working completely hand-in-hand with the Republican nominee.  And I would expect the head of the DNC to say the same thing as far as the Democrat.  So I understand there's a reality here that the head of the national committees are publicly going to say they're working with the candidate, their party's candidate for president.  I just didn't find those statements to be remarkable.  And again, I would be remiss if I didn't note at the time Mr. Priebus made those comments he was -- his loyalty, or I should say his, the RNC's commitment to the Trump campaign was under serious attack publicly, and he was reinforcing that we are supporting the Trump campaign.

As to the recount memorandum, I understand it was drafted by the Trump campaign.  The only -- I do have concerns, honestly, about what is meant, and I don't know, -- and I take the RNC's indication that, you know, Judge, this is a Trump campaign document and so forth.  But I do have concerns with the one language, it is potentially ambiguous, on page 2, Exhibit 5, about high risk and medium risk.  I do not know, I think there are different reasonable interpretations.  Obviously, the people who drafted it had a

certain meaning to those words "high risk" and "medium

risk."  But again, we could sit here and argue without

having personal knowledge what they meant.  Was it a high

risk of low turnout, was it a high risk of voter fraud?  I

don't know.  But the person who drafted the document

certainly had a specific meaning behind it.

And then the question becomes, people who received

that document, how did they interpret those requests or

those words, in what context.

So I do think on that one issue, even though I know

this was about depositions, I do think the DNC should be

able to submit their five interrogatory requests, you know,

and I'm not -- I'm not seeking as to what did the person who

drafted it mean.  What's going to be really is important is

what did anybody from the RNC who received it, first, what

did they understand it to mean; and then, two, did they do

anything in response to it.  And I just don't know enough

based on this record.  And believe me, I don't know if

anything was done at all.  I'm not making any presumptions

there as to what the facts will show.

But I do think that that language is ambiguous and

certainty could be interpreted reasonably by the DNC as to

this is potentially problematic.  So I will grant the DNC's

request to submit five interrogatories as to Exhibit 5.  And

if the answers are not satisfactory, or if the parties want

to take additional action, I will be available to rule on them promptly.

So my ruling will be, I will not -- I will deny the additional discovery requests as to Mr. Knepper, as to the Stampede and Nevada poll watchers, as to Mr. Priebus, but I will permit the five additional interrogatories as to Exhibit 5.

Okay, counsel?

MR. BURCHFIELD:  Your Honor, thank you for that, and we will -- we will await the DNC's interrogatories.

Five seems a bit many for one document, but the Court has considered that.

We would of course, given the time, urge that the DNC get its interrogatories to us promptly, so that this does not string out and put the Court in a bind as it was last fall to make an overly prompt ruling.

THE COURT:  Let me ask the DNC, how much time, Mr. Kaul, Mr. Genova, how much time do you need to get your five interrogatories out?

MR. KAUL:  Your Honor, we should be able to get those out early next week.  We would just ask, I guess, that RNC likewise respond promptly.

THE COURT:  That -- no, believe me, I want everybody answering these promptly.

What I will do is this then: I will -- I'm going to

enter an order today as to the rulings.  I will give -- I'll give the DNC until next Wednesday to get their questions out, their interrogatories out.  And I'll give the RNC a week to the following Wednesday to get their replies in.

If it seems to be too voluminous and the parties can agree to additional time, you can just submit a letter saying we agree to additional time.  We do not need to take it up by way of order.  Just -- and if the parties dispute, give me a call and we'll work it out.  Okay?

MR. BURCHFIELD:  That's acceptable to the RNC, Your Honor.  Thank you.

MR. KAUL:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, counsel.

MR. KAUL:  Thank you, Your Honor.

MR. BURCHFIELD:  Thank you, Your Honor.

( Telephone conference adjourned ).